**0UNITED STATES FEDERAL COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RODNEY JONES,

        Plaintiff,

v.

SEAN COMBS,
JUSTIN DIOR COMBS
CUBA GOODING JR.,
LUCIAN CHARLES GRAINGE,
KRISTINA KHORRAM,
LOVE RECORDS,
MOTOWN RECORDS,
UNIVERSAL MUSIC GROUP,
COMBS GLOBAL ENTERPRISES,
JOHN and JANE DOES 1-10 and
ABC CORPORATIONS. 1-10

        Defendants.

Case Number: 24-1457

<u>Second Amended Complaint</u>
<u>Civil Action</u>

**Jury Demand**

**<u>TRIGGER WARNING</u>:**
**THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A
SEXUAL NATURE, INCLUDING SEXUAL ASSAULT.  ADDITIONALLY,
THERE ARE GRAPHIC IMAGES OF THE AFTERMATH OF A SHOOTING,
REDACTED IMAGES OF SEXUAL INTERCOURSE, REDACTED IMAGES OF
MINORS, SEX WORKERS, AND PROSTITUTES, DETAILS OF SEX
TRAFFICKING, AND THE ILLEGAL DISTRIBUTION OF GUNS, AND DRUGS**

    Plaintiff Rodney "Lil Rod" Jones ("Mr. Jones") hereby alleges, as and for his Complaint against Defendant Sean Combs ("Mr. Combs"), Defendant Justin Dior Combs ("J. Combs"), Defendant Lucian Charles Grainge ("Mr. Grainge"), Defendant Cuba Gooding Jr. ("Mr. Gooding Jr."), Defendant Kristina Khorram ("Ms. Khorram"), Defendant Love Records ("LR"), Defendant Motown Records ("MR"), Defendant Universal Music Group ("UMG"), Defendant Combs Global Enterprises ("CGE"), John and Jane Does 1-10, ABC Corporations 1-10, as follows:

## JURISDICTION AND VENUE

1. This Court has personal jurisdiction over the Defendants under and consistent with the Constitutional requirements of Due Process in that the Defendants, acting directly or through his agents or apparent agents, committed one or more of the following:

   a. The transaction of any business within the state;

   b. The making of any contract within the state;

   c. The commission of a tortious act within this District; and

   d. The ownership, use, or possession of any real estate in this state.

2. From September 2022 to the date of this filing, Defendants have consistently and purposefully availed themselves of the privilege of conducting activities within New York, thus invoking the benefits and protections of New York law. In return for these benefits and protections, Defendants must submit to the burdens of litigation in New York.

3. This litigation arises from or relates to the tortious activities the defendants visited upon Plaintiff Jones in New York, California, Florida, Saint Barthelemy, and the United States Virgin Islands. This tortious conduct violated United States Federal Rico Laws and the United States Victims ("USVI") of the Trafficking and Violence Protection Act of 2000 ("TVPA").

4. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise from some conduct occurring by Defendants in New York. Specifically, the trafficking of Plaintiff across State lines between California, Florida, New York, and the USVI, and the trafficking of Plaintiff internationally to Saint-Barthélemy.

## PARTIES

5. Plaintiff Rodney Jones is an American artist and music producer. Mr. Jones is domiciled in the state of New York.



**Defendant Sean Combs**

6.   Defendant Sean Combs is a rapper and record executive popularly known by his stage names Puff Daddy, Puffy, P. Diddy, Diddy, Brother Love or Love.  Mr. Combs became famous in the early 1990s with his record label Bad Boy Records.  He rose to prominence in the music and entertainment industry over the decades and is regularly referred to as a hip-hop mogul.  Mr. Combs is domiciled at 200 South Mapleton Dr., Beverly Hills, California 90024.



**Defendant Justin Dior Combs**

7.   Defendant Justin Dior Combs is the son of Mr. Combs and Misa Hylton.  J. Combs was born on December 30, 1993.  J. Combs is a producer and actor.  He has appeared on TV series like Catfish: The TV Show, Wild' N Out, and Hip-Hop Squares.  Defendant Justin Dior Combs is domiciled at 1550 N El Centro Ave, Los Angeles, CA 90028.



**Lucian Charles Grainge**

8. Defendant Lucian Charles Grainge is the CEO of Defendant Universal Music Group.  Upon information and belief, Defendant Lucian Charles Grainge is domiciled at 53551 Ross Ave Unit 34A, La Quinta, CA 92253, and 668 Chautauqua Blvd, Pacific Palisades, CA 90272. Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to enter into a general business partnership agreement and to provide financial resources to their general business partners, Defendants Sean Combs and Love Records, Inc.



**Cuba Gooding, Jr.**

9. Defendant Cuba Gooding, Jr. was a relevant actor who has fallen from grace due to several sexual assault lawsuits and a recent guilty plea for sexual assault.  Upon information and belief, Defendant Gooding, Jr. is domiciled at 60 Collister Street, Apt. #2B, New York, NY 10013.



**Kristina Khorram, Chief of Staff to Sean "Diddy" Combs**

10. Defendant Kristina Khorram is the Chief of Staff to Sean "Diddy" Combs, Combs Global Enterprises.  Upon information and belief, she is domiciled at 10445 Wilshire Blvd Apt 501, Los Angeles, CA 90024.   Defendant Khorram manages the day-to-day operation of the Combs RICO and TVPA Enterprises.



11. Defendant Motown Records is a record label with a principal place of business located at 1750 Vine St, Los Angeles, CA. According to a Declaration by former Motown Chairwoman and CEO Ethiopia Habtemariam, Motown Records, with the consent of Defendant UMG, and presumably, Ms. Habtemariams direct supervisor, Defendant Lucian Grainge, entered a general partnership, as that term is defined by the laws of the State of New York, with Defendants Love Records, Inc. and Sean Combs.

5



12. Defendant Universal Music Group is a record label with a principal place of business located at 2220 Colorado Avenue in Santa Monica, California. Lucian Grainge is the Chairman & CEO of Universal Music Group. Defendant Lucian Charles Grainge, as CEO of UMG, authorized Universal Music Group to enter a general business partnership with Love Records, Inc. and Sean Combs. Additionally, according to former Motown Records Chairwoman, Ms. Habtemariam, they provided funding and/or reimbursements for expenses associated with the recording cost of the Love Album. The Love Album was released on September 23, 2023.



13. Defendant Love Records is a record label with a principal place of business located at 6255 Sunset Boulevard Suite 713. Los Angeles, CA, United States 90028. Defendant Combs founded Defendant Love Records. According to their website, Defendant Motown Records helped Sean Combs establish Love Records and had a distribution deal for the Love Album.



**Combs Global**

6

14. Defendant Combs Enterprises is a diverse portfolio of businesses and investments, including music, fashion, fragrance, beverage, marketing, film, television, and media properties.  They have a principal place of business located in New York, New York.

## RODNEY LIL ROD JONES

15. Rodney "Lil Rod" Jones Jr. is from the Windy City [Chi-town].  He was born and raised in Chicago, Illinois.  Mr. Jones is the second oldest son and fourth child out of nine siblings.  Mr. Jones comes from a long line of Gospel Music influencers.

16. Mr. Jones started playing instruments at the age of five.  He began playing drums in church, and at thirteen, he picked up playing the guitar.  From thirteen to the present day, Mr. Jones has taught himself to play over thirteen instruments.



**Mr. Jones, the Child Prodigy**

17. Mr. Jones is considered a musical prodigy.  His talents have led him to produce and create a commercial marketplace for music that has been recorded by some of the most prestigious and highly acclaimed artists in music history.

18. Throughout his career, Mr. Jones has worked the south side of the Chicago Music scene, playing with the following legendary acts: Georgia Mass Choir, Donald Lawrence, The Clark Sisters, and The Smokie Norful.

19. On or about August 2022, Mr. Jones received a call from Mr. Combs's representative requesting that he produced several songs on a rhythm and blues album titled "The Love Album: Off the Grid," ("Love Album").

20. Mr. Jones agreed, and his life has been detrimentally impacted ever since.

21. During the relevant period, Defendants John and Jane Does 1-10 are currently unknown individuals and/or employees who aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment, Defendants ratified, embraced, and added to this conduct. As parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

22. During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities who employed Plaintiff or aided and/or abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

## <u>SUMMARY OF EVENTS</u>

23. From September 2022 to September 2023, Mr. Jones produced nine songs on Mr. Combs' Love album.

24. From September 2022 to September 2023, Mr. Jones lived with Mr. Combs for months, spending holidays, birthdays and missing major family events.

25. Mr. Jones resided at Mr. Combs's residences in Los Angeles, California, and Miami, Florida. He also spent several weeks on a yacht rented by Mr. Combs in the US Virgin Islands and Saint-Barthélemy. As detailed below, Mr. Jones made several trips with Mr. Combs to New York City throughout his time living with him.

26. Throughout his time with Mr. Combs, Mr. Jones witnessed, experienced, and endured many things that went far beyond his role as a Producer on the Love album.

27. The claims raised in this complaint have been corroborated through witness statements, video/audio recordings, personal experiences, and images Mr. Jones possesses.

28. Mr. Combs required Mr. Jones to record him constantly. On several occasions, Mr. Combs took Mr. Jones's cell phone and began recording himself. As a result, Mr. Jones has secured **HUNDREDS** of hours of footage and audio recordings of Mr. Combs, his staff, and his guests engaging in serious illegal activity.

29. Mr. Jones has personally witnessed and secured irrefutable evidence of:

   a. The acquisition, use, and distribution of ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms,

b.  The displaying and distribution of unregistered illegal firearms,

c.  Mr. Combs providing laced alcoholic beverages to minors (LA home July 2023) and sex workers at his homes in California, the U. S. Virgin Islands[1], Florida, and Saint-Barthélemy,

d.  Mr. Combs Chief of Staff, Kristina Khorram ("KK") instructs her staff to retrieve drugs so she can provide them to Mr. Combs for his consumption,

e.  Christian Combs drugging and sexually assaulting a woman[2],

f.  Mr. Combs detailing how he planned to leverage his relationship with Bishop T.D. Jakes, to soften the impact on his public image of Cassie Ventura's lawsuit,

g.  Yung Miami's cousin and or assistant sexually assaulting Mr. Jones,

h.  Actor Cuba Gooding Jr. sexually harassing and assaulting Mr. Jones,

i.  Rapper[3] (REDACTED) on Mr. Combs yacht consorting with underaged girls, sex workers, and

j.  R&B Singer[4] (REDACTED) in Mr. Combs Los Angeles home consorting with underaged girls and sex workers.

### CHALICE RECORDING STUDIOS SHOOTING

30. On or about September 12, 2022, Mr. Combs held a writers and producers camp at Chalice Recording Studio at 845 Highland Ave, Los Angeles, CA 90038.

31. Mr. Combs, his son Justin Combs, and Justin's friend G were present at this camp.

32. Based on information and belief, Mr. G is a 30-year-old tall African American male.

33. Based on information and belief, in addition to these individuals, other musicians were present at the camp.  This writer has spoken to several musicians who attended the camp.

34. One evening during this camp, Mr. Combs, J. Combs, and G were in a heated conversation.

35. That conversation was moved out of the studio and into a restroom adjacent to where Mr. Jones was sitting.

---

[1] This writer spoke with several employees of the yacht rented by Mr. Combs in the U.S. Virgin Islands and Saint-Barthélemy who personally witnessed Defendant Khorram instruct her staff, Brendan Paul, Frankie Santella, and Moy Baun spike bottles of champagne with ecstasy.  Upon information and belief, this occurred the day of the December 31, 2022 New Year's Eve party.
[2] A complaint is forthcoming.
[3] He is a Philadelphia Rapper who dated Nicki Minaj.
[4] He is a Grammy Award winning R&B singer who had trouble with law enforcement after assaulting a Bajan Billionaire.

36. Mr. Jones was approximately 2 feet away from the bathroom when gunshots rang out.  Mr. Jones recalls hearing multiple gunshots.

37. Mr. Jones immediately went into a state of shock and feared that he would be shot next.  Mr. Jones genuinely believed that he would be shot through the door due to how close he was.

38. After the shooting ended, a crowd gathered around the restroom.

39. Upon information and belief, when the door finally opened, Mr. Combs and J. Combs exited.

40. G was lying on the restroom floor in a fetal position, holding his stomach and bleeding out of his torso and leg/hip area.

41. Everyone stood around looking upon G.  Frustrated by the lack of aid to G, Mr. Jones dropped everything, ran to G, and immediately began placing pressure on G's gunshot wound to his torso.

42. As he was applying pressure to his torso, Mr. Jones realized that G was gushing blood from another area near his leg/hip.

43. He decided to lift G and placed him to sit on the toilet.  Mr. Jones asked the crowd to call the ambulance.

44. Mr. Jones lifted G and brought him to the ambulance at the front of the studio.  At this time, Mr. Combs and Justin disappeared to another part of the studio.

45. Mr. Combs gave strict instructions to inform the police that he had nothing to do with the shooting.  He also forced Mr. Jones to lie to the police by telling them that G was shot standing outside the studio by a drive-by assailant.



46. Mr. Jones has several corroborating witnesses who spoke with this writer anonymously because they feared retaliation from Mr. Combs. They have agreed to speak publicly when subpoenaed.

47. Mr. Jones has the clothing he wore that day and believes it may still have G's blood stains and DNA.

48. The following are screenshots of the aftermath of the restroom where G was shot by either Mr. Combs or J. Combs:



**Aftermath of the Shooting of G**

49. Upon information and belief, it is clear that G was NOT shot outside of the studio, as Mr. Combs instructed his team to report to law enforcement.

50. Upon information and belief, Mr. Combs and Defendant's LR, MR, UMG, and CRS provided private security for the writers' camp at Chalice.

51. The Security was porous and lackluster at best.

52. The fact that either Mr. Combs and J. Combs were allowed to enter CRS with guns, and those guns were not confiscated by security is a clear breach of duty by Mr. Combs, Defendant's LR, MR, and UMG to protect Mr. Jones and the other attendees of this writers' camp.

53. As a result of this shooting, Mr. Jones is severely traumatized.  Mr. Jones now suffers from PTSD, severe anxiety, depression, and insomnia.

54. The following is an image of Mr. Combs a couple of hours before G is shot in the restroom of Chalice:



**This photo of Mr. Combs was taken at Chalice Recording Studios outside of Studio G hours before G was shot.**

**<u>CHALICE RECORDING STUDIOS, AND DEFENDANTS SEAN COMBS AND JUSTIN COMBS REPRESENTATIVE SHAWN HOLLEY<br>PROVIDE CONFLICTING AND INTELLECTUALLY DISHONEST ACCOUNTS CONCERNING THE SHOOTING</u>**

55. On or about, February 28, 2024, Chalice sent an Instagram message which alleges that G was shot a "half a block <u>away</u> from Chalice."



**Instagram Message From Chalice Recording Studios**

56. Upon information and belief, Shawn Holley[5] claimed that she had "evidence" the shooting took place several blocks away and that G returned to the studio after being shot.

57. Upon information and belief, TMZ[6] reports that their "law enforcement sources" claim that "the story that was told to cops that night -- namely, that the victim was robbed at gunpoint and shot by unknown assailants outside.  The gunshot victim [G] stepped outside of the studio around 3:30 AM and was accosted by two individuals ... at which point they tried to rob him. … the man suffered a gunshot wound."

58. Below is an image of the front of Chalice Recording Studios:

---

[5] Shawn Holley previously represented Tory Lanez and Danny Masterson.
[6] https://www.tmz.com/2024/02/28/diddy-lawyer-women-come-forward-deny-underage-claim-lawsuit/



**Photo of Chalice Recording Studios**

59. In the photo above, the white van is blocking a security gate.

60. Upon information and belief, to enter the building, you must buzz the gate and announce which session you are there to attend.

61. Upon information and belief, once the correct session is confirmed, you then must go past another layer of security before you can enter the reception area.

62. Upon information and belief, once inside the reception area, you must identify yourself, and the receptionist will check to ensure that you are on the list of visitors for that session.  Once you are confirmed, you are then allowed in.

