**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RODNEY JONES, <br><br> Plaintiff, <br><br> v. <br><br> SEAN COMBS, <br> JUSTIN DIOR COMBS, <br> ETHIOPIA HABTEMARIAM, <br> LUCIAN CHARLES GRAINGE, <br> KRISTINA KHORRAM, <br> CHALICE RECORDING STUDIOS, <br> LOVE RECORDS, <br> MOTOWN RECORDS, <br> UNIVERSAL MUSIC GROUP, <br> COMBS GLOBAL ENTERPRISES, <br> JOHN and JANE DOES 1-10; and <br> ABC CORPORATIONS 1-10, <br><br> Defendants. | CASE NO.:  24-1457 <br><br><br> **DECLARATION OF DONALD S. ZAKARIN IN SUPPORT OF DEFENDANTS' UNIVERSAL MUSIC GROUP, MOTOWN RECORDS AND SIR LUCIAN GRAINGE MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

I, Donald S. Zakarin, declare as follows:

1.      I am a member of Pryor Cashman LLP, counsel for Defendants Sir Lucian Grainge CBE, Ethiopia Habtemariam and Motown Records (a division of UMG Recordings, Inc.).  Plaintiff has also named Universal Music Group as a defendant but there is no such juridical entity.  Universal Music Group is an umbrella name commonly used to refer to all of the various companies and record labels that are encompassed within UMG Recordings, Inc.  I therefore assume that Plaintiff has misnamed Universal Music Group, intending to actually name UMG Recordings, Inc., and I will refer to Universal Music Group herein as UMG Recordings, Inc. ("UMG Recordings").  I have personal knowledge of the facts set forth in this Declaration and if called and sworn as a witness, I could and would competently testify thereto.

1

2.      Before I turn to the falsity of the Plaintiff's First Amended Complaint, I want to address the wholly unauthorized and improper filing of a purported Second Amended Complaint, which was filed at or about midnight on March 26, 2024.  Because it was unauthorized, we intend to move against the only authorized amended complaint, the First Amended Complaint. However, I note that I specifically wrote to both this Court and to Mr. Blackburn and advised that we would not consent to his filing a Second Amended Complaint that did not dismiss our clients (collectively the "UMG Defendants") from this action.  Mr. Blackburn had no authority to amend as of right.

3.      In any event, having reviewed the Second Amended Complaint, it is, if anything, even more offensively false than the First Amended Complaint and this time Mr. Blackburn cannot attribute the falsity to his client.  Without the slightest factual basis – indeed contrary to the declaration of Ethiopia Habtemariam, on which he purports to base the Second Amended Complaint's newly invented allegations – Mr. Blackburn has completely jettisoned every single one of the original foundational and utterly false allegations of the First Amended Complaint, on which all of the claims against the UMG Defendants were based and has fabricated, all by himself, entirely different foundational allegations for the claims against the UMG Defendants.

4.      First, whereas the First Amended Complaint alleged that Motown Records was the "parent company" of Love Records, Inc (and as shown below and in the accompanying declarations, that allegation was knowingly false), Mr. Blackburn has now swapped that out for the new foundational and indisputably false allegation that Motown Records and/or UMG Recordings were in a "general partnership" with Love Records, Inc. or Mr. Combs.

5.      Second, the First Amended Complaint alleged that both Sir Lucian Grainge and Ms. Habtemariam were supposedly aware of the alleged sex trafficking by Combs because, in

detailed paragraphs, Plaintiff and Mr. Blackburn recount that Plaintiff saw them at "listening parties" where there were underage girls and sex workers allegedly being given alcohol and drugs and being molested.

6.      These completely false allegations (as documented below and as I said in my letter to Mr. Blackburn on March 4, 2024, Sir Lucian was never in any of Mr. Combs' homes) have now been completely jettisoned.  Instead, without the slightest basis, Mr. Blackburn has invented an entirely new theory that lacks the slightest factual basis: because Motown Records was obligated to pay recording costs under the license agreement that gave it the right to distribute the Love Records, Inc. album (which is a commonplace commercial transaction), Mr. Blackburn blithely tosses off his own conclusions that the money was excessive and that it was supposedly used by Combs for illicit purposes and that the UMG Defendants were obligated to know that and prevent it.[1]

7.      Third, whereas the First Amended Complaint alleged that the UMG Defendants supposedly aided and abetted Combs' alleged sex trafficking activities by handing over "cash" to Combs (even alleging it was millions of dollars of cash), these allegations too are now jettisoned. Instead, the unauthorized Second Amended Complaint now alleges that the UMG Defendants wired or made payments to Love Records (no longer the "bags of cash" Mr. Blackburn previously alleged) which they supposedly should have known would be used by Combs to support the alleged sex trafficking activity.

