# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODNEY JONES,<br><br>                Plaintiff,<br><br>   v.<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>ETHIOPIA HABTEMARIAM,<br>LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>CHALICE RECORDING STUDIOS,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10; and<br>ABC CORPORATIONS 1-10,<br><br>                Defendants. | CASE NO.: 24-1457<br><br>**DECLARATION OF ETHIOPIA HABTEMARIAM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS UNIVERSAL MUSIC GROUP, MOTOWN RECORDS AND SIR LUCIAN GRAINGE** |

I, Ethiopia Habtemariam, declare as follows:

      1.     I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and, if called upon to testify as a witness, I could and would competently testify thereto.

      2.     I began my employment with the Universal Music companies in January 2003, becoming employed on the music publishing side of the business by Universal Music Publishing Group ("UMPG").  In or around February 2014, I was promoted to President of Urban Music/Co-Head of Creative at UMPG.

      3.     In or around February 2014, I moved over to the recorded music side of the business and became the President of Motown Records and Executive Vice President of Capitol Music

Group. Motown Records is not an independent company but a record label that is a division of UMG Recordings, Inc. ("UMG Recordings").

4. In or around March 2021, I became the Chairperson and Chief Executive Officer of Motown Records. I left Motown Records and UMG Recordings at the end of November 2022.

### A. The False Allegations Regarding My Presence At Combs' Homes Where There Were Allegedly Drugs, Underage Girls and Sex Workers

5. Contrary to the allegations of the First Amended Complaint regarding my alleged presence at Mr. Combs' homes in Miami and New York at alleged "parties" at which underage girls and sex workers were present and being drugged (¶¶ 171-176), I have never visited either of those homes, and I have never attended any "party" at any of Mr. Combs' homes (other than a single black-tie event in Los Angeles on June 26, 2022 celebrating his "lifetime achievement" award from BET). The only property of Mr. Combs that I ever visited was in Los Angeles, and, as discussed below, all of my visits preceded Plaintiff's alleged commencement of his work for Mr. Combs and Love Records, Inc. in September 2022. I understand that Plaintiff has now abandoned his claims that either I or Mr. Grainge ever visited Combs' homes.

6. I have been in the music industry for nearly 20 years, and in my experience, it is not uncommon for some of the most successful people in the music industry to hold business meetings at their homes. It is also very common for successful artists to have recording studios at their homes, where they work on records and conduct related business. Mr. Combs' Los Angeles property included a home studio in a separate building on the property, and this is where, to my knowledge, Mr. Combs conducted most of his work and his business meetings while in Los Angeles.

7. I visited Mr. Combs' property a total of four times, and each time was for business purposes. Three of the times I visited Mr. Combs' property in Los Angeles were all business

meetings in connection with the license agreement between Motown Records and Love Records, Inc. and all took place either in the home studio or an outdoor patio. I also visited his property for the party in Mr. Combs' backyard celebrating his lifetime achievement award from BET.

8. My first visit was in the Spring of 2022, preceding the license agreement. The purpose of the meeting was to listen, in Mr. Combs' home studio, to the recordings he had already made for his album that Love Records, Inc. intended to release. There was no party involved.

9. My second visit to Mr. Combs' home was within a few weeks after the license agreement was signed (May 4, 2022). This meeting was an introduction meeting between Motown staff and the Love Records Inc./Combs Enterprise team over lunch on the outdoor patio. It was purely business: I was there with my team and we met with Mr. Combs and his team. Again, by his own admission, Plaintiff could not have been there (and there were no underage girls or sex workers).

10. My third visit, as I mentioned above, was for a formal, black-tie event held outdoors at Mr. Combs' property, celebrating the lifetime achievement award from BET that he had received at the BET awards show earlier that day. There were many people in attendance at this event, including high-profile artists and producers. However, Plaintiff would not have been there as it was in late June 2022 and I can state without any hesitation, I observed no underage girls, sex workers or drug use at the party.

11. My final visit to Mr. Combs' home in Los Angeles occurred in the July/August 2022 timeframe. The purpose of the visit was to discuss the delivery and release schedule for the Love Records, Inc. album and to have a face to face conversation with Mr. Combs to make sure we met our release schedule deadlines. Again, this meeting preceded Plaintiff's own claimed start

of his work for Mr. Combs and Love Records, Inc. and I observed no underage girls, sex workers or drug use there.

