# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
CASANDRA VENTURA                                    :
                                                    :                    Civil Case No.: 23-cv-10098
                            Plaintiff,              :
                                                    :
                                                    :
            v.                                      :
                                                    :                    **COMPLAINT**
SEAN COMBS, BAD BOY ENTERTAINMENT,                  :
BAD BOY RECORDS, EPIC RECORDS, COMBS                :                    **JURY TRIAL DEMAND**
ENTERPRISES, LLC, and DOE CORPS. 1-10,              :
                                                    :
                            Defendants.             :
------------------------------------------------------------------X

<div style="border:1px solid black">

TRIGGER WARNING:
THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A
SEXUAL NATURE, INCLUDING SEXUAL ASSAULT

</div>

Plaintiff Casandra Ventura ("Ms. Ventura") hereby alleges, as and for her Complaint

against Defendant Sean Combs ("Mr. Combs"), Bad Boy Entertainment, Bad Boy Records, Epic

Records, Combs Enterprises, LLC, and Doe Corporations 1-10 (together, "Defendant

Corporations," and together with Mr. Combs, "Defendants") as follows:

**PRELIMINARY STATEMENT**

1.      Defendant Sean Combs is a rapper and record executive popularly known by his

stage names Puff Daddy, P. Diddy, or Diddy. Mr. Combs came to fame in the early 1990s with

his record label Bad Boy Records. He rose to prominence in the music and entertainment

industry over the decades and is regularly referred to as a hip-hop mogul.

2.      In 2022, Mr. Combs received the Lifetime Achievement Award at the BET

Awards. During his acceptance speech, Mr. Combs stated, "I have to give a special shoutout,

thank you, love, to the people that was really there for me." He named a number of people,

before adding, "[a]nd also Cassie, for holding me down in the dark times, love."

1

O49RJONc                              *ZAK DEC*

*Exh 6*

UNITED STATES DI
SOUTHERN DISTRIC
----------------

RODNEY JONES,

                    F

          v.                                     1475 (JPO)

SEAN COMBS, ET A
                                            )ne Conference

               Defendants.
------------------------------x
                                    New York, N.Y.
                                    April 9, 2024
                                    3:30 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                        District Judge

                         APPEARANCES

T.A. BLACKBURN LAW, PLLC
     Attorneys for Plaintiff
BY:  TYRONE A. BLACKBURN

PRYOR CASHMAN LLP
     Attorneys for Defendants UMG,
BY:  DONALD S. ZAKARIN

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

O49RJONc

1        THE COURT:  Good afternoon.  This is Judge Oetken.
2   Mr. Hampton will call the place, please.

3        (Case called)

4        MR. BLACKBURN:  Good afternoon, your Honor.  This is
5   Attorney Tyrone Blackburn, T.A. Blackburn Law, PLLC, Brooklyn,
6   New York.

7        THE COURT:  Good afternoon.

8        MR. ZAKARIN:  Good afternoon, your Honor.  Don Zakarin
9   of Pryor Cashman for defendants Universal, Motown Records and
10  Sir Lucian Grainge.

11        THE COURT:  Good afternoon.  Is anyone else on the
12  call who wanted to identify yourself?

13        All right.  I think Mr. Zakarin is the only lawyer who
14  has appeared for any parties in the case on the defendant's
15  side.  Mr. Blackburn, have you served the other defendants?

16        MR. BLACKBURN:  Your Honor, I sent out a Rule 4 waiver
17  of service to the individuals who presented themselves.  I
18  guess we'll call them counsel, Mr. Combs' counsel and counsel
19  for the remaining defendants, and they had not responded to any
20  of my messages, so I sent out my process server to serve them.

21        THE COURT:  What was that?

22        MR. BLACKBURN:  I'll give you the date.  One second.
23  Would you like the date for the Rule 4 waiver sent, or are you
24  asking for the process service?

25        THE COURT:  Both, please.

O49RJONc

1          MR. BLACKBURN:  Okay.  The Rule 4 waiver email was

2     sent on March 13, and then the process server -- one second.

