# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RODNEY JONES,<br><br>      Plaintiff,<br><br>  v.<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>CHALICE RECORDING STUDIOS,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10; and<br>ABC CORPORATIONS 1-10,<br><br>      Defendants. | CASE NO.:  24-1457<br><br><br><br>**DECLARATION OF MARTHA BRAITHWAITE IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT BY DEFENDANTS UNIVERSAL MUSIC GROUP, MOTOWN RECORDS, AND SIR LUCIAN GRAINGE** |

I, Martha Braithwaite, declare as follows:

1. During the time period applicable to the claims in this action, I was the Executive Vice President, Business Affairs for the Capitol Music Group, which is affiliated with UMG Recordings, Inc. ("UMG Recordings" incorrectly sued herein as "Universal Music Group").  As set forth in the accompanying declaration of Sir Lucian Grainge, UMG Recordings' Chairman and Chief Executive Officer, UMG Recordings is incorporated in the State of Delaware, with its principal operating offices in Santa Monica, California.   UMG Recordings is the principal legal entity for all recorded music operations in the United States for the global music and entertainment company colloquially known as "Universal Music Group." I have personal knowledge of the facts set forth in this Declaration and if called and sworn as a witness, I could and would competently testify thereto.

1

2.      I am advised that in the First Amended Complaint ("FAC"), the Plaintiff in this action claimed that Motown Records was the "parent company" of Love Records, Inc.  This assertion was baseless and I understand it has now been abandoned by the Plaintiff and his counsel in the Second Amended Complaint ("SAC").

3.      Instead, I understand that Plaintiff and his counsel, Mr. Blackburn, have substituted an equally false allegation in the SAC: that Motown Records and/or UMG Recordings is or was in a "general business partnership" with Love Records, Inc. and/or Mr. Combs.  During the relevant timeframe, I was the executive responsible for handling all of the business and legal affairs for Motown Records.  Motown Records is not a separate legal entity, but a record label that is an unincorporated division of UMG Recordings.  Neither Motown Records nor any of UMG Recordings' subsidiaries or affiliates are, nor were they ever, in a "general business partnership" (or any other kind of a partnership) with Love Records, Inc., Mr. Combs or any of his business entities.

4.      To my knowledge, Love Records, Inc. is a company associated with Sean Combs (and I believe owned by him, directly or indirectly).  I know this because, during the period starting in or around February 2022 through the beginning of May, 2022, I negotiated and executed an arm's length license agreement, for a limited term, on behalf of Motown Records with Love Records, Inc., which was dated May 4, 2022.  Love Records, Inc. was represented by Kenneth Meiselas, who I am aware has been Sean Combs' long-time transactional counsel.

5.      I am aware that in the SAC, it is admitted (in various paragraphs, including paragraphs 13, 163 and 164), that Motown Records entered into a license agreement to distribute

a Love Records album.  A redacted copy of that license agreement, which I am informed was provided to Mr. Blackburn by our counsel, is attached hereto as Exhibit A.[1]

6.     Paragraph 16. 11 of the License Agreement specifically provides as follows:

> "You [Love Records] and Artist [Combs] are entering into this Agreement and are performing your obligations hereunder as Independent contractors.  **Nothing herein contemplates or constitutes you or Artist as Motown's partners, joint venturers, agents or employees."**

7.     As I said, Mr. Blackburn was provided a copy of this license agreement.  I do not understand how, in the face of the plain language of this agreement, he can continue to allege that Motown Records and/or UMG Recordings had a "general business partnership" with Love Records, Inc. and/or Mr. Combs.

8.     Because I negotiated the license agreement, I can also address what I understand is the assertion of Plaintiff and his counsel that no recordings were created by Love Records, Inc. until at least September 2022.  This assertion is completely false.

9.     To begin with, my negotiations with Mr. Meiselas only began after Ethiopia Habtemariam, who was then the Chairman and Chief Executive Officer of Motown Records, attended a listening session at Mr. Combs' studio to hear the recordings he had already recorded and intended to include on the album that became the subject of the license agreement. Ultimately, I am aware that Mr. Combs decided to record additional tracks beyond the ones he had already recorded.

---

[1] The reason I have redacted the license agreement is because most of its terms and conditions have nothing to do with this action.  Rather, the main provisions that relate to this action are those that address the license, the advance/recording costs and the representations and warranties, all of which I have not redacted.

10.     During my negotiations with Mr. Meiselas, he advised me that Mr. Combs and Love Records, Inc. had already spent several million dollars in recording and other costs on the album.  As such, one part of my negotiations with Mr. Meiselas addressed his request for the reimbursement of the costs that Mr. Meiselas advised had already been incurred by Love Records, Inc. in recording tracks prior to our negotiations.  Motown Records was not prepared to reimburse all of the costs that Mr. Meiselas advised had been incurred by Love Records, Inc. (particularly for a distribution deal of a limited duration and no copyright ownership of the recordings) and we ultimately agreed that Motown Records would reimburse the sum of $1.3 million.  This reimbursement amount is specifically identified in Paragraph 7.02(a) of the license agreement.[2]

11.     I am advised that Mr. Blackburn, without the slightest basis, alleges that Mr. Combs supposedly used the $1.3 million for sex workers.  It appears this is premised on his completely incorrect assertion that, until Plaintiff showed up in September 2022, there had been no recordings made by Mr. Combs and no expenses were incurred.  Based upon only a lack of knowledge and baseless conclusions, Mr, Blackburn and the SAC label the license agreement as a "ruse."

12.     As I have said, Mr. Blackburn is completely incorrect.   Not only did Ms. Habtemariam listen to tracks that had already been recorded by Mr. Combs before we entered into the license agreement, Motown Records also spent a great deal of money marketing and

---

[2] The requirement that these costs be documented is a standard provision of our agreements. However, because we have had many negotiations with Mr. Meiselas and his firm, we accepted his representation that the actual costs incurred were far greater than the $1.3 million.  Moreover, since we ended up terminating the license agreement and did not distribute the album, there was no reason for us to do a full accounting of the costs both before and after the license agreement and we did not do one.

promoting one of the tracks already recorded by Mr. Combs, "Gotta Move On," which featured Bryson Tiller.  Motown released this single recording in or about June 2022 (prior to the termination of our license agreement), and I understand it was thereafter also included on the expanded version of the album that Mr. Combs ultimately completed and released (after the termination of the license agreement).  I am attaching hereto as Exhibit B, some invoices for expenses incurred and paid by Motown Records in connection with this recording **before September 2022**.  I do so in order to show that, contrary to what is asserted in the SAC and by Mr. Blackburn, there were tracks already recorded by Mr. Combs long before September 2022 (and it was for these already extant tracks that the $1.3 million was reimbursing Love Records, Inc. for some of its recording costs).

13.     I understand that in the SAC and at a telephonic conference with the Court on April 9, 2022, Mr. Blackburn also claimed that Motown Records did not administer any recording budget as provided for in the paragraph 4 of the license agreement, suggesting instead that Motown Records simply gave money to Mr. Combs, which he then supposedly used to pay for sex workers instead of making recordings (apparently Mr. Blackburn bases this incorrect conclusion solely on Plaintiff's claim that Mr. Combs allegedly did not pay him).

14.     Beyond the fact that money is fungible and there is no way that Mr. Blackburn can possibly know how Mr. Combs used any of the money, his assertion is also again incorrect.

15.     First of all, paragraph 4.02(b) provided that Motown Records would administer the budget for the recordings and pay recording costs.  In fact, that is what Motown Records did. Attached hereto as Exhibit C are some illustrative invoices for recording costs that were submitted directly to Motown Records and paid by Motown Records.  Motown paid for studio time, engineers and producers.  It did not pay cash, and it did not pay sex workers.

16.     I would also note that Paragraph 4.04(a) of the license agreement imposed on Love Records, Inc., not on Motown Records, the obligation to negotiate, draft and execute all producer agreements and the corresponding obligation to pay producers, unless Love Records, Inc. requested that Motown Records undertake the obligation of paying certain of the producers. As reflected in Exhibit, as part of the recording costs payable under the license agreement, Motown did directly pay some of the producers.

17.     In short, contrary to every uninformed assertion that is made in the SAC and by Mr. Blackburn at the hearing on April 9, 2024, Motown Records reimbursed Love Records, Inc. for recording costs that Love Records, Inc. actually incurred before the license agreement was executed (and paid marketing and promotion costs associated with the release of such recordings), and it directly paid recording costs Love Records, Inc. incurred after the license agreement was executed.  And also contrary to what the SAC and Mr. Blackburn have alleged, Motown Records did not pay, directly, indirectly, intentionally or unintentionally, any money to sex workers on behalf of Mr. Combs.  The direct payments made by Motown Records to third-party vendors, such as producers, engineers, recording studios, videographers and insurance companies, were not paid to sex workers nor were they paid to Love Records, Inc. and were thus not available to be used by Mr. Combs for the supposedly improper purposes alleged in the SAC.

18.     I also understand that the SAC claims that Motown Records, UMG Recordings and/or Lucian Grainge somehow profited by virtue of this license agreement.  In fact, as I stated in my original declaration in support of the motion to dismiss the FAC, subsequent to executing the license agreement, Motown Records and Mr. Combs decided that Motown Records would not release and distribute the album that Mr. Combs had created.  Accordingly, I negotiated and executed a separate document that terminated the license agreement, effective as of February 1,

2023, on behalf of Motown Records.  Under the termination agreement, Motown assigned back to Love Records, Inc., on a quitclaim basis, all of Motown Records rights as a licensee in the recordings.  The termination agreement ended any relationship between Love Records, Inc. and Mr. Combs on the one hand, and UMG Recordings on the other hand, and Mr. Combs' company, Love Records, Inc. released the album independently.

19.     Because Motown Records did not distribute the album, it had no opportunity to recoup the recording costs (and marketing and promotional costs) it paid to or on behalf of Love Records, Inc. nor did it recoup the reimbursement of recording costs it paid to Love Records, Inc. under the license agreement.  Thus, far from profiting from the album, the license agreement was not profitable for Motown Records or UMG Recordings.

20.     I understand that the claim in the FAC that Motown Records and/or UMG Recordings were responsible for the security at Chalice Recording Studio at which there was allegedly a shooting (and that the security provided was allegedly inadequate) has been abandoned (but that there remains some allegation about Motown Records, UMG Recordings and/or Lucian Grainge nevertheless somehow being responsible for security).  Whether it is asserted as a claim or an allegation, it is false.

21.     I can confirm that neither Motown Records nor UMG Recordings were invoiced for and did not pay for security at Chalice Recording Studio.  Love Records, not Motown Records or UMG Recordings, was responsible for security at any Love Recordings' writers' camp or recording session at Chalice Recording Studio (or anywhere else for that matter).  Motown Records did pay for studio time at Chalice Recording Studio, as well engineers and producers that worked there.  But it had no responsibility for nor did it pay for any security.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 18, 2024

Martha Braithwaite

8

# EXHIBIT A

DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1

## EXCLUSIVE RECORDING AGREEMENT

This exclusive recording agreement ("**Agreement**")

is dated as of _____ May 4 , 2022
and is by and between

Motown Records, a division of UMG Recordings, Inc., 1750 North Vine Street, Hollywood, California 90028 ("**Motown**"),

-and-

Love Records, Inc. c/o Tri Star Sports & Entertainment Group, 9255 Sunset Blvd., 2d Floor, W. Hollywood, CA 90069, Attn. Lou Taylor ("**you**").

