# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RODNEY JONES,

                 Plaintiff,

     v.

SEAN COMBS,
JUSTIN DIOR COMBS,
CUBA GOODING, Jr.,
LUCIAN CHARLES GRAINGE,
KRISTINA KHORRAM,
CHALICE RECORDING STUDIOS,
LOVE RECORDS,
MOTOWN RECORDS,
UNIVERSAL MUSIC GROUP,
COMBS GLOBAL ENTERPRISES,
JOHN and JANE DOES 1-10; and
ABC CORPORATIONS 1-10,

                 Defendants.

CASE NO.: 24-1457

**DECLARATION OF ETHIOPIA HABTEMARIAM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT BY DEFENDANTS UNIVERSAL MUSIC GROUP, MOTOWN RECORDS AND SIR LUCIAN GRAINGE**

I, Ethiopia Habtemariam, declare as follows:

1.      I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and, if called upon to testify as a witness, I could and would competently testify thereto.

2.      I began my employment with the Universal Music companies in January 2003, becoming employed on the music publishing side of the business by Universal Music Publishing Group ("UMPG"). In or around February 2014, I was promoted to President of Urban Music/Co-Head of Creative at UMPG.

3. In or around February 2014, I moved over to the recorded music side of the business and became the President of Motown Records and Executive Vice President of Capitol Music

1

DocuSign Envelope ID: 58C82DB3-E87D-4B64-93D1-7715E650E340

Group.  Motown Records is not an independent company but a record label that is a division of UMG Recordings, Inc. ("UMG Recordings").

4.      In or around March 2021, I became the Chairperson and Chief Executive Officer of Motown Records.  I left Motown Records and UMG Recordings at the end of November 2022.

### A. The False Allegations Regarding My Presence At Combs' Homes Where There Were Allegedly Drugs, Underage Girls and Sex Workers

5.      Contrary to the allegations of the First Amended Complaint regarding my alleged presence at Mr. Combs' homes in Miami and New York at alleged "parties" at which underage girls and sex workers were present and being drugged (¶¶ 171-176), I have never visited either of those homes, and I have never attended any "party" at any of Mr. Combs' homes (other than a single black-tie event in Los Angeles on June 26, 2022 celebrating his "lifetime achievement" award from BET).  The only property of Mr. Combs that I ever visited was in Los Angeles, and, as discussed below, all of my visits preceded Plaintiff's alleged commencement of his work for Mr. Combs and Love Records, Inc. in September 2022.  I understand that Plaintiff has now abandoned his claims that either I or Mr. Grainge ever visited Combs' homes.

6.      I have been in the music industry for nearly 20 years, and in my experience, it is not uncommon for some of the most successful people in the music industry to hold business meetings at their homes.  It is also very common for successful artists to have recording studios at their homes, where they work on records and conduct related business.  Mr. Combs' Los Angeles property included a home studio in a separate building on the property, and this is where, to my knowledge, Mr. Combs conducted most of his work and his business meetings while in Los Angeles.

7.      I visited Mr. Combs' property a total of four times, and each time was for business purposes.  Three of the times I visited Mr. Combs' property in Los Angeles were all business

2

2868064

meetings in connection with the license agreement between Motown Records and Love Records, Inc. and all took place either in the home studio or an outdoor patio. I also visited his property for the party in Mr. Combs' backyard celebrating his lifetime achievement award from BET.

8.      My first visit was in the Spring of 2022, preceding the license agreement. The purpose of the meeting was to listen, in Mr. Combs' home studio, to the recordings he had already made for his album that Love Records, Inc. intended to release. There was no party involved.

9.      My second visit to Mr. Combs' home was within a few weeks after the license agreement was signed (May 4, 2022). This meeting was an introduction meeting between Motown staff and the Love Records Inc./Combs Enterprise team over lunch on the outdoor patio. It was purely business: I was there with my team and we met with Mr. Combs and his team. Again, by his own admission, Plaintiff could not have been there (and there were no underage girls or sex workers).

10.     My third visit, as I mentioned above, was for a formal, black-tie event held outdoors at Mr. Combs' property, celebrating the lifetime achievement award from BET that he had received at the BET awards show earlier that day. There were many people in attendance at this event, including high-profile artists and producers. However, Plaintiff would not have been there as it was in late June 2022 and I can state without any hesitation, I observed no underage girls, sex workers or drug use at the party.

11.     My final visit to Mr. Combs' home in Los Angeles occurred in the July/August 2022 timeframe. The purpose of the visit was to discuss the delivery and release schedule for the Love Records, Inc. album and to have a face to face conversation with Mr. Combs to make sure we met our release schedule deadlines. Again, this meeting preceded Plaintiff's own claimed start

2868064

DocuSign Envelope ID: 58C82DB3-E87D-4B64-93D1-7715E650E340

of his work for Mr. Combs and Love Records, Inc. and I observed no underage girls, sex workers or drug use there.

12.     I have no recollection of ever having met Rodney Jones, the Plaintiff in this action. As far as I know, he was never present any of the four (4) times I visited Mr. Combs' property in Los Angeles. Indeed, according to the Plaintiff's own timeline in his Amended Complaint, it would have been physically impossible for me to have ever met him at Mr. Combs' house in Los Angeles because my visits there all preceded the commencement of his alleged work for Mr. Combs in September 2022 (¶ 24).

### B. Motown Enters Into A License Agreement With Love Records, Inc.

13.     I am aware that the First Amended Complaint claims that Motown Records was the parent company of Love Records, Inc. (and that the new proposed complaint claims that Motown Records or UMG Recordings was in a "general partnership" with Love Records, Inc.) As of the time I left Motown Records in November 2022, both of those assertions are completely false. To my knowledge and understanding, Love Records, Inc. was a company owned by Mr. Combs (whether directly or through one of his companies, I do not know). Instead, as I will explain below, Motown Records entered into a license agreement to distribute a single album featuring the performance of Mr. Combs that was to be (or had been) recorded by Love Records, Inc. This is a commonplace agreement in the music industry.

