# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODNEY JONES,<br><br>                    *Plaintiff*,<br><br>-against-<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>CUBA GOODING JR.,<br>LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10 and<br>ABC CORPORATIONS. 1-10,<br>                    *Defendants*. | Case No.: 24-cv-01457<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SANCTIONS** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT UMGS MOTION FOR SANCTIONS**

**Tyrone A. Blackburn, Esq.**
**T. A. Blackburn Law, PLLC**
**1242 E. 80th Street, 3rd Floor**
**Brooklyn, NY 11236**
*Counsel for Plaintiff*

## INTRODUCTION

As much as the UMG defendants pouted and threw a temper tantrum because they were named in this litigation, they have inexplicably continued their involvement by filing this unwarranted motion for sanctions against Plaintiff and its Counsel. The Defendants' motion is facially deficient, presenting no support in law or fact that would entitle them to the "highly unusual" and "limited" relief provided for under § 1927 or the Court's inherent power to award sanctions.

The Defendant's sole ground is that the Plaintiff's now withdrawn Complaint was deficient and filed in bad faith (even though the Court granted Plaintiff's request to amend). The law is clear that the mere filing and withdrawal of a single Complaint cannot form the basis for § 1927 or discretionary sanctions.

Furthermore, even if an initial pleading could provide the basis for such sanctions (it cannot), the Defendants' motion does not include a single particularized allegation to establish the "clear showing of bad faith" required for such sanctions. Nor could it.

This lawsuit was instituted to recover damages for Defendants' participation in the Sean Combs sex trafficking and RICO enterprise. The Plaintiff and its Counsel engaged in a reasonable investigation before asserting the Plaintiff's claims and had a well-founded basis for the merits allegations in the Complaint.

Plaintiff's reasoned decision to withdraw its claims after discovering that Sean Combs ("Combs") did not sign the sham distribution agreement with Motown Records, Plaintiff reasoned that it would be impractical to hold the UMG defendants liable for the actions of Combs when they may themselves be victims of fraud perpetrated by Combs. When Plaintiff notified Defendant of his decision, Plaintiff had nearly seven days, pursuant to Rule 11's safe harbor provision, to voluntarily dismiss the case against the UMG defendants.

In a showing of good faith, Plaintiff allowed Defendant counsel Donald Zakarin ("Zakarin") to draft the dismissal documents, including the declaration. Zakarin informed Plaintiff that after the documents were filed, he would respond and consent to the dismissal. Zakarin never informed the Plaintiffs' Counsel of his intention to engage in dirty, unethical gamesmanship by repacking his Rule 11 sanctions motion as a sanction motion pursuant to § 1927 or the Court's inherent power. This dirty move by Zakarin evidenced his true character.

2

It is pretty rich for the UMG defendants and Zakarin to claim that the Plaintiff multiplied the proceedings when, in fact, the Plaintiff's voluntary dismissal was done for the sole purpose of minimizing the proceedings. Indeed, the Defendants acted to extend litigation by bringing a sanctions motion completely devoid of merit. The Defendants proceeded to seek sanctions that the Defendants acknowledge in their motion papers are prohibited under Rule 11.

Under these circumstances, the cause exists to require the Defendant and their Counsel to bear the Plaintiff's costs and attorney's fees incurred in responding to this baseless and improper motion.

## FACTUAL BACKGROUND

The Plaintiff assumes the Court is well-versed in the claims raised in the Second Amended Complaint and incorporates those facts hereto.

## LEGAL STANDARD

The sanctions authority provided by 28 U.S.C. § 1927 and the District Court's inherent powers only operate in the limited circumstances where a party (or its attorney) has acted in bad faith. Eisemann v. Greene, 204 F.3d 393, 395-96 (2d Cir. 2000); see also Gianna Enterprises v. Miss World (Jersey) Ltd., 551 F. Supp. 1348, 1359 (S.D.N.Y. 1982). Under § 1927, any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The Court also maintains inherent power to award reasonable attorneys' fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986) (quotation marks and citations omitted)[1].

The Second Circuit has cautioned that the power to issue such sanctions should be exercised "with restraint and discretion," limited to circumstances involving a "particularized showing of bad faith." United States v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO, 948 F.2d 1338, 1345 (2d Cir. 1991); see also West

---

[1] The bad faith requirements for sanctions based on the Court's inherent power and § 1927 are "nearly identical," with the only practical distinction being that § 1927 sanctions can be made only against attorneys, while sanctions according to the Court's inherent power may be made against an attorney, a party, or both. Jenkins v. XpresSpa Grp., Inc., No. 19 Civ. 1774, 2020 WL 7261138, at *13 (S.D.N.Y. December 10, 2020) (Caproni, J.); see also Oliveri, 803 F.2d at 1273 ("[T]he only meaningful difference between an award made under § 1927 and one made according to the court's inherent power is ... that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both").

Virginia v. Chas. Pfizer & Co., Inc., 440 F.2d 1079, 1092 (2d Cir. 1971) (§ 1927 sanctions are "highly unusual and require[] a clear showing of bad faith"). These sanctions "are not to be lightly imposed … [T]o justify the imposition of excess costs of litigation upon an attorney, his conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." Colucci v. New York Times Co., 533 F. Supp. 1011, 1013-14 (S.D.N.Y. 1982).

When deciding whether to impose sanctions under the Court's inherent authority and according to § 1927, the Court must find that the challenged claims were (i) "without a colorable basis" and (ii) "brought in bad faith, i.e., motivated by improper purposes such as harassment or delay." Schlaifer Nance & Co. v. Est. of Warhol, 194 F.3d 323, 340 (2d Cir. 1999) (Mot. at 6); see also Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 79 (2d Cir. 2000) (holding that, "[t]o impose sanctions under [the court's inherent authority or section 1927], the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes") (all quotation marks and citations omitted). "The test is conjunctive, and neither meritlessness alone nor improper purpose alone will suffice." Jenkins, 2020 WL 7261138 at *13 (Caproni, J.) (internal quotation marks and citation omitted). "[B]ad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose[.]" Id. (quotation marks and citation omitted).

I. **UMG Defendants Authored The Dismissal Documents And Are Using Their Work To Justify Sanctions Under The Court's Inherent Power**:

UMG and their counsel, Zakarin have engaged in unethical, bad faith, vexatious gamesmanship to secure the voluntary dismissal. (Blackburn Decl. ¶ 17). The plaintiffs' Counsel drafted a declaration for voluntary dismissal, and Zakarin insisted on amending it. (Blackburn Decl. ¶ 6).  In good faith, Plaintiff Counsel agreed to allow Zakarin to amend the dismissal documents in exchange for Defendants not filing the sanctions motion on May 17, 2024. (Blackburn Decl. ¶ 14).  Zakarin double-crossed this writer and filed a revamped version of UMG's Rule 11 Sanctions motion on May 17, 2024. (Blackburn Decl. ¶ 16).

II.  **The UMG Defendants Are Not Entitled To Relief Pursuant To Section 1927 And/Or The Court's Inherent Powers**:

     a.  ***Sanctions Pursuant to Inherent Powers Are No Substitute for Rule 11***

As United States Magistrate Judge for the Southern District of New York Sarah Netburn held on December 1, 2023, in *Dwelling Mgmt. v. Mission 8, LLC*, 23-cv-02593, "it would be improper for the Court to impose sanctions pursuant to § 1927 and the Court's inherent authority [so that] a party could evade Rule 11's safe harbor provision by simply seeking sanctions under other authority [.]. The safe harbor provision would be rendered "meaningless." *Richtone Design Grp. L.L.C. v. Classical Pilates, Inc*., No. 06-cv-0547 (NRB), 2007 U.S. Dist. LEXIS 26998, 2007 WL 1098706, n.1 (S.D.N.Y. April 10, 2007) (citing *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1059 (7th Cir. 1998)); Bellistri v. the United States, No. 94-cv-3768 (KMW), 1998 U.S. Dist. LEXIS 9251, 1998 WL 337884, at *1 (S.D.N.Y. June 25, 1998) (holding that where a court "declined to award Rule 11 sanctions because of [plaintiff's] failure to comply with the safe harbor provision of Rule 11," awarding § 1927 sanctions "would undermine the safe harbor provision of Rule 11 by essentially reading it out of the Rule"); see also Danielle Kie Hart, And the Chill Goes On — Federal Civil Rights Plaintiffs Beware: Rule 11 Vis-à-Vis 28 U.S.C. 1927 and the Court's Inherent Power, 37 Loy. L.A. L. Rev. 645, 684 (2004) (arguing that "there are strong policy arguments that using 28 U.S.C. 1927 or the court's inherent power to sanction to sidestep Rule 11's procedural requirements should be improper").

