UNITED STATES FEDERAL COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODNEY JONES,<br>        *Plaintiff*,<br>-against-<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>CUBA GOODING JR.,<br>LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10 and<br>ABC CORPORATIONS.  1-10,<br>        *Defendants*. | Case No.: 24-cv-01457<br><br>**DECLARATION OF<br>TYRONE BLACKBURN<br>IN OPPOSITION TO THE UMG<br>DEFENDANTS' MOTION FOR<br>SANCTIONS** |

I, Tyrone A. Blackburn, Esq., declare according to 28 U.S.C. §1746 as follows:

1. I am over eighteen years old and am Counsel to Rodney Jones ("Plaintiff") in this action. I make this declaration in opposition to the UMG Defendants Motion For Sanctions.

2. I am thoroughly familiar with all matters set forth herein and verify that they are accurate to the best of my knowledge, except as to the matters stated to be alleged upon information and belief, and, as to those matters, I believe them to be true.

3. For the reasons set forth more fully below, the UMG Defendant's motion should be denied.

**UMG Defendants Authored The Dismissal Documents And Are Using Their Work To Justify Sanctions Under The Court's Inherent Power**:

4. On May 10, 2024, I emailed Donald Zakarin, counsel for the UMG Defendants, to inform him of the Plaintiff's decision to dismiss the case against them (**see Exhibit 1**).

5. I sent Zakarin my proposed notice of voluntary dismissal.  (**see Exhibit 2**).

6. Zakarin insisted on drafting a completely different notice of voluntary dismissal and declaration.  (**see Exhibit 3**).

7. I filed the document prepared by Zakarin as an extension of good faith (**see Exhibit 4**).

1

8. Prior to the Plaintiff's decision to voluntarily dismiss his claims against the UMG defendants, we spent extensive time researching and investigating the validity of Sean Combs's signature on the agreement between Love Records, Combs, and Motown.

9. We pulled over 40 examples of Combs' signature from agreements he signed with various artists, record labels, and banks for mortgages. Many of these signatures came from exhibits from prior litigation Combs was involved in throughout the years.

10. We even secured the services of a handwriting expert, who confirmed our suspicions that Combs did not sign the agreement with Motown.

11. As a result, Plaintiff Jones felt that Motown and the UMG defendants were more than likely victims of fraud perpetrated by Combs, and it would be implausible to hold them equally liable for the harm Combs visited upon Mr. Jones.

12. On or about April 26, 2024, before the discovery that Combs did not sign the Motown love records contract and the subsequent decision to voluntarily dismiss the case against the UMG defendants, Plaintiff received a Rule 11 motion. (**see Exhibit 5**).

13. The email in Exhibit 5 states explicitly that the Plaintiff has until May 17, 2024, to voluntarily dismiss the case against the UMG defendant, or the motion for sanctions will be filed (**see Exhibit 5**).

14. In reliance on the April 26, 2024 email and an extension of good faith, I agreed to allow Zakarin to amend the dismissal documents in exchange for Defendants not filing the sanctions motion on May 17, 2024.

15. The documents were filed, Zakarin consented to a follow-up filing, and the Court dismissed the UMG defendants from the case.

16. On May 17, 2024, four days after the dismissal, Zakarin double-crossed this writer and filed a revamped version of the Rule 11 Sanctions motion.

17. Zakarin used unethical gamesmanship to get Plaintiff to voluntarily dismiss his Complaint against the UMG defendants with prejudice in exchange for not filing their sanctions motion.

18. Zakarin disguised his Rule 11 Motion for Sanctions as a sanctions motion under 28 U.S.C. §1927 and the Court's inherent powers.

19. A close look at both documents will allow the Court to see that the motions are nearly identical.

20. Zakarin did not have the decency to attempt to hide his bad faith; instead, the motion, according to 28 U.S.C. §1927 and the Court's inherent powers, is replete with Rule 11 sanction case citations.

21. I honestly should have known better than to believe that Zakarin would act with integrity. His actions and failed gamesmanship during the April 9, 2024, hearing was a clear indication of who he truly is.

