# EXHIBIT # 5.1

**From:** **Charron, William** WCharron@pryorcashman.com 📎
**Subject:** Jones v. Combs
**Date:** April 26, 2024 at 8:06 AM
**To:** Tyrone Blackburn tblackburn@tablackburnlaw.com
**Cc:** Zakarin, Donald S. DZakarin@pryorcashman.com, Janowitz, James A. JJanowitz@pryorcashman.com

Dear Mr. Blackburn:

Please see the attached zip drives including copies of papers supporting a motion for sanctions by the UMG Defendants upon Plaintiff and you being made pursuant to Fed. R. Civ. P. 11. Papers are being served upon you by FedEx pursuant to Fed. R. Civ. P. 5.

Pursuant to Rule 11(c)(2), Plaintiff and you have 21 days (i.e., until May 17, 2024) to withdraw all claims asserted against the UMG Defendants with prejudice. Your failure to do so will result in the filing of this motion with the Court without further notice.

Very truly yours,

William L. Charron
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036
Direct Dial: (212) 326-0156
Direct Fax: (212) 798-6927
Cell: (917) 270-3172
wcharron@pryorcashman.com
Linkedin | Bio

***CONFIDENTIALITY NOTICE***
This email contains confidential information which may also be legally privileged and which is intended only for the use of the recipient(s) named above. If you are not the intended recipient, you are hereby notified that forwarding or copying of this email, or the taking of any action in reliance on its contents, may be strictly prohibited. If you have received this email in error, please notify us immediately by reply email and delete this message from your inbox.




Motion for          Motion for
Sancti...f 2.zip    Sancti...f 2.zip

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

RODNEY JONES,

                         *Plaintiff*,

             -against-

SEAN COMBS, JUSTIN DIOR COMBS, CUBA
GOODING JR., LUCIAN CHARLES GRAINGE,
KRISTINA KHORRAM,  LOVE RECORDS, MOTOWN
RECORDS,  UNIVERSAL MUSIC GROUP, COMBS
GLOBAL ENTERPRISES, JOHN and JANE DOES 1-10
and  ABC CORPORATIONS.  1-10,

                      *Defendants*.

Case No.: 24-cv-01457

**NOTICE OF MOTION FOR
SANCTIONS**

---

      **PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law in support

of this Notice of Motion, the Declaration of Donald S. Zakarin dated April 24, 2024, and the

exhibits annexed thereto, and all prior proceedings heretofore had and all papers filed herein,

Defendants Sir Lucian Grainge, Motown Records and UMG Recordings, Inc. (incorrectly named

as Universal Music Group) (the "UMG Defendants") will move this Court, at a date and time to

be determined by the Court, for Orders, pursuant to Federal Rules of Civil Procedure 11(b) and (c)

sanctioning plaintiff Rodney Jones ("Plaintiff") and Plaintiff's counsel, Tyrone Anthony

Blackburn, Esq.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to Federal Rules of Civil Procedure

11(c), this Motion is based on the following grounds:

      1.   The Complaint, Amended Complaint, and Second Amended Complaint were presented

            for improper purposes, including to harass and defame Defendants, create public and

1

media attention for Plaintiff and Plaintiff's counsel, and needlessly create and increase the cost of litigation, all in violation of Rule 11(b)(1);

2. The claims in Plaintiff's Complaint, Amended Complaint, and Second Amended Complaint are not warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing establishing law or for establishing new law in violation of Rule 11(b)(2); and

3. The factual contentions in the Complaint, Amended Complaint, and Second Amended Complaint lack evidentiary support in violation of Rule 11(b)(3).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Civil Rule 6.1(b), any opposing affidavits and memoranda shall be served within fourteen days following the date that is 21 days after the service of this motion in accordance with the time requirements of Rule 11, and any reply papers shall be served within 7 days after service of the answering papers.

Dated: New York, New York
      April 26, 2024

                        **PRYOR CASHMAN LLP**

                        By: _____
                            Donald S. Zakarin
                            James A. Janowitz
                            William L. Charron
                            Nicholas Saady
                            Alina Jamil Mian
                        7 Times Square
                        New York, New York  10036
                        (212) 421-4100
                        dzakarin@pryorcashman.com

                        *Attorneys for the UMG Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

RODNEY JONES,

                    *Plaintiff*,

           -against-

SEAN COMBS, JUSTIN DIOR COMBS, CUBA
GOODING JR., LUCIAN CHARLES GRAINGE,
KRISTINA KHORRAM,  LOVE RECORDS, MOTOWN
RECORDS,  UNIVERSAL MUSIC GROUP, COMBS
GLOBAL ENTERPRISES, JOHN and JANE DOES 1-10
and  ABC CORPORATIONS.  1-10,

                    *Defendants*.

Case No.: 24-cv-01457

**<u>MEMORANDUM OF LAW IN
SUPPORT OF RULE 11
MOTION</u>**

**PRYOR CASHMAN LLP**
Donald S. Zakarin
James A. Janowitz
William L. Charron
Nicholas G. Saady
Alina Jamil Mian
7 Times Square, New York, NY 10036
Tel.: (212) 421-4100
Fax: (212) 798-6307

*Attorneys for the UMG Defendants*

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT & RELEVANT FACTS.............................................1

Plaintiff's And Blackburn's Lack Of Credibility And Propensity To Allege False Facts..............1

Plaintiff's And Blackburn's New False Facts In The SAC .........................................4

Plaintiff's And Blackburn's Frivolous Legal Claims In The SAC ...........................9

ARGUMENT .....................................................................................................................11

    I.      PLAINTIFF AND BLACKBURN SHOULD BE SANCTIONED .............................11

          A.  Sanctions Should Be Ordered Based Upon Plaintiff's And
               Blackburn's Authorship And Publication Of Frivolously Alleged Facts ................12

          B.  Sanctions Should Be Ordered Based
               Upon Plaintiff's Objectively Frivolous Claims .......................................................17

CONCLUSION...................................................................................................................19

i

## **TABLE OF AUTHORITIES**

**CASES**                                                                                           **PAGE(s)**

*Abdelhamid v. Altria Grp., Inc.*,
    515 F. Supp. 2d 384 (S.D.N.Y. 2007) ................................................................. 15-16

*AJ Energy LLC v. Woori Bank*,
    No. 18-CV-3735 (JMF), 2019 WL 4688629 (S.D.N.Y. Sept. 26, 2019),
    *aff'd*, 829 F. App'x 533 (2d Cir. 2020) ................................................................... 14

*Charles Equip. Energy Sys., LLC v. INNIO Waukesha Gas Engines, Inc.*,
    No. 22 CIV. 2716 (CM), 2023 WL 2346337 (S.D.N.Y. Mar. 3, 2023) ................................ 12

*Colliton v. Cravath, Swaine & Moore LLP*,
    No. 08 CIV 0400 (NRB), 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008),
    *aff'd*, 356 F. App'x 535 (2d Cir. 2009) ................................................................... 12

*Craig v. UMG Recordings, Inc.*,
    380 F. Supp. 3d 324 (S.D.N.Y. 2019) (Oetken, J.) ................................................... 14

*Demaree v. Castro*,
    No. 22 Civ. 8772 (CM)(SN), 2023 WL 6465881 (S.D.N.Y. Oct. 4, 2023) ......................... 17

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
    671 F. Supp. 3d 387 (S.D.N.Y. 2023) ......................................................................... 9

*Edmonds v. Seavey*,
    No. 08 Civ. 5646 (HB), 2009 WL 2949757 (S.D.N.Y. Sept. 15, 2009),
    *aff'd*, 379 F. App'x 62 (2d Cir. 2010) ......................................................................... 9

*Galonsky v. Williams*,
    No. 96 CIV. 6207 (JSM), 1997 WL 759445 (S.D.N.Y. Dec. 10, 1997) .............................. 16

*Gong v. Sarnoff*,
    No. 23-CV-343 (LJL), 2023 WL 5372473 (S.D.N.Y. Aug. 22, 2023) ........................... *passim*

*Katzman v. Victoria's Secret Catalogue*,
    167 F.R.D. 649 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) ......................... 11, 17

*Lawson v. Rubin*,
    No. 17-CV-6404 (BMC), 2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018) .............................. 9

*Levine v. F.D.I.C.*,
    2 F.3d 476 (2d Cir. 1993) ................................................................................. 13-14

## **TABLE OF AUTHORITIES**

**CASES**                                                                                    **PAGE(s)**

*LifeTree Trading Pte., Ltd. v. Washakie Renewable Energy, LLC*,
    No. 14-CV-9075, 2017 WL 2414805 (S.D.N.Y. June 2, 2017)
    (Oetken, J.)............................................................................................................. 12-13

*McCullough v. World Wrestling Ent., Inc.*,
    No. 3:15-cv-001074 (VLB), 2016 U.S. Dist. LEXIS 156459
    (D. Conn. Nov. 10, 2016) ...........................................................................................16

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018)..........................................................................9

*Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*,
    682 F.3d 170 (2d Cir. 2012)........................................................................... 11-12, 18

*An v. Despins*,
    No. 22-CV-10062 (VEC), 2023 WL 4931832 (S.D.N.Y. Aug. 2, 2023) ...............................16


**STATUTES AND RULES**

18 U.S.C. § 1591.............................................................................................................2

18 U.S.C. § 1961.............................................................................................................2

Fed. R. Civ. P. Rule 11 ...................................................................... *passim*


**WEBSITES**

https://www.billboard.com/music/rb-hip-hop/sean-diddy-combs-motown-records-love-
records-1235068952/ ................................................................................................. 5-6

https://www.wbls.com/news/diddy-receives-first-grammy-nomination-as-a-lead-artist/ ...............6

Defendants, Sir Lucian Grainge ("Grainge"), Motown Records ("Motown") and UMG Recordings, Inc. ("UMG Recordings," incorrectly identified in the Complaint, First Amended Complaint and Second Amended Complaint as Universal Music Group, which is not a juridical entity; hereinafter sometimes collectively referred to as the "UMG Defendants"), submit this Memorandum of Law in support of their motion, pursuant to Fed. R. Civ. P. 11.

## PRELIMINARY STATEMENT & RELEVANT FACTS

Rule 11 imposes obligations on both litigants and attorneys to assure that pleadings and other papers signed by attorneys and filed in federal court are not advanced for <u>improper purposes</u> and are the product of appropriate inquiries into both the <u>facts</u> and <u>law</u>. The attorney's signature is the certification that the pleadings and other papers comply with Rule 11 obligations.

And to enforce compliance — and protect litigants from those who would disregard the Rule 11 requirements — Rule 11 also punishes parties, and their lawyers, for advancing: (a) frivolously alleged facts that could not have been the product of good faith investigation and assertion; and/or (b) frivolous legal claims that could not have been the product of good faith interpretation of the law or advocacy to change the law. Fed. R. Civ. P. 11(b)(2)-(3).

Plaintiff and his attorney, Tyrone Blackburn ("Blackburn"), should be sanctioned because Plaintiff's claims against the UMG Defendants are both factually and legally frivolous.

## Plaintiff's And Blackburn's Lack Of Credibility And Propensity To Allege False Facts

Plaintiff and Blackburn have a demonstrated history of knowingly, recklessly and/or frivolously alleging false facts. Their initial two pleadings in this case represented, in detail, that Plaintiff had <u>personally seen</u> Grainge and former co-defendant Ethiopia Habtemariam ("Habtemariam") attend multiple "listening parties" hosted by co-defendant Sean Combs ("Combs") where sex trafficking activities allegedly occurred. Blackburn signed pleadings that

stated Plaintiff "recalls seeing Defendant Grainge visiting Mr. Combs [sic] home [sic] in Miami, Florida and Los Angeles, California"; that "whenever Grainge visited Mr. Combs at his homes, it would be in the evening, and he and Mr. Combs would disappear for hours in Mr. Combs [sic] bedroom [sic]"; and that "Grainge sponsored and attended several Love Album listening parties at Mr. Combs'[s] home in Los Angeles, California."  (ECF No. 2 ¶¶ 162-164.)  Blackburn cut and pasted those identical allegations into the original and First Amended Complaint ("FAC") with respect to Habtemariam as well.  (*Id.* ¶¶ 171-174.)

Plaintiff and Blackburn relied on those highly incendiary allegations as the purported factual basis for the supposed personal knowledge of Grainge (and Habtemariam) of Combs's alleged "sex trafficking" activity, thereby supposedly implicating them in this conduct, to impose federal civil racketeering and sex trafficking liability on the UMG Defendants under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961, *et seq.*, and the Trafficking Victims Protection Act of 2000 ("TVPA"), 18 U.S.C. §§ 1591, *et seq.*  Plaintiff wasted no time publishing such allegations not only in this Court, but in the press – indeed, the UMG Defendants understand that Blackburn provided his scurrilous pleading to the press <u>before</u> even filing it.  (Declaration of Donald S. Zakarin dated Apr. 24, 2024 ("Zakarin Decl.") at ¶ 45.)

<u>Those allegations by Plaintiff and Blackburn were lies</u>, and they caused real damage to Grainge, who has had to endure wholly misplaced public scorn and even threats to his safety because of them (indeed, Plaintiff and Blackburn unnecessarily published Grainge's home address and picture in the original complaint and FAC, only removing the address in the Second Amended Complaint ("SAC")).  (*Id.* at ¶¶ 53, 55; Declaration of Sir Lucian Grainge dated Apr. 18, 2024 ("Grainge Decl.") at ¶ 18.)  Plaintiff and Blackburn withdrew these particular allegations from their SAC, but Blackburn continued to lie about his reasoning in another paper he signed and filed

with the Court:  *i.e.*, his letter dated March 28, 2024 (ECF No. 30).  In that letter, Blackburn claimed he "was clear" in his initial pleadings that "Combs identified" Grainge and Habtemariam to Plaintiff, but that Plaintiff did not himself recognize Grainge or Habtemariam or "meet them and speak with them."  (*Id.* at p.3.)  Blackburn wrote no such thing in the original complaint or the FAC, instead specifically alleging that Plaintiff personally observed both Grainge and Habtemariam at Combs's homes during alleged "sex trafficking" activities.  He recklessly and irresponsibly exposed Grainge to danger and disrepute without a care in the world for "clarity," or truth.

Plaintiff and Blackburn also jettisoned (without any explanation) the false allegation from their initial pleadings that Motown is the "parent" company of co-defendant Love Records, which is Combs's record label.  (ECF No. 2 ¶¶ 9, 222.)  Plaintiff and Blackburn had relied on that completely fabricated allegation as the basis to impose so-called "respondent [sic] superior" liability on the UMG Defendants under the civil RICO statute.  (*Id.* ¶¶ 200, 220, 222.)  During the telephonic conference on April 9, 2024, this Court inquired about the basis for the "parent company" allegation.  (4/9/24 Hrg. Tr. at 6:25-8:5.)  Mr. Blackburn dodged the question, because he had no basis.  (*Id.*)

Blackburn's propensity for using irresponsible and half-baked federal court filings as weapons to try to coerce quick settlements was recently called out by Judge Cote in another matter pending before this Court:  *Zunzurovski v. Fisher*, No. 23-CV-10881.  (*See* ECF Nos. 33, 34.)  By Order dated April 3, 2024, Judge Cote referred Blackburn to the Grievance Committee of the Southern District of New York after finding that his "pattern of behavior is that he improperly files cases in federal court to garner media attention, embarrass defendants with salacious allegations, and pressure defendants to settle quickly."  (ECF No. 34 at pp.13-14.)

Blackburn has signed and filed multiple other papers (letters) with the Court in this action where he has defended his conduct as *bona fide*. (ECF Nos. 28, 30, 34, 35.) Blackburn, however, has no credibility, as Judge Cote already determined.

Blackburn's inability or refusal to tell the truth was also on full display during the April 9, 2024 hearing with the Court, when he falsely answered this Court's straightforward question as to when service of process of his FAC had occurred. (4/9/24 Hrg. Tr. at 2:15-4:1.) Blackburn misrepresented that he had sent the FAC to a process server to be served on the Combs parties in this Action on March 18, 2024. (*Id.* at Tr. 3:1-25.) That was a false statement that Blackburn made to the Court: Blackburn did not even request the issuance of a summons until <u>April 17, 2024</u>. (*See* ECF Nos. 39, 40.)[1] Blackburn also falsely represented to the Court that he requested a waiver of service from the Combs defendants on March 13, 2024, when, in fact, he did not do so until March 25, 2024. (ECF No. 42 ¶¶ 21-24.)

**<u>Plaintiff's And Blackburn's New False Facts In The SAC</u>**

In his March 28, 2024 letter to the Court, Blackburn took the position that Plaintiff was "required" to amend his pleading after receiving a demand letter from the UMG Defendants because Plaintiff "took them at their word" in their demand letter that the allegations against them were false. (ECF No. 30 at p.4.) But Plaintiff and Blackburn did not withdraw all of the allegations against the UMG Defendants, even though the UMG Defendants told them <u>all</u> of the salient allegations were false. Instead, Plaintiff and Blackburn concocted new – and equally bogus – allegations to try to maintain their civil RICO and TVPA claims that are their hoped-for settlement leverage against the UMG Defendants (and instrumental to Blackburn's self-promotion).

---

[1] The clerk bounced that request on April 18, 2024 as it was not proper. Blackburn did not bother to make a new request until **after** the UMG Defendants served him with their motion to dismiss the SAC on April 24, 2024. And that request was bounced again by the clerk on April 25, 2024.

Specifically, Plaintiff and Blackburn have replaced their prior false allegation that Motown is the "parent" company of Love Records with the new false allegation, repeated some 46 times throughout the SAC, that Motown and Love Records are so-called "general business partners." (*E.g.*, ECF No. 38 ¶¶ 8, 11, 12, 173, 372.)  Plaintiff and Blackburn make this allegation as the hook for their nonsensical and entirely unsupported theory that the UMG Defendants are "generally" responsible for all of Combs's personal conduct and activities that involve his receipt and expenditure of money, including his alleged sex trafficking, because the UMG Defendants supposedly provide "unchecked financing" to Love Records through their purported "general business partnership."  (*E.g.*, *id.* ¶ 372.)  This new theory is frivolous (and completely fabricated) for many reasons.

