# EXHIBIT # 5.3

Mr. Combs. And as documented in the accompanying declaration of Ms. Braithwaite, the license agreement (Exhibit A to the Braithwaite declaration) specifically provides, in paragraph 16.11, that there was no partnership.

12.     Beyond the falsity of the foundational allegations by which the SAC tries to connect the UMG Defendants to the alleged RICO claim, the claim alleges wire and mail fraud without a single specific allegation. Nor does it identify who supposedly sent what communication (by wire or mail) to whom and when it was sent or what it said that made it fraudulent. Instead, the allegations generically refer only to communications from the "defendants." (SAC ¶¶ 264-276).

13.     At bottom, the SAC RICO claim bases a criminal accusation against Sir Lucian Grainge, Motown Records and UMG Recordings not on any wrongful act that any of them are alleged to have committed but solely based on the "general business partnership" allegation that is knowingly false and on the equally false (and legally absurd) conclusion that the UMG Defendants were obligated to supervise and control how Love Records, Inc. spent any of the monies that were paid to Love Records, Inc. under the license agreement. As set forth in the Memorandum of Law, the RICO claim does not remotely comply with Rule 8 (and patently fails to satisfy Rule 12(b)(6)).

14.     But the Rule 8 violation of the RICO claim pales in comparison to the violation of Rule 8 by the "sex trafficking" claims against the UMG Defendants (the Fifteenth and Sixteenth Causes of Action).[1] These Causes of Action fail to identify any specific acts, but are instead

---

[1] The Seventh Cause of Action, for aiding and abetting the alleged "sex trafficking" by Combs, while still pleaded in the SAC, has been withdrawn pursuant to Mr. Blackburn's acknowledgement at the hearing on April 9, 2024 that it was baseless.

filled with conclusory allegations and also base the supposed liability of the UMG Defendants

solely on the newly fabricated foundational allegation about a non-existent "general business

partnership" between Motown Records and/or UMG Recordings and Love Records, Inc. and/or

Mr. Combs. As with the RICO allegations, this non-existent "partnership" is coupled with the

legally non-existent "duty" on the part of the UMG Defendants to supervise and control how Mr.

Combs spent any of the monies required to be paid under the license agreement.

15.    Based solely on these two factually baseless assertions (the "general business

partnership and supposed duty allegations), which also lack any legal basis, the SAC accuses Sir

Lucian Grainge, Motown Records and UMG Recordings of participating in and benefiting from

Mr. Combs' alleged "sex trafficking venture" and supposedly obstructing enforcement of the sex

trafficking laws under 18 USC § 2 (which does not even provide a private right of action).[2]

16.    There are no facts contained in the allegations but only strident conclusions in

violation of FRCP Rule 8. Paragraph 375 is the most glaring example of how far the SAC

deviates from Rule 8. It starts on page 83 of the SAC and continues on, for six pages of single-

spaced non-factual and conclusory (and redundant) paragraphs, to page 89. Not only does it

contain no factual matter whatsoever, it is also anything but a short, plain and concise statement

of the claim.

---

[2] As explained in the attached Braithwaite declaration, the UMG Defendants did not benefit from
the license agreement. On the contrary, because the agreement was terminated, Motown Records
did not even recoup the monies it paid to Love Records, Inc.

**D. The SAC Contains Prejudicial And Scandalous Accusations In Violation of FRCP Rule 12(f)**

17.     As discussed in detail in the accompanying declarations, and as any review of the SAC shows, it is filled with outrageously offensive accusations against Sir Lucian Grainge. From the gratuitous inclusion of Sir Lucian Grainge's picture to the offensively false RICO and sex trafficking allegations, the SAC should be stricken.

**E. The First Amended Complaint Should Be Dismissed Pursuant to FRCP Rule 12(b)(6) For Failure to State A Claim For Relief Against the UMG Defendants**

**(i) There Is No General Business Partnership Between Love Records, Inc. and Motown Records or any other UMG Entity**

18.     As set forth in the accompanying declaration of Ms. Habtemariam, there was never any partnership between Motown Records and Love Records, Inc. and despite having been provided with the license agreement (attached as Exhibit A to the Braithwaite declaration), which specifically, in paragraph 16.11, makes clear that there was no partnership, the SAC alleges, as its foundational allegation for all of the claims against the UMG Defendants, that Motown Records or UMG Recordings was in a "general business partnership" with Love Records, Inc. and/or Mr. Combs.  Based on this knowingly false foundational allegation, the SAC alleges that the UMG Defendants somehow had some obligation to supervise and control how Love Records, Inc. and/or Mr. Combs spent any of the money paid or reimbursed to Love Records, Inc. under the license agreement.

19.     As detailed in the accompanying declaration of Martha Braithwaite, neither Motown Records nor any other UMG Records company ever had a "general business partnership" with Love Records, Inc.  Rather, Motown Records had a briefly operative arm's

7

length license agreement to distribute one album, entered into in May 2022 and terminated as of February 1, 2023.[3]

20.    So where did Plaintiff and Mr. Blackburn obtain this information about Motown Records or UMG Recordings supposedly having a "general business partnership" with Love Records, Inc. or Mr. Combs?  Without any investigation into the facts, Plaintiff and Blackburn selectively chose to "rely" on the colloquial and shorthand reference in some press reports to the license agreement between Motown Records and Love Records, Inc. as a "partners" with respect to the single album subject to the license agreement.

21.    The SAC alleges there is a "general business partnership" despite the fact Ms. Habtemariam's declaration attached to the SAC says there was only a license agreement, not a partnership.

22.    Moreover, not content to ignore Ms. Habtemariam's declaration, in paragraph 218 of the SAC, Mr. Blackburn intentionally misrepresents what she says in her declaration.  He states that Ms. Habtemariam "states that she was given approval by Defendant UMG **to enter the partnership with Sean Comes** (sic) to help establish Love Records."

23.    Nowhere in her declaration does Ms. Habtemariam say any such thing.  The word "partnership" is nowhere mentioned in the declaration attached to the SAC (and her declaration in support of this motion specifically refutes any such alleged partnership).  Rather, Ms. Habtemariam's declaration states only that she received approval to enter into **a license agreement**.

---

[3] As noted in the accompanying Memorandum of Law, because the SAC not only references the license agreement (SAC ¶¶ 163-164) but attaches a declaration of Ms. Habtemariam which discusses the license agreement, the UMG Defendants are entitled to include the license agreement in this motion to dismiss.

24.     The "general business partnership" allegation, which forms the basis for every claim and every allegation against the UMG Defendants (there are no less than 46 separate references to the non-existent "general business partnership" in the SAC), also ignores the clear language of paragraph 16.11 of the license agreement, which, as noted above, was provided to Mr. Blackburn in the UMG Defendants' motion to dismiss the FAC. That paragraph expressly states that Motown Records and Love Records, Inc. were not partners but were independent contractors.

25.     In short, the foundational allegation of the SAC that Motown Records and Love Records, Inc. were in a "general business partnership" is knowingly false. Any claim based on this completely fabricated and non-existent "general business partnership" allegation must be dismissed. As every claim against the UMG Defendants is based on this non-existent relationship, all of the claims should be dismissed.

**(ii) Sir Lucian Grainge Has Never Been To Any Of Combs' Homes**

26.     While the FAC falsely and offensively alleged that Sir Lucian Grainge attended what Plaintiff and his counsel have described as "freak off" parties at Mr. Combs' homes in Los Angeles, Miami and New York, where underage girls and sex workers were allegedly plied with drugs and alcohol (and sexually preyed upon, as Plaintiff claims he was), this allegation has been abandoned in the SAC. To be clear, Sir Lucian Grainge has **never** been to any of Mr. Combs' homes (Grainge Decl. ¶ 25).

27.     So what was the basis for this now abandoned accusation? The FAC specifically claimed that Plaintiff saw Grainge at Combs' homes, even recounting seeing Grainge disappear into Combs' bedroom with Combs for hours. Yet, in Mr. Blackburn's letter motion to file the

SAC, he portrayed the allegations as being only what Combs had supposedly told Plaintiff, not on any personal knowledge of the Plaintiff.[4] That was not what the FAC said.

28.     Regardless, because the SAC no longer pleads that Sir Lucian Grainge had any actual personal knowledge of any of the supposed wrongful acts of Mr. Combs, the RICO and "sex trafficking" claims against the UMG Defendants are now founded on the non-existent "general business partnership" and the equally non-existent duty of the UMG Defendants to supervise and control how Mr. Combs spends his money.

29.     As set forth in the accompanying Memorandum of Law, not only are the claims based on completely fabricated conclusory allegations, there is no basis in law for the RICO claim and the "sex trafficking" claims as against the UMG Defendants. They should be dismissed with prejudice.

### (iii) The First Amended Complaint's "Should Have Known" Allegations Are Chronologically Impossible

30.     Beyond the non-existent "general business partnership" allegation and the non-existent alleged duty to control Mr. Combs' financial affairs, the SAC repeats the same nonsensical argument made in the FAC: that the UMG Defendants supposedly should have known that Mr. Combs was engaging in alleged sex trafficking activity because of a complaint filed by a Cassie Ventura and a claim made by a Jonathan Oddi accusing Mr. Combs of sex trafficking (SAC ¶¶ 375(h) and (i), 386).

