# EXHIBIT # 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODNEY JONES,<br><br>                     Plaintiff,<br><br>     v.<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>CHALICE RECORDING STUDIOS,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10; and<br>ABC CORPORATIONS 1-10,<br><br>                     Defendants. | CASE NO.: 24-1457<br><br>**DECLARATION OF MARTHA BRAITHWAITE IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT BY DEFENDANTS UNIVERSAL MUSIC GROUP, MOTOWN RECORDS, AND SIR LUCIAN GRAINGE** |

I, Martha Braithwaite, declare as follows:

    1.    During the time period applicable to the claims in this action, I was the Executive Vice President, Business Affairs for the Capitol Music Group, which is affiliated with UMG Recordings, Inc. ("UMG Recordings" incorrectly sued herein as "Universal Music Group"). As set forth in the accompanying declaration of Sir Lucian Grainge, UMG Recordings' Chairman and Chief Executive Officer, UMG Recordings is incorporated in the State of Delaware, with its principal operating offices in Santa Monica, California. UMG Recordings is the principal legal entity for all recorded music operations in the United States for the global music and entertainment company colloquially known as "Universal Music Group." I have personal knowledge of the facts set forth in this Declaration and if called and sworn as a witness, I could and would competently testify thereto.

1

2. I am advised that in the First Amended Complaint ("FAC"), the Plaintiff in this action claimed that Motown Records was the "parent company" of Love Records, Inc.  This assertion was baseless and I understand it has now been abandoned by the Plaintiff and his counsel in the Second Amended Complaint ("SAC").

3. Instead, I understand that Plaintiff and his counsel, Mr. Blackburn, have substituted an equally false allegation in the SAC: that Motown Records and/or UMG Recordings is or was in a "general business partnership" with Love Records, Inc. and/or Mr. Combs.  During the relevant timeframe, I was the executive responsible for handling all of the business and legal affairs for Motown Records.  Motown Records is not a separate legal entity, but a record label that is an unincorporated division of UMG Recordings.  Neither Motown Records nor any of UMG Recordings' subsidiaries or affiliates are, nor were they ever, in a "general business partnership" (or any other kind of a partnership) with Love Records, Inc., Mr. Combs or any of his business entities.

4. To my knowledge, Love Records, Inc. is a company associated with Sean Combs (and I believe owned by him, directly or indirectly).  I know this because, during the period starting in or around February 2022 through the beginning of May, 2022, I negotiated and executed an arm's length license agreement, for a limited term, on behalf of Motown Records with Love Records, Inc., which was dated May 4, 2022.  Love Records, Inc. was represented by Kenneth Meiselas, who I am aware has been Sean Combs' long-time transactional counsel.

5. I am aware that in the SAC, it is admitted (in various paragraphs, including paragraphs 13, 163 and 164), that Motown Records entered into a license agreement to distribute

a Love Records album. A redacted copy of that license agreement, which I am informed was provided to Mr. Blackburn by our counsel, is attached hereto as Exhibit A.[1]

      6.      Paragraph 16. 11 of the License Agreement specifically provides as follows:

> "You [Love Records] and Artist [Combs] are entering into this Agreement and are performing your obligations hereunder as Independent contractors. **Nothing herein contemplates or constitutes you or Artist as Motown's partners, joint venturers, agents or employees."**

      7.      As I said, Mr. Blackburn was provided a copy of this license agreement. I do not understand how, in the face of the plain language of this agreement, he can continue to allege that Motown Records and/or UMG Recordings had a "general business partnership" with Love Records, Inc. and/or Mr. Combs.

      8.      Because I negotiated the license agreement, I can also address what I understand is the assertion of Plaintiff and his counsel that no recordings were created by Love Records, Inc. until at least September 2022. This assertion is completely false.

      9.      To begin with, my negotiations with Mr. Meiselas only began after Ethiopia Habtemariam, who was then the Chairman and Chief Executive Officer of Motown Records, attended a listening session at Mr. Combs' studio to hear the recordings he had already recorded and intended to include on the album that became the subject of the license agreement. Ultimately, I am aware that Mr. Combs decided to record additional tracks beyond the ones he had already recorded.

---

[1] The reason I have redacted the license agreement is because most of its terms and conditions have nothing to do with this action. Rather, the main provisions that relate to this action are those that address the license, the advance/recording costs and the representations and warranties, all of which I have not redacted.

10. During my negotiations with Mr. Meiselas, he advised me that Mr. Combs and Love Records, Inc. had already spent several million dollars in recording and other costs on the album. As such, one part of my negotiations with Mr. Meiselas addressed his request for the reimbursement of the costs that Mr. Meiselas advised had already been incurred by Love Records, Inc. in recording tracks prior to our negotiations. Motown Records was not prepared to reimburse all of the costs that Mr. Meiselas advised had been incurred by Love Records, Inc. (particularly for a distribution deal of a limited duration and no copyright ownership of the recordings) and we ultimately agreed that Motown Records would reimburse the sum of $1.3 million. This reimbursement amount is specifically identified in Paragraph 7.02(a) of the license agreement.[2]

11. I am advised that Mr. Blackburn, without the slightest basis, alleges that Mr. Combs supposedly used the $1.3 million for sex workers. It appears this is premised on his completely incorrect assertion that, until Plaintiff showed up in September 2022, there had been no recordings made by Mr. Combs and no expenses were incurred. Based upon only a lack of knowledge and baseless conclusions, Mr, Blackburn and the SAC label the license agreement as a "ruse."

