**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RODNEY JONES,<br><br>     Plaintiff,<br><br>  v.<br><br>SEAN COMBS,<br>JUSTIN DIOR COMBS,<br>CUBA GOODING, JR.,<br>LUCIAN CHARLES GRAINGE,<br>KRISTINA KHORRAM,<br>LOVE RECORDS,<br>MOTOWN RECORDS,<br>UNIVERSAL MUSIC GROUP,<br>COMBS GLOBAL ENTERPRISES,<br>JOHN and JANE DOES 1-10; and<br>ABC CORPORATIONS 1-10,<br><br>     Defendants. | CASE NO.:  24-1457<br><br><br><br>**REPLY DECLARATION OF DONALD S. ZAKARIN IN RESPONSE TO OPPOSING DECLARATION OF TYRONE BLACKBURN AND IN FURTHER SUPPORT OF MOTION OF DEFENDANTS UNIVERSAL MUSIC GROUP, MOTOWN RECORDS AND SIR LUCIAN GRAINGE FOR SANCTIONS PURSUANT TO 28 U.S.C. SECTION 1927 AND UNDER THE INHERENT POWER OF THIS COURT** |

I, Donald S. Zakarin, declare as follows:

1.  I am a member of Pryor Cashman, LLP, counsel for former Defendants Sir Lucian Grainge CBE, and Motown Records (a division of UMG Recordings, Inc.).  Plaintiff had also named Universal Music Group as a defendant but there is no such juridical entity.  Universal Music Group is an umbrella name commonly used to refer to all of the various companies and record labels that are encompassed within UMG Recordings, Inc.  I have personal knowledge of the facts set forth in this Declaration and if called and sworn as a witness, I could and would competently testify thereto.

2.  This reply declaration is submitted in further support of the motion of Sir Lucian Grainge, Motown Records and UMG Recordings, Inc. (collectively, "UMG") for sanctions against Mr. Blackburn pursuant to 28 U.S.C. § 1927 and against Mr. Blackburn and the Plaintiff

pursuant to the inherent power of this Court.  In particular, this declaration responds to the opposing declaration submitted by Mr. Blackburn.

3.       A declaration is not a meaningless document.  It is sworn to under penalty of perjury.  Especially on this sanctions motion, it is therefore critically important to examine the truth or falsity of the statements contained in Mr. Blackburn's declaration, particularly as it bears on the bad faith he has exhibited throughout this proceeding.  As I will show below, there are statements in Mr. Blackburn's declaration that are demonstrably false.  There are also statements that are purposefully incomplete and misleading.  Mr. Blackburn's declaration provides further evidence of the bad faith that supports the award of sanctions under 28 USC § 1927 and pursuant to the inherent power of this Court.

4.       As addressed in the accompanying Reply Memorandum of Law, the law does not support Mr. Blackburn's attempt to foreclose this motion by casting it as simply a thinly disguised Rule 11 motion, purportedly barred by Mr. Blackburn's belated dismissal of the claims against UMG on the eve of the expiration of the 21 day safe harbor.  Moreover, the facts also do not support his assertion.

5.       Yes, the relevant facts showing the improper conduct of Jones and Mr. Blackburn and their patent bad faith in making ever-shifting and completely unfounded accusations against UMG that supported UMG's two served Rule 11 motions are also relevant to this sanctions motion under 28 USC § 1927 and the inherent power of this Court.[1]  But the bases for this

---

[1] My initial declaration in support of this motion (ECF No. 54) included, as Exhibit A (*see* ECF Nos. 54-1 to 54-3), my declaration in support of UMG's motion for Rule 11 sanctions and Exhibits 1 to 4 thereto.  While all 9 of the exhibits to that Rule 11 declaration were served on Mr. Blackburn on April 26, 2024, apparently Exhibits 5 through 9 were inadvertently not filed with my initial declaration.  I am attaching them hereto as a single Exhibit G to this declaration.  In any event, Mr. Blackburn has had all of those exhibits since April 26 but the Court should also have them available.

motion extend beyond Rule 11.  The facts show that Mr. Blackburn's conduct in sequentially pursuing three iterations of a complaint, based on completely different foundational allegations, lacked any basis in fact or law as against UMG and were pursued in bad faith and improperly multiplied this proceeding unnecessarily and to the detriment of UMG.

6.      This is especially true with respect to Mr. Blackburn's insistence on pursuing the Second Amended Complaint ("SAC") after having been served with UMG's motion to dismiss the First Amended Complaint ("FAC") and UMG's first Rule 11 motion, which made clear that Jones's claims against UMG lacked any legal or factual basis.  The law is clear that, even if one may dodge a Rule 11 motion due to the 21 day "safe harbor," where a litigant knowingly advances bad faith allegations in the face of indisputable evidence of their falsity, vexatiously multiplying the proceedings unreasonably and improperly, that litigant is still liable to be sanctioned under 28 USC § 1927 and under the inherent power of this Court.  Here, Jones and Mr. Blackburn caused UMG to incur hundreds of thousands of dollars in legal fees that were unnecessary and UMG never should have been forced to incur those costs.