63. Upon information and belief, to get to the restroom where G was bleeding out, you have to follow a maze.  Once you've passed the receptionist, you walk down a long hallway, walk past three recording studios, turn left, and go past a lounge area before you arrive at the restroom where G was bleeding out.

64. Upon information and belief, TMZ also reported that Mr. Combs and J. Combs were not in the studio when the police arrived.  That is also factually inaccurate.

65. Mr. Combs and J. Combs were located in Studio G across the parking lot from the building where G was shot (near Studio A).  Mr. Combs and J. Combs hid out in Recording Studio G while the police "investigated," and were the first to depart after the officers left[7].



**Mr. Combs Published the Love Records Chalice Recording Studios
Assignment List.  Mr. Combs Stayed in Studio G
Throughout The Duration of the Writers Camp**

66. Upon information and belief, after being shot in the torso and hip/leg, G was physically incapable of walking; therefore, the notion that he was shot several blocks away (Shawn Holley), half a block away (CRS), or as he stepped outside of the studio is implausible.

67. If G could do as much walking as Shawn Holley and CRS claim, then Mr. Jones would not have been required to physically pick him up off the restroom floor and walk him through the maze that is CRS for him to receive care from the ambulance.

---

[7] This FACT will be made crystal clear in discovery.

68. As of the date of this filing, neither the Los Angeles Police Department nor the Los Angeles Fire Department has released any official reports surrounding this shooting. There has been no body camera footage or 911 call recording. What is even more disturbing is that there has been no citing of G.

   a. The LAPD has only released a vaguely written "News Release" dated September 12, 2022.

69. The unfortunate shooting of G, the unexplained disappearance of G, the lack of disclosures by the LAPD and LAFD, and the incoherent nature of Shawn Holley and Chalice Recording Studios' account of the shooting raises more questions than answers point to foul play, and an apparent **massive coverup**.

### THE DEAFENING SILENCE FROM THE ATTENDEES OF THE CRS SHOOTING STEMS FROM UNDERSTANDABLE FEAR THAT THE ATTENDEES WOULD BE SUED BY MR. COMBS FOR VIOLATING A NON-DISCLOSURE AGREEMENT

70. Upon information and belief, a few days before the September 12, 2022, shooting inside of Chalice Recording Studio, Mr. Combs required all attendees of the CRS shooting to sign a Non-disclosure Agreement.

71. Mr. Jones did not sign the agreement.

72. A copy of the non-disclosure agreement[8] that a witness who has asked to remain anonymous provided this writer is attached.  (**Attachment A**).

### MR. JONES WAS SEXUALLY HARASSED, AND ASSAULTED BY MR. COMBS

73. Throughout his time living with Mr. Combs, Mr. Jones was the victim of constant unsolicited and unauthorized groping and touching of his anus by Mr. Combs.

74. These events occurred in LA, NY, FL, Saint-Barthélemy, and the United States Virgin Islands.

75. In addition to the unsolicited and unauthorized touching, Mr. Jones was forced by Mr. Combs to work in Mr. Combs' bathroom as Mr. Combs walked around naked and showered in a clear glass enclosure.

---

[8] Unfortunately for the attendees of the writers' camp, they are unaware that NDA's are non-binding when it comes to reporting **criminal activity** such as a shooting, sex trafficking, and the distribution and use of illegal drugs and guns.

76. As a heterosexual Christian man, Mr. Jones was uncomfortable with Mr. Combs' advances and expressed his discomfort to Mr. Combs' Chief of Staff, Defendant Kristina Khorram.

77. KK responded to Mr. Jones complaint with, "you know, Sean will be Sean."

78. KK also attempted to downplay Mr. Combs groping of Mr. Jones's anus and genitals as friendly horseplay, stating that those acts were Mr. Combs's way of "showing that he likes you [Mr. Jones]."

79. Despite these assurances, on several occasions, when Mr. Combs began to undress and walk around his house naked, KK would say, "Okay, I am leaving now," and she would disappear. KK's hypocrisy is breathtaking at best or enabling at worst.

80. Mr. Jones believes that KK aided and abetted Mr. Combs' sexual assault and was working with Mr. Combs to groom him into accepting a homosexual relationship.

81. Through these sexually deviant acts, one would say Mr. Combs has a pattern and practice of engaging in such nefarious activity. This ongoing conduct shows that Mr. Combs cannot be rehabilitated.

## MR. COMBS ATTEMPTED TO GROOM MR. JONES INTO ENGAGING IN GAY SEX

82. Mr. Combs knew Mr. Jones looked up to and idolized music Producer Steven Aaron Jordan ("Stevie J").

83. Based on information and belief, Stevie J is an American DJ, record producer, and television personality.

84. Based on information and belief, Stevie J was part of the Bad Boy Records production team, the Hitmen.

85. Upon information and belief, in 1997, Stevie J won a Grammy Award for his work on Puff Daddy's debut album.

86. Upon information and belief, throughout the late 1990s, Stevie J produced for several artists, including Mariah Carey, Tevin Campbell, The Notorious B.I.G., 112, Jodeci, Faith Evans, Jay-Z, and Eve.

87. Based on information and belief, Stevie J was one of the producers of the Love Album.

88. According to Mr. Jones, Mr. Combs used access to Stevie J and his knowledge of Mr. Jones' admiration of Stevie J to groom and entice Mr. Jones to engage in homosexual acts.

89. Mr. Combs went so far as to share a video of who he claims was Stevie J[9] anally penetrating a Caucasian male without a condom.  Mr. Jones believes that Mr. Combs showed him this and attributed it to his idol Stevie J. to ease Mr. Jones' anxiety concerning homosexuality.  According to Mr. Jones, Mr. Combs said, "this is a normal practice in the music industry, look even Stevie J[10] is doing it."

90. According to Mr. Jones, Mr. Combs informed Mr. Jones that he had engaged in sexual intercourse with rapper[11] (REDACTED), R&B singer[12] (REDACTED), and Stevie J.

91. According to Mr. Jones, Mr. Combs promised to make sure that Mr. Jones wins producer of the year at the Grammys if he engaged in homosexual acts.

### THANKSGIVING 2022, MR. JONES IS SEXUALLY ASSAULTED BY YUNG MIAMI'S COUSIN

92. On Thanksgiving Day, 2022, Mr. Jones was in Mr. Combs' house in Miami, Florida.   Yung Miami and her female cousin (Jane Doe 1) were also present.

93. According to Mr. Jones, Mr. Combs was intoxicated and offered cocaine to Mr. Jones.  Mr. Jones rejected him and proceeded to walk to the restroom.

94. While using the restroom, Yung Miami's cousin burst into the bathroom and began groping Mr. Jones.  Mr. Jones believes that Mr. Combs sent her in there to sexually assault Mr. Jones.

95. According to Mr. Jones, as she entered the bathroom, she dropped to her knees and began performing oral sex on Mr. Jones' exposed penis.  Mr. Jones pushed her away and exited the bathroom.

96. According to Mr. Jones, Yung Miami's cousin did not accept Mr. Jones rejection, as she proceeded to follow Mr. Jones out of the bathroom.

97. She started undressing and attempted to straddle him and have sex with him in the presence of Mr. Combs and his staff.

98. Despite the lack of assistance from Mr. Combs and his staff, Mr. Jones pushed her off.  The following are images from a video[13] of Yung Miami, her cousin, Mr. Jones, and Mr. Combs:

---

[9] This writer is in possession of the video and will provide a copy to the court.
[10] Upon information and belief, Stevie J denies that he is the person in the video.  A male porn star claimed that he was the black male in the video.  Mr. Jones stands by his position that Mr. Combs provided him with the video and identified the individual in the video as Stevie J.
[11] He is a Philadelphia Rapper who dated Nicki Minaj.
[12] He performed at the Superbowl and had a successful Vegas residency.
[13] This writer is in possession of the video and will provide a copy to the court.



**Mr. Jones and Mr. Combs on Thanksgiving Day right before Mr. Combs invites Mr. Jones into the restroom and attempted to force him to take cocaine**.



**Yung Miami, and Jane Doe 1 who sexually assaulted Mr. Jones on Thanksgiving Day 2022**

## <u>TRAFFICKING AND VICTIMS' PROTECTION ACT</u>

99. According to Mr. Jones, he was transported from California to New York, Florida, Saint-Barthélemy, and the United States Virgin Islands throughout his time with Mr. Combs.

100.   According to Mr. Jones, during this time, Mr. Jones was forced to solicit sex workers and perform sex acts to the pleasure of Mr. Combs.

101.   On or about February 4, 2023, Mr. Combs forced Mr. Jones to bring prostitutes and sex workers back to his home in Miami, Florida.



**The Sex Workers That Mr. Combs Forced Mr. Jones To Bring Back To His Home**

102.   On or about February 2, 2023, Mr. Jones believes Mr. Combs drugged him.  Mr. Jones recalls waking up naked, dizzy, and confused.  He was in bed with two sex workers and Mr. Combs.  He also recalls aimlessly wandering around the house with no clothes on.



**Sex Workers In Mr. Jones Bed The Morning After Being Drugged**

103.  According to Mr. Jones, on another occasion in Miami, Florida, on Thanksgiving night of 2022, Mr. Combs asked Mr. Jones and DeForrest Taylor to enter the studio bathroom.

104.  According to Mr. Jones, he asked them for a hundred-dollar bill because he wanted them to do cocaine with him.

105.  Mr. Jones was scared, but luckily, he didn't have a hundred-dollar bill, so Mr. Combs waited a little later to do coke with Yung Miami.

106.  According to Mr. Jones, later that evening, Mr. Combs required Mr. Jones to solicit sex workers from Booby Trap on the River, located at 3615 NW S River Dr, Miami, FL 33142. Mr. Jones did so, and Mr. Combs forced him to engage in unsolicited sex acts with these workers.



**Booby Trap on the River**

107.   According to Mr. Jones, as part of Mr. Jones' sex worker recruitment tools, Mr. Combs provided Mr. Jones with an exclusive Bad Boy baseball cap.  They required him to wear it to Booby Trap on the River as a signal to any sex worker he approached that Mr. Combs was in town and had sent Mr. Jones to recruit them.

108.   According to Mr. Jones, Mr. Jones had no desire to visit Booby Trap on the River.  Mr. Jones had no desire to solicit sex workers from Booby Trap on the River.  Mr. Combs used his power and influence to intimidate and force Mr. Jones into soliciting sex workers from Booby Trap on the River.  As detailed below, Mr. Combs used many tactics to maintain dominion and control over Mr. Jones.

109.   According to Mr. Jones, these workers were accustomed to servicing Mr. Combs and would know he was in town by the sight of the Bad Boys baseball cap.

110.   The following are Instagram Profiles of two of the sex workers that Mr. Combs required Mr. Jones to solicit and have sex with at his home in Miami, Florida:



111.   Mr. Jones had no desire to solicit and or have sex with the individuals in the previous paragraph.  According to Mr. Jones, Mr. Combs used his power and influence to intimidate and force Mr. Jones into soliciting and sleeping with these women.

112.   The following is the phone number of another sex worker that Mr. Combs required Mr. Jones to solicit and perform sex acts with at his home in Miami, Florida:



113.   Mr. Jones had no desire to solicit and or have sex with the individual in the previous paragraphs.  According to Mr. Jones, Mr. Combs used his power and influence to intimidate and force Mr. Jones into soliciting and sleeping with the individuals above.

114.   According to Mr. Jones, Mr. Combs used many tactics to maintain dominion and control over Mr. Jones.  He promised him a Grammy for Producer of the Year for the Love Album.

He offered him $250,000.00 to purchase all the instruments he wanted.  He promised him ownership of his $20,000,000 property, 1 Star Island, in Miami, Florida.  He promised access to record label executives.

115.   According to Mr. Jones, Mr. Combs would often switch up his approach.  He would go from promising Mr. Jones the world to threatening Mr. Jones with physical harm.  Mr. Combs threatened to eat Mr. Jones' face and informed Mr. Jones that he was willing to kill his mother, Janice Combs, if he must get what he wanted so he wouldn't think twice about harming Mr. Jones.  In light of Mr. Combs' detailed history of committing violent crimes, Plaintiffs fear of Mr. Combs is reasonable.

### MR. JONES HAS PERSONALLY WITNESSED MR. COMBS AND J. COMBS SOLICIT, DRUG AND ENGAGE IN ILLICIT SEX ACTS

116.   On or about July 2, 2023, Mr. Combs held a "listening party" at his home in California.

117.   According to Mr. Jones, present at this party were an R&B artist (REDACTED), J. Combs, sex workers, and some underaged girls.

118.   According to Mr. Jones, the event began at 7 pm.  Mr. Combs requested female sex workers and required Mr. Jones to solicit them.  An hour later, several sex workers appeared.

119.   According to Mr. Jones, in addition to sex workers, there were at least five women in the crowd who were under the age of sixteen.

120.   According to Mr. Jones, Mr. Combs forced all the women to drink laced DeLeon liquor.  Upon information and belief, Mr. Combs laced the liquor with ecstasy.

121.   According to Mr. Jones, Mr. Combs did not check the identification of any of these underage girls.

122.   According to Mr. Jones, the presence of these underage women made him very uncomfortable[14].  He attempted to leave, and Mr. Combs forced him to stay.

123.   According to Mr. Jones, Mr. Combs went so far as to take Mr. Jones' car keys to prevent him from leaving.

124.   After being forced to drink laced DeLeon shots, Mr. Jones began feeling lightheaded and recalls passing out and waking up at 4 am the following morning naked with a sex worker sleeping next to him.

---

[14] Plaintiff Jones is in possession of the video and will provide a copy to the court.

### MR. COMBS ATTEMPTS TO PASS OFF MR. JONES TO CUBA GOODING JR.

125. Mr. Jones believes Mr. Combs was grooming him to pass him off to his friends.

126. This fear became a reality when Mr. Combs introduced Mr. Jones to Cuba Gooding Jr. while they were on Mr. Combs' yacht.

127. According to Mr. Jones, during the introduction, Mr. Combs suggested that Cuba "get to know" Mr. Jones better.  He then left them alone in a makeshift studio on the yacht[15].



**Mr. Combs and Cuba Gooding Jr. Moments Before Mr. Jones is Assaulted**

128. As evidenced by a video, of which screenshots are embedded below, Cuba Gooding Jr. began touching, groping, and fondling Mr. Jones' legs, his upper inner thighs near his groin, the small of his back near his buttocks, and his shoulders.

129. According to Mr. Jones, he was extremely uncomfortable and proceeded to lean away from Mr. Gooding Jr.

---

[15] This writer has spoken to an eyewitness who was a former employee of the yacht who confirmed this.

130.   He rejected his advances and Mr. Gooding Jr. did not stop until Mr. Jones forcibly pushed

him away.  The following is a screenshot[16] of the encounter with Cuba Gooding Jr.:



**Cuba Gooding Jr[17]. Forcibly Touching Mr. Jones on Mr. Combs yacht**

## THE LOVE ALBUM

131.   Throughout his time with Mr. Combs, Mr. Jones was under an implied work-for-hire

agreement.

132.   According to Mr. Jones, he was not compensated for his time living with Mr. Combs or for

the songs he produced.

133.   According to Mr. Jones, he was recruited by **Frankie Santella** to work on the Love Album.

Mr. Jones informed Mr. Santella that he required the following to work on the Love Album:

a.   $20,000.00 per song,

b.   Four royalty points,

c.   Credit as producer and credited for each instrument Mr. Jones played, and

d.   Mr. Jones must retain his publishing rights.

134.   According to Mr. Jones, they agreed to the terms detailed above after meeting with Frankie

Santella.  Mr. Jones met with Defendant Combs, who further reiterated and guaranteed that

the abovementioned terms were accepted.  As a result, Mr. Jones began working on the album.