---

[1] Even though the unauthorized Second Amended Complaint is clearly the handiwork of Mr. Blackburn and not the Plaintiff, unlike the First Amended Complaint, which made virtually no allegations on "information and belief," in the unauthorized Second Amended Complaint, Mr. Blackburn plainly hoping to find a safe harbor that might spare him Rule 11 sanctions, litters "information and belief" allegations throughout the pleading and attributes the allegations to his client.  I think it clear that these "caveats" are a pretense.  It is Mr. Blackburn's handiwork.

8.      In short, without bothering to identify any of the massive changes he has made in the unauthorized Second Amended Complaint regarding the allegations against the UMG Defendants, Mr. Blackburn has completely eliminated every single basis alleged in the First Amended Complaint for the allegations he made against the UMG Defendants and, without having any factual basis for the new alleged bases for the claims, has simply invented entirely new bases for the same claims.  Mr. Blackburn's indifference to the requirements of Rule 11 and the obligations of attorneys practicing in our courts could not be made clearer than by his unauthorized Second Amended Complaint.

9.      And where do these new and completely contrary foundational allegations come from?  Certainly not from any investigation into the facts conducted by Mr. Blackburn.  He has plainly done none.  The only basis for the new allegations, which pervade the entirety of the unauthorized Second Amended Complaint, trying to sweep UMG Recordings, Motown Records and Sir Lucian Grainge into this case, is the short declaration provided by Ms. Habtemariam in return for Mr. Blackburn's agreement to drop her from this case.

10.     But Ms. Habtemariam's declaration, attached to the purported Second Amended Complaint, says nothing about a "general partnership" between UMG Recordings or Motown Records and Love Records, Inc.  In fact, she says the exact opposite.  Ms. Habtemariam also says there were no cash payments, only payments under the license agreement for invoiced expenses.

11.     As Ms. Habtemariam states in the declaration attached to the purported Second Amended Complaint, Motown Records entered into a **license agreement** with Love Records, Inc. to distribute an album.  It did not enter into a "partnership" of any sort and most assuredly

not a general partnership.[2]  And she says that under the license agreement, Motown Records paid for invoiced recording costs and expenses.

12.     So what did Mr. Blackburn do with this information which refuted the bases of his completely false allegation in the First Amended Complaint (paragraph 9) that Motown Records was the "parent company" of Love Records, Inc. and that the UMG Defendants supposedly provided Combs or Love Records with "cash?"  Instead of complying with Rule 11 by inquiring about the license agreement referenced by Ms. Habtemariam (and referenced as well in my March 4, 2024 letter to him), he conducted no inquiry whatsoever.  He did the exact opposite.  He simply invented a new theory – the non-existent "general partnership."

13.     And instead of the allegation in the First Amended Complaint about the UMG Defendants supposedly bringing Combs bags of "cash," he invented the assertion that Combs misused the completely legitimate payments due under the license agreement for his alleged sex trafficking activity (ignoring that money is fungible and that Combs is a very rich man – according to Forbes, in 2022 his net worth exceeded $1 billion).  Under this newly minted and completely false assertion, the UMG Defendants should somehow have been able to distinguish between Combs' own monies and their payments under the license agreement and known that payments made in the ordinary course of a commercial business transaction (but apparently not Combs' own funds) would allegedly be misused.  It is a completely absurd and baseless assertion.

14.     And because Sir Lucian Grainge was never at Combs' homes (and Ms. Habtemariam was never there when Plaintiff was there and never saw any alleged sex

---

[2] As I discuss below, the press reports about Motown Records "partnership" with Love Records, Inc. with respect to the album could not be clearer: it was no partnership in any legal sense.  It was simply a colloquial way of describing the distribution license agreement for the album.

trafficking, Mr. Blackburn now relies instead on the license agreement payments and the unsupported (and completely invented) assertion that the UMG Defendants somehow should have known that such payments, but not Combs' own monies, would allegedly be misused by Combs.

15.     As Mr. Blackburn noted in his March 23, 2024 letter to this Court, I have been a member of the bar of this Court for nearly 50 years.  In all that time, I have never seen any attorney display anything remotely like the utter indifference shown by Mr. Blackburn towards his obligations as an attorney.

16.     I have never seen any lawyer, in any pleading, in any Court, accuse people and companies of criminal conduct without the slightest basis and then try to file an amended pleading completely jettisoning every allegation underpinning the original claims and substituting completely different and irreconcilable allegations to support the very same claims.