12. I have no recollection of ever having met Rodney Jones, the Plaintiff in this action. As far as I know, he was never present any of the four (4) times I visited Mr. Combs' property in Los Angeles. Indeed, according to the Plaintiff's own timeline in his Amended Complaint, it would have been physically impossible for me to have ever met him at Mr. Combs' house in Los Angeles because my visits there all preceded the commencement of his alleged work for Mr. Combs in September 2022 (¶ 24).

**B. Motown Enters Into A License Agreement With Love Records, Inc.**

13. I am aware that the First Amended Complaint claims that Motown Records was the parent company of Love Records, Inc. (and that the new proposed complaint claims that Motown Records or UMG Recordings was in a "general partnership" with Love Records, Inc.) As of the time I left Motown Records in November 2022, both of those assertions are completely false. To my knowledge and understanding, Love Records, Inc. was a company owned by Mr. Combs (whether directly or through one of his companies, I do not know). Instead, as I will explain below, Motown Records entered into a license agreement to distribute a single album featuring the performance of Mr. Combs that was to be (or had been) recorded by Love Records, Inc. This is a commonplace agreement in the music industry.

14. At some point in the spring of 2022, I entered into discussions with Sean Combs and his counsel, Kenny Meiselas, about Motown Records potentially entering into a license agreement with Mr. Combs' company, Love Records, Inc. for the right to obtain or distribute a new album featuring Mr. Combs as an artist. To my knowledge, as of that time, Mr. Combs had not recorded as an artist for many years, and this would be his first album on Love Records, Inc.

2868064

DocuSign Envelope ID: 58C82DB3-E87D-4B64-93D1-7715E650E340

15. I visited Mr. Combs' home studio at or around the time the license agreement was being negotiated (as I recall, Martha Braithwaite, an attorney within UMG Recordings, negotiated the agreement with Mr. Meiselas) to listen to the recordings that Mr. Combs had already recorded. It was originally contemplated, when Motown Records entered into the license agreement with Love Records, Inc., that Motown Records was going to be licensing, for distribution, a nearly completed album and the "advance" payment (some amount of royalties or profit shares are commonly advanced and recouped from the income generated by recordings) would actually serve to reimburse Love Records, Inc. for the recording costs it had incurred in producing the album.

16. On or about May 4, 2022, Motown Records and Love Records, Inc. entered into a license agreement whereby Motown Records obtained the right to distribute, for defined period of time, a single album that was tentatively entitled *The Love Album*. I understand that a redacted copy of the license agreement is attached to the accompanying declaration of Ms. Braithwaite as Exhibit A thereto.

17. In public statements announcing the license agreement, I am aware that both Motown Records and Love Records, Inc. (and Mr. Combs) expressed their excitement at "partnering" with respect to Mr. Combs' forthcoming album. This was a colloquial use of the term "partner" or "partnering." Motown Records and Love Records, Inc. were not "partners" in any legal sense but we were going to be working together with respect to the production and distribution of the album under the license agreement. To my knowledge, any assertion that Motown Records or UMG Recordings was in a "general partnership" with Love Records, Inc. is false.

18. While, as I have stated, the original contemplation of the license agreement was that Love Records, Inc. would be delivering an album that was substantially completed, at some point thereafter, Mr. Combs decided that he wanted to create and record additional tracks.

### C. While I Was Chairperson and CEO, Motown Records Did Not Financially Sponsor Or Provide Security For The Writers' Camps Or Listening Sessions.

19. The Amended Complaint makes allegations about the supposed obligation of Motown Records and/or UMG Recordings to provide security at writers camps and/or listening sessions at Mr. Combs' homes and claims that Motown Records or UMG Recordings "sponsored" the camps and/or listening sessions. While I was chairperson and CEO of Motown Records, to my knowledge, Motown Records never financially sponsored any so-called "writer camps" or listening sessions and did not provide or pay for security for Love Records, Inc. I expect that if there were any security, that would have been the obligation of Love Records, Inc., which was running the "writers' camp" and any listening sessions.

20. My understanding is consistent with what is stated in the accompanying declaration of Ms. Braithwaite: Love Records, Inc., not Motown Records or UMG Recordings, was responsible for security at any Love Recordings' writers' camp or listening sessions.

21. Moreover, as I have said, the only "listening" session I ever attended at Mr. Combs' Los Angeles property (the only one I ever visited) was before the license agreement was entered into in order to listen to the recordings he had already made in his home studio. I do not know if there was any security at Mr. Combs' home but if there were, my understanding is that he or one of his companies would have been responsible for it, not Motown Records.