3     Let me pull that up.

4          MR. ZAKARIN:  Your Honor, this is Don Zakarin.  For

5     whatever it's worth, we never received any email about any

6     waiver of service, as your Honor knows.  We unilaterally

7     voluntarily waived service at the same time that we served our

8     motion to dismiss, but we never received any such waiver

9     notice.

10          MR. BLACKBURN:  Right.  I never sent it to you.

11          THE COURT:  Did you send it only to counsel for

12     Mr. Combs?

13          MR. BLACKBURN:  Yes, Combs and the remaining

14     defendants.

15          THE COURT:  And the remaining defendants?

16          MR. BLACKBURN:  Yes, because they are all represented

17     by the same attorneys.  At least, that's what was represented

18     to me.

19          THE COURT:  Okay.  Got it.  All right.  So Mr. Zakarin

20     represents UMG, Grainge and Motown, and the defendants, you

21     understand, are represented by someone to whom you sent a

22     waiver by email.  And when did you send the process server?

23          MR. BLACKBURN:  I'll tell you right now.  I'm pulling

24     that up.  One second.  I sent the process server five days

25     after that, and I have not gotten any receipts of service back

O49RJONc

1    yet.

2         THE COURT:  Okay.  All right.  Well, I scheduled the

3    call in response to the various letters I've received mainly

4    discussing the issue of what is the operative complaint here.

5    I wanted to get everyone on the same page because I don't

6    really want to decide a motion to dismiss based on ten letters

7    about futility rather than a single brief targeted at a single

8    complaint, because that's not efficient, at least not for me.

9         So the state of play here is that plaintiff filed the

10   initial complaint, which was 335 paragraphs on February 26.

11   Then on March 4, another complaint was filed, which was 370

12   paragraphs, which was marked complaint, but I guess we're

13   treating that as the first amended complaint because it was

14   different from the first one, even though the first one was

15   bounced for a filing error.  And then on March 25, plaintiff

16   filed another complaint, a third complaint, which was 402

17   paragraphs, also bounced for a filing error, and then bounced

18   again on March 27 because the clerk realized that no leave had

19   been granted and this was actually the second amended complaint

20   and, therefore, not fileable as a right.

21        So Mr. Zakarin for the UMG defendants filed a motion

22   to dismiss March 27, which purports to dismiss the first

23   amended complaint even though various allegations about his

24   clients have been removed in the second amended complaint.  And

25   he opposes the filing of the second amended complaint even

O49RJONc

1    though some of the most disturbing allegations are removed in

2    the second amended complaint because he wants to argue that

3    it's untimely.  So it's kind of an odd state of play.  As I

4    say, I don't particularly want to have to decide motions as to

5    two different targets, as opposed to one different target,

6    particularly if some of the allegations are superseded by a

7    second amended complaint and are not made in that complaint.

8    And I know there's a Rule 11 sanctions issues out there as

9    well.

10          So I guess, Mr. Zakarin, I'll turn to you first, and I

11   understand why you filed the letters and why you wanted to move

12   to dismiss the first amended complaint, because you feel

13   strongly that there are baseless allegations in there, and if I

14   need to, I'll decide that as a Rule 11 sanction or otherwise.

15   But why shouldn't I allow the filing of the second amended

16   complaint given that it removes some of the allegations, and I

17   can then address a single motion to dismiss.

18          MR. ZAKARIN:  Your Honor, and I understand the

19   efficiency of it, but from our perspective, you are correct

20   that the most offensive allegations are gone.  But the

21   allegations that remain are still unfounded both factually,

22   legally.  It's clear that they have no basis in fact, and they

23   don't even have a good-faith basis for them.  And even if you

24   assumed the truth of the allegations, it doesn't satisfy the

25   pleading burdens that they have with the claim they make

O49RJONc

1    against us.  So whether it's the amended complaint, the second

2    amended complaint, they don't state a claim.  And so, there's a

3    futility issue as it relates to us, because there is no merit

4    even if you accepted the truth of what they say, and it's not

5    there and there's no basis for it.

6          Indeed, your Honor, today's declaration put in by

7    Mr. Jones, his multipage declaration effectively admits there

8    was no basis for bringing the complaint against our complaints

9    to begin with.  So everything he said in there is Combs

10   supposedly told him.  There's not a single factual basis for

11   the claims they've made against us based upon Jones' own

12   declaration.  So there's a futility issue.  The reason why we

13   moved, even when they were percolating with a second amended

14   complaint, is our clients have been the subject of attacks on

15   the internet, on social media for something they haven't done,

16   and it's deeply disturbing.