Capitalized terms used and not otherwise defined herein have the meanings assigned or referred to on **Exhibit B**. Rules of interpretation for this Agreement are set forth in paragraph 16.13.



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



## 1.    **SERVICES**

1.01    (a)    During the Term, you shall furnish to Motown the non-exclusive services of Sean Love Combs, individually and professionally known as "Diddy" ("**Artist**") in the Territory solely with respect to the Commitment Album, including the non-exclusive right to record Artist's Performances in connection with the Commitment Album. You shall, and shall cause Artist to, render all services hereunder to the best of your and Artist's respective abilities, in accordance with first-class standards of performance for the production of Recordings in the recording industry and in compliance with the terms hereof.

(b)    Notwithstanding anything to contrary contained herein, during the Term, neither you nor Artist shall, at any time, release or otherwise exploit (or authorize or permit any Person to release or otherwise exploit) another EP, Album or so-called "mixtape" ("**Project**") principally featuring the Performances of Artist (i.e., a Project by Artist or where Artist is designated as a so-called "main" or "primary artist" on the Project) or another similarly titled or branded Project (e.g., "Off The Grid 2" or "Love Album 2", depending on the final title of the Commitment Album) (such Projects, "**Artist Projects**"). For the avoidance of doubt, Artist Projects does not include a Project principally featuring Performances of another artist signed to you, produced by Artist and/or individual Recordings embodying Artist's Performances as a side artist (even if designated as a "primary artist") in connection with such Recording.

1.02    Intentionally omitted.

1.03    Neither you nor Artist shall, at any time, do (or authorize or permit any Person to do) anything inconsistent with, or that might diminish, impair or interfere with, any of Motown's rights or the full and prompt performance of your obligations hereunder. Without limitation of the foregoing, except as otherwise permitted herein, neither you nor Artist shall: (a) authorize or permit the exploitation of Artist Projects during the Term and anywhere in the Territory by any Person other than Motown for any purpose (and shall take reasonable measures to prevent the same); (b) authorize or permit any Person other than Motown to manufacture, distribute, sell, market, promote or otherwise exploit Recordings delivered to Motown and released by Motown hereunder as part of the Commitment Album or in connection therewith during the License Period and anywhere in the Territory (and shall take reasonable measures to prevent the same), unless otherwise agreed to in writing and in advance by the parties hereto (e.g., as part of a label waiver or third-party clearance (such approved exploitations, "**Reciprocal Uses**")); or (c) during the License Period and throughout the Territory, use, or authorize or permit any Person other than Motown to use your or Artist's names, likenesses (including any picture, portrait or caricature) or biography in connection with the sale or other exploitation of Recordings or Records delivered to Motown and released by Motown hereunder as part of the Commitment Album or in connection therewith, unless otherwise agreed to in writing and in advance by the parties (including in connection with Reciprocal Uses). If you or Artist becomes aware of any unauthorized recording, manufacture, distribution, sale, use or other activity by any Person contrary to the restrictions herein, you shall notify Motown of such activity and cooperate with Motown in any action, proceeding or other efforts Motown commences against such Person.

2.    **TERM**

2.01    The term of this Agreement will consist of an initial contract period ("**Term**"). (The Initial Period is sometimes referred to as a "**Contract Period**.") The Initial Period starts on the date first set forth above and will continue, unless extended as provided herein, until the last day of the 9th full calendar month following the month in which the initial commercial release in the US (i.e., the US retail street date) of the Commitment Album Delivered by you occurs.

2.02    [Intentionally omitted].

3.    **RECORDING COMMITMENT AND DELIVERY OBLIGATIONS**

3.01    During the Term, you shall Deliver to Motown a sufficient number of newly recorded audio-only Subject Recordings to fulfill your Recording Commitment that are technically satisfactory to Motown in its good faith discretion for the production, sale and other exploitation of Records (each, a "**Commitment Subject Recording**"). No Multiple Albums, "live" or "in concert"-type Recordings, or "cover" Recordings will apply toward your Recording Commitment without Motown's written consent (which Motown may withhold for any reason), and Motown will not be required to make any payments in connection with any such Recordings (except for any royalties payable hereunder if Motown Exploits any such Recordings).

3.02    (a)    During the Term, you shall Deliver to Motown a sufficient number of Commitment Subject Recordings (that satisfy the requirements of paragraph 3.01) for one Album, it being understood that such Commitment Subject Recordings shall be curated by Artist and principally feature the performances of other recordings artists (such artists, "**Featured Artists**") (but which may include Artist's services as a performer, producer and/or songwriter). The Album to be recorded and/or Delivered as part of your Recording Commitment is sometimes referred to herein as a "Commitment Album" and is tentatively titled "The Love Album". Notwithstanding the foregoing, subject to your and Motown's prior written approval, in lieu of Delivering an Album, for the purposes of satisfying your obligations under this paragraph 3.02, you may instead elect to Deliver to Motown at least 10 Commitment Subject Recordings, which may be released individually or collectively as Singles and/or EPs.

(b)    Simultaneously with the Delivery of the Commitment Album (or on such other date mutually approved in writing by you and Motown), you may (but shall not be obligated to) Deliver to Motown additional Subject Recordings for use by Motown in connection with the applicable Commitment Album (e.g., retail exclusives, international versions, "deluxe" Albums) ("**Other Commitment Subject Recordings**"). All costs of recording the Other Commitment Subject Recordings will constitute Recording Costs incurred in connection with the Commitment Album concerned, and Motown shall pay such costs pursuant to an Authorized Budget for such Subject Recordings and may deduct such costs from the Recording Fund for such Commitment Album. No additional Advances will be payable to you or Artist in connection with the Other Commitment Subject Recordings.

(c)    The Commitment Album(s) and the Other Commitment Subject Recordings for each Contract Period are sometimes collectively referred to herein as your "**Recording Commitment.**" If Motown accepts a Multiple Album in satisfaction of your Recording Commitment, such Multiple Album will count as only one (1) Album for purposes of the Recording Commitment and the computation of the applicable Recording Fund or Advance. For purposes of fulfilling the Recording Commitment in any Contract Period, separate Recordings of the same Composition will be deemed to collectively constitute one Track.

3.03    You shall Deliver to Motown the Commitment Album by a mutually designated date based on the commercial release date designated by you (in consultation with Motown) for such Commitment Album.

3.04    In connection with each Subject Recording and Album that you are required to Deliver hereunder, unless you and Motown otherwise approve in writing, you shall deliver to Motown all of the Recordings, documents, materials and information set forth on **Exhibit C,** in accordance with the terms set forth in Exhibit C (collectively, "**Delivery Elements**"). Motown may revise the Delivery Elements at any time (e.g., in order to conform to technological or commercial changes in the recording industry) by providing you with an updated version of Exhibit C. Without limiting or relieving you from your obligations, Motown will use commercially reasonable efforts to provide administrative assistance with respect to certain items on Exhibit C (e.g., sample clearances, mechanical licenses, label waivers, union matters, etc).

3.05    Without limitation of any of Motown's rights or remedies hereunder, if you fail to timely Deliver any Commitment Album or Subject Recordings (unless (a) caused solely by either a Force Majeure Event or by Motown's wrongful acts or omissions or (b) approved in writing by Motown, provided that Motown's payment of (or agreement to pay) such excess shall not be deemed approval by Motown), and Motown pays or incurs any expenses by reason thereof, such amounts will constitute Overages. Motown's election to make a payment to you that is due upon Delivery of such Commitment Album or to release any Record derived from such Album or Subject Recordings will not constitute an acknowledgment that such "Delivery" was properly made, and Motown will not be deemed to have waived either its right to require complete and proper Delivery or its remedies for your failure to do so.

3.06    Without limitation of anything contained in this Article 3, Motown may reject any Subject Recording or other Basic Work that: (a) Motown reasonably believes is patently offensive to reasonable standards of public taste, contains an obscenity, violates any Law, infringes or violates the rights of any Person, or may subject Motown to (i) regulatory action, (ii) scrutiny from a governmental organization or body or (iii) Losses; or (b) includes an endorsement or commercial tie-in that was not pre-approved by Motown in writing (provided that Motown shall not unreasonably withhold such approval, and provided further that references to DeLeón and Cîroc are hereby pre-approved by Motown as long as such references do not conflict with any third-party guidelines, rules or restrictions imposed on Motown or otherwise hinder Motown's ability to exploit or fully monetize such Basic Works in accordance with the terms of this agreement (including without limitation, standard monetization of any AV Recordings on YouTube). For the avoidance of doubt, notwithstanding anything to the contrary contained herein, Motown shall have no obligation to approve any endorsement or commercial tie-in that Motown reasonably believes, in its good faith business judgment, would cause a Basic Work to be "demonetized", blocked or otherwise negatively targeted by a third-party digital service provider.

## 4.    **RECORDING PROCEDURES**

4.01    With respect to each Subject Recording to be recorded hereunder during the Term, you shall designate each of the following elements in meaningful consultation with Motown (collectively, "**Recording Elements**"): (a) the individual producer; (b) engineer/mixers(s); (c) musicians and vocalists; (d) the dates and places of recording; and (e) the Compositions to be recorded; provided that your decision shall control in the event of a dispute. For the avoidance of doubt, your failure to consult with Motown in connection with Subject Recordings recorded prior to the Term shall not be deemed a breach hereof and your inadvertent failure to consult with Motown in connection with Subject Recordings recorded during the Term shall not be deemed a breach hereof. Subject to the terms of this Article 4, you shall engage all artists, producers, musicians and other personnel (collectively, "**Production Personnel**") for all recording sessions hereunder and, unless you request for Motown to handle, you shall handle all scheduling and booking of all studio time during the Term. Motown's representatives may attend any recording sessions hereunder at Motown's non-recoupable expense.

4.02    (a)    You shall submit to Motown for its approval a written budget listing all Recording Costs to be incurred by Motown in connection with such Commitment Album and its Other Commitment Subject Recordings (such approved budget, the "**Authorized Budget**"); provided that Motown will not

withhold its approval if the Authorized Budget does not exceed the then-current balance of the applicable Recording Fund.