14.     At some point in the spring of 2022, I entered into discussions with Sean Combs and his counsel, Kenny Meiselas, about Motown Records potentially entering into a license agreement with Mr. Combs' company, Love Records, Inc. for the right to obtain or distribute a new album featuring Mr. Combs as an artist. To my knowledge, as of that time, Mr. Combs had not recorded as an artist for many years, and this would be his first album on Love Records, Inc.

DocuSign Envelope ID: 58C82DB3-E87D-4B64-93D1-7715E650E340

15.     I visited Mr. Combs' home studio at or around the time the license agreement was being negotiated (as I recall, Martha Braithwaite, an attorney within UMG Recordings, negotiated the agreement with Mr. Meiselas) to listen to the recordings that Mr. Combs had already recorded. It was originally contemplated, when Motown Records entered into the license agreement with Love Records, Inc., that Motown Records was going to be licensing, for distribution, a nearly completed album and the "advance" payment (some amount of royalties or profit shares are commonly advanced and recouped from the income generated by recordings) would actually serve to reimburse Love Records, Inc. for the recording costs it had incurred in producing the album.

16.     On or about May 4, 2022, Motown Records and Love Records, Inc. entered into a license agreement whereby Motown Records obtained the right to distribute, for defined period of time, a single album that was tentatively entitled *The Love Album.* I understand that a redacted copy of the license agreement is attached to the accompanying declaration of Ms. Braithwaite as Exhibit A thereto.

17.     In public statements announcing the license agreement, I am aware that both Motown Records and Love Records, Inc. (and Mr. Combs) expressed their excitement at "partnering" with respect to Mr. Combs' forthcoming album. This was a colloquial use of the term "partner" or "partnering." Motown Records and Love Records, Inc. were not "partners" in any legal sense but we were going to be working together with respect to the production and distribution of the album under the license agreement. To my knowledge, any assertion that Motown Records or UMG Recordings was in a "general partnership" with Love Records, Inc. is false.

2868064

18.     While, as I have stated, the original contemplation of the license agreement was
that Love Records, Inc. would be delivering an album that was substantially completed, at some
point thereafter, Mr. Combs decided that he wanted to create and record additional tracks.

## C. While I Was Chairperson and CEO, Motown Records Did Not Financially Sponsor Or Provide Security For The Writers' Camps Or Listening Sessions.

19.     The Amended Complaint makes allegations about the supposed obligation of
Motown Records and/or UMG Recordings to provide security at writers camps and/or listening
sessions at Mr. Combs' homes and claims that Motown Records or UMG Recordings
"sponsored" the camps and/or listening sessions. While I was chairperson and CEO of Motown
Records, to my knowledge, Motown Records never financially sponsored any so-called "writer
camps" or listening sessions and did not provide or pay for security for Love Records, Inc. I expect
that if there were any security, that would have been the obligation of Love Records, Inc., which
was running the "writers' camp" and any listening sessions.

20.     My understanding is consistent with what is stated in the accompanying
declaration of Ms. Braithwaite: Love Records, Inc., not Motown Records or UMG Recordings,
was responsible for security at any Love Recordings' writers' camp or listening sessions.

21.     Moreover, as I have said, the only "listening" session I ever attended at Mr. Combs'
Los Angeles property (the only one I ever visited) was before the license agreement was entered
into in order to listen to the recordings he had already made in his home studio. I do not know if
there was any security at Mr. Combs' home but if there were, my understanding is that he or one
of his companies would have been responsible for it, not Motown Records.

22.     With respect to the "writers' camp" at Chalice Studios in September 2021, I did
briefly visit the studio to hear some of the new tracks that had been recorded (or were in the process
of being recorded). I have no recollection of meeting the Plaintiff at Chalice Studios (there were

a number of different rooms there and it may be that Plaintiff was in a different area than I was in, if he was there at all).

23.     Regardless, at the time that I was at Chalice Studios, there was no shooting inside or nearby.

### D.  I Did Not Make And Am Not Aware Of Any "Cash" Payments Being Made To Love Records, Inc. or Mr. Combs By Motown Records Or UMG Recordings

24.     In addition to accusing me of engaging in a criminal racketeering enterprise (which is categorically untrue), the First Amended Complaint accused me, Lucian Grainge, Motown Records and UMG Recordings of having participated in, aided and abetted and helped to conceal alleged sex trafficking by Mr. Combs and his colleagues.  These are vile and deeply upsetting accusations, and are completely untrue.

25.     As I understand it, the foundational bases for these claims in the First Amended Complaint (and they have no basis in fact) are the false assertions that Motown Records was the parent company of Love Records, Inc. and that Lucian Grainge and I both attended "listening parties" at various of Mr. Combs' homes at which such alleged sex trafficking occurred.  I never attended any such listening party and Motown Records was not the parent company of Love Records, Inc.  I am not aware of Lucian Grainge ever visiting any of Mr. Combs' homes.  I understand that in a proposed new complaint, Plaintiff has now abandoned every one of these allegations.

26.     As I understand the allegations of the First Amended Complaint, it also claims that I, Lucian Grainge, Motown Records and/or UMG Recordings delivered "cash" to Mr. Combs, allegedly "millions of dollars" and concealed this alleged delivery of "cash" by failing to file required tax forms.  Again, I understand that this allegation has also been abandoned in the new proposed complaint.