USMJ Netburn's opinion reverberates throughout United States District Courts nationwide. The relationship between § 1927 and the Rules (particularly Rule 11) is important, especially if § 1927 is used to "sidestep" the safe harbor protections of Rule 11.  See, e.g., Danielle Kie Hart, And the Chill Goes On--Federal Civil Rights Plaintiffs Beware: Rule 11 Vis-a-Vis 28 U.S.C. § 1927 and the Court's Inherent Power, 37 Loy. L.A. L. Rev. 645, 649, 684 (2004).

A number of courts have expressed concern, therefore, with relying on § 1927 to sanction conduct fully addressed within the Rules. In *Chatham Partners v. Fidelity and Deposit Co. of Maryland*, Judge Martin stated in dictum that "given the policy considerations that gave rise to the adoption of Rule 11's safe harbor provision, it seems inappropriate to use 28 U.S.C. § 1927 to do what the Court cannot do under Rule 11" (namely, award attorney fees for a frivolous filing even though no Rule 11 notice was served). <u>See</u> 2001 U.S. Dist. LEXIS 17205, 2001 WL 1262960, at *2 (S.D.N.Y. 2001) (attorney fees were awarded under § 1927 even though a Rule 11

motion was never filed because Judge Martin concluded that Rule 11 sanctions were not available for filing an unwarranted order to show cause that did not permit the 21-day safe harbor notice under Rule 11); *see also Malbrough v. Kilpatrick & Stockton, LLC.*, 1999 U.S. Dist. LEXIS 13066, 1999 WL 643663 (E.D. La. August 23, 1999); *Bellistri v. United States*, 1998 U.S. Dist. LEXIS 9251, 1998 WL 337884 (S.D.N.Y. June 25, 1998) ("to award § 1927 sanctions in the context of this case would undermine the safe harbor provision of Rule 11 by essentially reading it out of the Rule"). *New Eng. Surfaces v. E. I. Dupont De Nemours & Co.*, 558 F. Supp. 2d 116, 124 n.12 (D. Me. 2008).

Here, UMG and Zakarin used unethical gamesmanship to get Plaintiff to voluntarily dismiss his Complaint against them with prejudice in exchange for not filing their sanctions motion. (Blackburn Decl. ¶ 16-17). In good faith and in reliance on the April 26, 2024 email, this writer allowed Zakarin to draft the dismissal papers. (Blackburn Decl. ¶ 14). Four days after the dismissal, Zakarin filed the Rule 11 motion for sanctions but disguised it as a sanctions motion pursuant to 28 U.S.C. §1927 and the Court's inherent powers. (Blackburn Decl. ¶ 18). A close look at both documents will allow the Court to see that the motions are nearly identical. (Blackburn Decl. ¶ 19). Zakarin did not have the decency to attempt to hide his bad faith; instead, the motion pursuant to 28 U.S.C. §1927 and the Court's inherent powers is replete with rule 11 sanction citations. (Blackburn Decl. ¶ 20).

In *Richtone*, where the parties "failed to avail themselves of the remedies provided for in Rule 11," the Court noted its reluctance to invoke its inherent powers such that safe harbor rights are rendered meaningless. *Id*.

### b. *Section 1927 Does Not Apply to The Conduct Alleged by Defendants*:

Even if the Court entertains UMG's effort to evade Rule 11, §1927 is inapplicable to the alleged circumstances. The statute targets attorneys that "multiply the proceedings in any case unreasonably and vexatiously." 28 U.S.C. §1927. Its "purpose is to deter unnecessary delays in litigation." *Eisner*, 407 F.Supp.3d at 139, n 9. It is thus employed when attorneys clog a court's docket with duplicative motions and frivolous arguments. See *Rosenberg v. Frontline Asset Strategies, LLC*, 556 F.Supp.3d 157, 166 (E.D.N.Y. August 16, 2021) (making "the same losing arguments over and over again constitutes the kind of vexatious litigation that §1927 and the inherent power of the Court are designed to prevent.").

Therefore, unlike Rule 11's emphasis on specific statements or submissions to the Court, §1927 addresses a "course of conduct" by attorneys in litigation—that is, attorney conduct during litigation because "the statute is not aimed at pre-litigation conduct" like the contents of a complaint governed by Rule 11. Neu Prods. Inc. v. Outside Interactive, Inc., 2024 US Dist LEXIS 47842, at *35 (S.D.N.Y. March 19, 2024) (citing *Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 2012 U.S. Dist. LEXIS 37883, at *2 (E.D.N.Y. March 19, 2012) (dismissing claims under §1927 because it is "not aimed at a plaintiff's pre-filing conduct"). In *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 144 (2d Cir. 2023), the Second Circuit addressed the quintessential sort of §1927 litigation misconduct, where an attorney "stood by" the Complaint he filed via continued submissions to the Court even after the falsity of its allegations became apparent. *Id*. Where an attorney, however, signals their readiness to withdraw such a claim, no vexatious bad faith can be found. In *Peralta v. Regent Catering, Inc.*, No. 17-cv-6993, 2019 US Dist LEXIS 172855, at *5-6 (E.D.N.Y. September 30, 2019), plaintiffs' readiness "to enter into a stipulation of dismissal" [as is the case here] defeated any suggestion of vexatious conduct, because it was defendants that chose to continue litigation, not plaintiffs. In such circumstances, sanctions are inappropriate under §1927 (or, as discussed above, pursuant to a Rule 11 motion).

Plaintiff complies with his requirements pursuant to rule 11 of the FRCP on March 23, 2024, when he attempted to amend his pleadings to conform with the objections raised by the Defendants in their March 4, 2024, letter, again cuts against the imposition of any sanctions. (Blackburn Decl. ¶ 23).  Even the Court acknowledged that the Plaintiff's proposed second amended Complaint conformed with the demands UMG made in its March 4, 2024, letter.  Refusal to back down and to vet the new information Defendants provided to support their position does not amount to bad faith or to a conclusion that Plaintiff knowingly filed false statements or multiple frivolous arguments.  (Blackburn Decl. ¶ 24).

UMG's allegations simply do not fit within the statute. They suggest that the fact that the Plaintiff did not immediately sprint and acquiesce to their "table pounding" and "angry man" letters but opted to conduct further research and vetting to ensure what the Defendants were claiming was indeed true somehow evidences bad faith that "multiplied the proceedings."  There is no rule in the Federal Rules of Civil Procedure that requires plaintiffs or their Counsel to take the word of the defendants at face value, especially when the Plaintiff has conflicting information and personal experiences that support their position.  As was the case here.

The Plaintiff and Counsel did not file any part of this lawsuit in bad faith. The Plaintiff relied on 13 months of personal experiences, conversations, and things he saw and reluctantly participated in. (Jones Decl. ¶ 4). According to Plaintiff, the UMG Defendants were not the only record labels and business partners present at Combs' home and parties. (Jones Decl. ¶ 78). Plaintiff added UMG as defendants due to their public statements that they entered a partnership with Combs and the personal conversations Combs had with Plaintiff concerning the UMG defendants.

      c.   ***The Sanctions Motion Is Inconsistent With Rule 11***:

Defendants' sanctions motion addresses the sufficiency of Plaintiff's Complaint and thus falls "directly within the ambit of Rule 11." See *Bellistri v. U.S., Drug Enf't Agency*, No. 94 Civ. 3768, 1998 WL 337884, at *1 (S.D.N.Y. June 25, 1998). But courts in this Circuit have made clear that a party cannot circumvent the requirements of Rule 11 by seeking sanctions under different authorities if the conduct at issue falls within Rule 11's scope. Id. (§ 1927 sanctions precluded when the sanctions were based on Plaintiff filing a complaint and opposing a motion to dismiss – actions "directly subject to scrutiny under Rule 11"); *Behrens*, 2019 WL 1437019, at *14 n.15 (declining to "invoke [the Court's] inherent powers to impose sanctions in light of the fact that the parties … failed to properly avail themselves of the remedies provided for in Rule 11"). To award sanctions through other legal means where Rule 11's safe harbor prohibits them "would undermine the safe harbor provision of Rule 11 by essentially reading it out of the Rule." *Bellistri*, 1998 WL 337884, at *1; also *Richtone Design Grp., L.L.C. v. Classical Pilates, Inc.*, No. 06 Civ. 0547, 2007 WL 1098706, at *2 n.1 (S.D.N.Y. April 10, 2007) ("[T]he invocation of this Court's inherent powers in situations … where the moving party might have availed itself of Rule 11, would have the unwanted and undesirable effect of rendering Rule 11's … safe harbor provision[] meaningless." (internal quotation marks and citation omitted)).