22. Not only was Zakarin unprepared during the April 9, 2024, hearing, as it was evident that he had no answers concerning the apparent inconsistencies displayed in the Motown, Combs, and Love Records contract, but he also tried and failed to convince the Court that Plaintiff should not be permitted to file his Second Amended Complaint.

23. As the Court indicated, the Plaintiff's Second Amended Complaint complied with the requirements according to rule 11 of the FRCP because it corrected the objections raised by the Defendants in their letter of March 4, 2024.

24. Of course, the Plaintiff's decision to amend rather than voluntarily dismiss infuriated Zakarin, but the defendants' refusal to back down and vet the new information they provided to support their position (the Motown, Love Records, and Combs contract) does not amount to bad faith or to a conclusion that the Plaintiff knowingly filed false statements or multiple frivolous arguments.

25. I did not act in bad faith in filing adding the UMG defendants to this litigation.

26. This lawsuit was instituted because the UMG Defendants knowingly conducted business with Combs, whom they knew, or should have known, was a violent, deceptive, morally flawed individual through past experiences where he physically assaulted their former executive, Steve Stoute, with a bottle of champagne and a chair. (**see Exhibit 6**).

27. This lawsuit was not instituted for "some improper purpose" but rather for the very legitimate purpose of recovering damages for the UMG Defendants' reckless, self-serving decision to enter a "partnership" with Combs to "develop love records." (**see Exhibit 7**).

28. I spent many weeks researching the UMG defendant's relationship with Combs, even speaking with current and former UMG employees.

29. The Complaint's merit claims were well-founded and based on a reasonable investigation into the facts and law.

30. The UMG defendants may not like being tied to Sean Combs, who is a confirmed woman beater, accused sex trafficker, drugger, and rapist. Still, they made the conscious decision to partner with and employ him on multiple occasions throughout the years despite Combs' well-documented indiscretions.
31. Combs' storied history of debauchery is well documented in many news articles and a simple Google search.
32. Since November 2023, Combs has been named as a defendant in at least eight lawsuits accusing him of everything from statutory rape to sex trafficking and drugging.
33. It should be no surprise that UMG and its subsidiaries have been named co-defendants in several Combs lawsuits.

**As Time Goes On, Every Claim Plaintiff Jones Has Raised Has Come To Pass**:

34. In the second amended Complaint, Plaintiff provided details about the individual players in the Combs Rico and Sex Trafficking Enterprise.
35. One of the individuals Plaintiff highlighted was Brendan Paul, who Plaintiff referred to as Combs Drug mule.
36. The Plaintiff provided details about how Mr. Paul transported cocaine, tusi, and other illegal drugs—sharing that he would transport it through his carry-on luggage through TSA.
37. The Plaintiff also provided screenshots of a video I have in my possession of Mr. Paul with a drug pouch, showing off bottles of illegal drugs.
38. On March 25, 2024, Paul was arrested on drug charges at a Miami airport as he attempted to board a private jet with Diddy. (**see Exhibit 8**).
39. Mr. Paul had a pouch on his person when law enforcement arrested him at Miami Airport and located cocaine and other illegal controlled substances on his person.
40. In the second amended Complaint, Plaintiff Jones provided details of Combs sex trafficking. He included a chart with the phone numbers, and dates, and Uber receipts of at least eight sex workers.
41. On March 25, 2024, the SDNY and the United States Department of Homeland Security raided two of Combs' houses and his private jet.
42. According to media reports, the raid was part of a sex trafficking investigation. (**see Exhibit 8**).