<u>First</u>, Plaintiff and Blackburn claim to have relied on "public statements" by Motown and Love Records announcing their so-called "general business partnership."  (ECF No. 30 at p.3.) Not only are there no such "public statements" (only colloquial references to the license agreement having Motown and Love Records "partnering" with respect to a single album), but it does not remotely support a partnership allegation (and the law cited by Mr. Blackburn in his letter to this Court (ECF No. 30), itself contradicts any claim of partnership).  Even if Mr. Blackburn had no other information – and he had concrete and indisputable information establishing there was no partnership before he filed the SAC – no lawyer, consistent with Rule 11, could have pleaded that Motown and Love Records were so-called "general business partners."

The press reporting at issue, which was from 2022, announced that Motown and Love Records had "partner[ed]" on "a one-time album deal with Motown Records" to release Love Records' inaugural album (referred to in the SAC as "the Love Album").  (ECF No. 38 ¶ 12; *e.g.*, https://www.billboard.com/music/rb-hip-hop/sean-diddy-combs-motown-records-love-records-

1235068952/.)  Moreover, no joint release of the Love Album by Love Records and Motown ever actually occurred – Love Records released the Love Album independently, as Plaintiff (a claimed producer of tracks on that album) and Blackburn readily could have determined for themselves with virtually no effort (which is, unfortunately, more effort than Blackburn put into conducting anything remotely approximating a proper Rule 11 inquiry).  (*E.g.*, https://www.wbls.com/news/diddy-receives-first-grammy-nomination-as-a-lead-artist/.)   Plaintiff and Blackburn cannot, consistent with their obligations and the law, claim to have based their "general business partners" allegation on public press.

Second, even on the face of "the public statements made by Defendants on their websites and on their LinkedIn business pages," which Blackburn cites in his March 28 letter to the Court, (ECF No. 30 at p.3), Plaintiff and Blackburn could not have reasonably concluded that Motown and Love Records ever agreed to be "general business partners."  The citations are to statements that unequivocally reference only that Motown and Love Records were "partnering" to release "Diddy's new album" as "the first release from Love Records" (which, once again, never actually even occurred and was not a "partnership" in any legal sense).  (*Id.*)  Even if this were the only information that Plaintiff and Mr. Blackburn possessed when the SAC was filed – and it was anything but their only information – it would still not support Plaintiff's and Blackburn's leap to allege that Love Records and Motown are "general business partners."

Third, Plaintiff and Blackburn cite a Declaration they received from Habtemariam in exchange for releasing her as a co-defendant from this case as "the confirmation [Plaintiff] needed concerning the business partnership and the funding of the Love Album …."  (ECF No. 30 at p.2.)  Indeed, in Paragraph 218 of the SAC, despite attaching Ms. Habtemariam's declaration to the SAC,

Plaintiff alleges that, in Ms. Habtemariam's declaration, she states that she obtained authorization from Grainge to enter into the "general business partnership" with Combs.

Both Blackburn's statement in his letter to this Court (ECF No. 30) and Plaintiff's allegation (written by Blackburn) in Paragraph 218 of the SAC are complete misrepresentations of what Habtemariam's declaration actually states. Habtemariam's declaration states only that she was authorized to enter into a **license agreement** with Love Records. Nowhere did she say anything about a "partnership," because there was none. Indeed, both she and her attorneys specifically told Blackburn, when he tried to foist a declaration on her that proclaimed a "partnership," that there was none and they rejected that attempt by him. (Zakarin Decl. Ex. 5.) Blackburn's description of what Habtemariam said in her declaration is not some innocent mistake or misinterpretation. It is a flat out, purposeful misrepresentation.

Fourth, Plaintiff and Blackburn know from the terms of the License Agreement between Motown and Love Records – which is the basis for Habtemariam's declaration, and which Plaintiff and Blackburn also expressly reference and incorporate into their SAC – that Motown and Love Records expressly were not "partners" at all but were "Independent contractors" with respect to one another, and that "[n]othing herein contemplates or constitutes [Love Records] or [Combs] as Motown's partners, joint venturers, agents or employees" as a legal matter. (ECF No. 42-2 Braithwaite Decl. Exhibit A at ¶ 16.11.)

Blackburn and Plaintiff had the license agreement in their possession for two weeks before they filed the SAC on April 12, 2024 (since March 27, 2024, when the UMG Defendants filed their motion to dismiss the FAC). But because it did not fit their false narrative about a "general business partnership," they simply ignored it.

In his April 8, 2024 signed letter to the Court, (ECF No. 34), Blackburn vacuously tried to sidestep the inconvenient License Agreement's terms by announcing that "Plaintiff has reason to believe the [License Agreement] defendants rely on is a ***ruse***" and "a toothless sham". (*Id.* at pp.1, 5.)  Blackburn had, and has, absolutely no good faith basis to take such a position in order to pretend that the license agreement does not exist.  In fact, at best, he has no knowledge at all, which instead of precluding him from offering statements of purported fact, Blackburn seems to believe entitles him to make statements of purported fact he knows nothing about.

In fact, in that same April 8 letter, Blackburn unwittingly admitted that he had no idea whether what he had written was true or false, conceding that Plaintiff and he <u>cannot</u> support such a position and instead asked "that the Court allow the parties to engage in limited discovery" so that they could try to fish for information to backfill their baseless pleading position to survive a motion to dismiss as well as this anticipated Rule 11 motion.  (*Id.* at p.1.)  That, of course, is the exact opposite of how the process of litigation works.

<u>Fifth</u>, consistent with their concession that they have no actual knowledge to support their frivolous and inflammatory allegations that the UMG Defendants engaged in racketeering and sex trafficking (and therefore require discovery), Plaintiff and Blackburn also unwittingly acknowledged in Blackburn's March 28 letter to the Court that their theory against the UMG Defendants was based upon the notion that they "either <u>negligently or</u> intentionally funded the activities of Defendant Sean Combs."  (ECF No. 30 at p.1 (emphasis supplied).)

It is worth pausing here to consider the significance of this admission: in three separate complaints, Plaintiff and Blackburn made vile criminal accusations against Grainge, Motown and UMG Recordings, at the same time that they admitted that they did not know, even assuming the truth of their allegations (and as discussed above and as documented in the accompanying Zakarin

Declaration, virtually nothing in the SAC regarding the UMG Defendants is even remotely true),

whether anything the UMG Defendants supposedly did was anything more than "negligence."

 Yet, despite their critical admission that they have no knowledge of any actual awareness

and intentional involvement by the UMG Defendants in Combs's alleged sex trafficking, Plaintiff

and Blackburn did not restrain themselves from alleging – inconsistently, outrageously, falsely

and frivolously – that the UMG Defendants, "[t]hrough their general business partnership with

[Combs and Love Records] … <u>actively participated</u> in the recruitment of victims of the [sex

trafficking] venture."  (ECF No. 38 ¶ 372 (emphasis supplied).)  There are <u>no</u> allegations in the

SAC that support Plaintiff's and Blackburn's astonishing and wholly irresponsible allegation that

the UMG Defendants "actively recruited" sex trafficking victims.  Nor is there any reasonable

basis for Plaintiff and Blackburn to have stretched their baseless and frivolous allegation of a

"general business partnership" to support an inference that the UMG Defendants "actively

recruited" sex trafficking victims.

**<u>Plaintiff's And Blackburn's Frivolous Legal Claims In The SAC</u>**

 The UMG Defendants have explained in their pending motion to dismiss the SAC why the

claims against the UMG Defendants are meritless.  (*See generally* ECF No. 41.)  Indeed, they are

frivolous and not reflective at all of good faith, sensible consideration of the relevant law.  If

nothing else, Blackburn should have understood that civil RICO and TVPA liability <u>cannot</u> be

based upon allegations of "negligence."  *E.g.*, *Edmonds v. Seavey*, No. 08-CV-5646 (HB), 2009

WL 2949757, at *5 (S.D.N.Y. Sept. 15, 2009), *aff'd*, 379 F. App'x 62 (2d Cir. 2010); *Lawson v.

Rubin*, No. 17-CV-6404 (BMC), 2018 WL 2012869, at *11 (E.D.N.Y. Apr. 29, 2018); *Noble v.

Weinstein*, 335 F. Supp. 3d 504, 525 (S.D.N.Y. 2018); *Doe 1 v. Deutsche Bank Aktiengesellschaft*,

671 F. Supp. 3d 387, 409 (S.D.N.Y. 2023).

Blackburn also should have understood <u>from this Court</u>, during the April 9, 2024 conference, that his theory that the UMG Defendants may be strictly liable for alleged civil RICO and TVPA violations by Combs based upon nothing more than the alleged payment of money <u>to make music</u> is baseless and hopeless. This Court told Blackburn:

> I'm not hearing anything that would plausibly give rise to a theory that would make UMG liable because they gave him [Combs] money and because they had a deal with respect to budgets and overseeing certain aspects of their distribution agreement, that they had a duty to babysit him [Combs] and prevent him from doing all these bad things and that somehow gives rise to liability on the part of the company, I just don't know any authority for that.

(4/9/24 Hrg. Tr. at 16:16-23.)[2]

Ignoring this Court's warning, ignoring the total absence of law that might support their theory, ignoring the UMG Defendants' motion to dismiss the FAC (which provided ample notice that the allegations and claims against the UMG Defendants were not only frivolous but they were completely unfounded and false), and ignoring the safe harbor provision of Rule 11, Blackburn and Plaintiff refused to withdraw their frivolous civil RICO and TVPA claims against the UMG Defendants. The conduct of Blackburn in this case, as noted by Judge Cote, is not some outlier. It is his pattern. As discussed below, Rule 11 sanctions are now warranted.

---

[2] *See also id.* at 7:8–10 (Court: "so without [the license agreement] you thought it was appropriate to file a complaint simply asserting that Motown was the parent company of Love Records with no basis?"), 8:10–8:13 (Court: "But you're saying, because this company was paying money to Sean Combs, that it's responsible for the sexual assaults and other conduct by Mr. Combs in his home; is that the theory?"), 9:7–9:12 (Court: "The fact that he had a deal with his record company to pay him, and there was certain oversight the company was supposed to give, makes them responsible for all these things that he did in his house?"; Mr. Blackburn: "Not just his house, your Honor. It wasn't just his house. It was a yacht.").

## ARGUMENT

### I.     PLAINTIFF AND BLACKBURN SHOULD BE SANCTIONED

Rule 11(b) provides that, "[b]y presenting to the court a pleading, written motion, or other

paper … an attorney … certifies that to the best of the person's knowledge, information, and belief,

formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, …;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; …."

Violation of Rule 11(b) empowers the Court to exercise its discretion and "impose an

appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for

the violation." Fed. R. Civ. P. 11(c)(1).  The sanction is "to deter repetition of the conduct or

comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(4).

"Rule 11's deterrence value is particularly important in the RICO context, as the

commencement of a civil RICO action has 'an almost inevitable stigmatizing effect' on those

named as defendants.  Accordingly, Courts in this Circuit have on numerous occasions imposed

Rule 11 sanctions based upon the filing of a frivolous RICO action." *Katzman v. Victoria's Secret

Catalogue*, 167 F.R.D. 649, 660 (S.D.N.Y. 1996) (citations omitted), *aff'd*, 113 F.3d 1229 (2d Cir.

1997).

The Court reviews Plaintiff's and his counsel's conduct according to a standard of

"objective unreasonableness."  *Gong v. Sarnoff*, No. 23-CV-343 (LJL), 2023 WL 5372473, at *8

(S.D.N.Y. Aug. 22, 2023).  The standard is "not based on the subjective beliefs of the person

making the statement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012) (emphasis supplied); *accord Gong*, 2023 WL 5372473, at *8 ("[A]n attorney files a pleading … in violation of Rule 11 if it is 'frivolous, legally unreasonable, or factually without foundation, even though not signed in subjective bad faith.'") (citations omitted).

Under this standard, Plaintiff and Blackburn should both be sanctioned.

A. **Sanctions Should Be Ordered Based Upon Plaintiff's And Blackburn's Authorship And Publication Of Frivolously Alleged Facts**

An attorney has an "affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Charles Equip. Energy Sys., LLC v. INNIO Waukesha Gas Engines, Inc.*, No. 22 CIV. 2716 (CM), 2023 WL 2346337, at *2 (S.D.N.Y. Mar. 3, 2023) (citation omitted).

It is now uncontroverted that Plaintiff and Blackburn lied when they initially alleged in both the original complaint and the FAC that Plaintiff personally saw Grainge at Combs' homes in Miami and Los Angeles. (ECF No. 2 at ¶ 162.) Plaintiff abandoned this scurrilous allegation in the SAC. (Zakarin Decl. at ¶¶ 26-28, 30.) But nowhere does Blackburn try to explain or justify having made this accusation to begin with (outside of his intentional misrepresentation of what is clearly and falsely said in the original complaint and FAC in his letter to this Court of March 28, 2024 (ECF No. 30)). Plaintiff and Blackburn should both be sanctioned for this reason alone. *See Colliton v. Cravath, Swaine & Moore LLP*, No. 08-CV-0400 (NRB), 2008 WL 4386764, at *13 (S.D.N.Y. Sept. 24, 2008) (imposing sanctions under Rule 11 where plaintiff initially alleged he had been continuously employed by defendants as an attorney, but then pivoted and denied he had ever been an attorney after defendants demonstrated contrary proof, and explaining that "[i]t is clear that sanctions are appropriate where facts have been 'concocted.'"), *aff'd*, 356 F. App'x 535 (2d Cir. 2009); *cf. LifeTree Trading Pte., Ltd. v. Washakie Renewable Energy, LLC*, No. 14-CV-

12

9075, 2017 WL 2414805, at *6 (S.D.N.Y. June 2, 2017) (Oetken, J.) (imposing sanctions under Court's inherent authority where party committed fraud on court by submitting declarations that it later admitted were untrue); *see also* 4/9/24 Hrg. Tr. at 20:23-21:3 ("[T]he fact finder may find a contradictory statement in the earlier complaint and consider that for credibility purposes.  So what I'm saying is I would like to decide the motion to dismiss based on the new complaint, but on Rule 11, you can point stuff in the earlier complaint that you want to point out contradictions, et cetera.").

It is not necessary that Blackburn was aware that his client was lying (and, according to the Rule 11 letter sent to Blackburn by Jonathan Davis on behalf of Combs, Plaintiff apparently has a criminal history, which, if true, warrants Blackburn conducting significantly more diligence and thorough investigation into all allegations made by his client).

Blackburn had a duty to diligently investigate Plaintiff's allegation before making himself the author and publisher of it.  There is no possibility that Blackburn did so.  Blackburn initially wrote, in Plaintiff's first filed pleading, that he had seen video evidence of <u>other</u> named defendants — <u>not</u> any of the UMG Defendants — at purported sex trafficking events.  (ECF No. 1 at ¶¶ 80; 108; 112; 162; 186.)  Blackburn wrote specific and lurid details about <u>other</u> named defendants — <u>not</u> any of the UMG Defendants — engaging in purported sexual misconduct.  (*Id.* at ¶¶ 74-80; 109-114.)

Blackburn knew, or as an attorney practicing before this Court, should have known, how to investigate Plaintiff's allegations, and he knew that investigation revealed <u>no</u> corroboration with respect to the UMG Defendants.  Blackburn proceeded anyway to drag them through the mud upon the basis of general and conclusory — and <u>false</u> — allegations only, which Blackburn had to have understood paled in comparison to his more particularized allegations regarding other defendants. *See Levine v. F.D.I.C.*, 2 F.3d 476, 479 (2d Cir. 1993) (imposing sanctions on attorney under Rule

11 and explaining that "the creativity of an attorney may not transcend the facts of a given case; counsel in his attempts at creativity concocted 'facts' that were not well grounded, and therefore exceeded the bounds of conduct [under Rule 11].");  *AJ Energy LLC v. Woori Bank*, No. 18-CV-3735 (JMF), 2019 WL 4688629, at *11 (S.D.N.Y. Sept. 26, 2019) (imposing sanctions on attorney under Rule 11 where allegations of theft of €8 billion were facially implausible, self-contradictory and relied on apparently forged documents, and explaining that, which an attorney is "entitled to rely on the objectively reasonable representations of the client, … [she] may not simply take her client's word on faith where that word would be easily proved (or disproved) through a reasonable investigation or where red flags should have (and would have) alerted counsel to problems."), *aff'd*, 829 F. App'x 533 (2d Cir. 2020) (internal citation & citation omitted); *cf. Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 338 (S.D.N.Y. 2019) (Oetken, J.) (imposing sanctions on attorney under 28 U.S.C. § 1927 where attorney filed "entirely meritless" motion to disqualify expert witness based upon false assertion that expert was conflicted due to plaintiff supposedly sharing confidential information).

But the reality here is that it is highly unlikely that Blackburn was simply the scrivener of Plaintiff's falsehoods, but instead was an active author himself.  The "general business partnership" allegations are those of Blackburn and they are knowingly false.  The representation to this Court about putting the complaint out to service on Combs on March 18, 2024 was Blackburn and it was knowingly false.  The allegations about the UMG Defendants providing "vast sums of cash" to Combs to facilitate his alleged sex trafficking parties is Blackburn's writing and it is knowingly false.  And the correlating "failure to make required tax filings" allegation (tax filings required with respect to cash payments) are plainly Mr. Blackburn's handiwork and there is no possible way he could have had any good faith basis for the assertion (because tax filings are not public

documents).  (ECF No. 2 ¶¶ 343(b), 351.)   While the cash payment allegations have been jettisoned in the SAC, Blackburn now fabricates an allegation that Combs failed to properly pay taxes (something about which he cannot have any knowledge) and nonsensically manufactures a duty on the UMG Defendants to have overseen Combs's tax filings.  (ECF No. 38 at ¶¶ 375 (b)(k)(m), 383, Zakarin Decl. at ¶ 11)

There was never any good faith basis for Blackburn and Plaintiff to have made such "cash" payment allegations (nor any good faith basis for the tax filings allegations).  Blackburn admitted in his March 28 letter that his <u>only</u> support for these allegations (which have also been dropped from the SAC) was evidence that Motown provided funding for the production of Love Records' first album.  (ECF No. 30 at 2.)  Contractual payments made as part of a commonplace commercial transaction are not "cash" payments.  Plaintiff's and Blackburn's allegations about the UMG Defendants, pursuant to the License Agreement, "providing unfettered access to financing, which made the sex-trafficking venture possible," and "[p]roviding Mr. Combs with large sums of U.S. currency," are beyond good faith artistic license; they are false, unreasonable, bad faith and frivolous extrapolations.  (ECF No. 38 ¶ 371.)