---

[4] Indeed, this Court has Plaintiff's declaration, which was attached to Mr. Blackburn's reply letter in support of his letter motion to file the SAC. That declaration conclusively demonstrates that the allegations of the SAC are based almost exclusively on, at most, rank hearsay, not any personal knowledge of the Plaintiff. Virtually every conclusory allegation in the SAC is attributed to things that Mr. Combs supposedly told Plaintiff.

31.     These assertions are both false and chronologically impossible. Attached hereto

as Exhibit 5 is the first page of Ms. Ventura's complaint against Mr. Combs. It was filed on

November 16, 2023. As Ms. Braithwaite's declaration establishes, Motown's license agreement

with Love Records, Inc. was terminated as of February 1, 2023, months before Ms. Ventura's

complaint was filed (and that ended any relationship between the UMG Defendants and Mr.

Combs and Love Records, Inc.).[5]

### (iv) The SAC Jettisons the "Cash" Allegations of the FAC and Invents A Duty On The Part of the UMG Defendants to Oversee Combs' Tax Filings

32.     The FAC claimed that the UMG Defendants provided "cash" to Mr. Combs (even

fantasizing that it was "likely millions of dollars"), the "cash" supposedly enabling Mr. Combs to

perpetrate his alleged sex trafficking activity. The SAC abandons these baseless accusations but

now invents a wholly new allegation: the UMG Defendants were obligated to assure that their

supposed "general business partner" Love Records, Inc. or Mr. Combs properly filed and paid

taxes, and are responsible for their alleged failure to make the required filings (SAC ¶¶ 375

(b),(k),(m), 383).

33.     On its face, this allegation is breathtakingly absurd. Aside from the obvious fact

that neither Plaintiff nor Mr. Blackburn could have any knowledge of Mr. Combs' tax filings,

there is no legal basis on which any such alleged obligation may be imposed on the UMG

Defendants, even if there were a "general business partnership," and there is no such partnership.

---

[5] In December 2023, Jonathan Oddi, who, according to public reports, was a porn actor and had been arrested at the Trump Doral Hotel in Miami in 2018 carrying a gun and threatening the then-President, claimed that he had, years ago, engaged in sexual activity with Ms. Ventura and Mr. Combs. Again, even were this assertion true, it surfaced long after the events pleaded in the SAC, after Plaintiff was no longer involved with Mr. Combs (SAC ¶¶ 23- 24) and months after the license agreement between Motown Records and Love Records, Inc. was terminated.

34.     Every claim against the UMG Defendants in the SAC is factually and legally

baseless. They should be dismissed with prejudice. The UMG Defendants will be serving an

updated Rule 11 motion on Mr. Blackburn and anticipate that at the end of the 21 day period,

will file it with this Court.

35.     I now turn, as I said above, to the section of this declaration that will document

the extent to which Plaintiff and Mr. Blackburn have filled the SAC not merely with baseless

conclusions but with allegations that they know are completely false.

**F.      Mr. Blackburn's Lack Of Candor With This Court**

36.     Before I document the purposeful and knowing falsity of the SAC, including by

comparing its allegations to the completely different and now abandoned allegations of the FAC,

I believe that this Court should be advised of representations Mr. Blackburn made directly to this

Court that he knew were untrue when he made them. On April 9, 2024, this Court held a

telephonic hearing attended by me and by Mr. Blackburn. I am attaching, for the Court's

convenience, a copy of the transcript of that hearing as Exhibit 6.

37.     On page 2 of that transcript, the Court asked Mr. Blackburn whether he had

served the other defendants (meaning the defendants other than the UMG Defendants). Given

that the FAC was filled with poisonous accusations against all of the Defendants, I believe that

the Court wanted to assure that the Plaintiff and Mr. Blackburn were expeditiously undertaking

to prosecute their claims.[6]

---

[6] As the transcript also reflects, we voluntarily waived service on behalf of the UMG Defendants,
without waiver being sought, so that we could move against the FAC as quickly as possible and
try to start correcting the false narrative of the FAC.

12

38.     Mr. Blackburn represented to the Court that he had sent a Rule 4 waiver form to Mr. Combs' counsel, who did not respond, so he sent out his process server to serve the Combs defendants.

39.     The Court then asked when these things occurred and on page 3 of the transcript, Mr. Blackburn directly represented to the Court that he had emailed the Rule 4 waiver form to Combs' counsel on March 13 and that he sent the complaint to be served on the Combs defendants to the process server 5 days later (on March 18, 2024).

40.     However, contrary to Mr. Blackburn's representation, I was aware that the docket did not reflect any request for the issuance of a summons so that his representation could not have been truthful. In fact, as shown by ECF 39, Mr. Blackburn did not even request the issuance of a summons until April 17, 2024, a month later than he represented to this Court that he had sent the complaint to a process server for service (and as has been typical of Mr. Blackburn's filings, that request was rejected by the clerk as it was not properly filed and as of the date of this declaration, Mr. Blackburn has yet to refile such request).

41.     In fact, even Mr. Blackburn's representation to this Court about sending an email requesting a Rule 4 waiver of service from the Combs' defendants on March 13, 2024 was untrue. Attached hereto as Exhibit 7 is an email from Mr. Blackburn to Jonathan Davis dated March 25, 2024 (with some unprofessional emoji's included) requesting a Rule 4 waiver. I am advised that this is the first and only request that Mr. Blackburn made of Mr. Davis for a waiver.

42.     I provide this background, not because it is directly relevant to the UMG Defendants' motion to dismiss the SAC, but because I believe that Mr. Blackburn's willingness to knowingly speak untruths in response to direct questions from the Court is consistent with his willingness to fill the SAC with offensively false accusations against Sir Lucian Grainge. It

13

should be deeply concerning when a member of the bar of this Court cares so little for the truth and is so willing, armed with the litigation privilege, to defame people and companies.

### G.  The Changed Allegations Of The SAC Are As False And Baseless As the Allegations Of The FAC

43.     In my original declaration, submitted in support of the motion to dismiss the FAC, I detailed the falsity of the FAC.  To the extent it remains relevant, I will cross-reference the allegations of the FAC with the very much different allegations of the SAC.

44.     While very much different, the SAC's allegations against the UMG Defendants, remain offensively false and I do not believe that Mr. Blackburn can attribute the falsity to his client.  Mr. Blackburn has completely jettisoned every single one of the original foundational and utterly false allegations of the FAC, on which all of the claims against the UMG Defendants were based, and has fabricated entirely different foundational allegations for the claims against the UMG Defendants.

45.     First, whereas the FAC alleged that Motown Records was the "parent company" of Love Records, Inc. – and Mr. Blackburn has failed to identify a single fact that supports such an allegation – the SAC's foundational allegation is now that Motown Records and/or UMG Recordings were in a "general business partnership" with Love Records, Inc. or Mr. Combs.

46.     Second, the FAC alleged that both Sir Lucian Grainge and Ms. Habtemariam were supposedly aware of the alleged sex trafficking by Combs because, in detailed paragraphs, the FAC purports to recount Plaintiff's supposed personal knowledge that he saw them at "listening parties" where there were underage girls and sex workers allegedly being given alcohol and drugs and being molested.  As set forth in detail in the accompanying declaration of Mr. Grainge, he was never at any of Mr. Combs' homes and Ms. Habtemariam was only there

for business meetings, there were never any alleged "sex trafficking" going on and she was only there before Plaintiff claims he began working for Mr. Combs in September 2022.

47.     These completely false allegations about the supposed presence of Mr. Grainge and Ms. Habtemariam at Combs' alleged "sex trafficking" parties are jettisoned in the SAC. Instead, the SAC admits that Motown Records was obligated to pay certain monies to or on behalf of Love Records pursuant to a license agreement (SAC ¶ 164). However, without the slightest factual basis (and without any legal foundation whatsoever), the SAC claims that the UMG Defendants, especially Sir Lucian Grainge, were supposedly obligated to oversee and control how Love Records, Inc. and/or Mr. Combs spent the money. And again, without the slightest factual or legal basis, the SAC claims that the monies paid to or on behalf of Love Records, Inc. were supposedly misused by Combs for illicit purposes and that the UMG Defendants were obligated to know that and prevent it.[7]

48.     Third, whereas the FAC alleged that the UMG Defendants supposedly aided and abetted Combs' alleged sex trafficking activities by handing over "cash" to Combs (even alleging it was millions of dollars of cash), these allegations too are now abandoned (and as noted above, the "aiding and abetting" claim has been withdrawn as against the UMG Defendants). Instead, despite admitting that Motown Records was obligated to make certain payments and reimbursements under the license agreement, the SAC alleges that the UMG Defendants should have known the monies that Motown Records to or on behalf of Love

---

[7] Even though the unauthorized SAC is clearly the handiwork of Mr. Blackburn, unlike the FAC, which made virtually no allegations on "information and belief," in the SAC, Mr. Blackburn plainly hoping to find a safe harbor that might spare him Rule 11 sanctions, litters "information and belief" allegations throughout the pleading and attributes the allegations to his client.