12. As I have said, Mr. Blackburn is completely incorrect. Not only did Ms. Habtemariam listen to tracks that had already been recorded by Mr. Combs before we entered into the license agreement, Motown Records also spent a great deal of money marketing and

---

[2] The requirement that these costs be documented is a standard provision of our agreements. However, because we have had many negotiations with Mr. Meiselas and his firm, we accepted his representation that the actual costs incurred were far greater than the $1.3 million. Moreover, since we ended up terminating the license agreement and did not distribute the album, there was no reason for us to do a full accounting of the costs both before and after the license agreement and we did not do one.

promoting one of the tracks already recorded by Mr. Combs, "Gotta Move On," which featured Bryson Tiller.  Motown released this single recording in or about June 2022 (prior to the termination of our license agreement), and I understand it was thereafter also included on the expanded version of the album that Mr. Combs ultimately completed and released (after the termination of the license agreement).  I am attaching hereto as Exhibit B, some invoices for expenses incurred and paid by Motown Records in connection with this recording **before September 2022**.  I do so in order to show that, contrary to what is asserted in the SAC and by Mr. Blackburn, there were tracks already recorded by Mr. Combs long before September 2022 (and it was for these already extant tracks that the $1.3 million was reimbursing Love Records, Inc. for some of its recording costs).

13. I understand that in the SAC and at a telephonic conference with the Court on April 9, 2022, Mr. Blackburn also claimed that Motown Records did not administer any recording budget as provided for in the paragraph 4 of the license agreement, suggesting instead that Motown Records simply gave money to Mr. Combs, which he then supposedly used to pay for sex workers instead of making recordings (apparently Mr. Blackburn bases this incorrect conclusion solely on Plaintiff's claim that Mr. Combs allegedly did not pay him).

14. Beyond the fact that money is fungible and there is no way that Mr. Blackburn can possibly know how Mr. Combs used any of the money, his assertion is also again incorrect.

15. First of all, paragraph 4.02(b) provided that Motown Records would administer the budget for the recordings and pay recording costs.  In fact, that is what Motown Records did. Attached hereto as Exhibit C are some illustrative invoices for recording costs that were submitted directly to Motown Records and paid by Motown Records.  Motown paid for studio time, engineers and producers.  It did not pay cash, and it did not pay sex workers.

5

16. I would also note that Paragraph 4.04(a) of the license agreement imposed on Love Records, Inc., not on Motown Records, the obligation to negotiate, draft and execute all producer agreements and the corresponding obligation to pay producers, unless Love Records, Inc. requested that Motown Records undertake the obligation of paying certain of the producers. As reflected in Exhibit, as part of the recording costs payable under the license agreement, Motown did directly pay some of the producers.

17. In short, contrary to every uninformed assertion that is made in the SAC and by Mr. Blackburn at the hearing on April 9, 2024, Motown Records reimbursed Love Records, Inc. for recording costs that Love Records, Inc. actually incurred before the license agreement was executed (and paid marketing and promotion costs associated with the release of such recordings), and it directly paid recording costs Love Records, Inc. incurred after the license agreement was executed. And also contrary to what the SAC and Mr. Blackburn have alleged, Motown Records did not pay, directly, indirectly, intentionally or unintentionally, any money to sex workers on behalf of Mr. Combs. The direct payments made by Motown Records to third-party vendors, such as producers, engineers, recording studios, videographers and insurance companies, were not paid to sex workers nor were they paid to Love Records, Inc. and were thus not available to be used by Mr. Combs for the supposedly improper purposes alleged in the SAC.

18. I also understand that the SAC claims that Motown Records, UMG Recordings and/or Lucian Grainge somehow profited by virtue of this license agreement. In fact, as I stated in my original declaration in support of the motion to dismiss the FAC, subsequent to executing the license agreement, Motown Records and Mr. Combs decided that Motown Records would not release and distribute the album that Mr. Combs had created. Accordingly, I negotiated and executed a separate document that terminated the license agreement, effective as of February 1,

2023, on behalf of Motown Records.  Under the termination agreement, Motown assigned back to Love Records, Inc., on a quitclaim basis, all of Motown Records rights as a licensee in the recordings.  The termination agreement ended any relationship between Love Records, Inc. and Mr. Combs on the one hand, and UMG Recordings on the other hand, and Mr. Combs' company, Love Records, Inc. released the album independently.

19. Because Motown Records did not distribute the album, it had no opportunity to recoup the recording costs (and marketing and promotional costs) it paid to or on behalf of Love Records, Inc. nor did it recoup the reimbursement of recording costs it paid to Love Records, Inc. under the license agreement.  Thus, far from profiting from the album, the license agreement was not profitable for Motown Records or UMG Recordings.

20. I understand that the claim in the FAC that Motown Records and/or UMG Recordings were responsible for the security at Chalice Recording Studio at which there was allegedly a shooting (and that the security provided was allegedly inadequate) has been abandoned (but that there remains some allegation about Motown Records, UMG Recordings and/or Lucian Grainge nevertheless somehow being responsible for security).  Whether it is asserted as a claim or an allegation, it is false.

21. I can confirm that neither Motown Records nor UMG Recordings were invoiced for and did not pay for security at Chalice Recording Studio.  Love Records, not Motown Records or UMG Recordings, was responsible for security at any Love Recordings' writers' camp or recording session at Chalice Recording Studio (or anywhere else for that matter). Motown Records did pay for studio time at Chalice Recording Studio, as well engineers and producers that worked there.  But it had no responsibility for nor did it pay for any security.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 18, 2024

_____
Martha Braithwaite