7.      Just as the original complaint, the FAC and the SAC consciously misused the litigation privilege to make scurrilously false accusations against Sir Lucian Grainge, Ethiopia Habtemariam, UMG Recordings, Inc. and Motown Records, so too does Mr. Blackburn's declaration in opposition to UMG's sanctions motion.  If the pursuit of three baseless complaints against UMG were not sufficient to show his bad faith, Mr. Blackburn's declaration confirms that he has acted throughout with the utmost bad faith, advancing allegations without the slightest basis in fact, pursuing his "say anything" approach to litigation.

8.      In his own declaration in support of Jones's motion to dismiss all claims against UMG, Mr. Blackburn admitted that all of the claims against UMG were legally baseless.  Yet,

3

his current declaration repeats virtually all of the same accusations, insists they were made in good faith, refers to supposed "conversations" he claims to have had with "third party witnesses" but refuses to name any of them or provide anything from any of them that supports a single allegation he has made in any of the complaints he drafted or that he now repeats in his declaration.

9.      And for good measure, Mr. Blackburn now adds me to the baseless accusations he feels free to level against anyone and everyone arrayed against him, accusations that are demonstrably untrue and which would be libelous but for the litigation privilege.  It is obvious, as Judge Cote noted, that Mr. Blackburn crafts his submissions to attract media attention, engaging in character assassination with complete disregard for whether anything he says is truthful.  This conduct and his offensively false accusations confirm his malice and bad faith and warrants sanctions.

10.      I would also note, at the outset, that Mr. Blackburn's belatedly filed opposition was filed without either our consent to the late filing or permission from this Court, again reflecting his disregard for the rules of this Court.  Were this an isolated matter, one might excuse it.  It is, unfortunately, part of a pattern of conduct showing that Mr. Blackburn has no regard for proper procedure and the obligations of counsel practicing in this Court and to that we do object.   Indeed, his Memorandum of Law violates this Court's page limits, without seeking or obtaining leave to do so.

11.      As already documented in UMG's motion for sanctions, and as I will further show, Mr. Blackburn's own declaration, with its unattributed and false accusations and references to supposed unidentified "third party witnesses," is of a piece with the falsity of the complaints Mr. Blackburn has filed.  He is unrepentant.  Unless this Court imposes some

sanction for his conduct, both monetary and disciplinary, there is no reason to believe that he will cease abusing the privilege of practicing law in this District.

**Mr. Blackburn's Declaration Misrepresents His Misrepresentations To This Court**

12.     Mr. Blackburn's declaration presents himself as if he and Jones were the innocent victims of my unethical behavior.  His rhetoric, however, has no connection to reality, just as his three complaints against UMG had no connection to reality.  A time-line of this matter, attached hereto as Exhibit A, documents the falsity of Mr. Blackburn's presentation, documents his bad faith and shows how his "say anything" approach to litigation has ignored the truth and the obligations of counsel practicing in this Court, resulting in the vexatious multiplication of the proceedings in this case, causing UMG to incur hundreds of thousands of dollars in unnecessary cost.

13.     As this Court already knows, when UMG presented Mr. Blackburn with evidence showing that the allegations in the original complaint and the FAC against UMG were legally and factually baseless – indeed, showing that they were completely untrue – instead of dismissing the claims, which is what he should have done, he simply swapped out one set of completely baseless allegations for another set of baseless allegations, indifferent to whether there was any truth to any of them, forcing UMG to spend in excess of two hundred thousand dollars on a motion to dismiss the SAC and preparing and serving a second Rule 11 motion (not counting the costs of this motion).

14.     Mr. Blackburn misuses this Court to self-promote through flamboyantly false allegations.  His conduct is the epitome of bad faith tactics.  But this is exactly how Mr. Blackburn misconceives law should be practiced.  His declaration in opposition to UMG's present motion adopts the very same improper approach of the three complaints he filed in this

5

action: it is filled with untruths, misrepresentations and naked allegations utterly unsupported by any facts whatsoever.  His complete indifference to evidence or truth is exemplified by his reference to allegations made in the press about Mr. Combs that have nothing to do with the dismissed claims against UMG or this sanctions motion.

15.     In demonstrating Mr. Blackburn's indifference to the truth, I start with Paragraph 97 of his declaration, Mr. Blackburn tries to explain away a false statement he made about service of process on the Combs' defendants in direct response to this Court's question at the April 9, 2024 telephonic conference.  First, Mr. Blackburn pretends that the Court only asked him about the date on which he sent a Rule 4 waiver to the Combs' defendants.  At the conference, Mr. Blackburn responded to the Court's question, specifically stating that he sent the waiver on March 13, 2024.  In fact, he did not send it until March 25, 2024.  He explains away this discrepancy by saying that he made a "slight error" in response to the Court's question.

16.     This "slight error" regarding the date on which he served Rule 4 waivers might be credible if it stood alone.  But it was not the only question on the topic of service of process that the Court asked of Mr. Blackburn.  The Court also asked Mr. Blackburn whether and when he had sent the complaint out for service by a process server.  Mr. Blackburn omits this from his declaration.  But in response to the Court's direct question, Mr. Blackburn specifically stated that he had sent the FAC to his process server five days after the false waiver date of March 13, 2024 (or on March 18, 2024).  Mr. Blackburn was very specific about these dates.