---

[16] This writer is in possession of the video and will provide a copy to the court.
[17] Mr. Gooding Jr. has a storied history of sexually assaulting and forcibly touching individuals against their well. https://www.usatoday.com/story/entertainment/celebrities/2023/11/22/cuba-gooding-jr-lawsuits-sexual-assault-battery/71682417007/

135.   As evidence, he was listed as a producer for the following songs on the Love Album final release:   *Deliver Me, Stay PT 1, Reachin', What's Love, Stay Awhile, Moments, Need Somebody, Homecoming,* and *Tough Love.*

136.   Mr. Combs and Defendants LR, MR, and UMG benefited from Mr. Jones' work product.

137.   They failed to compensate Mr. Jones for his work.

138.   As a result, Mr. Combs and Defendants LR, MR, and UMG were all unjustly enriched at Mr. Jones' expense.

139.   According to Mr. Jones, he attempted to work with Mr. Combs to secure his publishing and royalty rights for the work he completed on the Love album.   Mr. Combs only offered Mr. Jones $29,000.00 for 13 months, thousands of hours of work, and nine songs that made it to the Love album.   Mr. Jones was willing to take $50,000.00, his publishing and royalties.   Mr. Combs' self-serving greed would not allow him to pay[18] Mr. Jones an additional $21,000.

140.   Mr. Combs deceptive business practices became so bad that Mr. Jones was left with no choice other than to make a public plea on social media for Mr. Combs to pay him for his work.

141.   After publicly requesting that Mr. Combs do the right thing and pay him fairly, Mr. Jones received an onslaught of threatening messages from Stevie J and Love Records A&R DeForrest Taylor [19].

---

[18] This writer has retained other creatives, artists, and writers who have experienced this same treatment from Mr. Combs and will file suit in the coming month.

[19] As the A&R of Love Records, DeForrest Taylor did not require Mr. Jones or any of the other creatives, musicians, or artists to sign an NDA.



**DeForrest Taylor Threatening Mr. Jones**

## MR. COMBS USED HIS POWER, AND INFLUENCE TO THREATEN AND INTIMIDATE MR. JONES

142.   According to Mr. Jones, Mr. Combs is very forceful and demanding.

143.   According to Mr. Jones, Mr. Combs does not take no for an answer and would often threaten to inflict bodily harm on Mr. Jones if Mr. Jones did not comply with his demands.

144.   As detailed above, Mr. Combs threatened to eat Mr. Jones' face.

145.   According to Mr. Jones, on another occasion, while standing in Mr. Combs' bedroom, Mr. Jones was forced to watch as Mr. Combs displayed his guns and bragged about getting away with shooting people.

146.   According to Mr. Jones, Mr. Combs shared that he was responsible for the shooting in the nightclub in New York City with rapper Shyne.



147. According to Mr. Jones, he shared that artist and Mr. Combs' girlfriend at the time, Jennifer Lopez, aka, J-Lo, carried the firearm into the club for him and passed him the gun after he got into an altercation with another individual.

148. According to a civil complaint filed by Cassie Ventura, during their decade long relationship, Mr. Combs "demanded that Ms. Ventura to carry his firearm in her purse just to make her uncomfortable and demonstrate how dangerous he is."

149. According to Mr. Jones, as was the case with Jennifer Lopez and Ms. Ventura, Mr. Combs required Brendan Paul and Mr. Jones to carry his firearm on their person whenever they went out. One of these occasions Mr. Jones was required to carry Mr. Combs' firearm was when Mr. Combs recorded himself coaching Mr. Jones on how to solicit sex workers.



150.   According to Mr. Jones, the shooting in Chalice Recording Studios confirmed Mr. Combs' statements.

151.   Based on information and belief, these statements reinforced Mr. Jones's fear of Mr. Combs and strengthened Mr. Combs's dominion and control over Mr. Jones.

152.   Mr. Jones was terrified of Mr. Combs.  He felt like he could not tell him no.

153.   According to Mr. Jones, Mr. Combs consistently made it clear that he has immense power in the music industry and with law enforcement.

154.   According to Mr. Jones, Mr. Combs made it clear that his head of security, Faheem Muhammad ("Mr. Muhammad"), had the power to make people and problems disappear.



**Faheem Muhammad**

155.   According to Mr. Jones, Mr. Combs instructs his staff to always contact Mr. Muhammad if the police in Miami or California ever pull them over.

156.   Upon information and belief, Mr. Muhammad spoke with the LAPD after G was shot at CRS.   The LAPD was in CRS and witnessed the blood in the restroom, and they went with the bogus claim that the shooting of G occurred outside of the studio.   This was all thanks to Mr. Muhammad's connections within law enforcement.

157.   Mr. Jones had no reason to disbelieve Mr. Combs as he had seen firsthand through the shooting of G and the subsequent silence of the LAPD and the media that Mr. Combs indeed had the power to harm him.

158.   he LAPD spent **HOURS** in CRS after the shooting of G, yet there were no arrests.   Mr. Jones witnessed the LAPD in the restroom pictured above, yet no arrests were made.

159.   The morning after the shooting, Mr. Jones and several others arrived at CRS, and G's blood was still on the floor of the restroom; Mr. Combs hired a cleaning crew to clean it up.

///
///
///
///
///
///
///
///
///
///

32

**DEFENDANT LUCIAN CHARLES GRAINGE IN HIS CAPACITY AS CEO OF UMG,
MOTOWN RECORDS, AND UNIVERSAL MUSIC GROUP THROUGH THEIR
GENERAL BUSINESS PARTNERSHIP, AND
THEIR FINANCIAL SUPPORT OF SEAN COMBS AND LOVE RECORDS, INC.,
AIDED AND ABETTED MR. COMBS ACTIONS AS DETAILED BELOW**

160.  On March 21, 2024, former Motown Records Chairwoman and CEO Ethiopia
Habtemariam provided Mr. Jones with a Declaration ("Habtemariam Declaration").  (**See
attachment B**).

161.  According to the Habtemariam Declaration, as Motown Records' Chairwoman and CEO,
she reported directly to Defendant Lucian Charles Grainge.

162.  According to the Habtemariam Declaration, Motown Records entered into an agreement
with Love Records, Inc., in or around May 2022.

163.  According to the Habtemariam Declaration, UMG was aware of and **authorized** Motown
Records to enter into a license agreement with Love Records.

164.  According to the Habtemariam Declaration, under the license agreement, Motown Records
agreed to **pay (or reimburse)** Love Records for certain of the invoiced recording costs
incurred by Love Records in making The Love Album.

165.  According to the Habtemariam Declaration, since leaving Motown Records in November
2022, she has not been involved with Love Records.

166.  s detailed throughout this pleading, Plaintiff Jones began working on the Love Album in
September 2022 until it was released in September 2023.

167.  According to Mr. Jones, the recording of the Love Album began in Chalice Recording
Studios, where Mr. Combs hosted a nightly party where sex workers and alcohol laced with
drugs were provided.

168.  Mr. Jones informed Mr. Combs that the Chalice Recording Studios sessions cost him over
$500,000.

169.  In addition to the Chalice Recording Studios recording sessions, The Love Album was
recorded in Mr. Combs' homes in Los Angeles, California, and Miami, Florida.

170.  Mr. Jones has a copy of every song recorded for the Love Album, including songs recorded
on the Yacht Mr. Combs and Love Records, Inc., chartered from December 2022 to January
2023.

171.   According to Mr. Jones, every song has at least five versions, and many other songs never made it on the Love Album.  Each of these files is timestamped and provides a clear timeline of the creation of The Love Album.

172.   According to Mr. Jones, during the creation of the Love Album, Mr. Combs was very serious about setting the mood and creating a love-making atmosphere.  To accomplish this, Mr. Combs did the following:

    a.   He installed a lighting system so he could adjust the lighting in the room to red, blue, pink, or any color he wanted, depending on the mood he was going for.

    b.   Mr. Combs required everyone working on the Love Album to take shots of Ciroc and Deleon alcohol.  He would instruct either DeForrest Taylor or KK to eliminate them if they refused.  On several occasions, Mr. Combs would send voice notes to the Love Album phone group chat and pose questions to the group, soliciting their opinions on Mr. Jones, questioning his loyalty and whether they think he is a good fit for the team. Mr. Combs knew that Mr. Jones was on the group chat, in his house, and received those voice notes.  After witnessing several people sent home for refusing to engage in the acts Mr. Combs required to show loyalty, Mr. Jones feared what could happen to him if he told Mr. Combs no.  This is another example of Mr. Combs' grooming of Mr. Jones.

    c.   Throughout the creation of the Love Album, Mr. Combs required Mr. Jones and others to solicit sex workers and engage in sex acts.  According to Mr. Jones, Mr. Combs felt that you cannot make a love album without making love.



173.   As the general business partners of Sean Combs and Love Records, Inc., and the financial backer for the creation of the Love Album, Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, had a duty to ensure that the financial support they provided to Sean Combs and Love Records was not being used for sex workers, drugs, and laced alcohol.

174.   It is no secret that Mr. Combs had specific bottles of alcohol designated for females, and other bottles designated for his staff, his artists, and himself.   This fact was detailed by former artists and bodyguards of Mr. Combs.

175.   n the YouTube channel The Art of Dialogue, former bodyguard Gene Deal exposed Mr. Combs's pill-mixing method to spike cranberry juice and orange juice.  According to Mr. Deal, Mr. Combs would place ecstasy[20] and other date rape drugs in the juices[21].

176.   On YouTube, the Art of Dialogue, former artist Mark Curry exposed Mr. Combs spiking bottles of Moet champagne in the VIP section of night clubs.  Mr. Combs would have a set of Moet champagne bottles for his artists, and a set for women[22].

### DEFENDANT KRISTINA KHORRAM IS THE GHISLAINE MAXWELL TO SEAN COMBS JEFFREY EPSTEIN



177.   According to Mr. Jones, during the thirteen months he lived and traveled with Mr. Combs, he witnessed Mr. Combs display and distribute guns from his bedroom closets in Miami, Florida, and Los Angeles, California, to questionable individuals dressed in all black.

178.   According to Mr. Jones, during the thirteen months he lived and traveled with Mr. Combs, he witnessed Defendant Khorram openly order her assistants to keep Mr. Combs "high" off gummies and pills[23].

179.   Defendant Khorram required all employees, from the butler to the chef to the housekeepers, to walk around with a black Prada pouch or fanny pack filled with cocaine, GHB, ecstasy,

---

[20] This writer has spoken with several former employees of Mr. Combs who witnessed Defendant Khorram instruct her staff to lace Champagne, DeLeon, and Ciroc liquor bottles with ecstasy and other drugs.
[21] https://youtu.be/MFIP8b2IDeg?si=VVM397WmKXlnbHU-
[22] https://youtu.be/pjvhfwUmMQw?si=6-5_W6evemGP_AI0
[23] We have a recording of this and will provide it to the court.

marijuana gummies (100 - 250 mg's each), and Tuci (a pink drug that is a combination of ecstasy and cocaine).



**TUCI**

180.   According to Mr. Jones, Defendant Khorram wanted Mr. Combs' drug of choice immediately ready when he asked for it.

181.   According to Mr. Jones, Defendant Khorram ordered sex workers for Mr. Combs.  On one occasion, she sent Mr. Jones a text message requesting that he call a particular sex worker. We have the message.

182.   According to Mr. Jones, Defendant Khorram ordered and distributed ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms to Mr. Combs and his celebrity guests, who were present on his rented yacht and in his homes in LA and Miami.

183.   According to Mr. Jones, on multiple occasions, Defendant Khorram forced him to carry Mr. Combs' drug pouch against his will.  The pouches were always black, and several of Mr. Combs' staff carried black Prada pouches.

184.   According to Mr. Jones, Defendant Khorram also sent Mr. Jones to solicit sex workers for Mr. Combs.  When the sex workers arrived at Mr. Combs' residence, Defendant Khorram would negotiate their price and would take them aside and pay them.



**Sean Combs Butler, Frankie with the Black Prada Pouch Mentioned Above While On The Yacht From December 2022 to January 2023**

185.   As the Chief of Staff, Defendant Khorram was instrumental in organizing and executing the RICO and TVPA Enterprises.  Defendant Khorram had the following individuals execute the following tasks for the RICO, and TVPA enterprises:

    a.  **Stevie J**: Recruits sex workers and attends and participates in freak offs[24].

    b.  **Justin Combs**:  Solicits Prostitutes, Underaged Girls, and Sex Workers.  Would engage in Freak Offs.

    c.  **Brendan Paul**: Works as Mr. Combs Mule.  He acquires, and distributes, Mr. Combs Drugs, and Guns.



**Brendan Paul and Mr. Combs**

    d.  **Frankie Santella[25]**:  Works alongside Brendan.  While Brendan acquires, and distributes, Mr. Combs Drugs, and Guns.  Frankie carries the money and pays for the Guns and Drugs.

---

[24] We have a video of Mr. Combs, Stevie J, and Plaintiff Jones at a strip club.  Mr. Combs is recording the video, while coaching and training Plaintiff Jones how to recruit the sex workers.
[25] Vice President of Music Management & Strategic Partnerships Vice President of Music Management & Strategic Partnerships, Combs Global.



**Frankie Santella and Sean Combs**

    e.  **Moy Baun**:  Hires sex workers, attends and participates in freak offs.



**Moy Baun, Thanksgiving 2022 When Mr. Combs Offered Mr. Jones Cocaine**.

186.  According to Mr. Jones, Mr. Combs funded and used his affiliation with local gangs and gang leaders[26] who would frequent his homes in LA, and Miami to secure the drugs and guns he obtained and distributed out of his homes in LA and Miami.

---

[26] Plaintiff has intentionally left the names, and images of these individuals out of the pleading out of fear of retaliation. He will provide the information to the Court under seal or in Camera.

187.   According to Mr. Jones, Defendants executed their RICO and TVPA Enterprises with threats of violence: threatening to eat Plaintiff's face, displaying and distributing guns in Plaintiff's presence, bragging about having law enforcement under control, bragging about murdering people, and bragging about bribing witnesses, and jurors in the criminal case concerning the 1999 NYC nightclub shooting with Shyne.  As a result, Mr. Combs could maintain dominion and control over Mr. Jones.

188.   According to Mr. Jones, Defendants executed his RICO and TVPA Enterprises with threats of isolation from the music and entertainment industry: parading powerful music industry executives at his parties filled with sex workers and illegal drugs, such as ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms.

189.   According to Mr. Jones, Defendant Combs executed his RICO and TVPA Enterprise with threats of nonpayment for work completed, fake promises of cash payments ($250,000), producer of the year Grammy awards, and guaranteed access to future projects, and a 20-million-dollar home on Star Island in Miami.

## MR. COMBS IS ALLOWED TO WREAK HAVOC

190.   While living and traveling with Mr. Combs, Mr. Jones discovered that Mr. Combs had hidden cameras in every room of his home.

191.   Mr. Jones believes that Mr. Combs has recordings of several celebrities, artists, music label executives, and athletes engaging in illegal activity at Mr. Combs' functions.

192.   Upon information and belief, these individuals were recorded without their knowledge and consent. As is the case with the homosexual sex tape that Mr. Combs provided to Mr. Jones, claiming to be Stevie J., Mr. Combs possesses compromising footage of every person who has attended his freak-off parties and his house parties.

193.   Upon information and belief, due to this treasure trove of evidence he has in his possession, Mr. Combs believes that he is above the law and untouchable.

194.   Based on information and belief, Mr. Combs employs Jose Cruz as his IT director.  This writer has spoken to several former employees of Mr. Combs, who confirmed that Jose Cruz is the gatekeeper to all of Mr. Coms recordings.

195.   Upon information and belief, Jose Cruz intentionally hides behind the camera and from social media and the internet due to all of the incriminating acts he was required to record for Mr. Combs.



### DEFENDANT MR. COMBS HIRED PRIVATE INVESTIGATOR RUSSELL L. GREENE TO SEEK OUT, HARASS, AND BRIBE INDIVIDUALS TO PROVIDE DIRT ON MR. JONES

196.   On or about March 2, 2024, Mr. Jones was informed by a close friend from his church that Mr. Combs' engineer, Matt Testa, provided an individual's phone number to Los Angeles-based private investigator Russell L. Greene[27].

---

[27] https://nextdoor.com/pages/blue-diamond-investigationscom/



197.   Upon information and belief, Mr. Greene attempted to bribe this anonymous individual with an uncertain amount of money in exchange for her producing text messages or any evidence that this individual could produce to paint Mr. Jones in a bad light.

198.   During a call with Mr. Jones, this individual expressed fear for their safety and the safety of their family.

199.   This is a clear example of some of the tactics implemented by Mr. Combs and the members of Combs Rico and TVPA Enterprise.