17.     I cannot think of anything that could more clearly demonstrate Mr. Blackburn's contempt for the most basic obligations imposed on attorneys practicing in this Court (indeed in any Court).  He filed a pleading making offensive criminal accusations against Sir Lucian Grainge, Ethiopia Habtemariam, UMG Recordings and Motown Records that was knowingly or recklessly false and as to which, as shown below, he did not conduct the slightest inquiry in compliance with Rule 11.  When he obtained a declaration (and my March 4, 2024 letter) that conclusively demonstrated that the allegations against our clients lacked any factual or legal basis, instead of dismissing the claims, which is exactly what he should have done, he doubled down on filing dishonest pleadings in this Court.

18.     Desperate for the press attention he seems to crave, Mr. Blackburn invented completely different and completely false foundational assertions.  And then he filed, without

6

any authorization, a Second Amended Complaint filled with offensively false allegations of criminal behavior against Sir Lucian Grainge, UMG Recordings and Motown Records when he had no factual basis for doing so.

19.     If this Court permits Mr. Blackburn's Second Amended Complaint, we will file a second motion to dismiss against it.  But to aid the Court in considering whether to allow Mr. Blackburn to file a further offensively false pleading against our clients, we are filing this motion to dismiss the First Amended Complaint.  And we will file a Rule 11 motion that will now be underscored by this new unauthorized filing by Mr. Blackburn.

**The Motion To Dismiss the First Amended Complaint**

20.     I submit this declaration in support of the motion of Defendants Sir Lucian Grainge (CBE), Ethiopia Habtemariam, Motown Records and UMG Recordings (sometimes collectively referred to herein as the "UMG Defendants") to dismiss the Complaint on the following bases: (i) under Federal Rule 12(b)(2) for lack of personal jurisdiction; (ii) under Federal Rule 12(b)(3) for improper venue; (iii) under Federal Rule 8(a)(2) and (d)(1) for failure to plead in simple and concise statements; and (iv) under Federal Rule 12(b)(6) for failure to state a claim.  In addition, I submit this declaration in support of the motion of the UMG Defendants pursuant to Federal Rule 12(f) to strike impertinent and scandalous material from the Amended Complaint.[3]

21.     There are two primary purposes for this declaration.  The first is, hopefully, to assist the Court by summarizing the undisputed facts set forth in the declarations of Sir Lucian

---

[3] On March 23, 2024, Plaintiff submitted a letter to this Court indicating he intended to dismiss Ms. Habtemariam from this case.  According to the docket, as of March 25, 2024, he has filed a notice of dismissal of Ms. Habtemariam.  Assuming that she is dismissed, the references herein to Ms. Habtemariam as a defendant will no longer be operative but she remains our client in connection with this case.

Grainge, Martha Braithwaite and Ms. Habtemariam and providing a roadmap through the facts establishing the factual and legal baselessness of the First Amended Complaint and the UMG Defendants' entitlement to its dismissal.  These declarations show not only the lack of personal jurisdiction over the UMG Defendants but that the accusations that have been leveled against them are knowingly (or at least, recklessly) false, accusations that could not have been made in good faith had Plaintiff and his counsel complied with their obligations under Rule 11 of the Federal Rules of Civil Procedure.  A copy of Sir Lucian Grainge's declaration is attached hereto as Exhibit 1.  A copy of Ms. Braithwaite's declaration is attached hereto as Exhibit 2.  A copy of Ms. Habtemariam's declaration is attached hereto as Exhibit 3.

22.     The second purpose of this declaration is to address the patent pleading deficiencies of the First Amended Complaint, deficiencies which are not merely correctable pleading defects but are instead wholesale failures to plead any facts (and, as set forth in the accompanying Memorandum of Law, the claims against the UMG Defendants have no legal merit).  As I will document below, Plaintiff and his counsel have filed a 70-plus-page pleading filled with undifferentiated group allegations and naked conclusions that have no basis in fact (but instead are completely contrary to the actual facts).

### A.  Pursuant to FRCP Rule 12(b)(2), There Is No Personal Jurisdiction Over Sir Lucian Grainge and Ms. Habtemariam

23.     First of all, as set forth in the accompanying declarations of Sir Lucian Grainge and Ms. Habtemariam, there is no basis for personal jurisdiction over them in this Court.  The First Amended Complaint (a copy of which is attached hereto as Exhibit 4) admits, in Paragraphs 8 and 10 that they both live in Los Angeles.  The sole "contacts" identified in the First Amended Complaint between them and any activity that allegedly occurred in New York is not only non-

specific (¶¶ 214, 220, 222 and 343(f)) but, as set forth in the accompanying declarations, is untrue.

24.     Moreover, every other defendant (with the exception of a "Combs Enterprises') is also alleged to be based in Los Angeles, and the activities complained of all took place in California or Florida.  Based on my review of online sources, it appears that Combs Enterprises (which has changed its name) is a limited liability company organized under Delaware law and owned by Mr. Combs.  I am informed as well that it is headquartered in Florida but I assume that the Combs' defendants will address this point.