22. With respect to the "writers' camp" at Chalice Studios in September 2021, I did briefly visit the studio to hear some of the new tracks that had been recorded (or were in the process of being recorded). I have no recollection of meeting the Plaintiff at Chalice Studios (there were

a number of different rooms there and it may be that Plaintiff was in a different area than I was in, if he was there at all).

23. Regardless, at the time that I was at Chalice Studios, there was no shooting inside or nearby.

### D. I Did Not Make And Am Not Aware Of Any "Cash" Payments Being Made To Love Records, Inc. or Mr. Combs By Motown Records Or UMG Recordings

24. In addition to accusing me of engaging in a criminal racketeering enterprise (which is categorically untrue), the First Amended Complaint accused me, Lucian Grainge, Motown Records and UMG Recordings of having participated in, aided and abetted and helped to conceal alleged sex trafficking by Mr. Combs and his colleagues. These are vile and deeply upsetting accusations, and are completely untrue.

25. As I understand it, the foundational bases for these claims in the First Amended Complaint (and they have no basis in fact) are the false assertions that Motown Records was the parent company of Love Records, Inc. and that Lucian Grainge and I both attended "listening parties" at various of Mr. Combs' homes at which such alleged sex trafficking occurred. I never attended any such listening party and Motown Records was not the parent company of Love Records, Inc. I am not aware of Lucian Grainge ever visiting any of Mr. Combs' homes. I understand that in a proposed new complaint, Plaintiff has now abandoned every one of these allegations.

26. As I understand the allegations of the First Amended Complaint, it also claims that I, Lucian Grainge, Motown Records and/or UMG Recordings delivered "cash" to Mr. Combs, allegedly "millions of dollars" and concealed this alleged delivery of "cash" by failing to file required tax forms. Again, I understand that this allegation has also been abandoned in the new proposed complaint.

27. I never gave any cash to Mr. Combs or Love Records, Inc. and I am not aware of any cash ever being provided to Mr. Combs or Love Records, Inc. (or anyone else associated with Mr. Combs) by Lucian Grainge, Motown Records or UMG Recordings while I was employed by Motown Records. Rather, to my knowledge, under the license agreement, there was provision for the payment or reimbursement of certain recording costs and other legitimate expenses of Love Records, Inc. that were invoiced. I have no reason to believe that Mr. Combs could or did misuse any of the monies Motown Records was required to pay Love Records, Inc. under the license agreement.

### E. Mr. Blackburn's Proffer To Let Me Out Of This Case If I Gave Him A Declaration Presenting A False Narrative

28. Being falsely accused of criminal conduct is deeply upsetting to me. I did no wrong. I never saw or participated in any alleged racketeering enterprise, and I never saw, aided or abetted or tried to conceal any sex trafficking activity. I did not distribute cash to Mr. Combs or anyone else. In short, there is no basis for any of the claims asserted against me and I should never have been named as a defendant in this lawsuit.

29. After the filing of the Amended Complaint, Mr. Jones's counsel, Tyrone Blackburn, approached me and proposed to dismiss me from this case if I would provide a declaration. He sent over a proposed declaration to my personal counsel, but the declaration he presented was materially false, and I would not and could not sign it.

30. My counsel provided a revised declaration that addressed the topics that Mr. Blackburn addressed and corrected his false narrative. I am aware that Mr. Blackburn found my truthful version to be unsatisfactory to him and he presented yet another version that again presented a false narrative.

31.   My counsel again provided Mr. Blackburn with a revised version of the declaration, which again tried to correct his false narrative.

32.   As can be seen from the declaration itself, which is less than two pages, it summarizes my employment history with UMG Recordings and Motown Records, it notes Motown's license agreement with Love Records, Inc., and goes on to confirm that I have no knowledge supporting Jones's claims that (i) Motown or UMG sponsored listening parties or writers' camps, or (ii) Motown or UMG made cash payments to Mr. Combs or Love Records.  I provided the declaration (though my personal counsel) to Mr. Blackburn. Shortly thereafter, Jones filed a dismissal of the case, as against me as a defendant.

33.   I am informed and believe that Mr. Blackburn has falsely represented to various social media sites and other media outlets that I agreed to "testify against" Mr. Combs.  This is completely untrue.  I have no personal knowledge of any alleged wrongdoing by Mr. Combs and there is nothing I could testify to that would be against his interest.  I have never indicated, in the declaration or otherwise, that I have any intention of testifying "against" Mr. Combs or otherwise testifying on behalf of Plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 27, 2024

DocuSigned by:

_____
Ethiopia Habtemariam