17         MR. BLACKBURN:  Your Honor, could I say something,

18   please?  This is Tyrone Blackburn.

19         THE COURT:  Yes, Mr. Blackburn.

20         MR. BLACKBURN:  Thank you.  The complaint is not

21   futile at all, your Honor.  UMG is attempting to escape their

22   responsibilities pursuant to their own contract and their own

23   agreement that they provided Mr. Combs and Love Records for the

24   establishment of the Love Record label as well as the

25   establishment and the distribution of the Love album.  When my

O49RJONc

1    client first filed this complaint, when he provided it to us,

2    he did not have the contract between UMG and Mr. Combs and Love

3    Records.  That only came to light through the motion to

4    dismiss.

5         In that contract, it is clear that UMG did not follow

6    what they put in there and what they claim to have set out for

7    themselves, and, you know, a lot of things --

8         THE COURT:  So without that information, you thought

9    it was appropriate to file a complaint simply asserting that

10   Motown was the parent company of Love Records with no basis?

11        MR. BLACKBURN:  No, no.  Your Honor, that was based on

12   what Motown placed on their web site, what UMG placed on their

13   website -- on LinkedIn, and what my client was told when he was

14   working and living with Mr. Combs for over 13 months.  So it's

15   about what we had in the public domain, and it's about what my

16   client knew and what my client spoke to Mr. Combs about

17   directly.  So it's not like we just made things up out of thin

18   air.

19        When Ethiopia provided us her declaration, and prior

20   to that, leading up to getting her declaration speaking with

21   her counsel, she gave us additional insight, which was not

22   placed in the declaration, which I spoke to my client about and

23   informed him about.  And we made the decision to move forward

24   and remove her from the complaint in exchange for her

25   declaration and to amend the complaint with the new information

1     that some supports what my client new in the real time from

2     what he learned from Mr. Combs, and some of it was contradicted

3     by what Ethiopia share and what UMG's counsel provided in their

4     letter.  So doing our due diligence, we moved to update the

5     complaint to make it more factually correct.

6           THE COURT:  Understood.  At a high level, let me just

7     try to understand the theory here as to UMG.  UMG had a license

8     as to one of Mr. Combs' records, albums.

9           MR. BLACKBURN:  It's two, your Honor.

10          THE COURT:  Okay, maybe two.  I don't know.  But

11    you're saying, because this company was paying money to Sean

12    Combs, that it's responsible for the sexual assaults and other

13    conduct by Mr. Combs in his home; is that the theory?

14          MR. BLACKBURN:  No, no, no, no.  It's beyond that,

15    your Honor.  The theory is that they were intentionally

16    complacent with what they did Mr. Combs.  They gave

17    Mr. Combs -- if you look at the agreement in Section 7.2 of the

18    agreement, they gave Mr. Combs $1.3 million upon him signing

19    the agreement.  But then they contradict themselves in Sections

20    4.2(a), 4.2(b) and 4.4 of the agreement because they say they

21    would be providing oversight, that Mr. Combs had to come to

22    them to get permission to hire producers.  That never happened.

23    Mr. Combs was required to get agreements written and signed by

24    producers approved by Motown.  That never happened.  Mr. Combs

25    was Motown to administer the approved budget for all approved

O49RJONc

1   recording costs for the production of the album.  That never

2   happened.  They just gave him $1.3 million, and he used it to

3   pay for sex workers, to purchase drugs, to do a lot of other

4   things other than make music.  Because if he used it for the

5   music, Mr. Jones would have been paid.  He was not paid.

6   Mr. Jones produced nine songs.

7           THE COURT:  The fact that he had a deal with his

8   record company to pay him, and there was certain oversight the

9   company was supposed to give, makes them responsible for all

10  these things that he did in his house?