(b)     Unless the parties otherwise agree in writing and in advance, Motown shall administer the Authorized Budget and shall pay Recording Costs for the production of Subject Recordings under your Recording Commitment in an amount not to exceed the Authorized Budget therefor (it being understood that you previously incurred or paid certain actual, third-party and bona fide Recording Costs in connection with the Commitment Album and Motown is reimbursing you for such Recording Costs under paragraph 7.02(a) (such costs to be reimbursed, "**Prior Album Costs**" and such reimbursement, the "**Recording Cost Reimbursement**"). Following the execution hereof, you shall submit to Motown a summary of the Prior Album Costs for Motown's records (e.g., to ensure there is no double payment). Without limiting Motown's other rights or remedies, if it reasonably appears to Motown that the Recording Costs for any Subject Recordings will exceed the Authorized Budget therefor, or that the Subject Recordings being produced will not conform to the requirements set forth herein, Motown may immediately cease advancing Recording Costs unless you establish to Motown's reasonable satisfaction that: (i) you can and will pay or reimburse Motown for any Recording Costs in excess of the Authorized Budget, or (ii) the Subject Recordings being produced will conform to the requirements set forth herein, as applicable. If Motown advances any excess Recording Costs under this paragraph 4.02(b) (excluding excess Recording Costs (i) caused solely by either a Force Majeure Event or Motown's wrongful acts or omissions or (ii) approved in writing by Motown, provided that Motown's payment of (or agreement to pay) such excess shall not be deemed approval by Motown), such amounts will constitute Overages.





    4.04    (a)    Subject to the terms of this Article 4, you shall engage each producer pursuant to a written producer agreement containing material terms approved by Motown (not to be unreasonably withheld), and you will be solely responsible for the negotiation, drafting and execution of each producer agreement. Except as set forth in paragraph 4.04(b), you will be solely responsible for and shall pay all royalties and other compensation that may be payable to any producers of Subject Recordings or other similar royalty participants that render services in connection with the production of Subject Recordings hereunder.

    (b)    Notwithstanding anything to the contrary in paragraph 4.04(a), if, as an accommodation to you, you desire that Motown pay any advances, fees or royalties to any producer or other third-party royalty participant on your behalf, you shall deliver to Motown a fully executed "letter of direction" ("**LOD**") substantially similar to the form of **Exhibit E**, unless Motown otherwise agrees in writing. If Motown makes any such payments prior to the receipt of such letter of direction, they will be deemed made pursuant to the terms set forth on Exhibit E, unless Motown otherwise agrees in writing. For the avoidance of doubt and

without limitation of the foregoing set forth above in this paragraph 4.04(b), Motown shall be under no obligation to accept any LOD which has not been delivered to Motown within twenty-four (24) months following the initial commercial release of the Subject Recording(s) concerned. Notwithstanding anything to the contrary contained in this paragraph 4.04(b), but subject to the immediately preceding sentence, Motown shall not reject an LOD with respect to a producer or other third-party royalty participant provided that (i) such party's services are embodied on a Basic Work Exploited by Motown hereunder, (ii) the fees and royalties payable to such third party were previously approved in writing by Motown (such approval not to be unreasonably withheld and provided that an aggregate all-in royalty rate of 20% payable to all third-parties in connection with a given Subject Recording is hereby pre-approved), and (iii) you have delivered a fully executed agreement with respect to such third party that contains the standard terms and conditions necessary for Motown to exercise its rights hereunder (including all exploitation rights contemplated herein with respect to all Basic Works and the marketing and promotion thereof, it being understood that such agreements may include standard restrictions (e.g., approval of name and likeness, etc.)).

## 5.   **ARTWORK AND PACKAGING**



Love Records (The Love Album) - Recording Agreement.EXECUTION



6. **INTENTIONALLY OMITTED**

7. **CERTAIN DEDUCTIONS AND ADVANCES**

7.01    With respect to the Commitment Album, the "**Recording Fund**" will be equal to Two Million Dollars ($2,000,000).

7.02

(a)    Promptly following full execution of this Agreement, from the Recording Fund for the Commitment Album, Motown shall pay you an amount equal to One Million Three Hundred Thousand Dollars ($1,300,000) as the Recording Cost Reimbursement (which shall be deemed a Deduction hereunder); and

(b)    Conditioned upon the full performance of your then-current, material obligations hereunder, Motown shall pay you the following monies:

(i)    If you Deliver the Commitment Album prior to Motown's commercial release thereof, then in connection with your Delivery thereof, promptly following the Delivery of that Album or, if later,

promptly following Motown's final determination of the Recording Costs for that Album, an Advance from the Recording Fund for that Album in the amount, if any, by which the applicable Recording Fund exceeds the Recording Costs for that Album, less the amount payable to you under paragraph 7.02(a).

(ii)     If Motown commercially releases the Commitment Album prior to your Delivery thereof:

(A)     Promptly following the commercial release by Motown of that Album, a payment from the Recording Fund for that Album in the amount, if any, by which the applicable Recording Fund exceeds the Recording Costs for that Album, less (A) the amount payable to you under paragraph 7.02(a), and (B) the Delivery Reserve. The "**Delivery Reserve**" shall be an amount equal to the aggregate amount of outstanding Recording Costs for the Commitment Album at the time such Album is commercially released, which Motown shall use commercially reasonable efforts to determine in good faith promptly after the release of such Album.

(B)     Promptly following your Delivery of each Commitment Album, or if later, promptly following Motown's final determination of the Recording Costs for that Album, a payment from the Recording Fund for that Album in the amount, if any, by which the applicable Recording Fund exceeds the Recording Costs for that Album, less the amount payable to you under paragraph 7.02(a) and the Advance payable to you under paragraph 7.02(b)(ii)(A).



7.03     If the Recording Costs and other Advances paid or reimbursed by Motown for any Recording in fulfillment of your Recording Commitment exceed the applicable Recording Fund designated under this Article 7, such amounts will constitute Overages, unless otherwise agreed to in writing by Motown (or if due to Force Majeure Event or Motown's wrongful acts or omissions).

7.04     In addition to those Advances set forth in paragraph 7.02(b), 7.02(c) and 7.03, the following costs paid or incurred by Motown or an Affiliate/Principal Licensee will constitute Advances: (a) all costs incurred with your prior written consent in connection with Artist's professional development activities (including vocal coaching, acting lessons, choreography lessons, personal trainers, cosmetic dental work) or articles of dress or styling for Artist (provided that Motown shall have no obligation hereunder to incur such costs, and provided further that if you request or approve such activities or articles of dress or styling, then the related costs shall be deemed approved for the purposes hereof); (b) [intentionally omitted].

7.05    Upon your written request and delivery to Motown of the necessary documentation (as determined by Motown in its sole, good-faith business judgment), solely as an accommodation to you, Motown shall pay all "per record" royalties and union scale payments required to be paid to Artist or third parties in connection with Subject Recordings commercially released hereunder; provided that the foregoing will not relieve you of your responsibility for making such payments. All payments made by Motown at your request will constitute Deductions for purposes hereof, and Motown will have no liability by reason of any erroneous payment or failure to comply with such authorization. You shall indemnify and hold Motown harmless (in accordance with the terms of paragraph 15.07) against any claims asserted against any of the Motown Indemnified Parties, and any damages, losses or expenses any of the Motown Indemnified Parties incur, by reason of any such payment or otherwise in connection with such authorization.

## 8.    **RIGHTS**

8.01    (a)    As between Motown and you, you are the sole, exclusive and perpetual owner of all Basic Works (including all copyrights thereto) hereunder. Motown is the sole, exclusive licensee, solely during the License Period and throughout the Territory of all Basic Works (excluding the copyright in any Compositions contained therein) from the inception of the creation thereof, free of any claims whatsoever by you, Artist, or any other Person. You hereby grant Motown, during the License Period and throughout the Territory, a license to all right and interest in: (i) the copyrights to the Basic Works and all renewals and extensions thereof (including all rights of the owner of copyright specified in §106 of the US Copyright Act and under the Laws of any foreign state, territory or country); (ii) all rights of use and control of the Basic Works; and (iii) any reproductions or copies made thereof. You and Artist agree that, for purposes of copyright law and as between the parties hereto, each Basic Work, from inception of creation, will be deemed a work exclusively licensed to Motown during the License Period by you, Artist and all other Persons rendering services in connection with such Basic Work. You and Artist shall, upon Motown's reasonable request, cause to be executed and delivered to Motown any documents that Motown deems necessary or appropriate to vest in Motown the rights granted to Motown herein, and you and Artist irrevocably appoint Motown as your limited attorney-in-fact for the sole, limited purpose of executing such documents in your names. Motown shall give you five (5) business days' notice before signing any document in your name, provided Motown may dispense with that waiting period when necessary, in Motown's reasonable business judgment, to protect or enforce Motown's rights. As a non-material obligation hereunder, Motown shall provide you with copies of documents signed by Motown in your or Artist's name. In accordance with the foregoing, Motown may record Motown's exclusive license in the Basic Works with the appropriate Copyright Office or register the copyright in each Subject Recording on your behalf in your name, subject to the terms of this paragraph 8.01. You and Artist waive all moral rights (or equivalent thereof) available to you in connection with each Basic Work and all Controlled Compositions hereunder. Notwithstanding anything to the contrary contained herein, during the six-month period immediately following the License Period ("**Sell-Off Period**"), Motown may continue to non-exclusively Exploit Physical Records embodying Subject Recordings in accordance with the terms hereof. Motown shall not: (A) manufacture excessive copies of Physical Records embodying Subject Recordings in anticipation of the end of the License Period; or (B) manufacture additional Physical Records embodying Subject Recordings during the Sell-Off Period. With respect to Licensing Exploitations authorized during the License Period, Motown may continue to Exploit such Subject Recordings via such authorized uses and the terms contained therein.

(b)    Without limiting the generality of the foregoing, during the License Period and throughout the Territory, Motown will have the exclusive right to (i) create, reproduce, manufacture, sell, distribute, advertise, license, publicly perform, synchronize with any medium (including motion pictures, commercials and video games), compile and recompile, remix, edit or adapt, exhibit, publicly display or otherwise exploit the Basic Works, and Records and Reproductions containing Basic Works, by any method, or in any media, now or hereafter known or developed, under any trademarks, trade names or labels, for any purposes, and (ii) lease, license, convey or otherwise use or dispose of any Basic Works, by any method, or in any field of use, now or hereafter known or developed, on any terms Motown approves; or Motown may

Page 10
Love Records (The Love Album) - Recording Agreement.EXECUTION

delay or refrain from doing any of the foregoing. Motown or its designee may include on any Basic Work all such trademarks, trade names, information, logos and other items, as Motown customarily includes on such types of works, including, as applicable, Internet Addresses, watermarks, metadata, and hyperlinks to Internet Addresses.



8.02   (a)   During the License Period, Motown has the right to reproduce, print, publish or disseminate in any medium the approved names (both legal and professional, whether presently or hereafter used), approved likenesses, approved autographs (including facsimile signatures), and approved biographies of you, Artist, the individual producer and all other Persons performing services in respect of the Basic Works (to the extent permissible pursuant to the applicable agreements with such producers or other Persons, and solely to the extent that you advise Motown in advance in writing of any applicable restrictions or provide the applicable agreements or label waivers to Motown) for all purposes of trade, advertising, promotion and the general goodwill of Motown and Affiliate/Principal Licensees. Motown's rights under this paragraph 8.02(a) are (i) exclusive during the License Period with respect to Basic Works and (ii) non-exclusive during the License Period in all other respects.