2868064

27.     I never gave any cash to Mr. Combs or Love Records, Inc. and I am not aware of

any cash ever being provided to Mr. Combs or Love Records, Inc. (or anyone else associated with

Mr. Combs) by Lucian Grainge, Motown Records or UMG Recordings while I was employed by

Motown Records. Rather, to my knowledge, under the license agreement, there was provision for

the payment or reimbursement of certain recording costs and other legitimate expenses of Love

Records, Inc. that were invoiced. I have no reason to believe that Mr. Combs could or did misuse

any of the monies Motown Records was required to pay Love Records, Inc. under the license

agreement.

### E. Mr. Blackburn's Proffer To Let Me Out Of This Case If I Gave Him A Declaration Presenting A False Narrative

28.     Being falsely accused of criminal conduct is deeply upsetting to me. I did no wrong.

I never saw or participated in any alleged racketeering enterprise, and I never saw, aided or abetted

or tried to conceal any sex trafficking activity. I did not distribute cash to Mr. Combs or anyone

else. In short, there is no basis for any of the claims asserted against me and I should never have

been named as a defendant in this lawsuit.

29.     After the filing of the Amended Complaint, Mr. Jones's counsel, Tyrone Blackburn,

approached me and proposed to dismiss me from this case if I would provide a declaration. He

sent over a proposed declaration to my personal counsel, but the declaration he presented was

materially false, and I would not and could not sign it.

30.     My counsel provided a revised declaration that addressed the topics that Mr.

Blackburn addressed and corrected his false narrative. I am aware that Mr. Blackburn found my

truthful version to be unsatisfactory to him and he presented yet another version that again

presented a false narrative.

2868064

31.     My counsel again provided Mr. Blackburn with a revised version of the declaration, which again tried to correct his false narrative.

32.     As can be seen from the declaration itself, which is less than two pages, it summarizes my employment history with UMG Recordings and Motown Records, it notes Motown's license agreement with Love Records, Inc., and goes on to confirm that I have no knowledge supporting Jones's claims that (i) Motown or UMG sponsored listening parties or writers' camps, or (ii) Motown or UMG made cash payments to Mr. Combs or Love Records.  I provided the declaration (though my personal counsel) to Mr. Blackburn. Shortly thereafter, Jones filed a dismissal of the case, as against me as a defendant.

33.     I am informed and believe that Mr. Blackburn has falsely represented to various social media sites and other media outlets that I agreed to "testify against" Mr. Combs.  This is completely untrue.  I have no personal knowledge of any alleged wrongdoing by Mr. Combs and there is nothing I could testify to that would be against his interest.  I have never indicated, in the declaration or otherwise, that I have any intention of testifying "against" Mr. Combs or otherwise testifying on behalf of Plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 27, 2024

Ethiopia Habtemariam

2868064

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODNEY JONES, | |
| Plaintiff, | CASE NO.:  24-1457 |
| v. | |
| SEAN COMBS,<br>JUSTIN DIOR COMBS, CUBA GOODING,<br>Jr., LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10; and<br>ABC CORPORATIONS 1-10,<br><br>Defendants. | **DECLARATION OF DONALD S.<br>ZAKARIN IN SUPPORT OF<br>DEFENDANTS' UNIVERSAL MUSIC<br>GROUP, MOTOWN RECORDS AND SIR<br>LUCIAN GRAINGE MOTION TO<br>DISMISS THE SECOND AMENDED<br>COMPLAINT** |

I, Donald S. Zakarin, declare as follows:

1.      I am a member of Pryor Cashman LLP, counsel for Defendants Sir Lucian

Grainge CBE, and Motown Records (a division of UMG Recordings, Inc.).  Plaintiff has also

named Universal Music Group as a defendant but there is no such juridical entity.  Universal

Music Group is an umbrella name commonly used to refer to all of the various companies and

record labels that are encompassed within UMG Recordings, Inc.  I therefore assume that

Plaintiff has misnamed Universal Music Group, intending to actually name UMG Recordings,

Inc., and I will refer to Universal Music Group herein as UMG Recordings, Inc. ("UMG

Recordings").  I have personal knowledge of the facts set forth in this Declaration and if called

and sworn as a witness, I could and would competently testify thereto.

2.      I submit this declaration in support of the motion of Defendants Sir Lucian

Grainge (CBE), Motown Records and UMG Recordings (sometimes collectively referred to

1

herein as the "UMG Defendants") to dismiss the Second Amended Complaint ("SAC") on the

following bases: (i) under Federal Rule 12(b)(2) for lack of personal jurisdiction; (ii) under

Federal Rule 12(b)(3) for improper venue; (iii) under Federal Rule 8(a)(2) and (d)(1) for failure

to plead in simple and concise statements; and (iv) under Federal Rule 12(b)(6) for failure to

state a claim.  In addition, I submit this declaration in support of the motion of the UMG

Defendants pursuant to Federal Rule 12(f) to strike impertinent and scandalous material from the

SAC.

        3.      I am mindful that the Court wants us to focus this motion to dismiss on the legal

insufficiency of the SAC.  And in furtherance of that, we have narrowly focused the

Memorandum of Law on the legal insufficiency to show that, even without regard for the lack of

any factual basis for the allegations made against the UMG Defendants in the SAC, the SAC

fails to state any claim against the UMG Defendants.

        4.      Also, consistent with the approach of the Memorandum of Law, the first portion

of this declaration will be focused solely on the undisputed facts and documents that are

integrally related to the SAC, establishing that there is no factual or legal basis for any of the

claims against the UMG Defendants and that the claims against them should be dismissed with

prejudice.