Defendants rely on *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) to argue that a voluntary dismissal does not deprive the Court of jurisdiction to award sanctions in this context but neglects to mention that *Cooter* was decided three years before the Rule 11 amendments that added the safe harbor provision, which superseded Cooter's reasoning. See *Qiu v. Shanghai Cuisine, Inc.*, No. 18 Civ. 5448, 2021 WL 3929242, at *3 (S.D.N.Y. September 1, 2021) (Cooter was "superseded when Rule 11 was amended to include the safe-harbor provision

… 'Thus, a court can no longer issue Rule 11 sanctions in a case where, as in *Cooter & Gell*, a complaint was voluntarily dismissed within 21 days of a request for Rule 11 sanctions'" (citation omitted))[2].

Defendants cite cases where courts considered sanctions motions under § 1927 or the Court's inherent authority without addressing Rule 11 sanctions. These cases are entirely distinguishable as they covered conduct beyond the initial filing of a Complaint and outside of the scope of Rule 11 sanctions.[3] Other cases cited by Defendants addressed § 1927 and inherent sanctions in conjunction with Rule 11 sanctions because the party accused of sanctionable conduct did not take advantage of the safe harbor period. Defendants have not cited a single case where the conduct at issue fell within the ambit of Rule 11, the movant was prohibited from seeking Rule 11 sanctions pursuant to the safe harbor provision, and the Court still awarded sanctions under § 1927 or the Court's inherent authority for that conduct. Indeed, several cases in this District make clear that seeking § 1927 or inherent sanctions is "inappropriate" in such circumstances.

*Chatham Partners, Inc. v. Fid. And Deposit Co. of Maryland*, No. 99 Civ. 12308, 2001 WL 1262960, at *2 (S.D.N.Y. October 19, 2001) (Mot. at 4) ("[G]iven the policy considerations that gave rise to the adoption of Rule 11's safe harbor provision, it seems inappropriate to use 28 U.S.C. § 1927 to do what the Court cannot do under Rule 11"); see also *Pac. Elec. Wire & Cable Co., Ltd. v. Set Top Int'l Inc.*, No. 03 Civ. 9623, 2005 WL 2036033, at *6 (S.D.N.Y. August 23, 2005) (Mot. at 5) (declining to award sanctions under § 1927 when "Plaintiffs withdrew their [] claims as soon as [Defendant] threatened to bring a Rule 11 motion"); *Galonsky v. Williams*, No. 96 Civ. 6207, 1997 WL 759445, at *4, 7 (S.D.N.Y. December 10, 1997) (Mot. at 8) (awarding sanctions for "only the expenses the defendant incurred to oppose those claims that were unreasonably multiplicative and vexatious" (i.e., moving to amend after "the Court advised him that the application would not be granted and warned him that Rule 11 sanctions might follow"), but not for the initial sanctionable Complaint because the Court could not grant Rule 11 sanctions "[d]ue to defendants' technical failure to comply with the safe harbor provision").

---

[2] Other cases cited by Defendants are similarly unavailing, *Chambers v. NASCO*, 501 U.S. 32 (1991) was also decided before Rule 11's safe harbor provision and is distinguishable because much of the sanctionable conduct fell outside of Rule 11.

[3] *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 55 (2d Cir. 2018) (affirming § 1927 sanctions for "numerous frivolous and vexatious actions" by an attorney, including making misrepresentations to the Court, seeking the Judge's recusal after he pointed out the misrepresentations, changing his theory of the case midlitigation, and repeatedly filing letters exceeding the Court's page limit and ignoring procedures set out in the Court's protective order).

d. ***Counsel Did Not Multiply Proceedings As Required By § 1927***:

28 U.S.C. § 1927 expressly limits sanctions to instances where an attorney "multiplies the proceedings" in a case. In cases similar to this one, where defendants "essentially complain[] that the plaintiff pursued a meritless lawsuit … not that plaintiff's counsel litigated the action in a way that multiplied or delayed the proceedings" and the plaintiff "voluntarily discontinued the action … it cannot be concluded that the plaintiff unnecessarily multiplied the proceedings or delayed the litigation." *Unite Here v. Cintas Corp.*, 500 F. Supp. 2d 332, 335–36 (S.D.N.Y. 2007); also, *Jimenez v. City of New York*, 162 F. Supp. 3d 173, 183 (S.D.N.Y. 2015), aff'd in part, vacated in part, 666 F. App'x 39 (2d Cir. 2016) (declining to impose sanctions under § 1927 when claims were "voluntarily withdrawn by plaintiff's counsel" and describing that "[a] refusal to withdraw [] a claim [ultimately proven to be baseless] may be sanctionable behavior, but timely dropping baseless claims, as Plaintiff's Counsel did here, is not."). Authority cited by Defendants on § 1927 sanctions support that more than the filing and withdrawal of a single complaint is required to show multiplication of proceedings. See *Pac. Elec. Wire & Cable Co., Ltd.*, 2005 WL 2036033, at *6 (denying sanctions when Plaintiff filed a single complaint and withdrew it, and distinguishing cases that awarded sanctions under § 1927 because those cases "involve[d] plaintiffs who repeatedly asserted frivolous claims despite warnings from the Court that the claims were groundless[4]").

These decisions align with the Second Circuit authority describing that the purpose of § 1927 is "to deter unnecessary delays in litigation" and avoid unreasonably prolonged litigation. *Int'l Brotherhood of Teamsters*, 948 F.2d at 1345 (Mot. at 4). Here, Plaintiff's Counsel's only purportedly sanctionable conduct was filing a Second Amended Complaint on Plaintiff's behalf and voluntarily discontinuing the action on Plaintiff's behalf after Defendants filed their motion to dismiss – which served to minimize, not extend, proceedings. Defendants have no colorable argument that Plaintiff's Counsel delayed, extended, or multiplied the litigation, and thus, no legal basis for seeking sanctions under 28 U.S.C. § 1927.

Not to mention that Your Honor read the proposed SAC and permitted Plaintiff to file the SAC.  Never once did Your Honor indicate that the SAC was frivolous. Your Honor rejected Zakarin's attempts to deny Plaintiff the opportunity to file the SAC.  This fact will be analyzed in more detail below.

---

[4] It is important to note that the Court did not make any

e.   ***Plaintiff Jones nor Counsel Acted In Bad Faith***:

Even if voluntarily dismissing a complaint in response to a motion to dismiss was sanctionable under § 1927 or the Court's inherent authority (it is not for the reasons described above), these sanctions "may be imposed only for conduct undertaken in bad faith." *Wachtel Masyr & Missry LLP v. Genger*, 568 F. App'x 10 (2d Cir. 2014); see also Mot. at 4 (acknowledging that "bad faith is the touchstone of an award under this statute"). The movant has the burden of showing bad faith by clear evidence. *Cap. Bridge Co., Ltd. v. IVL Techs. Ltd.*, No. 04 Civ. 4002, 2007 WL 3168327, at \*9 (S.D.N.Y. October 26, 2007).