4

**Zakarins Claim That I Did Not Do My Due Diligence Before Filing Suit Is False**:

43. I corroborated Mr. Jones' claims through conversations with witnesses who attended the Club Love parties at Chalice Recording Studios, at Combs' home in Miami, Los Angeles, and on a Yacht in the Virgin Islands.
44. I also spoke with former employees of the Yacht and a former employee of Combs.
45. These individuals provided details of what they personally witnessed and experienced.
46. Some even provided the names of producers, artists, record label executives, and entertainers.
47. I will not disclose the names of these witnesses, executives, and artists as they are not directly related to this litigation.
48. These individuals fear the backlash and retaliation they would be exposed to if their identities are revealed.
49. Additionally, unlike many plaintiffs, Mr. Jones came to me with tons of evidence that established the validity of all of his claims.
50. Mr. Jones provided text messages, audio and video recordings, flight ticket information, uber receipts, photos, and detailed dates, times, and places of events.
51. Mr. Jones was so thorough that he provided a detailed description of Combs's residence, his behavior patterns, and the behavior patterns of his security team and staff.
52. It was reasonable, in the face of all of the evidence Plaintiff Jones provided, for me to reasonably believe that Combs was operating a RICO and sex trafficking enterprise.
53. The only aspect of Plaintiff Jones's claims that he did not have physical images or videos to substantiate were the claims concerning the UMG defendants. This did not raise concerns for me, as his claims are corroborated through conversations with third-party witnesses.
54. Mr. Jones was so spot on concerning everything else that his claims concerning conversations with Combs, coupled with the fact that I spoke with former UMG employees who provided me with documents that evidenced UMG engaging in acts that were as bad, if not worse than the actions of Combs, were enough for me to believe Mr. Jones's claims that they funded and approved Combs' behavior.
55. I relied on the documents and sworn statement from Plaintiff and spoke with others who witnessed many of the things Plaintiff claimed.

56. I also relied on legal research that states employers are vicariously liable for the actions of their employees under the Federal Rico statute.
57. I also relied on public statements from the UMG defendants celebrating the signing of Combs as an artist.
58. The Combs' signing as an artist was separate from the public claims they made celebrating the establishment of Love Records.

**The UMG Defendants Are Desperate to Detach Themselves From Combs**:

59. Former Defendant and CEO of Motown Records Ethiopia Habtemariam ("Hab") admitted in her declaration that she partied at Sean Combs' home but conveniently denied seeing sex workers, minors, or drugs present.
60. She also conveniently denies partying at his home after September 2022.
61. I find this claim to be odd, especially since she went out of her way to promote and celebrate the partnership (her words) with Combs to help "establish Love Records" and the "Love Album."
62. It is implausible to believe Hab would attend a house party for the Combs BET Lifetime Achievement award. Yet, she would not attend a writer's camp and club Love at Chalice Recording Studios, with over 150 songwriters, producers, record label executives, and major recording artists present.
63. It is implausible to believe that Hab, with the consent of her boss, Grainge, would fork over 1.3 million dollars to Combs to create the Love Album and develop Love Records, yet Hab conveniently did not attend any Club Love events and Chalice Recording Studios from September 2022 until Hab purported forced termination from UMG in November 2022.
64. If Plaintiff wanted to, we could have filed a motion for limited discovery and asked the Court to compel Hab and Grainge to turn over their phone records and use their cellphone data to see if they were at Chalice or Combs' residence at any time between September 2022 to February 2023.
65. Cellular phone tower antennas will quickly provide their locations during that time frame.
66. The irony of the UMG Defendants' temper tantrum is that Hab went on a press tour celebrating the partnership with Combs.

67. If the UMG Defendants did not want the public to believe they have a partnership with Combs, then maybe they should not go on a press tour calling it a partnership. (**see Exhibit 7**).

**UMG Defendants Had Knowledge of Combs Checkered Past**:

68. Before November 16, 2023 (the date of Cassie Ventura's lawsuit), Defendants were willing to crawl over hot coals to touch the hem of Comb's garment.
69. They did not care that Combs shot Natania Griffin in the face in a nightclub in 1999. (**see Exhibit 9**).
70. UMG did not care that Combs beat up one of their executives, Steve Stoute, with a bottle of champagne and a chair in 1999. (**see Exhibit 6**).
71. UMG did not care that Combs assaulted his son Justin Combs' college football coach at UCLA in 2015 with a kettlebell. (**see Exhibit 10**).
72. UMG did not care that Combs was accused in 2019 of stomping a baby out of the stomach of his ex-girlfriend, Gina Huynh, and forcing her to have multiple abortions against her will. (**see Exhibit 11**).
73. None of Combs's deplorable public acts mattered to UMG. They were willing to look past it all and marry themselves to Combs because Combs was potentially good for UMG's bottom line.