Contractual financing for record production is not sex trafficking.  That point really should not have to be explained to an attorney.  Blackburn's tortured and purely conclusory assertion to the contrary is, and always was, frivolous and sanctionable.  *See Gong*, 2023 WL 5372473, at *13 (imposing sanctions under Rule 11 where "the only factual allegations made to support" claims that defendants were unregistered agents of Chinese government were that the defendants "performed legal work on behalf of a Chinese company" and that one defendant had "offices in [China] from which it conducts 'lucrative' business with a 'potentially significant impact on the country,'" which were not actionable allegations of fact on their face); *Abdelhamid v. Altria Grp.,*

*Inc.*, 515 F. Supp. 2d 384, 399-400 (S.D.N.Y. 2007) (imposing sanctions on attorney under Rule 11 where allegations about corporate parent "appear[ed] to be without any grounding in fact," and finding that "a competent attorney could not form a reasonable belief that [the allegations] were well grounded in fact.").

Sanctions are particularly warranted given Blackburn's persistent presence on social media regarding this action and his studied indifference to actually ever serving the FAC or the SAC. As Judge Cote noted, Blackburn has a pattern of filing salacious complaints, ignoring Rule 11 and seeking to publicize his complaints. *See Galonsky v. Williams*, No. 96-CV-6207 (JSM), 1997 WL 759445, at *4 (S.D.N.Y. Dec. 10, 1997) (imposing sanctions under Rule 11 where frivolous claims were "apparently made for their public relations value and as tactical moves in th[e] litigation."); *An v. Despins*, No. 22-CV-10062 (VEC), 2023 WL 4931832, at *6 (S.D.N.Y. Aug. 2, 2023) ("A court may infer an improper purpose if, in light of Plaintiffs' conduct during and outside of litigation, a complaint is so baseless as to suggest that there is an ulterior motive behind the lawsuit."); *McCullough v. World Wrestling Ent., Inc.*, No. 3:15-CV-001074 (VLB), 2016 U.S. Dist. LEXIS 156459, at *37-38 (D. Conn. Nov. 10, 2016) ("Baseless claims that are included in a complaint as part of a media campaign to pressure the defendant with negative public relations have been found to evidence bad faith and improper purpose on the part of filing counsel.") (citation omitted)

Plaintiff's pleadings as against the UMG Defendants were filed for improper purposes of publicity (for Mr. Blackburn, as Judge Cote observed), pressure and harassment. The UMG Defendants have had their reputations dragged through the mud for things they never did and which Plaintiff and Mr. Blackburn either knew they never did or did not care that they never did. The mere dismissal of the SAC will not recompense the UMG Defendants for the damage done to

them.  They are entitled not only to have their names cleared but to an award of meaningful

sanctions so that plaintiffs and attorneys like Mr. Blackburn or those who would emulate him

understand that there are consequences for such conduct.  *See, e.g.*, *Gong*, 2023 WL 5372473, at

*4 & n.7.

###### B.     Sanctions Should Be Ordered Based Upon Plaintiff's Objectively Frivolous Claims

As the UMG Defendants have explained in their pending Rule 12 motion to dismiss the

SAC, the declarations and exhibits for which are attached to the Zakarin Declaration, Plaintiff's

claims arising under the civil RICO and TVPA statutes are without basis on multiple, obvious

grounds.  (*See generally* ECF No. 40-42.)[3]

As to RICO, Plaintiff failed to viably allege almost <u>every</u> necessary element.  (ECF No. 41

at pp. 10-21.)  *See, e.g.*, *Katzman*, 167 F.R.D. at 660-61 ("The total lack of substance [to the RICO

claim] gives rise to the inference that the action was filed for improper purposes."); *Demaree v.

Castro*, No. 22-CV-8772 (CM), 2023 WL 6465881, at *16 (S.D.N.Y. Oct. 4, 2023) ("Under the

'objectively reasonable' standard, no competent attorney could have formed a reasonable belief

that the RICO claims (asserted in the FAC) were well grounded in fact and warranted by existing

law.  The Court thus agrees that Rule 11 sanctions should be awarded against Plaintiffs' counsel …

for filing that claim.") (citation omitted).

Further, as explained above, Plaintiff's and Blackburn's entire theory of civil RICO

liability based upon a non-existent "general business partnership," and upon the mere payment of

money by the UMG Defendants to Love Records <u>to make music</u>, is frivolous.

---

[3] Plaintiff and Blackburn have now effectively admitted that the California Premises Liability claim and the TVPA "aiding and abetting" claims initially asserted against the UMG Defendants are meritless by withdrawing them from the SAC.  But they were pleaded twice and they were not withdrawn until after the UMG Defendants moved against them.

As to the TVPA, Plaintiff does not even have a private right of action for the obstruction claim asserted (nor did Plaintiff for the baseless aiding and abetting claim against the UMG Defendants in the FAC, which Plaintiff grudgingly withdrew from the SAC).  (ECF No. 41 at p 24)  *See Gong*, 2023 WL 5372473, at *11 (finding that federal claim "lacked any chance of success and was objectively frivolous" where, *inter alia*, there was no private right of action under the federal statute).

Even if a private right of action existed, however, Plaintiff has not alleged anything beyond bad faith speculation and conclusions to support such a claim, or any of his other TVPA claims. (*Id.*)  *See Gong*, 2023 WL 5372473, at *11; *Star Mark*, 682 F.3d at 177 ("[T]he operative question is whether the argument is frivolous, i.e., the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'") (citations omitted).

Blackburn's acknowledgement in his March 28 letter that Plaintiff is purely guessing whether the UMG Defendants supposedly engaged in anything more than "negligent[]" conduct is a final nail in the coffin of the frivolous claims in the SAC.  No competent attorney could reasonably believe that liability under civil RICO and the TVPA could be imposed upon the UMG Defendants because of alleged "negligen[ce]."  *See, e.g.*, *Star Mark*, 682 F.3d at 177.  If they are guessing — and they admit that they are — that is not a basis for filing three complaints alleging criminal conduct against innocent parties.

Having manufactured a knowingly false "general business partnership" foundation for the Plaintiff's claims in the SAC, replacing the completely unfounded "parent company" foundation of the original complaint and the FAC, and having then invented non-existent duties to supervise and control how Combs supposedly spent the money Motown Records was contractually obligated to pay to or on behalf of Love Records, Inc., the SAC still does not plead any viable claims against

the UMG Defendants.  The claims and allegations should never have been made.  There was never a good faith basis for them and the refusal by Plaintiff and Blackburn to drop the claims and remove the allegations when they received unassailable and indisputable documentary evidence establishing that their foundational allegations are untrue makes Rule 11 sanctions wholly warranted in this case.

## **CONCLUSION**

Plaintiff and Blackburn have shown no understanding of or interest in the consequences of their reckless, irresponsible, unprofessional, and frivolous conduct.  They are unrepentant.  They continually choose to 'double-down' as they pedal false, unfounded and highly damaging accusations in their "say anything" approach.  Both are indifferent to the severe harm they have caused to the UMG Defendants.  The completely different theories of the SAC as compared to the FAC and the completely contrary "facts" underpinning the very same claims, definitively show the baselessness of the FAC and SAC.  Blackburn's conduct has already been rebuked by Judge Cote's Order.  As Her Honor recognized, Rule 11 exists to deal with outrageous and, thankfully, outlier situations like this.  Blackburn, and Plaintiff, should be sanctioned.

For the foregoing reasons, the UMG Defendants respectfully request:  (i) appropriate sanctions ordered against Plaintiff pursuant to Fed. R. Civ. P. 11; (ii) appropriate sanctions ordered against Plaintiff's counsel, Tyrone Blackburn, Esq., pursuant to Fed. R. Civ. P. 11; and (iii) such other and further relief as the Court deems just and proper.

Dated:  New York, New York
      April 26, 2024

**PRYOR CASHMAN LLP**

By: _____
      Donald S. Zakarin
      James A. Janowitz
      William L. Charron
      Nicholas G. Saady
      Alina Jamil Mian

7 Times Square
New York, New York  10036
(212) 421-4100
dzakarin@pryorcashman.com

*Attorneys for the UMG Defendants*

20

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODNEY JONES,<br><br>           Plaintiff,<br><br>   v.<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>CUBA GOODING, JR.,<br>LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10; and<br>ABC CORPORATIONS 1-10,<br><br>           Defendants. | CASE NO.:  24-1457<br><br><br><br>**DECLARATION OF DONALD S. ZAKARIN IN SUPPORT OF MOTION OF DEFENDANTS UNIVERSAL MUSIC GROUP, MOTOWN RECORDS AND SIR LUCIAN GRAINGE FOR RULE 11 SANCTIONS** |

I, Donald S. Zakarin, declare as follows:

      1.     I am a member of Pryor Cashman, LLP, counsel for Defendants Sir Lucian Grainge CBE, and Motown Records (a division of UMG Recordings, Inc.).  Plaintiff has also named Universal Music Group as a defendant but there is no such juridical entity.  Universal Music Group is an umbrella name commonly used to refer to all of the various companies and record labels that are encompassed within UMG Recordings, Inc.  I therefore assume that Plaintiff has misnamed Universal Music Group, intending to actually name UMG Recordings, Inc. and I will refer to Universal Music Group herein as UMG Recordings, Inc. ("UMG Recordings").   I have personal knowledge of the facts set forth in this Declaration and if called and sworn as a witness, I could and would competently testify thereto.

2.      I submit this declaration in support of the motion of Defendants Sir Lucian Grainge (CBE), Motown Records and UMG Recordings (sometimes collectively referred to herein as the "UMG Defendants") for Rule 11 sanctions against both Plaintiff and his counsel Mr. Blackburn.  This motion has been served on Mr. Blackburn in accordance with the requirements of Rule 11 to afford him with the opportunity to avoid the imposition of sanctions.

3.      We do not represent Mr. Combs or any of his entities or the associates identified in the First Amended Complaint ("FAC") or the Second Amended Complaint ("SAC").[1]  We represent only the UMG Defendants.  Whatever the truth of the allegations that Plaintiff has made against Mr. Combs, his entities and his associates – and the extent to which Mr. Blackburn has demonstrated a willingness to ignore facts, indeed, to say things he knows are untrue, makes me deeply suspicious that his accusations against Mr. Combs and his associates are, at best, highly exaggerated – there was no basis for the accusations against the UMG Defendants.

4.      Prior to the service of this motion on Mr. Blackburn, as counsel to plaintiff, and in his personal capacity, the UMG Defendants moved to dismiss the SAC as it pertains to them. The declarations submitted in support of that motion to dismiss provide the factual detail showing that the SAC filed by Mr. Blackburn and his client was filled with indisputably false allegations against the UMG Defendants and Mr. Blackburn knew that they were false when he filed the SAC.  The SAC is also legally baseless, even if one ignored the falsity of the allegations.

---

[1] Plaintiff and Mr. Blackburn moved for leave to amend to file the SAC and leave was granted after a teleconference with the Court on April 9, 2024.  As described below and in my declaration in support of the UMG Defendants' motion to dismiss the SAC, not only do the changes from the FAC confirm Plaintiff's and Mr. Blackburn's violation of Rule 11, Mr. Blackburn straight out knowingly told this Court falsehoods at the April 9, 2024 conference.

**In Jettisoning The Foundational Allegations of the FAC, the SAC Confirms That the Allegations of the FAC Were Baseless To Begin With**

5.      The SAC confirms that the foundational allegations of the FAC were not only false but were not, and could not have been, filed in compliance with Rule 11.  Mr. Blackburn seems to believe that pleadings are a game of "whack-a-mole."  If one set of accusations is shown to be false, then he is free to simply file a different set of accusations, apparently under the rubric of "no harm, no foul."  But the accusations he has made against the UMG Defendants in both the FAC and the SAC are criminal accusations.  There is harm and there is a foul.

6.      I am attaching the declarations submitted in support of the motion to dismiss the SAC in support of the UMG Defendants' motion for Rule 11 sanctions.  Attached hereto as Exhibit 1 is the declaration of Sir Lucian Grainge dated April 18, 2024.  Attached hereto as Exhibit 2 is the declaration of Martha Braithwaite dated April 18, 2024.  Attached hereto as Exhibit 3 is the declaration of Ethiopia Habtemariam dated March 27, 2024.  Attached hereto as Exhibit 4 is my declaration, dated April 24, 2024.

7.      At the outset, as I did in my declaration in support of the UMG Defendants' motion to dismiss, I want to walk through an analysis of the purported changes Mr. Blackburn has made from the FAC in the SAC and how those changes confirm not only the purposeful falsity of the FAC but the equally purposeful falsity of the SAC.

8.      Without the slightest factual basis – indeed contrary to the declaration of Ms. Habtemariam and to the redacted copy of the May 4, 2022 license agreement between Motown Records and Love Records, Inc., provided to Mr. Blackburn as part of the UMG Defendants' motion to dismiss the FAC, filed on March 27, 2024 – Mr. Blackburn has substituted an entirely new foundational allegation for all of the claims against the UMG Defendants: that Motown Records and/or UMG Recordings was in a "general business partnership" with Love Records,

3

Inc. and/or Mr. Combs.  This new foundational allegation is as false as the original foundational allegation of the FAC.

9.      The FAC based all of its criminal accusations on the foundational allegations that Motown Records was the "parent company" of Love Records, Inc. and that the UMG Defendants were liable for the alleged conduct of Combs under a "respondent (sic) superior" relationship. The "parent company" allegation was simply invented by Plaintiff and Mr. Blackburn, as was the non-existent "respondeat superior" relationship.  Without bothering to flag the change he made in the SAC for the Court (no blackline of the changes made in the SAC were provided in Mr. Blackburn's motion to amend), the SAC eliminates this foundational "parent company" allegation along with the "respondent (sic) superior" allegation, swapping it out for the equally baseless "general business partnership" allegation.

10.     What is the explanation for this fundamental change?  None is offered.  Yet now the "general business partnership" allegation, in lieu of the "parent company" allegation, coupled with the absurd allegation that somehow the UMG Defendants were responsible to monitor and control how Mr. Combs supposedly spent the monies paid by Motown Records to Love Records, Inc. under their license agreement, are the centerpiece of strident criminal accusations the SAC makes against the UMG Defendants.

11.     Indeed, demonstrating only how completely indifferent Mr. Blackburn and Plaintiff are to their Rule 11 obligations, the SAC goes so far as to claim that Mr. Combs did not file or pay taxes and that the UMG Defendants were somehow responsible for monitoring and compelling him to pay his taxes.  The fact that neither Plaintiff nor Mr. Blackburn have any knowledge of Mr. Combs' tax filings is no deterrent to their willingness to say anything, with or without a good faith basis.  But Mr. Blackburn's invention of an obligation on the part of the

4

UMG Defendants to oversee the tax filings of Mr. Combs is nothing short of breathtakingly ludicrous.

12.     With the abandonment of the baseless "parent company" assertion, instead of dismissing the complaint as against the UMG Defendants, Mr. Blackburn simply invented a "general business partnership" allegation for the SAC.  He did so despite being fully aware that it is completely untrue.  As I said, Mr. Blackburn seems to view the filing of pleadings in Federal Court as a game of whack-a-mole: each time you demonstrate that what he has written is utterly untrue, he simply changes what he writes to something equally untrue.

13.     When Mr. Blackburn first tried to file the SAC containing the baseless "general business partnership" allegation (he could not do so without leave of Court), he was immediately put on notice by Ms. Habtemariam's personal counsel, Ashlee Lin, that the allegation in the SAC that Motown Records and Love Records, Inc. entered into a "general business partnership" was not only false but was directly contrary to what they had told him.  Indeed, Ms. Lin pointed out that her firm had expressly rejected Mr. Blackburn's attempt to manufacture this false "general business partnership" narrative in a declaration he had sought to have Ms. Habtemariam sign, and which she rejected because it was false.  Attached hereto as Exhibit 5 is the March 26, 2024 letter from Ms. Lin to Mr. Blackburn.

14.     Mr. Blackburn was also specifically told by Ms. Habtemariam, who, as the head of Motown Records, made the license agreement with Love Records, Inc., that there was no partnership, only a distribution license for one album.

15.     And as noted above, not only had Mr. Blackburn been told by both Ms. Habtemariam and her counsel that there was no "general business partnership," by the time he filed the SAC (on April 12), more than two weeks had passed since he received (on March 27)

5

the UMG Defendants' motion to dismiss the FAC which included a redacted copy of the license agreement (attached again on this motion as Exhibit A to the current declaration of Ms. Braithwaite). And that license agreement, at paragraph 16.11, specifically provided that there was no partnership between Motown Records and Love Records, Inc.

16.    But worse yet, consistent with Mr. Blackburn's willingness to completely misrepresent indisputable documents, in paragraph 218 of the SAC, he specifically states that Ms. Habtemariam's declaration, attached to the SAC, "states that she was given approval by Defendant UMG **to enter the partnership with Sean Comes** (sic) to help establish Love Records."