15

Records, Inc. supposedly would be misused by Combs to support the alleged "sex trafficking" activity.

49.     But where do these new and completely contrary foundational allegations come from? Certainly not from any investigation into the facts conducted by Mr. Blackburn. He has plainly done none. Instead, it appears that Mr. Blackburn contends that the SAC is based on the short declaration provided by Ms. Habtemariam in return for Mr. Blackburn's agreement to drop her from this case.

50.     But, as noted above, Ms. Habtemariam's declaration, attached to the SAC, says nothing about a "general business partnership" between UMG Recordings or Motown Records and Love Records, Inc. In fact, she says the exact opposite.

51.     As Ms. Habtemariam states in the declaration attached to the SAC, Motown Records entered into a **license agreement** with Love Records, Inc. to distribute an album. It did not enter into a "partnership" of any sort and most assuredly not a "general business partnership." And she says that under the license agreement, Motown Records paid for invoiced recording costs and expenses.

52.     And because a redacted version of the license agreement was attached to the declaration of Martha Braithwaite (who negotiated and executed the license agreement on behalf of Motown Records) in support of the UMG Defendants' motion to dismiss the FAC (filed on March 27, 2024), by the time Mr. Blackburn filed the SAC (on April 12, 2024) he already knew for certain that there was no "general business partnership." Paragraph 16.11 of the license agreement specifically provided the business relationship between Motown Records and Love Records, Inc. was as independent contractors, not partners or joint venturers.

53.     So what did Mr. Blackburn do with the information provided to him by Ms. Habtemariam and the license agreement? He ignored it because he needed to fabricate a supposed basis on which he could try to connect the UMG Defendants to the supposed wrongful acts of the Combs' defendants. Hence, the non-existent "general business partnership." Of course, even if it existed – and it does not – it would still not provide any basis for the RICO and "sex trafficking" claims against the UMG Defendants.

54.     And instead of the "cash" allegations in the FAC, the SAC invented the assertion that Mr. Combs misused the completely legitimate payments due under the license agreement for his alleged sex trafficking activity (ignoring that money is fungible and that Combs is a very rich man – according to Forbes, in 2022 his net worth exceeded $1 billion). As pleaded in the SAC, the UMG Defendants not only were inexplicably required to monitor and control how Combs spent his money, they were somehow required to trace the alleged use of money by Combs, distinguishing all expenditures between Combs' own monies and the payments required to be made by Motown Records under the license agreement.

55.     Not only is there no factual basis for these allegations, there is no such obligation on the UMG Defendants as a matter of law.

56.     The SAC also alleges, and Mr. Blackburn claimed at the hearing on April 9, 2024 (Tr. pp. 8-9), that Motown Records did not administer any budgets or pay any vendors but instead simply handed over money to Mr. Combs to be used as he chose.[8] The SAC also alleges, and Mr. Blackburn claimed at the April 9, 2024 hearing (Tr. pp. 14-16) that there were no recordings made prior to Plaintiff's arrival on the scene in September 2022 and therefore, the

---

[8] As shown in the accompanying Memorandum of Law, even if this were true – and it is not – it would not provide Plaintiff with any claim against the UMG Defendants.

17

$1.3 million paid to reimburse Love Records, Inc. for recordings made prior to the license agreement (May 4, 2022) was, in Mr. Blackburn's words, a "ruse."

57.     It is by now perfectly clear that Mr. Blackburn makes statements on subjects about which he has no knowledge because he apparently does not care if what he is saying is true or false. As stated in the declaration of Ms. Habtemariam and as shown in the accompanying declaration of Martha Braithwaite (and illustrated by its attached Exhibit B), contrary to what Mr. Blackburn represented to this Court on April 9, 2024, not only were there tracks recorded by Love Records, Inc. before the license agreement was executed, at least one of those tracks, 'Gotta Move On," was released as a single by Motown Records in June or July of 2022, and Motown Records marketed and promoted that single recording at considerable expense (paid to third party vendors, not to Love Records, Inc.). And this track, "Gotta Move On," was included on the expanded version of the album (released by Love Records, Inc. after Motown Records and Love Records, Inc. terminated the license agreement).

58.     And with respect to the recording costs incurred after Plaintiff claims he commenced working for Mr. Combs in September 2022, as illustrated by Exhibit C to Ms. Braithwaite's declaration, Motown Records did not simply pay Love Records, Inc. but in its administration of the payment of recording costs, Motown Records paid third party vendors directly. So these (and other third party vendor payments) could not have been "misused" by Mr. Combs for alleged "sex trafficking" as the payments were not made to him.

59.     In short, not only is the entire foundational theory of the SAC false – the "general business partnership" – but the accusations that the UMG Defendants simply showered monies on Mr. Combs and that the license agreement was a "ruse" are completely and offensively false.

18

60.     Again, just as Mr. Blackburn was willing to flat out misrepresent to this Court whether and when he supposedly undertook to serve the Combs defendants in this case, so too are all of the foundational allegations in the SAC completely false.  Mr. Blackburn is content to simply make things up as he goes along and if they are shown to be false, he is perfectly willing to substitute new and equally false allegations.

### H. The SAC Was Filed In Violation Of Plaintiff's And Mr. Blackburn's Obligations Under FRCP Rule 11

61.     As this Court knows, when the FAC was filed, I wrote to Mr. Blackburn to put him on notice that the allegations he had made against the UMG Defendants were completely false and demanded that he withdraw all of the claims against my clients.  A copy of my letter to him dated March 4, 2024 is attached hereto as Exhibit 8.   While he has abandoned many of the completely false allegations of the FAC, he has not dismissed all of the claims against the UMG Defendants.  Instead, as discussed above and in the accompanying declarations, he invented new completely false allegations and included them in the SAC.

62.     The allegations made against my clients – particularly Sir Lucian Grainge – remain offensively false, conclusory and lacking in any factual support or legal basis.  But for the litigation privilege in this State, falsely accusing individuals and companies of engaging in criminal behavior would be libelous per se.

63.     We have provided Plaintiff and Mr. Blackburn with clear and unequivocal notice that just as the FAC failed to comply with Rule 11, so too does the SAC.  We will be serving and, in due course, filing, an updated motion with this Court for Rule 11 sanctions against Plaintiff and Mr. Blackburn.  But our first and primary goal is to secure the speedy dismissal of the SAC with prejudice.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  April **24**, 2024

_____
Donald S. Zakarin

# EXHIBIT 5



**EISNER**, LLP

March 26, 2024

**VIA EMAIL ONLY**

Tyrone Blackburn, Esq.
T.A. Blackburn Law, PLLC
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
E-Mail: tblackburn@tablackburnlaw.com

### RE:   RODNEY JONES V. SEAN COMBS, ET AL. – SDNY NO. 24 CIV. 1457
### CEASE AND DESIST ISSUED BY ETHIOPIA HABTEMARIAM

Dear Mr. Blackburn:

As you are aware, this Firm is legal counsel to Ethiopia Habtemariam ("Ethiopia"). Reference is made to the lawsuit captioned *Rodney Jones v. Sean Combs et al.*, No. 24 Civ. 1457 (S.D.N.Y.) (the "Action") initiated by your client Rodney Jones ("Jones") on February 26, 2024. When the Action was first filed, you improperly named Ethiopia as a defendant, without any legitimate cause or factual basis.

As you know, on March 21, 2024, Jones and Ethiopia entered into a "Dismissal Agreement" whereby Ethiopia agreed to provide a declaration concerning her complete lack of involvement in the claims or issues raised by the Action (the "Declaration"). In connection with the foregoing, as it was clear Ethiopia had no knowledge related to the claims in the lawsuit, Jones agreed to dismiss her from the Action with prejudice.

The Declaration, which is less than two pages, summarizes Ethiopia's employment history with Universal Music Publishing Group ("UMG") and Motown Records ("Motown"). The Declaration notes Motown's license agreement with Love Records, Inc. ("Love Records"), relating to rights to distribute *The Love Album*, and goes on to confirm Ethiopia has no knowledge supporting Jones's claims that (i) Motown or UMG sponsored listening parties or writers camps, or (ii) Motown or UMG made cash payments to Sean Combs ("Combs") or Love Records.

The Declaration provides no other information relating to the Action, does not mention your client, and expressly disclaims any knowledge or information relating to your client's allegations. The Declaration explains to your client that Ethiopia has nothing to do with the claims and issues raised by the Action; it does not support your client's allegations in any way, shape, or form. In fact, it is clear from the Declaration that Ethiopia has no knowledge whatsoever that would be useful to support any of Jones's claims.