17.     But as shown in UMG's sanctions motion, the truth is that Mr. Blackburn did not even seek the issuance of a summons from the clerk until April 17, 2024, over a month later.  So the story about having sent the complaint to a process server on March 18, 2024 to be served was completely false.

18.     What Mr. Blackburn now characterizes as a "slight error" was in fact a series of falsehoods he directly told to this Court and which he has now again misrepresented in his declaration.  Having to correct falsity, repeatedly, in itself multiplies the work that must be done in any litigation.  Mr. Blackburn's "say anything" approach is not merely reflective of his bad faith, it also necessarily vexatiously increases the cost of litigation. The entire transcript of the conference is attached as Exhibit 6 to my declaration in support of UMG's motion to dismiss the SAC.[2]

**Mr. Blackburn's Declaration Inaccurately And Incompletely Recounts How The Dismissal Of The Claims Against UMG Came About And UMG's Non-Existent Agreement to Forego Sanctions**

19.     I now turn to Mr. Blackburn's incomplete recitation of how the dismissal of the claims against UMG came about (and his accusations against me).  Paragraphs 4-15 of Mr. Blackburn's declaration omit important facts.  Indeed, it appears that Mr. Blackburn would have this Court believe that he filed a complaint, was advised that it was baseless and then proceeded to voluntarily dismiss the offending pleading.  But that is not remotely what happened here.  And with respect to motions for sanctions under both the inherent power of this Court and 28 USC § 1927, as the cases make clear, the facts matter.

20.     As this Court knows, and set forth in our motion and as Exhibit A hereto documents, Jones and Mr. Blackburn did not simply file one version of the complaint and then voluntarily drop their claims.  Instead, there were three versions of the complaint filed.  And

---

[2] In Paragraphs 22 and 23 of his declaration, repeated in his Memorandum of Law, Mr. Blackburn offers a fictional version of the April 9, 2024 conference.  He asserts that I was unprepared for the conference (which is both untrue and irrelevant) and that the Court supposedly indicated that the SAC complied with Rule 11 (which, as the transcript documents, is literally 180 degrees away from the Court's observation about Mr. Blackburn's theories for the claims against UMG not being plausible).

there were two motions to dismiss filed, one directed to the FAC and one to the SAC.  There were two Rule 11 motions served, one directed to the FAC and one directed to the SAC.  And contrary to Mr. Blackburn's version of what occurred during the April 9, 2024 telephonic conference, this Court too made clear to Mr. Blackburn that his theory for suing UMG (attempting to hold UMG liable for the actions of Combs, when he was not their employee and when UMG had no duty to supervise or control him) was not plausible.  Yet nothing caused Mr. Blackburn and Jones to drop the claims against UMG until the very eve of the due date for their opposition to UMG's second filed motion to dismiss and the expiration of the 21 day safe harbor for UMG's second served Rule 11 motion.

21.     Thus, in trying to rewrite history to make it appear as if there were simply a single pleading filed and that Jones and Mr. Blackburn then voluntarily dismissed the claims against UMG, Mr. Blackburn's declaration intentionally omits virtually all of what occurred.  Exhibit 1 to his declaration is an email exchange, going back to an email I sent to him on April 10, in which I detailed the lack of merit of the SAC (as if I needed to do so after having filed a motion to dismiss the FAC and served a Rule 11 motion).  Yet Mr. Blackburn still filed the SAC on April 12, ignoring the Court's admonition and making virtually all of the same claims against UMG but, in bad faith, substituting entirely different "facts" to support the claims than had been alleged in the FAC.

22.     As it relates to Mr. Blackburn's accusations in Paragraphs 16-21 and 94-97 of his declaration (repeated throughout his Memorandum of Law) that I am unethical, lacking in integrity, engaged in bad faith, "dirty gamesmanship" and that I "double-crossed" him, I believe I can highlight for this Court how the same email chain (and emails Mr. Blackburn omits) gives lie to these accusations.  Again, armed with the litigation privilege, Mr. Blackburn's malice and

bad faith is obvious: he is completely indifferent to whether the accusations he makes have any factual basis, which even now continue to cause the vexatious multiplication of the litigation costs in this action.

23.     Within Exhibit 1 to Mr. Blackburn's declaration is an April 22 email in which he proposed to dismiss UMG from the case in return for the production of documents and a declaration from UMG.  I had seen how he misused Ms. Habtemariam's declaration – attaching her declaration to the SAC and then falsely asserting, in Paragraph 218 of the SAC, that she had said she was authorized to enter into a general business partnership with Love Records, when she never said any such thing (and apparently falsely claiming on social media that she agreed to testify against Combs).  UMG was not prepared to provide Mr. Blackburn with anything in return for the unconditional dismissal of all claims against UMG and its executives.

24.     The same email chain within Exhibit 1 has my response to Mr. Blackburn's April 22 email.  On April 24, the same day that UMG filed the motion to dismiss the SAC, I responded to his "proposal."  And with specific relevance to his *ad hominem* attack on me in his declaration, I said as follows:

> You may yet be able to **moderate, however slightly, some of the impending adverse consequences that you and your client are going to face for your conduct** by immediately dismissing the SAC with prejudice against our clients."

I further stated in the same email that there were "no terms or conditions that we will accept for such dismissal."