200.        Besides contacting the individual previously mentioned, Mr. Greene contacted Mr. Jones's eight-year-old daughter.  He solicited information from this child about her father until she cried in fear and handed the phone to her mother.  At that time, her mother hung up the phone.  Mr. Greene proceeded to text her; she informed him that she did not want to be bothered, and he continued to send her unwanted harassing, text messages.

### FIRST CAUSE OF ACTION
**CONDUCT AND PARTICIPATE IN A RICO ENTERPRISE
THROUGH A PATTERN OF RACKETEERING ACTIVITY
VIOLATION OF RACKETEER INFLUENCED AND
CORRUPT ORGANIZATION ACT, CODIFIED AT 18 U.S.C. § 1962(A), (C)-(D)
(Against Defendants Lucian Charles Grainge in his capacity as CEO of UMG,
Motown Records, Universal Music Group, Sean Combs, Justin Combs, Kristina Khorram,
Combs Global, and Love Records)**

201.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

202.   Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group ("the collective"), is 100% liable for the actions of Sean Combs, and by extension, Love Records, Combs Global, Justin Combs, and Kristina Khorram ("RICO orchestrators") as they were acting in their capacities as the collectives' General Business Partners when they committed the acts detailed below.  The collective financially benefited from Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram through their partnership and distribution deal with Sean Combs and Love Records. The collective provided Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram with unfettered access to financial resources in the form of wire transfers, direct payments, and invoice reimbursements and failed to adequately investigate, supervise, and or monitor where the money was being used, who was using the money, and what the money was being used for.

203.   The financial support provided by the collective was the lifeline that spearheaded and maintained Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram's depraved actions.  Upon information and belief, the establishment and distribution partnership deal between the collective and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram was intentionally written overly broad.  For Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs,

and Kristina Khorram to receive financial support  from the collective, they had to state that the payment was for "Love Album Related Expenses." Well, the writer's camp at CRS, the nightly Club Love parties at CRS, and the yacht were all spaces that Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram utilized to produce songs that were released on the Love Album.   The "Love Album Related Expenses" reimbursement requirement was a ruse.   The collective knew or should have known that Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram had no intention to utilize the collective's financial support for album-related expenses, and they did not put any mechanism in place to ensure that the money was not being used for any illegal activity.   The collective's willful blindness resulted in Plaintiff Jones suffering the harm detailed herein.

204.   Defendants are individuals and entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Lucian Charles Grainge, Sean Combs, Justin Combs, Kristina Khorram, Combs Global, Motown Records, Love Records, Universal Music Group, JOHN, and JANE DOES 1-10, and ABC CORPORATIONS 1-10.

205.   In the relevant part, 18 U.S. Code 1961 defines a racketeering activity as:

(1)  (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, *dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act)*, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: … *section 933 (relating to trafficking in firearms)*, section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), sections 1461–1465 (relating to obscene matter), *section 1511 (relating to the obstruction of State or local law enforcement)*, *sections 1581–1592 (relating to peonage, slavery, and trafficking in persons)*, section 1952 (relating to racketeering), section 1956 (relating to the laundering of monetary instruments), (D) any offense involving fraud connected with a case under title 11…the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical.

206.   Section 1962(a) makes it:

*unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity* or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of,

any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce.  18 U.S.C. § 1962(a).

207.   Section 1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. §1962(c).

208.   Section 1962(d) makes it:

unlawful for "any person to conspire to violate" Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

209.   Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

210.   Throughout this pleading, Mr. Jones has detailed many acts by Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram, which are prohibited under 18 U.S.C. §1962.

211.   Defendants have unlawfully increased their profits by luring and deceiving producers, musicians, writers, creators, and artists such as Plaintiff to their organization for the misstated purpose of using their talents as creatives to produce music.  Defendants' true intentions are later revealed through a calculated grooming scheme that involves false promises of business opportunities, exposure to music executives with the promise of future introductions, and the promise of awards and accolades, which quickly shifts to unauthorized drugging, threats of bodily harm, sex trafficking, and sleep deprivation.  According to Mr. Jones, Defendant Combs often required Mr. Jones to work for several consecutive days without sleep. According to Mr. Jones, it was imperative always to look like he was working whenever Mr. Combs walked by.

212.   Within a few months of working for and living with Mr. Combs, Mr. Jones witnessed KK instruct her direct reports and Combs enterprise employees Brendan, Frankie, and Moy to acquire and transport the following drugs: ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms.  Mr. Jones personally witnessed Combs Enterprise employee Brendan transport firearms to and from nightclubs, strip clubs, and other venues for Mr. Combs on his person in Miami, Florida.  Mr. Jones personally witnessed Mr. Combs distribute firearms out of his bedroom closet to individuals that Mr. Jones knew to be members of local gangs[28].   During

---

[28] Plaintiff is intentionally being vague, in fear of his personal safety. He can provide more detail to the Court in camera.

the making of the Love Album, several evenings, Mr. Jones personally witnessed Mr. Combs instruct the Combs enterprise employees Brendan, Frankie, and Moy to solicit sex workers to the recording studio at his homes and to the Chalice Recording Studios.  According to Mr. Jones, Mr. Combs felt there was too much testosterone in the studio and wanted sex workers there to create the vibe for the Love Album.  Then these workers arrived, and Mr. Jones and the other musicians and producers were required to engage in sex acts with them.  KK and Frankie would often negotiate the price for the sex workers' services.  They would either pay the workers in cash, electronically (cash app, Venmo, PayPal, or wire transfers), or through any other form requested by the sex worker.  As detailed in the chart below, when Mr. Jones was groomed into soliciting sex workers for Mr. Combs, he often negotiated the cost via text message.

213.   The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association, in fact, of persons, including each Defendant and other unnamed co-conspirators.   That association was structured by various general partnership agreements, establishment deals, distribution deals, contracts, and non-contractual relationships between the Defendants, by which Defendants assumed different roles in either knowingly or negligently funding, directly or indirectly participating in the acts necessary to carry out a scheme to acquire and distribute drugs, firearms, prostitutes, and sex workers.  They also worked collectively to deceptively obtain the labor of producers, musicians, writers, creators, and artists such as Plaintiff to utilize their talents and labor to produce music and other tangible goods and services without full compensation.  As detailed herein, Plaintiff Jones worked for Mr. Combs for thirteen months. Combs Enterprise employee Frankie solicited him to produce the Love Album.  Frankie and Mr. Combs agreed to provide Mr. Jones $20,000.00 per song, four royalty points per song, credit as producer, credit for each instrument Mr. Jones played, and publishing rights for Mr. Jones' work in exchange for Mr. Jones' services on The Love Album.  Over thirteen months, Mr. Jones fulfilled his end of the agreement and provided services for the Love Album.  Mr. Combs benefited from Mr. Jones' services and refused to compensate him by their agreement.  Mr. Jones is not the only creative who had his services stolen by Mr. Combs; many creatives worked for months on the Love Album and were never compensated for their work.

214.   According to the Habtemariam Declaration, the collective reimbursed or paid for the production of the Love Album.  Mr. Jones was not compensated, so if the Habtemariam Declaration is correct, what was the collective financial support used for?  And what mechanism did the collective have in place to ensure the money provided to Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram were used for the purposes outlined in the collective's partnership deal with Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram.

215.   The collective and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram all share a common purpose: to use deception, coercion, force, and the threat of violence to enrich themselves at the expense of individuals like the Plaintiff. As set forth herein, although members of the collective may not have directly threatened coerced, force or violently threaten Plaintiff, they financially benefitted from Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram scheme of defrauding, and intimidating the Plaintiff with threats of violence (threatening to eat Plaintiff's face, displaying and distributing guns in Plaintiff's presence, bragging about having law enforcement under control, bragging about murdering people, and bragging about bribing witnesses, and jurors in the criminal case concerning the 1999 NYC nightclub shooting with Shyne), threats of isolation from the music and entertainment industry (parading influential music industry executives at Mr. Combs parties filled with sex workers, minors, and illegal drugs, such as ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms), threats of nonpayment for work completed, fake promises of cash payments ($250,000), producer of the year Grammy awards, guaranteed access to future projects, and a $20 million dollar home on Star Island in Miami.  It is reasonable to believe Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram would not have engaged in these acts of threats but for the existence of the Rico scheme and their understanding that the collective would provide unfettered access to financial recourses without ever questioning Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram use of the money.

216.   Upon information and belief, the collective and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram have had several partnerships throughout the years.  As is the case here, Defendant UMG provided Mr. Combs

with unfettered access to financial dollars in exchange for Mr. Combs and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram providing Defendant UMG with the fruits of the labor of producers, musicians, writers, creators, and artists such as Plaintiff to utilize their talents and labor to produce music, and other tangible goods and services without full compensation.

| Date of Partnership | Participants in the Partnership | Details of the Partnership |
|---|---|---|
| 2003 to 2005[29] (3 years) | Sean Combs, Bad Boy Records, and Universal Music (subsidiary of Defendant UMG) | Joint Venture |
| 2009 to 2015 (6 years) | Sean Combs, Bad Boy Records, and Universal/Interscope Geffen A&M (subsidiary of Defendant UMG)[30] | Worldwide Distribution Deal |
| 2022 to 2023 (approx. 1 year) | Sean Combs and Motown Records (subsidiary of Defendant UMG)[31] | Establish Love Records and distribute the Love Album |

217.   As outlined in the chart above, from 2003 to 2005, Defendant Combs, the then CEO and owner of Bad Boy Records, entered a joint venture deal with Universal Music, a subsidiary of Defendant Universal Music Group.   Upon information and belief, at the time Defendant Combs and UMG entered their three-year joint venture, it was public knowledge that Mr. Combs had a serious reputation for violence and engaging in criminal activity.   Defendant UMG had firsthand knowledge of Combs' propensity for violence because on April 16, 1999, Defendant Combs assaulted Steve Stoute, their Executive Vice President of Interscope Geffen A&R.   Combs was arrested and charged with two felonies — second-degree assault and criminal mischief — in the beating of Steve Stoute, who says Combs and two bodyguards beat him with their fists, a telephone, a champagne bottle, and a chair.   Mr. Combs had a criminal trial surrounding the 1999 Nightclub shooting in NYC, when Mr. Combs required his then-girlfriend, Jennifer Lopez, to transport his illegal firearm into the NYC nightclub.   In

---

[29] https://www.nytimes.com/2003/02/08/business/p-diddy-signs-3-year-deal-with-universal-records.html
[30] "Puff is a rare person in the music industry today, that can move the culture in many areas – fashion, TV, music – as well as making records," commented IGA Chairman Jimmy Iovine. "Whenever a free agent like him comes along, which is rare, you grab him."
[31] https://www.ebony.com/diddy-launches-new-rb-label-in-partnership-with-motown-records/ and https://www.motownrecords.com/culture/diddy-and-motown-partner-up/

2001, Former television host Roger Mills sued Mr. Combs for assault.  This case did not end until 2004, two years into the joint venture deal.  Despite all these public warning signs of a pattern and practice of behavior that evidence a propensity to engage in violent crimes and other criminal activity, Defendant UMG chose to enter into a general partnership agreement with Mr. Combs.  Defendant UMG knew or should have known that it had a duty to monitor how the financial resources they provided to Mr. Combs were being spentUpon information and belief, from 2009 to 2015, the collective and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram[32] continued their Rico enterprise when Mr. Combs, UMG and Mr. Grainge entered a general business partnership to internationally distribute music produced by Mr. Combs and Bad Boy Records.  As part of that deal UMG provided financial support to Mr. Combs and paid for all expenses related to the development and distribution of the music Mr. Combs and Bad Boy Records produced.

218.   On or about 2022 to 2023, the collective and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram established the latest iteration of their RICO enterprise when they entered a general business partnership to establish Love Records and to distribute Love Records first album, the Love Album off the Grid.  According to the Declaration of Ms. Habtemariam, as the Chairwoman and CEO of Motown Records, she reported directly to Defendant Lucian Grainge.   Ms. Habtemariam also states that she was given approval by Defendant UMG to enter the partnership with Sean Comes to help establish Love Records.  It is safe to assume that Defendant Lucian Grainge, Ms. Habtemariam's direct supervisor, was aware of and signed off on the UMG and Sean Combs partnership, which led to the establishment of Love Records.  According to Ms. Habtemariam, Defendants UMG and MR financed Sean Combs for "approved" invoices associated with the creation of the Love Album.   Ms. Habtemariam did not identify any mechanism MR or UMG implemented to ensure the financial support remitted to Mr. Combs and Love Records went to approved invoices associated with the Love Album.  If the treatment of Plaintiff Jones is any indication of how Defendants UMG and MR ensured that their financing of Love Records and the Love Album was applied in accordance with the partnership agreement, then they would have

---

[32] Upon information and belief, Defendant Kristina Khorram began her employment with Defendant Combs, and Combs Enterprises in 2013.

realized that artists like Plaintiff Jones had worked for several months on the Love Album without full compensation.

219.   Upon information and belief, if the collective financed Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorramin in the manner described by Ms. Habtemariam's declaration, then it is safe to assume that they financed the "recording costs" at Chalice Recording Studios, Defendant Combs houses in Miami and Los Angeles, as well as the Yacht as evidenced by posts Mr. Combs made on his Instagram page from September 2022 to September 2023 (on or about the time the Love Album was released), as well as the videos, and photos in Mr. Jones possession, Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram did more than just record music.  On a daily basis, Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram had sex workers and endless drugs flowing through the recording sessions at CRS, Mr. Combs' homes, and on the Yacht which Mr. Combs rented. Unless the collective had an overseer present at the recording sessions to account for how the money they provided Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorramwas being spent, it is safe to say they were complicit in allowing their money to pay for illegal drugs, and sex workers.

220.   As evidenced by the hundreds of hours of video and audio recordings in Plaintiff's possession, Defendants Sean Combs, Justin Combs, Kristina Khorram, his assistants, and staff all orchestrated, participated, managed, and executed the RICO Enterprise by purchasing and distributing ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms.  They transported the drugs by flying on commercial airlines from California to New York, Florida, the Virgin Islands, and Saint Barthélemy in the French Caribbean.  They placed these controlled substances in their carry-on luggage through TSA.  They then carried these substances in black pouches and distributed the drugs to Mr. Combs, his friends, house guests, girlfriends, and sex workers.

221.   The RICO enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

222.   Upon information and belief, the enterprise was characterized by the collective providing unlimited, unchecked financing to Defendants Sean Combs and Love Records for the establishment of Love Records and the creation of the Love Album.  Defendants Sean Combs,

Love Records, and Kristina Khorram had a pattern of making false representations and omissions to the artists, creatives, musicians, and producers who used their talents to provide services to the RICO enterprise. These false representations and omissions were designed to induce artists, creatives, musicians, and producers to utilize their talents and labor to produce music and other tangible goods and services without full compensation. These artists, producers, creatives, and musicians were also forced to solicit and participate in sexual encounters with prostitutes and sex workers. They were also required to transport illegal, unregistered handguns and to purchase and distribute narcotics.

223. As part of this scheme, Defendants required their artists, creatives, musicians, and producers to visit strip clubs wearing exclusive authentic Bad Boy merchandise and to use the name and reputation of Mr. Combs to solicit sex workers and prostitutes.



**Mr. Jones and Brendan wearing the Bad Boy Hat**

224. Additionally, Mr. Combs used the prospects of winning Grammy awards, purchasing 20-million-dollar homes, participating in future projects, making $250,000 cash payments, and meeting influential music industry executives. This pattern of false representations was disseminated to artists, creatives, musicians, and producers who reside in California, Florida, New York, and around the country by Defendants based in California, Florida, and New York

under the direction and on behalf of Defendants in New York.  The dissemination typically used interstate telephone wires, social media messages, and electronic mail.

225.   Upon information and belief, the true nature of Defendants' scheme was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiff Jones and other unwitting artists, creatives, musicians, and producers.