25.     However, even if there were personal jurisdiction over Combs Enterprises – and no facts are pleaded that would warrant personal jurisdiction (nor is there anything showing that Combs Enterprises, whatever it is, had anything to do with this matter) – and even if that somehow provided, under the RICO statute, a basis for jurisdiction over people and entities having nothing to do with the claims or New York, because the RICO claims against the UMG Defendants are so factually and legally baseless, the objection to personal jurisdiction is and should be preserved here.

26.     The First Amended Complaint also alleges that Plaintiff resides in both Los Angeles and New York (with no specificity provided as to either address).  Indeed, in Paragraph 16, the First Amended Complaint alleges that the Plaintiff is from the "Windy City," Chicago. Thus, it appears that venue may not be proper in this Court as neither Plaintiff nor Defendants (nor the claims) appear to have any substantial connection to New York.

**B.   The First Amended Complaint Violates FRCP Rule 8**

27.     Rule 8 of the Federal Rules requires that Complaints contain short and plain statements and be simple and concise.  The First Amended Complaint is anything but.  Just by

way of example, the RICO claim (the First Cause of Action, ¶¶ 199-246), consists largely of group pleadings, referring generally to "defendants" without any specificity as to who did what and when.  It is entirely conclusory, reciting the statute but identifying virtually no facts.  And yet, it contains multiple paragraphs filled with contain general and sweeping conclusions that defy any ability to respond (¶¶ 208-209, 216-217, 220, 222).[4]

28.     But the pleading flaws of the RICO claim are at least equaled by the First Amended Complaint's sex trafficking claims against the UMG Defendants (the Ninth, Fourteenth and Fifteenth Causes of Action).  Without identifying any specific acts (other than the completely conclusory, unsupported and false assertions about providing Mr. Combs with "cash," which will be discussed further below), the First Amended Complaint accuses the UMG Defendants with "aiding and abetting" Mr. Combs' supposed "sex trafficking venture;" participating in and benefiting from the alleged "sex trafficking venture" and obstructing enforcement of the sex trafficking laws under 18 USC § 2 (which does not provide a private right of action).

29.     The allegations are both entirely conclusory and violate FRCP Rule 8.  Paragraph 343 is perhaps the most glaring example: it starts on page 65 of the First Amended Complaint and continues on, in 32 single-spaced lettered non-factual and conclusory (and redundant) paragraphs, to page 71.  That is anything but a short, plain and concise statement of the claim.

---

[4] As set forth in the accompanying declarations of Sir Lucian Grainge, Ms. Braithwaite and Ms. Habtemariam and as will be discussed below, the main premise of the RICO claims against the UMG Defendants - that because Motown Records supposedly owned Love Records, Inc. these defendants had a duty to supervise and control Mr. Combs - is completely untrue.

**C. The First Amended Complaint Contains Prejudicial And Scandalous Accusations In Violation of FRCP Rule 12(f)**

30.    As discussed in detail in the accompanying declarations, and as any review of the First Amended Complaint shows, it is filled with outrageously offensive accusations against Sir Lucian Grainge, Ms. Habtemariam, Motown Records and UMG Recordings.  From the gratuitous inclusion of Sir Lucian Grainge's address and his picture (and that of Ms. Habtemariam) to the offensive RICO and sex trafficking allegations that have no basis in fact, the First Amended Complaint should be stricken.

**D. The First Amended Complaint Should Be Dismissed Pursuant to FRCP Rule 12(b)(6) For Failure to State A Claim For Relief Against the UMG Defendants**

**(i) Neither Motown Records Nor Any Other UMG Recordings Company Has Ever Been the Parent Company of Love Records, Inc.**

31.    The First Amended Complaint hurls accusations of criminal racketeering and criminal sex trafficking against the UMG Defendants, respected individuals and companies having utterly nothing to do with Plaintiff's claims (which are entirely based on his alleged interactions with Sean Combs and various of Mr. Combs' associates and companies).  As detailed in the accompanying declarations of Sir Lucian Grainge, Ms. Braithwaite and Ms. Habtemariam, these accusations are recklessly false and, but for the fact that they are embodied in a complaint, would be libelous per se (I am aware that Mr. Blackburn has engaged in publicity for his lawsuit that takes him out from the protections of the litigation privilege).

32.    As set forth in Sir Lucian Grainge's declaration (¶¶ 12-14), one foundational premise for the claims against the UMG Defendants is the assertion, in Paragraph 9 of the First Amended Complaint, that Motown Records is the "parent company" of Love Records, Inc. (Love Records, Inc. being the company that allegedly failed to pay Plaintiff the additional

$21,000 he conceives he was entitled to receive for his alleged work on the album being recorded by Mr. Combs).