11          MR. BLACKBURN:  Not just his house, your Honor.  It

12  wasn't just his house.  It was a yacht.  It was the Chalice

13  Recording Studios.  I can provide you two recordings of sex

14  workers in Chalice Recording Studios.  I can provide you with

15  several recordings on the yacht where there was a makeshift --

16  makeshift studio where there were sex workers knocked out.

17          THE COURT:  Sure.  An employer can be responsible for

18  improper employment of workers, failure to pay and sexual

19  misconduct that happens in the workplace.  You are not

20  suggesting that the UMG defendants are employers of Mr. Combs,

21  are they?

22          MR. BLACKBURN:  I'm suggesting they are partners with

23  Mr. Combs, joint partners with Mr. Combs.  They are trying to

24  create this -- this, you know, smoke and mirrors type of

25  approach, that oh, you know, we were just here to distribute

O49RJONc

1    one album, but then you do nothing that the contract says that

2    you are supposed to do.  You contradict yourself from paragraph

3    four to paragraph seven if your own agreement.  You pay him

4    $1.3 million.  You're not minding the money at all.  I read

5    this contract is a ruse to just give him whatever he wants to

6    use the money to do whatever he wants with it.  Okay, and this

7    is a -- this is one example of multiple years of a pattern and

8    practice of them doing this exact same thing with him.

9              THE COURT:  Giving him money?

10             MR. BLACKBURN:  Giving him money and allowing him to

11   do whatever he wants.  Like, for instance, when he was with Bad

12   Boy Records a few years back, he physically assaulted Steve

13   Stoute, which is one of their VPs.  He continued working with

14   them for multiple years after that.  Right?  So it's not

15   like -- it's not like they were -- they were unaware that this

16   money has problems.  They knew this, but they took profits over

17   people.  They put their profits and their bottom line over what

18   was consciously the right thing to do.  And they knew or should

19   have known that they were required to give this man overtime,

20   and they didn't.  And they wrote it in the contract and did not

21   execute the contract as written.  So they are equally as

22   liable.  And now they want to, because he got raided, want to

23   say that they were not general business partners with him.

24             THE COURT:  Okay.  Well, since I gave him a chance,

25   Mr. Zakarin, I'll give you a chance just at a high level.  I

O49RJONc

1   wasn't really planning to get into the merits too deeply, but

2   if you want to respond to that, you may.

3           MR. ZAKARIN:  Sure.  This was a distribution license

4   for one album, and it's a standard agreement.  There's nothing

5   unusual.  The only thing that made it different was that most

6   of the recordings, or many of the recordings, had been already

7   done.  As was stated in Ms. Habtemariam's declaration, the

8   original contemplation was he had recorded a lot of these

9   recordings already, and that's why the million-three was going

10  to be paid upon execution to repay him, and it says it very

11  clearly in the agreement, to repay him for or reimburse him for

12  the costs he had already incurred.  That's why it was paid.

13  And there were other recording costs that would come up, and

14  they agreed to fund those recording costs.  There's a specific

15  provision in the agreement that makes it clear, it was no

16  partnership.  They were independent contractors.  It is the

17  standard agreement.

18          Now, in the original complaint, Motown was supposedly

19  the parent company, and employed under Respondeat Superior

20  basis all of these, you know, Combs and everybody else.  That

21  theory is junked for a partnership, which is equally baseless.

22  There was no partnership.  It was a distribution deal.

23  Colloquially termed, you know, with their partners in this

24  album.  Yeah, they were partners in that they were distributing

25  or going to distribute the album.

O49RJONc

1      As it happened, Motown didn't distribute the album.

2 Ms. Habtemariam left Motown in 2022, so she couldn't have been

3 at all of these activities that were alleged by the plaintiff.

4 After she was gone, the contract was terminated.  Motown and

5 Combs decided they did not want to go forward together, and

6 they terminated the agreement.  So the album was never even

7 distributed by Motown or Universal.  This whole notion of

8 partners and that we should have known, and because 20 years

9 ago, Combs supposedly injured or had a fight with Steve Stoute,

10 everybody should have known everything.