(b)   During the Term, you shall designate the professional name to be used by Artist for the purposes of this Agreement (including for the Exploitation, marketing and promotion of the Commitment Album and other Basic Works as set forth herein (such purposes, "**Motown Album Purposes**")), provided that following Motown's approved release of the first Subject Recording hereunder, neither you nor Artist shall use a different professional name for the Motown Album Purposes unless you and Motown agree in writing.

(c)   (i)   Any and all pictures of Artist or biographical material about Artist or any side artist or producer which Motown proposes to use hereunder shall be subject to your prior written approval, including for packaging, advertising or publicity of the Commitment Album (and related release) hereunder. Motown will not use any such material unless you approve such material in writing (such approval not to be unreasonably delayed or withheld). In any event, Motown will not be required to incur expenses beyond those customary for a compilation-like Album such as the Commitment Album hereunder. This paragraph 8.02(c) will not apply to any material previously approved by you or used by Motown for the use concerned. You may submit photographs, likenesses and biographical material of Artist for a particular

Page 11
Love Records (The Love Album) - Recording Agreement.EXECUTION

use and your submission of same will constitute your approval thereof for such use, provided that your approval of a given photograph, likeness or biographical material hereunder shall not limit your other approval rights as set forth in this Agreement.







Page 14
Love Records (The Love Album) - Recording Agreement.EXECUTION



9.    **ROYALTIES**







Page 17
Love Records (The Love Album) - Recording Agreement.EXECUTION



10.   **ROYALTY STATEMENTS AND PAYMENTS**



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



11.    **LICENSES FOR MUSICAL COMPOSITIONS**





Love Records (The Love Album) - Recording Agreement.EXECUTION





12. **MARKETING AND PROMOTION; RELEASE COMMITMENT**





Love Records (The Love Album) - Recording Agreement.EXECUTION









DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1





13. **REPRESENTATIONS, WARRANTIES AND CERTAIN COVENANTS**

You represent, warrant and covenant to Motown as follows:

13.01   You have the right, power, authority and capacity to execute and deliver this Agreement, to grant Motown the rights set forth herein and to perform fully hereunder, without the consent or approval of any other Person. This Agreement has been duly executed and delivered by you, and constitutes a legal, valid and binding obligation on your part, enforceable in accordance with its terms.

13.02   Neither this Agreement nor the fulfillment hereof by any party infringes upon the rights of any Person or violates any Laws, and you have no knowledge of any claim or potential claim that may interfere with Motown's exercise of its rights hereunder or create any liability on the part of Motown. Without limitation of the foregoing: (a) each Person who renders any services in connection with the creation of the Basic Works has the right to render such services, without any legal or contractual restrictions, and has or will grant you and Motown all of the rights referred to herein, without any restrictions (subject to restrictions in the label waivers for the applicable Featured Artists or standard approvals in Featured Artist and producer agreements); (b) none of the Basic Works or any other Materials created or provided by you or Artist, or any authorized use of the foregoing by Motown or Affiliate/Principal Licensees or their respective grantees, licensees or assigns hereunder, will violate or infringe upon the rights of any Person; and (c) all Basic Works and other Materials supplied to Motown by you or Artist will be free of any liens and encumbrances.

13.03   Motown will not be required to make any payments for or in connection with the acquisition, exercise or exploitation of rights pursuant to this Agreement, except as specifically provided herein.

13.04   Artist is or will become, and shall remain throughout the Term, a member in good standing of all labor unions or guilds in which membership is required under Motown's agreements with such unions or guilds for the performance of Artist's services hereunder, and all terms provided for in the 2002-2006 SAG-AFTRA Code Article 17, as may be amended from time-to-time, related to Contracts with Artists will be deemed incorporated herein by reference. As between you and Motown, you will be solely responsible for and shall pay any union or guild payments (including "new use" and "conversion" fees and any health and welfare contributions) required in connection with your or Artist's use of Stems or Subject Recordings at Artist's live Performances.

13.05   [Intentionally omitted].

13.06   No Controlled Composition is subject to any agreement between you or Artist and any co-writer, publisher or other Person that is in any other way inconsistent with your granting the rights granted herein to such Controlled Composition in its entirety.

13.07   You or Artist have all of the rights necessary to use the professional name to be used by Artist hereunder, without any further third party clearances or approval, for the purposes of your and Artist's services hereunder and Motown's exercise of its rights as set forth in this Agreement.

13.08    Artist has reached legal age of majority pursuant to the Laws governing this Agreement and its performance hereunder.

13.09    Throughout the Term, Artist shall actively perform as a musical entertainer. You and Artist (and each Person acting on behalf of you or Artist) are in compliance with, and throughout the Term shall comply with, all applicable Laws in fulfilling your obligations hereunder and otherwise conducting your professional activities in connection herewith (including compliance with Sections 317 and 508 of the Communications Act of 1934).

13.10    You are, and at all times during the Term will be, a corporation in good standing in the jurisdiction of your formation.

13.11    Neither Motown's acceptance of any Materials hereunder nor Motown's knowledge of any facts that would constitute a breach of any representation, warranty or covenant of yours hereunder, will affect Motown's indemnification rights or other remedies hereunder even if Motown has provided you with assistance in obtaining mechanical licenses, Artwork acquisitions/clearances, sample clearances, trademark clearances or other clearances.

13.12    Neither you nor Artist shall speak, write or otherwise communicate any remark, comment, message, declaration, statement or other communication through any means or media, whether verbal, in writing, electronically transmitted or otherwise, that might reasonably be construed to disclose, incorporate, discuss, include or otherwise involve any confidential or proprietary information of any of the Motown Parties; and neither you nor Artist shall cause, encourage or solicit any Person to do or further or assist any Person in doing any of the foregoing described in this paragraph 13.12.

13.13    During the License Period, Artist shall not perform for any Person other than Motown for the purpose of making Records or Recordings embodying (and neither you nor Artist shall permit the use by any Person other than Motown of Artist's name or likeness for or in connection with any such Record or Recording embodying) any Composition recorded or delivered as embodied in a Subject Recording provided that such Subject Recording has been released by Motown hereunder during the Term (each such Composition, a "**Recorded Composition**").

## 14.    **CERTAIN PROVISIONS RELATING TO YOU AND ARTIST**

14.01    You represent, warrant and covenant that you have, and at all times during the Term, you shall have, the sole and exclusive right to furnish the services of Artist as required herein and to grant the rights set forth herein, including as they relate to Artist and any and all copyright interests in and to the Basic Works. Simultaneously with the execution of this Agreement, you have delivered to Motown, an inducement agreement in the form of **Exhibit A** ("**Inducement Agreement**"), executed by Artist. You hereby give your consent and approval to the terms of the Inducement Agreement. You and Motown each intend that the rights granted herein include a grant of rights to receive injunctive relief pursuant to the provisions of California Civil Code Section 3423(e) and California Code of Civil Procedure Section 526 (second paragraph 5) concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services.

14.02    (a)    You represent and warrant that as of the end of each of the first seven (7) Contract Years of this Agreement, Artist will have received minimum Compensation at the rate of: Nine Thousand Dollars ($9,000) for the first Contract Year, Twelve Thousand Dollars ($12,000) for the second Contract Year and Fifteen Thousand Dollars ($15,000) for each of the third through seventh Contract Years (each, an "**Annual Minimum Payment**"). Compensation paid in any Contract Year in excess of the applicable Annual Minimum Payment will apply to reduce the Compensation otherwise required to be paid in any subsequent Contract Year.

(b)     [Intentionally omitted].

(c)     You acknowledge and agree that the provisions of this paragraph 14.02 are intended to preserve Motown's right to seek injunctive relief to prevent a breach of a contract for the rendition or furnishing of personal services. If California law is changed to provide for different or additional provisions as a requisite for injunctive relief than those provisions set forth herein, and such law may apply to this Agreement, then Motown may unilaterally amend this Agreement to comply with such law as of the effective date of such change.

14.03   In the event that you fail to fulfill any of your material obligations hereunder then, at any time after the occurrence of any such event, in addition to any other remedies that may be available, Motown may, exercisable by notice to you, terminate the Term or require Artist to render Artist's personal services directly to Motown for the remainder of the Term, including any extension thereof, for the purpose of fulfilling your obligations hereunder, upon all the same terms set forth herein. If Motown exercises its option to require Artist to render Artist's personal services directly to Motown, then Artist will be deemed substituted for you as a party to this Agreement as of the date of such option exercise.

15.     **FAILURE OF PERFORMANCE; CERTAIN REMEDIES**







16. **MISCELLANEOUS**









16.11   You and Artist are entering into this Agreement and are performing your obligations hereunder as independent contractors. Nothing herein contemplates or constitutes you or Artist as Motown's partners, joint venturers, agents or employees. Without limitation of the foregoing, you and Artist have no right to execute any agreement or incur any obligation for which Motown may be liable or otherwise bound. No fiduciary relationship or duty or special relationship of trust and confidence exists between you or Artist, on the one hand, and Motown, on the other hand, and no such relationships or duties will be deemed to be created by this Agreement or the business relations between you or Artist, on the one hand, and Motown, on the other hand.





16.14   This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Any signed copy of this Agreement (including an electronic signature), or copies or counterparts thereof, delivered by facsimile or electronic delivery, will for all purposes be treated as if it were delivered containing an original manual signature of the party whose signature appears in the facsimile or electronic mail and will be binding upon such party in the same manner as though an originally signed copy had been delivered.

IN WITNESS WHEREOF, the parties have signed this Agreement in the spaces provided below.

**MOTOWN RECORDS**,
a division of UMG Recordings, Inc.

By: *Martha Braithwaite*   CB
An authorized signatory

**LOVE RECORDS, INC.**

DocuSigned by:
By: _____
A9C62A591DE6430
An authorized signatory

**INSOFAR AS IT RELATES TO VIRGIN:**

By: *Martha Braithwaite*   CB
**VIRGIN MUSIC LABEL AND ARTIST SERVICES**,
a division of UMG Recordings, Inc.

## Exhibit A

## Inducement Agreement

Date:    May 4, 2022

Motown Records,
a division of UMG Recordings, Inc.
1750 North Vine Street
Hollywood, CA 90028

Ladies and Gentlemen:

The undersigned ("Artist") has been advised that concurrently herewith Motown Records, a division of UMG Recordings, Inc. ("**Motown**") is entering into an agreement with Love Records, Inc. ("**Company**") pursuant to which Company agrees to furnish Artist's non-exclusive services, among other things, to curate an Album ("**Recording Agreement**"). Capitalized terms used herein and not otherwise defined have the meanings assigned to such terms in the Recording Agreement. This inducement agreement is subject to the rules of interpretation set forth in paragraph 16.13 of the Agreement.