        5.      However, because the Plaintiff and Mr. Blackburn have now knowingly filed

three complaints filled with offensively false criminal accusations, simply seeking and obtaining

the dismissal of the SAC for legal insufficiency does not and cannot fully address the harm that

Plaintiff and Mr. Blackburn have visited on my clients.  Accordingly, while I fully understand

that, in order to dismiss this case with prejudice against the UMG Defendants, this Court may

neither need nor want to examine all of the falsehoods that permeate the SAC and Mr.

2

Blackburn's highly improper conduct, I think it important for this declaration to document the extent to which Plaintiff and Mr. Blackburn have filled the SAC not merely with baseless conclusions but with allegations that they know are completely false. Documenting the falsity of the SAC (and Mr. Blackburn's outright misrepresentations to this Court) will be deferred to the second portion of this declaration.

## A. The Roadmap Through the Accompanying Declarations In Support Of The Motion To Dismiss the SAC

6.      The primary purpose of this declaration is to assist the Court by summarizing the undisputed facts set forth in the declarations of Sir Lucian Grainge, Martha Braithwaite and Ms. Habtemariam. Those declarations conclusively show the factual and legal baselessness of the SAC and the UMG Defendants' entitlement to its dismissal. A copy of Sir Lucian Grainge's declaration is attached hereto as Exhibit 1. A copy of Ms. Braithwaite's declaration is attached hereto as Exhibit 2. A copy of Ms. Habtemariam's declaration is attached hereto as Exhibit 3.

## B.      Pursuant to FRCP Rule 12(b)(2), There Is No Personal Jurisdiction Over Sir Lucian Grainge

7.      As set forth in the accompanying declaration of Sir Lucian Grainge, there is no basis for personal jurisdiction over him in this Court. The SAC, a copy of which is attached hereto as Exhibit 4, admits that Mr. Grainge lives in Los Angeles. While the FAC falsely alleged contacts between Mr. Grainge and New York, those allegations have been abandoned in the SAC (instead, attributing the supposed "mail" and "wire" communications to Mr. Combs). As this Court already knows, Mr. Blackburn has been referred by Judge Cote to the Southern District Grievance Committee for his persistent failure, in multiple cases, to properly investigate personal jurisdiction issues.

8.    Moreover, every other defendant (with the exception of a "Combs Enterprises" and the newly added Cuba Gooding, Jr.) is also alleged to be based in Los Angeles, and the activities complained of took place in California or Florida.  Based on my review of online sources, it appears that Combs Enterprises (which has changed its name) is a limited liability company organized under Delaware law and owned by Mr. Combs.  I am informed as well that it is headquartered in Florida.

9.    I understand that a proper RICO claim can support personal jurisdiction over foreign defendants, assuming a sufficient nexus with the forum.  However, because the RICO claims against the UMG Defendants are factually and legally baseless, the objection to personal jurisdiction is being preserved here.

### C.  The SAC Violates FRCP Rule 8

10.    Rule 8 of the Federal Rules requires that Complaints contain short and plain statements and be simple and concise.  The SAC is anything but.  Just by way of example, the RICO claim (the SAC First Cause of Action, ¶¶ 201-276) frequently refers generally to "defendants" without any specificity as to who did what and when.  To the extent it attempts to connect the UMG Defendants to the alleged RICO "conspiracy" or "enterprise," it does so solely with conclusory allegations about a supposed "general business partnership" between Motown Records and/or UMG Recordings with Love Records, Inc. and/or Mr. Combs and the supposed failure of the UMG Defendants to supervise and control how Mr Combs allegedly spent monies payable by Motown Records under the license agreement (attached as Exhibit A to the Braithwaite declaration).

11.    As set forth in the accompanying declaration of Ms. Habtemariam, there never a "partnership" between Motown Records and/or UMG Recordings and Love Records, Inc. and/or

Mr. Combs. And as documented in the accompanying declaration of Ms. Braithwaite, the license agreement (Exhibit A to the Braithwaite declaration) specifically provides, in paragraph 16.11, that there was no partnership.

12.     Beyond the falsity of the foundational allegations by which the SAC tries to connect the UMG Defendants to the alleged RICO claim, the claim alleges wire and mail fraud without a single specific allegation. Nor does it identify who supposedly sent what communication (by wire or mail) to whom and when it was sent or what it said that made it fraudulent. Instead, the allegations generically refer only to communications from the "defendants." (SAC ¶¶ 264-276).

13.     At bottom, the SAC RICO claim bases a criminal accusation against Sir Lucian Grainge, Motown Records and UMG Recordings not on any wrongful act that any of them are alleged to have committed but solely based on the "general business partnership" allegation that is knowingly false and on the equally false (and legally absurd) conclusion that the UMG Defendants were obligated to supervise and control how Love Records, Inc. spent any of the monies that were paid to Love Records, Inc. under the license agreement. As set forth in the Memorandum of Law, the RICO claim does not remotely comply with Rule 8 (and patently fails to satisfy Rule 12(b)(6)).

14.     But the Rule 8 violation of the RICO claim pales in comparison to the violation of Rule 8 by the "sex trafficking" claims against the UMG Defendants (the Fifteenth and Sixteenth Causes of Action).[1] These Causes of Action fail to identify any specific acts, but are instead

---

[1] The Seventh Cause of Action, for aiding and abetting the alleged "sex trafficking" by Combs, while still pleaded in the SAC, has been withdrawn pursuant to Mr. Blackburn's acknowledgement at the hearing on April 9, 2024 that it was baseless.

5

filled with conclusory allegations and also base the supposed liability of the UMG Defendants solely on the newly fabricated foundational allegation about a non-existent "general business partnership" between Motown Records and/or UMG Recordings and Love Records, Inc. and/or Mr. Combs. As with the RICO allegations, this non-existent "partnership" is coupled with the legally non-existent "duty" on the part of the UMG Defendants to supervise and control how Mr. Combs spent any of the monies required to be paid under the license agreement.