In this case, there is absolutely no evidence that Plaintiff or its Counsel acted in bad faith in bringing this lawsuit. (Blackburn Decl. ¶ 25).  To the contrary, this lawsuit was instituted because Defendants knowingly conducted business with Combs, whom they knew, or should have known, was a violent, deceptive, morally flawed individual through past experiences where he physically assaulted Defendant former executive Steve Stoute with a bottle of champagne and a chair. (Blackburn Decl. ¶ 26).  This lawsuit was not instituted for "some improper purpose," but rather, for the very legitimate purpose of recovering damages for Defendants' reckless, self-serving decision to enter into a "partnership" with Combs to "Develop love records." (Blackburn Decl. ¶ 27).  It was reasonable for Plaintiff Jones, whose sole purpose is working with Combs for the Love Album, to sue the UMG defendants for the harm he suffered throughout the process of working on the Love Album.

If the Plaintiff had intended to pursue this case in bad faith, he would have named every record label executive from all the other record labels present at Chalice and Combs' home as a Defendant, but he did not.

i.   ***Second Circuit Assessment***:

The Second Circuit Court of Appeals has established a high bar when imposing sanctions pursuant to purported "Bad Faith." *Eisemann v. Greene*, 204 F.3d 393, 396-97 (2d Cir. 2000), the Second Circuit interpreted the bad faith standard restrictively:

> To ensure . . . that fear of an award of attorney's fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or other improper purposes *and a high degree of specificity in the factual findings of the lower courts.*

*Dow Chem. Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir. 1986) (emphasis added) (internal citations, quotation marks, and brackets omitted); *see also Schlaifer Nance*, 194 F.3d at 338 ("The Court's factual findings of bad faith must be characterized by a high degree of specificity." (internal quotation marks omitted)); *MacDraw, Inc. v. CIT Group Equip. Fin.,* 73 F.3d 1253, 1262 (2d. Cir. 1996) (vacating imposition of sanctions because the District Court "engaged in no detailed consideration of what conduct by plaintiff's counsel satisfied the bad faith requirement").

In imposing sanctions in the instant case, the District Court found bad faith on the part of Eisemann's Counsel. The Court stated that Eisemann's motion for reconsideration was the latest manifestation of [her] Counsel's belief, displayed repeatedly throughout this case, that upon any motion by his adversary, he has 'no choice' but to respond by interposing a similar motion of his own. The inevitable effect of this tactic can only be to increase the burdens on the Court and all Counsel for no proper purpose, as the record of this case amply demonstrates.

The only other reason cited by the Court for the imposition of sanctions is the fact that counsel "persisted" with his motion for reconsideration after he had been forewarned by the Judge's law clerk during the telephone conference that Counsel's contentions were on their face inappropriate for reconsideration. The Court stated that "this disregard of the applicable standards for reconsideration, coupled with the patent invalidity of the legal arguments presented in the plaintiff's motions, make clear that the motion was brought in bad faith."

A District Court's imposition of sanctions is reviewed for abuse of discretion. *See Schlaifer Nance*, 194 F.3d at 333. However, this standard of review "is not as simple as it may appear at first blush." *Id.* Indeed, recently, we have observed that

> [ a] troublesome aspect of a trial court's power to impose sanctions, either as a result of a finding of contempt, pursuant to the Court's inherent power, or under a variety of rules . . . is that the trial court may act as accuser, fact finder and sentencing Judge, not subject to restrictions of any procedural code and at times not limited by any rule of law governing the severity of sanctions that may be imposed.

*Mackler Prods. v. Cohen,* 146 F.3d 126, 128 (2d Cir. 1998). Thus, although we are mindful that "the decision to impose sanctions is uniquely within the province of a district court, we nevertheless need to ensure that any such decision is made with restraint and discretion." *Schlaifer Nance,* 194 F.3d at 334.

The District Court did not make sufficiently specific factual findings to support its conclusion that Eisemann's motion for reconsideration, or any other motion filed in the course of this litigation, was "entirely without color and . . . taken for reasons of harassment or delay or for other improper purposes." *Dow Chem. Pacific Ltd.,* 782 F.2d at 344. Instead, the Court's conclusory determination that Eisemann's motion was filed in bad faith rested almost entirely on its lack of merit. It is sometimes possible to infer bad faith from the meritlessness of a motion. *See Schlaifer Nance,* 194 F.3d at 338. But absent greater specificity from the District Court, the failure to meet the standards of Local Rule 6.3--a proper basis for denial of her motion for reconsideration--is not, without more, a proper basis for the imposition of sanctions on Eisemann's Counsel.

Moreover, imposing sanctions, in part, for failing to heed the Court's "advice" as to whether a motion is appropriate amounts to establishing an unacceptable requirement that parties obtain the Court's prior authorization before filing a motion. Although we have recognized that "it is within the judge's discretion to hold a pre-motion conference for the purpose of persuading a party not to file a perceived meritless motion," 4 *Milltex Indus. Corp. v. Jacquard Lace Co.,* 55 F.3d 34, 39 (2d Cir. 1995), we have made it clear that "the judge may not require that the court's permission be secured at such a conference before a party may file the motion." *Milltex,* 55 F.3d at 39; *see also MacDraw,* 73 F.3d at 1256 n.2 (same); *Richardson,* 825 F.2d 647 at 652 ("Absent extraordinary circumstances, . . . a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure.").

In the circumstances presented, we are required to conclude that the District Court's determination of bad faith and its imposition of sanctions on Eisemann's Counsel was an abuse of discretion. Accordingly, the District Court's order of August 27, 1998, is reversed insofar as it imposed sanctions on Eisemann's Counsel. *Eisemann v. Greene*, 204 F.3d 393, 396-97 (2d Cir. 2000). Unlike the Court in Eisemann, Your Honor did not say Plaintiffs Second Amended Complaint ("SAC") was baseless. In fact, Your Honor denied Zakarins attempt at preventing its filing.

     f.   ***Plaintiff's Complaint Was Well-Founded***:

Lacking the ability to assert any particularized allegations of bad faith whatsoever, Defendants claim that the Court can infer bad faith from the pleadings. Not so. "Bad faith may be

inferred 'only if the actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Schlaifer*, 194 F.3d at 336.

The Plaintiff's claims were far from "completely without merit." To the contrary, the Complaint's merit claims were well-founded and based on a reasonable investigation into the facts and law. (Blackburn Decl. ¶ 29). The UMG defendants may not like being tied to Sean Combs, who is a confirmed woman beater, accused sex trafficker, drugger, and rapist, but they made the conscious decision to partner with and employ him on multiple occasions throughout the years despite Combs' well-documented indiscretions. (Blackburn Decl. ¶ 30).

To date, there have been a total of 8 civil lawsuits filed against Mr. Combs with eerily similar accusations. (Blackburn Decl. ¶ 32). UMG and/or its subsidiaries have been named co-defendants in several of them. (Blackburn Decl. ¶ 33). According to Mr. Jones, he personally witnessed Combs engage in sex trafficking and RICO activities. (Jones Decl. ¶ 45-53). These claims were accompanied by screenshots of videos, text messages, uber receipts, and photos of Combs drug mule, Chief of Staff, and other employees transporting Combs drugs in their black pouches. (Jones Decl. ¶ 78-89). Presumably, this was the same pouch Combs employee Brendan Paul had on his person when law enforcement arrested him in Miami Airport and located cocaine and other illegal controlled substances on his person. (Blackburn Decl. ¶ 39).

The UMG defendants were named as co-defendants based on what Mr. Jones personally saw, experienced, and was told by Combs. (Jones Decl. ¶ 45-53). Mr. Blackburn corroborated Mr. Jones' claims through conversations with witnesses who attended the Club Love parties at Chalice Recording Studios, at Combs' home in Miami, Los Angeles, and on a Yacht in the Virgin Islands. (Blackburn Decl. ¶ 43-44). These individuals provided details of what they personally witnessed and experienced. (Blackburn Decl. ¶ 45). Some of them went so far as to provide the names of producers, artists, record label executives, and entertainers. (Blackburn Decl. ¶ 46). Mr. Jones did not personally identify who was also in attendance at these parties. (Jones Decl. ¶ 45-53). In the interest of not outing these attendees and witnesses who are not party to this action, Plaintiff has purposely not named them. If the Court requires these disclosures, Plaintiff will happily make them In-Camera. As the Court could imagine, these individuals are deathly afraid of the backlash and retaliation they would be exposed to if their identities are revealed. (Blackburn Decl. ¶ 48).