**UMG Defendants Gave Combs $1.3 million**:

74. To distance themselves from Combs, the UMG defendants produced a heavily redacted, self-serving document purporting to be a distribution contract with Combs.
75. This sham contract did nothing to free them of their questionable, self-serving decision to partner with Combs.
76. The contract, if real, was a farce, as the UMG defendants gave Combs over 1.3 million dollars of free money for work on an album that was never done.
77. In addition to giving Combs free money, the UMG defendants did not bother to ensure that Combs adhered to any of the provisions in the sham contract.
78. For example, section 4.04(a) required Combs to get pre-approval before hiring any producers, and the producers were required to sign a contract approved by Motown.
79. The final and probably most troubling revelation of the Combs and UMG defendant's sham agreement is that Combs did not sign the agreement!

80. This point was raised to Zakarin.
81. Blackburn asked Zakarin to provide the certification page from DocuSign so we can confirm Combs' location on the date of the signature.
82. The DocuSign document has an IP address that can determine where it was sent from, where the person who opened it was located, and where the person who reviewed and signed it was located.
83. It was a simple ask that anyone with *integrity* would be willing to share.  True to form, Zakarin inexplicably denied the request.
84. Even though he presented the sham contract to the Court.
85. I shared my concerns about the validity of Combs' signature and informed him that if Combs failed to sign the agreement, he and UMG were general business partners (as defined by New York State law), as Plaintiff claimed in his SAC.
86. Of course, this fact meant nothing to UMG, as Zakarin stated that the contract existed as long as there was substantial performance.
87. As detailed above, Combs did not substantially perform any part of the sham contract.
88. In fact, UMG representative and legal counsel Martha Brathwaite admitted to taking Combs, attorney Kenneth Meiselas' word for it.  (**see Exhibit 12**).
89. Buried in footnote 2 of Martha Brathwaite's declaration, she says,

    "The requirement that these costs be documented is a standard provision of our agreements. However, *because we have had many negotiations with Mr. Meiselas and his firm, we accepted his representation that the actual costs incurred were far greater than the $1.3 million*. Moreover, since we ended up terminating the license agreement and did not distribute the album, *there was no reason for us to do a full accounting of the costs both before and after the license agreement, and we did not do one*."

90. UMG was negligent.
91. Plaintiff Jones was correct when he said they gave Combs unchecked money to do whatever he wanted to do.
92. Plaintiff Jones was correct when he said, that Combs told him that he never spends his money on anything.
93. Well, in this instance, since UMG was admittedly willfully negligent in confirming that Combs had incurred the pre-contract expenses, as well as the post-contract expenses, they gave him millions of dollars, which was used to pay for drugs and sex workers.

8

**Zakarin's Desperate Attempts To Paint Me In A Bad Light**:

94. I will not waste my time addressing Zakarins' use of an opinion that had nothing to do with this case or his client, as he only exhibits another example of his dirty gamesmanship and lack of ethics.

95. Zakarin is attempting to distract from the fact that he had no basis to file this sanctions motion. Like a fish out of water, he is desperate in his efforts to justify needlessly multiplying this litigation.

96. I addressed Judge Cote's opinion in a letter to the court Dated April 9, 2024. As I explained in my letter to the Court, I pick my clients, I do not pick their facts.

97. Zakarin also points to the fact I unintentionally misstated the date I made the Rule 4 request to the Combs defendants as some ace in the hole, which proves his very weak assertion that I somehow filed this lawsuit in bad faith. Zakarin completely disregarded the fact that we were on a call, and I had to quickly search my email to find the date. I made a slight error as I was scrambling to find the answer to an unanticipated question.

98. What's interesting is that the Combs defendants found time to collude with Zakarin and turn over emails, yet for nearly a month, they have failed to turn over the signed Rule 4 waiver for the Second Amended Complaint.

99. I have sent them several text messages and an email with the completed Rule 4 waiver form for Sean Combs, Justin Dior Combs, Love Records, and Combs Global Enterprises.

Under penalty of perjury under the laws of the United States of America, I declare that the preceding is true and correct. I understand that if I intentionally lie, I will be punished.

Execution Date: June 3, 2024

*Tyrone A. Blackburn, Esq.*
Tyrone Blackburn