17.    It is literally incomprehensible how Mr. Blackburn could have written these words when the Habtemariam declaration is attached to the SAC. Nowhere in her declaration does Ms. Habtemariam say any such thing. The word "partnership" is nowhere mentioned in the declaration attached to the SAC (and her declaration in support of UMG's motion to dismiss specifically refutes any such alleged partnership). Rather, Ms. Habtemariam states in her declaration attached to the SAC that Motown Records entered into a **license agreement** with Love Records, Inc. to distribute an album and that UMG approved of Motown Records entering into a license agreement. It did not enter into a "partnership" of any sort and most assuredly not a general business partnership and neither Mr. Grainge nor UMG approved of Motown Records entering into a partnership with Love Records, Inc. or with Mr. Combs.

18.    Mr. Blackburn seems to believe that it is ok if he invent things that were not said and did not happen. His conduct is the antithesis of the good faith required of attorneys under Rule 11.

6

19.     But as I indicated above, Mr. Blackburn's conduct in this regard is not some

outlier.  He seems to feel unencumbered by any need to be truthful in his papers or, indeed, in

response to direct questions from this Court.   The hearing on April 9, 2024 provides a further

troubling example of Mr. Blackburn's dishonesty.  A copy of the transcript of that hearing is

attached to my declaration in support of the UMG Defendants' motion dismiss as Exhibit 6.

20.     On page 2 of that transcript, the Court asked Mr. Blackburn whether he had

served the other defendants with the complaint (meaning the defendants other than the UMG

Defendants).  I believe that the Court wanted to assure that the Plaintiff and Mr. Blackburn were

expeditiously undertaking to prosecute their claims instead of simply filing a complaint filled

with poisonous accusations.

21.     Mr. Blackburn represented to the Court that he had sent a Rule 4 waiver form to

Mr. Combs' counsel, who did not respond, so he sent out his process server to serve the Combs

defendants.

22.     The Court then asked when these things occurred and on page 3 of the transcript,

Mr. Blackburn directly represented to the Court that he had emailed the Rule 4 waiver form to

Combs' counsel on March 13 and that he sent the complaint to be served on the Combs

defendants to the process server 5 days later (on March 18, 2024).

23.     However, contrary to Mr. Blackburn's representation, I was aware that the docket

did not reflect any request for the issuance of a summons so that his representation could not

have been truthful.  In fact, as shown by ECF 39, Mr. Blackburn did not even request the

issuance of a summons until April 17, 2024, a month later than he represented to this Court that

he had sent the complaint to a process server for service (and that request was rejected by the

clerk as it was not properly filed and as of the date of this declaration, Mr. Blackburn still has yet to refile such request for the issuance of a summons).

24.     In fact, even Mr. Blackburn's representation to this Court about sending an email requesting a Rule 4 waiver of service from the Combs' defendants on March 13, 2024 was untrue.  Attached to my declaration in support of the UMG Defendants' motion to dismiss as Exhibit 7 is an email from Mr. Blackburn to Jonathan Davis dated March 25, 2024 (with some unprofessional emoji's included) requesting a Rule 4 waiver.  I am advised that this is the first and only request that Mr. Blackburn made of Mr. Davis for a waiver.

25.     Just like paragraph 218 of the SAC completely misrepresents what Ms. Habtemariam's declaration (attached to the SAC) says, so too did Mr. Blackburn's direct statements to this Court misrepresent indisputable documented facts.  Mr. Blackburn has a deeply troubling inability or unwillingness to tell the truth, even when there are documents showing him to be not telling the truth.

26.     But there are more examples of Mr. Blackburn's dishonesty.  The FAC alleged that both Sir Lucian Grainge and Ms. Habtemariam were supposedly aware of the alleged sex trafficking by Combs because, in detailed paragraphs, the FAC purported to recount Plaintiff's supposed personal knowledge that he saw them at "listening parties" where the alleged "sex trafficking" supposedly took place.  Indeed, the FAC specifically alleged, in *haec verba* allegations, that Plaintiff personally saw both Grainge and Habtemariam at Combs' homes and that they each, separately, disappeared with Mr. Combs' into his bedroom for hours.

27.     These knowingly false statements were abandoned in the SAC (and the declarations of Mr. Grainge and Ms. Habtemariam submitted in support of the motions to dismiss both the FAC and the SAC conclusively debunked these baseless allegations).

28.     But in his letter motion to amend, Mr. Blackburn intentionally misrepresented to this Court what is expressly said in the FAC: he claimed that the FAC alleged only that Combs told Plaintiff that Grainge and Habtemariam were at his homes, not that Plaintiff ever saw or met them there.  That is not what the FAC said.  On the contrary, the FAC specifically stated that Plaintiff saw them there and saw them going into Mr. Combs' bedroom with Mr. Combs on multiple occasions.  Nowhere did the FAC even suggest that Plaintiff had only supposedly been told this by Mr. Combs.

29.     As I said above, Mr. Blackburn has a demonstrated pattern of misrepresenting what exists on paper in black and white.  He appears to be willing to say and write anything without regard for whether it is true or false and even without regard for whether it can be swiftly shown to be false by documents that are indisputable.

30.     The completely false allegations about Sir Lucian Grainge and Ms. Habtemariam being at supposed "sex trafficking" parties may no longer be in the SAC, but Mr. Blackburn is silent about how these offensive allegations could ever have found their way into a complaint to begin with.  Even assuming it were true that Mr. Combs supposedly told it to Plaintiff (never mind that is not what is alleged in the FAC), that is no basis on which to accuse people of criminal conduct.  But Mr. Blackburn does not care about the reputational damage to individuals that his baseless accusations leave in their wake, not so long as he can self-promote on social media.

31.     Having abandoned the story about Mr. Grainge and Ms. Habtemariam being present at the alleged "sex trafficking" parties, the SAC needed a new theory on which to try to affix responsibility on the UMG Defendants for the alleged conduct of Mr. Combs.  Because no legally cognizable basis exists for imposing liability on a payor under a contract for what the

payee does with the payments, Mr. Blackburn simply invented a non-existent duty on the part of the UMG Defendants to supervise and control Mr. Combs' expenditure of his own money.

32.     Mr. Blackburn couples this non-existent duty with allegations for which he has no factual basis, to the effect that the UMG Defendants simply handed money over to Mr. Combs and that the license agreement was a "ruse."[2]

33.     First of all, Mr. Blackburn seems to be unaware of the fact that money is fungible. He ignores the fact that Mr. Combs is and was, in 2022, a very rich man (according to Forbes, in 2022 Mr. Combs was worth in excess of a billion dollars).  The license agreement provided for certain payments to be made to Love Records, including for the payment of invoiced recording costs.  Beyond paying for or reimbursing such costs, Motown was not in the business of running Love Records' financial accounting.

34.     But equally important, as documented by the declaration of Ms. Braithwaite in support of the motion to dismiss the SAC, Mr. Blackburn's uninformed assertions that Love Records did not make any recordings before September 2022 and that Motown Records simply handed money over to Mr. Combs (instead of paying third party vendors for the recording and other costs as provided in the license agreement) are utterly false.  Again, Mr. Blackburn has no compunction about saying and writing things without the slightest knowledge or basis (just as he has no compunction about saying and writing things that he knows are completely untrue).

---

[2] Even though the unauthorized SAC is clearly the handiwork of Mr. Blackburn and not the Plaintiff, unlike the FAC, which made virtually no allegations on "information and belief," in the unauthorized SAC, Mr. Blackburn plainly hoping to find a safe harbor that might spare him Rule 11 sanctions, litters "information and belief" allegations throughout the pleading and attributes the allegations to his client.  I think it clear that these "caveats" are a pretense.  The SAC is plainly Mr. Blackburn's handiwork.

35.     In effort to hold onto a baseless claim against the UMG Defendants, the SAC has replaced the FAC's completely baseless supposed actual knowledge of Sir Lucian Grainge of Mr. Combs' alleged activity with equally baseless "should have known" allegations that supposedly arise out of a legally and factually non-existent obligation to oversee and control how Love Records and/or Mr. Combs were supposedly spending monies payable under an arm's length commercial transaction.  The allegations are nonsensical and exists nowhere in the law or in the facts.[3]

36.     The FAC also claimed, without any possible factual or legal basis, that the UMG Defendants supposedly aided and abetted Combs' alleged sex trafficking activities by handing over "cash" to Combs (even alleging it was millions of dollars of cash).  The FAC also alleged that the UMG Defendants obstructed inquiry by the government into Combs' alleged sex trafficking activity by allegedly failing to file necessary tax forms respecting the alleged cash payments.   It is, of course, obvious that, just as Plaintiff and Mr. Blackburn cannot possibly have any knowledge about Mr. Combs' tax filings, they most certainly had no knowledge of the UMG Defendants' tax filings (as they are not a matter of public knowledge).

37.     The SAC tosses these "cash" allegations aside (other than for the absurd contention that the UMG Defendants were supposedly obligated to supervise and control Mr. Combs' tax filings).[4]   Instead, while acknowledging that Motown Records was obligated to

---

[3] The SAC persists with the FAC's chronologically baseless assertion that the UMG Defendants should have known about Mr. Combs' allegedly improper conduct from the Cassie Ventura complaint.  As noted in my declaration in support of the motion to dismiss the SAC, that complaint was not filed until November 2023, months after the license agreement was terminated.

[4] And while the "aiding and abetting" claim – which is non-existent as a matter of law – remains pleaded in the SAC, Mr. Blackburn acknowledged it had no basis at the April 9, 2024 hearing and withdrew it as against the UMG Defendants.

make payments to or for the benefit of Love Records, Inc. under the license agreement, the SAC

offers up the unsupported (and false) conclusion that the UMG Defendants wired or made

payments to Love Records, Inc. which supposedly were in excessive amounts (by a definition of

excessive amounts that is not provided and does not exist) and that the UMG Defendants should

have known Combs would or did use such funds to support the alleged "sex trafficking activity."

38.    Again, there is no factual basis for this assertion (and it is in fact, utterly untrue,

as documented in the Braithwaite declaration).  It is a pure invention by Mr. Blackburn.

39.    Mr. Blackburn's complete indifference to the requirements of Rule 11 and the

obligations of attorneys practicing in our courts could not be made clearer than by the changes he

has made between the FAC and the SAC, his silence regarding how he came to plead the now

jettisoned foundational allegations of the FAC and how he could possibly make his new

foundational allegations in the SAC **after** he already knew that his "general business

partnership" allegation was completely untrue.

40.    Mr. Blackburn has now filed three different complaints, each of which makes

offensive criminal accusations against Sir Lucian Grainge, UMG Recordings and Motown

Records that Mr. Blackburn not only lacked a good faith basis for asserting but in fact knew were

false when he filed each pleading.

**The UMG Defendants are Entitled to Recover the Costs and Fees Incurred In
Moving to Dismiss the Baseless Claims Against Them**

41.    The service of this motion pursuant to Rule 11 is not the first notice we have

provided to Plaintiff and Mr. Blackburn.  On March 4, 2024, I sent Mr. Blackburn a detailed

letter identifying flaws in his Amended Complaint (which he had filed that day, following up on

the original complaint filed on February 26, 2024).  I attach a copy of my transmittal email to

Mr. Blackburn and my attached letter of March 4, 2024 is attached as Exhibit 8 to my declaration

12

in support of the UMG Defendants' motion to dismiss.  We also served a Rule 11 motion in connection with the motion to dismiss the FAC.  That motion was served more than 21 days ago but instead of filing that motion, to avoid burdening the Court with sequential Rule 11 motions, we are making this motion to update that prior Rule 11 motion.

42.     On March 4, 2024, approximately one hour after I had sent him my letter, Mr. Blackburn sent me back what one might call a "responsive" email.  I consider it anything but. Ignoring the facts set forth in my letter, indeed quite obviously without bothering to conduct the slightest investigation into the facts set forth in my letter, Mr. Blackburn instead doubled down on the false allegations of the FAC.  A copy of Mr. Blackburn's email is attached hereto as Exhibit 6.

43.     In his email, he referred to a "public rollout," supposedly by Ms. Habtemariam, "celebrating the creation of Love Records in May 2022."  He also repeated the claim of the FAC (which Ms. Habtemariam's declaration conclusively refutes), that Ms. Habtemariam was supposedly present at Love Records' parties and the writers' camp.  He repeated the assertion that his client saw Sir Lucian Grainge and Ms. Habtemariam at Mr. Combs' home and that bags of cash were supposedly brought to Mr. Combs' home (again, this is directly contrary to what Mr. Blackburn's letter motion to amend falsely says was alleged in the FAC).

44.     Having already conducted my investigation into the facts (based on the allegations of the February 26, 2024 complaint, which, as to the UMG Defendants, was substantially unchanged in the FAC), I responded to Mr. Blackburn's March 4, 2024 email within about a half of an hour.  A copy of my email dated March 4, 2024 is attached hereto as Exhibit 7.

45.     In my email response to Mr. Blackburn, I noted that we had discovered that he had sent his complaint to the press (I believe he did so before it was filed).  I told him that the "bags of cash" assertion was "preposterously false" and that had he done any investigation, he would have known that Motown Records simply had a one album distribution deal with Love Records.  And I reiterated that his client could not have seen Sir Lucian Grainge at Mr. Combs' house in Los Angeles or Miami or anywhere else because he was never there.  I strongly suggested, again, that he dismiss all of the claims against all of my clients.

46.     As I have said, the false foundational allegations of the FAC were abandoned in the SAC.  Any lawyer with integrity, when all of the foundational allegations of a complaint they drafted are shown to be untrue, would carefully examine the facts before filing an amended complaint.  But not Mr. Blackburn.  Indeed, not only did he not examine the facts, he ignored them and simply created different allegations that he already knew to be false.

47.     It is perfectly obvious that in the time between March 4, 2024 and April 12, 2024, when he filed the SAC, Mr. Blackburn made no further effort to investigate the facts.  The baseless criminal accusations remain, only their foundation has been changed.[5]

48.     As noted above, the offensively false allegations made in the FAC, and repeated in Mr. Blackburn's March 4, 2024 email, have been abandoned in the SAC, even as Mr. Blackburn's letter motion to amend sought to hold onto the claims once based on these allegations.  But where did these false allegations come from?  What was their basis?  Why

---

[5] On March 4, 2024, Mr. Blackburn also received a "Rule 11" letter from Mr. Combs' counsel, Jonathan Davis.  A copy is attached hereto as Exhibit 8.  In his letter, in addition to referencing Plaintiff's criminal record (which should have prompted a more rigorous inquiry by Mr. Blackburn), Mr. Davis confirmed that Sir Lucian Grainge was never at any of Mr. Combs' homes (and that Ms. Habtemariam left Motown months before the one "listening party" the FAC identified).  He also confirmed that the license agreement and relationship between Motown and Love Records had been terminated long before the alleged "listening party"

should anything this Plaintiff and Mr. Blackburn say be believed when they are so indifferent to the truth that they think that they can make criminal accusations against people and companies based on lies and then simply make up new lies to try to support the same accusations?  Why should anything they say or write be believed when Mr. Blackburn is even willing to make false representations to this Court in response to direct questions posed by the Court?

49.     The "parent company" allegation of the FAC never had any basis.  The "general business partnership" allegation of the SAC has no basis.  Mr. Blackburn was expressly told there was no partnership by Ms. Habtemariam, the former head of Motown Records who made the deal with Love Records, Inc.  Weeks before he filed the SAC, he was provided with a copy of the license agreement which, in paragraph 16.11 thereof, expressly said there was no partnership.  Yet the non-existent "general business partnership" is the foundation for his claims against the UMG Defendants in the SAC and Mr. Blackburn filed the SAC knowing the allegation is untrue.

50.     It is indisputable that Mr. Blackburn and his client have filed three complaints filled with offensively false criminal accusations against the UMG Defendants knowing that their allegations are completely baseless, legally and factually.

51.     If these actions are not a Rule 11 violation, if these actions are not worthy of referral to the Second Judicial Department Attorney Grievance Committee, then I do know what is.

52.     As I indicated at the hearing on April 9, 2024, while we were pleased that Mr. Blackburn dismissed the FAC as against Ms. Habtemariam and that some of the most offensively false allegations of the FAC were removed from the proposed (and now filed) SAC, Sir Lucian Grainge, UMG Recordings, Inc. and Motown Records remain accused of engaging in vile

15

criminal acts that they never committed.  They are accused of failing to exercise supervision and control over Mr. Combs that they had no obligation, authority or ability to exercise.

53.     The fact that the SAC abandons accusations that had no basis to begin with (substituting newly invented and equally false accusations) does not wipe the slate clean.  The offensive allegations were made in a public document against my clients and Mr. Blackburn has publicized these allegations and the newly framed accusations of criminal conduct in the SAC remain offensively false.

54.     Mr. Blackburn, as Judge Cote has noted (in a decision attached hereto as Exhibit 9) has a pattern of failing to comply with his Rule 11 obligations.  Mr. Blackburn's conduct in this action occurred within a few days after Judge Cote already issued an Order To Show Cause regarding Mr. Blackburn's conduct in the case before her (and in other cases brought to her attention).

55.     As I said above, whatever the truth or falsity of the SAC's allegations against Mr. Combs and any of his companies and/or associates, there is no merit to the accusations made against the UMG Defendants.  Plaintiff and Mr. Blackburn have unfairly, without any basis in fact, and without conducting the slightest investigation into the facts required under Rule 11 – indeed, knowing that their accusations are untrue – publicly accused the UMG Defendants of engaging in criminal behavior.  The UMG Defendants, and in particular, Sir Lucian Grainge, should recover, as a sanction for violation of Rule 11, the costs and expenses they have incurred to defend against these claims.