Nonetheless, you filed a fraudulent and misleading Second Amended Complaint, appending the Declaration, which completely mischaracterizes the Declaration. For example, the Second Amended Complaint alleges that the Declaration states that Motown and Love Records entered into a "general partnership" (¶ 11; *see also* ¶ 218)—you made this claim even *after our Firm informed you* that there was no partnership, *and after we rejected all of the language you had originally proposed* in any earlier draft of the Declaration related to this point.

Further, it appears that you and your client have touted Ethiopia's innocuous Declaration to the media and social media channels as somehow indicating Ethiopia will be "testifying against" Combs, or otherwise

433 North Camden Drive | 4th Floor | Beverly Hills, CA 90210
T 310.855.3200 | F 310.855.3201

www.eisnerlaw.com

152 West 57th Street | 48th Floor | New York, NY 10019
T 646.876.2600 | F 212.600.5020



Tyrone Blackburn, Esq.
March 26, 2024
Page 2 of 2

testifying on behalf of Jones. Indeed, it appears you and your client have gone as far as explicitly representing to the media, including outlets such as Sandra Rose and The Neighborhood Talk, that Ethiopia will "testify against" Combs, presumably in effort to garner additional media attention. To be clear, such representation is spurious and without any factual basis whatsoever. While Ethiopia will of course comply with her lawful obligations in responding to any subpoena, Ethiopia has never indicated, in the Declaration or otherwise, that she has any intention of providing testimony on behalf of Jones.

Accordingly, your and your client's misrepresentations about Ethiopia are completely untrue, and blatantly defamatory. We are surprised that you would be willing to take actions, designed to spread false information, and risk exposing both you and your client to liability. We expect that Judge Oetken will not appreciate your conduct either.

Accordingly, demand is hereby made that (i) you immediately cease and desist from making any further misrepresentations relating to Ethiopia, including any suggestion that she has agreed to testify against Combs or otherwise on Jones's behalf; and (ii) you contact any media outlets or other third parties to whom you misrepresented Ethiopia intends to testify against Combs and withdraw such representation.

The foregoing is not a waiver of any defenses, nor a complete expression of our clients' rights and remedies, all of which remain expressly reserved.

Very truly yours,

Ashlee Lin

433 North Camden Drive | 4th Floor | Beverly Hills, CA 90210
T 310.855.3200 | F 310.855.3201          www.eisnerlaw.com          152 West 57th Street | 48th Floor | New York, NY 10019
T 646.876.2600 | F 212.600.5020

# EXHIBIT 6

## Zakarin, Donald S.

| | |
|---|---|
| **From:** | Tyrone Blackburn <tblackburn@tablackburniaw.com> |
| **Sent:** | Monday, March 4, 2024 7:03 PM |
| **To:** | Zakarin, Donald S. |
| **Cc:** | Charron, William; Janowitz, James A. |
| **Subject:** | Re: Jones v. Combs et. al.  24 Civ. 1457 |

Mr. Zakarin,

Ethiopia did a public rollout on behalf of Motown, celebrating the creation of Love Records in May of 2022. She was also present at Love Record parties and the writer's camp. My client saw your clients at Mr. Combs' home and witnessed individuals bringing bags of cash to Mr. Combs' home. Mr. Combs attributed this cash to the labels (i.e., your clients).

I am open to having a conversation with you if you would like to discuss your letter or the claims that my client has raised in his pleading.

Regards,

Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC.
Phone: 347-342-7432
TABlackburnlaw.com

> On Mar 4, 2024, at 6:00 PM, Zakarin, Donald S. <DZakarin@pryorcashman.com> wrote:
>
> Mr. Blackburn:
>
> Attached please find our Rule 11 letter on behalf of our clients, Sir Lucian Grainge, Ethiopia Habtemariam, Universal Music Group and Motown Records regarding your Amended Complaint in the above action.
>
> *Donald S. Zakarin*
> Pryor Cashman, LLP
> 7 Times Square
> New York, NY 10036
> 212-326-0108 (P)
> 212-798-6306 (F)
> 347-820-0793 (C)
> dzakarin@pryorcashman.com

***CONFIDENTIALITY NOTICE***

This email contains confidential information which may also be legally privileged and which is intended only for the use of the recipient(s) named above. If you are not the intended recipient, you are hereby notified that forwarding or copying of this email, or the taking of any action in reliance on its contents, may be strictly prohibited. If you have received this email in error, please notify us immediately by reply email

and delete this message from your inbox.
<Ltr to Tyrone Blackburn RE Combs_UMG(8465776.3).pdf>

# EXHIBIT 7

## Zakarin, Donald S.

| | |
|---|---|
| **From:** | Zakarin, Donald S. |
| **Sent:** | Monday, March 4, 2024 7:32 PM |
| **To:** | Tyrone Blackburn |
| **Cc:** | Charron, William; Janowitz, James A. |
| **Subject:** | RE: Jones v. Combs et. al.  24 Civ. 1457 |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Mr. Blackburn:

Your client's assertions, which you seem to have taken at face value instead of doing the slightest investigation into the facts (or you yourself embellished and further falsified them), are completely false and your allegations in the Complaint regarding our clients are baseless. The notion of bags of cash being delivered to Combs by my clients is so preposterously false that it is inconceivable that any reputable lawyer would, without a very comprehensive investigation into such a nonsensical assertion, take the word of any client, let alone Mr. Jones, and include such allegations in a public pleading (and publicly disseminate such defamatory lies by sending the pleading to the press). As to "celebrating" the "creation" of Love Records, had you conducted the slightest inquiry, you would have known that while Motown initially and simply entered into a distribution deal for the Combs' album that Love Records was working on – and Love Records is an entity in which Universal and Motown had and have no interest – that distribution deal was terminated as of February 2023. Your client never saw Sir Lucian Grainge at Combs' house in LA or Miami or anywhere else because he was never there.

We have provided you with notice regarding the falsity of the allegations of your complaint. I strongly suggest you undertake to dismiss all claims and all of the offensively false allegations against our clients or we will proceed as I have already stated.

On behalf of my clients, I specifically reserve all of their rights and remedies.

*Donald S. Zakarin*
Pryor Cashman, LLP
7 Times Square
New York, NY 10036
212-326-0108 (P)
212-798-6306 (F)
347-820-0793 (C)
dzakarin@pryorcashman.com

**From:** Tyrone Blackburn <tblackburn@tablackburnlaw.com>
**Sent:** Monday, March 4, 2024 7:03 PM
**To:** Zakarin, Donald S. <DZakarin@pryorcashman.com>
**Cc:** Charron, William <WCharron@pryorcashman.com>; Janowitz, James A. <JJanowitz@pryorcashman.com>
**Subject:** Re: Jones v. Combs et. al. 24 Civ. 1457

Mr. Zakarin,

Ethiopia did a public rollout on behalf of Motown, celebrating the creation of Love Records in May of 2022. She was also present at Love Record parties and the writer's camp. My client saw your clients at Mr. Combs' home and witnessed individuals bringing bags of cash to Mr. Combs' home. Mr. Combs attributed this cash to the labels (i.e., your clients).

I am open to having a conversation with you if you would like to discuss your letter or the claims that my client has raised in his pleading.

Regards,

Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC.
Phone: 347-342-7432
TABlackburnlaw.com

> On Mar 4, 2024, at 6:00 PM, Zakarin, Donald S. <DZakarin@pryorcashman.com> wrote:
>
> Mr. Blackburn:
>
> Attached please find our Rule 11 letter on behalf of our clients, Sir Lucian Grainge, Ethiopia Habtemariam, Universal Music Group and Motown Records regarding your Amended Complaint in the above action.
>
> *Donald S. Zakarin*
> Pryor Cashman, LLP
> 7 Times Square
> New York, NY 10036
> 212-326-0108 (P)
> 212-798-6306 (F)
> 347-820-0793 (C)
> dzakarin@pryorcashman.com
>
> ---
>
> ***CONFIDENTIALITY NOTICE***
>
> This email contains confidential information which may also be legally privileged and which is intended only for the use of the recipient(s) named above. If you are not the intended recipient, you are hereby notified that forwarding or copying of this email, or the taking of any action in reliance on its contents, may be strictly prohibited. If you have received this email in error, please notify us immediately by reply email and delete this message from your inbox.
> <Ltr to Tyrone Blackburn RE Combs_UMG(8465776.3).pdf>

# EXHIBIT 8

# JONATHAN D. DAVIS, P.C.

ATTORNEYS AT LAW

1 ROCKEFELLER PLAZA
SUITE 1712
NEW YORK, NEW YORK 10020

TEL: (212) 687-5464
FAX: (212) 697-2521
WWW.JDDAVISPC.COM

March 4, 2024

**VIA EMAIL/PDF**

Tyrone A. Blackburn, Esq.
T.A. Blackburn Law
1242 East 80th Street, 3rd Floor
Brooklyn, New York 11236

Re: Fed R. Civ. P. 11 Warning Letter - *Jones v. Combs, et al.*, 24-cv-01457

Dear Mr. Blackburn:

As you are aware, my co-counsel, Shawn Holley and Bobbi C. Sternheim, and I are the attorneys for Sean Combs, Justin Combs, Love Records, and CE Opco, LLC d/b/a Combs Global in the above-referenced action.