25.     I did not say to Mr. Blackburn that he and Jones could avoid all sanctions by dismissing the claims.  Rather, contrary to Mr. Blackburn's personal attack on me, I said instead that by immediately dismissing the SAC, with prejudice, he might be able to "moderate, however slightly, some of the impending adverse consequences" for his conduct.

26.     Regardless, Mr. Blackburn did not immediately dismiss the SAC following my April 24 email.  Accordingly, our clients incurred the added expense of our work on a second Rule 11 motion, which we served on April 26.  And even after that motion was served, Mr. Blackburn still did not dismiss the claims against UMG.  Instead, he waited until virtually the eve of his time to file an opposition to our motion to dismiss (as to which he clearly had no basis for opposition) and the expiration of the 21 day safe harbor under Rule 11 before he even broached dismissal.

27.     In the opposing Memorandum of Law, Mr. Blackburn refers to an April 26 email as supposedly offering to trade the elimination of sanctions for dismissal (directly contrary to my very clear April 24, 2024 email).  The April 26 email made no such proposal.  Rather, the April 26 email was simply the transmittal of our second Rule 11 motion and it stated, accurately, as follows:

> "Pursuant to Rule 11(c)(2), Plaintiff and you have 21 days (i.e., until May 17, 2024) to withdraw all claims asserted against the UMG Defendants with prejudice.  Your failure to do so will result in the filing of this motion with the Court without further notice."

28.     Nowhere mentioned by Mr. Blackburn in his declaration was that he first offered only a partial dismissal in his email of May 8 (part of Exhibit 1 to his declaration), offering to dismiss only the claims against Lucian Grainge, while continuing the case against Motown and UMG.  And in that email, he raised, for the first time, the irrelevant assertion about Combs supposedly not having signed the license agreement and demanding discovery of the execution of the license agreement (a subject of no relevance to either Jones's claims against UMG or to this sanctions motion, which I will address below).  Also in this May 8 email, Blackburn threatened to pursue sanctions against our clients and our firm for having filed a document (the license agreement) that we supposedly knew was false.

29.     In fact, this email documents Mr. Blackburn's bad faith in offering yet another knowingly false statement in his declaration.  In Paragraph 11 of his declaration, Mr. Blackburn states that Jones decided to dismiss the claims against UMG because they were likely victims of Combs' fraud (referring to the supposed fact that Combs did not sign the license agreement). But that professed "sympathy" for UMG is completely contrary to what Mr. Blackburn said in his email to me on May 8.  The filing of the allegedly "false" license agreement – and there is nothing false about the license agreement -  could not simultaneously be a basis for seeking sanctions against our client and our firm and the basis for dismissing the claims.

30.     This story about the supposed invalidity of the license agreement being why Jones and Blackburn decided to dismiss the claims against UMG is clearly an after-the-fact fabrication intended to make it appear that Jones and Mr. Blackburn did not dismiss the claims in the SAC against UMG because they were baseless but because they took pity on UMG.  Nothing could be further from the truth.

31.     Again, the problem exemplified by Mr. Blackburn's declaration is that he plainly believes that, even in a document sworn to under penalty of perjury, just as he did in three complaints, he is allowed to fabricate stories that he thinks sound good, even if they are demonstrably untrue.  That bad faith conduct multiplies the litigation costs of addressing arguments advanced without any truth to them or basis for them.  Again, unless there is some penalty for the conduct of Jones and Mr. Blackburn, whether its monetary or losing the privilege of practicing in this Court (or both), it will continue.

32.     In any event, my May 9 email, also within Exhibit 1 to Mr. Blackburn's declaration, rejected his May 8 proposal to dismiss the claims against Sir Lucian Grainge but continue them against Motown and UMG and demanded complete dismissal with prejudice.

33.     This then is the background for where Mr. Blackburn starts in Paragraph 4 of his declaration.  His declaration is intended to make it appear as if he and Plaintiff voluntarily decided to drop their claims after only filing one complaint.  However, because he starts at the end, he omits what occurred before and after and how Mr. Blackburn came to make a motion to dismiss, supported by his declaration admitting that there was no legal basis for the claims against UMG.

34.     Attached hereto as Exhibit B is my email correspondence with Mr. Blackburn on May 10, following the last email in Exhibit 1, which led to our May 13 correspondence (that Mr. Blackburn attaches as Exhibit 4 to his declaration).  As shown in Exhibit B, Mr. Blackburn first asked me if the dismissal would be on consent.  I responded that it should be by a motion to the Court, which he should show us before filing and if we approved of it, we would submit a response showing our agreement.  I was not going to stipulate to a dismissal that would allow Jones and Mr. Blackburn to pretend that there was some *quid pro quo* for the dismissal when there was not.  He then pressed me again for a joint letter motion and again, because of how he had mischaracterized his dismissal of Ms. Habtemariam, I rejected his request and said he should make a motion.

35.     Despite our emails on May 10 and my express requirement that he make a motion that we would, assuming we agreed with what it said, consent to, on May 13, Mr. Blackburn sent me what is attached as Exhibit 2 to his declaration, which was the very sort of stipulation I had already rejected (it was not a motion and it had no declaration).  I therefore rejected what he sent me as being contrary to what we had discussed on May 10 and made clear we were not entering into a stipulation for dismissal.  I offered to prepare a declaration and a

motion for him, which he accepted, and I did so and sent it to him.  Attached hereto as Exhibit C is my email to him on May 13 attaching a draft declaration and a notice of motion.