226.   Upon information and belief, Defendants profited from the enterprise, and Plaintiff Jones suffered because the enterprise diminished Plaintiff Jones's finances due to 13 months of nonpayment and diminished Plaintiff Jones's health through consistent drugging and forced sexual encounters with prostitutes and sex workers.  Defendants used the proceeds from this scheme to advance the scheme by funding and operating their marketing machine, including through the use of the mail, social media, word of mouth, and interstate wires to sell the illusion that Mr. Combs was serious about the talents and skills of the artists, creatives, musicians, and producers, and wanted to use those skills to make music when nothing could be further from the truth.  Defendants provided their artists, creatives, musicians, and producers with this misrepresentative information, including via email all over interstate wireline communications systems and obtaining free labor, the distribution of drugs and firearms, as well as prostitutes, sex workers, and minors.  Defendants obtained revenue via wire transfers, documents, and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to Plaintiff Jones as described throughout.

227.   Upon information and belief, The Defendants' scheme was reasonably calculated to deceive Plaintiff Jones, artists, creatives, musicians, and producers of ordinary prudence and comprehension through the execution of their complex and illegal scheme to misrepresent the effectiveness of soliciting prostitutes, sex workers, and minors and distributing drugs and guns that did not, would not, and could not lead to securing Grammy Awards, purchasing $20 million homes, participating on future projects, $250,000 cash payments, and meeting influential music industry executives.  Plaintiff Jones would not have lived with Mr. Combs for 13 months, missing birthdays, holidays, and family events, but for the illegal racketeering scheme operated by Defendants.

228.   Upon information and belief, Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiff Jones, and each participated in the enterprise as follows:

229.   Upon information and belief, Defendants Lucian Charles Grainge, Combs Global, Motown Records, Love Records, and Universal Music Group control and participate in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to developing and marketing scores of writing camps, and listening parties services that are marketed to innocent, unassuming artists, creatives, musicians, and producers who are.

230.   Throughout the relevant period, Defendant Lucian Charles Grainge in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to enter into a general partnership agreement with Sean Combs and Love Records.  As general business partners, each member is responsible for the partners' actions in the partnership.  Defendants Lucian Charles Grainge, Motown Records, and Universal Music Group have an ethical obligation to ensure their business partners, Sean Combs and Love Records, were not using the partnership assets to engage in illegal activity.

231.   Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to their general business partners, Defendants Sean Combs and Love Records.   Defendants Sean Combs and Love Records used the financial resources provided by their general business partners to solicit through the mail, email, social media, and the telephone artists, creatives, musicians, and producers whom they would promise Grammy Awards, expensive property, participation on future projects, cash payments, and meetings with powerful music industry executives.  Defendants Sean Combs and Love Records instructed Defendants Justin Combs, Kristina Khorram, and her staff to solicit these artist's creatives, musicians, and producers who resided in New York, Illinois, California, Georgia, and Florida.  Defendants Justin Combs, Kristina Khorram, and her staff relied on the mail, email, social media messenger, and telephone to disseminate the misleading information described herein.  Defendants Sean Combs, Love Records, Justin Combs, and Kristina Khorram did not disclose to the individuals they solicited the fact that they would be drugged, required to sleep with sex workers, and forced to work for days at a time without compensation.  As it relates to Plaintiff Jones, Defendants Sean Combs, Love Records, and Kristina Khorram controlled his ability to travel.  They did not

provide him with full compensation for the work he provided.  As a result, Mr. Jones did not have the finances to return home without Defendants Sean Combs, Love Records, and Kristina Khorram paying for it.  On several occasions in Miami, Florida, he asked Defendants Sean Combs and Kristina Khorram for permission to visit his family for their birthdays and holidays.  Defendants Sean Combs and Kristina Khorram refused.  They went so far as threatening Mr. Jones by telling him that if he left, he would not be paid for the work he had done, would not be allowed to return, and would not receive the promised Grammy Awards, expensive property, participation in future projects, cash payments, and meetings with influential music industry executives.

232.   In connection with Defendants acting from New York, these Defendants used the mail and interstate wires to solicit Plaintiff Jones and artists, creatives, musicians, and producers and to use Plaintiff Jones and the artists, creatives, musicians, and producers to utilize their talents and labor to produce music, and other tangible goods and services without full compensation, as well as the solicitation of sexual encounters with prostitutes, sex workers, and the purchasing and distribution of illegal firearms and drugs.  Each of these acts was undertaken with the knowledge and approval of all other Defendants to further the goals of their conspiracy.

233.   Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to their general business partners, Defendants Sean Combs and Love Records.  As the financial supplier of Defendants Sean Combs and Love Records, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, had a duty to direct and control the manner in which Defendants Sean Combs and Love Records, used the money they supplied. In furtherance of the goals of their conspiracy, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, used the Love Album as a ruse to provide Defendants Sean Combs and Love Records with the financial resources he used to execute his RICO enterprise.  Throughout the relevant period, Defendants Sean Combs and Love Records used the financial resources their general business partners provided to solicit potential artists, creatives, musicians, and producers.  As detailed throughout, they relied on the mail, email, social media, text messages, and WhatsApp messages to disseminate the misleading information described herein and profit from the free

labor of these artists, creatives, musicians, and producers.  In addition to the forced free labor, they used their power and influence to force these creatives to solicit sex workers and to engage in unwanted sexual encounters with these sex workers.  They also used their power and influence to force these creatives to purchase, transport, and distribute illegal firearms and drugs.  As the general business partner of Defendants Sean Combs and Love Records, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, are equally liable for the commission of these acts.

234.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to Defendants Sean Combs and Love Records through wire transfers to Defendants Sean Combs and Love Records accountant Robin Greenhill.  Upon information and belief, Ms. Greenhill ensured the wiring, funds transfer, or cash payments to sex workers were completed.  Defendant Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul, would negotiate the fees the sex workers received and would ensure that the workers are paid in one of the manners detailed above.   According to Plaintiff Jones, Defendant Sean Combs bragged about having several women on a monthly stipend.  According to Plaintiff Jones, the women who received these payments are Caresha Romeka Brownlee, aka "Yung Miami," Jade Ramey, aka "Jade," and Daphne Joy Cervantes Narvaez, aka, "Daphne Joy" who were paid a monthly fee to work as Mr. Combs' sex workers.  Based on information and belief, they received payment via wire transfer from Robin Greenhill.  It is unclear if they were provided the appropriate United States federal tax documents for these payments or if they independently declared these payments on their taxes.  It is unclear if Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, requested an audit of Defendants Sean Combs and Love Records' financial records to ensure the financial support they provided to Defendants Sean Combs and Love Records as part of their general business partnership was not being used to pay Caresha Romeka Brownlee, Jade Ramey, and Daphne Joy Cervantes Narvaez.

235.   During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Complaint.

236.   Beginning at an exact date unknown to Plaintiff, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

237.   The acts set below ("Racketeering Acts") followed the same pattern and purpose: to defraud the Plaintiff for the Defendants' benefit.  Each Racketeering Act involved the same or similar methods of commission and participants.

238.   The Defendants' business would not have succeeded without the repeated predicate acts and the ability to conduct their fraud using mail, telecommunications wires, interstate travel, international travel, and money laundering.

239.   The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to solicit potential artists, creatives, musicians, and producers.  As detailed throughout, they relied on the mail, email, social media, text messages, and WhatsApp messages to disseminate the misleading information described herein and profit from the free labor of these artists, creatives, musicians, and producers.  In addition to the forced free labor, they used their power and influence to force these creatives to solicit sex workers and to engage in unwanted sexual encounters with these sex workers.  They also used their power and influence to force these creatives to purchase, transport, and distribute illegal firearms and drugs.

240.   The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiff Jones and the artists, creatives, musicians, and producers to utilize their talents and labor to produce music, and other tangible goods and services without full compensation.  In addition to the forced free labor, they used their power and influence to force these creatives to solicit sex workers and to engage in unwanted sexual encounters with these sex workers.  They also used their power and influence to force these creatives to purchase, transport, and distribute illegal firearms and drugs.

241.   The Defendants' wrongful conduct has injured Plaintiff Jones, remains part of their ongoing business practices, and continues to threaten Plaintiff Jones and the public.

242.   Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

243.   To further their goals, Defendants worked in concert to engage in various forms of criminal activity, including the solicitation of sexual encounters with sex workers and the purchasing and distribution of illegal firearms and drugs.

244.   The defendant's ongoing racketeering activity has injured and continues to injure Plaintiff Jones.  The Defendants' pattern of forcing Plaintiff Jones and the artists, creatives, musicians, and producers to solicit sexual encounters with sex workers and to purchase, transport, and distribute illegal drugs and firearms was the proximate cause of the injuries suffered by Plaintiff.

**Defendants Committed Multiple Acts of Sex Trafficking in Violation of 18 U.S.C. § 1591 (Sex trafficking of children or by force, fraud, or coercion) in Furtherance of the Enterprise**

245.   As detailed throughout this pleading, Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul knowingly affected interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting by any means a person (Plaintiff Jones) to engage in illegal sex acts.  In addition to violating federal law, these acts violated the following state statutes: Florida, Penal Code 796.07(2)(f); California, Penal Code 647(b); New York, Penal Code 230.05; and USVI, Penal Code tit. 14, § 1622.

246.   In addition to violation of laws in the United States territory, Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul's actions, may have violated the laws of Saint-Barthélemy.

247.   As detailed throughout this pleading, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to Defendants Sean Combs and Love Records.  Through their general business partnership, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, Universal Music Group, Love Records, Sean Combs, and by extension through Sean Combs, Justin Combs, Combs Enterprises, and Kristina Khorram knowingly

benefited, financially or by receiving anything of value, in a venture which has engaged in an act described in violation of paragraph (1) of 18 U.S.C. § 1591.

248.   Defendants Love Records, Kristina Khorram, Sean Combs, and by extension through Sean Combs, Justin Combs, and Combs Enterprises knowingly, or, except where the act constituting the violation of paragraph (1) 18 U.S.C. § 1591 advertised, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2) of 18 U.S.C. § 1591, or any combination of such means will be used to cause Plaintiff Jones to engage in several commercial sex acts.

249.   By way of example, on or about January 28, 2023[33], Plaintiff Jones[34] was residing in Defendant Combs' home at 2 Star Island Drive in Miami, Florida.  Defendants Sean Combs and Kristina Khorram forced Mr. Jones to send Ubers to transport a sex worker to Mr. Combs' home located at 2 Star Island Drive in Miami, Florida.  We have the complete text thread and have intentionally opted not to include it here to protect the identity of this sex worker. Defendant Combs forced Mr. Jones to have sex with this individual against his will. According to Mr. Jones, Defendant Combs felt there was too much testosterone in the studio and wanted sex workers there to create the vibe for the Love Album.  Upon information and belief, this Uber and this sex worker were compensated from the financial support Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide to Sean Combs and Love Records for the recording costs associated with the creation of the Love Album.

---

[33] According to Counsel for Defendants Lucian Charles Grainge, Motown Records, and Universal Music Group, they ended their general business partnership agreement with Mr. Combs and Love Records at some point during the month of February 2023.

[34] In the interest of preserving Plaintiff Jones Fifth Amendment rights, we will provide the remaining text messages, and voice memos to the Court in Camera.  It is important for the Court to remember that Plaintiff was coerced through threats of violence to engage in these acts.  Additionally, Defendants Khorram and Sean Combs controlled the purse, and would only allow Plaintiff to leave their custody and control based on their terms.



250.   By way of example, on or about February 8, 2023, Plaintiff Jones was forced by Defendants
Sean Combs and Kristina Khorram to send Ubers to transport a sex worker to and from Mr.
Combs' home located at 2 Star Island Drive in Miami, Florida.  We have the complete text
thread and have intentionally opted not to include it here to protect the identity of this sex
worker.  Defendant Combs forced Mr. Jones to have sex with this individual against his will.
According to Mr. Jones, Defendant Combs felt there was too much testosterone in the studio
and wanted sex workers there to create the vibe for the Love Album.  Upon information and
belief, this Uber and this sex worker were compensated from the financial support Defendants
Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and
Universal Music Group to provide to Sean Combs and Love Records for the recording costs
associated with the creation of the Love Album.



251. From at least in or about September 2022, up to and including in or about November 2023, in the States of New York, California, Florida, the USVI and elsewhere, Defendants Sean Combs and Kristina Khorram and others known and unknown, in and affecting interstate commerce, did knowingly combine, conspire, confederate and agree to recruit, entice, harbor, transport, provide, obtain, and maintain by any means a person, and to benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud and coercion, and combination of such means, would be used to cause the person (Plaintiff Jones) to engage in a commercial sex act, to wit, Defendants Sean Combs and Kristina Khorram and others known and unknown caused Plaintiff Jones to engage in commercial sex acts in the United States cities of Miami, Los Angeles, and New York, as well as within the special maritime and territorial jurisdiction of the United States by means of force, threats of force, fraud and coercion, and a combination of such means.

252.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the States of New York, California, Florida, the USVI, and elsewhere:

    a.   In or about September 2022, Defendant Sean Combs, through his authorized agent, Frankie Santella, recruited Plaintiff Jones to work for him as a producer, musician, and creative for Love Records.  Defendant Combs promised to pay Mr. Jones the following to work on the Love Album: $20,000.00 per song, four royalty points, Credit as producer, and Credit for each instrument Mr. Jones played.  Mr. Jones must retain his publishing rights.

    b.   In or about September 2022, Defendant Sean Combs began slowly grooming Plaintiff Jones by directly[35] teaching Mr. Jones how to go about recruiting sex workers.  He provided Mr. Jones with a Bad Boy Baseball cap, instructed his agents Stevie J., and Moy Baun to teach Plaintiff Jones the type of sex workers to solicit, and way to solicit them.

    c.   As part of his grooming of Plaintiff Jones, in or about December 2022, while on a Yacht, Defendant Combs bragged about and detailed how he got away with a New York City nightclub shooting in 1999.  In or about January 2023, while in his home in Miami, Defendant Combs required Mr. Jones to work out of his bedroom and watch as Defendant Combs distributed guns to individuals dressed in all black.  In or about April 2023 in Los Angeles, Defendant Combs required Mr. Jones to work out of his bedroom and watch as Defendant Combs distributed guns to individuals that Mr. Jones knew to be members of a local gang.  In or about April 2023, Defendant Combs threatened to eat Mr. Jones' face and informed him that he would not hesitate to kill his own mother to get what he wanted.

    d.   As evidenced by the chart below, at the direction of Defendants Combs and Kristina Khorram, Plaintiff Jones was forced to solicit the identified sex workers.  These workers were brought to Mr. Combs' homes at 2 Star Island Drive in Miami, Florida, and 1 Star Island Drive in Miami, Florida.  Plaintiff Jones had no authority to invite guests to Defendant Combs' home without either Defendant Combs' or Defendant

---

[35] We have a recording, taken my Mr. Combs at a club in Miami Florida.  This was the night that Mr. Combs personally taught Mr. Jones how to solicit sex workers.  We will provide a copy of the video to the court in camera.

Kristina Khorram's consent. Defendant Combs property is protected by 24-hour security, and all visitors must be verified before entry:

| Sex Workers and last two digits of their cellphone | Dates of forced solicitation | Location |
|---|---|---|
| Sex Worker 1 (98) | 1/30/23, 1/31/23, 2/1/23, 2/2/23 | 2 Star Island Drive in Miami, Florida. |
| Sex Worker 2 (87) | 2/8/23, 2/9/23, 4/4/23 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 3 (82) | 11/29/22, 1/26/23, 2/2/23, 2/4/23 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 4 (82) | 11/30/22, 12/1/22, 12/2/22 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 5 (77) | 2/1/23, 2/2/23, 2/4/23, 2/5/23 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 6 (43) | 1/28/23, 1/28/23 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 7 (31) | 12/3/22, 12/6/22, 1/26/23, 1/27/23, 1/29/23, 1/30/23, 4/1/23, 5/5/23, 5/6/23, 5/7/23, 5/8/23, | 2 Star Island Drive in Miami, Florida, and 1 Star Island Drive in Miami, Florida |
| Sex Worker 8 (72) | 5/8/23 | 2 Star Island Drive in Miami, Florida |

253.   From at least in or about September 2022, up to and including in or about November 2023, in the States of New York, California, Florida, the USVI, and elsewhere, Defendants Sean Combs and Kristina Khorram and others known and unknown, in and affecting interstate commerce, knowingly did recruit, entice, harbor, transport, provide, obtain, and maintain, by any means a person (Plaintiff Jones), and did benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud and coercion, and a combination of such means, would be used to cause the person to engage in a commercial sex act, to wit, Defendants Sean Combs and Kristina Khorram caused Plaintiff Jones to engage in

commercial sex acts utilizing force, threats of force, fraud and coercion, and a combination of such means. Additionally, Defendant Combs received personal gratification by watching Plaintiff Jones engage in commercial sex acts with the aforementioned sex workers.