33.     Citing no facts to support this allegation, the First Amended Complaint leaps to the conclusion, asserted in the RICO claim (First Cause of Action), the Negligent Security claim (Eighth Cause of Action) and the sex trafficking claims (Ninth, Fourteenth and Fifteenth Causes of Action) that the UMG Defendants had a duty to exercise control and supervision over Mr. Combs, as their alleged employee, supposedly arising out of an alleged "respondent superior" relationship – I assume Mr. Blackburn meant "respondeat superior."

34.     The First Amended Complaint then alleges that Motown Records and UMG Recordings failed to provide security at a Chalice Recording Studios, a recording studio where there was allegedly a shooting (Eighth Cause of Action) and that Sir Lucian Grainge and Ms. Habtemariam both allegedly attended, and failed to prevent, what the First Amended Complaint alleges were "listening" parties at Mr. Combs' homes in Los Angeles, Miami and New York at which there were supposedly sex workers and underage girls who were all plied with alcohol and drugs (the Ninth, Fourteenth and Fifteenth Causes of Action).[5]

35.     The linchpin of all of these claims – the assertion that Motown Records was the parent company of Love Records, Inc. and that duties and obligations sprang from that alleged ownership that were not performed – is based on nothing but a conclusion casually tossed into Paragraph 9 of the First Amended Complaint.  Not only is it unsupported, it is completely false.

36.     As detailed in the accompanying declarations of Sir Lucian Grainge and Martha Braithwaite, neither Motown Records nor any other UMG Records company ever had any

---

[5] In a Rule 11 letter sent to Plaintiff's counsel, Mr. Blackburn by Jonathan Davis, counsel for the Combs Defendants, Mr. Davis documented that the allegations of the First Amended Complaint about a shooting at Chalice Studios are categorically false.

interest in Love Records, Inc. (instead, Motown Records only had a briefly operative arm's length license agreement to distribute one album, entered into in May 2022 and terminated as of February 1, 2023).  Nevertheless, to test Mr. Blackburn's compliance with Rule 11, I personally did my own research, using only publicly available sources.  It took me approximately 5 minutes to confirm, from public sources, that Love Records, Inc. is not owned by or even affiliated with any UMG Records company.

37.     First, I went online to the Delaware Secretary of State's business search and found that Love Records, Inc. was incorporated on January 7, 2021.  A screen shot of the information is attached hereto as Exhibit 5.  Thus, the incorporation of Love Records, Inc. preceded any relationship with Motown Records by over a year.  That, at the least, should have been a red flag alerting Plaintiff and Mr. Blackburn to the possibility that Love Records, Inc. was not owned by Motown Records.

38.     Then I went online to see what was publicly reported, if anything, about Motown Records entering into a license agreement with Love Records, Inc.  By inputting Love Records and Motown Records, I immediately obtained news articles about Love Records, Inc. being a Sean Combs record label and announcing that Love Records, Inc. entered into a one album deal with Motown Records in May 2022.  A copy of one such article is attached hereto as Exhibit 6.  This too should have been, at least, a red flag.

39.     I then searched online to see if there were any publicly available information about whether Love Records, Inc. was a label affiliated with any UMG company  Indeed, such a list was readily available.  Attached hereto as Exhibit 7 is a list of all of the labels and entities that are affiliated with or distributed by UMG Recordings that I obtained from a simple search asking for record labels that are affiliated in some way with UMG Recordings.  Love Records,

Inc. is not mentioned.  Again, this should have been a third red flag telling Plaintiff and Mr. Blackburn that their allegation that Motown Records was the "parent company" of Love Records, Inc. was inconsistent with public information.

40.     Plaintiff and his counsel could have easily done the same search.  They clearly did not bother (because it would have prevented them from making the claims they wanted to assert).  As set forth in the accompanying declaration of Ms. Braithwaite, neither Motown Records nor any of UMG Recordings' subsidiaries or affiliates has any ownership interest in Love Records, Inc.  Instead, she negotiated and executed an arm's length license agreement, for a limited term, on behalf of Motown Records with Love Records, Inc. in May 2022, more than a year after Love Records, Inc. was formed by Mr. Combs in Delaware.  And as Ms. Braithwaite's declaration states, Love Records, Inc. was represented by Kenneth Meiselas, Sean Combs' long-time transactional counsel.[6]

41.     So where did Plaintiff and his counsel, Mr. Blackburn, obtain this information about Motown Records supposedly being the parent company of Love Records, Inc.?  Based on my review of the publicity regarding the license agreement between Motown Records and Love Records, Inc. in May 2022, at best, without any investigation into the facts, they selectively chose to "rely" on the colloquial and shorthand reference in some press reports (and publicity on Motown Records' website) to the license agreement between Motown Records and Love Records, Inc. as a "partnership" with respect to the single album subject to the license agreement.