11      Money -- and we've said it in our papers.  Money is

12 fungible.  Combs was a very rich man.  Combs was reputed in

13 2022 to be a billionaire.  I haven't counted his money, but I

14 have no doubt that he's wealthy.  He gets paid a lot of money

15 by Diageo for his alcohol brands.  You know, under the

16 plaintiff's theory, Diageo should be a defendant because they

17 pay money to Combs.  The bank that pays Combs interest -- if he

18 is worth a billion dollars, I assume he's getting interest

19 someplace -- they should be a defendant because they pay him

20 interest.

21      Mr. Blackburn doesn't seem to understand that in

22 transactions, a normal transaction where one party pays the

23 other party money, they don't have oversight.  They don't have

24 control, and they don't get to dictate whether that money is

25 used or somebody else's money is used or how Combs or Love

O49RJONc

1   Records used their money.  It's just not the way that it works

2   because money is fungible.  If Combs did any of the things that

3   the plaintiff alleges that he did, he used whatever money he

4   had to do it, and you cannot and they will not be able to and

5   they couldn't ever trace it to us or to Diageo or to any bank

6   or to any brokerage.

7           It is a completely frivolous claim, and it's a

8   frivolous claim with the false allegations about Grainge being

9   at these sex parties.  That was the original theory that they

10  should have known, and we saw it and we could control it

11  because we were there.  Now, what's the basis?  Not that he was

12  ever there, and by the way, he wasn't there.  He had denied

13  that he was ever there.  And the basis is, well, you've got

14  Jones saying well, Combs told me he was there.  They have a

15  picture of Grainge in the complaint.  And by the way, they've

16  published his addresses in the complaint, so that he has now

17  had to beef up security because of all of these accusations

18  being made.  But there's a picture of him.  Does the plaintiff

19  say, oh, yeah, that was the guy I saw, which he couldn't say

20  because it would be a lie.  But he wants to say that Combs told

21  me he was there, and he wasn't.

22          There's not a single thing in any of these complaints

23  that have the slightest factual basis.  And if the sole basis

24  for the claims is (A) Combs told me, and at the same time he is

25  saying Combs is this incredibly disreputable person, but on

O49RJONc

1   this he speaks the truth, it's not true.  I don't believe that

2   Combs ever told him any of these things, and if he did, that's

3   not a basis for bringing these kinds of claims against anybody.

4   And in terms of the money, what Mr. Blackburn has said doesn't

5   make out a case.  It doesn't make out a claim under the sex

6   trafficking laws, under RICO.  He cannot state a claim.  He

7   hasn't stated a claim, not in the first amended complaint, not

8   in the original complaint, not in his proposed second amended

9   complaint.  There's just no basis for it, and our clients have

10  had their reputations improperly, unnecessarily and offensively

11  degraded based upon Mr. Combs told me this; Mr. Combs told me

12  that.  It's unbelievable.  I've never seen anything like it,

13  your Honor.  To have these kinds of salacious allegations based

14  upon a supposition, a belief or what Combs told me, that's not

15  a good-faith investigation of the facts by Mr. Blackburn.

16          MR. BLACKBURN:  Your Honor, can I say something,

17  please?

18          THE COURT:  Sure.

19          MR. BLACKBURN:  Thank you.  So, your Honor, earlier

20  counsel said that the recordings were made prior to, which is

21  why -- prior to Mr. Combs and Love Records entering into the

22  arrangement with Motown and UMG.  That is demonstrably false.

23  We have every recording that was made for Love Records.  They

24  are all timestamped.  Mr. Jones has everything.  There are five

25  or six versions of them.  They are timestamped.  They are --

O49RJONc

 1   you can figure out when they were made, how many times they
 2   were edited, who edited, time plates, all of those things.  And
 3   none of this stuff was done prior to Mr. Combs entering into
 4   the business agreement -- business arrangement with Motown and
 5   UMG.  And if UMG had done their due diligence, they would have
 6   known that instead of paying him $1.3 just based on his word.

 7          If Mr. Grainge is wrong for taking Mr. Combs' word for
 8   it, UMG is equally wrong for taking Mr. Combs' word for it.
 9   He's wrong saying when these records were actually created.
10   Counsel also says that that partnership was just a turn of
11   phrase.  It was just used loosely online, but partnerships in
12   practice is very, very different than you just saying we're
13   partnering to create an album.  That's not what they say.  They
14   said we had partnered with Mr. Combs to establish Love Records,
15   and to distribute his first -- his first album.  Okay.