In consideration of Motown's execution of the Recording Agreement and as a further inducement for Motown to do so (it being to Artist's benefit that Motown execute such agreement), Artist hereby agrees as follows:

1.       Company is, and at all times during the term of the Recording Agreement (as it may be extended or renewed, the "**Term**") will be, authorized to furnish Artist's recording services to Motown as provided in the Recording Agreement. Artist is familiar with each provision of the Recording Agreement relating to Artist's obligations, assents to the execution thereof, and agrees to be bound by all the restrictions and other provisions therein relating to Artist. Artist acknowledges that Motown will have no obligations to make any payments to Artist in connection with the services rendered by Artist or the fulfillment of Artist's other obligations under the Recording Agreement, except as provided in paragraph 7.05 and 14.03 of the Recording Agreement.

2.       If, during the Term, Company ceases to be entitled to Artist's services in accordance with the terms of the Artist Agreement, or if Company fails or refuses to furnish Subject Recording recordings embodying Artist's Performances to Motown in accordance with the Recording Agreement, (a) Artist shall, at Motown's request, do all such acts and things so as to give Motown the same rights, privileges, and benefits as Motown would have had under the Recording Agreement if Company had continued to be entitled to Artist's services and if Company had continued to furnish Recordings to Motown; and (b) such rights, privileges, and benefits will be enforceable in Motown's behalf against Artist.

3.       All of the representations and warranties made by Company in the Recording Agreement that concern Artist are true and correct. All of the terms, conditions and restrictions relating to Artist in the Recording Agreement will be binding upon Artist and regardless of the name(s) by which Artist may be identified in Artist's artistic endeavors. Company's rights, obligations, liabilities, prohibitions and restrictions contained in the Recording Agreement are applicable hereto and incorporated herein by reference.

4.       Artist hereby confirms and joins in the granting to Motown of the rights specified in the Recording Agreement, including all rights in and to the results and proceeds of Artist's services and the right to use and publish Artist's names (legal, group and professional) and likenesses as set forth in the Recording Agreement.

Page 39
Love Records (The Love Album) - Recording Agreement.EXECUTION

5.      Artist agrees and acknowledges that Motown is the exclusive licensee of all copyright and other rights in all Subject Recordings and other Basic Works delivered to Motown and released by Motown or made by Motown pursuant to the Recording Agreement during the Term (including the right to record Motown's exclusive license in the Basic Works with the appropriate Copyright Office or register the copyright in each Subject Recording on your behalf in your name in accordance with the terms of the Recording Agreement), and that Motown may exercise all rights of the copyright owner as provided in the Recording Agreement.

6.      Intentionally omitted.

7.      Motown may, in its own name, institute any action or proceeding against Artist to enforce its rights under the Recording Agreement or this agreement. Artist acknowledges that its services under the Recording Agreement are of a special, unique, intellectual and extraordinary character which gives them peculiar value, and that if Company or Artist breaches any term of this agreement or of the Recording Agreement, Motown will be caused irreparable injury which cannot adequately be compensated by money damages, and Motown will be entitled to equitable relief, including injunctive relief, to enforce the provisions of such agreements; provided, however, you can challenge the imposition of equitable relief on grounds other than that your and Artist's services are not of a special, unique, intellectual and extraordinary character.

8.      Intentionally omitted.

9.      Artist, for itself and on behalf of any publisher or other Person who has or may have any interest in or to any Controlled Composition, hereby licenses to Motown mechanical reproduction and other rights with respect to each Controlled Composition upon the terms and at the rates applicable to Controlled Compositions licensed to Motown by Company under Article 11 of the Recording Agreement.

10.     Artist agrees to indemnify, defend and hold Motown harmless from and against any third party liability, loss, damage, cost or expense (including reasonable attorneys' fees) paid or incurred by Motown by reason of any breach by Artist of the representations, warranties or covenants contained herein or in the Recording Agreement, and agrees to reimburse Motown on demand for any payment made by Motown after the date hereof with respect to any of the foregoing, all in accordance with the terms set forth in paragraph 15.07 of the Recording Agreement.

11.     Intentionally omitted.

12.     This agreement and all matters directly or indirectly arising out of, under or related to this agreement or any related document or instrument are governed by the arbitration, choice of law, jurisdiction and forum

**[Remainder of page intentionally left blank; signature page follows]**

terms contained in paragraphs 16.09 and 16.10 of the Recording Agreement. Any process in any action, arbitration, suit or proceeding arising out of or relating to this agreement may, among other methods, be served upon Artist by delivering it or mailing it in accordance with paragraph 16.01 of the Recording Agreement. Any such delivery or mail service will have the same force and effect as personal service.

**Very truly yours,**

DocuSign by:

**SEAN LOVE COMBS**

**Acknowledged and agreed:**

**LOVE RECORDS, INC.**

DocuSigned by:

By:
An authorized signatory

**MOTOWN RECORDS,**
a division of UMG Recordings, Inc.

By: Martha Braithwaite    CB
An authorized signatory

**Exhibit B**

**Definitions**



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



Page 43
Love Records (The Love Album) - Recording Agreement.EXECUTION

DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1









Page 47
Love Records (The Love Album) - Recording Agreement.EXECUTION



## Exhibit C

## DELIVERY ELEMENTS





DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1 :





## Exhibit C-1

**SONGWRITER SPLITS**



**PUBLISHING INFORMATION**
*If you represent more than one writer on the same song, please indicate shares per writer.*

Title:

Timing:

Artist:

Preliminary Writers:

| Writer(s) | Publisher(s) | Mech. Share | Performance Society |
|-----------|--------------|-------------|---------------------|
|           |              |             | ASCAP/BMI/SESAC/Other |
|           |              |             | ASCAP/BMI/SESAC/Other |
|           |              |             | ASCAP/BMI/SESAC/Other |
|           |              |             | ASCAP/BMI/SESAC/Other |
|           |              |             | ASCAP/BMI/SESAC/Other |

If a Sample is included, title and artist of Sampled Song: _____

Title:

Timing:

Artist:

Preliminary Writers:

| Writer(s) | Publisher(s) | Mech. Share | Performance Society |
|-----------|--------------|-------------|---------------------|
|           |              |             | ASCAP/BMI/SESAC/Other |

| | | | ASCAP/BMI/SESAC/Other |
|---|---|---|---|
| | | | ASCAP/BMI/SESAC/Other |
| | | | ASCAP/BMI/SESAC/Other |
| | | | ASCAP/BMI/SESAC/Other |

If a Sample is included, title and artist of Sampled Song: _____

## Exhibit D

## Producer's Declaration





DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



**Schedule C-1**

**List of Musical Compositions**

## Exhibit E

## Letter of Direction





## FOREIGN ROYALTY TERMS



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1 :



# EXHIBIT B

**Eye Catching Media, Inc.**
5530 Elaine Ave SE
Auburn, WA 98092

| | |
|---|---|
| Invoice #: | 1611 |
| Page: | 1 |
| Date: | 6/27/2022 |

**Please Remit Payment To:**

Eye Catching Media, Inc.
5530 Elaine Ave SE
Auburn, WA 98092

Client: Capitol Records
Contact: Brittany O'Garro
Address: 1750 Vine Street
　　　　Los Angeles, CA 90028
Campaign:  uMusic (Digital Mobile Billboards)
**Truck 1 (Diddy)**

---

Start Date: 6/24/2022                     End Date: 6/26/2022

---

**Digital Mobile Billboard:**

Truck 1 (Diddy):

1 Digital MB @ $1,400/day x 3 days                     $4,200

**Payment Terms:**

Payments are due upon receipt.

**Thanks for your business!**

| | |
|---|---|
| **TOTAL DUE:** | **$4,200.00** |



MVS
www.mvsmediagroup.com
1.877.728.9631

Alex Bushtaber I President
Tel: 1.877.728.9631
alex@mvsmediagroup.com

1800 S. Ocean Drive, Suite# 4003 Hallandale, Florida, USA 33009 I www.mvsmediagroup.com

# INVOICE

| | Invoice No. | 11713 |
|---|---|---|

**Customer**

| | | | **Misc** | |
|---|---|---|---|---|
| Name | Motown records, Attn: John Kozak | | Date | 7/20/2022 |
| Address | 1750 Vine Street | | Order No. | |
| City | Los Angeles | State CA   ZIP 90028 | Rep | |
| Phone | | | FOB | |

| Qty | Description | Unit Price | TOTAL |
|---|---|---|---|
| 1 | MIA LED Truck Rental for Rolling Loud July 22-24, 2022  8 hours per day | $  3,600.00 | $  3,600.00 |
| | | | |
| | | | |
| | PO# USP0660700 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SubTotal | $3,600.00 |
| | | Paid | $0.00 |

Tax Rate(s)

| | **TOTAL OWED** | $3,600.00 |
|---|---|---|

**Payment**   Check

Comments: _____

CHK #: _____
Expires: _____

Office Use Only

*Please make all checks payable to:  MVS MEDIA GROUP, LLC*

*Thank you for your business*

20220831001433686E

From: John.Kozak@umusic.com

To: umg.invoice.usa@umusic.com;

Subject: PLEASE PROCESS: MVS MEDIA GROUP_DUKE DEUCE_USP0660700

Sent Date: Tuesday, August 30, 2022 11:50:43 PM
Received Date: Tuesday, August 30, 2022 11:51:48 PM
Email Unique ID: 43e13d43-295e-4a53-80a9-d358afda25ef
This email is from an external source. Review carefully before clicking links or attachments.
Thanks!

John Kozak
Capitol Music Group
Hollywood. California
John.kozak@umusic.com<mailto:John.kozak@umusic.com>

**Lex Promotions & Marketing**
20533 Biscayne Blvd Suite 4523
Aventura, FL  33180 US
accounting@lexpromotions.com

# Invoice



PO# USP0653040

BILL TO
John Kozak
Capitol Records
1750 Vine Street
Ca
Los Angeles, CA  90028

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 1975 | 07/11/2022 | $4,000.00 | 07/11/2022 | Due on receipt | |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | Mobile Billboard Marketing | 7/1/2022-7/3/2022 | 1 | 4,000.00 | 4,000.00 |

Diddy Essence festival

Company admin fee of 10% of total invoice amount will be paid if invoice is not paid in within 30 days of invoice fee.

**BALANCE DUE**          **$4,000.00**

20220727001424087E

From: John.Kozak@umusic.com

To: umg.invoice.usa@umusic.com;

Subject: PLEASE PROCESS: LEX PROMOTIONS_DIDDY_USP0653040

Sent Date: Wednesday, July 27, 2022 5:07:51 PM
Received Date: Wednesday, July 27, 2022 5:08:32 PM
Email Unique ID: 9c495bad-96ac-42f3-b142-a30e843e7ae5
This email is from an external source. Review carefully before clicking links or attachments.
Thanks!