15.    Based solely on these two factually baseless assertions (the "general business partnership and supposed duty allegations), which also lack any legal basis, the SAC accuses Sir Lucian Grainge, Motown Records and UMG Recordings of participating in and benefiting from Mr. Combs' alleged "sex trafficking venture" and supposedly obstructing enforcement of the sex trafficking laws under 18 USC § 2 (which does not even provide a private right of action).[2]

16.    There are no facts contained in the allegations but only strident conclusions in violation of FRCP Rule 8. Paragraph 375 is the most glaring example of how far the SAC deviates from Rule 8. It starts on page 83 of the SAC and continues on, for six pages of single-spaced non-factual and conclusory (and redundant) paragraphs, to page 89. Not only does it contain no factual matter whatsoever, it is also anything but a short, plain and concise statement of the claim.

---

[2] As explained in the attached Braithwaite declaration, the UMG Defendants did not benefit from the license agreement. On the contrary, because the agreement was terminated, Motown Records did not even recoup the monies it paid to Love Records, Inc.

**D. The SAC Contains Prejudicial And Scandalous Accusations In Violation of FRCP Rule 12(f)**

17.　　As discussed in detail in the accompanying declarations, and as any review of the SAC shows, it is filled with outrageously offensive accusations against Sir Lucian Grainge. From the gratuitous inclusion of Sir Lucian Grainge's picture to the offensively false RICO and sex trafficking allegations, the SAC should be stricken.

**E. The First Amended Complaint Should Be Dismissed Pursuant to FRCP Rule 12(b)(6) For Failure to State A Claim For Relief Against the UMG Defendants**

**(i) There Is No General Business Partnership Between Love Records, Inc. and Motown Records or any other UMG Entity**

18.　　As set forth in the accompanying declaration of Ms. Habtemariam, there was never any partnership between Motown Records and Love Records, Inc. and despite having been provided with the license agreement (attached as Exhibit A to the Braithwaite declaration), which specifically, in paragraph 16.11, makes clear that there was no partnership, the SAC alleges, as its foundational allegation for all of the claims against the UMG Defendants, that Motown Records or UMG Recordings was in a "general business partnership" with Love Records, Inc. and/or Mr. Combs.  Based on this knowingly false foundational allegation, the SAC alleges that the UMG Defendants somehow had some obligation to supervise and control how Love Records, Inc. and/or Mr. Combs spent any of the money paid or reimbursed to Love Records, Inc. under the license agreement.

19.　　As detailed in the accompanying declaration of Martha Braithwaite, neither Motown Records nor any other UMG Records company ever had a "general business partnership" with Love Records, Inc.  Rather, Motown Records had a briefly operative arm's

length license agreement to distribute one album, entered into in May 2022 and terminated as of February 1, 2023.[3]

20.     So where did Plaintiff and Mr. Blackburn obtain this information about Motown Records or UMG Recordings supposedly having a "general business partnership" with Love Records, Inc. or Mr. Combs?  Without any investigation into the facts, Plaintiff and Blackburn selectively chose to "rely" on the colloquial and shorthand reference in some press reports to the license agreement between Motown Records and Love Records, Inc. as a "partners" with respect to the single album subject to the license agreement.

21.     The SAC alleges there is a "general business partnership" despite the fact Ms. Habtemariam's declaration attached to the SAC says there was only a license agreement, not a partnership.

22.     Moreover, not content to ignore Ms. Habtemariam's declaration, in paragraph 218 of the SAC, Mr. Blackburn intentionally misrepresents what she says in her declaration.  He states that Ms. Habtemariam "states that she was given approval by Defendant UMG **to enter the partnership with Sean Comes** (sic) to help establish Love Records."

23.     Nowhere in her declaration does Ms. Habtemariam say any such thing.  The word "partnership" is nowhere mentioned in the declaration attached to the SAC (and her declaration in support of this motion specifically refutes any such alleged partnership).  Rather, Ms. Habtemariam's declaration states only that she received approval to enter into **a license agreement**.

---

[3] As noted in the accompanying Memorandum of Law, because the SAC not only references the license agreement (SAC ¶¶ 163-164) but attaches a declaration of Ms. Habtemariam which discusses the license agreement, the UMG Defendants are entitled to include the license agreement in this motion to dismiss.

24.     The "general business partnership" allegation, which forms the basis for every claim and every allegation against the UMG Defendants (there are no less than 46 separate references to the non-existent "general business partnership" in the SAC), also ignores the clear language of paragraph 16.11 of the license agreement, which, as noted above, was provided to Mr. Blackburn in the UMG Defendants' motion to dismiss the FAC.  That paragraph expressly states that Motown Records and Love Records, Inc. were not partners but were independent contractors.

25.     In short, the foundational allegation of the SAC that Motown Records and Love Records, Inc. were in a "general business partnership" is knowingly false.  Any claim based on this completely fabricated and non-existent "general business partnership" allegation must be dismissed.  As every claim against the UMG Defendants is based on this non-existent relationship, all of the claims should be dismissed.

### (ii) Sir Lucian Grainge Has Never Been To Any Of Combs' Homes

26.     While the FAC falsely and offensively alleged that Sir Lucian Grainge attended what Plaintiff and his counsel have described as "freak off" parties at Mr. Combs' homes in Los Angeles, Miami and New York, where underage girls and sex workers were allegedly plied with drugs and alcohol (and sexually preyed upon, as Plaintiff claims he was), this allegation has been abandoned in the SAC.  To be clear, Sir Lucian Grainge has **never** been to any of Mr. Combs' homes (Grainge Decl. ¶ 25).