These individuals are record label owners, founders, and executives who Mr. Jones knew personally and who were present at the parties.  (Jones Decl. ¶ 45-53).  Mr. Jones intentionally did not disclose the identities of these companies and individuals because they were not business partners or employers of Combs and Love Records. (Jones Decl. ¶ 45-53).

Former Defendant and CEO of Motown Records Ethiopia Habtemariam ("Hab") admitted in her declaration that she partied at Sean Combs' home but conveniently denied seeing sex workers, minors, or drugs present.  (Blackburn Decl. ¶ 59).  She also conveniently denies partying at his home after September 2022 (Blackburn Decl. ¶ 60).  This is an odd claim, especially since she went out of her way to promote and celebrate the partnership (her words) with Combs to help "establish Love Records" and the "Love Album." (Blackburn Decl. ¶ 61).  It is implausible to believe Hab would attend a house party for the Combs BET Lifetime Achievement award, yet she would not attend a writer's camp and club Love at Chalice Recording Studios, which had over 150 songwriters, producers, record label executives, and major recording artists present.  (Blackburn Decl. ¶ 62).  It is implausible to believe that Hab, with the consent of her boss Grainge, would fork over 1.3 million dollars to Combs for the creation of the Love Album and the development of Love Records, yet Hab conveniently did not attend any of the Club Love events and Chalice Recording Studios from September 2022 until Hab purported forced termination from UMG in November 2022.  (Blackburn Decl. ¶ 63).

Plaintiff Jones swore under penalty of perjury that he saw Hab and Grainge at several events at Combs's home and at Chalice Recording Studios.  (Jones Decl. ¶ 78).  Plaintiff Jones also declared that he did not personally meet Hab and Grainge at any of these events because Combs was using a meeting or introduction to Hab and Grainge as a treat or something of value that would be potentially life-changing for someone in Plaintiff's shoes. (Jones Decl. ¶ 78).  Habs' status as CEO of Motown Records held a lot of value, and an introduction from Combs could have had a life-changing impact on a producer like Mr. Jones, who was trying to transition from Gospel music to Rhythm and Blues.  (Jones Decl. ¶ 2).  Historically, Motown Records is the mecca of black pop culture.  From its inception in the 1960s and 70s, Motown Records provided the soundtrack to the civil rights movement in the United States.  Mr. Jones' grandparents were preachers and involved in the civil rights movement in the 1960s and 70's.

In the face of this history and knowing that Combs was the gatekeeper who had the ability to make the introduction if Mr. Jones followed his orders, Mr. Jones did not approach Hab and

Grainge when he saw them at Combs's parties.  (Jones Decl. ¶ 78).  Combs informed Jones that an introduction to Hab and Grainge would be forthcoming if Combs felt that Plaintiff Jones was worthy of an introduction.  (Jones Decl. ¶ 78).  A person in Plaintiff Jones' position who saw the likes of Chris Brown, D.J Kahlad, Rick Ross, French Montana, and Amy Schumer parading in and out of Mr. Combs' home, Yacht, and Club Love parties, it was reasonable for him to believe that Combs had the power to make or break his career. (Jones Decl. ¶ 78).

If Plaintiff Jones was acting in bad faith, he could have forced the issue by filing a motion for limited discovery. As detailed above, absent a showing of clear merit lessness, the Court would have granted the motion.  He could have subpoenaed Hab and Grainge's phone records and used their cellphone data to see if they were at Chalice or Combs' residence at any time between September 2022 to February 2023.  (Blackburn Decl. ¶ 64).  Despite what he personally saw and what he discussed with Combs concerning the identities of the individual UMG defendants, Plaintiff Jones decided to voluntarily dismiss Hab and Grainge from the case based solely on their denials.  Jones acknowledged that he was drugged by Combs on many occasions, and absent physical proof, he did not feel comfortable pressing the issue if Hab and Grainge declared under penalty of perjury that they were not present.

It is clear from their motion for sanctions the defendants are upset that they were associated with Combs and his deplorable behavior.  But Defendants are solely responsible for the stench they must now wear for repeatedly deciding to be business partners with the likes of Combs.  As the old proverb says, "Tell me who your friends are, and I will tell you who you are."

Defendants are trying to impose a ridiculous standard on plaintiff Jones, essentially demanding that he teleport back in time to the date Motown "signed" their contract with Combs and Love Records to see the making and signing of the agreement.  As Plaintiff swore to in his declaration, he was present when cash was delivered to Combs' house and stashed in an inner closet located in Combs' bedroom closet. (Jones Decl. ¶ 80-81).  Combs personally informed Plaintiff that UMG defendants sent him that money.  Plaintiff Jones took Combs at his word, as he had no reason to believe otherwise.  It's not as if the individuals who delivered the money showed up wearing UMG paraphernalia while Shuckin' and jivin' and singing a jingle so the world knows that UMG was delivering money.   Plaintiff Jones also witnessed gang members and other questionable individuals at Combs' home picking up money and guns from Combs.  Plaintiff Jones did not attribute that to the UMG defendants.

Defendants also clutch their pearls over the fact that Plaintiff Jones decided to believe Combs when he stated that UMG paid for the writer's camp at Chalice, where there was an influx of sex workers, drugs, and underage girls. (Jones Decl. ¶ 97). Combs made it very clear that he never used his money to pay for anything. (Jones Decl. ¶ 95). The plaintiff has videos, photos, uber receipts, and text messages from many of the sex workers. (Jones Decl. ¶ 43). In the SAC, the Plaintiff included a chart with the last two digits and dates of appearance for at least eight sex workers. (Jones Decl. ¶ 43). Defendants wanted Mr. Blackburn to look past all of this irrefutable evidence in Plaintiff Jones' possession and somehow disbelieve Plaintiff's claim that Combs personally told him the money, which Plaintiff saw with his own two eyes, came from UMG.

What's even more foolish about Defendant's motion is the fact that they expect Plaintiff, who was not privy to the heavily redacted sham agreement between Combs, Love Records, and Motown, to know that they had a purported distribution agreement and not a partnership with Combs, and Love Records. This is despite Motown and Hab's public campaign bragging about their PARTNERSHIP with Combs. (Blackburn Decl. ¶ 66). If Defendants did not want the public to believe they have a partnership with Combs, then maybe they should not go on a press tour calling it a partnership. (Blackburn Decl. ¶ 67).

Any person with a modicum of commonsense can see that the Defendant's bedwetting is disingenuous. Before November 16, 2023 (the date of Cassie Ventura's lawsuit), Defendants were willing to crawl over hot coals to touch the hem of Comb's garment. (Blackburn Decl. ¶ 68). They knew Combs' success as a hip hop and R&B executive, absent that he had not released a hit record in decades, could mean instant success for UMG. They did not care that Combs shot Natania Griffin in the face in a nightclub in 1999. (Blackburn Decl. ¶ 69). UMG did not care that Combs beat up one of their executives, Steve Stoute, with a bottle of champagne and a chair in 1999. (Blackburn Decl. ¶ 70). UMG did not care that Combs assaulted his son Justin Combs' college football coach at UCLA in 2015 with a kettlebell. (Blackburn Decl. ¶ 71). UMG did not care that Combs was accused in 2019 of stomping a baby out of the stomach of his ex-girlfriend, Gina Huynh, and forcing her to have multiple abortions against her will. (Blackburn Decl. ¶ 72). None of these deplorable public acts by Combs mattered to UMG. They were willing to look past it all in order to marry themselves to Combs because Combs was potentially good for UMGs bottom line. (Blackburn Decl. ¶ 73).

It wasn't until Cassie Ventura filed her civil suit detailing Combs' sex trafficking that UMG decided to distance itself from him.  Now, suddenly, they did not have a partnership. Suddenly, it was a simple distribution agreement, nothing more, nothing less[5].  UMG and Zakarin's about-face can be reduced to, 'please don't look at all of our public statements from May of 2022, when it was cool to be affiliated with Combs; we want the public to rely on the terms of a purported agreement that was never made public until Mr. Jones sued us.'