56.     But that alone is not enough.  Mr. Blackburn should be referred to the Second Judicial Department Attorney Grievance Committee to assess his fitness to practice before the

Courts. I do not believe, in nearly 50 years of practice, I have encountered anyone who is less qualified to practice law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 24, 2024

Donald S. Zakarin

17

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODNEY JONES,<br><br>              Plaintiff,<br><br>v.<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>CUBA GOODING, JR. LUCIAN CHARLES<br>GRAINGE,<br>KRISTINA KHORRAM,<br>CHALICE RECORDING STUDIOS,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10; and<br>ABC CORPORATIONS 1-10,<br><br>              Defendants. | CASE NO.: 24-1457<br><br><br><br><br><br>**DECLARATION OF SIR LUCIAN<br>GRAINGE IN SUPPORT OF MOTION<br>TO DISMISS SECOND AMENDED<br>COMPLAINT BY DEFENDANTS<br>UNIVERSAL MUSIC GROUP,<br>MOTOWN RECORDS AND SIR LUCIAN<br>GRAINGE** |

I, Sir Lucian Grainge, CBE declare as follows:

1.      I am the Chairman and Chief Executive Officer of Universal Music Group, N.V.

("UMG NV"). UMG NV is a public company organized and existing under the laws of the

Netherlands with its principal operating offices and companies located in Santa Monica,

California. I have personal knowledge of the facts set forth in this Declaration and, if called and

sworn as a witness, I could and would competently testify thereto.

2.      I have been named personally as a Defendant in the original complaint, First

Amended Complaint ("FAC") and now in the Second Amended Complaint ("SAC"). Motown

Records, which is also a named defendant in the SAC, is not an independent company but a

record label that is a division of UMG Recordings, Inc. ("UMG Recordings"), which is an

indirect wholly owned subsidiary of UMG, NV. I am also the Chairman and Chief Executive

1

Officer of UMG Recordings, which is a Delaware corporation with its principal place of business in Santa Monica, California.  Universal Music Group is also named as a Defendant in the SAC.[1]

## A.  The Court Lacks Personal Jurisdiction Over Me

3.      As the SAC (¶ 8) admits, I am a resident of California, not New York.[2]  As I will detail below, I engaged in no activity in New York whatsoever with respect to this matter (in fact, beyond authorizing Ms. Habtemariam to make a deal to distribute one album recorded by Mr. Combs, I engaged in no activity with respect to this matter anywhere).  I understand that Plaintiff's counsel, Mr. Blackburn, has been referred to the Grievance Committee of the Southern District of New York by Judge Cote for repeatedly failing to properly investigate personal jurisdiction over individuals he has sued in other cases.

4.      The SAC has abandoned the every one of the four false allegations about my supposed New York activity that were in the FAC -- (i) that I was involved in disseminating unidentified false information to unidentified artists in New York (¶ 214); (ii) that I sent unidentified advertisements to unidentified artists in New York (¶ 220); (iii) that I oversaw the unidentified marketing and soliciting to unidentified artists in New York (¶ 222); and (iv) that I was supposedly present in Mr. Combs' alleged home in New York at which Mr. Combs engaged in alleged sex trafficking (¶ 343(f)).

5.      The SAC now accuses Combs and his colleagues of the first three actions (SAC ¶¶ 231-234) and the SAC no longer alleges that I was ever at any of Mr. Combs' homes.  Thus,

_____

[1] Universal Music Group is not an actual entity but a name commonly used to refer generally to the various companies and labels owned by UMG NV.  I assume Plaintiff intended to name UMG Recordings, but he and his counsel have not bothered to correct this in the SAC.

[2] The Plaintiff and his counsel identified my California addresses in the FAC for no purpose other than to harass me.  Having invaded my privacy unnecessarily, I understand that they have removed my addresses from the SAC.

2

the bases for jurisdiction over me in New York, which were untrue to begin with, now no longer even exist.

### B. The SAC Completely Changes The Foundational Bases For Claims Against Me, Motown Records and UMG Recordings

6.    The FAC originally claimed that Motown Records was the supposed "parent company" of Love Records, Inc., and therefore we were responsible for his actions under a "respondent (sic) superior" relationship. The SAC replaces these allegations with the equally baseless "general business partnership" allegation by which Plaintiff and his counsel seek to make me, Motown Records and UMG Recordings responsible for the allegedly wrongful activities of Mr. Combs and his associates.

7.    As detailed in the accompanying declaration of our counsel, Donald Zakarin, based upon a declaration of Plaintiff that was submitted to this Court on April 9, 2024, and based on Mr. Blackburn's own communications with this Court, there was never **any** basis for the "parent company" allegation and the "respondent (sic) superior" allegation. It appears instead that they were simply made up.[3]

8.    The "general business partnership" allegation is completely contrary to the clear and unambiguous language of the license agreement between Motown Records and Love Records, Inc. (which I understand has been provided to Plaintiff and Mr. Blackburn in redacted form). And from this non-existent "general business partnership," Plaintiff and Mr. Blackburn

---

[3] In the FAC, the Plaintiff also specifically alleged personally seeing me at Mr. Combs' homes in Los Angeles and Miami at which there were allegedly "sex trafficking" parties. Indeed, according to the FAC, Plaintiff observed both me and Ms. Habtemariam (at separate times apparently) disappearing into Mr. Combs' bedroom with him for hours. As I was never at any of Mr. Combs' homes, this accusation was knowingly false. I am advised that the Plaintiff's declaration essentially disavows having any personal knowledge of anything, attributing virtually everything that is alleged in the FAC and SAC to what he was supposedly told by Mr. Combs.

3

fabricate an equally non-existent duty on the part of me, Motown Records and UMG Recordings to supervise and control the manner in which Love Records, Inc. and/or Mr. Combs spent the monies Motown Records was required to pay to or on behalf of Love Records, Inc. under the license agreement.

9.     As set forth in the accompanying declaration of Martha Braithwaite, who negotiated and executed the license agreement, there was never any partnership of any kind between Motown Records and/or UMG Recordings with either Mr. Combs or Love Records, Inc. On the contrary, the license agreement itself specifically provided that there was no partnership or joint venture between Motown Records and Love Records, Inc.  Instead, the parties were independent contractors.

10.     Given it is my understanding that Plaintiff's counsel was provided with a redacted copy of the license agreement, I do not understand how he can, in good faith, make this "general business partnership" allegation in the face of the plain terms of that agreement. Further, I understand that Mr. Blackburn was expressly advised by Ms. Habtemariam, before he ever drafted the SAC, that there was no partnership between Motown Records and Love Records, Inc. As Mr. Zakarin says in his declaration, the only possible  explanation for this allegation in the SAC is that Mr. Blackburn has chosen to ignore facts of which he is aware in effort to try to manufacture legally baseless and offensively false claims against me personally, Motown Records and UMG Recordings.

11.     The SAC's contention that Motown Records, UMG Recordings and I had some sort of obligation to supervise, monitor and control the use of any of the funds required to be paid to or on behalf of Love Records, Inc. by Motown Records under the terms of the license agreement is contrary to any business or legal principle of which I am aware.  I am advised that

4

the SAC even contends that I, Motown Records and UMG Recordings had an obligation to assure that Love Records, Inc. and/or Mr. Combs properly paid their taxes (¶ 383).

12.     While the prior false accusations of the FAC that I personally attended supposed "sex trafficking parties" at Mr. Combs' homes have been removed, the SAC continues to be filled with vile and completely untrue accusations against me personally.  It alleges horrible conduct on the part of Mr. Combs and his associates – never alleging any participation in such allegedly improper activities by me, Motown Records or UMG Recordings.  Instead, the SAC accuses me of "intentionally or unintentionally" funding such improper activities by virtue of our supposedly having provided funding through the license agreement that was allegedly misused by Mr. Combs and by supposedly failing to control how Mr. Combs supposedly used the monies paid to Love Records, Inc. by Motown Records (¶ 373).

13.     As Mr. Zakarin's declaration states, none of these allegations are supported by a single fact.  They are unsupported conclusions that are, in fact, completely untrue and absurd (and I fully intend to pursue both Plaintiff and his counsel for having made such false accusations against me).

14.     As I will detail below, I had nothing to do with Mr. Combs or Love Records, Inc. ("Love Records").  I had no role with respect to the license agreement or any payments made to Love Records, Inc. by Motown Records.  I had no oversight, nor any right to exercise any oversight or control, over Love Records, Inc. or Mr. Combs.  Indeed, given that money is fungible, I have no idea how any contracting party could ever have oversight and control over monies required to be paid to another contracting party under a license agreement once that money has been paid.

15.     I am the Chairman and Chief Executive Officer of a multi-national public

company. That alone is a full-time job, and I am also deeply committed to various philanthropic

causes. I do not get involved in the day-to-day operation of the thousands of agreements UMG

and its labels and publishers have entered into with artists and writers and did not do so with

respect to Motown Records' license agreement with Mr. Combs' company, Love Records. In

short, I had nothing to do with any of the actions alleged in the SAC.

## B. The Claims Against Me, Motown Records and UMG Recordings Are Factually And Offensively False

### (i)    The SAC Advances Knowingly False Allegations

16.     The SAC purports to link me, Motown Records and UMG Recordings to an

alleged criminal racketeering enterprise and participating in and obstructing the government

from addressing alleged sex trafficking activity supposedly engaged in by Combs and certain of

his named associates. These accusations are based solely on the fabricated "general business

partnership" and the alleged failure on our part to fulfill the non-existent legal duty supposedly

imposed on us to control how Love Records, Inc. and/or Mr. Combs supposedly used the monies

paid by Motown Records under the license agreement.

17.     It is indisputable that Plaintiff's counsel has made these allegations despite the

fact that he is fully aware that they are completely false. He has been advised of the falsity by

Mr. Zakarin. He has been advised of the falsity by Ms. Habtemariam and her counsel. He has

our original motion to dismiss, which sets out the factual falsity of his accusations against me,

Motown Records and UMG Recordings and the legal baselessness of his claims. He has the

redacted license agreement between Motown Records and Love Records, Inc. which specifically

disclaims any partnership. Yet he has persisted in asserting offensively false claims against me,

Motown Records and UMG Recordings that have no basis whatsoever.

6

18.     As Plaintiff and Mr. Blackburn no doubt intended, these scandalously false

accusations against me (which Mr. Blackburn has commented on in social media), together with

the entirely unnecessary and improper publication of my private home address in the FAC, have

created serious risk to me and my family.  As I have said, I do not intend to simply walk away

from this matter once it is dismissed but intend to pursue the fullest available remedies against

both Plaintiff and Mr. Blackburn, including bringing his conduct to the attention of the Second

Department in New York.

> **(ii)     The False Premise of the SAC that Motown Records or UMG Recordings
> is in a General Business Partnership with Love Records, Inc. or Mr.
> Combs**

19.     Having abandoned the original claim in the FAC that Motown Records

supposedly owned Love Records and therefore had an alleged "respondent superior"[sic] role, as

I said above, the SAC advances an equally baseless "general business partnership" allegation

coupled with the repeated assertion that UMG Recordings, Motown Records and I had a duty to

supervise and control how Mr. Combs and Love Records, Inc. used any of the monies that

Motown Records was obligated to pay to or on behalf of Love Records, Inc. under the license

agreement.

20.     No longer does the SAC claim, as the FAC did, that I personally attended

listening parties at Mr. Combs' homes in Los Angeles and Miami (and New York) where there

were allegedly sex workers and underage women being sexually exploited and plied with alcohol

and drugs and that I had a duty to prevent these things from happening.[4]

---

[4] In language that is unclear to me, in subparagraph (f) of paragraph 375 of the SAC, it appears
that Plaintiff and his counsel are continuing to allege that I supposedly was present at Chalice
Recording Studio when there was allegedly a shooting there.  I was not present at Chalice
Recording Studio or at any of Mr. Combs' homes.

7

21.    Instead, in the SAC, our supposed responsibility comes from the non-existent "general business partnership" and the alleged duty to control the financial affairs of Love Records, Inc. and Mr. Combs. Nowhere, other than through the chronologically absurd Cassie Ventura complaint (filed in November 2023, long after Motown Records terminated the license agreement with Love Records, Inc.), and purely fictional conclusions, does the SAC identify any supposed basis on which I, Motown Records or UMG Recordings could supposedly have known of the alleged purposes to which Mr. Combs was supposedly putting the monies paid by Motown Records under the license agreement (even assuming that such knowledge, which we did not have, could create a basis for some liability).[5]

22.    To be clear, Motown Records, UMG Recordings, and I had no right or ability to exercise supervisory control or authority over Love Records or Mr. Combs. We did not have any control or authority with respect to the financial affairs of Mr. Combs or Love Records, Inc. and no obligation to exercise any such control. Mr. Combs was not our employee or our partner. Love Records, Inc. was not the partner of Motown Records or UMG Recordings. Motown Records' sole relationship to Mr. Combs and Love Records, Inc. was through a commonplace and ordinary arms-length relationship of a licensor (Love Records, Inc.) and licensee (Motown Records). And as Ms. Braithwaite states in her declaration, that relationship was terminated as of February 1, 2023.

23.    The FAC alleged a claim against me, Motown Records and UMG Recordings, claiming we were responsible for security at Chalice Recording Studio that was allegedly

---

[5] The SAC vaguely alleges that some unidentified employees of UMG Recordings or Motown Records supposedly were present at either Chalice Recording Studio or at alleged "listening parties" at Mr. Combs' homes. Who they are, when they attended and what occurred is nowhere mentioned in the SAC. I have no reason to believe that such vague allegations are any more truthful than any of the accusations that Plaintiff and Mr. Blackburn have made against me.

8

deficient. The SAC drops that claim. However, for some reason, the SAC continues to assert
that Motown Records and UMG Recordings, along with Combs, Love Records, Inc. and Chalice
Recording Studio, were responsible for security.

24.     Again, I do not understand how Plaintiff and Mr. Blackburn can make this
allegation as they have no basis for it, and it has already been refuted in our original motion to
dismiss. Both Ms. Braithewaite and Ms. Habtemariam specifically stated in their declarations
that we were not responsible for any security at Chalice Recording Studio or any other Love
Records, Inc. activity. Rather, either Mr. Combs or Love Records, Inc. were responsible for
security. As I said above, I do not understand why Plaintiff and Mr. Blackburn persist in
pleading claims and allegations that they know are false.[6]

### (iii)    I Have Never Been In Mr. Combs' Houses

25.     As I said in my original declaration in support of the motion to dismiss the FAC,
contrary to the unsupported allegations that were in the FAC (¶¶ 162-167), I have never been in
Mr. Combs' house in Los Angeles, Miami or anywhere else and I did not sponsor, or attend any
"listening parties" at Mr. Combs' homes. I did not know – and do not know – whether there
were ever any allegedly underage girls and sex workers supposedly being sexually exploited and
plied with alcohol and drugs at any listening parties at Mr. Combs' house (and what Plaintiff
calls "freak offs"). The false story in the FAC about my supposedly having spent hours in Mr.
Combs' bedroom has not only been abandoned, but it appears that Plaintiff now claims only that
he was supposedly told this by Mr. Combs. The notion that Mr. Combs would supposedly tell
Plaintiff that I was not only at his homes, when I was never there, but that I also disappeared into

---

[6] I am advised that Mr. Combs' counsel has provided Plaintiff's counsel, Mr. Blackburn, with
indisputable evidence showing that, contrary to what is alleged in the SAC, no alleged shooting
took place at Chalice Recording Studios.

9

his bedroom with him for hours, is so completely ridiculous that, on its face, it is plainly one
more in a series of fabrications by either, or both, Plaintiff and his counsel.

26.     Further, the SAC's allegations regarding my supposed knowledge of any alleged
improper activity engaged in by Mr. Combs and his associates is also completely untrue. The
conclusions that are made throughout the SAC about Motown Records, UMG Recordings and/or
I funding Mr. Combs' alleged improper activities are not facts, are not true and make no sense.
Mr. Combs was and is, according to public press reports, worth a billion dollars. I do not know
how anyone could possibly determine the source of any dollar that was allegedly misused by Mr.
Combs for any supposed improper purpose.

27.     Motown Records had a briefly operative license agreement with Love Records,
Inc., and it had payment obligations under that license agreement. Motown Records had no right,
no ability and no duty to control how Love Records, Inc. spent any of the monies paid to it by
Motown Records.

### (iv)    The Sex Trafficking Allegations Are Completely Conclusory, Chronologically Baseless and Completely False

28.     The SAC, like the FAC also accuses me personally, along with Motown Records
and UMG Recordings, of the most scurrilously false allegations, claiming that we participated in,
aided and abetted and obstructed discovery of Mr. Combs' alleged sex trafficking (Seventh,
Fifteenth and Sixteenth "Causes of Action").[7]   Just as there was not a single fact, as opposed to
conclusions, supporting any such claim pleaded anywhere in the FAC, so too there is not a single
fact pleaded in the SAC. The claims are based on purely conclusory assertions about alleged

---

[7] I am advised that at the Court telephonic hearing on April 9, 2024, Mr. Blackburn advised that
he was dropping this aiding and abetting claim. It is still alleged in the SAC but I believe it has
been withdrawn (because it has no legal basis).

10

knowledge that we did not have, a general business partnership relationship that did not exist and a duty to effectively manage the financial affairs of Love Records, Inc. and Mr. Combs that also does not exist.

29.     As I have said, I have no personal knowledge of any of the alleged activities that supposedly took place at any of Mr. Combs' homes or on his boat (which I was also not on) or at Chalice Recording Studio. And I most assuredly did not participate in or aid and abet or obstruct anything relating to such alleged activity about which I knew nothing, never participated in, and never observed.

30.     While our original motion to dismiss already pointed out that the FAC's reference to a complaint filed by a Cassie Ventura was chronologically impossible (because, as documented in Mr. Zakarin's declaration, Ms. Ventura's complaint was not filed until November 16, 2023, long after Motown Records terminated its license agreement with Love Records), the SAC continues to make this same chronologically impossible allegation.[8] As I have said above, Plaintiff and Mr. Blackburn simply refuse to allow facts to deter them from making baseless claims.

31.     As Mr. Zakarin's declaration also notes, both the FAC and the SAC also point to some person by the name of Jonathan Oddi, who apparently also made some allegations against Mr. Combs on or about December 17, 2023. Again, since Motown Records terminated its agreement with Love Records Inc. long before Mr. Oddi's allegations, it remains chronologically impossible for his allegations to have provided any notice of anything to us.