Your recently filed revised or amended Complaint, dated March 2, 2024 (the "Complaint" or "Compl."), on behalf of Rodney Jones, is false, defamatory, and recklessly damaging to our clients. If you do not immediately withdraw it, we will move against you and your client under Fed. R. Civ. P. 11 for sanctions, including attorney's fees, at the appropriate time. You have already caused – and will continue to cause – irreparable harm, including financial, reputational, and emotional damages, to our clients by reason of your frivolous claims.

Had you made even the slightest effort to investigate the facts underlying Mr. Jones's alleged claims, you would have quickly recognized that they were fabricated and built upon lies and improbable scenarios. Instead, unable to force Mr. Combs's hand to settle your client's baseless claims, you elected to victimize Mr. Combs, his sons, employees, and former business relationships by suing them as a tactic to induce Mr. Combs to pay Mr. Jones undeserved monies to prevent your filing of egregiously fake claims.

If you seriously considered the source of the allegations in the Complaint, namely, Mr. Jones, someone with a criminal history, including a conviction for reckless homicide and sexual assault, and a restraining order obtained by an ex-girlfriend, then you would have embraced our repeated overtures to educate you about his connection to Mr. Combs and to avoid the legal and ethical lapses that now overwhelm you.

Instead, you continue to engage in a campaign of avoidance and provocation. Your brazen behavior towards Ms. Holley is inexplicable. Your emails and Instagram posts, including charges

Tyrone A. Blackburn, Esq.
March 4, 2024
Page 2

that she attended one of Mr. Combs's house parties (a client she just met and began representing), that her representation of Mr. Combs will lead to his incarceration at Riker's Island or elsewhere, and the emojis of water drips (representing your strategy to harass and taunt both parties and lawyers with old texts and videos), is beyond any standard of reasonable or appropriate conduct of a lawyer. Your baseless charge this weekend that Mr. Combs is bribing witnesses and that you will contact law enforcement is outrageous and reckless. All of your conduct violates the New York Rules of Professional Conduct ("RPC"), is manifestly undignified, and contravenes the standards of practice in the Southern District of New York.

## A.    **Your Multiple Rule 11 Violations**

Under Rule 11, every attorney who files a pleading or other paper "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that, among other things:

> (1) "it is not being presented for any improper purpose;"
>
> (2) "the claims … and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;" and
>
> (3) "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

You have violated each of these requirements. First, the Complaint was filed for the "improper purpose" of forcing Mr. Combs to pay your client tens of millions of dollars to prevent Mr. Jones from spreading scandalous lies. The Complaint contains vicious lies about alleged sexual and criminal conduct that never occurred. It also alleges harm that was never suffered by Mr. Jones – or anyone else for that matter – by acts or conduct committed by Mr. Combs, defendants, or anyone else mentioned in your pleading. Second, not a single fact supports any of your client's defamatory, salacious claims – let alone ones that can be established by extending, modifying, or reversing existing law or establishing new law. Third, none of the purported facts in the Complaint have any credible evidentiary support or can be supported after a reasonable opportunity to investigate or discover facts. In short, the Complaint is entirely made up and borders on extortion by an ex-felon.

Your misconduct is ample ground for a sanction under Rule 11. *See, e.g., Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 541 (2d Cir. 2023) (affirming award of attorney's fees under Rule 11 where complaint contained numerous allegations "that a reasonable attorney would know are inaccurate, irrelevant, or frivolous"); *Goldman v. Barrett*, No. 15-cv-9223 (PGG), 2019 WL 4572725, at *5 (S.D.N.Y. Sept. 20, 2019) (imposing monetary sanction under Rule 11 where

Tyrone A. Blackburn, Esq.
March 4, 2024
Page 3

counsel filed complaint "containing vague and implausible allegations which he had to have
known were based on no more than speculation" and "when confronted with evidence suggesting
that the claims were untrue … [he] refused to withdraw the claims"), *aff'd*, 825 F. App'x 35 (2d
Cir. 2020); *Abdelhamid v. Altria Grp., Inc.*, 515 F. Supp. 2d 384, 398 (S.D.N.Y. 2007) (imposing
dismissal of complaint as Rule 11 sanction where evidence "directly contradicted" many
allegations and counsel was put on notice).

## B.    Your "Bury the Head in the Sand" Legal Strategy

As demonstrated below, from Thursday, February 22, until Monday, February 26 at 3:38
p.m., I repeatedly attempted to address with you the falsity of the accusations in your demand
letter, dated February 21, 2024 (the "Demand Letter"), which was sent on the morning of February
22. Without speaking to me, you filed the Complaint well before 5 p.m. on February 26. I was
alerted to the filing only after I received an email from NBC Network News seeking comment on
a myriad of questions stemming from your filing, which contained "[a]llegations [that] included
violation of RICO, sexual assault, sexual harassment, negligent infliction of emotional distress,
violation of the Trafficking Victims' Protection Act, obstruction and enforcement of the
Trafficking Victims' Protection Act." [Email from Diana Diasrath to Jonathan D. Davis, dated
February 26, 2024, at 4:22 p.m.][1] When I ultimately obtained a copy of the Complaint that evening,
I learned that you repeated, almost verbatim, the false and scandalous allegations in the Demand
Letter.

Following my receipt of the Demand Letter, I promptly emailed and telephoned you to
discuss the content of your letter. But you did not respond. On Friday afternoon, February 23, you
finally acknowledged, via email, my previous day's communications, but you failed to talk to me
as I had requested. The substance of your email was that Mr. Jones "is not waiting beyond
Monday" to file his complaint, but that you and I "will be in touch over the weekend" with the
"hope to have an answer by Sunday" regarding settlement. On Saturday morning, you emailed,
stating, among other things, that you would send me "a draft of Mr. Jones's complaint by …
tomorrow … [adding that] [y]ou will receive 2; one will be a thin complaint to be filed on Monday,
and the second will be the amendment that will be filed on Wednesday [February 28]."

I emailed you Saturday afternoon, inquiring when you could speak on Sunday to "discuss
the contents of your email … [so that I could] set the record straight." Having not heard from you,
I again emailed you on Sunday, at 11:20 a.m., inquiring when we could speak, but I never heard
back from you. On Monday, February 26, at 9:47 a.m., I again emailed you, at which time I
"encourage[d] you to call [Ms. Holley and me] because we don't want you to make an unforced
error here. If you commence any action without speaking to us, you are likely headed for an
outcome you could surely have avoided."

---

[1] In addition to the flagrant ethical violations detailed below, you transmitted to the media your defamation-riddled
Complaint *before* it was filed with the district court, vitiating any litigation privilege that might have applied and
exposing you and your client to liability for damages. *See Gottwald v. Sebert*, 40 N.Y.3d 240, 254 (2023).

Tyrone A. Blackburn, Esq.
March 4, 2024
Page 4

## C.   The Obvious Falsehoods in the Demand Letter and Complaint

Although you attempted to distort my February 26 email, the "unforced error" and "outcome" that I implicitly referred to and wanted to avoid was your filing of a demonstrably false pleading. If you had contacted me, I would have provided you with concrete, indisputable evidence that what you were about to prominently highlight in your pleading, which was already in the Demand Letter, were falsehoods and could not be corroborated by any credible evidence or testimony. Without commenting on each falsehood, I planned to apprise you, if we had spoken, of the following incontrovertible facts that disproved the bald-faced lies in your Complaint:

First, Mr. Combs and his son, Justin Combs, were never involved in the shooting of "Mr. G" on September 12, 2022, which you allege occurred inside a bathroom at Chalice Recording Studio, in Los Angeles. Compl. ¶¶ 31-55. These allegations are bald-faced lies. Neither of the Combs were near where you alleged the shooting occurred. Mr. G was shot outdoors several blocks from the recording studio. The shooters were a crew of thieves who robbed Mr. G at gun point and then shot him. Mr. Combs and his son were never suspects, never investigated, and never interviewed by the police. The individuals suspected of committing this crime and other robberies, Rudolph Flowers, Laron Bundley, and Taniqueka Harris, were arrested on November 17, 2023. Mr. Flowers is the suspected shooter. They are all awaiting trial.

Second, the Complaint alleges that "[o]n or about July 2, 2023," Mr. Combs held a "'listening party'" at his "home," which was attended by "J[ustin] Combs, sex workers, and some underage girls." *Id.* at ¶¶ 118-28. These allegations are bald-faced lies. Mr. Combs and his son never cavorted with or entertained "underaged girls" at any time for any immoral, illegal, or other purpose. The photographs imbedded in the Complaint are not photographs of any underage women or sex workers, but rather images of adult guests at that party. In particular, the photograph depicting Mr. Combs embracing a female is not an "underage girl," but, instead, his thirty-three year-old then-girlfriend, who is a mother of young children. *Id.* at ¶ 128. Likewise, the photograph depicting Justin Combs standing next to a female is not an "underage girl," but, instead, his girlfriend, who is thirty-two years old. *Id.* Furthermore, the Complaint's damning allegation that Mr. Combs's son, Christian Combs, "drugg[ed] and sexually assaulted a woman" at some unspecified time is a bald-faced lie. *Id.* at ¶ 30. If an action is pursued against Mr. Combs's son, then it will be defeated with lightning speed and result in legal and financial consequences to you and anyone else participating in its filing.