36.     As shown in his Exhibit 4, Mr. Blackburn made some changes to the declaration I drafted (which I then slightly modified) and he then apparently further modified it again and filed it.  And I then filed my declaration consenting to the dismissal with prejudice of all claims against the UMG Defendants.  A copy of my declaration is attached hereto as Exhibit D.

37.     Significantly, consistent with my email to Mr. Blackburn of April 24 and consistent with our unalterable demand that the dismissal be unconditional, my declaration specifically stated that we consented to the dismissal "<u>with full reservation of our clients' rights.</u>" Those reserved rights include the right to seek to recover at least some of the unnecessary costs incurred by our clients due to the baseless claims filed in three successive complaints by Jones and Mr. Blackburn which vexatiously multiplied the proceedings to their detriment.

**Mr. Blackburn's Declaration Mischaracterizes The Claims Against UMG Which Were Factually and Legally Baseless In All Three Complaints**

38.     Another example of Mr. Blackburn's bad faith and his difficulty with the truth is shown in Paragraphs 26 through 33 of his declaration (which is repeated in the Memorandum of Law).  Mr. Blackburn attempts to justify having sued UMG in three successive complaints (which, as documented in UMG's motion papers, relied on completely different foundational "factual" allegations for the same claims of criminal sex trafficking and racketeering asserted against UMG, none of which were true).  Mr. Blackburn states, under penalty of perjury that "this lawsuit was instituted because the UMG Defendants knowingly conducted business with Combs, whom they knew or should have known, was a violent, deceptive, morally flawed individual…"

37.     But Jones and Mr. Blackburn were not suing UMG to challenge the wisdom of a business transaction.  Instead, based solely on the fact that Motown entered into a license agreement with Love Records, Inc. to distribute a single recording, Jones and Mr. Blackburn falsely, recklessly and in bad faith, with no legal or factual basis for their claims, accused Sir Lucian Grainge, UMG and Motown of engaging in criminal sex trafficking and criminal racketeering claims.  Without the benefit of a single pleaded fact in three complaints (actually as documented in UMG's motion for sanctions, UMG's Rule 11 motion and in UMG's motion to dismiss, the few pleaded "facts" were completely untrue), Mr. Blackburn filed three complaints that, were one to believe him now, were based solely on "guilt by association."

38.     Not only is Mr. Blackburn's explanation for why UMG was supposedly sued false, his statement illustrates his willingness to advance diametrically opposed arguments at the same time.  While Mr. Blackburn states, in Paragraph 26 of his Declaration, that Combs is "deceptive" and "morally flawed," he and Jones nevertheless purportedly relied on what Combs supposedly told Jones as the basis for making accusations of criminal behavior against UMG.

39.     In fact, in virtually every instance, as it pertains to UMG (the alleged attendance of Grainge and Habtemariam at Combs' alleged sex parties and the alleged delivery of cash to Combs), it appears that things that Combs supposedly told Jones about UMG are the source for the accusations against UMG in the original complaint, the FAC and the SAC.[3]  But nowhere was it ever stated in any of the complaints that the basis for the claims was rank hearsay (even

---

[3] Elsewhere in his declaration, Mr. Blackburn seems to now attribute the allegations of the original complaint, the FAC and the SAC to unnamed "third party witnesses."  And in the Memorandum of Law, which is, of course, unsworn, Mr. Blackburn writes that Jones supposedly did see Grainge and Habtemariam at Combs' homes, something he has already admitted was not true (and which was not true, as Grainge and Habtemariam have sworn to in their declarations). I will address this below.

assuming that Combs actually said any such thing to Jones) and nowhere does Mr. Blackburn explain how he could have based criminal accusations on the supposed hearsay statements of someone like Combs who, according to him, is "deceptive" and "morally flawed."[4]

40.     In seeking to evade the imposition of sanctions, while Mr. Blackburn pretends he acted in good faith in accusing UMG of criminal behavior in three successive complaints – only to ultimately admit there was no legal basis for the claims (an admission which his declaration now seemingly tries to minimize or recant) – nowhere in his declaration does he remotely identify a single fact of which he was aware that supported any of these accusations of criminal behavior.[5]  Indeed, the lack of any factual basis for the claims is confirmed by the fact that the foundational allegations of the FAC and the SAC are completely different.

41.     The original Complaint and the FAC were based on a "respondent" (sic) superior claim because Motown was supposedly the parent company of Love Records.  While that "parent company" assertion disappeared in the SAC, Blackburn has yet to explain where it came from (never responding to the Court's direct question about its origin at the April 9, 2024 conference).

---

[4] As this Court already knows, the original complaint and the FAC specifically alleged that Jones personally saw Grainge and Habtemariam at Combs' homes during sex trafficking parties (and claims that Jones even saw them both go into Combs' bedroom with him for hours).  However, when that story was debunked (because Grainge was never in any of Combs' homes and Habtemariam was never there after Jones was hired by Combs), in Blackburn's letter motion to amend and in Jones' April 8 declaration in support of that motion (submitted again on this motion for sanctions), Jones' personal knowledge was suddenly transmuted into his only being told that Grainge and Habtemariam were present (and being told that UMG provided bags of cash) by Combs, whom they allege is otherwise unworthy of belief.