254.   From at least in or about September 2022, up to and including in or about November 2023, in the States of New York, California, Florida, the USVI, and elsewhere, Defendants Sean Combs and Kristina Khorram and others known and unknown, in and affecting interstate commerce, did use and cause to be used facilities in interstate and foreign commerce, to wit internet and cellular telephone services, with the intent to promote manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, a business enterprise involving prostitution offenses in violation of applicable state law, and thereafter performed and attempted to perform an act to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of such unlawful activity.

**Defendants Committed Multiple Acts of procuring, transporting, and distributing controlled substances in Violation of Title 18, United States Code, Sections 1961(1) and 1961(5) Furtherance of the Enterprise**

255.   As detailed throughout this pleading, Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul, knowingly affected interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5). In addition to violating federal law, these acts violated the following state statutes: Florida, Penal Code 893.135; California, Health and Safety Code § 11352; New York, Penal Codes 220.77, 220.18, 220.50, and 220.06; and USVI, Penal Code tit. 19, § 614a.

256.   **The Combs Rico Enterprise**[36]: As detailed throughout this pleading, Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her

---

[36] "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C.S. § 1961 (LexisNexis, Lexis Advance through Public Law 118-40, approved March 1, 2024).

direct reports Frankie Santella, Moy Baun, and Brendan Paul, are an enterprise as the term is defined pursuant to 18 USCS § 1961 (4).  That is, a group of individuals associated, in fact, that engaged in, and the activities of which affected interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit to achieve the enterprise's objectives.

257.   Upon information and belief, the Combs Rico Enterprise is comprised of individuals residing in and around Los Angeles, California, Miami, Florida, New York, New York, among other places.  Members and associates of the Combs Rico Enterprise have engaged in drug trafficking and firearms trafficking.

258.   Upon information and belief, members and associates of the Combs Rico Enterprise procured, transported, and distributed ecstasy, cocaine, GHB, ketamine, marijuana, mushrooms, and tuci in and around the States of New York, California, Florida, the USVI, and elsewhere.  During the relevant timeframe, through their general business partnership, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to Defendants Sean Combs and Love Records.  According to the Habtemariam Declaration, this financial support was supposed to pay (or reimburse) Love Records for certain of the invoiced recording costs incurred by Love Records in making The Love Album.  According to Plaintiff Jones, while the Combs Rico Enterprise was procuring, transporting, and distributing ecstasy, cocaine, GHB, ketamine, marijuana, mushrooms, and tuci, it was during the making of The Love Album.

259.   **The purpose of the Combs Enterprise**: As detailed throughout this pleading, and according to Plaintiff Jones, the purpose of the Combs Enterprise is to:

    a.  Use its position, power, and influence to control artists, creatives, musicians, and producers to force these creatives to purchase, transport, and distribute illegal firearms and drugs,

    b.  Promoting and enhancing the prestige, reputation, and position of the enterprise with respect to rival music labels, artists and executives,

    c.  Preserving and protecting the power, territory, and criminal ventures of the enterprise through the use of intimidation, threats of violence, and coercion,

    d.  Keeping victims in fear of the enterprise and its members and associates,

    e.  Enriching the members and associates of the enterprise through criminal activity, including narcotics trafficking and fraud,

    f.  Concealing the activities of the enterprise from law enforcement by instructing the associates of the enterprise to consult with Faheem Muhammed, the enterprise head of security, if they ever encounter any problems with law enforcement.

260.  **Methods and Means of the Enterprise**:  Upon information and belief, among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

    g.  Members of the enterprise and their associates procured, transported and distributed ecstasy, cocaine, GHB, ketamine, marijuana, mushrooms, and tuci by packing these substances in their carry-on luggage and going through TSA.  Plaintiff Jones personally witnessed members of the enterprise do this during national and international travel, as detailed below:

| Enterprise Member | Approximate Dates of Travel | Location: (Starting and destination) |
|---|---|---|
| DeForrest Taylor | 11/22/2022 | Los Angeles, California to Miami, Florida |
| Brendan Paul | 12/22/2022 | Miami, Florida to Saint Barthélemy[37] |
| Brendan Paul[38], and Kristina Khorram | 04/28/2023 | Los Angeles – to New York City – Virginia – to Los Angeles |
| Brendan Paul[39] | 11/4/2023 | Los Angeles, California to London England[40] |

[37] Mr. Jones is uncertain if it was a direct flight or if he stopped off in Los Angeles or New York prior to his arrival to Saint Barthélemy.
[38] Brendan and Kristina Khorram brought drugs.  Plaintiff and the Combs Rico Enterprise were rehearsing for "something in the water festival" in Virginia. Plaintiff Jones personally witness Mr. Combs do a few lines of coke in his dressing room.  Defendant Sean Combs wanted tuci but Brendan forgot it, so Defendant Kristina Khorram called Yung Miami. Who then brought it on the private jet from Miami.
[39] Packed cocaine in his carryon luggage in the garage of Defendant Combs house the evening of 11/3/2023.
[40] Defendant Combs and Giggs reunited in London, England on November 7, 2023, for a sold-out show at O2 Shepherd's Bush Empire.   https://www.voice-online.co.uk/entertainment/music/2023/10/30/hip-hop-titans-giggs-and-diddy-to-perform-special-one-night-only-event/

261.   According to Mr. Jones, the Combs Enterprise defendants informed the members and associates of the enterprise that it would be safe to transport narcotics through in their carryon luggage because according, to a TSA advisory, TSA security officers do not search for marijuana or other illegal drugs[41].

262.   The following is a screenshot of a video taken on Mr. Combs' yacht on or about December 25, 2022, at 2:40 am; Brendan Paul is videotaped with one of the black pouches Defendant Combs, and Kristina Khorram required the associates and members of the Combs Rico Enterprise to carry.  This pouch was filled with ecstasy, cocaine, GHB, ketamine, marijuana, mushrooms, and tuc:



---

[41] https://www.tsa.gov/travel/security-screening/whatcanibring/items/medical-marijuana#:~:text=Accordingly%2C%20TSA%20security%20officers%20do,to%20a%20law%20enforcement%20officer.

263.   The pattern of racketeering activity through which Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul, together with others, agreed to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise consisted of multiple offenses involving dealing in controlled substances, in violation of Title 21, United States Code, Sections 841, 843 and 846. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

**Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

264.   Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs out of money, relying on the mail.  They committed these acts with the intent to defraud Plaintiff Jones and the artists, creatives, musicians, and producers.

265.   Defendants used the mail to execute the fraudulent scheme herein.

266.   Specifically, the Defendants agreed to each of the acts of mail fraud described throughout this Complaint.  In addition, They agreed to rely on the mail to secure wire frauds and cash payments from purchasers of the illegal firearms and drugs they required others to sell and distribute.

267.   In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants, either individually or in combination with themselves, used and caused to be used the U.S. mail by both placing and causing to be placed cash, letters, marketing materials, advertisements, agreements and other matters in depositories and by removing or causing to be removed letters and other mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. § 1341.

268.   Defendants could not have furthered their fraud without the use of the mail.  For example, Defendants sought to acquire wire transfers and cash payments and to utilize their talents and labor to produce music and other tangible goods and services without full compensation. Defendants also required the mail to distribute misleading advertisements to various states, including New York.  For these reasons, the use of mail to conduct fraudulent activity was necessary and inevitable.

**Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

269.   Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff out of money, in reliance on the mail.  Defendants committed these acts with the intent to defraud Plaintiff Jones and the artists, creatives, musicians, and producers.

270.   Specifically, Defendants agreed to each of the acts of wire fraud described throughout this Complaint.  In addition, Defendants agreed to rely on interstate wires to disseminate funds and to submit payment to sex workers and prostitutes, as well as to transfer payment for the distribution and procurement of drugs and guns.  Defendants illegally acquired wire transfers, money transfers, credit cards, and bank cards via search engines and other online platforms to further their collective goal of furthering their RICO enterprise.  Defendants knew that these online purchases were illegally made.

271.   Additionally, Defendants agreed that Defendants should facilitate these fraudulent purchases over interstate wires in furtherance of the fraud.  Sex workers and prostitutes nationwide have received payment from Defendants.

272.   In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants, either individually or in combination with themselves, used or caused to be used interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343..

273.   Defendants could not have furthered their fraud without the ability to use telecommunications to share information with clients and retailers nationwide.  Because Defendants needed to communicate with clients and retailers around the country, using interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable.

274.   Plaintiffs have been damaged in their business or property because Defendants violated 18 U.S.C. § 1962(a), (c)-(d)), and, therefore, he is entitled to recover the damages and other remedies enumerated therein..

275.   Defendants' acts or omissions were actuated by actual malice and a willful and wanton disregard for the consequences suffered by Plaintiff and with knowledge of a high degree of probability of harm to Plaintiff and reckless indifference to the consequences of their acts or omissions.

276.   Compensatory damages alone will be insufficient to deter such conduct in the future.  There needs to be a criminal referral to the United States Justice Department, as well as to the States Attorney General's Office.

**WHEREFORE,** Plaintiff requests that the Court issue an Order and grant Judgment to the Plaintiffs as follows:

    a.  Granting Plaintiff statutory, common law, and punitive damages, and applicable pre- and post-judgment interest, in full recompense for damages;[42]

    b.  Entering judgment according to the declaratory relief sought;

    c.  Granting Plaintiff such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

    d.  Granting Plaintiff an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

## SECOND CAUSE OF ACTION
### SEXUAL ASSAULT AND SEXUAL HARASSMENT
### (against Mr. Combs)

277.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

278.   As described above, Mr. Combs frightened and placed Plaintiff in apprehension of harm when he physically and sexually assaulted him from October 2022 to October 2023 in Mr. Combs' home in Miami, New York, the United States Virgin Islands, and Los Angeles.

279.   Mr. Combs forcibly touched and attempted and/or threatened to touch Plaintiff's intimate areas and/or touched Plaintiff with his own intimate body parts.

280.   Mr. Combs violently gripped and palmed Mr. Jones' anus and crotch without consent.  Mr. Combs forced Mr. Jones to work in Mr. Combs' bathroom and watch Mr. Combs as he showered.  Mr. Combs forced Mr. Jones to work in the studio while Mr. Combs stripped naked to get his body massaged.  Mr. Combs forced Mr. Jones to work while Mr. Combs walked around naked.

281.   As a result of Mr. Combs' conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which he is entitled to an award of monetary damages and other relief.

---

[42] Damages shall include, but not be limited to, all damages permitted under the New Jersey Racketeer Influenced and Corrupt Organizations Act.

282.   Mr. Combs' conduct described above was willful, wanton, and malicious.  At all relevant times, Mr. Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

### THIRD CAUSE OF ACTION
### SEXUAL ASSAULT
### (against Jane Doe 1 (Yung Miami's Cousin))

283.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

284.   As described above, Jane Doe 1 frightened and placed Plaintiff in apprehension of harm when she physically and sexually assaulted him on Thanksgiving Day, 2022, in Mr. Combs's home in Miami, Florida.

285.   Jane Doe 1 forcibly touched and attempted and/or threatened to touch Plaintiff's intimate areas and/or touched Plaintiff with her own intimate body parts.  Jane Doe 1 used her mouth and performed oral sex on Plaintiff while he was urinating in the restroom.  The Plaintiff fought her off while Mr. Combs and his associates sat outside loudly laughing.  Jane Doe 1 then followed Mr. Jones outside of the restroom and began undressing in front of Mr. Combs and his associates, straddled Mr. Jones, and attempted to have forced sexual intercourse with him.

286.   As a result of Jane Doe 1's conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which he is entitled to an award of monetary damages and other relief.

287.   The conduct of Jane Doe 1 described above was willful, wanton, and malicious.  At all relevant times, Jane Doe 1 acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that her conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION
## PREMISES LIABILITY FOR THE SEXUAL ASSAULT COMMITTED BY
## JANE DOE 1 (YUNG MIAMI'S COUSIN)
### (against Mr. Combs)

288.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

289.   Mr. Jones was sexually assaulted by Jane Doe 1 in Miami, Florida, on Thanksgiving 2022. Mr. Combs was present while Mr. Jones was being assaulted by Jane Doe 1.  Mr. Jones was legally on the premises as a guest and invitee of Mr. Combs.  Jane Doe 1 was legally on the premises as a guest and invitee of Mr. Combs.  Mr. Combs owned the premises and had dominion and control over the premises where Mr. Jones was harmed.  Mr. Combs had dominion and control over the actions of Jane Doe 1 and failed to step in and stop Jane Doe 1 from sexually assaulting Mr. Jones.

290.   As the property owner, Mr. Combs had a duty to protect Mr. Jones from the harm he suffered at the hands of Jane Doe 1.  Mr. Combs breached his duty when he failed to stop Jane Doe 1 from sexually assaulting Mr. Jones.  In furtherance of this breach, Mr. Combs was laughing and encouraging Jane Doe 1 to continue her assault on Mr. Jones.  Mr. Jones has suffered immensely because of Mr. Combs' intentional breach of his duty to him.

291.   As a result of Mr. Combs's breach of his duty, Mr. Jones has suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages, for which he is entitled to an award of monetary damages and other relief.

292.   Mr. Combs's conduct described above was willful, wanton, and malicious.  At all relevant times, Mr. Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION
## PREMISES LIABILITY FOR THE SEXUAL ASSAULT COMMITTED
## BY CUBA GOODING, JR.
### (against, Mr. Combs)

293.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

294.   Here, Mr. Jones was sexually assaulted by Cuba Gooding Jr. on a yacht rented by Mr. Combs in the US Virgin Islands in January 2023.   Mr. Combs was present while Cuba Gooding Jr. was assaulting Mr. Jones.   Mr. Jones was legally on the premises as a guest and invitee of Mr. Combs.   Cuba Gooding Jr was legally on the premises as a guest and invitee of Mr. Combs.   Mr. Combs owned (through renting) the premises and had dominion and control over the premises where Mr. Jones was harmed.   Mr. Combs had dominion and control over the actions of Cuba Gooding Jr and failed to step in and stop Cuba Gooding Jr from sexually assaulting Mr. Jones.

295.   As the owner of the property, Mr. Combs had a duty to protect Mr. Jones from the harm he suffered at the hands of Cuba Gooding Jr.   Mr. Combs breached his duty when he failed to stop Cuba Gooding Jr from sexually assaulting Mr. Jones.   In furtherance of this breach, Mr. Combs encouraged Cuba Gooding Jr to continue his assault on Mr. Jones when he said that Cuba Gooding Jr should privately get to know Mr. Jones better.   Mr. Jones has suffered immensely because of Mr. Combs's intentional breach of his duty to him.

296.   As a result of Mr. Combs' breach of his duty, Mr. Jones has suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages, for which he is entitled to an award of monetary damages and other relief.

297.   Mr. Combs' conduct described above was willful, wanton, and malicious.   At all relevant times, Mr. Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.   By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## SIXTH CAUSE OF ACTION
### TRAFFICKING AND VICTIMS' PROTECTION ACT
### (against, Defendants Sean Combs, Justin Combs, Kristina Khorram, And Combs Global)

298.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

299.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knowingly and intentionally participated in, perpetrated, assisted, supported, and facilitated a sex-

trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

300.   Among other things, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Mr. Jones, as well as other Class Members, knowing that Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Mr. Jones, as well as others, some of whom were under the age of seventeen, to engage in commercial sex acts.

301.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global and its employees had actual knowledge that they were perpetrating and facilitating Mr. Combs' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Mr. Jones as well as others who were under the age of seventeen, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

302.   Despite such knowledge, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global intentionally paid for, facilitated, perpetrated, and participated in Mr. Combs' violations of 18 U.S.C. § 1591(a)(1), which Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knew, and were in reckless disregard of the fact that Mr. Combs would coerce, defraud, and force Mr. Jones to engage in commercial sex acts.