42.     However, even if one were willing to suspend disbelief and instead assume that this was Plaintiff's and Mr. Blackburn's basis for the allegation that Motown Records was the

---

[6] As Ms. Braithwaite's declaration also states, this license agreement was terminated as of February 1, 2023.

"parent company" of Love Records, Inc., the reference to a "partnership" with respect to the album is actually contrary to the allegation.  Partners do not own each other.  Attached hereto as Exhibit 8 are the press reports published in Billboard and in Revolt about the license agreement. Even these press reports make clear that Love Records was Mr. Combs' label and Motown would be "partnering" with Love Records to release a single album from Love Records.

43.     Moreover, the First Amended Complaint does not speak of any alleged partnership.  It claims, with no basis at all (and contrary to the documented and easily obtainable public information that I referenced above), that Motown Records was the parent company of Love Records, Inc.  That is something that Plaintiff and Mr. Blackburn made up.

44.     I would also note that Paragraph 16.11 of the May 4, 2022 license agreement between Motown Records and Love Records (attached as Exhibit A to the declaration of Ms. Braithwaite), specifically provides that Motown Records and Love Records are independent contractors and are not partners (and that neither Love Records nor Mr. Combs are the employees of Motown Records).

**(ii) Sir Lucian Grainge Has Never Been To Any Of Combs' Homes**

45.     In addition to fabricating the assertion that Motown Records owned Love Records, Inc., the First Amended Complaint also alleges that Sir Lucian Grainge attended what Plaintiff and his counsel have described as "freak off" parties at Mr. Combs' homes in Los Angeles, Miami and New York where underage girls and sex workers were allegedly plied with drugs and alcohol (and sexually preyed upon, as Plaintiff claims he was).  These allegations, along with the baseless claim that Motown Records was the parent of Love Records, Inc., underpin Plaintiff's accusations that the UMG Defendants were involved in a criminal

racketeering enterprise and that they participated in, aided and abetted and obstructed inquiry into sex trafficking activities allegedly engaged in by Mr. Combs.[7]

46.     But as detailed in the accompanying declarations of Sir Lucian Grainge and Ms. Habtemariam, in addition to the false assertion that Motown Records was the parent company of Love Records, Inc., the second underlying premise of these claims – that Sir Lucian Grainge and Ms. Habtemariam were present in Mr. Combs' homes when these alleged activities occurred – is also categorically false.  Sir Lucian Grainge has **never** been to any of Mr. Combs' homes (Grainge Decl. ¶ 15) and Ms. Habtemarian was never at any home of Mr. Combs, other than having visited Mr. Combs' home in Los Angeles four (4) times and all four of those occasions preceded the commencement (in September 2022) of Plaintiffs claimed involvement with Mr. Combs and Love Records, Inc. (First Amended Complaint ¶ 24; Habtemariam Decl. ¶¶ 5-11).

47.     So the tale Plaintiff tells in the First Amended Complaint about seeing Sir Lucian Grainge and Ms. Habemariam at Mr. Combs' various homes at which there were allegedly underage girls and sex workers and drugs present is entirely fabricated.

48.     Because the allegations about the presence of Sir Lucian Grainge and Ms. Habtemariam are completely false, Sir Lucian Grainge and Ms. Habtemariam never witnessed any of the alleged "sex trafficking" activities, had no knowledge that they occurred (assuming that they occurred) and had no ability to prevent them.  And because Motown Records was not the parent company of Love Records, Inc., Sir Lucian Grainge and Ms. Habtemariam had no duty or obligation to supervise Mr. Combs to begin with (and no ability to do so).

---

[7] No date is provided for any of these alleged "parties," other than one in Miami that supposedly occurred on Thanksgiving in 2022 and one in July 2023.  As stated in their declarations, Ms. Habtemariam was never at Mr. Combs' home in Miami (and Sir Lucian Grainge was never at any of Mr. Combs' homes) and Ms. Habtemariam left Motown Records in November 2022.

49.     I would also add that, with respect to the RICO claim asserted against the UMG Defendants, as set forth in the accompanying Memorandum of Law, in addition to the factual falsity of underlying bases for the claim, the claim, which is based solely on conclusory assertions (largely parroting the statute), fails to satisfy the legal requirements for a RICO claim and should be dismissed.