16          They made a distinction that they were establishing a
17   label with him, and then they were distributing an album.
18   Okay, so UMG, from what I understand, is a publicly traded
19   company, and the things you say in the public matters.  It's
20   all regulated by the FCC, so I don't even know what they are
21   trying to pull now because his mansion has been raided.  He
22   says that the agreement between UMG and Mr. Combs is strictly
23   a -- a distribution deal.  But if you read the agreement,
24   4.02(a) Love Records must submit budgets for approval.  Okay.
25          Where are the budgets?  Where are the budgets?  Show

O49RJONc

1    me what he submitted?  Where is the itemized budget list to

2    show which producers were paid, which songwriters were paid?

3    Did you pay Chalice Recording Studios?  Where is the budget

4    submitted?  Or did you just give them a blank check, which is

5    what you did, and did not ask him for any receipts, which I

6    know you do not have.  Okay.  4.02(b) Motown administers the

7    authorized budget and shall pay the recording costs for the

8    productions.  Okay.  That doesn't sound like a partnership to

9    me because you are taking an active role in the running and the

10   distribution of the business and how -- how the money was to be

11   deviated and shared out.

12          You cannot have it both ways.  That's exactly what

13   they are trying to do.  They are trying to rewrite history

14   because of the events of March 25, 2024.  That is what they are

15   trying to do.  Okay.  I can keep going.

16          THE COURT:  I'm not hearing anything that would

17   plausibly give rise to a theory that would make UMG liable

18   because they gave him money and because they had a deal with

19   respect to budgets and overseeing certain aspects of their

20   distribution arrangement, that they had a duty to babysit him

21   and prevent him from doing all these bad things and that

22   somehow gives rise to liability on the part of the company, I

23   just don't know of any authority for that.  But, you know,

24   maybe on the motion, you'll respond to that?

25          MR. BLACKBURN:  Yeah, I mean, your Honor, I definitely

O49RJONc

1    will.  I think that pursuant -- you know, in one of their
2    letters they claim that New York State General Partnership Law
3    does not apply but California does.  Well, you know the laws
4    are pretty much identical.  So, you know, we will definitely
5    address that on their motion.

6         But in addition to that, your Honor, there are other
7    provisions of this agreement as well as their actions.  He
8    said -- he says that Ethiopia and Lucian were not present at
9    Mr. Combs' house at the time that Mr. Jones was working there.
10   But there were other executives present in the house, at
11   Chalice Recording Studios, on the yacht from December to
12   January, in the studio.  I didn't name them in the complaint
13   and I'm not going to do that now because there are more than 30
14   people on this call.  So I won't do that, but I would be more
15   than happy to provide the Court with additional documentation
16   to substantiate what he says in the complaint.

17         THE COURT:  So just so be clear, the second amended
18   complaint, the one you've now requested leave, that is what you
19   want to be the operative complaint?  I'm not going to get
20   another one now, right?

21         MR. BLACKBURN:  No, no, no, no, your Honor.  No.  You
22   know, I looked at -- I looked at the letter in opposition, and,
23   you know, defendants said that one of the -- well, I'll only
24   agree that only one of the potential TVPA causes of action may
25   not be actionable, but everything else I think we're fine on.

O49RJONc

1   So that's only the thing.

2           THE COURT:  Sorry I didn't follow that.  TVPA?

3           MR. BLACKBURN:  Yep, yep.  I'll tell you which one it

4   is.

5           THE COURT:  Are you saying that one of the complaints

6   in the second amended complaint you want to drop now?

7           MR. BLACKBURN:  No, no, no.  I'm saying they raised

8   concern that one of causes of action in their letter,

9   opposition.  You know, I went back and I reviewed it, and I'm

10  going to concede that that one cause of action is going to be

11  withdrawn from the second amended complaint.  But the remaining

12  causes of action are fine, I think.