John Kozak
Capitol Music Group
Hollywood. California
John.kozak@umusic.com<mailto:John.kozak@umusic.com>



A RISK STRATEGIES COMPANY

DeWitt Stern
500 N. Brand Blvd., Ste. 1600
Glendale, CA 91203
T 818.623.5400
www.dewittstern.com
License #0F06675

# INVOICE

**Love**
**ATTN:** Leslie  Taylor
**C/O Motown Records**
1750 N. Vine Street

Hollywood , CA 90028          USA

**Invoice Date: 6/17/2022**
**Invoice No.  : 157712-1**
**Bill To Code:** Universal Music Group
**P/O:** USP0646440

**Job ID:** Gotta Move On                    **Amount Due:** $17,194.46

| Policy Effective | Carrier | Policy No. | Policy | Amounts |
|---|---|---|---|---|
| 10/31/2021 | Allianz Global Risk US Ins. Co. | UST020974210 | Entertainment Package | $11,836.16 |
| | Allianz Global Risk US Ins. Co. | UST016102211 | Commercial Umbrella | $809.13 |
| | Chubb | 9908 65 31 | Group Travel Accident | $0.00 |
| | Hiscox | USUUA263266921 | Error and Omissions | $2,031.67 |
| | Allianz Global Risk US Ins. Co. | UST020973210 | Comm. General Liability | $1,104.17 |
| | Allianz Global Risk US Ins. Co. | UST020973210 | Comm. Auto Liability | $1,413.33 |

**Job ID: Gotta Move On**                    **Amount Due:** $17,194.46

**Comments:**

**Please Make Check Payable and return top portion to:**
**RSC Insurance Brokerage Inc**
**dba Risk Strategies Company**
**PO Box 970069**
**Boston, MA 02297**

Should you wish to wire the payment, the wire information is: First Republic BK, A DIV ML B&T CO, 160 Federal Street, Boston, MA 02110
ABA No.: 321081669, Insured's Pmnt: RSC Insurance Brokerage, Inc., Premium Trust Acct. Account #
Swift Code

DeWitt Stern is compensated through fees and/or commissions for services provided to clients to identify, value, mitigate, transfer, and administer their risks.  In addition to this compensation, DeWitt Stern has agreements with many of its insurance markets through which it is compensated for insurance placed in these insurance markets.  These payments are based upon such factors as the overall volume, growth, and profitability of the total premium placed with each insurer.  DeWitt Stern provides additional information about its compensation practices at the request of a client.

20220617001414652E

From: emoreno@risk-strategies.com

To: umg.invoice.usa@umusic.com;

Subject: UMG - Motown Records - Love - Gotta Move On - June 16-17 - Invoice 157712

Sent Date: Friday, June 17, 2022 4:35:22 PM
Received Date: Friday, June 17, 2022 4:36:07 PM
Email Unique ID: e79e42df-72dd-47fa-8380-d1faf7536c97
This email is from an external source. Review carefully before clicking links or attachments.
To whom it may concern,

Please scan the attached invoice into Uniport under the following account:
Jennifer.Hawkins@umusic.com<mailto:Jennifer.Hawkins@umusic.com>

Regards,


Elizabeth?        Moreno   |     Account Manager
p 818-623-5407<tel:818-623-5407>      |     emoreno@risk-strategies.com<mailto:emoreno@risk-strategies.com>
From: Hawkins, Jennifer <Jennifer.Hawkins@umusic.com>
Sent: Thursday, June 16, 2022 12:31 PM
To: Moreno, Elizabeth <emoreno@risk-strategies.com>
Cc: Taylor, Leslie <Leslie.Taylor@umusic.com>
Subject: [EXT] RE: UMG - Motown Records - Love - Gotta Move On - June 16-17 - P.O. Request -
157712

CAUTION: This email originated outside of the Company network. Do not click links or open attachments
unless you recognize the sender and know the content is safe.

_____

Hello

Please note PO # USP0646440

Thank you
J

# STURDY.



HTTP://WWW.STURDY.CO —A CREATIVE COMPANY—
DIRECTION, VISUAL DESIGN, SCENOGRAPHY EST.2018.
BASED IN LOS ANGELES, CA

**MAKE PAYMENT TO**

**STURDY.PRODUCTIONS LLC**
156 N LARCHMONT BLVD
LOS ANGELES, CA 90004

**BILL TO**

**MOTOWN RECORDS**
1750 N VINE ST
HOLLYWOOD, CA 90028
ATTN: JENNIFER HAWKINS

**PROJECT**

| INVOICE | LOVE - GOTTA MOVE ON MUSIC VIDEO BUDGET | $89,625.00 |
|---|---|---|
| STURDY-CMG3 | 25% DEPOSIT (AFTER SHOOT COMPLETION) | |

| DATE | **TOTAL** | $89,625.00 |
|---|---|---|

06/16/22

**PAYMENT DUE**

UPON RECEIPT

**BANKING INFORMATION**

**CITY NATIONAL BANK**
STURDY.PRODUCTIONS LLC CHECKING ACCOUNT
16133 VENTURA BLVD.
SUITE 100
ENCINO, CA 91436

**CHECKING ACCT**
**WIRE ROUTNG #**



**CLIENT**
UMG

1 (760) 989-0840
CONTACT@STURDY.CO



**STURDY.**

HTTP://WWW.STURDY.CO —A CREATIVE COMPANY—
DIRECTION, VISUAL DESIGN, SCENOGRAPHY EST 2018.
BASED IN LOS ANGELES, CA

**MAKE PAYMENT TO**

**STURDY.PRODUCTIONS LLC**
156 N LARCHMONT BLVD
LOS ANGELES, CA 90004

**BILL TO**

**MOTOWN RECORDS**
1750 N VINE ST
HOLLYWOOD, CA 90028
ATTN: JENNIFER HAWKINS

**PROJECT**

| INVOICE | LOVE - GOTTA MOVE ON MUSIC VIDEO BUDGET | $179,250.00 |
| STURDY-CMG1 | 50% DEPOSIT | |

| DATE | **TOTAL** | $179,250.00 |

06/15/22

**PAYMENT DUE**

UPON RECEIPT

**BANKING INFORMATION**

**CITY NATIONAL BANK**
STURDY.PRODUCTIONS LLC CHECKING ACCOUNT
16133 VENTURA BLVD.
SUITE 100
ENCINO, CA 91436

**CHECKING ACCT**
**WIRE ROUTNG #**



**CLIENT**
UMG

1 (760) 989-0840
CONTACT@STURDY.CO

# EXHIBIT C



# INVOICE

**Day At Nite LLC**
4114 S Halldale Ave
LOS ANGELES, California 90062
United States

Phone: (530) 218 5441
Mobile: (407) 637 6372
dayatnite.com

BILL TO
**Motown Records**
1750 Vine Street
Los Angeles, California 90028
United States

| | |
|---|---|
| **Invoice Number:** | 7290 |
| **Invoice Date:** | December 21, 2022 |
| **Payment Due:** | December 21, 2022 |
| **Amount Due (USD):** | **$5,000.00** |

| Services | Price | Amount |
|---|---|---|
| Kaito - photo shoot/ single artwork ONE OF ME | $5,000.00 | $5,000.00 |
| | **Total:** | $5,000.00 |
| | **Amount Due (USD):** | **$5,000.00** |

# Nicholas Guinan - DBA Nick Bane Music Services

3333 W 2ND St. Apt. 55-312
Los Angeles, CA, 90004
allsonickbane@gmail.com
(646)549-4410

|  | Date: | 10.31.22 |
| --- | --- | --- |
|  | Invoice #: | 1 |
|  | PO#: | USP0675025 |

Bill To:
Motown
UMG

Zelle: 6465494410 / allsonickbane@gmail.com

Cashapp: $NBNBMoney

**Wire Transfer Information:**
Bank Name: --- Citi Bank
Bank ABA: ---
Bank Location: --- Los Angeles, CA
Name of Beneficiary:
Account Number:

| DESCRIPTION - ARTIST | SERVICE | Studio | Date | RATE | Hours Overtime | Overtime Rate | AMOUNT |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Engineer - Ant / Nova / Writers / Duke | Recording / Edits | Chalice - Camp Love | 9.9.22 | $300 per 12 hours | 3 | $30 per hour | $390 |
| Engineer - Haben / Mike City / Jeremih / Bongo / DA / Mahon | Recording / Edits | Chalice - Camp Love | 9.10.22 | $300 per 12 hours | 3 | $30 per hour | $390 |
| Engineer - Duke / Davion / Xania / Jeremih / KalaniFrFr | Recording / Edits | Chalice - Camp Love | 9.11.22 | $300 per 12 hours | 2 | $30 per hour | $360 |
| Engineer - Jay Uncut / Will G / Eazy / P2J | Recording / Edits | Chalice - Camp Love | 9.12.22 | $300 per 12 hours |  |  | $300 |
| Engineer - Will G / Skylar G / StereoTypes | Recording / Edits | Chalice - Camp Love | 9.13.22 | $300 per 12 hours | 3 | $30 per hour | $390 |
| Engineer - James Fauntleroy | Recording / Edits | Chalice - Camp Love | 9.14.22 | $300 per 12 hours | 2 | $30 per hour | $360 |
|  |  |  |  |  |  |  |  |
|  | **TOTAL:** |  |  |  |  |  | $2,190 |

From: Steve.Cook@umusic.com

To: umg.invoice.usa@umusic.com;

Subject: Inv_14_from_HitBoy_Music_Inc._7944.pdf

Sent Date: Wednesday, October 12, 2022 5:01:45 AM
Received Date: Wednesday, October 12, 2022 5:02:26 AM
Email Unique ID: 25f86bd2-6480-4986-9771-298bffd41ea1
This email is from an external source. Review carefully before clicking links or attachments.
For immediate processing

# Chalice Recording Studio

845 N. Highland Avenue
Los Angeles, CA 90038

# Invoice

(323) 957-7100
www.chalicerecording.com

**Bill To:**

Liz Isik
Capitol Music Group
1750 N. Vine Street, 11th fl.
Los Angeles, CA  90028

| | |
|---|---|
| Inv # | **8365** |
| Inv Date | 9/27/22 |
| Invoiced by | Sandra |
| Project # | 10966 |
| Client PO# | USP0662243 |
| Client | 8698 |