27.     So what was the basis for this now abandoned accusation?  The FAC specifically claimed that Plaintiff saw Grainge at Combs' homes, even recounting seeing Grainge disappear into Combs' bedroom with Combs for hours.  Yet, in Mr. Blackburn's letter motion to file the

9

SAC, he portrayed the allegations as being only what Combs had supposedly told Plaintiff, not on any personal knowledge of the Plaintiff.[4] That was not what the FAC said.

28.     Regardless, because the SAC no longer pleads that Sir Lucian Grainge had any actual personal knowledge of any of the supposed wrongful acts of Mr. Combs, the RICO and "sex trafficking" claims against the UMG Defendants are now founded on the non-existent "general business partnership" and the equally non-existent duty of the UMG Defendants to supervise and control how Mr. Combs spends his money.

29.     As set forth in the accompanying Memorandum of Law, not only are the claims based on completely fabricated conclusory allegations, there is no basis in law for the RICO claim and the "sex trafficking" claims as against the UMG Defendants. They should be dismissed with prejudice.

### (iii) The First Amended Complaint's "Should Have Known" Allegations Are Chronologically Impossible

30.     Beyond the non-existent "general business partnership" allegation and the non-existent alleged duty to control Mr. Combs' financial affairs, the SAC repeats the same nonsensical argument made in the FAC: that the UMG Defendants supposedly should have known that Mr. Combs was engaging in alleged sex trafficking activity because of a complaint filed by a Cassie Ventura and a claim made by a Jonathan Oddi accusing Mr. Combs of sex trafficking (SAC ¶¶ 375(h) and (i), 386).

---

[4] Indeed, this Court has Plaintiff's declaration, which was attached to Mr. Blackburn's reply letter in support of his letter motion to file the SAC. That declaration conclusively demonstrates that the allegations of the SAC are based almost exclusively on, at most, rank hearsay, not any personal knowledge of the Plaintiff. Virtually every conclusory allegation in the SAC is attributed to things that Mr. Combs supposedly told Plaintiff.

31.     These assertions are both false and chronologically impossible. Attached hereto

as Exhibit 5 is the first page of Ms. Ventura's complaint against Mr. Combs. It was filed on

November 16, 2023. As Ms. Braithwaite's declaration establishes, Motown's license agreement

with Love Records, Inc. was terminated as of February 1, 2023, months before Ms. Ventura's

complaint was filed (and that ended any relationship between the UMG Defendants and Mr.

Combs and Love Records, Inc.).[5]

### (iv) The SAC Jettisons the "Cash" Allegations of the FAC and Invents A Duty On The Part of the UMG Defendants to Oversee Combs' Tax Filings

32.     The FAC claimed that the UMG Defendants provided "cash" to Mr. Combs (even

fantasizing that it was "likely millions of dollars"), the "cash" supposedly enabling Mr. Combs to

perpetrate his alleged sex trafficking activity. The SAC abandons these baseless accusations but

now invents a wholly new allegation: the UMG Defendants were obligated to assure that their

supposed "general business partner" Love Records, Inc. or Mr. Combs properly filed and paid

taxes, and are responsible for their alleged failure to make the required filings (SAC ¶¶ 375

(b),(k),(m), 383).

33.     On its face, this allegation is breathtakingly absurd. Aside from the obvious fact

that neither Plaintiff nor Mr. Blackburn could have any knowledge of Mr. Combs' tax filings,

there is no legal basis on which any such alleged obligation may be imposed on the UMG

Defendants, even if there were a "general business partnership," and there is no such partnership.

---

[5] In December 2023, Jonathan Oddi, who, according to public reports, was a porn actor and had been arrested at the Trump Doral Hotel in Miami in 2018 carrying a gun and threatening the then-President, claimed that he had, years ago, engaged in sexual activity with Ms. Ventura and Mr. Combs. Again, even were this assertion true, it surfaced long after the events pleaded in the SAC, after Plaintiff was no longer involved with Mr. Combs (SAC ¶¶ 23- 24) and months after the license agreement between Motown Records and Love Records, Inc. was terminated.

11

34.     Every claim against the UMG Defendants in the SAC is factually and legally
baseless. They should be dismissed with prejudice. The UMG Defendants will be serving an
updated Rule 11 motion on Mr. Blackburn and anticipate that at the end of the 21 day period,
will file it with this Court.

35.     I now turn, as I said above, to the section of this declaration that will document
the extent to which Plaintiff and Mr. Blackburn have filled the SAC not merely with baseless
conclusions but with allegations that they know are completely false.

### F.     Mr. Blackburn's Lack Of Candor With This Court

36.     Before I document the purposeful and knowing falsity of the SAC, including by
comparing its allegations to the completely different and now abandoned allegations of the FAC,
I believe that this Court should be advised of representations Mr. Blackburn made directly to this
Court that he knew were untrue when he made them. On April 9, 2024, this Court held a
telephonic hearing attended by me and by Mr. Blackburn. I am attaching, for the Court's
convenience, a copy of the transcript of that hearing as Exhibit 6.

37.     On page 2 of that transcript, the Court asked Mr. Blackburn whether he had
served the other defendants (meaning the defendants other than the UMG Defendants). Given
that the FAC was filled with poisonous accusations against all of the Defendants, I believe that
the Court wanted to assure that the Plaintiff and Mr. Blackburn were expeditiously undertaking
to prosecute their claims.[6]

---

[6] As the transcript also reflects, we voluntarily waived service on behalf of the UMG Defendants,
without waiver being sought, so that we could move against the FAC as quickly as possible and
try to start correcting the false narrative of the FAC.

12

38.     Mr. Blackburn represented to the Court that he had sent a Rule 4 waiver form to Mr. Combs' counsel, who did not respond, so he sent out his process server to serve the Combs defendants.