Even the UMG defendant's last-minute self-serving waiving of their contract with Combs did nothing to free them of their questionable self-serving decision to partner with Combs. (Blackburn Decl. ¶ 74-75).  This was evident from the fact that they went so far as to provide Combs with over $1.3 million dollars of free money for work on an album that was never done. (Blackburn Decl. ¶ 76).  We know that no work was done on the album because Plaintiff has every version of every song, released and unreleased, for the Love Album.  The tracks are all timestamped, and none of the tracks predates the signature on the sham agreement between the UMG defendants, Love Records, and Combs.

Even more embarrassing for UMG is the fact that Combs did not adhere to any of the provisions in the sham contract.  (Blackburn Decl. ¶ 77).  Section 4.04(a) required Combs to get pre-approval before hiring any producers, and the producers were required to sign a contract approved by Motown.  (Blackburn Decl. ¶ 78).  The Plaintiff was a producer. (Jones Decl. ¶ 71). He produced nine songs and played instruments on several others. (Jones Decl. ¶ 4).  He was never paid for any of his work and was never provided a contract, much less a contract approved by Motown.  (Jones Decl. ¶ 95).

The final and probably most troubling revelation of the Combs UMG sham agreement is that Combs did not sign the agreement! (Blackburn Decl. ¶ 79).  The Plaintiff has over 40 examples of Combs' signature, and compared to the signature on the sham agreement, Combs was not the signatory of the contract.  (Blackburn Decl. ¶ 9).   This point was raised to Zakarin.  (Blackburn Decl. ¶ 80).  Blackburn asked Zakarin to provide the certification page from DocuSign so we can confirm Combs' location on the date of the signature. (Blackburn Decl. ¶ 81).  The DocuSign document has an IP address that can determine where the document was sent from, where the person who opened it was located, and where the person who reviewed and signed it was located. (Blackburn Decl. ¶ 82).  It was a simple ask that any person with *integrity* would be willing to

---

[5]

share. True to form, Zakarin inexplicably denied the request. (Blackburn Decl. ¶ 83). Even though he presented the sham contract to the Court.  (Blackburn Decl. ¶ 84).  Mr. Blackburn shared his concerns about the validity of Combs' signature and informed him that if Combs failed to sign the agreement, he and UMG were general business partners (as defined by New York State law), as Plaintiff claimed in his SAC.  (Blackburn Decl. ¶ 85). Of course, this fact meant nothing to UMG, as Zakarin stated that the contract existed as long as there was substantial performance.  (Blackburn Decl. ¶ 86).  As detailed above, Combs did not substantially perform any part of the sham contract. (Blackburn Decl. ¶ 87).  In fact, Combs did not perform his duties in the contract at all.  This contract was a sham, and it would not be surprising if it is eventually discovered the $1.3 million was a cover to launder money, as UMG inexplicably gave Combs $1.3 million unchecked, and Combs failed to secure the approvals and contracts before hiring Plaintiff as a producer.

In fact, UMG representative and legal counsel Martha Brathwaite admitted to taking Combs, attorney Kenneth Meiselas' word for it.  (Blackburn Decl. ¶ 88). Buried in footnote 2 of Martha Brathwaite's declaration, she says,

> "The requirement that these costs be documented is a standard provision of our agreements. However, *because we have had many negotiations with Mr. Meiselas and his firm, we accepted his representation that the actual costs incurred were far greater than the $1.3 million*. Moreover, since we ended up terminating the license agreement and did not distribute the album, *there was no reason for us to do a full accounting of the costs both before and after the license agreement, and we did not do one*." (Blackburn Decl. ¶ 89).

UMG was negligent.  Plaintiff Jones was correct when he said they gave Combs unchecked money to do whatever he wanted to do.  (Blackburn Decl. ¶ 91).  Plaintiff Jones was correct when he said, that Combs told him that he never spends his money on anything.  (Blackburn Decl. ¶ 92). Well, in this instance, since UMG was admittedly willfully negligent in confirming that Combs had incurred the pre-contract expenses, as well as the post-contract expenses, they gave him millions of dollars, which was used to pay for drugs and sex workers. (Blackburn Decl. ¶ 93).

A claim is colorable and, thus, not sanctionable "when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." Adkins v. Gen. Motors Acceptance Corp., 479 F. App'x 386, 387 (2d Cir. 2012); see also Schlaifer, 194 F.3d at 337 ("The question is whether a reasonable attorney … could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." (quotation

marks and citation omitted)). The Plaintiff's claims here were colorable, grounded in fact and law, and did not imply an improper purpose.

III.   **Plaintiff Had Objectively Reasonable Grounds for Believing That His Claims were Meritorious**:

Defendants assert in conclusory fashion that Plaintiff's claims lacked merit, without addressing a single allegation from Plaintiff's Complaint or providing any other explanation of this purported lack of merit, instead handwaving towards the motion to dismiss.  The Plaintiff had (and has) objectively reasonable grounds for its claims, which are supported by law, fact, and corroborating witnesses.

a.   *Plaintiffs Respondeat Superior Liability Under RICO*:

The Southern District of New York imposes RICO liability on employers.  In order to demonstrate that a corporation is directly involved or central to the RICO scheme alleged, Plaintiffs must show that a corporate officer or director had knowledge of or was recklessly indifferent toward the unlawful activity. *See Amendolare,* 747 F. Supp. at 169; *Laro,* 866 F. Supp. at 140. Even upon such a finding, other factors, including the number of high-level employees involved, their degree of participation in the alleged scheme, as well as the extent of the corporation's benefit from the scheme, should then be considered before corporate liability is properly attributed. *See Amendolare,* 747 F. Supp. at 169; *Laro,* 866 F. Supp. at 140; *see also Dubai Islamic Bank v. Citibank, N.A.,* 126 F. Supp. 2d 659, 671 (S.D.N.Y. 2000).

Some courts in this Circuit have imposed RICO liability on a corporation for the acts of its employees based, at least in part, on whether the corporation itself benefitted from the scheme. *See Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York,* 808 F. Supp. 213, 236 (S.D.N.Y. 1992) ("Where the employer allegedly benefits from the predicate acts, respondeat superior liability under RICO is appropriate."); *Connors v. Lexington Ins. Co.,* 666 F. Supp. 434, 453 (E.D.N.Y. 1987) ("§ 1962(c) liability may be appropriate so long as the employer/enterprise actually benefitted from the [] predicate acts.") This approach was adopted by the Seventh Circuit in *D & S Auto Parts Inc. v. Schwartz,* 838 F.2d 964, 967 (7th Cir. 1988).  However, even under the analysis in *D & S Auto Parts,* the Seventh Circuit held that "an employee violating RICO without his employer's knowledge is highly unlikely to be acting for his employer's benefit," 838 F.2d at 967, thereby incorporating the presumption that for a corporation to be held liable under RICO, an employer will most likely be aware of the wrongdoing of its employee.

Courts have also focused on principles of agency in determining the appropriateness of corporate vicarious liability in the RICO context. *Connors,* 666 F. Supp. at 453; *Bernstein v. IDT Corp.,* 582 F. Supp. 1079, 1083-84 (D. Del. 1984) ("When conduct is proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly imposed, the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent."); *see also Amendolare,* 747 F. Supp. at 168-171 (agency one of a number of principles considered in determining vicarious liability); *Kovian,* 100 F. Supp. 2d at 133 (finding that high-ranking officers of a bank could not implicate the Bank's liability because they were acting outside the scope of their employment). However, under agency principles, for liability to be attributed to the corporation, an agent must be acting within the scope of his employment, typically meaning that the corporation must have been aware of the scheme or artifice to defraud. *Kovian,* 100 F. Supp. 2d at 133; *see also* Restatement (Second) of Agency § 219 (1958).  *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 328-29 (S.D.N.Y. 2003).