---

[8] The SAC refers to a fight that took place between Steven Stoute and Mr. Combs some 25 years ago. I fail to see how a 25 year-old event possibly bears on the SAC's alleged RICO and "sex trafficking" claims that supposedly arose in 2022 and 2023.

11

32.     The FAC falsely alleged that UMG Recordings, Motown Records and/or I

provided Love Records, Inc. and/or Mr. Combs with cash. The SAC has not entirely dropped

this accusation, but the primary allegation now is that monies Motown Records was obligated to

pay under the license agreement were supposedly misused by Love Record, Inc. and/or Mr.

Combs and that we were obligated to control how the funds were spent. Yet inconsistently, the

SAC admits that Motown Records was obligated to pay or reimburse Love Records, Inc. for

recording costs incurred by Love Records, Inc. (SAC ¶ 164).

## C.  The Amended Complaint Should Be Dismissed With Prejudice

33.     Accordingly, for all of the reasons stated above and in the accompanying

Declarations of Donald S. Zakarin, Martha Braithwaite and Ethiopia Habtemariam, and as set

forth in detail in the accompanying Memorandum of Law, not only does the SAC fail to state any

claim against me, UMG Recordings and Motown Records, but the claims are based on

completely unsupported conclusions masquerading as "facts" - and the actual facts completely

refute the fabrications of the SAC. Indeed, as noted above, in virtually all instances, the Plaintiff

and his counsel already know that their allegations are baseless. Further, according to Plaintiff's

own declaration, at most, the allegations are not even based on any personal knowledge of the

Plaintiff but on hearsay statements supposedly made by Mr. Combs to Plaintiff, yet they have

refused to eliminate them and dismiss the claims they have asserted against me, Motown

Records and UMG Recordings.

34.     I have devoted my entire professional career to the music industry and have tried

to lead an honorable personal and professional life. I believe I have succeeded in doing so. I

have had the honor of being appointed Commander of the Order of The British Empire (CBE) in

2010. I was knighted in 2016 and inaugurated to the Order of the British Empire and Knight

12

Bachelor in 2016. I have received honors, recognizing my devotion to philanthropic causes, that I value highly, including the Spirit of Life Award from the City of Hope.

35.     It has been said that a single lie can destroy a reputation of integrity and that while it takes years to build a reputation, it can be ruined in five minutes. The original complaint, the FAC and the SAC, despite their completely different theories for attempting to hold me, Motown Records and UMG Recordings liable activities of which we had no knowledge and as to which we had no involvement, are filled with lies and are beyond reckless in their accusations against me, none of which have any factual basis but are instead are knowingly and maliciously false and defamatory.[9]

36.     The SAC as against me, UMG Recordings and Motown Records should be dismissed with prejudice and we should be awarded sanctions against the Plaintiff and his counsel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 18, 2024

Sir Lucian Grainge, CBE

---

[9] I expect that my attorneys will do everything in their power to remedy the maliciously false accusations leveled in the Amended Complaint.

13

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RODNEY JONES,<br><br>                        Plaintiff,<br><br>        v.<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>CHALICE RECORDING STUDIOS,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10; and<br>ABC CORPORATIONS 1-10,<br><br>                        Defendants. | CASE NO.:  24-1457<br><br><br><br>**DECLARATION OF MARTHA BRAITHWAITE IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT BY DEFENDANTS UNIVERSAL MUSIC GROUP, MOTOWN RECORDS, AND SIR LUCIAN GRAINGE** |

I, Martha Braithwaite, declare as follows:

1.      During the time period applicable to the claims in this action, I was the Executive Vice President, Business Affairs for the Capitol Music Group, which is affiliated with UMG Recordings, Inc. ("UMG Recordings" incorrectly sued herein as "Universal Music Group").  As set forth in the accompanying declaration of Sir Lucian Grainge, UMG Recordings' Chairman and Chief Executive Officer, UMG Recordings is incorporated in the State of Delaware, with its principal operating offices in Santa Monica, California.   UMG Recordings is the principal legal entity for all recorded music operations in the United States for the global music and entertainment company colloquially known as "Universal Music Group." I have personal knowledge of the facts set forth in this Declaration and if called and sworn as a witness, I could and would competently testify thereto.

1

2.      I am advised that in the First Amended Complaint ("FAC"), the Plaintiff in this action claimed that Motown Records was the "parent company" of Love Records, Inc. This assertion was baseless and I understand it has now been abandoned by the Plaintiff and his counsel in the Second Amended Complaint ("SAC").

3.      Instead, I understand that Plaintiff and his counsel, Mr. Blackburn, have substituted an equally false allegation in the SAC: that Motown Records and/or UMG Recordings is or was in a "general business partnership" with Love Records, Inc. and/or Mr. Combs.  During the relevant timeframe, I was the executive responsible for handling all of the business and legal affairs for Motown Records.  Motown Records is not a separate legal entity, but a record label that is an unincorporated division of UMG Recordings.  Neither Motown Records nor any of UMG Recordings' subsidiaries or affiliates are, nor were they ever, in a "general business partnership" (or any other kind of a partnership) with Love Records, Inc., Mr. Combs or any of his business entities.

4.      To my knowledge, Love Records, Inc. is a company associated with Sean Combs (and I believe owned by him, directly or indirectly).  I know this because, during the period starting in or around February 2022 through the beginning of May, 2022, I negotiated and executed an arm's length license agreement, for a limited term, on behalf of Motown Records with Love Records, Inc., which was dated May 4, 2022.  Love Records, Inc. was represented by Kenneth Meiselas, who I am aware has been Sean Combs' long-time transactional counsel.

5.      I am aware that in the SAC, it is admitted (in various paragraphs, including paragraphs 13, 163 and 164), that Motown Records entered into a license agreement to distribute

a Love Records album.  A redacted copy of that license agreement, which I am informed was

provided to Mr. Blackburn by our counsel, is attached hereto as Exhibit A.[1]

      6.      Paragraph 16. 11 of the License Agreement specifically provides as follows:

> "You [Love Records] and Artist [Combs] are entering into this
> Agreement and are performing your obligations hereunder as
> Independent contractors.  **Nothing herein contemplates or constitutes
> you or Artist as Motown's partners, joint venturers, agents or
> employees."**

      7.      As I said, Mr. Blackburn was provided a copy of this license agreement.  I do not

understand how, in the face of the plain language of this agreement, he can continue to allege

that Motown Records and/or UMG Recordings had a "general business partnership" with Love

Records, Inc. and/or Mr. Combs.

      8.      Because I negotiated the license agreement, I can also address what I understand

is the assertion of Plaintiff and his counsel that no recordings were created by Love Records, Inc.

until at least September 2022.  This assertion is completely false.

      9.      To begin with, my negotiations with Mr. Meiselas only began after Ethiopia

Habtemariam, who was then the Chairman and Chief Executive Officer of Motown Records,

attended a listening session at Mr. Combs' studio to hear the recordings he had already recorded

and intended to include on the album that became the subject of the license agreement.

Ultimately, I am aware that Mr. Combs decided to record additional tracks beyond the ones he

had already recorded.

---

[1] The reason I have redacted the license agreement is because most of its terms and conditions
have nothing to do with this action.  Rather, the main provisions that relate to this action are
those that address the license, the advance/recording costs and the representations and
warranties, all of which I have not redacted.

10.     During my negotiations with Mr. Meiselas, he advised me that Mr. Combs and

Love Records, Inc. had already spent several million dollars in recording and other costs on the

album.  As such, one part of my negotiations with Mr. Meiselas addressed his request for the

reimbursement of the costs that Mr. Meiselas advised had already been incurred by Love

Records, Inc. in recording tracks prior to our negotiations.  Motown Records was not prepared to

reimburse all of the costs that Mr. Meiselas advised had been incurred by Love Records, Inc.

(particularly for a distribution deal of a limited duration and no copyright ownership of the

recordings) and we ultimately agreed that Motown Records would reimburse the sum of $1.3

million.  This reimbursement amount is specifically identified in Paragraph 7.02(a) of the license

agreement.[2]

11.     I am advised that Mr. Blackburn, without the slightest basis, alleges that Mr.

Combs supposedly used the $1.3 million for sex workers.  It appears this is premised on his

completely incorrect assertion that, until Plaintiff showed up in September 2022, there had been

no recordings made by Mr. Combs and no expenses were incurred.  Based upon only a lack of

knowledge and baseless conclusions, Mr, Blackburn and the SAC label the license agreement as

a "ruse."

12.     As I have said, Mr. Blackburn is completely incorrect.   Not only did Ms.

Habtemariam listen to tracks that had already been recorded by Mr. Combs before we entered

into the license agreement, Motown Records also spent a great deal of money marketing and

---

[2] The requirement that these costs be documented is a standard provision of our agreements.
However, because we have had many negotiations with Mr. Meiselas and his firm, we accepted
his representation that the actual costs incurred were far greater than the $1.3 million.  Moreover,
since we ended up terminating the license agreement and did not distribute the album, there was
no reason for us to do a full accounting of the costs both before and after the license agreement
and we did not do one.

promoting one of the tracks already recorded by Mr. Combs, "Gotta Move On," which featured Bryson Tiller. Motown released this single recording in or about June 2022 (prior to the termination of our license agreement), and I understand it was thereafter also included on the expanded version of the album that Mr. Combs ultimately completed and released (after the termination of the license agreement). I am attaching hereto as Exhibit B, some invoices for expenses incurred and paid by Motown Records in connection with this recording **before September 2022**. I do so in order to show that, contrary to what is asserted in the SAC and by Mr. Blackburn, there were tracks already recorded by Mr. Combs long before September 2022 (and it was for these already extant tracks that the $1.3 million was reimbursing Love Records, Inc. for some of its recording costs).

13.     I understand that in the SAC and at a telephonic conference with the Court on April 9, 2022, Mr. Blackburn also claimed that Motown Records did not administer any recording budget as provided for in the paragraph 4 of the license agreement, suggesting instead that Motown Records simply gave money to Mr. Combs, which he then supposedly used to pay for sex workers instead of making recordings (apparently Mr. Blackburn bases this incorrect conclusion solely on Plaintiff's claim that Mr. Combs allegedly did not pay him).

14.     Beyond the fact that money is fungible and there is no way that Mr. Blackburn can possibly know how Mr. Combs used any of the money, his assertion is also again incorrect.

15.     First of all, paragraph 4.02(b) provided that Motown Records would administer the budget for the recordings and pay recording costs. In fact, that is what Motown Records did. Attached hereto as Exhibit C are some illustrative invoices for recording costs that were submitted directly to Motown Records and paid by Motown Records. Motown paid for studio time, engineers and producers. It did not pay cash, and it did not pay sex workers.

16.     I would also note that Paragraph 4.04(a) of the license agreement imposed on Love Records, Inc., not on Motown Records, the obligation to negotiate, draft and execute all producer agreements and the corresponding obligation to pay producers, unless Love Records, Inc. requested that Motown Records undertake the obligation of paying certain of the producers. As reflected in Exhibit, as part of the recording costs payable under the license agreement, Motown did directly pay some of the producers.

17.     In short, contrary to every uninformed assertion that is made in the SAC and by Mr. Blackburn at the hearing on April 9, 2024, Motown Records reimbursed Love Records, Inc. for recording costs that Love Records, Inc. actually incurred before the license agreement was executed (and paid marketing and promotion costs associated with the release of such recordings), and it directly paid recording costs Love Records, Inc. incurred after the license agreement was executed.  And also contrary to what the SAC and Mr. Blackburn have alleged, Motown Records did not pay, directly, indirectly, intentionally or unintentionally, any money to sex workers on behalf of Mr. Combs.  The direct payments made by Motown Records to third-party vendors, such as producers, engineers, recording studios, videographers and insurance companies, were not paid to sex workers nor were they paid to Love Records, Inc. and were thus not available to be used by Mr. Combs for the supposedly improper purposes alleged in the SAC.

18.     I also understand that the SAC claims that Motown Records, UMG Recordings and/or Lucian Grainge somehow profited by virtue of this license agreement.  In fact, as I stated in my original declaration in support of the motion to dismiss the FAC, subsequent to executing the license agreement, Motown Records and Mr. Combs decided that Motown Records would not release and distribute the album that Mr. Combs had created.  Accordingly, I negotiated and executed a separate document that terminated the license agreement, effective as of February 1,

2023, on behalf of Motown Records.  Under the termination agreement, Motown assigned back to Love Records, Inc., on a quitclaim basis, all of Motown Records rights as a licensee in the recordings.  The termination agreement ended any relationship between Love Records, Inc. and Mr. Combs on the one hand, and UMG Recordings on the other hand, and Mr. Combs' company, Love Records, Inc. released the album independently.

19.      Because Motown Records did not distribute the album, it had no opportunity to recoup the recording costs (and marketing and promotional costs) it paid to or on behalf of Love Records, Inc. nor did it recoup the reimbursement of recording costs it paid to Love Records, Inc. under the license agreement.  Thus, far from profiting from the album, the license agreement was not profitable for Motown Records or UMG Recordings.

20.      I understand that the claim in the FAC that Motown Records and/or UMG Recordings were responsible for the security at Chalice Recording Studio at which there was allegedly a shooting (and that the security provided was allegedly inadequate) has been abandoned (but that there remains some allegation about Motown Records, UMG Recordings and/or Lucian Grainge nevertheless somehow being responsible for security).  Whether it is asserted as a claim or an allegation, it is false.

21.      I can confirm that neither Motown Records nor UMG Recordings were invoiced for and did not pay for security at Chalice Recording Studio.  Love Records, not Motown Records or UMG Recordings, was responsible for security at any Love Recordings' writers' camp or recording session at Chalice Recording Studio (or anywhere else for that matter).  Motown Records did pay for studio time at Chalice Recording Studio, as well engineers and producers that worked there.  But it had no responsibility for nor did it pay for any security.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 18, 2024

Martha Braithwaite

8

# EXHIBIT A

## EXCLUSIVE RECORDING AGREEMENT

This exclusive recording agreement ("**Agreement**")

is dated as of _____ May 4 , 2022
and is by and between

Motown Records, a division of UMG Recordings, Inc., 1750 North Vine Street, Hollywood,
California 90028 ("**Motown**"),

-and-

Love Records, Inc. c/o Tri Star Sports & Entertainment Group, 9255 Sunset Blvd., 2d Floor, W. Hollywood,
CA 90069, Attn. Lou Taylor ("**you**").

Capitalized terms used and not otherwise defined herein have the meanings assigned or referred to on **Exhibit
B**. Rules of interpretation for this Agreement are set forth in paragraph 16.13.





## 1. **SERVICES**

1.01   (a)   During the Term, you shall furnish to Motown the non-exclusive services of Sean Love Combs, individually and professionally known as "Diddy" ("**Artist**") in the Territory solely with respect to the Commitment Album, including the non-exclusive right to record Artist's Performances in connection with the Commitment Album. You shall, and shall cause Artist to, render all services hereunder to the best of your and Artist's respective abilities, in accordance with first-class standards of performance for the production of Recordings in the recording industry and in compliance with the terms hereof.

(b)   Notwithstanding anything to contrary contained herein, during the Term, neither you nor Artist shall, at any time, release or otherwise exploit (or authorize or permit any Person to release or otherwise exploit) another EP, Album or so-called "mixtape" ("**Project**") principally featuring the Performances of Artist (i.e., a Project by Artist or where Artist is designated as a so-called "main" or "primary artist" on the Project) or another similarly titled or branded Project (e.g., "Off The Grid 2" or "Love Album 2", depending on the final title of the Commitment Album) (such Projects, "**Artist Projects**"). For the avoidance of doubt, Artist Projects does not include a Project principally featuring Performances of another artist signed to you, produced by Artist and/or individual Recordings embodying Artist's Performances as a side artist (even if designated as a "primary artist") in connection with such Recording.

1.02   Intentionally omitted.

1.03   Neither you nor Artist shall, at any time, do (or authorize or permit any Person to do) anything inconsistent with, or that might diminish, impair or interfere with, any of Motown's rights or the full and prompt performance of your obligations hereunder. Without limitation of the foregoing, except as otherwise permitted herein, neither you nor Artist shall: (a) authorize or permit the exploitation of Artist Projects during the Term and anywhere in the Territory by any Person other than Motown for any purpose (and shall take reasonable measures to prevent the same); (b) authorize or permit any Person other than Motown to manufacture, distribute, sell, market, promote or otherwise exploit Recordings delivered to Motown and released by Motown hereunder as part of the Commitment Album or in connection therewith during the License Period and anywhere in the Territory (and shall take reasonable measures to prevent the same), unless otherwise agreed to in writing and in advance by the parties hereto (e.g., as part of a label waiver or third-party clearance (such approved exploitations, "**Reciprocal Uses**")); or (c) during the License Period and throughout the Territory, use, or authorize or permit any Person other than Motown to use your or Artist's names, likenesses (including any picture, portrait or caricature) or biography in connection with the sale or other exploitation of Recordings or Records delivered to Motown and released by Motown hereunder as part of the Commitment Album or in connection therewith, unless otherwise agreed to in writing and in advance by the parties (including in connection with Reciprocal Uses). If you or Artist becomes aware of any unauthorized recording, manufacture, distribution, sale, use or other activity by any Person contrary to the restrictions herein, you shall notify Motown of such activity and cooperate with Motown in any action, proceeding or other efforts Motown commences against such Person.

DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1 :

2.    **TERM**

2.01     The term of this Agreement will consist of an initial contract period ("**Term**"). (The Initial Period is sometimes referred to as a "**Contract Period**.") The Initial Period starts on the date first set forth above and will continue, unless extended as provided herein, until the last day of the 9th full calendar month following the month in which the initial commercial release in the US (i.e., the US retail street date) of the Commitment Album Delivered by you occurs.

2.02     [Intentionally omitted].