Third, the Complaint alleges in multiple paragraphs that Lucian Grainge, the Chairman and CEO of Universal Music Group ("UMG"), "sponsored and attended several Love Album listening parties at Mr. Combs' home in Los Angeles, California." *E.g.*, *id.* at ¶¶ 164, 219, 341. These allegations are bald-faced lies. Mr. Grainge has *never* visited any of Mr. Combs's residences and never attended a party that Mr. Combs held at any residence. Moreover, the business relationship between Love Records and Motown Records, one of UMG's divisions, was severed on February 1, 2023, which was five months before the date of the "listening party" alleged in the Complaint and eight months before the release of "The Love Album: Off the Grid" ("Love Album"). And, finally, Ethiopia Habemariam, the former head of Motown Records, stepped down as CEO of the

Tyrone A. Blackburn, Esq.
March 4, 2024
Page 5

label on or about November 29, 2022, which means that she left the label more than nine months before the alleged listening party.

Fourth, the Complaint alleges that Mr. Combs "share[d] a video of who he claims was Stevie J anally penetrating a Caucasian male without a condom … to ease Mr. Jones' anxiety concerning homosexuality." *Id.* at ¶ 91. Not only is that allegation a bald-face lie and disputed by Mr. Combs, but it is also disputed by the person who is in the photograph, a black porn actor named "Knockout," who has publicly acknowledged the image is of him from a film from years ago. The now-demonstrated inaccuracy of your allegation cannot be remedied by the post-hoc insertion of Mr. Jones's "position that Mr. Combs provided him with the video and identified the individual in the video as Stevie J." *Id.* at ¶ 91 n.9.

Fifth, the Complaint alleges that "Mr. Jones resided at Mr. Combs['s] residence located in Los Angeles, California, New York City, and Miami, Florida … and [that he] spent several weeks on a yacht rented by Mr. Combs in the US Virgin Islands." *Id.* at ¶¶ 26, 177. These allegations are bald-faced lies. Mr. Jones never lived with Mr. Combs. During periods that Mr. Jones provided engineering services for the Love Album, he spent certain days at Mr. Combs's residences to work at his home recording studio in Los Angeles and Miami, along with many producers, musicians, and other technical staff that were needed to complete the album tracks. While there were late night work sessions, technical staff, like your client, stayed in the guest cottages at Mr. Combs's residence in Miami only, but never elsewhere. Mr. Combs does not own a residence in New York. And Mr. Jones never traveled to the U.S. Virgin Islands with or for Mr. Combs. There are multiple witnesses who can substantiate those facts, together with security video. Mr. Jones was no more than a third-party vendor who performed services for the Love Album, and he was neither Mr. Combs's confidante, nor his personal friend, nor anyone else's in the household.

Sixth, the Complaint alleges, among other things, that Kristina Khorram "openly order[ed] her assistants to keep Mr. Combs 'high' off gummies and pills;" … that all employees were "required … to walk around … with cocaine, GHB, ecstasy, marijuana gummies …, and Tuci (a pink drug that is a combination of ecstasy and cocaine) …;" that she "ordered sex workers, and prostitutes for Mr. Combs;" and that she was "instrumental in organizing and executing the RICO enterprise." *Id.* at ¶¶ 178-84. These and the other allegations about Ms. Khorram are bald-faced lies. He had little or nothing to do with her. Ms. Khorram is an executive who, among other professional functions, runs Mr. Combs's day-to-day *business* affairs and was never distracted by technical staff such as your client.

Seventh, the Complaint alleges that Mr. Jones performed work "under an implied work-for-hire agreement," that he was listed as a producer of "nine songs" on "[the] Love Album[']s final release," and that he was not paid "for his work." *Id.* at ¶¶ 24, 135, 139-41. Mr. Jones was paid approximately $60,000, including expenses, for all work performed on the Love Album. That sum was paid by TriStar Sports & Entertainment on behalf of Love Records. The Complaint falsely alleges that he was not "compensate[d] … for his work," and it also falsely alleges that he was a "producer" on nine songs. *Id.* He was hired as an engineer, and sometime session musician, and that is precisely what he was paid for doing. Only months after the Love Album was released did

Tyrone A. Blackburn, Esq.
March 4, 2024
Page 6

Mr. Jones contend for the first time that he was owed money and that he should be credited as a producer.

## D.    **Your Improper and Inaccurate February 26 Email**

Ms. Holley and I were never given the opportunity to share the above facts and information with you. You finally surfaced at 12:21 p.m. on the Monday you filed the initial Complaint, but only to declare disingenuously in your February 26 email that we were not being earnest with you in discussing the disputed claims, despite your not returning a single call that I made to you over four days. Furthermore, you gave us only a couple of days to mull over your astronomical settlement demands. You then stated that "[a]t 5 pm [that Monday], I will file a redacted version of the attached complaint …. THERE IS NOTHING YOU SAY OR DO TO STOP ME FROM FILING." You added, among other things, that, after filing the Complaint, "[we] will have until the end of the day tomorrow to resolve the case …. Failure to do so will result in an amended complaint being filed on Wednesday, with the addition of New York State, Florida State, and California State Civil RICO claims."

You ended your February 26 email stating that Mr. Jones's settlement demand was being increased by many millions of dollars, and even that newly increased demand would be further increased by many millions more on February 27. I emailed you a little over an hour later to make clear to you the following:

> We have made earnest attempts to contact you this past weekend and this morning. We have indisputable facts, including video and statements, which contradict what Rodney Jones has told you. Before you file a pleading (for which there is no looming statute of limitations) containing false information, you should be aware that independent witnesses, who are unrelated to Mr. Combs, have provided information that undermines and negates your client's allegations. Failure to communicate with us and to ignore this critical information places your client in legal jeopardy and yourself in ethical jeopardy. We are attempting to have a substantive conversation with you to alert you to facts that will prevent an unnecessary error. This is a professional courtesy, not a threat.

You never responded to my email either by telephone, email, or text. Having never heard from you, I again emailed you at 3:38 p.m. at which time I reiterated that we possessed evidence that your allegations were "provably false;" that you told us that we could not dissuade you from filing the Complaint (which I reminded you was "inconsistent with your ethical obligations to fully investigate facts before filing a federal complaint"); and that "if you insist[ed] on filing" the Complaint (despite being "on notice of its falsity"), then "you must nonetheless remove all personal information, including addresses and photographs," to protect those named in the action from unnecessary harm or injury.

Tyrone A. Blackburn, Esq.
March 4, 2024
Page 7

As before, you ignored my email and filed the Complaint without any redaction, except for the identity of two non-parties, whom you presumably revealed anyway, based on the chatter on social media, by the telling details you provided about those individuals. The Complaint you filed was not the "thin complaint" that you promised in your February 23 email. It was the "amended complaint" that you threatened (in your February 26 email) to file on February 27 (one which was unredacted with RICO allegations), if the case was not resolved sooner. You did not keep your word about the Complaint and you did not remove the home addresses and photographs of any of the individual defendants, placing them at risk of harassment and harm. Since the filing of the lawsuit, and today's amended filing, defendants have been pursued, threatened, and/or victimized by the public and media. None of this would have occurred if you had conducted a reasonable inquiry into the facts, not filed the pleading for an improper purpose, and complied with your ethical obligations.

## E.    **Your Violation of the Rules of Professional Conduct**

You have violated not only Rule 11 by filing a fraudulent complaint, but also many ethical rules under the RPC, including the Standards of Civility ("Standards"). Based on the content of the pleading, you violated RPC 3.1(a), 3.3(a)(1), 3.4(e), 4.4(a), and 8.4(c), respectively:

(1)    a lawyer cannot bring an action "unless there is a basis in law and fact for doing so that is not frivolous," and "[a] lawyer's conduct is 'frivolous' if" … he "knowingly asserts material factual statements that are false" or "the conduct … serves merely to harass or maliciously injure another;"

(2)    a lawyer cannot knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;"

(3)    a lawyer cannot use "means that have no substantial purpose other than to embarrass or harm a third person;"

(4)    a   lawyer   cannot   engage   in   "dishonesty"   and/or "misrepresentation;" and

(5)    a lawyer cannot "present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."

By filing the Complaint, and its amendment, you asserted claims that have no basis in fact or law, which are both dishonest and factual misrepresentations, and which have been knowingly filed with a court to maliciously injure defendants and to embarrass and harm third parties regarding sexual and criminal acts that never happened. All of this could have been avoided if you had returned my multiple emails and telephone calls to discuss your Demand Letter and draft

Tyrone A. Blackburn, Esq.
March 4, 2024
Page 8

complaint. I alerted you to what I wanted to discuss, but even so, you proceeded full steam ahead to file the Complaint with willful blindness to the truth. And, even this past weekend, you threatened to contact law enforcement based on made-up facts with the obvious intent to induce Mr. Combs to settle your client's false claims and to extract an undeserved settlement.