[5] Again, as discussed below, Mr. Blackburn vaguely refers to "conversations" he supposedly had with unidentified "third party witnesses" whom he refuses to identify and whose alleged information is nowhere provided.

42.     Making the disappearance of this "parent company" allegation from the FAC to the SAC even more perplexing (and illustrative of Mr. Blackburn's bad faith willingness to say anything at any time regardless of whether it is true and regardless of whether it corresponds to anything he has said before or even at the same time) is that Mr. Blackburn seems to be trying to revive it in his declaration.  In Paragraph 56 of his declaration, he announces that in suing UMG, he relied on legal research "that states employers are vicariously liable for the actions of their employees under the Federal RICO statute."

43.     Even assuming that this sweeping statement accurately reflected the law, Combs was not UMG's employee, was not alleged in the original complaint or the FAC to be UMG's employee, even assuming that the "parent company" allegation had been true (which it was not) and even assuming it had not disappeared in the SAC (which it did).  So Mr. Blackburn's declaration is attempting to explain away his bad faith vexatious multiplication of proceedings by referring to a supposed legal principle that, even if it had any validity, had no application to the original complaint, the FAC or the SAC.

44.     As this Court knows – because it unsuccessfully questioned Mr. Blackburn at the April 9 conference about the origin of the abandoned "parent company" allegation - the "parent company" allegation was replaced in the SAC by the equally unsupported "general business partnership" allegation.  Fabricating new "factual" bases for the assertion of claims in sequential pleadings, which is what Mr. Blackburn did in the SAC, is precisely the sort of conduct that 28 USC § 1927 is intended to address.  It is not simply conduct proscribed by Rule 11.  As discussed in the accompanying Reply Memorandum of Law, it is concrete evidence of bad faith conduct that vexatiously multiplies the costs of litigation.

16

45.     As already noted in UMG's sanctions motion, in Paragraph 218 of the SAC, Mr. Blackburn claimed that in her declaration attached to the SAC, Ms. Habtemariam supposedly said that she was authorized by Sir Lucian Grainge to enter into a partnership with Love Records.  But Ms Habtemariam said no such thing and her attorneys said the exact opposite (Exhibit 5 to Exhibit A to my moving declaration, now in Exhibit G).

46.     And while Mr. Blackburn's declaration continues to try to justify the foundational "general business partnership" allegation of the SAC (relying only on colloquial press reports), his declaration oddly makes no mention of the indisputable fact that, when he filed the SAC (on April 12), he had been in possession of the actual redacted license agreement for nearly three weeks and, therefore, knew that it specifically provided that there was neither a partnership nor joint venture between Motown and Love Records, Inc.

**The Irrelevant And Incorrect Argument That The License Agreement Was A "Sham," A "Ruse," A "Farce"**

47.     That brings me to Mr. Blackburn's arguments about the supposed invalidity of the license agreement (which he has variously labeled a "sham" a "ruse" and a "farce.")  This assertion is not only a complete digression – because it has nothing to do with the merits of Jones's claims against UMG and nothing to do with our sanctions motion – but the entire Combs' signature argument (which fills Paragraphs 8-10 and 74-89 of Blackburn's declaration) is both a complete red herring and further evidence of the bad faith of Mr. Blackburn and Jones in raising it.

48.     First, neither of the parties to the license agreement – Motown and Love Records, Inc. - has ever contested the due execution and validity of the license agreement, and as documented in Ms. Braithwaite's declaration in support of the motion to dismiss (Exhibit 2 to Exhibit A to my moving declaration on this sanctions motion), the license agreement, until it was

terminated as of February 2023, was performed by both sides.[6]  Motown distributed and spent

money to promote recordings that Combs had recorded (before Jones showed up in September

2022) and paid monies directly to vendors in connection with additional recordings in the fall of

2022.  Mr. Blackburn's statement in Paragraph 76 about payment for an album that was never

done is demonstrably untrue.

49.      As has been typical of Mr. Blackburn's filings in this Court, his bad faith and

disregard for the truth is shown by his willingness to make unsupported and unfounded

assertions, ignoring the evidence already in the record that refutes his naked statements.

Labeling the license agreement a "ruse" a "sham" and a "farce" without the slightest evidence to

support the assertions may be the stuff of social media and press reports, but it is not evidence,

and it is not what passes or should pass for what gets sworn to in a declaration, especially when

the only evidence in the record is completely to the contrary.  Again, this is the sort of bad faith

behavior that vexatiously multiplies proceedings and increases unreasonably the costs of

litigating, thereby warranting sanctions under 28 USC § 1927.

50.      Second, Jones and Mr. Blackburn have no standing to challenge the validity of the

license agreement.  They are strangers to it.  Third, contrary to Mr. Blackburn's naked and

unsupported labels about the license agreement being a "ruse" or a "sham," the license

agreement was sent to Motown by Combs' long-time lawyer as a partially executed agreement.