303.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's actions were in and affecting interstate and foreign commerce, including its music distributing and publishing activities which were in and affecting interstate and foreign commerce.

304.   By taking the concrete steps alleged in this complaint, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knowingly participated in sex trafficking and furthered the Combs' sex-trafficking venture.  The concrete steps constituted taking part in the sex-trafficking venture and were necessary for its success.  The concrete steps constituted active engagement by Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global in Mr. Combs's sex-trafficking venture.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knew that its active engagement would lead to and cause coercive commercial sex trafficking.

305.   As part of perpetrating TVPA violations, between on or about September 12, 2022, and through about November 2023, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global concealed its delivery of hundreds of thousands of dollars in cash to Mr. Combs and his associates.

306.   In addition to perpetrating TVPA violations, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global willfully failed to file required taxes with the federal government.

307.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's affirmative conduct was committed knowing, and in reckless disregard of the facts, that Mr. Combs would use cash and the financial support provided by Defendants Love Records, Motown Records, and the Universal Music Group as a means of defrauding, forcing, and coercing sex acts from Plaintiff Jones as well as others.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's conduct was outrageous and intentional.   On or about January 2023, Justin Combs engaged in a freak-off session on a yacht with his father and sex workers.

308.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's knowing and intentional conduct has caused Mr. Jones serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

309.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's knowing and intentional conduct has caused Mr. Jones harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, to avoid incurring that harm.

310.   This case does not involve mere fraud.   Instead, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's criminal conduct in perpetrating TVPA violations was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs

Global's criminal conduct was directed specifically at Mr. Jones, who was the victim of Mr. Combs' sexual abuse and sex trafficking harassment.

311.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's outrageous and intentional conduct in this case is part of a pattern and practice of profiting by undertaking illegal "high risk, high reward" actions.

312.   By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global are liable to Mr. Jones for the damages they sustained, and reasonable attorneys' fees.

313.   By virtue of these intentional and outrageous violations of 18 U.S.C. § 1591(a)(1), 1595, Defendants Sean Combs, Justin Combs, and Kristina Khorram are liable to Mr. Jones.

## SEVENTH CAUSE OF ACTION
### AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595
### (against Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group)

314.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

315.   Defendants Lucian Charles Grainge in his capacity as CEO of UMG, authorized Motown Records, and Universal Music Group to enter into a general partnership agreement with Sean Combs and Love Records.   As general business partners each individual member is responsible for the actions of the partners of the partnership. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, authorized Motown Records, and Universal Music Group to provide financing to Sean Combs, and Love Records, Inc. According to the Habtemariam Declaration this financial support was supposed to pay (or reimburse) Love Records for certain of the invoiced recording costs incurred by Love Records in making The Love Album.   According to Plaintiff Jones, while the Combs Rico Enterprise was engaging in sex trafficking activities it was during the making of The Love Album.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group did not implement any mechanism to monitor how the Mr. Combs and Love Records, Inc. was spending the money.   As a result of their intentional or negligent failure of their duty to supervise, Defendants Lucian Charles Grainge in his

capacity as CEO of UMG, Motown Records, and Universal Music Group aided, abetted, and induced Sean Combs' sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

316.   The crimes that Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group aided and abetted are (1) Mr. Combs's perpetrating of coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(1), and (2) Mr. Combs' co-conspirators knowingly benefitting from coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate and foreign commerce.

317.   Mr. Combs' co-conspirators benefitted financially and received things of value from their participation in the Combs sex-trafficking venture, including payments and other compensation from Mr. Combs. The co-conspirators who benefitted financially include Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun.

318.   Under 18 U.S.C. § 2, as a result of their general business partnership with Defendant Sean Combs, and Love Records, Inc., and their failure to monitor their financing of Defendants Sean Combs and Love Records, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group are punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, counseled, commanded, induced, and procured Combs' and his co-conspirators sex-trafficking venture and sex trafficking of Plaintiff Jones, as well as others.

319.   Under 18 U.S.C. § 2, as a result of their general business partnership with Defendant Sean Combs, and Love Records, Inc., and their failure to monitor their financing of Defendants Sean Combs and Love Records, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, inducing, and procuring Combs' and his co-conspirator's sex-trafficking venture and the sex trafficking of Mr. Jones. As a consequence, Mr. Jones is a victim of Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun's criminally aided, abetted, and inducing Combs' and his co-conspirators' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2).

320.   Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing the sex-trafficking venture and the sex trafficking of Plaintiff Jones.  Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun themselves directly violated Chapter 77 by committing and perpetrating these violations.

321.   Among other things, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun aided, abetted, and induced Combs' and his co-conspirators' sex-trafficking venture and sex trafficking of Plaintiff Jones knowing that Combs and his-conspirators would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Mr. Jones to engage in commercial sex acts.

322.   By aiding, abetting, and inducing Mr. Combs' and his co-conspirators' sex-trafficking venture and sex trafficking of Plaintiff.  Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun benefited, both financially and by receiving things of value, from participating in Combs' sex-trafficking venture.

323.   Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun and its employees had actual knowledge that they were aiding, abetting, and inducing Combs' and his co-conspirators' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Mr. Jones as well as others, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.  Defendants knew, and should have known, that Mr. Combs had engaged in acts in violation of the TVPA.

324.   Despite such knowledge, and through their intentional or negligent failure to monitor how their financial support of Mr. Combs and Love Records was being spent, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group financed and aided, abetted, and induced Combs' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew or should have known if they had conducted a simple investigation, and acted in reckless disregard of the fact that, Combs would coerce, defraud, and force Mr. Jones to engage in commercial sex acts.

325.   Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's affirmative conduct of blindly financing Defendant Combs and Love Records, Inc. aided, abetted, and induced Combs'.  Their violations were committed knowingly, and in reckless disregard of the facts, that Mr. Combs would use the financial support provided by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group as a means of defrauding, forcing, and coercing sex acts from Mr. Jones.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Groups conduct was outrageous and intentional.

326.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's knowing and intentional conduct of aiding, abetting, and inducing Combs's violations has caused Mr. Jones serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

327.   Through their unchecked financial support Defendants Sean Combs, and Love Records, Inc., Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's aided, abetted, and induced Combs's violations and caused Mr. Jones harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

328.   This case does not involve mere fraud.  Instead, Defendants' criminal conduct in aiding, abetting, and inducing Combs's violations of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's criminal conduct was directed specifically at Mr. Jones, who was the victim of Mr. Combs's sexual abuse and sex trafficking organization.

329.   Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's outrageous and intentional conduct in this case is part of a

pattern and practice of Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group profiting by undertaking illegal "high risk, high reward" general business partnerships.

330.   By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group are liable to Mr. Jones for the damages he sustained and reasonable attorneys' fees.

331.   By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group are liable to Mr. Jones for punitive damages.

## EIGHT CAUSE OF ACTION
### NIED (FOR SEXUAL ASSAULT)
**(against Defendant Jane Doe 1 (Yung Miami's Cousin))**

332.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

333.   Jane Doe 1's conduct created an unreasonable risk of causing emotional distress to Plaintiff, and Jane Doe 1 knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

334.   The Plaintiff's emotional distress was foreseeable to Jane Doe 1.

335.   As a direct and proximate result of the negligent conduct of Jane Doe 1, Plaintiff suffered and will continue to suffer severe emotional distress.

336.   Jane Doe 1's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## NINTH CAUSE OF ACTION
### NIED (FOR SEXUAL ASSAULT)
**(against Mr. Combs)**

337.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

338.   Mr. Combs' conduct created an unreasonable risk of causing emotional distress to Plaintiff, and Plaintiff knew or should have known that such conduct was likely to result in emotional distress that might and/or would likely cause illness or bodily harm.

339.   The Plaintiff's emotional distress was foreseeable to Mr. Combs.

340.   As a direct and proximate result of the negligent conduct of Mr. Combs, Plaintiff suffered and will continue to suffer severe emotional distress.

341.   Mr. Combs' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TENTH CAUSE OF ACTION
### IIED (FOR SEXUAL ASSAULT)
### Defendant Jane Doe 1 (Yung Miami's Cousin)

342.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

343.   Jane Doe 1 engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

344.   The sexual assault and misconduct by Jane Doe 1 were extreme and outrageous conduct that shocks the conscience.

345.   These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

346.   As a direct and proximate result of Jane Doe 1's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

347.   The Defendant's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## ELEVENTH CAUSE OF ACTION
### IIED (FOR SEXUAL ASSAULT)
### (against Mr. Combs)

348.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

349.   Mr. Combs engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

350.   The sexual assault and misconduct by Mr. Combs were extreme and outrageous conduct that shocks the conscience.

351.   These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

352.   As a direct and proximate result of Mr. Combs' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

353.   The Defendant's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWELFTH CAUSE OF ACTION
## IIED (FOR SEXUAL ASSAULT)
### (against Mr. Gooding, Jr.)

354.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

355.   Mr. Gooding, Jr. engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

356.   The sexual assault and misconduct by Mr. Gooding, Jr. were extreme and outrageous conduct that shocks the conscience.

357.   These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

358.   As a direct and proximate result of Mr. Gooding, Jrs' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

359.   The Defendant's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## THIRTEENTH CAUSE OF ACTION
## NIED (FOR SEXUAL ASSAULT)
### (against Mr. Gooding, Jr.)

360.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

361.   Mr. Gooding, Jrs' conduct created an unreasonable risk of causing emotional distress to Plaintiff, and Plaintiff knew or should have known that such conduct was likely to result in emotional distress that might and/or would likely cause illness or bodily harm.

362.   The Plaintiff's emotional distress was foreseeable to Mr. Gooding, Jr.

363.   As a direct and proximate result of the negligent conduct of Mr. Gooding, Jr., Plaintiff suffered and will continue to suffer severe emotional distress.

364.   Mr. Gooding, Jr.s' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## FOURTEENTH CAUSE OF ACTION
### SEXUAL ASSAULT
### (against Mr. Gooding, Jr.)

365.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

366.   As described above, Mr. Gooding, Jr. frightened and placed Plaintiff in apprehension of harm when he physically and sexually assaulted him on a yacht chartered by Mr. Combs in the USVI.

367.   Mr. Gooding, Jr. forcibly touched and attempted and/or threatened to touch Plaintiff's intimate areas and/or touched Plaintiff with his own intimate body parts.  Mr. Gooding, Jr. used his hand and forcibly touched Plaintiff while he was in sitting on the yacht.  The Plaintiff pushed him off while Mr. Combs failed to intervene.

368.   As a result of Mr. Gooding, Jr.'s conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which he is entitled to an award of monetary damages and other relief.

369.   The conduct of Mr. Gooding, Jr. described above was willful, wanton, and malicious.  At all relevant times, Mr. Gooding, Jr. acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.


## FIFTEENTH CAUSE OF ACTION
### KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 1591(A)(2), 1595
### (against Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group)

370.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

371.   Upon information and belief, through their general business partnership with Defendants Sean Combs and Love Records, Inc., and their financing of the establishment of Love Records and the Love Album, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group knowingly and intentionally benefitted,

financially and by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2)Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, took many concrete steps to aid and participate in Mr. Combs' sex-trafficking venture.  Among the concrete steps that Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, took to aid Mr. Combs was providing unfettered access to financing, which made the sex-trafficking venture possible. Providing Mr. Combs with large sums of U.S. currency caused Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, to receive the benefits detailed throughout this pleading.  Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Groups, willingness to provide large sums of unchecked financing to Mr. Combs was the quid pro quo for it receiving the benefits detailed within this pleading from Mr. Combs.

372.   Upon information and belief, the financing that Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, provided was necessary for Mr. Combs to coerce Plaintiff Jones to engage in commercial sex acts.  The financing directly formed part of the commercial nature of the sex acts.  The financing was also a necessary and required part of Mr. Combs' recruitment of Plaintiff Jones, as well as other sex workers.  By providing unchecked financing, Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew or should have known that the money would be used to fund the sex trafficking venture.  Through their general business partnership with Defendants Sean Combs and Love Records, Inc., Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, actively participated in the recruitment of victims of the venture.

373.   Upon information and belief, the unchecked financing that Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, provided went far beyond providing routine partnership or compensation to a general business partner.  It was far from routine for Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, to provide substantial financing throughout the years to Mr. Combs, who did not have an apparent legitimate need for such

extravagant sums.   The sheer number of "listening parties," yacht parties, and nighttime writers camp after parties, which Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, either intentionally or unintentionally funded, went far beyond normal for the music industry.   Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew or should have known through reasonable inquiry that they were feeding Mr. Combs sexual deviancy.   Moreover, the circumstances in which Mr. Combs requested such large amounts were far from routine and should have raised numerous "red flags"—taking it well outside routine circumstances.

374.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, provided large sums of financing to Mr. Combs, which, under the circumstances of this case, was entirely inconsistent with the ordinary duties of a record label, music group, publishing partner, or general business partnership member.

375.   Upon information and belief, the reason that Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, ignored the numerous red flags about Mr. Combs was to receive financial benefits from Mr. Combs and his sex-trafficking venture.   Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew that it would gain far-from-routine financial benefits by ignoring the red flags associated with Mr. Combs and by participating in his sex- trafficking venture.

> a.   Upon information and belief, among the concrete steps that Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group took to aid and participate in the Combs sex-trafficking venture were opening up numerous lines of finance for Mr. Combs's production of the Love Album. By opening these unchecked lines of finance, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, received many benefits from participating in Mr. Combs's venture.   Through their general business partnership agreement with Defendant Sean Combs and Love Records, Inc., they adopted by association the intentional acts of their general business partner, Sean Combs, and Love Records, Inc.'s affirmative conduct that caused Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group to receive those benefits.
>
> b.   Upon information and belief, among the concrete steps that Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, took to aid the Combs sex- trafficking venture between about 2003 -

2005, 2009-2015, and 2022 and continuing through about November 2023, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group concealed its delivery of vast sums financing (likely millions of dollars) to Mr. Combs and his associates.  To benefit from the Combs sex-trafficking venture, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, willfully failed to do their due diligence and ensure that their general business partners, Defendants Sean Combs and Love Records, Inc. accurately accounted for all of the financing that they received as it relates to the establishment of Love Records, Inc., and distribution of Love Album by timely filing required tax disclosures surrounding the funding of these sex trafficking parties with the federal government, because doing so would imperil its ability to profit from the sex-trafficking venture.  Due to their status as a general business partner of Defendant Combs and Love Records, Inc., Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, were equally liable for the concealment of the financial transactions caused it to receive financial benefits through the continuation of the Combs sex-trafficking venture.

c. Upon information and belief, among the concrete steps that Defendants Lucian Charles Grainge took in his capacity as CEO of UMG, Motown Records, and Universal Music Group took to aid the Combs sex- trafficking venture was its failure to ensure that their general business partners Sean Combs and Love Records, Inc. followed AML requirements.  This failure was not just passive facilitation but a deliberate omission by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group.  This omission was a specific act of concealment, which allowed Combs to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented. Combs paid for his sex workers through cash payments or wire transfers.

d. Upon information and belief, by taking the concrete steps outlined above (along with the others alleged in this complaint), Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowingly participated in sex trafficking and furthered the Combs sex-trafficking venture.  The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success.  The concrete steps above constituted active engagement by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group in Combs's sex- trafficking venture.

e. Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Mr. Combs, with Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's knowledge, or their reckless disregard of the fact, that Combs would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff Jones, as well as others, some of whom were under the age of seventeen, to engage in commercial sex acts.

f. Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew, through years of

lawsuits, hush money settlements, and notice that was provided by Ms. Cassie Venture at the beginning of 2023, that Mr. Combs was engaging in sex trafficking, and that Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group was participating in a particular sex-trafficking venture—i.e., the coercive Combs sex-trafficking venture outlined above through their general business partnership deal with Defendants Sean Combs and Love Records, Inc. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's knowledge went far beyond having an abstract awareness of sex trafficking in general.  Indeed, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's representatives, were present at Chalice Recording Studios and in Mr. Combs' Miami and Los Angeles homes while he was actively engaging in acts enumerated in this pleading, and the large sum of financing that Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group gave him access to.  Thus, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, did not simply fail to adequately detect signs of Combs' sex trafficking; it did detect multiple signs of Combs' coercive sex-trafficking venture and continued to participate in the venture.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew or should have known that the venture was ongoing, which was why Combs required vast sums of financing.