### (iii) The First Amended Complaint's "Should Have Known" Allegations Are Chronologically Impossible

50.     In a strong indication that Plaintiff and Mr. Blackburn fully know that neither Sir Lucian Grainge nor Ms. Habtemariam were ever present when any alleged "sex trafficking" activity occurred, the First Amended Complaint tries to create an alternative basis for asserting its sex trafficking claims against the UMG Defendants by alleging that they should have known that Mr. Combs was engaging in alleged sex trafficking activity because of a complaint filed by a Cassie Ventura and a claim made by a Jonathan Oddi accusing Mr. Combs of sex trafficking (¶¶ 343(f) and (h), 353, 354).

51.     The First Amended Complaint carefully omits any information about the dates on which any alleged activity occurred (other than identifying a July 2, 2023 "listening party" in California, September 12, 2022 as the date of the alleged shooting at Chalice Studios and Thanksgiving 2022 for some alleged wrongful activity in Miami).

52.     First, as detailed above and in the accompanying declarations, the two underlying foundational bases for the "sex trafficking" claims – that Motown Records was supposedly the parent company of Love Records, Inc. and that Sir Lucian Grainge and Ms. Habtemariam were physically present when such alleged activity occurred – are completely false.  But the alternative theory, based on Ms. Ventura's complaint and Mr. Oddi's alleged claims supposedly providing the UMG Defendants with notice of Mr. Combs' alleged sex trafficking activity, is

both false and chronologically impossible.  Attached hereto as Exhibit 9 is the first page of Ms. Ventura's complaint against Mr. Combs.  It was filed on November 16, 2023.  Ms. Ventura's complaint was thus filed months after the last "listening party" identified in the First Amended Complaint.

53.     Equally important, as Ms. Braithwaite's declaration establishes, Motown's license agreement with Love Records, Inc. was terminated as of February 1, 2023, months before Ms. Ventura's complaint was filed (and that ended any relationship between the UMG Defendants and Mr. Combs and Love Records, Inc.).[8]

54.     In short, Plaintiff's and Mr. Blackburn's attempt to use Ms. Ventura's complaint and Mr. Oddi's allegations to manufacture an alternative basis for their recklessly false sex trafficking claims against the UMG Defendants is, as I stated above, chronologically impossible.  By the time these allegations were made public, the UMG Defendants had long since severed any involvement with Mr. Combs and Love Records, Inc.

**(iv) The First Amended Complaint's Allegations About The UMG Defendants Providing "Cash" to Mr. Combs are Completely Fabricated**

55.     The First Amended Complaint is littered with dozens of references to "cash," including completely unbelievable alleged promises by Mr. Combs to pay Plaintiff "$250,000 in cash" (as well as give him a $20 million home on Star Island).  As to the UMG Defendants, the First Amended Complaint claims, in purely conclusory and unsupported allegations, that the UMG Defendants provided "cash" to Mr. Combs (even fantasizing that it was "likely millions of

---

[8] In December 2023, Jonathan Oddi, who, according to public reports, was a porn actor and had been arrested at the Trump Doral Hotel in Miami in 2018 carrying a gun and threatening the then-President, claimed that he had, years ago, engaged in sexual activity with Ms. Ventura and Mr. Combs.  Even were this assertion true, it surfaced long after the events pleaded in the First Amended Complaint, after Plaintiff was no longer involved with Mr. Combs (¶ 24) and months after the license agreement between Motown Records and Love Records, Inc. was terminated.

dollars"), thereby supposedly enabling him to perpetrate his alleged sex trafficking activity (¶¶ 339, 340-343(b), (f), (k), (l), (o), (q), (y), 350-352 and 354).

56.     But there is literally not a single factual basis set forth for any of these "cash" allegations.  Instead, Plaintiff and Mr. Blackburn simply state and restate their naked conclusion, over and over again, that the UMG Defendants made "cash" payments to Mr. Combs without any facts supporting such outrageous assertions.

57.     Compounding their falsity (and actually confirming that Plaintiff and Mr. Blackburn know their "cash" payment allegations are complete fabrications), the First Amended Complaint also alleges that the UMG Defendants, supposedly to conceal and hinder the authorities from catching Mr. Combs, failed to make tax filings reflecting the alleged cash payments (¶¶ 351, 354).

58.     It is perfectly obvious that there is no possible way that Plaintiff or Mr. Blackburn could have any knowledge about any tax filings that the UMG Defendants did or did not make. Tax documents are not public records.  But I believe it is clear that, because Plaintiff and Mr. Blackburn know that their "cash" payment allegations are fabrications, they also know that the UMG Defendants would not have made any such tax filings because none would have been required.