13          THE COURT:  So you are dropping one?

14          MR. BLACKBURN:  One, just one cause of action, based

15  on --

16          THE COURT:  Which one was that?

17          MR. BLACKBURN:  I'll tell you right now, one second.

18          MR. ZAKARIN:  Your Honor, this is Don Zakarin again,

19  if I might?  If what Mr. Blackburn is referring to was the

20  original claim that UMG was somehow responsible for the

21  security at Chalice Studios, I think that's a claim that he has

22  dropped, that had no basis to begin with.  But if that's what

23  Mr. Blackburn is referring to, he did drop that from the

24  second -- from the various iterations of the second amended

25  complaint.

O49RJONc

1          MR. BLACKBURN:  No, that's not it.  I believe what you
2      wrote -- okay.  You claimed that the obstruction was not valid,
3      but I have case law that says it is.
4          MR. ZAKARIN:  So you are dropping then something
5      additional, the obstruction claim; is that what you're saying?
6          MR. BLACKBURN:  No, no, no, you claimed that the
7      obstruction claim is not valid.  That is actually pretty valid.
8      You saw that in my letter that I wrote (inaudible).
9          (Reporter clarified)
10          In the Southern District of New York, there's a case
11      with Mr. Epstein, where it says, I believe, that it was
12      Judge -- I submitted it earlier.  It was -- one second.
13          MR. ZAKARIN:  Your Honor, we cited.  We referenced
14      Judge Rakoff's decision.
15          MR. BLACKBURN:  Yeah, Judge Rakoff's decision, and
16      that applies to our case as well.
17          MR. ZAKARIN:  If I can, your Honor, that was just
18      another -- that was just an additional basis on which most of
19      the courts that have considered it have found that it doesn't
20      exist, except with respect to the government.  We've cited
21      those cases as well, but that was only one basis on which the
22      claim has no standing at all.  That's not a viable claim.
23      There were other bases as well.  I think your Honor has
24      indicated those things already as well today.
25          THE COURT:  Are you talking about the sixth cause of

1  action, Trafficking and Victims Protection Act?  The TVPA, is

2  that the claim you are talking about?

3         MR. BLACKBURN:  No, no, no.  We're keeping that, but

4  the issue I believe that counsel raised, I had it --

5         THE COURT:  Let me go back to Mr. Zakarin.  I'm not

6  going to wade through a bunch of letters, and I'm not going to

7  decide a motion to dismiss based on a complaint that has been

8  superseded.  It just doesn't make sense.  Among other things,

9  in your Rule 11 letter, Mr. Zakarin, dated March 4, you said

10 you can avoid a Rule 11 violation only by withdrawing the

11 complaint or immediately amending it to remove all allegations

12 and claims against our client.  Now, it's true you said "all

13 allegations", but he did remove some of them and filed a second

14 amended complaint.  And you want me to deny his filing the

15 second amended complaint and make me decide a motion about

16 other allegations that would not otherwise be before me.  It

17 doesn't make sense.

18        The Second Circuit has held that when a new complaint

19 is filed, the Court looks at the allegations in the most recent

20 complaint because that complaint supersedes the original

21 complaint.  A statement in a written complaint that is

22 superseded by an amended complaint, no longer a conclusive

23 judicial admission.  However, the fact finder may find a

24 contradictory statement in the earlier complaint and consider

25 that for credibility purposes.  So what I'm saying is I would

O49RJONc

1   like to decide the motion to dismiss based on the new

2   complaint, but on Rule 11, you can point stuff in the earlier

3   complaint that you want to point out contradictions, et cetera.

4        MR. ZAKARIN:  Sure.  I understand, your Honor.  I

5   understand the practicality of it.  As I said, our approach was

6   predicated on getting this done quickly for the benefit of our

7   clients, but in addition because the second amended complaint,

8   as I said, even though it withdrew some of the more salacious

9   allegations -- although, Mr. Blackburn in his letter today

10  seems to want to hold on to those salacious allegations --

11  because the claims -- our view of amending, would be that it

12  would be futile to amend because he still doesn't have a claim.

13  But where your Honor is going, and I seem to understand it, if

14  your Honor is going to allow him to amend to the second amended

15  complaint, what we would do is simply revise our motion to

16  dismiss and address it to the second amended complaint, because

17  it would be substantially the same, except, you know, changing

18  it to address the, you know, the allegations that are

19  different.