## Project: Puff x Love Records

| Date | Item | Description | Qty | Time | | Unit Price | Tax/Disc | | Line Total |
|---|---|---|---|---|---|---|---|---|---|
| **Rooms** | | | | | | | | | |
| 9/9/22 | Studio G | 4:00PM - 4:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,100.00 T | | $ | 2,100.00 |
| 9/9/22 | Studio G | 4:00AM - 11:30AM - OVERTIME | 1 | 7.5 | $ | 250.00 T | | $ | 1,875.00 |
| 9/10/22 | Studio G | 1:00PM - 1:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,100.00 T | | $ | 2,100.00 |
| 9/10/22 | Studio G | 1:00AM - 4:30AM - OVERTIME | 1 | 3.5 | $ | 250.00 T | | $ | 875.00 |
| 9/11/22 | Studio G | 2:00PM - 2:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,100.00 T | | $ | 2,100.00 |
| 9/11/22 | Studio G | 2:00AM - 6:00AM - OVERTIME | 1 | 4 | $ | 250.00 T | | $ | 1,000.00 |
| 9/12/22 | Studio G | 4:00PM - 4:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,100.00 T | | $ | 2,100.00 |
| 9/12/22 | Studio G | 4:00AM - 6:00AM - OVERTIME | 1 | 2 | $ | 250.00 T | | $ | 500.00 |
| 9/13/22 | Studio G | 3:00PM - 3:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,100.00 T | | $ | 2,100.00 |
| 9/13/22 | Studio G | 3:00AM - 4:30AM - OVERTIME | 1 | 1.5 | $ | 250.00 T | | $ | 375.00 |
| 9/14/22 | Studio G | 1:00PM - 1:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,100.00 T | | $ | 2,100.00 |
| 9/14/22 | Studio G | 1:00AM - 5:30AM - OVERTIME | 1 | 4.5 | $ | 250.00 T | | $ | 1,125.00 |
| 9/15/22 | Studio G | 4:00PM - 4:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,100.00 T | | $ | 2,100.00 |
| 9/15/22 | Studio G | 4:00AM - 4:30AM - OVERTIME | 1 | .5 | $ | 250.00 T | | $ | 125.00 |
| 9/16/22 | Studio G | 4:00PM - 4:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,000.00 T | | $ | 2,000.00 |
| 9/16/22 | Studio G | 4:00AM - 5:30AM - OVERTIME | 1 | 1.5 | $ | 250.00 T | | $ | 375.00 |
| 9/17/22 | Studio G | 4:00PM - 4:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,000.00 T | | $ | 2,000.00 |
| 9/17/22 | Studio G | 4:00AM - 6:00AM - OVERTIME | 1 | 2 | $ | 250.00 T | | $ | 500.00 |
| 9/18/22 | Studio G | 10:00PM - 7:00AM - DISCOUNTED 12 HOUR LOCKOUT | 1 | 1 | $ | 2,000.00 T | | $ | 2,000.00 |
| | | | | | | Rooms Total | $ | | **27,450.00** |
| **Rentals** | | | | | | | | | |
| 9/9/22 | Roland Juno | 50% OFF RENTAL FEE X 10 DAYS | 1 | 10 | $ | 100.00 | | $ | 1,000.00 |
| 9/9/22 | Sony C-800G | CHALICE COMP X 10 DAYS | 0 | 10 | $ | 150.00 | | $ | |
| 9/9/22 | Akai MPK49 | CHALICE COMP X 10 DAYS | 0 | 10 | $ | 75.00 | | $ | |
| 9/9/22 | M-Audio Axiom | CHALICE COMP X 10 DAYS | 0 | 10 | $ | 75.00 | | $ | |
| 9/9/22 | Midi Controller | CHALICE COMP X 9 DAYS | 0 | 9 | $ | 75.00 | | $ | |
| 9/13/22 | Avalon 737 | CHALICE COMP X 6 DAYS | 0 | 6 | $ | 125.00 | | $ | |

2022120700145751 2E

# Chalice Recording Studio



# Invoice

845 N. Highland Avenue
Los Angeles, CA 90038

(323) 957-7100
www.chalicerecording.com

**Bill To:**

Liz Isik
Capitol Music Group
1750 N. Vine Street, 11th fl.
Los Angeles, CA  90028

| | |
|---|---|
| Inv # | **8365** |
| Inv Date | 9/27/22 |
| Invoiced by | Sandra |
| Project # | 10966 |
| Client PO# | USP0662243 |
| Client | 8698 |

### Project: Puff x Love Records

| Date | Item | Description | Qty | Time | | Unit Price | Tax/Disc | Line Total |
|---|---|---|---|---|---|---|---|---|
| 9/15/22 | M-Audio | CHALICE COMP X 3 DAYS | 0 | 3 | $ | 75.00 | $ | |
| 9/15/22 | Presonus | CHALICE COMP X 3 DAYS | 0 | 3 | $ | 75.00 | $ | |
| 9/15/22 | Neumann U-87 | CHALICE COMP X 3 DAYS | 0 | 3 | $ | 150.00 | $ | |

| | | |
|---|---|---|
| Rentals Total | $ | 1,000.00 |
| Subtotal | $ | 28,450.00 |
| Total Tax | $ | |
| Total w/Tax | $ | 28,450.00 |
| Payments | $ | |

*Comments*

*PUFF WRITING CAMP FOR LOVE RECORDS WITH VARIOUS WRITERS AND
PRODUCERS
SETUPS IN CONTROL ROOM, LIVE ROOM & LOUNGE
SESSION DETAILS LISTED ON ATTACHED WORK ORDERS*

Balance Due <u>15 days</u> From Inv Date **Balance** $ **28,450.00**

USD

Bank Wire Info:    CHALICE RECORDING STUDIO    BANK OF AMERICA   (323) 730-9140
ACCOUNT #                 SUNSET-OGDEN BRANCH 0324
ROUTING #                  7800 SUNSET BLVD.
SWIFT CODE                HOLLYWOOD, CA 90046, USA

*Please make check payable to Chalice Recording Studio.
**If a legal dispute arises regarding this invoice, actual attorney fees and costs incurred by
Chalice Recording Studio shall be added to any amounts due or any judgment obtained.

Stay Royal Productions

# INVOICE

1414 e 23rd st Los Angeles California, 90011

# 2

Vendor #563707

Date: Nov 1, 2022

Bill To: Motown Records 345 N Maple Dr
**UMG**   Beverly Hills, CA 90210

**Balance Due:**     **$500.00**

Shawnbarron@gmail.com
Deforrest.taylor@icloud.com
fsantella@combsenterprises.com
Umg.invoice.usa@umusic.com

Su-rmi.givens@umusic.com

| Item | Quantity | Rate | Amount |
|------|----------|------|--------|
| Love Records Writers Experience - Engineering Services - 10.27.22 | 1 | $500.00 | $500.00 |

| | | |
|---|---|---|
| Subtotal: | $500.00 |
| Tax (0%): | $0.00 |
| Total: | $500.00 |

20221110001451640E

From: umg.invoiceexceptions.usa@umusic.com

To: Su-rmi.Givens@umusic.com;Vanessa.Cordoba@umusic.com;umg.invoice.usa@umusic.com;

Subject: RE: EX-VMF Doc# 8001306922, Multiple vendor names, PPI V# 563707 - Stay Royal Productions

Sent Date: Thursday, November 10, 2022 8:05:28 PM
Received Date: Thursday, November 10, 2022 8:06:20 PM
Email Unique ID: a39e7b98-2749-46c2-a0d6-3797f859d452
This email is from an external source. Review carefully before clicking links or attachments.
Adding scanning center.

Regards,


[cid:image002.jpg@01D8F56D.DD53D9D0]

Ganesh Uttekar | Universal Music Group



PTP Accountant (US)




Level 5, Tower VIII, Wing A & B, Magarpatta Township Development and Construction Co. Ltd, Magarpatta City Village Hadapsar, Taluka Haveli, Pune, Maharashtra, 411014.



Calls: 1-855-856-5808 X 2 (8:00 am to 6:30 pm PST)
Emails: Uniport.Helpdesk.US@umusic.com<mailto:Uniport.Helpdesk.US@umusic.com>
Global Finance Community
site<https://nam02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fsecure-web.cisco.com%2F1AbTEZHY0piUmrjokkUc_8v1NVWwt9wb0-G3h1SX4SvM6dk1XaQhsJSkdFdV1G-Y7sNWn3KxP5c9LKEFDQspf9O079IljhGdEkqry0A9gB89h9IV3QfEPRPrEFlM4apWwovGlhdfoGqntyeuUmL4t1_-Oh4-xpcpx9k5IBHvQkc3gOcTLUlSBE9z3M7I67IWRtEOKeJAoUnEQ6FO6IMhI9bvxYtQf13PVUzjZWXKS8ZlA

_xGkGMVV6SnO0sz82RMOYXAboFWGmaxFB2ZQngWuAjd8VjPE89STHocGFTys5BSCOJBYjyv9eVt5
vkRXJk9o4%

781 WHEELER ST NW STUDIO 8
ATLANTA, GA  30318 US
(404)827-8503
info@singmastering.com
https://www.singmastering.com

**S I N G**
MASTERING

PO# USP0677574

**BILL TO**
Capitol Music Group
Attn:  Liz Isik
1750 N. Vine Street, 11th floor
Hollywood, CA  90028

**INVOICE 10698**

**DATE** 10/03/2022   **TERMS** Due on receipt

**DUE DATE** 10/03/2022

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Audio Mastering<br>Audio Mastering for DIDDY "GOTTA MOVE ON" RMX (RECALL 10.2.22-3) Single.  Mastered by Colin Leonard at SING Mastering, Atlanta, GA. MAIN | 1 | 475.00 | 475.00 |
| Audio Mastering:Add'l Mixes<br>Additional Mixes (Each) CLN, INST, ACA, | 3 | 100.00 | 300.00 |
| Audio Mastering<br>Audio Mastering for DIDDY "GOTTA MOVE ON" RMX (RECALL 10.5.22) Single.  Mastered by Colin Leonard at SING Mastering, Atlanta, GA. MAIN | 1 | 475.00 | 475.00 |
| Audio Mastering:Add'l Mixes<br>Additional Mixes (Each) CLN, INST, ACA | 1 | 100.00 | 100.00 |

| TOTAL DUE | **$1,350.00** |
|---|---|

20221117001453077E

From: Su-rmi.Givens@umusic.com

To: umg.invoice.usa@umusic.com;

Subject: Sing Mastering Invoice 10698

Sent Date: Thursday, November 17, 2022 3:40:22 AM
Received Date: Thursday, November 17, 2022 3:40:41 AM
Email Unique ID: b1c2bafe-12f3-4f78-9ca7-a6e7fa56d80d
This email is from an external source. Review carefully before clicking links or attachments.
For immediate processing

Su-Rmi Givens
Capitol Music Group + Motown Records

# INVOICE



**GETEM LLC**

Luis Cofre
11136 chandler blvd, 303, North Hollywood, CA 91601, UNITED
STATES
getemlouie@gmail.com

Invoice No#: 187
Invoice Date: Sep 19, 2022

## $2,700.00
AMOUNT DUE

**BILL TO**              PO# USP0668256

MOTOWN
345 N MAPLE DR, BEVERLY HILLS, CA 90210, UNITED STATES
essence.carson@umusic.com

| # | ITEMS & DESCRIPTION | QTY/HRS | PRICE | AMOUNT($) |
|---|---|---|---|---|
| 1 | CAMP LOVE @CHALICE ENGINEERING W GETELOUIE 9.9.22–9.18.22 | 9 | $300.00 | $2,700.00 |
| | | Subtotal | | $2,700.00 |

**TOTAL**        **$2,700.00 USD**

2022100400144185lE

From: Su-rmi.Givens@umusic.com

To: umg.invoice.usa@umusic.com;

Subject: GetEm LLC Invoice 187

Sent Date: Tuesday, October 4, 2022 1:09:54 AM
Received Date: Tuesday, October 4, 2022 1:10:36 AM
Email Unique ID: bf43cc51-4f03-4a29-a209-b06af768c393
This email is from an external source. Review carefully before clicking links or attachments.
For immediate processing

Su-Rmi Givens
Capitol Music Group
212 331-2227

**Daniel Lewis Garcia**
4829 Cartwright Ave.
North Hollywood, CA 91601

# INVOICE

# 444

| | | |
|---|---|---|
| Date: | | Sep 2, 2022 |
| Payment Terms: | | Check or DP |
| Due Date: | | Oct 5, 2022 |
| **Balance Due:** | | **$3,500.00** |

Bill To:
**Motown Records**
USP0669831

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **Audio Engineer Services for Diddy - 09/11-17/22** | 7 | $500.00 | $3,500.00 |
| Diddy/Love Records Writing Experience, Day 3-9 | | | |
| **Payment Info** | 0 | $0.00 | $0.00 |
| Bank: Wells Fargo | | | |
| Account Numbe : | | | |
| Routing Number: (Direct Deposit) | | | |
| BIC/Swift Code: WFBIUS6S | | | |

| | |
|---|---|
| Subtotal: | $3,500.00 |
| Tax (0%): | $0.00 |
| Total: | $3,500.00 |

Notes:

Recording sessions for Diddy/Love Records writing camp at Chalice Recording Studios in Hollywood, CA from September 11-17, 2022.