39.     The Court then asked when these things occurred and on page 3 of the transcript, Mr. Blackburn directly represented to the Court that he had emailed the Rule 4 waiver form to Combs' counsel on March 13 and that he sent the complaint to be served on the Combs defendants to the process server 5 days later (on March 18, 2024).

40.     However, contrary to Mr. Blackburn's representation, I was aware that the docket did not reflect any request for the issuance of a summons so that his representation could not have been truthful.  In fact, as shown by ECF 39, Mr. Blackburn did not even request the issuance of a summons until April 17, 2024, a month later than he represented to this Court that he had sent the complaint to a process server for service (and as has been typical of Mr. Blackburn's filings, that request was rejected by the clerk as it was not properly filed and as of the date of this declaration, Mr. Blackburn has yet to refile such request).

41.     In fact, even Mr. Blackburn's representation to this Court about sending an email requesting a Rule 4 waiver of service from the Combs' defendants on March 13, 2024 was untrue.  Attached hereto as Exhibit 7 is an email from Mr. Blackburn to Jonathan Davis dated March 25, 2024 (with some unprofessional emoji's included) requesting a Rule 4 waiver.  I am advised that this is the first and only request that Mr. Blackburn made of Mr. Davis for a waiver.

42.     I provide this background, not because it is directly relevant to the UMG Defendants' motion to dismiss the SAC, but because I believe that Mr. Blackburn's willingness to knowingly speak untruths in response to direct questions from the Court is consistent with his willingness to fill the SAC with offensively false accusations against Sir Lucian Grainge.  It

13

should be deeply concerning when a member of the bar of this Court cares so little for the truth and is so willing, armed with the litigation privilege, to defame people and companies.

### G. The Changed Allegations Of The SAC Are As False And Baseless As the Allegations Of The FAC

43.     In my original declaration, submitted in support of the motion to dismiss the FAC, I detailed the falsity of the FAC. To the extent it remains relevant, I will cross-reference the allegations of the FAC with the very much different allegations of the SAC.

44.     While very much different, the SAC's allegations against the UMG Defendants, remain offensively false and I do not believe that Mr. Blackburn can attribute the falsity to his client. Mr. Blackburn has completely jettisoned every single one of the original foundational and utterly false allegations of the FAC, on which all of the claims against the UMG Defendants were based, and has fabricated entirely different foundational allegations for the claims against the UMG Defendants.

45.     First, whereas the FAC alleged that Motown Records was the "parent company" of Love Records, Inc. – and Mr. Blackburn has failed to identify a single fact that supports such an allegation – the SAC's foundational allegation is now that Motown Records and/or UMG Recordings were in a "general business partnership" with Love Records, Inc. or Mr. Combs.

46.     Second, the FAC alleged that both Sir Lucian Grainge and Ms. Habtemariam were supposedly aware of the alleged sex trafficking by Combs because, in detailed paragraphs, the FAC purports to recount Plaintiff's supposed personal knowledge that he saw them at "listening parties" where there were underage girls and sex workers allegedly being given alcohol and drugs and being molested. As set forth in detail in the accompanying declaration of Mr. Grainge, he was never at any of Mr. Combs' homes and Ms. Habtemariam was only there

14

for business meetings, there were never any alleged "sex trafficking" going on and she was only there before Plaintiff claims he began working for Mr. Combs in September 2022.

47.     These completely false allegations about the supposed presence of Mr. Grainge and Ms. Habtemariam at Combs' alleged "sex trafficking" parties are jettisoned in the SAC. Instead, the SAC admits that Motown Records was obligated to pay certain monies to or on behalf of Love Records pursuant to a license agreement (SAC ¶ 164). However, without the slightest factual basis (and without any legal foundation whatsoever), the SAC claims that the UMG Defendants, especially Sir Lucian Grainge, were supposedly obligated to oversee and control how Love Records, Inc. and/or Mr. Combs spent the money. And again, without the slightest factual or legal basis, the SAC claims that the monies paid to or on behalf of Love Records, Inc. were supposedly misused by Combs for illicit purposes and that the UMG Defendants were obligated to know that and prevent it.[7]

48.     Third, whereas the FAC alleged that the UMG Defendants supposedly aided and abetted Combs' alleged sex trafficking activities by handing over "cash" to Combs (even alleging it was millions of dollars of cash), these allegations too are now abandoned (and as noted above, the "aiding and abetting" claim has been withdrawn as against the UMG Defendants). Instead, despite admitting that Motown Records was obligated to make certain payments and reimbursements under the license agreement, the SAC alleges that the UMG Defendants should have known the monies that Motown Records to or on behalf of Love

---

[7] Even though the unauthorized SAC is clearly the handiwork of Mr. Blackburn, unlike the FAC, which made virtually no allegations on "information and belief," in the SAC, Mr. Blackburn plainly hoping to find a safe harbor that might spare him Rule 11 sanctions, litters "information and belief" allegations throughout the pleading and attributes the allegations to his client.

15

Records, Inc. supposedly would be misused by Combs to support the alleged "sex trafficking" activity.

49.     But where do these new and completely contrary foundational allegations come from? Certainly not from any investigation into the facts conducted by Mr. Blackburn. He has plainly done none. Instead, it appears that Mr. Blackburn contends that the SAC is based on the short declaration provided by Ms. Habtemariam in return for Mr. Blackburn's agreement to drop her from this case.

50.     But, as noted above, Ms. Habtemariam's declaration, attached to the SAC, says nothing about a "general business partnership" between UMG Recordings or Motown Records and Love Records, Inc. In fact, she says the exact opposite.