Here, it was reasonable for Counsel, in the face of all of the evidence Plaintiff possesses, to substantiate the imposition of a claim for RICO.  The Combs Enterprises' participation in the RICO Enterprise to believe the claims Plaintiff made concerning the UMG Defendants. (Blackburn Decl. ¶ 53-54). Mr. Blackburn relied on the documents and sworn statement from Plaintiff and spoke with others who witnessed many of the things Plaintiff claimed.  (Blackburn Decl. ¶ 55). Counsel also relied upon legal research that states employers are vicariously liable for the actions of their employees under the Federal Rico statute.  (Blackburn Decl. ¶ 56). Counsel also relied on public statements from the UMG defendants celebrating the signing of Combs as an artist. (Blackburn Decl. ¶ 57).  The Combs' signing as an artist was separate from the public claims they made celebrating the establishment of Love Records. (Blackburn Decl. ¶ 58).

As previously stated, the Defendants did not require Combs and Love Records to adhere to the terms of their contract. They were complicit, sloppy, and grossly negligent. They gave Combs $1.3 million upon signing the ERA without ever receiving an invoice or proof of what he used that money for.

Defendants did not have any intention to enforce the terms of ERA.  Section 4.04(a) of this sham ERA states, "Subject to the terms of this Article 4, you shall engage each producer pursuant to a written producer agreement containing material terms approved by Motown…".  Plaintiff produced nine songs on the Love Album – Off the Grid. (Jones Decl. ¶ 4).  The Plaintiff was not

compensated for his work. (Jones Decl. ¶ 95). Additionally, Plaintiff did not have a written agreement with Love Records or Combs as required by section 4.04(a) of the sham ERA. Defendants did not contact Mr. Combs or Love Records to obtain a copy of the Plaintiff's signed producer agreement. If they had done so, they would have discovered that Plaintiffs' work on the Love Album – Off the Grid violated section 4.04(b) of the ERA.

   b.   ***The Defendants Are Partners In The Combs RICO Enterprise***:

As much as the Defendants are hoping to distance themselves from Combs and Love Records, they are equally as liable for all of the crimes he committed throughout the duration of ERA. Defendants intentionally redacted essential sections of the ERA to hide the details of how they agreed to share profits, losses, ownership of the partnership assets, liability to creditors, compensation for the defendants, and loans to the organization.

   *Management and control*: As detailed in section eight of the ERA, the Defendants had dominion and control over the artists, producers, and musicians for the Love album.  According to the ERA, the Defendants were the plaintiffs' attorneys, in fact, and had the power to execute documents on the Plaintiff's behalf and to control his artistry.

   See DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (to state a civil claim under 18 U.S.C. 1962(c), a plaintiff must allege that a defendant participated in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity") (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).  To participate in a racketeering enterprise under the relevant provisions of RICO, a defendant must "direct the enterprise's affairs." Reves v. Ernst & Young, 507 U.S. 170, 177, 180, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). While a defendant need not play the "predominant" part in the operation of the enterprise, it must "exert" some "control" over it. Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003).  *Doe v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 412 (S.D.N.Y. 2023).

   Here, if the defendants' sham ERA is to be trusted, the defendants exerted some control over the Combs RICO enterprise through sections 4.01, 4.02, and 4.04, which all required Combs and/or Love Records to provide notification, obtain consultation, and/or obtain approval from the Defendants before designating individual producers, engineers/mixers, and musicians; submit a written budget listing for its approval; and obtain written producer agreements. (Jones Decl. ¶ 95).

   c.   ***Plaintiffs Trafficking Victims Protection Act Claims In The SAC***:

Defendants erroneously claim no private right of action for an obstruction claim under the TVPA.  The Defendant's position contradicts well-settled law in this Court.  In *Doe v. Deutsche Bank Aktiengesellschaft*, the defendants argue that the TVPA does not provide a private right of action for obstruction.  Judge Rakoff disagreed.

In his opinion, Judge Rakoff held in the relevant part,

> "As an initial matter, defendants argue that JPM Jane Doe and DB Jane Doe have no right to assert obstruction claims.  The TVPA's "civil remedy," 18 U.S.C. § 1595(a), only provides a right of action to a "victim" of a violation of the TVPA.  18 U.S.C. § 1595(a).  The defendants argue that JPM Jane Doe and DB Jane Doe are not the victims of any obstruction of an enforcement effort.  The only victim of such an action, defendants say, is the government that makes such an effort.  See Doe v. Fitzgerald, 2022 U.S. Dist. LEXIS 8194, 2022 WL 425016, at *4 (C.D. Cal. January 6, 2022) ("The 'victim' of the obstruction of enforcement set out in section 1591(d) is the state or federal government[.]").  Thus, defendants say, the Jane Does do not have a right to assert their obstruction claims.

> The statute cannot be read in this cramped fashion.  While 18 U.S.C. § 1595(a) does not define "victim," a different section of the federal criminal code -- which establishes a criminal procedure that is generally applicable across federal crimes -- defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A); see also 34 U.S.C. § 20141(e)(2) (defining a victim as "a person that has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime").  This definition accords with ordinary usage, which recognizes a victim as "one that is injured, destroyed, or sacrificed under any of various conditions." Victim, Merriam-Webster's Collegiate Dictionary (10th ed.).  Thus, the "victims" of those who obstruct the enforcement of the TVPA include not just the government but also those who suffered harm because the government's enforcement efforts were hindered.

*Doe v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 409 (S.D.N.Y. 2023)

The *Doe v. Deutsche Bank Aktiengesellschaft* standard applies here.  UMG attempts to downplay its role in Combs' sex trafficking operation by stating that Plaintiff has no knowledge of their tax filings or reporting requirements for Combs and Love Records.

The plaintiffs' knowledge stemmed from Combs' statements that only poor people pay taxes, meaning he pays little to no taxes. (Jones Decl. ¶ 99(e)). In addition to Combs' statements, Plaintiff was not compensated for his nearly thirteen months of work on the Love Album. (Jones

Decl. ¶ 82). Defendants would know this if they did their due diligence as outlined in their sham contract and ensured that the Plaintiff producer agreement was signed as required by section 4.04(a). (Blackburn Decl. ¶ 78). Additionally, the Defendants would have been on notice if they required Combs to provide itemized Love Album recording invoices.  They did not.

### d. *Defendants Recklessly Disregarded The Existence Of Sex Trafficking*:

As detailed in the Plaintiff's Declaration, executives from the Defendants organization visited Combs' home, Chalice Recording Studios, and Club Love listening parties. (Jones Decl. ¶ 39, 62, 63, and 78). In the studios, there were sex workers present. (Jones Decl. ¶ 96-96). As detailed above, the Plaintiff has videos and photos evidencing this.  (Jones Decl. ¶ 97).  The Plaintiff also has Uber receipts and text messages from several sex workers Combs requested to be present during the recording sessions for the Love Album. (Jones Decl. ¶ 43). As stated earlier, Plaintiff was not compensated for his work on the Love Album.  (Jones Decl. ¶ 95).

There were other producers and engineers present at the studios who were not paid for the work they did on the Love Album.  (Jones Decl. ¶ 95). Yet, Plaintiff can show that the sex workers that were present in the recording studios, Love Album listening parties, Club Love parties, and Combs house parties were all paid. (Jones Decl. ¶ 96). According to the Defendants' sham contract, Combs and Love Records were required to get approval from the defendants before hiring the album's producers. The defendants also had access to all recording sessions associated with creating the Love album.

Plaintiff personally saw executives from the Defendant record label present at the recording sessions during the times that sex workers were present. (Jones Decl. ¶ 39, 62, 63, and 78). According to the Plaintiff's Declaration, Combs informed him that those individuals were there scouting for talent.  (Jones Decl. ¶ 39, 62, 63, and 78).  Defendants either knew or should have known through their authorized agents that Combs was engaging in sex trafficking, and they benefited from it.

Section 1595 allows for civil liability against facilitators who benefit from what they knew or should have known is a sex trafficking venture.  As a remedial statute, we construe the Act liberally Where, as here, a statute is "remedial," it "should be liberally construed." We cannot read out the language of section 1595 imposing civil liability against a person who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person

knew or *should have known* has engaged in an act in violation of this chapter." *A.B. v. Marriott Int'l, Inc*., 455 F. Supp. 3d 171, 189 (E.D. Pa. 2020).