3.    **RECORDING COMMITMENT AND DELIVERY OBLIGATIONS**

3.01     During the Term, you shall Deliver to Motown a sufficient number of newly recorded audio-only Subject Recordings to fulfill your Recording Commitment that are technically satisfactory to Motown in its good faith discretion for the production, sale and other exploitation of Records (each, a "**Commitment Subject Recording**"). No Multiple Albums, "live" or "in concert"-type Recordings, or "cover" Recordings will apply toward your Recording Commitment without Motown's written consent (which Motown may withhold for any reason), and Motown will not be required to make any payments in connection with any such Recordings (except for any royalties payable hereunder if Motown Exploits any such Recordings).

3.02     (a)     During the Term, you shall Deliver to Motown a sufficient number of Commitment Subject Recordings (that satisfy the requirements of paragraph 3.01) for one Album, it being understood that such Commitment Subject Recordings shall be curated by Artist and principally feature the performances of other recordings artists (such artists, "**Featured Artists**") (but which may include Artist's services as a performer, producer and/or songwriter). The Album to be recorded and/or Delivered as part of your Recording Commitment is sometimes referred to herein as a "Commitment Album" and is tentatively titled "The Love Album". Notwithstanding the foregoing, subject to your and Motown's prior written approval, in lieu of Delivering an Album, for the purposes of satisfying your obligations under this paragraph 3.02, you may instead elect to Deliver to Motown at least 10 Commitment Subject Recordings, which may be released individually or collectively as Singles and/or EPs.

(b)     Simultaneously with the Delivery of the Commitment Album (or on such other date mutually approved in writing by you and Motown), you may (but shall not be obligated to) Deliver to Motown additional Subject Recordings for use by Motown in connection with the applicable Commitment Album (e.g., retail exclusives, international versions, "deluxe" Albums) ("**Other Commitment Subject Recordings**"). All costs of recording the Other Commitment Subject Recordings will constitute Recording Costs incurred in connection with the Commitment Album concerned, and Motown shall pay such costs pursuant to an Authorized Budget for such Subject Recordings and may deduct such costs from the Recording Fund for such Commitment Album. No additional Advances will be payable to you or Artist in connection with the Other Commitment Subject Recordings.

(c)     The Commitment Album(s) and the Other Commitment Subject Recordings for each Contract Period are sometimes collectively referred to herein as your "**Recording Commitment.**" If Motown accepts a Multiple Album in satisfaction of your Recording Commitment, such Multiple Album will count as only one (1) Album for purposes of the Recording Commitment and the computation of the applicable Recording Fund or Advance. For purposes of fulfilling the Recording Commitment in any Contract Period, separate Recordings of the same Composition will be deemed to collectively constitute one Track.

3.03     You shall Deliver to Motown the Commitment Album by a mutually designated date based on the commercial release date designated by you (in consultation with Motown) for such Commitment Album.

3.04 In connection with each Subject Recording and Album that you are required to Deliver hereunder, unless you and Motown otherwise approve in writing, you shall deliver to Motown all of the Recordings, documents, materials and information set forth on **Exhibit C,** in accordance with the terms set forth in Exhibit C (collectively, "**Delivery Elements**"). Motown may revise the Delivery Elements at any time (e.g., in order to conform to technological or commercial changes in the recording industry) by providing you with an updated version of Exhibit C. Without limiting or relieving you from your obligations, Motown will use commercially reasonable efforts to provide administrative assistance with respect to certain items on Exhibit C (e.g., sample clearances, mechanical licenses, label waivers, union matters, etc).

3.05 Without limitation of any of Motown's rights or remedies hereunder, if you fail to timely Deliver any Commitment Album or Subject Recordings (unless (a) caused solely by either a Force Majeure Event or by Motown's wrongful acts or omissions or (b) approved in writing by Motown, provided that Motown's payment of (or agreement to pay) such excess shall not be deemed approval by Motown), and Motown pays or incurs any expenses by reason thereof, such amounts will constitute Overages. Motown's election to make a payment to you that is due upon Delivery of such Commitment Album or to release any Record derived from such Album or Subject Recordings will not constitute an acknowledgment that such "Delivery" was properly made, and Motown will not be deemed to have waived either its right to require complete and proper Delivery or its remedies for your failure to do so.

3.06 Without limitation of anything contained in this Article 3, Motown may reject any Subject Recording or other Basic Work that: (a) Motown reasonably believes is patently offensive to reasonable standards of public taste, contains an obscenity, violates any Law, infringes or violates the rights of any Person, or may subject Motown to (i) regulatory action, (ii) scrutiny from a governmental organization or body or (iii) Losses; or (b) includes an endorsement or commercial tie-in that was not pre-approved by Motown in writing (provided that Motown shall not unreasonably withhold such approval, and provided further that references to DeLeón and Cîroc are hereby pre-approved by Motown as long as such references do not conflict with any third-party guidelines, rules or restrictions imposed on Motown or otherwise hinder Motown's ability to exploit or fully monetize such Basic Works in accordance with the terms of this agreement (including without limitation, standard monetization of any AV Recordings on YouTube). For the avoidance of doubt, notwithstanding anything to the contrary contained herein, Motown shall have no obligation to approve any endorsement or commercial tie-in that Motown reasonably believes, in its good faith business judgment, would cause a Basic Work to be "demonetized", blocked or otherwise negatively targeted by a third-party digital service provider.

4. **RECORDING PROCEDURES**

4.01 With respect to each Subject Recording to be recorded hereunder during the Term, you shall designate each of the following elements in meaningful consultation with Motown (collectively, "**Recording Elements**"): (a) the individual producer; (b) engineer/mixers(s); (c) musicians and vocalists; (d) the dates and places of recording; and (e) the Compositions to be recorded; provided that your decision shall control in the event of a dispute. For the avoidance of doubt, your failure to consult with Motown in connection with Subject Recordings recorded prior to the Term shall not be deemed a breach hereof and your inadvertent failure to consult with Motown in connection with Subject Recordings recorded during the Term shall not be deemed a breach hereof. Subject to the terms of this Article 4, you shall engage all artists, producers, musicians and other personnel (collectively, "**Production Personnel**") for all recording sessions hereunder and, unless you request for Motown to handle, you shall handle all scheduling and booking of all studio time during the Term. Motown's representatives may attend any recording sessions hereunder at Motown's non-recoupable expense.

4.02 (a) You shall submit to Motown for its approval a written budget listing all Recording Costs to be incurred by Motown in connection with such Commitment Album and its Other Commitment Subject Recordings (such approved budget, the "**Authorized Budget**"); provided that Motown will not

withhold its approval if the Authorized Budget does not exceed the then-current balance of the applicable Recording Fund.

(b) Unless the parties otherwise agree in writing and in advance, Motown shall administer the Authorized Budget and shall pay Recording Costs for the production of Subject Recordings under your Recording Commitment in an amount not to exceed the Authorized Budget therefor (it being understood that you previously incurred or paid certain actual, third-party and bona fide Recording Costs in connection with the Commitment Album and Motown is reimbursing you for such Recording Costs under paragraph 7.02(a) (such costs to be reimbursed, "**Prior Album Costs**" and such reimbursement, the "**Recording Cost Reimbursement**"). Following the execution hereof, you shall submit to Motown a summary of the Prior Album Costs for Motown's records (e.g., to ensure there is no double payment). Without limiting Motown's other rights or remedies, if it reasonably appears to Motown that the Recording Costs for any Subject Recordings will exceed the Authorized Budget therefor, or that the Subject Recordings being produced will not conform to the requirements set forth herein, Motown may immediately cease advancing Recording Costs unless you establish to Motown's reasonable satisfaction that: (i) you can and will pay or reimburse Motown for any Recording Costs in excess of the Authorized Budget, or (ii) the Subject Recordings being produced will conform to the requirements set forth herein, as applicable. If Motown advances any excess Recording Costs under this paragraph 4.02(b) (excluding excess Recording Costs (i) caused solely by either a Force Majeure Event or Motown's wrongful acts or omissions or (ii) approved in writing by Motown, provided that Motown's payment of (or agreement to pay) such excess shall not be deemed approval by Motown), such amounts will constitute Overages.





4.04    (a)    Subject to the terms of this Article 4, you shall engage each producer pursuant to a written producer agreement containing material terms approved by Motown (not to be unreasonably withheld), and you will be solely responsible for the negotiation, drafting and execution of each producer agreement. Except as set forth in paragraph 4.04(b), you will be solely responsible for and shall pay all royalties and other compensation that may be payable to any producers of Subject Recordings or other similar royalty participants that render services in connection with the production of Subject Recordings hereunder.

(b)    Notwithstanding anything to the contrary in paragraph 4.04(a), if, as an accommodation to you, you desire that Motown pay any advances, fees or royalties to any producer or other third-party royalty participant on your behalf, you shall deliver to Motown a fully executed "letter of direction" ("**LOD**") substantially similar to the form of **Exhibit E**, unless Motown otherwise agrees in writing. If Motown makes any such payments prior to the receipt of such letter of direction, they will be deemed made pursuant to the terms set forth on Exhibit E, unless Motown otherwise agrees in writing. For the avoidance of doubt and

without limitation of the foregoing set forth above in this paragraph 4.04(b), Motown shall be under no obligation to accept any LOD which has not been delivered to Motown within twenty-four (24) months following the initial commercial release of the Subject Recording(s) concerned. Notwithstanding anything to the contrary contained in this paragraph 4.04(b), but subject to the immediately preceding sentence, Motown shall not reject an LOD with respect to a producer or other third-party royalty participant provided that (i) such party's services are embodied on a Basic Work Exploited by Motown hereunder, (ii) the fees and royalties payable to such third party were previously approved in writing by Motown (such approval not to be unreasonably withheld and provided that an aggregate all-in royalty rate of 20% payable to all third-parties in connection with a given Subject Recording is hereby pre-approved), and (iii) you have delivered a fully executed agreement with respect to such third party that contains the standard terms and conditions necessary for Motown to exercise its rights hereunder (including all exploitation rights contemplated herein with respect to all Basic Works and the marketing and promotion thereof, it being understood that such agreements may include standard restrictions (e.g., approval of name and likeness, etc.)).

## 5.    **ARTWORK AND PACKAGING**



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



6. **INTENTIONALLY OMITTED**

7. **CERTAIN DEDUCTIONS AND ADVANCES**

7.01 With respect to the Commitment Album, the "**Recording Fund**" will be equal to Two Million Dollars ($2,000,000).

7.02

(a) Promptly following full execution of this Agreement, from the Recording Fund for the Commitment Album, Motown shall pay you an amount equal to One Million Three Hundred Thousand Dollars ($1,300,000) as the Recording Cost Reimbursement (which shall be deemed a Deduction hereunder); and

(b) Conditioned upon the full performance of your then-current, material obligations hereunder, Motown shall pay you the following monies:

(i) If you Deliver the Commitment Album prior to Motown's commercial release thereof, then in connection with your Delivery thereof, promptly following the Delivery of that Album or, if later,

promptly following Motown's final determination of the Recording Costs for that Album, an Advance from the Recording Fund for that Album in the amount, if any, by which the applicable Recording Fund exceeds the Recording Costs for that Album, less the amount payable to you under paragraph 7.02(a).

(ii)    If Motown commercially releases the Commitment Album prior to your Delivery thereof:

(A)    Promptly following the commercial release by Motown of that Album, a payment from the Recording Fund for that Album in the amount, if any, by which the applicable Recording Fund exceeds the Recording Costs for that Album, less (A) the amount payable to you under paragraph 7.02(a), and (B) the Delivery Reserve. The "**Delivery Reserve**" shall be an amount equal to the aggregate amount of outstanding Recording Costs for the Commitment Album at the time such Album is commercially released, which Motown shall use commercially reasonable efforts to determine in good faith promptly after the release of such Album.

(B)    Promptly following your Delivery of each Commitment Album, or if later, promptly following Motown's final determination of the Recording Costs for that Album, a payment from the Recording Fund for that Album in the amount, if any, by which the applicable Recording Fund exceeds the Recording Costs for that Album, less the amount payable to you under paragraph 7.02(a) and the Advance payable to you under paragraph 7.02(b)(ii)(A).



7.03    If the Recording Costs and other Advances paid or reimbursed by Motown for any Recording in fulfillment of your Recording Commitment exceed the applicable Recording Fund designated under this Article 7, such amounts will constitute Overages, unless otherwise agreed to in writing by Motown (or if due to Force Majeure Event or Motown's wrongful acts or omissions).

7.04    In addition to those Advances set forth in paragraph 7.02(b), 7.02(c) and 7.03, the following costs paid or incurred by Motown or an Affiliate/Principal Licensee will constitute Advances: (a) all costs incurred with your prior written consent in connection with Artist's professional development activities (including vocal coaching, acting lessons, choreography lessons, personal trainers, cosmetic dental work) or articles of dress or styling for Artist (provided that Motown shall have no obligation hereunder to incur such costs, and provided further that if you request or approve such activities or articles of dress or styling, then the related costs shall be deemed approved for the purposes hereof); (b) [intentionally omitted].

7.05    Upon your written request and delivery to Motown of the necessary documentation (as determined by Motown in its sole, good-faith business judgment), solely as an accommodation to you, Motown shall pay all "per record" royalties and union scale payments required to be paid to Artist or third parties in connection with Subject Recordings commercially released hereunder; provided that the foregoing will not relieve you of your responsibility for making such payments. All payments made by Motown at your request will constitute Deductions for purposes hereof, and Motown will have no liability by reason of any erroneous payment or failure to comply with such authorization. You shall indemnify and hold Motown harmless (in accordance with the terms of paragraph 15.07) against any claims asserted against any of the Motown Indemnified Parties, and any damages, losses or expenses any of the Motown Indemnified Parties incur, by reason of any such payment or otherwise in connection with such authorization.

## 8.    **RIGHTS**

8.01    (a)    As between Motown and you, you are the sole, exclusive and perpetual owner of all Basic Works (including all copyrights thereto) hereunder. Motown is the sole, exclusive licensee, solely during the License Period and throughout the Territory of all Basic Works (excluding the copyright in any Compositions contained therein) from the inception of the creation thereof, free of any claims whatsoever by you, Artist, or any other Person. You hereby grant Motown, during the License Period and throughout the Territory, a license to all right and interest in: (i) the copyrights to the Basic Works and all renewals and extensions thereof (including all rights of the owner of copyright specified in §106 of the US Copyright Act and under the Laws of any foreign state, territory or country); (ii) all rights of use and control of the Basic Works; and (iii) any reproductions or copies made thereof. You and Artist agree that, for purposes of copyright law and as between the parties hereto, each Basic Work, from inception of creation, will be deemed a work exclusively licensed to Motown during the License Period by you, Artist and all other Persons rendering services in connection with such Basic Work. You and Artist shall, upon Motown's reasonable request, cause to be executed and delivered to Motown any documents that Motown deems necessary or appropriate to vest in Motown the rights granted to Motown herein, and you and Artist irrevocably appoint Motown as your limited attorney-in-fact for the sole, limited purpose of executing such documents in your names. Motown shall give you five (5) business days' notice before signing any document in your name, provided Motown may dispense with that waiting period when necessary, in Motown's reasonable business judgment, to protect or enforce Motown's rights. As a non-material obligation hereunder, Motown shall provide you with copies of documents signed by Motown in your or Artist's name. In accordance with the foregoing, Motown may record Motown's exclusive license in the Basic Works with the appropriate Copyright Office or register the copyright in each Subject Recording on your behalf in your name, subject to the terms of this paragraph 8.01. You and Artist waive all moral rights (or equivalent thereof) available to you in connection with each Basic Work and all Controlled Compositions hereunder. Notwithstanding anything to the contrary contained herein, during the six-month period immediately following the License Period ("**Sell-Off Period**"), Motown may continue to non-exclusively Exploit Physical Records embodying Subject Recordings in accordance with the terms hereof. Motown shall not: (A) manufacture excessive copies of Physical Records embodying Subject Recordings in anticipation of the end of the License Period; or (B) manufacture additional Physical Records embodying Subject Recordings during the Sell-Off Period. With respect to Licensing Exploitations authorized during the License Period, Motown may continue to Exploit such Subject Recordings via such authorized uses and the terms contained therein.

(b)    Without limiting the generality of the foregoing, during the License Period and throughout the Territory, Motown will have the exclusive right to (i) create, reproduce, manufacture, sell, distribute, advertise, license, publicly perform, synchronize with any medium (including motion pictures, commercials and video games), compile and recompile, remix, edit or adapt, exhibit, publicly display or otherwise exploit the Basic Works, and Records and Reproductions containing Basic Works, by any method, or in any media, now or hereafter known or developed, under any trademarks, trade names or labels, for any purposes, and (ii) lease, license, convey or otherwise use or dispose of any Basic Works, by any method, or in any field of use, now or hereafter known or developed, on any terms Motown approves; or Motown may

delay or refrain from doing any of the foregoing. Motown or its designee may include on any Basic Work all such trademarks, trade names, information, logos and other items, as Motown customarily includes on such types of works, including, as applicable, Internet Addresses, watermarks, metadata, and hyperlinks to Internet Addresses.



8.02 (a) During the License Period, Motown has the right to reproduce, print, publish or disseminate in any medium the approved names (both legal and professional, whether presently or hereafter used), approved likenesses, approved autographs (including facsimile signatures), and approved biographies of you, Artist, the individual producer and all other Persons performing services in respect of the Basic Works (to the extent permissible pursuant to the applicable agreements with such producers or other Persons, and solely to the extent that you advise Motown in advance in writing of any applicable restrictions or provide the applicable agreements or label waivers to Motown) for all purposes of trade, advertising, promotion and the general goodwill of Motown and Affiliate/Principal Licensees. Motown's rights under this paragraph 8.02(a) are (i) exclusive during the License Period with respect to Basic Works and (ii) non-exclusive during the License Period in all other respects.