Finally, you have violated many of the Standards, including Section I.A, B, and C, respectively: "[l]awyers should act in a civil manner regardless of the ill feelings that their clients may have toward others;" "lawyers should avoid … disparaging personal remarks or acrimony toward other counsel, parties or witnesses;" and "[l]awyers should not engage in conduct intended primarily to harass or humiliate witnesses." Finally, Section IV provides that "[a] lawyer should promptly return telephone calls and electronic communications and answer correspondence reasonably requiring a response, as appropriate."

\* \* \* \*

Based on all the foregoing, your actions cannot be justified or ignored by us. They violate Rule 11 and many ethical rules and obligations. We urge you to immediately withdraw the amended Complaint or, at the very least, correct it to allege claims that are predicated on actual facts supporting a *bona fide* claim. If you fail to take corrective action, then we will promptly file a Rule 11 motion at the earliest possible opportunity, as well as pursue all other available remedies against you and your client.

Nothing omitted from this letter shall constitute a waiver of any of the defendants' rights, privileges, or defenses, all of which are hereby expressly and fully reserved.

Very truly yours,

*/s/ Jonathan D. Davis*

Jonathan D. Davis

JDD:hs

cc:  Shawn Holley, Esq.
     Bobbi C. Sternheim, Esq.

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :      23cv10881(DLC)
ALEKSANDAR ZUNZUROVSKI,                 :
                                       :      OPINION AND ORDER
                          Plaintiff,    :
            -v-                         :
                                       :
LIANE FISHER, et al.,                   :
                                       :
                          Defendants.   :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiff:
Tyrone A. Blackburn
T.A. Blackburn Law
1242 East 80th St
Brooklyn NY 11236

For defendant:
Lisa Lynn Shrewsberry
Traub Lieberman Straus & Shrewsbury LLP
Seven Skyline Drive
Hawthorne, NY 10532

DENISE COTE, District Judge:

Attorney Tyrone A. Blackburn filed this action, asserting

that jurisdiction exists pursuant to 28 U.S.C. § 1332. He did

so without conducting a reasonable inquiry to support that

assertion. Because this filing appears to be part of a pattern,

he will be referred to this Court's Grievance Committee.

**Background**

Plaintiff filed this legal malpractice action on December 14, 2023, against defendant-attorneys Liane Fisher and Michael J. Taubenfeld, and their law firm Fisher Taubenfeld, LLP. He did so after being advised by defense counsel that complete diversity of citizenship did not exist because the plaintiff and defendant Fisher are both domiciled in New Jersey.

On February 9, defense counsel requested an immediate conference to discuss, inter alia, adverse counsel's abusive tactics and the lack of subject matter jurisdiction.[1] Defense counsel submitted the December 15 email she had sent to Blackburn repeating her representation to him that defendant Fischer is domiciled in New Jersey. In response, Blackburn filed a notice of voluntary dismissal as to defendant Fisher on February 9 and objected to the request for an immediate conference. Blackburn explained that he had voluntarily dismissed the action as to Fisher even though defense counsel had not produced evidence of Fisher's residence. The dismissal of Fisher did not solve the question regarding jurisdiction, however, since defendant Fisher Taubenfeld, LLP, takes the citizenship of its partners. See, e.g., Platinum-Montaur Life

---

[1] The initial conference, scheduled for February 16, had been adjourned at Blackburn's request to March 5.

2

Sciences, LLC v. Navidea Biopharmaceuticals, Inc., 943 F.3d 613, 615 (2d. Cir. 2019).

An Order of February 15 directed plaintiff's counsel to show cause why Rule 11 sanctions should not be imposed for his failure to conduct a reasonable inquiry into the defendants' citizenship prior to filing the complaint in this action. The Order also listed by docket number five other actions Blackburn had filed in this district that had been dismissed for lack of jurisdiction or transferred or dismissed for lack of venue. In a letter of February 16, Blackburn asserted that he had researched the addresses for the defendants in the instant action by using a "Lexis Nexis people search," which showed Fisher's residence is 225 Broadway. He added that a search of the records of the New York Department of State Division of Corporations showed that Fisher Taubenfeld LLP is a New York limited liability partnership.

At a conference held on March 5, Blackburn consented to dismissing the action without prejudice. Blackburn explained that he believed that defendant Fisher resided in New York because his client had told him so and because a LexisNexis search indicated that Suite 750 at 225 Broadway was her current residence. He accepted that what he had done was not an adequate search for the residence of defendant Fisher or the residence of each of the partners of the defendant law firm. He

3

was not prepared to address each of the five cases listed in the
February 15 Order.  Blackburn was directed to file by March 19:
1) an affidavit from the plaintiff regarding their discussion of
Fisher's residence, and 2) an explanation of his basis for
asserting he had complied with Rule 11 in the five cases listed
in the February 15 Order.

Blackburn's submission on March 19 ("March 19 Letter")
included his client's declaration.  The plaintiff represents
that he had told Blackburn that defendant Fisher had "shared
with me that she lived 'in the city.'"  Blackburn also presented
a description of the five cases which he had filed in this
district but which had been dismissed due to a lack of
jurisdiction or a change of venue.

## Discussion

Blackburn has, as he admits, failed to meet his Rule 11
obligations in this case. It appears that this is part of a
pattern.  The Court declines to impose sanctions pursuant to
Rule 11 or its inherent power but will refer him to this Court's
Grievance Committee.  There is a basis to believe that Blackburn
is filing cases in this district without diligently
investigating the existence of either jurisdiction or venue, as
required by Rule 11.

4

Fed. R. Civ. P. 11(b) provides that by presenting a
pleading, written motion, or other paper to the Court, an
attorney certifies that to the best of his or her knowledge,
information, and belief, formed after an inquiry reasonable
under the circumstances, it is not being presented for any
improper purpose, such as to harass; that the claims and other
legal contentions are warranted by existing law; and that the
factual contentions have evidentiary support.  Rule 11
"explicitly and unambiguously imposes an affirmative duty on
each attorney to conduct a reasonable inquiry into the viability
of a pleading before it is signed."  Gutierrez v. Fox, 141 F.3d
425, 427 (2d Cir. 1998) (citation omitted).  If an attorney
alleges jurisdiction "when reasonable inquiry would show that it
did not exist, he may be held liable for sanctions substantial
in amount."  Id. at 427.  As this Court advised Blackburn, it
"may enforce Rule 11 even after the plaintiff has filed a notice
of dismissal under Rule 41(a)(1)."  Cooter & Gell v. Hartmarx
Corp., 496 U.S. 384, 395 (1990).

Blackburn was advised by defense counsel before he filed
this action that diversity jurisdiction did not exist because
defendant Fisher lives in New Jersey, as does the plaintiff.
Blackburn had not done a reasonable investigation to satisfy his
Rule 11 obligation to confirm the existence of diversity

jurisdiction before that conversation, but he abjectly failed to do so after that warning.

Blackburn asserts he relied on two sources of information in deciding that Fisher is domiciled in New York: his client and a LexisNexis search. He asserts that his client told him that Fisher lived in "New York"; the plaintiff asserts that he told Blackburn that Fisher lived in the "city." Neither Blackburn nor his client have described a basis from which Blackburn could reasonably rely on his client to know Fisher's domicile for purposes of establishing diversity jurisdiction. Blackburn's reliance on the LexisNexis search was no more reliable. It listed Suite 1700 at 225 Broadway. 225 Broadway is an office building; indeed, it is the business address of Fisher Taubenfeld LLP, as shown on the firm's website.

Even after conceding that Fisher must be dismissed from this lawsuit because her domicile in New Jersey destroyed diversity jurisdiction, Blackburn sought to pursue this case against her law firm and her law partner. But, as a partnership, Fisher's domicile in New Jersey meant there was still no diversity jurisdiction for this lawsuit.

This failure to conduct the investigation required by Rule 11 appears to be a pattern. In the February 15 Order and at the March 5 conference, this Court advised Blackburn that it had identified five cases -- discussed below -- that he had filed in

6

this district that were dismissed for lack of jurisdiction or because of a change of venue. An Order of March 5 directed Blackburn to file a letter regarding his compliance with the requirements of Rule 11 in those cases. Blackburn's March 19 letter response to the March 5 Order does not dispel this Court's concerns.

1. Jones v. Fox Rothschild LLP (19cv11573)

The Jones v. Fox Rothschild LLP action was transferred to the District of New Jersey in May of 2020, about five months after Blackburn filed it in December of 2019 in this district. The defendants were a limited liability partnership organized under the laws of Pennsylvania with offices in New York and New Jersey, and an attorney at that firm. The plaintiff had worked in the firm's New Jersey offices and represented that she lived in California when the action was filed. The Honorable Alvin Hellerstein, in the order transferring the case, noted that the case "includes serious allegations of sexual harassment (in New Jersey), attempted rape (in New Jersey), and potential failures of the staff of an office (located in New Jersey)," and that the complaint was "bereft of meaningful reference to New York." The only allegations relating to New York were that the attorney-defendant had sent some of the allegedly improper text messages to the plaintiff while working out of the firm's New York office. In opposing the motion to transfer, the plaintiff had

7

attempted to salvage venue by filing an affidavit containing
allegations that Judge Hellerstein found "hard to credit."
19cv11573 (ECF No. 36 at 3, n.1).