Attached hereto as Exhibit E` is a copy of the email from Combs' lawyer transmitting the license

---

[6] This raises another falsity in Mr. Blackburn's declaration and Memorandum of Law.  Despite
the fact that the license agreement was terminated as of February 2023 and the Cassie Ventura
lawsuit was not filed until November 2023, triggering a stream of cases and news reports about
Combs' past behavior, Mr. Blackburn contends (in hyperbolic rhetoric better suited for a tabloid
than a court) that UMG did not sever its relationship with Combs until after all of the negative
news surfaced.  As I have stated multiple times, Mr. Blackburn will not let facts get in the way of
his rhetoric.

agreement signed by (or on behalf of) Combs and it specifically represented, in paragraph 13.01, that it had been "duly executed and delivered by you [Love Records], and constitutes a legal, valid and binding obligation on your part, enforceable in accordance with its terms."

51.     Fourth, as I pointed out to Mr. Blackburn on May 9 (part of his Exhibit 1 email chain), his own email of May 8 reflected that Combs authorized people to sign on his behalf, making the execution of an agreement as binding as if Combs had personally signed (where he had not personally signed).  And finally, as Docusign's  own website notes, Docusigned documents are not necessarily done by a human signature.  A copy of information from Docusign's website is attached hereto as Exhibit F.  So a handwriting expert opining that a particular Docusign signature is not that of Combs is meaningless because it likely would not be.

**Mr. Blackburn's Declaration Admits The Allegations Against UMG Were Based At Most On Hearsay Only, Which He Refuses To Supply**

52.     Mr. Blackburn also devotes a great deal of ink to the supposed validity of the claims he has asserted against Combs (Paragraphs 31-52) as well as to the recent press reports (and the ensuing lawsuits against Combs) that have arisen in the wake of both the Cassie Ventura lawsuit and this lawsuit.  If it were Combs who was moving for dismissal or for sanctions, Mr. Blackburn's self-congratulatory paragraphs might have some purpose.  They have none as it pertains to the now dismissed claims against UMG and to UMG's motion for sanctions.

53.     But perhaps unwittingly, buried in the middle of his declaration, in paragraph 53, Mr. Blackburn clearly admits that he never should have made the claims he made against UMG and its executives:

> "53.  The only aspect of Plaintiff Jones's claims that he did not have physical images
> or videos to substantiate were the claims concerning the UMG Defendants.  This did

not raise concerns for me, as his claims were corroborated through conversations with
third-party witnesses."

54.     In none of the three complaints he filed did Mr. Blackburn ever attribute any of
the claims to some unidentified and unknown "third party witnesses."  Nowhere in his
declaration does he now identify a single "third party witness," or what it was that such "third
party witnesses" said or what supposedly documented what they supposedly said.  Mr.
Blackburn has never provided a sworn statement from any such "third party witness."

55.     On the contrary, in Paragraph 47 of his declaration, Mr. Blackburn categorically
refuses to identify any such "third party witness" or provide anything remotely resembling a
good faith basis for believing anything that these purported witnesses supposedly told him.
Having stated that the basis for the claims against the UMG Defendants was not any personal
knowledge of Jones – and now, contrary to both Jones's April 8, 2024 declaration and Mr.
Blackburn's letter motion to this Court to amend the SAC, was apparently also not what Combs
supposedly told Jones but were instead "conversations" Mr. Blackburn supposedly had with
these elusive "third party witnesses" – we are left to imagine who they are, what they know (or
what they think they know) and how they know it.

56.     But this is not how our judicial system works: putting salacious accusations of
criminal conduct in a public document based on the supposed statements of unidentified
individuals.  But that seems to be something that Mr. Blackburn does not understand or care
about, no matter the harm caused to those he accuses without basis.  Instead, with the litigation
privilege as his purported shield, Mr. Blackburn has repeatedly made and continues to make
libelous statements which he claims are supported only by "conversations" he has supposedly

had with unidentified and unsworn "third party witnesses," about whom he refuses to disclose any information.

57.     And on this basis, Mr. Blackburn has filed three separate complaints, containing completely inconsistent "factual" allegations for the claims he asserted against UMG, which he admits Jones had no evidence to substantiate, and now, having already admitted in a declaration that he signed, that the claims he filed were legally baseless – and they were factually baseless as well – he has submitted a declaration to this Court in which he repeats accusations (and adds new ones) that he has already admitted were baseless.  This is the height of bad faith.  He provides not the slightest factual support for any of the new or repeated accusations but instead refers only to people supposedly hiding in the shadows with whom he had conversations that supposedly supported the accusations.

58.     But to show how illogical and senseless Mr. Blackburn's newly crafted justification for the supposed basis for the claims he asserted are, one need merely consider how what these unidentified people supposedly said could possibly be credited by any reputable attorney as a basis for criminal accusations when the "factual" predicate for the claims made in the FAC were changed on a wholesale basis in the SAC.  If these shadowy "third party witnesses" said Sir Lucian Grainge was personally at Combs' homes when he was never there, if they told Mr. Blackburn about the "bags of cash," how could Mr. Blackburn possibly file the SAC with criminal accusations based on anything they said when there was no actual evidence to support any of it?  If these "third party witnesses" were the source of the "Motown was the parent company of Love Records, Inc." allegation, then how could anything they said be credited?