g.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's actions, extend well beyond a situation of failing to train themselves and their staff about recognizing the warning signs of sex trafficking.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's employees, did recognize the signs of Combs' sex trafficking.  Upon information and belief, indeed, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's employees, knew about Combs' sex-trafficking venture.  But Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, decided to continue facilitating the Combs sex-trafficking venture rather than ending its participation in the venture.

h.  Upon information and belief, among the signs that Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, was facilitating Combs sex trafficking venture were those facts that came to the attention of Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group from the reporting of Cassie Ventura mentioned above.

i.  Upon information and belief, among the signs that Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, was facilitating Combs' sex trafficking venture were those facts that came to the attention of Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group were those facts that came to its attention through complaints filed by Cassie Ventura of Combs' sex trafficking.  Because of those complaints, Defendants Lucian Charles Grainge, in his capacity as

CEO of UMG, Motown Records, and Universal Music Group — knew to a certainty that Combs was engaged in sex trafficking.

j.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group and knew the names of many of Combs' sex trafficking/freak-off participants (Yung Miami, Daphne Joy, Stevie J, and Jade).

k.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, helped to conceal the names of Combs' victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture.  Among the ways in which Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, helped to conceal the venture's existence was by failing to properly monitor or audit Sean Combs and Love Records, Inc. to ensure that the finances they provided were being used in the manner outlined in the Habtemariam Declaration, as well as ensuring that the proper accounting and tax reporting was made to the federal government.  Additionally, they knew or should have known that Defendant Combs employed and empowered Faheem Muhammad to handle law enforcement and Defendant Khorram to compensate the sex workers.

l.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's concealment included failing to provide enhanced monitoring that is normally required in general business partnership agreements where one partner was providing the financing for the partnership.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, failed to implement enhanced monitoring of Mr. Combs to ensure that the finances they provided were being used for the purpose identified in Ms. Habtemariams's Declaration.  Upon information and belief, they failed to do this specifically to help conceal Combs' ongoing sex trafficking.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew that if it implemented that enhanced monitoring, it would have to stop providing Combs with the financing he needed to run his sex-trafficking venture.

m.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's concealment included failing to ensure that their general business partners, Sean Combs and Love Records, Inc. properly reported their financial support of Mr. Combs to the federal government for tax purposes.  This includes reporting all payments or wire transfers sent to Caresha Romeka Brownlee, Jade Ramey, and Daphne Joy Cervantes Narvaez.

n.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, had constructive knowledge of Combs' sex-trafficking venture because of specific acts by Mr. Combs that put it on notice of a particular and ongoing sex trafficking venture.  Among the specific acts were Combs' use of vast sums of financing and the club love parties that representatives of UMG periodically attended; Defendant Combs had drugs and sex workers present in circumstances that should have prompted Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group and its employees to raise questions about Combs's sex-trafficking, and

or his use of the financing provided to him by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group.

o. Also, among the specific acts giving rise to constructive knowledge were the facts that associates of Mr. Combs made numerous reimbursement requests to Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group through Mr. Combs' accountant Robin Greenhill. The circumstances of these reimbursement requests gave Defendants notice that Mr. Combs' sex-trafficking enterprise was being funded.

p. Upon information and belief, among the financial benefits that the Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group received for participating in and facilitating Combs' sex-trafficking venture were the affiliation and access to Mr. Combs' popularity. Before Cassie Ventura's lawsuit was filed, Mr. Combs was a popular and highly influential figure in the music industry to whom everyone wanted to connect. Mr. Combs was known for throwing the "best" parties. Affiliation with and/or general business partnerships with Mr. Combs garnered legitimacy, immense success, and access to top and emerging artists, celebrities, famous athletes, political figures, musicians, and international dignitaries like British Royal and Prince Harry. Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew first-hand the power, influence, and effect attaching themselves to Mr. Combs would have on their bottom-line and, as evidenced by their repeated general business partnership agreements with Mr. Combs from 2003-2005, 2009-2015, and 2022-2023. Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, profited from their affiliation with Mr. Combs and their general business partnership, which came with unmonitored financing that may have supported his sex-trafficking enterprise. Mr. Combs and Combs-controlled entities used the financing they received from their general business partners to facilitate their sex trafficking venture. Mr. Combs benefited from his general business partners' apparent willful blindness through their willingness to provide large amounts of financing in suspicious circumstances and their failure to ensure that their general business partners properly reported their financing to the U.S. Federal Government.

q. Upon information and belief, among the financial benefits that D Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group received for participating in Combs' sex-trafficking venture was the referral of business opportunities from Mr. Combs and his co-conspirators. Access to up-and-coming artists, producers, songwriters, and creatives. Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, profited from these referred business opportunities. Mr. Combs referred business opportunities to Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group in exchange for financing his sex trafficking venture. These referrals were a quid pro quo for Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's unchecked financing of the establishment of Love Records, Inc., and the funding and reimbursement for the invoiced expenses associated with the creation of the Love Album.

r.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowingly received financial benefits in return for its assistance, support, and facilitation of Combs' sex-trafficking venture.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew or should have known that if it stopped assisting, supporting, and facilitating Combs' sex-trafficking venture, it would no longer receive those benefits.

s.  Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew and was in reckless disregard of the fact that it was Combs's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce (private jets, yachts, and commercial airplanes) to entice, recruit, solicit, harbor, provide, obtain, and transport young women, and young men for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

t.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group and its employees had actual knowledge that they were facilitating Combs' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and propel Mr. Jones into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion, and a combination of all these means.

u.  Upon information and belief, despite such knowledge, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group intentionally paid for, facilitated, and participated in Combs' violations of 18 U.S.C. § 1591(a)(1), which Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew, and were in reckless disregard of the fact that Combs would coerce, defraud, and force Mr. Jones to engage in commercial sex acts.

v.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, through its employees and agents, actively participated in the sex trafficking conspiracy and led Mr. Jones and sex workers to believe that they would be rewarded if they cooperated and acquiesced to Mr. Combs' coercive demands.

w.  Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Mr. Combs would use the financial support provided by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group as a means of defrauding, forcing, and coercing sex acts from Mr. Jones.  Defendants Lucian Charles Grainge's capacity as CEO of UMG, Motown Records, and Universal Music Group's conduct was outrageous and intentional.

x.  Upon information and belief, in addition to actual knowledge that it was participating in and facilitating the Combs sex-trafficking venture, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

y.  Upon information and belief, in exchange for facilitating and covering up Combs' commercial sex trafficking, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, received international recognition, notoriety, and praise for the establishment of Love Records, Inc., and the development and distribution of the Love Album.  This was a result of securing the Sean Combs Love Records, Inc. relationship.

z.  Facilitating and covering up Combs' sexual trafficking and misconduct was a means of obtaining economic success and promotion within the Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group hierarchy.

aa. Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowing and intentionally conduct, has caused Mr. Jones serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

bb. Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowing and intentionally conduct has caused Mr. Jones harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing a commercial sexual activity, to avoid incurring that harm.

cc. This case does not involve mere fraud.  Instead, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, 's criminal conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Groups' willful blindness to Combs' criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's criminal conduct was directed specifically at Mr. Jones, who was the victim of Combs' sexual abuse and sex trafficking organization.

dd. Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's outrageous and intentional conduct, in this case, is part of a pattern and practice of Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group profiting by undertaking illegal "high risk, high reward" general business partnerships.

376.  By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, is liable to Mr. Jones for the damages he sustained and reasonable attorneys' fees.

///
///
///

## SIXTEENTH CAUSE OF ACTION
### OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)
### (against, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group)

377.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

378.   Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group and its officers and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

379.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group thereby violated Chapter 77, Title 18. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Mr. Jones by directly resulting in him coercively being caused to engage in commercial sex acts and in other ways.

380.   Upon information and belief, Defendant Sean Combs has a well-documented history of criminal investigations.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group were on notice of Mr. Combs proclivity to criminal activity.  They knew or should have known that Mr. Combs sex-trafficking operation would or could result in a criminal investigation by State and Federal prosecutors for violating (among other laws) the TVPA.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group should have taken a que from the Federal Prosecutors arrest and prosecution of Jeffrey Epstein on or about July 8, 2019.  On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein.  Mr. Combs, Defendants J. Combs, Khorram

and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun all engaged in the same activities as Mr. Epstein and Ms. Maxwell.  In fact, Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun may have done worse.

381.   Upon information and belief, by providing financing for Mr. Combs' sex trafficking organization, and concealing its actions thereafter, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group obstructed, interfered with, and prevented the state and federal government enforcement of the TVPA against Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun.  To the extent that the federal government was able to ultimately charge Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun with TVPA violations, the filing of those charges was delayed by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's actions.  Because of that delay, Mr. Jones was coercively caused to engage in commercial sex acts.

382.   As one example of how Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group obstructed, attempted to obstruct, interfered with, and prevented state and federal government's enforcement of the TVPA, Defendants Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group provided financial resources to Mr. Combs and so that the coercive commercial sex acts would escape the detection of state and  federal law enforcement and prosecuting agencies. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group provided financial resources to further the Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun sex-trafficking venture and with the purpose of helping Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun evade criminal liability for violating the TVPA.

383.   As an example of how Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group obstructed, attempted to obstruct, interfered with, and prevented state and federal government's enforcement of the TVPA, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal

Music Group failed to ensure that their general business partners, Sean Combs and Love Records, Inc. timely and accurately reported to the federal government the required tax forms that detailed the partnership payments provided by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group to Mr. Combs. Timely filing of these reports is required by the United States Tax code and related laws and regulations. These reports are tools that the federal government uses to detect and prosecute, among other illegal activities, sex trafficking in violation of the TVPA.  By failing to ensure that their general business partner timely and accurately filed, the required tax reporting documents regarding Mr. Combs' partnership financial transactions, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group obstructed, attempted to obstruct, interfered with, and prevented the government's enforcement of the TVPA by concealing from the government's attention Mr. Combs' financing in aid of sex trafficking.

384.   By providing unchecked financial support to Mr. Combs, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group intended and knew that Mr. Combs' coercive commercial sex acts would escape the detection of law enforcement and prosecuting agencies for some period of time. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group provided financial support to further the Combs sex-trafficking venture and with the purpose of helping Mr. Combs evade criminal liability for violating the TVPA.

385.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew that Mr. Combs was high risk— specifically, high risk to violate the TVPA through continuing criminal sex trafficking activities.  As evidenced by Cassie Ventura's civil complaint, she informed members of Mr. Combs parent label about the abuses he was visiting upon her, and instead of coming to her rescue, they forced her to return his calls and to return to his sex trafficking enterprise.

386.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group was aware Mr. Combs had a laundry

list of criminal charges, and barely escaped serving prison time.  Upon information and belief Mr. Combs engaged in witness intimidation, and bribery to escape criminal liability for shooting Natania Reuben in the face.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group was aware that there were public allegations that Mr. Combs illegal conduct was facilitated by several named co-conspirators.  They were made aware of this through complaints made my Cassie Ventura, and the lawsuit by former Diddy sex worker Jonathan Oddi.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group concealed from federal the government its numerous financial payments to Mr. Combs and Love Records, Inc. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group continued its affirmative conduct of providing financing to Mr. Combs so that he could make payments to his co-conspirators with knowledge that such transactions did not produce a clear paper trail. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by investigators and prosecuting agencies.

387.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's relationship with Mr. Combs in providing to his sex- trafficking venture with unchecked financing went far beyond a normal (and lawful) partnership relationship. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew, and intended, that its relationship with Mr. Combs would go far beyond a normal music industry relationship. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew that its decision to go beyond a normal music relationship with Mr. Combs obstructed the ability of law enforcement and prosecuting agencies to enforce the TVPA.

388.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction of the government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group intentionally and willfully caused Mr. Combs' commission of the

forcible commercial sex acts with Mr. Jones through its obstruction supporting the concealment of Mr. Combs' sex-trafficking venture. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew that Mr. Combs and his other co-conspirators would use means of force, threats of force fraud, coercion, and a combination of such means to cause Mr. Jones to engage in commercial sex acts.

389.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Mr. Combs with men, like Plaintiff Jones, young men, and young women.

390.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction has caused Mr. Jones serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

391.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction has caused Mr. Jones harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity to avoid incurring that harm.

392.   Upon information and belief, this case does not involve mere fraud. Instead, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction was directed specifically at Mr. Jones who was the victim of Mr. Combs' sex trafficking organization.

393.   By virtue of these violations of 18 U.S.C. § 1591(d), Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group is liable to Mr. Jones for the damages he sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

**SEVENTEENTH CAUSE OF ACTION**
**Breach of Oral Contract**
**(against, Love Records, and Sean Combs)**

394.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

395.   Plaintiff Jones and Defendants Mr. Combs and LR had an oral contract for Mr. Jones to receive $20,000 for every song he produced on the Love Album.  Mr. Combs agreed to allow Mr. Jones to keep his publishing, as well as 4 royalty points per song, and to credit him as a producer for every song that he touched, as well as credit him for each instrument he played.

396.   Mr. Jones fully executed his obligations under the contract when he produced: *Deliver Me, Stay PT 1, Reachin', What's Love, Stay Awhile, Moments, Need Somebody, Homecoming*, and *Tough Love.*

397.   Mr. Jones worked on the following songs: *Brought My Love, and Creepin Remix.*

398.   Mr. Jones lived and traveled with Mr. Combs from September 2022 to October 2023. Through the duration of that time Mr. Combs did not compensate Mr. Jones for his time or the work he did on the above-mentioned songs.  Mr. Combs also failed to provide Mr. Jones with producer credit, or 4 royalty points for all songs.

399.   As a result of Mr. Combs' actions, Mr. Jones has suffered the following losses: $180,000, 4 royalty points, and producer credit for the following songs: *Deliver Me, Stay PT 1, Reachin', What's Love, Stay Awhile, Moments, Need Somebody, Homecoming*, and *Tough Love.*

400.   As a result of Mr. Combs' actions, Mr. Jones has suffered the following losses: $40,000, 4 royalty points, and producer credit for the following songs: *Brought My Love, and Creepin Remix.*

401.   As a result of Mr. Combs' breach of contract, Mr. Jones has suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages for which he is entitled to an award of monetary damages and other relief.

402.   The conduct of Mr. Combs described above was willful, wanton, and malicious.  At all relevant times, Mr. Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury to Plaintiff Jones.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

    a.   A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the State of New York;

    b.   An award of damages against Defendant, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

    c.   An award of damages against Defendant, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

    d.   An award of punitive damages, in an amount to be determined at Trial;

    e.   Prejudgment interest on all amounts due;

    f.   An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

    g.   Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: March 25, 2024
Brooklyn, New York

                      T. A. BLACKBURN LAW, PLLC.
                      By: *Tyrone Blackburn, Esq.*
                      Tyrone A. Blackburn, Esq.
                      Attorney for Plaintiff
                      1242 E. 80th Street, 3rd Floor
                      Brooklyn, New York 11236

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors.  From this point forward, you are directed to prevent "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed.  Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses.  This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information.  You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

Regarding the paper information, you are directed to preserve any emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents about the controversy, parties, or witnesses.  We expect to obtain several documents and other data from you through discovery, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in

this case, arises independently from any order on such motion.  Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents.  Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media.  We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence.  Due to its format, electronic information is quickly deleted, modified, or corrupted.  Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter.  This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this Complaint's delivery date, relevant evidence should not be destroyed.  You must take the steps necessary to avoid the destruction of such evidence.

Dated: March 25, 2024
Brooklyn, New York

T. A. BLACKBURN LAW, PLLC.
By: *Tyrone Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
Attorney for Plaintiff
1242 E. 80th Street, 3rd Floor
Brooklyn, New York 11236


## DEMAND FOR INSURANCE COVERAGE

Defendants are demanded to provide a complete copy of their applicable insurance policies and declaration sheets demonstrating coverage within thirty (30) days of service of this Complaint.

Dated: March 25, 2024
Brooklyn, New York

T. A. BLACKBURN LAW, PLLC.
By: *Tyrone Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
Attorney for Plaintiff
1242 E. 80th Street, 3rd Floor
Brooklyn, New York 11236