59.     Thus, far from supporting the maliciously false cash payment allegations, the First Amended Complaint's claim that the UMG Defendants did not make any tax filings regarding these alleged cash payments serves only to confirm that Plaintiff and Mr. Blackburn knew that their "cash" payment allegations were completely baseless.  Either the allegations that the UMG Defendants failed to make tax filings were made without Plaintiff and Mr. Blackburn having any factual basis for the allegations (because they could not possibly know), or they knew the UMG

Defendants made no such tax filings because they knew there were no cash payments and no such filings needed to be made.

60.     In contrast to the knowingly false and defamatory "cash" payment allegations, as set forth in the accompanying declarations of Sir Lucian Grainge, Ms. Braithwaite and Ms. Habtemariam, under the terms of Motown Records' license agreement with Love Records, Inc., Motown Records was obligated to pay for or reimburse the invoiced recording costs incurred by Love Records, Inc. in connection with its production of the album it was recording, and it did so. It did not make cash payments to Mr. Combs or Love Records, Inc.  Paying or reimbursing recording costs is an unexceptional everyday commercial transaction in the recording industry.

### E.  It Is Indisputable That The First Amended Complaint Was Filed In Violation Of Plaintiff's And Mr. Blackburn's Obligations Under FRCP Rule 11

61.     When I obtained the First Amended Complaint in this action, I carefully reviewed it, investigated the facts and determined, to my satisfaction, that the allegations made against the UMG Defendants were baseless (and as shown in the accompanying Memorandum of Law, legally baseless as well).

62.     In light of the extraordinarily damaging accusations being leveled against my clients, accusing them of engaging in criminal behavior, including sex trafficking, I wrote to Mr. Blackburn to put him on notice that the allegations he had made against the UMG Defendants were completely false and demanded that he withdraw the claims against my clients.  A copy of my letter to him dated March 4, 2024 is attached hereto as Exhibit 10.   He has not done so.

63.     As this Court is aware, on March 23, 2024, Mr. Blackburn wrote to the Court advising that he intended to dismiss Ms. Habtemariam from this action, announcing he would be filing an amended complaint and making a series of assertions about me (and about Mr. Combs' counsel).

64.     I submitted a brief responsive letter on March 25, 2024.  As I stated, Plaintiff has no further right to amend as of right, having already amended once.  Also, Mr. Blackburn's assertions regarding our communications are materially inaccurate (which, based on the Amended Complaint he has drafted, appears to be something of a problem for Mr. Blackburn).

65.     I am aware that Mr. Combs' counsel also engaged in correspondence with Mr. Blackburn regarding his allegations.  I defer to Mr. Combs' counsel to address those allegations.

66.     The allegations made against my clients – particularly Sir Lucian Grainge – are horrific, conclusory and not only lacking in any factual support but they are completely false and I believe knowingly so (or at the very least, Plaintiff and Mr. Blackburn were recklessly indifferent to the falsity of their allegations).  But for the litigation privilege in this State, falsely accusing individuals and companies of engaging in criminal behavior would be libelous per se.

67.     As I have already shown above, it is not merely that Plaintiff and Mr. Blackburn filed a complaint that is filled with conclusory assertions and undifferentiated group allegations without pleading any facts to support them, but the fact that their allegations are false was well within their ability to ascertain with very little investigatory effort.  As I said above, I was able to verify that the fundamental premise of the claims, that Motown Records was the parent company of Love Records, Inc., was false from public records in a matter of minutes.  And given that Sir Lucian Grainge was never at any of Mr. Combs' homes (and Plaintiff could not have seen Ms. Habtemariam at Mr. Combs' homes – and she was never in any of his homes other than Los Angeles), it is clear that the Plaintiff's assertions about having seen Sir Lucian Grainge and Ms. Habtemariam at "parties" at Mr. Combs homes in Los Angeles, Miami and New York where minors and sex workers were allegedly exploited are knowingly false.

68.     Similarly, as stated in the accompanying declarations of Sir Lucian Grainge, Ms. Braithwaite and Ms. Habtemariam, the repeated unsupported accusations about "cash" payments being provided to Mr. Combs by the UMG Defendants are not only false but they defy belief. And, as I have explained above, based on their linkage of the alleged "cash" payments to the supposed failure of my clients to make tax filings, I believe it clear that Plaintiff and Mr. Blackburn made those allegations knowing that their "cash" payment allegations were false.

69.     We have provided Plaintiff and Mr. Blackburn with clear and unequivocal notice that the First Amended Complaint miserably and purposefully fails to comply with Rule 11. While we will seasonably be filing a motion with this Court for Rule 11 sanctions against Plaintiff and Mr. Blackburn, the first order of business for the UMG Defendants is to obtain the dismissal of the First Amended Complaint with prejudice.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 26 , 2024

Donald S. Zakarin