20        THE COURT:  Right.  I think that makes sense from my

21  perspective, and I understand why you did it this way

22  certainly.  But I think in terms of all of the motions I have

23  to decide in all of my cases, I think it would be helpful for

24  me if I would just have one operative complaint, and allow the

25  plaintiff to file that second amended complaint.  And then,

O49RJONc

1    have you file a new motion that is addressed to those

2    allegations.

3            Look, I'd remind everyone this is a 12(b)(6) motion,

4    and the focus is assuming the truth of well-pleaded

5    allegations, does it state a claim?  Assuming the well-stated

6    allegations, is there a legal theory that supports the claims

7    against UMG defendants?  Now, I understand that sometimes you

8    want to say there isn't a well-pleaded factual allegation

9    because it's conclusory, but to the extent we're ruling outside

10   the pleadings as to things that aren't integral to the

11   complaint, there's only so much I can do in terms of -- I mean,

12   I can't look outside those pleadings.  I know you understand

13   that, and part of what you're doing here is expressing the

14   reaction of your clients to these allegations, which you said

15   what you need to say about that.  But I just want to focus you

16   on the legal sufficiency of the allegations and not anything

17   extraneous to the complaint.

18           MR. ZAKARIN:  Thank you.  Your Honor, I fully

19   understand that.  I mean, I do think there's an element of what

20   is integral to this complaint, these kinds of complaints, and

21   so, I think there is some latitude there.  But I would also say

22   very candidly that if it gets to that, we are not uncomfortable

23   with, you know, the motion, if it should happen, being

24   converted to summary judgment as well, because we just know

25   that there is no legal or factual basis for the claims here.

O49RJONc

1  And again, as I said, Mr. Jones' declaration today, which is --
2  it shows you just how little knowledge and information they had
3  to bring these claims to begin with.

4          THE COURT:  Okay.  Well, let's leave it there.  As
5  discussed, I'm going to grant the letter motion for leave to
6  file the second amended complaint requested by plaintiff, and
7  then you can file a motion directed to that as discussed.  How
8  much time would you like for that, Mr. Zakarin?

9          MR. ZAKARIN:  If I can, your Honor, I've got a Second
10  Circuit argument next week that I want to try to turn to.  I
11  would think that we could turn it around -- I'm looking at my
12  team who is looking at me badly.  I'm thinking a maximum of
13  three weeks.

14          THE COURT:  That's fine.

15          MR. ZAKARIN:  We'll turn it around in three weeks.

16          THE COURT:  Okay.  That's fine.  Three weeks, that's
17  April 30.  And how long would you like to file a response,
18  Mr. Blackburn?

19          MR. BLACKBURN:  I'll tell you.

20          THE COURT:  Three weeks?

21          MR. BLACKBURN:  Yeah, that's fine.

22          THE COURT:  Two or three?

23          MR. BLACKBURN:  Three weeks is fine.

24          THE COURT:  Okay.  So you'll have three weeks.  And
25  then, would you like two weeks for the reply, Mr. Zakarin?

O49RJONc

1        MR. BLACKBURN:  Yes, please, your Honor.

2        THE COURT:  Three, three and two weeks, and we'll go

3    from there.  Is there anything else that you-all want to

4    address today, Mr. Blackburn?

5        MR. BLACKBURN:  No.  I just want to let the Court know

6    that the aiding and abetting claim is the one that I was

7    referring to.  I wanted to update the Court on that, but I have

8    nothing else.

9        THE COURT:  So can we treat that as a withdrawal of

10   the aiding and abetting claim?

11       MR. BLACKBURN:  As to -- as to UMG, yes.

12       THE COURT:  All right.  So Mr. Zakarin, for purposes

13   of your motion, you can just indicate in a footnote that

14   Mr. Blackburn is stating on the record that the aiding and

15   abetting claim is withdrawn as to your three clients.

16       MR. ZAKARIN:  Thank you, your Honor.  We'll note that.

17       THE COURT:  Anything else from defendant?

18       MR. ZAKARIN:  I don't think so.  Not from us, your

19   Honor.

20       THE COURT:  All right.  Thanks, everybody.

21       MR. ZAKARIN:  Thank you, your Honor.

22       THE COURT:  We're adjourned.  Bye now.

23       (Adjourned)

24                           o0o

25