Terms:

PASSED DUE - TO BE PAID IMMEDIATELY

INVOICE #301

September 19, 2022

# Alexander Brandon Miranda

6720 Hillpark Drive, Unit 203
Los Angeles, CA 90068
(949) 307-5896

## BILL TO

UMG RECORDINGS, INC.
PO BOX 25104
LEHIGH VALLEY , PA
18002-5104
USA

## FOR

**Diddy writing camp 9/9-9/17**

Recording Engineering
File Management
Operations oversight

## PURCHASE ORDER:USP0668106

## DESCRIPTION

| Description | Date | AMOUNT Unit Price |
|---|---|---|
| Day Rate | 9/9/22 | $500.00 |
| Day Rate | 9/10/22 | $500.00 |
| Day Rate | 9/11/22 | $500.00 |
| Day Rate | 9/12/22 | $500.00 |
| Day Rate | 9/13/22 | $500.00 |
| Day Rate | 9/14/22 | $500.00 |
| Day Rate | 9/15/22 | $500.00 |
| Day Rate | 9/16/22 | $500.00 |
| Day Rate | 9/17/22 | $500.00 |

| | |
|---|---|
| SUBTOTAL | $4,500.00 |
| TAX RATE | 0.00% |
| TOTAL | $4,500.00 |

Make all checks payable to Alexander B. Miranda.

# INVOICE

# Kieran Lasker

5519 Bevis Ave
Sherman Oaks, CA 91411
Cell: 512-920-9213
Email: kailaskermix@gmail.com

**BILL TO:**
**Motown Records**
**345 N. Maple Dr**
**Beverly Hills, CA 90210**

PROJECT TITLE: The Love Writing Experience
PROJECT DESCRIPTION: Vocal Engineering
P.O. NUMBER: -----
INVOICE NUMBER: 1
DATE: September 28, 2022

| Description | Quantity | Rate | Cost |
|---|---|---|---|
| Vocal Engineering - | | | |
| Recording - Sean Combs - 9/9 - 9/17 (Day Rate) | 9 | $  500.00 | $ 4,500.00 |
| | | Subtotal | $ 4,500.00 |
| | | **Total** | **$ 4,500.00** |

**Thank you!**

**Kieran Lasker**

Wells Fargo
Account
Electronic Routing
Wire Routing #
Swift Code:

20221003001441757E

From: Su-rmi.Givens@umusic.com

To: umg.invoice.usa@umusic.com;

Subject: Kieran Lasker Invoice #1

Sent Date: Monday, October 3, 2022 9:08:24 PM
Received Date: Monday, October 3, 2022 9:09:07 PM
Email Unique ID: 560263bc-4026-4ccd-9ef8-a509a630bee9
This email is from an external source. Review carefully before clicking links or attachments.
For immediate processing

Su-Rmi Givens
Capitol Music Group
212 331-2227

**Daheala & Co, LLC**
c/o Gelfand, Rennert & Feldman, LLC
1880 Century Park East #1600
Los Angeles, CA 90067

USP0653654

# INVOICE

| DATE | INVOICE # |
|------|-----------|
| 7/25/2022 | 072522 |

Bill To:

Motown Records
345 N Maple Drive
Beverly Hills, CA 90210

| | Due Date |
|---|---|
| | Upon Receipt |

| Item | Description | Amount |
|------|-------------|--------|
| | Daheala - Vocal Producer Fee for "One of Me" | $ 5,000.00 |
| | Daheala - Producer Advance for "One of Me" | $ 10,000.00 |

| Total Due (USD) | **$15,000.00** |
|---|---|

Wire Information
Account Name:      Daheala & Co, LLC
Account Number:
Routing Number:
SWIFT Code:
Bank Name:          City National Bank
Bank Address:       400 N Roxbury Dr, Beverly Hills, CA 90210

20220815001430421E

From: Su-rmi.Givens@umusic.com

To: umg.invoice.usa@umusic.com;

Subject: Daheala Invoice 072522

Sent Date: Monday, August 15, 2022 5:53:05 PM
Received Date: Monday, August 15, 2022 5:53:30 PM
Email Unique ID: 5a0af743-ec1d-4699-8475-0d538f47faf7
This email is from an external source. Review carefully before clicking links or attachments.
For immediate processing

Su-Rmi Givens
Capitol Music Group
212 331-2227

# Madeline St John                                       **Invoice**

518 Glenwood rd #201
Glendale, CA 91202
518-588-1038

| **Bill To** | **Payable to** | **Invoice No.** | **Date** |
|---|---|---|---|
| Motown | Madeline St John | 20 | 9/19/2022 |
| 345 N. Maple Dr | | | |
| Beverly Hills, CA 90210 | | | |

| **Description** | **Days** | **Day Rate** | **Amount** |
|---|---|---|---|
| Recording Engineer | 5 | $300.00 | $1,500.00 |
| September 9th. 10th, 15h, 16th, and 17th | | | $0.00 |
| | 5 | Subtotal | $1,500.00 |
| | | **Balance Due** | **$1,500.00** |

20221206001457061E

From: maddistjawn@gmail.com

To: UMG.Invoice.USA@umusic.com;Su-rmi.Givens@umusic.com;

Subject: Love Record Writing Experience Invoice

Sent Date: Tuesday, December 6, 2022 4:18:51 AM
Received Date: Tuesday, December 6, 2022 4:19:27 AM
Email Unique ID: 44eca5c6-99d9-49f5-bcd6-c0ae790f2644
This email is from an external source. Review carefully before clicking links or attachments.

Hello,

I'm trying to resubmit my invoice because it still hasn't been processed or paid.

Thank you!

--
Maddi St John
518-588-1038
maddistjawn@gmail.com<mailto:maddistjawn@gmail.com>

Songwriter | Vocal Producer | Singer
Audio Engineer | Tour Manager

HitBoy Music, Inc.

15233 Ventura Blvd.
Suite 1210
Sherman Oaks, CA 91403

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/21/2022 | 14 |

| Bill To |
|---------|
| Motown Records<br>345 N Maple Dr.<br>Beverly Hills, CA 90210 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| USP0669984 | | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 7 | Studio back writing room - Daily rate per agreement | 1,300.00 | 9,100.00 |
| | Please submit electronic payment to: | | |
| | HitBoy Music, Inc.<br>Routing<br>Account | | |
| | JP Morgan Chase<br>15100 Ventura Blvd,<br>Sherman Oaks, CA 91403 | | |

| | **Total** | $9,100.00 |
|--|-----------|-----------|

20221012001443877E

Stay Royal Productions

# INVOICE

1414 e 23rd st Los Angeles California, 90011

\# 2

Vendor #563707

| | |
|---|---|
| Bill To: Motown Records 345 N Maple Dr | Date:        Nov 1, 2022 |
| UMG       Beverly Hills, CA 90210 | **Balance Due:**       **$500.00** |

Shawnbarron@gmail.com
Deforrest.taylor@icloud.com
fsantella@combsenterprises.com
Umg.invoice.usa@umusic.com

## Su-rmi.givens@umusic.com

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **Love Records Writers Experience - Engineering Services - 10.27.22** | 1 | $500.00 | $500.00 |

| | |
|---|---|
| Subtotal: | $500.00 |
| Tax (0%): | $0.00 |
| Total: | $500.00 |

20221110001451640E

From: umg.invoiceexceptions.usa@umusic.com

To: Su-rmi.Givens@umusic.com;Vanessa.Cordoba@umusic.com;umg.invoice.usa@umusic.com;

Subject: RE: EX-VMF Doc# 8001306922, Multiple vendor names, PPI V# 563707 - Stay Royal Productions

Sent Date: Thursday, November 10, 2022 8:05:28 PM
Received Date: Thursday, November 10, 2022 8:06:20 PM
Email Unique ID: a39e7b98-2749-46c2-a0d6-3797f859d452
This email is from an external source. Review carefully before clicking links or attachments.
Adding scanning center.

Regards,


[cid:image002.jpg@01D8F56D.DD53D9D0]

Ganesh Uttekar | Universal Music Group



PTP Accountant (US)




Level 5, Tower VIII, Wing A & B, Magarpatta Township Development and Construction Co. Ltd, Magarpatta City Village Hadapsar, Taluka Haveli, Pune, Maharashtra, 411014.



Calls: 1-855-856-5808 X 2 (8:00 am to 6:30 pm PST)
Emails: Uniport.Helpdesk.US@umusic.com<mailto:Uniport.Helpdesk.US@umusic.com>
Global Finance Community
site<https://nam02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fsecure-web.cisco.com%2F1AbTEZHY0piUmrjokkUc_8v1NVwt9wb0-G3h1SX4SvM6dk1XaQhsJSkdFdV1G-Y7sNWn3KxP5c9LKEFDQspf9O079IijhGdEkqry0A9gB89h9IV3QfEPRPrEFIM4apVwovGlhdfoGqntyeuUmL4t1_-Oh4-xpcpx9k5lBHvQkc3gOcTLUISBE9z3M7I67IWRtEOKeJAoUnEQ6FO6IMhI9bvxYtQf13PVUzjZWXKS8ZIA

_xGkGMVV6SnO0sz82RMOYXAboFWGmaxFB2ZQngWuAjd8VjPE89STHocGFTys5BSCOJBYjyv9eVt5vkRXJk9o4%

## Eucalipto Music LLC

| | |
|---:|:---|
| **Invoice ID**: | 091922 |
| **Date of Invoice**: | 09.19.22 |
| **Payment Due**: | Upon Receipt |
| **P.O. #**: | USP0668363 |

**Bill To**:
Motown Records
345 N Maple Dr
Beverly Hills, CA
90210 United States

**Payable To**:
Eucalipto Music LLC
1505 Langston Ave SW
Atlanta GA 30310
Attention: Roark Bailey

| Qty | Description | Unit Price | Total |
|---:|:---|---:|---:|
| 9 | Love Records Camp Day Rate | 750 | $6750.00 |
| | | **TOTAL** | **$6750.00** |

**Notes:**

Engineering Day Rate For Roark Bailey
Date: 9/9/22 - 9/17/22