51.     As Ms. Habtemariam states in the declaration attached to the SAC, Motown Records entered into a **license agreement** with Love Records, Inc. to distribute an album. It did not enter into a "partnership" of any sort and most assuredly not a "general business partnership." And she says that under the license agreement, Motown Records paid for invoiced recording costs and expenses.

52.     And because a redacted version of the license agreement was attached to the declaration of Martha Braithwaite (who negotiated and executed the license agreement on behalf of Motown Records) in support of the UMG Defendants' motion to dismiss the FAC (filed on March 27, 2024), by the time Mr. Blackburn filed the SAC (on April 12, 2024) he already knew for certain that there was no "general business partnership." Paragraph 16.11 of the license agreement specifically provided the business relationship between Motown Records and Love Records, Inc. was as independent contractors, not partners or joint venturers.

53.     So what did Mr. Blackburn do with the information provided to him by Ms. Habtemariam and the license agreement? He ignored it because he needed to fabricate a supposed basis on which he could try to connect the UMG Defendants to the supposed wrongful acts of the Combs' defendants. Hence, the non-existent "general business partnership." Of course, even if it existed – and it does not – it would still not provide any basis for the RICO and "sex trafficking" claims against the UMG Defendants.

54.     And instead of the "cash" allegations in the FAC, the SAC invented the assertion that Mr. Combs misused the completely legitimate payments due under the license agreement for his alleged sex trafficking activity (ignoring that money is fungible and that Combs is a very rich man – according to Forbes, in 2022 his net worth exceeded $1 billion). As pleaded in the SAC, the UMG Defendants not only were inexplicably required to monitor and control how Combs spent his money, they were somehow required to trace the alleged use of money by Combs, distinguishing all expenditures between Combs' own monies and the payments required to be made by Motown Records under the license agreement.

55.     Not only is there no factual basis for these allegations, there is no such obligation on the UMG Defendants as a matter of law.

56.     The SAC also alleges, and Mr. Blackburn claimed at the hearing on April 9, 2024 (Tr. pp. 8-9), that Motown Records did not administer any budgets or pay any vendors but instead simply handed over money to Mr. Combs to be used as he chose.[8] The SAC also alleges, and Mr. Blackburn claimed at the April 9, 2024 hearing (Tr. pp. 14-16) that there were no recordings made prior to Plaintiff's arrival on the scene in September 2022 and therefore, the

---

[8] As shown in the accompanying Memorandum of Law, even if this were true – and it is not – it would not provide Plaintiff with any claim against the UMG Defendants.

$1.3 million paid to reimburse Love Records, Inc. for recordings made prior to the license agreement (May 4, 2022) was, in Mr. Blackburn's words, a "ruse."

57.    It is by now perfectly clear that Mr. Blackburn makes statements on subjects about which he has no knowledge because he apparently does not care if what he is saying is true or false.  As stated in the declaration of Ms. Habtemariam and as shown in the accompanying declaration of Martha Braithwaite (and illustrated by its attached Exhibit B), contrary to what Mr. Blackburn represented to this Court on April 9, 2024, not only were there tracks recorded by Love Records, Inc. before the license agreement was executed, at least one of those tracks, 'Gotta Move On," was released as a single by Motown Records in June or July of 2022, and Motown Records marketed and promoted that single recording at considerable expense (paid to third party vendors, not to Love Records, Inc.).  And this track, "Gotta Move On," was included on the expanded version of the album (released by Love Records, Inc. after Motown Records and Love Records, Inc. terminated the license agreement).

58.    And with respect to the recording costs incurred after Plaintiff claims he commenced working for Mr. Combs in September 2022, as illustrated by Exhibit C to Ms. Braithwaite's declaration, Motown Records did not simply pay Love Records, Inc. but in its administration of the payment of recording costs, Motown Records paid third party vendors directly.  So these (and other third party vendor payments) could not have been "misused" by Mr. Combs for alleged "sex trafficking" as the payments were not made to him.

59.    In short, not only is the entire foundational theory of the SAC false – the "general business partnership" – but the accusations that the UMG Defendants simply showered monies on Mr. Combs and that the license agreement was a "ruse" are completely and offensively false.

18

60.     Again, just as Mr. Blackburn was willing to flat out misrepresent to this Court whether and when he supposedly undertook to serve the Combs defendants in this case, so too are all of the foundational allegations in the SAC completely false.  Mr. Blackburn is content to simply make things up as he goes along and if they are shown to be false, he is perfectly willing to substitute new and equally false allegations.

### H. The SAC Was Filed In Violation Of Plaintiff's And Mr. Blackburn's Obligations Under FRCP Rule 11

61.     As this Court knows, when the FAC was filed, I wrote to Mr. Blackburn to put him on notice that the allegations he had made against the UMG Defendants were completely false and demanded that he withdraw all of the claims against my clients.  A copy of my letter to him dated March 4, 2024 is attached hereto as Exhibit 8.   While he has abandoned many of the completely false allegations of the FAC, he has not dismissed all of the claims against the UMG Defendants.  Instead, as discussed above and in the accompanying declarations, he invented new completely false allegations and included them in the SAC.

62.     The allegations made against my clients – particularly Sir Lucian Grainge – remain offensively false, conclusory and lacking in any factual support or legal basis.  But for the litigation privilege in this State, falsely accusing individuals and companies of engaging in criminal behavior would be libelous per se.

63.     We have provided Plaintiff and Mr. Blackburn with clear and unequivocal notice that just as the FAC failed to comply with Rule 11, so too does the SAC.  We will be serving and, in due course, filing, an updated motion with this Court for Rule 11 sanctions against Plaintiff and Mr. Blackburn.  But our first and primary goal is to secure the speedy dismissal of the SAC with prejudice.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April **24**, 2024

_____
Donald S. Zakarin