Plaintiffs SAC was not filed in bad faith.  As detailed above, Plaintiff had a plausible reason to believe that UMG funded and profited from Combs' sex trafficking enterprise based on what he experienced as a sexual assault survivor and unpaid producer.  Not to mention that Plaintiff had no reason to disbelieve Combs as he lived with him for 13 months, leaving in November of 2023. (Jones Decl. ¶ 4). The information Plaintiff had at the time, the law detailed above, and the research Counsel Blackburn conducted led Plaintiffs to reasonably believe he had a viable cause of action under the TVPA.

IV.   **UMGs Pandering To Court Falls Short**:

To pander to Your Honor, Zakarin scrummaged through pacer in search of any case where Your Honor imposed sanctions in hopes that whatever case he found would curry favor with the Court. Unfortunately, they only came up with *Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 339 (S.D.N.Y. 2019).  Aside from the obvious and shameless pandering to Your Honor, *Craig* is not analogous to this case.  In *Craig*, Your Honor sanctioned the notorious Richard Liebowitz for filing a meritless motion to disqualify an expert "[w]ith the full knowledge" that a necessary element of the motion was lacking. *Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 339 (S.D.N.Y. 2019), *reconsideration denied*, 2019 U.S. Dist. LEXIS 113771, 2019 WL 2992043. On that basis, Your Honor was able to infer that Liebowitz was behaving in bad faith. *Id*.  Here, Plaintiff did not file a meritless motion.  The second amended complaint was reviewed by Your Honor, and the Court granted permission for Plaintiff to file it.

*Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 659 (S.D.N.Y. 1996): In a clear display of bad faith, Zakarin relies on *Katzman*, a case that imposed Rule 11 Sanctions, as opposed to sanctions pursuant to § 1927 or the Court's inherent powers.  As stated above, pursuant to an implied understanding, Plaintiff voluntarily dismissed the second amended Complaint with prejudice before the expiration of the 21-day safe harbor rule in reliance on Zakarin's April 26, 2024, email.  As detailed above, the judges in this District have held that it would be improper to sanction Plaintiffs and counsel who adhere to the 21-day safe harbor rule.

In their motion papers, Zakarin jumps through hoops to rewrite history.  On April 9, 2024, Your Honor held a hearing. (Blackburn Decl. ¶ 21).  During that hearing, Your Honor reviewed

the Plaintiff's proposed SAC and challenged both party's positions concerning the filing of the Complaint.

After nearly 30 minutes, Zakarin *failed* to persuade the Court to deny Plaintiffs the right to file the proposed second amended Complaint.  (Blackburn Decl. ¶ 22). Your Honor saw right through Zakarins gamesmanship when the Court challenged Zaharins basis for objecting to the Plaintiffs filing the SAC when the Court correctly noted that the SAC was in response to a request Zakarin made pursuant to his March 4, 2024, letter. (Jones Decl. ¶ 23). In rejecting Zakarin's arguments, Your Honor acknowledged that the second amended Complaint essentially complied with most of the demands Zakarin made in his March 4, 2024, letter, absent his request to have Plaintiff dismiss the Defendants out of the case.

If Your Honor believed that Plaintiff did not have a meritorious claim and that filing the SAC would be futile, as Zakarin misleadingly states, the Court would have denied Plaintiff's request to file the SAC.  Your Honor is no stranger to denying amendment requests, as evidenced by the following cases:

| Case Name | Judge Oetkens Opinion |
|---|---|
| In re To, No. 17-CV-2987 (JPO), 2022 U.S. Dist. LEXIS 83767, at *36 (S.D.N.Y. May 9, 2022) | Under New York law, a plaintiff must allege an underlying actionable tort that was the subject of the conspiracy. *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 226 (N.D.N.Y. 2009). The alleged underlying tort for the Plaintiffs' conspiracy claim is S&P's publication of its withdrawal notice. Having concluded that the Plaintiffs failed to state a claim that the withdrawal notice was fraudulent, the Court accordingly denies the Plaintiffs leave to amend their Complaint with a conspiracy claim. |
| Aviles v. S&P Glob., Inc., Nos. 17-CV-2987 (JPO) (KHP), 17-CV-6087 (JPO) (KHP), 2022 U.S. Dist. LEXIS 29896, at *64-65 (S.D.N.Y. Feb. 18, 2022) | The company did not benefit from the negotiated settlement agreement—rather, it was rendered insolvent. Accordingly, Judge Oetken found that the allegations in the Complaint were sufficient to render plausible that the adverse interest exception to the *in pari delicto* doctrine applied. *See Aviles v. S&P Glob., Inc.*, 2020 U.S. Dist. LEXIS 61095, 2020 WL 1689405, at *3 (S.D.N.Y. Apr. 6, 2020). In contrast, Plaintiffs here allege that the company benefitted from |

| | the alleged fraud.   Accordingly, the Plaintiffs' conspiracy claims are futile. |
|---|---|
| Perez v. De La Cruz, No. 09 CV 0264 (JPO) (MHD), 2013 U.S. Dist. LEXIS 83557, at *14-15 (S.D.N.Y. Feb. 20, 2013) | As for the timing of the Plaintiff's application, it was made well after the filing of the defendants' Rule 56 motion and long after the close of the discovery period. In comparable circumstances, the Second Circuit has upheld the denial of a motion to amend where the party "waited more than three years to seek an amendment, and did so only after confronted with a motion for summary judgment." City of New York v. Group Health Inc., 649 F.3d 151, 158 (2d Cir. 2011). See also Longman v. Wachovia Bank, N.A., 702 F.3d 148, 151 (2d Cir. 2012).  That is precisely the case here.  In sum, Plaintiff's application to amend his Complaint is denied. |

V.   **The Court Should Exercise Its Discretion And Require Defendants and their Counsel to Bear Plaintiff's Costs and Fees for Defending Against This Motion**:

Zakarin's application for sanctions in this case is baseless for the reasons described herein. Unlike Plaintiff and its Counsel, whose conduct has been objectively reasonable throughout this litigation, the UMG Defendants and Zakarin vexatiously extended proceedings by engaging in deception to seek sanctions without proper grounds.   Throughout this litigation, Zakarin has consistently touted his nearly "50 years" of legal experience as if it grants him an automatic pass to engage in unethical gamesmanship and file a baseless retaliatory motion for sanctions in bad faith.

Plaintiff respectfully requests that the Court consider exercising its discretion by requiring Defendants and their Counsel to reimburse Plaintiff for the fees and costs incurred defending against this frivolous motion. See e.g., Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42, 57 (D.D.C. 2003) (sanctioning Plaintiff for seeking legally unsupported sanctions); Claudet v. First Fed. Credit Control, Inc., No. 14 Civ. 2068, 2015 WL 7984410, at *3 (M.D. Fla. November 17, 2015) (sanctioning defendants for filing an improper motion for sanctions "[d]espite achieving a voluntary dismissal"); JP Morgan Chase Bank, N.A. v. Winget, No. 08-13845, 2014 WL 12725040, at *1 (E.D. Mich. February 25, 2014) (requiring reimbursement of expenses incurred responding to a frivolous sanction motion); see also Bangkok Broad. & T.V. Co., LTD. v. IPTV Corp., No. 09 Civ. 3803, 2010 WL 11523703, at *6 (C.D. Cal. February 12, 2010) ("[A] frivolous motion for sanctions can be grounds for sanctions itself").

In addition to imposing sanctions against the UMG defendants for filing this baseless motion, the Plaintiff and Mr. Blackburn respectfully request that the court retain jurisdiction of the issues raised in the 5/21/24 and 5/23/24 letters emailed to chambers.  The plaintiff and his counsel have filed several complaints, and their devices are being assessed.  The Plaintiff and his counsel anticipate the UMG defendants being responsible for the claims raised in the letters.

**CONCLUSION**

For the preceding reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for sanctions and consider awarding Plaintiff fees and costs, as the Court deems reasonable and appropriate, that Plaintiff has incurred responding to Defendants' baseless motion.

Dated: June 3, 2024
Brooklyn, New York

By:/s/ *Tyrone A. Blackburn*
T. A. BLACKBURN LAW, PLLC
1242 East 80th Street, 3rd Floor
Brooklyn, NY 11236
tblackburn@tablackburnlaw.com
*Attorneys for Plaintiff Rodney Jones*