(b) During the Term, you shall designate the professional name to be used by Artist for the purposes of this Agreement (including for the Exploitation, marketing and promotion of the Commitment Album and other Basic Works as set forth herein (such purposes, "**Motown Album Purposes**")), provided that following Motown's approved release of the first Subject Recording hereunder, neither you nor Artist shall use a different professional name for the Motown Album Purposes unless you and Motown agree in writing.

(c) (i) Any and all pictures of Artist or biographical material about Artist or any side artist or producer which Motown proposes to use hereunder shall be subject to your prior written approval, including for packaging, advertising or publicity of the Commitment Album (and related release) hereunder. Motown will not use any such material unless you approve such material in writing (such approval not to be unreasonably delayed or withheld). In any event, Motown will not be required to incur expenses beyond those customary for a compilation-like Album such as the Commitment Album hereunder. This paragraph 8.02(c) will not apply to any material previously approved by you or used by Motown for the use concerned. You may submit photographs, likenesses and biographical material of Artist for a particular

Page 11
Love Records (The Love Album) - Recording Agreement.EXECUTION

use and your submission of same will constitute your approval thereof for such use, provided that your approval of a given photograph, likeness or biographical material hereunder shall not limit your other approval rights as set forth in this Agreement.



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



Love Records (The Love Album) - Recording Agreement.EXECUTION



Page 14
Love Records (The Love Album) - Recording Agreement.EXECUTION



9.   **ROYALTIES**





DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1





10. **ROYALTY STATEMENTS AND PAYMENTS**





Page 19
Love Records (The Love Album) - Recording Agreement.EXECUTION

11. **LICENSES FOR MUSICAL COMPOSITIONS**









12.  **MARKETING AND PROMOTION; RELEASE COMMITMENT**





Page 24
Love Records (The Love Album) - Recording Agreement.EXECUTION





Page 26
Love Records (The Love Album) - Recording Agreement.EXECUTION

DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



Page 27
Love Records (The Love Album) - Recording Agreement.EXECUTION

DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1 :





13.    **REPRESENTATIONS, WARRANTIES AND CERTAIN COVENANTS**

You represent, warrant and covenant to Motown as follows:

13.01    You have the right, power, authority and capacity to execute and deliver this Agreement, to grant Motown the rights set forth herein and to perform fully hereunder, without the consent or approval of any other Person. This Agreement has been duly executed and delivered by you, and constitutes a legal, valid and binding obligation on your part, enforceable in accordance with its terms.

13.02    Neither this Agreement nor the fulfillment hereof by any party infringes upon the rights of any Person or violates any Laws, and you have no knowledge of any claim or potential claim that may interfere with Motown's exercise of its rights hereunder or create any liability on the part of Motown. Without limitation of the foregoing: (a) each Person who renders any services in connection with the creation of the Basic Works has the right to render such services, without any legal or contractual restrictions, and has or will grant you and Motown all of the rights referred to herein, without any restrictions (subject to restrictions in the label waivers for the applicable Featured Artists or standard approvals in Featured Artist and producer agreements); (b) none of the Basic Works or any other Materials created or provided by you or Artist, or any authorized use of the foregoing by Motown or Affiliate/Principal Licensees or their respective grantees, licensees or assigns hereunder, will violate or infringe upon the rights of any Person; and (c) all Basic Works and other Materials supplied to Motown by you or Artist will be free of any liens and encumbrances.

13.03    Motown will not be required to make any payments for or in connection with the acquisition, exercise or exploitation of rights pursuant to this Agreement, except as specifically provided herein.

13.04    Artist is or will become, and shall remain throughout the Term, a member in good standing of all labor unions or guilds in which membership is required under Motown's agreements with such unions or guilds for the performance of Artist's services hereunder, and all terms provided for in the 2002-2006 SAG-AFTRA Code Article 17, as may be amended from time-to-time, related to Contracts with Artists will be deemed incorporated herein by reference. As between you and Motown, you will be solely responsible for and shall pay any union or guild payments (including "new use" and "conversion" fees and any health and welfare contributions) required in connection with your or Artist's use of Stems or Subject Recordings at Artist's live Performances.

13.05    [Intentionally omitted].

13.06    No Controlled Composition is subject to any agreement between you or Artist and any co-writer, publisher or other Person that is in any other way inconsistent with your granting the rights granted herein to such Controlled Composition in its entirety.

13.07    You or Artist have all of the rights necessary to use the professional name to be used by Artist hereunder, without any further third party clearances or approval, for the purposes of your and Artist's services hereunder and Motown's exercise of its rights as set forth in this Agreement.

13.08    Artist has reached legal age of majority pursuant to the Laws governing this Agreement and its performance hereunder.

13.09    Throughout the Term, Artist shall actively perform as a musical entertainer. You and Artist (and each Person acting on behalf of you or Artist) are in compliance with, and throughout the Term shall comply with, all applicable Laws in fulfilling your obligations hereunder and otherwise conducting your professional activities in connection herewith (including compliance with Sections 317 and 508 of the Communications Act of 1934).

13.10    You are, and at all times during the Term will be, a corporation in good standing in the jurisdiction of your formation.

13.11    Neither Motown's acceptance of any Materials hereunder nor Motown's knowledge of any facts that would constitute a breach of any representation, warranty or covenant of yours hereunder, will affect Motown's indemnification rights or other remedies hereunder even if Motown has provided you with assistance in obtaining mechanical licenses, Artwork acquisitions/clearances, sample clearances, trademark clearances or other clearances.

13.12    Neither you nor Artist shall speak, write or otherwise communicate any remark, comment, message, declaration, statement  or other communication through any means or media, whether verbal, in writing, electronically transmitted or otherwise, that might reasonably be construed to disclose, incorporate, discuss, include or otherwise involve any confidential or proprietary information of any of the Motown Parties; and neither you nor Artist shall cause, encourage or solicit any Person to do or further or assist any Person in doing any of the foregoing described in this paragraph 13.12.

13.13    During the License Period, Artist shall not perform for any Person other than Motown for the purpose of making Records or Recordings embodying (and neither you nor Artist shall permit the use by any Person other than Motown of Artist's name or likeness for or in connection with any such Record or Recording embodying) any Composition recorded or delivered as embodied in a Subject Recording provided that such Subject Recording has been released by Motown hereunder during the Term (each such Composition, a "**Recorded Composition**").

## 14.    **CERTAIN PROVISIONS RELATING TO YOU AND ARTIST**

14.01    You represent, warrant and covenant that you have, and at all times during the Term, you shall have, the sole and exclusive right to furnish the services of Artist as required herein and to grant the rights set forth herein, including as they relate to Artist and any and all copyright interests in and to the Basic Works. Simultaneously with the execution of this Agreement, you have delivered to Motown, an inducement agreement in the form of **Exhibit A** ("**Inducement Agreement**"), executed by Artist. You hereby give your consent and approval to the terms of the Inducement Agreement. You and Motown each intend that the rights granted herein include a grant of rights to receive injunctive relief pursuant to the provisions of California Civil Code Section 3423(e) and California Code of Civil Procedure Section 526 (second paragraph 5) concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services.

14.02    (a)    You represent and warrant that as of the end of each of the first seven (7) Contract Years of this Agreement, Artist will have received minimum Compensation at the rate of: Nine Thousand Dollars ($9,000) for the first Contract Year, Twelve Thousand Dollars ($12,000) for the second Contract Year and Fifteen Thousand Dollars ($15,000) for each of the third through seventh Contract Years (each, an "**Annual Minimum Payment**"). Compensation paid in any Contract Year in excess of the applicable Annual Minimum Payment will apply to reduce the Compensation otherwise required to be paid in any subsequent Contract Year.

(b)     [Intentionally omitted].

(c)     You acknowledge and agree that the provisions of this paragraph 14.02 are intended to preserve Motown's right to seek injunctive relief to prevent a breach of a contract for the rendition or furnishing of personal services. If California law is changed to provide for different or additional provisions as a requisite for injunctive relief than those provisions set forth herein, and such law may apply to this Agreement, then Motown may unilaterally amend this Agreement to comply with such law as of the effective date of such change.

14.03   In the event that you fail to fulfill any of your material obligations hereunder then, at any time after the occurrence of any such event, in addition to any other remedies that may be available, Motown may, exercisable by notice to you, terminate the Term or require Artist to render Artist's personal services directly to Motown for the remainder of the Term, including any extension thereof, for the purpose of fulfilling your obligations hereunder, upon all the same terms set forth herein. If Motown exercises its option to require Artist to render Artist's personal services directly to Motown, then Artist will be deemed substituted for you as a party to this Agreement as of the date of such option exercise.

## 15.     **FAILURE OF PERFORMANCE; CERTAIN REMEDIES**



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



Love Records (The Love Album) - Recording Agreement.EXECUTION



16.　**MISCELLANEOUS**



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1





Page 36
Love Records (The Love Album) - Recording Agreement.EXECUTION



16.11  You and Artist are entering into this Agreement and are performing your obligations hereunder as independent contractors. Nothing herein contemplates or constitutes you or Artist as Motown's partners, joint venturers, agents or employees. Without limitation of the foregoing, you and Artist have no right to execute any agreement or incur any obligation for which Motown may be liable or otherwise bound. No fiduciary relationship or duty or special relationship of trust and confidence exists between you or Artist, on the one hand, and Motown, on the other hand, and no such relationships or duties will be deemed to be created by this Agreement or the business relations between you or Artist, on the one hand, and Motown, on the other hand.





16.14    This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Any signed copy of this Agreement (including an electronic signature), or copies or counterparts thereof, delivered by facsimile or electronic delivery, will for all purposes be treated as if it were delivered containing an original manual signature of the party whose signature appears in the facsimile or electronic mail and will be binding upon such party in the same manner as though an originally signed copy had been delivered.

IN WITNESS WHEREOF, the parties have signed this Agreement in the spaces provided below.

**MOTOWN RECORDS,**
a division of UMG Recordings, Inc.

By:  *Martha Braithwaite*   CB

An authorized signatory

**LOVE RECORDS, INC.**

DocuSigned by:

By: _____

49C62A591DE6430

An authorized signatory

**INSOFAR AS IT RELATES TO VIRGIN:**

By:  *Martha Braithwaite*   CB

**VIRGIN MUSIC LABEL AND ARTIST SERVICES,**
a division of UMG Recordings, Inc.

### Exhibit A

### Inducement Agreement

Date: May 4, 2022

Motown Records,
a division of UMG Recordings, Inc.
1750 North Vine Street
Hollywood, CA 90028

Ladies and Gentlemen:

The undersigned ("Artist") has been advised that concurrently herewith Motown Records, a division of UMG Recordings, Inc. ("**Motown**") is entering into an agreement with Love Records, Inc. ("**Company**") pursuant to which Company agrees to furnish Artist's non-exclusive services, among other things, to curate an Album ("**Recording Agreement**"). Capitalized terms used herein and not otherwise defined have the meanings assigned to such terms in the Recording Agreement. This inducement agreement is subject to the rules of interpretation set forth in paragraph 16.13 of the Agreement.

In consideration of Motown's execution of the Recording Agreement and as a further inducement for Motown to do so (it being to Artist's benefit that Motown execute such agreement), Artist hereby agrees as follows:

1.       Company is, and at all times during the term of the Recording Agreement (as it may be extended or renewed, the "**Term**") will be, authorized to furnish Artist's recording services to Motown as provided in the Recording Agreement. Artist is familiar with each provision of the Recording Agreement relating to Artist's obligations, assents to the execution thereof, and agrees to be bound by all the restrictions and other provisions therein relating to Artist. Artist acknowledges that Motown will have no obligations to make any payments to Artist in connection with the services rendered by Artist or the fulfillment of Artist's other obligations under the Recording Agreement, except as provided in paragraph 7.05 and 14.03 of the Recording Agreement.

2.       If, during the Term, Company ceases to be entitled to Artist's services in accordance with the terms of the Artist Agreement, or if Company fails or refuses to furnish Subject Recording recordings embodying Artist's Performances to Motown in accordance with the Recording Agreement, (a) Artist shall, at Motown's request, do all such acts and things so as to give Motown the same rights, privileges, and benefits as Motown would have had under the Recording Agreement if Company had continued to be entitled to Artist's services and if Company had continued to furnish Recordings to Motown; and (b) such rights, privileges, and benefits will be enforceable in Motown's behalf against Artist.

3.       All of the representations and warranties made by Company in the Recording Agreement that concern Artist are true and correct. All of the terms, conditions and restrictions relating to Artist in the Recording Agreement will be binding upon Artist and regardless of the name(s) by which Artist may be identified in Artist's artistic endeavors. Company's rights, obligations, liabilities, prohibitions and restrictions contained in the Recording Agreement are applicable hereto and incorporated herein by reference.

4.       Artist hereby confirms and joins in the granting to Motown of the rights specified in the Recording Agreement, including all rights in and to the results and proceeds of Artist's services and the right to use and publish Artist's names (legal, group and professional) and likenesses as set forth in the Recording Agreement.

5.  Artist agrees and acknowledges that Motown is the exclusive licensee of all copyright and other rights in all Subject Recordings and other Basic Works delivered to Motown and released by Motown or made by Motown pursuant to the Recording Agreement during the Term (including the right to record Motown's exclusive license in the Basic Works with the appropriate Copyright Office or register the copyright in each Subject Recording on your behalf in your name in accordance with the terms of the Recording Agreement), and that Motown may exercise all rights of the copyright owner as provided in the Recording Agreement.

6.  Intentionally omitted.

7.  Motown may, in its own name, institute any action or proceeding against Artist to enforce its rights under the Recording Agreement or this agreement. Artist acknowledges that its services under the Recording Agreement are of a special, unique, intellectual and extraordinary character which gives them peculiar value, and that if Company or Artist breaches any term of this agreement or of the Recording Agreement, Motown will be caused irreparable injury which cannot adequately be compensated by money damages, and Motown will be entitled to equitable relief, including injunctive relief, to enforce the provisions of such agreements; provided, however, you can challenge the imposition of equitable relief on grounds other than that your and Artist's services are not of a special, unique, intellectual and extraordinary character.

8.  Intentionally omitted.

9.  Artist, for itself and on behalf of any publisher or other Person who has or may have any interest in or to any Controlled Composition, hereby licenses to Motown mechanical reproduction and other rights with respect to each Controlled Composition upon the terms and at the rates applicable to Controlled Compositions licensed to Motown by Company under Article 11 of the Recording Agreement.

10. Artist agrees to indemnify, defend and hold Motown harmless from and against any third party liability, loss, damage, cost or expense (including reasonable attorneys' fees) paid or incurred by Motown by reason of any breach by Artist of the representations, warranties or covenants contained herein or in the Recording Agreement, and agrees to reimburse Motown on demand for any payment made by Motown after the date hereof with respect to any of the foregoing, all in accordance with the terms set forth in paragraph 15.07 of the Recording Agreement.

11. Intentionally omitted.

12. This agreement and all matters directly or indirectly arising out of, under or related to this agreement or any related document or instrument are governed by the arbitration, choice of law, jurisdiction and forum

**[Remainder of page intentionally left blank; signature page follows]**

terms contained in paragraphs 16.09 and 16.10 of the Recording Agreement. Any process in any action, arbitration, suit or proceeding arising out of or relating to this agreement may, among other methods, be served upon Artist by delivering it or mailing it in accordance with paragraph 16.01 of the Recording Agreement. Any such delivery or mail service will have the same force and effect as personal service.

Very truly yours,

DocuSigned by:

**SEAN LOVE COMBS**

**Acknowledged and agreed:**

**LOVE RECORDS, INC.**

DocuSigned by:

By:
An authorized signatory

**MOTOWN RECORDS,**
a division of UMG Recordings, Inc.

By: *Martha Braithwaite* CB
An authorized signatory

**Exhibit B**

**Definitions**





DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



Page 44
Love Records (The Love Album) - Recording Agreement.EXECUTION



Page 45
Love Records (The Love Album) - Recording Agreement.EXECUTION



Love Records (The Love Album) - Recording Agreement.EXECUTION



Page 47
Love Records (The Love Album) - Recording Agreement.EXECUTION

DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



Page 48
Love Records (The Love Album) - Recording Agreement,EXECUTION

## Exhibit C

## DELIVERY ELEMENTS



Page 49
Love Records (The Love Album) - Recording Agreement EXECUTION



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1



Page 51
Love Records (The Love Album) - Recording Agreement,EXECUTION

DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1 :



## Exhibit C-1

**SONGWRITER SPLITS**



## PUBLISHING INFORMATION

*If you represent more than one writer on the same song, please indicate shares per writer.*

Title:

Timing:

Artist:

Preliminary Writers:

| Writer(s) | Publisher(s) | Mech. Share | Performance Society |
|-----------|--------------|-------------|---------------------|
|  |  |  | ASCAP/BMI/SESAC/Oth er |
|  |  |  | ASCAP/BMI/SESAC/Oth er |
|  |  |  | ASCAP/BMI/SESAC/Oth er |
|  |  |  | ASCAP/BMI/SESAC/Oth er |
|  |  |  | ASCAP/BMI/SESAC/Oth er |

If a Sample is included, title and artist of Sampled Song: _____

Title:

Timing:

Artist:

Preliminary Writers:

| Writer(s) | Publisher(s) | Mech. Share | Performance Society |
|-----------|--------------|-------------|---------------------|
|  |  |  | ASCAP/BMI/SESAC/Oth er |

| | | | ASCAP/BMI/SESAC/Oth er |
|---|---|---|---|
| | | | ASCAP/BMI/SESAC/Oth er |
| | | | ASCAP/BMI/SESAC/Oth er |
| | | | ASCAP/BMI/SESAC/Oth er |

If a Sample is included, title and artist of Sampled Song: _____

**Exhibit D**

**Producer's Declaration**



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1





**Schedule C-1**

**List of Musical Compositions**

## Exhibit E

## Letter of Direction





Schedule 1

## FOREIGN ROYALTY TERMS



DocuSign Envelope ID: 22199EA7-16E9-4200-9252-6BD31480A7D1