In his March 19 Letter, Blackburn refers to Fox
Rothschild's "domicile" as being Pennsylvania, presumably
because the firm is organized under Pennsylvania law and based
in Philadelphia.  This phrasing suggests that Blackburn
continues to misunderstand that unlike a corporation, the
citizenship of a partnership is determined by the citizenship of
each of its partners.  The March 19 Letter also fails to
acknowledge that the lawsuit lacked any meaningful connection to
New York.  Blackburn appears to take solace from the fact that
Judge Hellerstein did not sanction him for filing an action
without proper venue in this district.

2. Weingarten v. CBS et al (20cv2598)

As in Jones, in Weingarten v. CBS, the events alleged in
the complaint occurred outside of New York.  Blackburn filed the
Weingarten action in March of 2020.  Defense counsel had advised
plaintiff's counsel to withdraw the case and re-file it in the
Western District of Pennsylvania, where the events had occurred;
plaintiff had refused to do so.  The defendants then moved to
dismiss.  CBS's motion to dismiss quoted Judge Hellerstein's
language from Jones and noted that "[p]laintiff's counsel has
recently encountered this same issue."  20cv2598 (ECF No. 28 at

8

8).  On January 13, 2021, the parties agreed to dismiss the
action in its entirety with prejudice.

In his March 19 Letter, Blackburn states that his
involvement in Weingarten was limited to filing a pro hac vice
motion for an out-of-state attorney, and that he "did not sign
the complaint" or the motion papers.  But his electronic
signature does in fact appear on the initial complaint, the
amended complaint (which was filed after the pro hac motion was
granted), and the memoranda in opposition to each defendant's
motion to dismiss.  20cv2598 (ECF No. 1 at 20; No. 23 at 19; No.
36 at 23; No. 44 at 19).  Even if he was not the only or even
the lead attorney on the case, Rule 11's requirements apply to
any attorney who "present[s] to the court a pleading, written
motion, or other paper -- whether by signing, filing,
submitting, or later advocating it."  Ipcon Collections LLC v.
Costco Wholesale Corp., 698 F.3d 58, 63 n.6) (quoting Fed. R.
Civ. P. 11(b)) (emphasis supplied).

3. von der Schmidt et al. v. Higgins et al. Actions --
   23cv3389 ("April von der Schmidt Action") and 23cv3919
   (May von der Schmidt Action")

The two von der Schmidt actions asserted subject matter
jurisdiction based on diversity of citizenship.  The April von
der Schmidt Action was filed on April 21, 2023, and dismissed by
the Honorable Jesse Furman for lack of subject-matter
jurisdiction on May 4, 2023.  As Judge Furman wrote, the

9

plaintiffs amended their complaint twice at the Court's
direction, "but still failed to allege the citizenship of every
party. Plaintiffs allege the residence of themselves and the
individual defendants . . . but, as the Court has repeatedly
admonished, allegations of residency alone are insufficient."
23cv3389 (ECF No. 9).

A mere six days later, the same plaintiffs, still
represented by Blackburn, filed the May von der Schmidt Action
against the same defendants. 23cv3919 (ECF No. 1). That action
was assigned to the Honorable Kevin P. Castel. In a November
30, 2023 Order, Judge Castel noted that Blackburn, "on behalf of
his clients, invokes the Court's diversity jurisdiction but in
doing so -- and despite the recent dismissal of an overlapping
claim against substantially the same defendants before Judge
Furman -- he fails to allege the citizenship, i.e. the domicile,
of his clients." 23cv3919 (ECF No. 38 at 2). Judge Castel
further noted that the complaint "artfully" disclosed the
residency and national citizenship of each plaintiff but not
their domicile. Id. There was also a failure to allege the
place of incorporation and principal place of business of the
corporate defendant.

Judge Castel thus ordered the plaintiffs to produce
supporting affidavits indicating when the change in domicile had

10

occurred,[2] the states in which plaintiffs filed their tax

returns, and the state of their voter registrations and drivers'

licenses.  In a December 3 letter, Blackburn indicated that the

plaintiffs could not produce the required information and

therefore requested that the Court dismiss the case without

prejudice.  Judge Castel did so on December 18, with the caveat

that, "[i]n the event a new action is filed in this Court

raising factually related claims against any of the named

defendants, plaintiffs' counsel shall mark the civil cover sheet

of the new action as related to this action and request that it

be assigned" to Judge Castel.  23cv3919 (ECF No. 40).

     In his March 19 Letter to this Court, Blackburn blamed the

complaint's failure to properly allege diversity jurisdiction in

the von der Schmidt Actions on the allegedly erratic behavior by

one of the plaintiffs in that case.  He adds that he had sought

to withdraw as counsel for the plaintiff in the May von der

Schmidt Action.

     4. Emanuel v. Harron et al (23cv4211)

     Meanwhile, Blackburn filed the Harron case on May 21, 2023

-- 17 days after Judge Furman's "repeated[] admonish[ments]"

about the failure to properly allege citizenship in an action

---

[2] The November 30, 2023 Order indicated that the plaintiffs had
recently alleged their domicile as New York, but were now
alleging it was California.

11

based on diversity. 23cv3389 (ECF No. 9). The Harron
complaint, brought on behalf of a New York plaintiff, asserted
the existence of diversity jurisdiction on the basis of the
individual defendant's alleged domicile in New Jersey. Roughly
four months later, on September 25, Blackburn requested that the
Honorable John Cronan, to whom the case had been assigned,
dismiss the case without prejudice because of a lack of complete
diversity.

In the interim, Blackburn had been pursuing entry of a
default judgment against the defendants. On September 19,
however, an attorney for the defendants advised the Court that
the individual defendant was a long-time resident of New York
who is registered to vote in New York and has a New York
driver's license. Defense counsel added that the location where
service on the defendant was attempted was a virtual office in
New Jersey. Defense counsel sought to file a motion to dismiss
on multiple grounds, including lack of subject matter
jurisdiction, and to file a motion to strike scandalous and
irrelevant allegations attributing racism to the defendants.

In his September 25 letter to Judge Cronan requesting
dismissal of the action, Blackburn explained that his client
"knew" Harron's domicile to be 35 Journal Square, 4th floor,
#4006, in Jersey City. That address is an office building. A
simple Google search confirms as much -- as does the Proof of

12

Service filed by Blackburn as an exhibit to his motion for
default judgment.

Blackburn claims in his March 19 Letter to this Court that
the address "was corroborated by a skip trace search conducted
by my process serving company". He adds that he had "several"
telephone conversations with the defendant in which she
confirmed to him that she resided at the Journal Square address.
Blackburn asserts that the Harron case was the only case of the
five listed in the February 15 Order in which he erred regarding
an individual defendant's domicile.

5. The Instant Action

Just 11 days after filing the December 3, 2023 letter
admitting he could not establish diversity in the May von der
Schmidt Action, Blackburn filed the complaint in this case. As
Blackburn has admitted, he failed to comply with his Rule 11
obligations in doing so. Blackburn argues, however, that
neither he nor his client gained anything by filing this case in
federal instead of state court. The record in this case, and
the history of his other cases in this District, contradict that
claim.

At the March 5 conference, defense counsel reported that
Blackburn had told her he filed this case in federal court
because doing so would make the press more likely to pick up on
it. A reasonable inference from Blackburn's pattern of behavior

13

is that he improperly files cases in federal court to garner media attention, embarrass defendants with salacious allegations, and pressure defendants to settle quickly. Indeed, his submissions to this Court have been rife with disturbing allegations against the defendants and defense counsel. Blackburn has called defense counsel in this action a "disgusting racist" for rejecting his preferred mediators. In response to this Court's Order requiring plaintiff to submit an affidavit "regarding the representation made by the plaintiff to counsel regarding Fisher's residence," Blackburn filed a wholly inappropriate 53-paragraph affidavit containing multiple irrelevant and scandalous accusations against Fisher.

Regardless of Blackburn's intentions, his actions in this and prior cases indicate a repeated failure to meet his Rule 11 obligations. Cf. Storey v. Cello Holdings, LLC, 347 F.3d 370, 387 (2d Cir. 2003) ("[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness, and is not based on the subjective beliefs of the person making the statement." (citation omitted)). Significant resources have been spent by judges of the Court and defendants named in actions he has filed to address glaring deficiencies in his filings. A referral to this Court's Grievance Committee is warranted.

## Conclusion

Tyrone A. Blackburn is referred to the Grievance Committee
of this district for such action as it deems appropriate.

Dated:    New York, New York
          April 3, 2024

                                    DENISE COTE
                            United States District Judge

15