59.     When it was obvious that the foundational allegations of the original complaint and FAC were completely false, when Mr. Blackburn had in his possession the license agreement and UMG's motion to dismiss the FAC (and their first Rule 11 motion) for over two weeks, how could he, in good faith, have filed the SAC, making the same claims against UMG based on totally different "facts?"  That alone shows the bad faith of Jones and Mr. Blackburn and how they vexatiously multiplied this litigation, increasing unreasonably UMG's costs and warrants the imposition of sanctions.

60.     While it is clear that none of the three complaints had any basis for the claims against UMG, even if one wanted to suspend disbelief and assume that Mr. Blackburn was entitled to believe anything that Jones may have told him or anything that these unidentified (and likely non-existent) "third party witnesses" may have told him, once he had the factual information provided in UMG's motion to dismiss and in UMG's first Rule 11 motion, he could not, in good faith, have proceeded to file the SAC.  But he did so, and he caused the UMG Defendants to incur more than an additional $200,000 in legal fees unnecessarily.

61.     I just want to briefly comment as well on Mr. Blackburn's expressed dubiety, in paragraphs 59-66 of his declaration (repeated in his Memorandum of Law), about Ms. Habtemariam's statement in her declaration (Exhibit 3 to Exhibit A to my declaration in support of this motion for sanctions) that she was never at Combs' homes after the summer of 2022 (before Jones showed up) and never observed any supposed sex trafficking party.  These paragraphs of Mr. Blackburn's declaration do not express any facts.  They are not based on any knowledge of Mr. Blackburn.  It is pure rhetoric and he is accusing Ms. Habtemariam of not telling the truth without the slightest basis for doing so.  And it illustrates the impropriety of how Mr. Blackburn operates.  He either does not understand or does not care about what constitutes

evidence.  He is willing to say anything, call people names and accuse them of dishonesty (or in my case, ethical violations) without the slightest basis.

62.     I also want to briefly address Mr. Blackburn's reference to all of the news that has come to light regarding Combs' alleged behavior in the wake of the Cassie Ventura lawsuit in November 2023.  While allegations are not evidence, the videos and the press reports regarding Combs' alleged conduct are deeply disturbing.  However, these recent news reports about Mr. Combs' alleged behavior and the lawsuits against him (including this one and another one also brought without basis by Mr. Blackburn) have nothing to do with either the claims that were made against UMG in this case or this sanctions motion.  Again, this is part and parcel of Mr. Blackburn's guilt by association approach and his disregard for evidence and proper procedure. I would also be remiss if I did not observe as well that while Mr. Blackburn attacks UMG for having entered into a one album distribution license with Love Records, Inc. in May 2022 (which was terminated as of February 2023), Mr. Jones too apparently entered into an agreement with Mr. Combs.

63.     The outright falsity and misrepresentations filling Mr. Blackburn's declaration are troubling enough, but this motion for sanctions was filed, in large measure, because, in filing three successive complaints filled with offensively false and salacious allegations lacking any factual or legal basis, Mr. Blackburn acted with extreme bad faith, vexatiously increased the costs for UMG improperly and unreasonably.  I provided him with multiple warnings and multiple opportunities to drop his claims against UMG.  He only did so at the last minute because he had no basis to oppose UMG's motion to dismiss and the expiration of the 21 day Rule 11 safe harbor was looming.

64.     But at no time did I ever offer, propose or agree to relinquish UMG's right to seek sanctions in return for dismissal of the claims against UMG.  The dismissal of the claims against UMG before the expiration of the 21 day safe harbor period may have foreclosed an award of sanctions under Rule 11, but it is not a "get out of jail free" card, immunizing Jones and Mr. Blackburn from sanctions under the inherent power of this Court and under 28 USC § 1927 for their bad faith pursuit of baseless claims based on knowingly false accusations.  My clients, and in particular, Sir Lucian Grainge, have been dragged through the mud, being attacked repeatedly and continuously on social media, including disgusting antisemitic slurs, based on the criminal accusations that Mr. Blackburn so casually and irresponsibly leveled against them in three successive complaints without the slightest basis, let alone in conformity with the good faith required under 28 USC § 1927 and the inherent power of this Court.

65.     As I said in our motion papers, I am prepared, at a hearing or for in camera inspection by the Court, to provide this Court with exemplars of disgustingly false press and social media postings that have used the allegations of this action as a springboard to attack Sir Lucian Grainge (including the widespread antisemitic slurs), necessitating that he secure enhanced security for himself and his family and to also provide this Court with copies of our bills for the work we have been compelled to perform for our clients since this action was commenced in February.  I am also prepared to provide Mr. Blackburn with redacted copies of our bills (to preserve our clients' privilege and to also avoid having Mr. Blackburn splay them across social media) if this Court believes it necessary or appropriate.

66.     For all of the reasons set forth herein and in the moving papers submitted in support of this motion for sanctions, UMG should be awarded sanctions under 28 U.S.C. § 1927 and under the inherent power of this Court that are meaningful and effective to deter the conduct

of Plaintiff and Mr. Blackburn and that will stand as a warning to others who would misuse the

Federal Courts as has been done here.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 7, 2024

Donald S. Zakarin