# EXHIBIT # 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

THALIA GRAVES,

               Plaintiff,                              No. 24 Civ. 7201

         v.

SEAN COMBS, JOSEPH SHERMAN, DADDY'S       **COMPLAINT AND**
HOUSE RECORDINGS INC., CE OPCO, LLC d/b/a  **DEMAND FOR**
COMBS GLOBAL f/k/a COMBS ENTERPRISES LLC, **JURY TRIAL**
BAD BOY ENTERTAINMENT HOLDINGS, INC.,
BAD BOY PRODUCTIONS HOLDINGS, INC.,
BAD BOY BOOKS HOLDINGS, INC., BAD BOY
RECORDS LLC, BAD BOY ENTERTAINMENT LLC,
BAD BOY PRODUCTIONS LLC, AND
ORGANIZATIONAL DOES 1-10,

               Defendants.

-------------------------------------------------------------X

       Plaintiff Thalia Graves ("Plaintiff"), by and through her attorneys, Allred Maroko

& Goldberg and Cuti Hecker Wang LLP, for her Complaint alleges as follows:

## **INTRODUCTION**

      1.     In or around the summer of 2001, Plaintiff's life was violently knocked off course

when Defendants Sean Combs and Joseph Sherman viciously raped her at the Bad Boy Records

studio in New York City.

      2.     Plaintiff was twenty-five at the time and dating one of Combs' employees, a

relationship that Combs exploited to lure Plaintiff into meeting him and Sherman alone. Once

they successfully sequestered Plaintiff, Combs and Sherman gave Plaintiff a drink, likely laced

with a drug that eventually caused her briefly to lose consciousness. She awoke to find herself

bound and restrained.

3.      Combs and Sherman proceeded to brutally sexually abuse and violate Plaintiff. Combs mercilessly raped her, anally and vaginally.  Sherman forcefully slammed Plaintiff onto a table, slapped her, and repeatedly thrust his penis into her mouth.  Both men were undeterred by Plaintiff's cries for help throughout the attack.

4.      Plaintiff never recovered from Defendants' violent rape.  She had suicidal thoughts and ideation and has received extensive psychological treatment because of Defendants' attack.  For decades, she remained silent and did not report the crime out of fear that Defendants would use their power to ruin her life, as they had repeatedly, explicitly threatened to do.  To this day, Plaintiff suffers from severe depression, anxiety, and panic attacks, and still lives in fear of Defendants.

5.      Any progress Plaintiff had made in healing from the attack over the years was dramatically reversed on or around November 27, 2023, when she learned for the first time that Combs and Sherman had video-recorded the horrific rape twenty-two years before and had shown the video to multiple men, seeking to publicly degrade and humiliate both Plaintiff and her boyfriend.

6.      Plaintiff could not believe that Defendants would record themselves committing such a gruesome crime and then proceed proudly and widely to disseminate the recording of it. She was distraught and sunk into a deep depression.  She again considered ending her life.

7.      This action seeks redress for Defendants' brutalizing, misogynistic, and violent attacks on Plaintiff, starting in 2001 with their rape and continuing in the subsequent years as they compounded her humiliation by showing the video of the sexual assault to others.

**PARTIES**

8.      Plaintiff Thalia Graves is a female who resides in Harris County, Texas.

2

9.      Defendant Sean Combs is a male who, on information and belief, resides in Los Angeles County, California, though at the time of filing was incarcerated in the Metropolitan Detention Center in Brooklyn.  On information and belief, at all relevant times Combs owned and/or controlled Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., Bad Boy Books Holdings, Inc., Bad Boy Records LLC, Bad Boy Entertainment LLC, Bad Boy Productions LLC, (collectively "Bad Boy"), Daddy's House Recording Studio, Inc., and CE OPCO, LLC d/b/a Combs Global, f/k/a Combs Enterprises LLC (all together, the "Combs Corporations").  The facts of Combs' ownership and titles at the Combs Corporations enabled him to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

10.     Defendant Joseph Sherman, a/k/a "Big Joe" is a male who, on information and belief, resides in Westchester County, New York.  On information and belief, Sherman was employed by Combs and/or by the Combs Corporations during the relevant period.  The facts of Combs' ownership and titles and Sherman's titles at the Combs Corporations enabled Sherman to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

11.     Defendant Daddy's House Recordings, Inc. ("Daddy's House") is a domestic business corporation that is incorporated in New York and on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069.  Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.  At the time of the events alleged herein, Daddy's House was a world-class recording studio owned by Combs located at 321 W 44th Street, Suite 201, New York, New York 10036.  On information and belief, at all relevant times, Bad Boy and Combs

together owned and operated Daddy's House.  On information and belief, the Bad Boy recording studio was located on the premises of Daddy's House.  Combs and Sherman used the Daddy's House premises and their ownership and titles at Daddy's House to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

12.     Defendant CE OPCO, LLC d/b/a Combs Global, f/k/a Combs Enterprises LLC ("Combs Global") is a limited liability company incorporated in Delaware that has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069.  On information and belief, all members of Combs Global are citizens of Delaware, New York, and/or California.  On information and belief, Combs Global is an alter ego for Combs and/or a successor in interest to Combs' other corporations and/or was established or used by Combs for the purpose of moving, disposing of, and/or insulating his assets, including in connection with his criminal activities and to avoid liability.  Combs Global currently owns, controls, and/or oversees Bad Boy and Combs' other business ventures in the music, fashion, fragrance, beverage, marketing, film, television, and media industries.

13.     As part of his renowned Bad Boy record label and brand, Combs has established several corporate entities under the "Bad Boy" name over the past few decades, including but not limited to Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., Bad Boy Books Holdings, Inc., Bad Boy Records LLC, Bad Boy Entertainment LLC, and Bad Boy Productions LLC (together, "Bad Boy").  On information and belief, all Bad Boy corporate entities are alter egos for Combs, are controlled and/or directed by Combs, and/or were established or used by Combs for the purpose of moving, disposing of, and/or insulating his assets, including in connection with his criminal activities and to avoid liability.  On information

4

and belief, all active Bad Boy entities are now owned and/or controlled by Combs and/or by Combs Global. Combs and Sherman used the Bad Boy premises/recording studio and their ownership and titles at Bad Boy to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

    a.   Defendant Bad Boy Entertainment Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069. Bad Boy Entertainment Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global. Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.

    b.   Defendant Bad Boy Productions Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069. Bad Boy Productions Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global. Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.

    c.   Defendant Bad Boy Books Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 1440 Broadway, 3rd Floor, New York, New York 10018.

Bad Boy Books Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global.  The CEO listed on public filings is Eddie Norward Jr., with a listed address of 1710 Broadway, New York, New York 10019, the same address listed for Sean Combs in public filings for Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., and Daddy's House Recordings, Inc.

d.  Defendant Bad Boy Records LLC is a Delaware limited liability company that on information and belief is headquartered in New York and/or California.  On information and belief, all members of Bad Boy Records LLC are citizens of Delaware, New York, and/or California.  On information and belief, Bad Boy Records LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs.  On information and belief, Bad Boy Records LLC is now owned and/or controlled by Combs and/or by Combs Global.

e.  Defendant Bad Boy Entertainment LLC is a New York limited liability company that on information and belief is headquartered in New York and/or California. On information and belief, all members of Bad Boy Entertainment LLC are citizens of New York and/or California.  Bad Boy Entertainment LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs. On information and belief, Bad Boy Entertainment LLC is now owned and/or

6

controlled by Bad Boy Entertainment Holdings, Inc. and/or by Combs, and/or by Combs Global.

    f.    Defendant Bad Boy Productions LLC is a New York limited liability company that on information and belief is headquartered in New York and/or California. On information and belief, all members of Bad Boy Productions LLC are citizens of New York and/or California. Bad Boy Productions LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs. On information and belief, Bad Boy Productions LLC is now owned and/or controlled by Combs and/or by Combs Global.

14.    Defendants Organizational Does 1-10 are currently unknown entities who were owned by and/or employed Defendants Combs and/or Sherman and enabled the commission of the conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities by name.

15.    Each of the Combs Corporations (a) aided and abetted Combs and Sherman in committing the unlawful sexual violence against Plaintiff described herein and/or in harassing and subsequently intimidating her into silence after the rape, (b) provided Combs and Sherman with the studio/office space where they committed the rape, and/or with chattel including recording equipment, storage equipment, etc. to record the rape and disseminate it; (c) are alter egos for Combs, completely dominated by him and used for his personal interests and to engage in wrongdoing which harmed Plaintiff and others, and/or (d) serve or have served as vehicles for Combs to move, dispose of, and/or insulate his assets, including in connection with his criminal activities and to avoid compensating the victims of his many crimes, including Plaintiff.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states, and the amount in controversy exceeds $75,000.

17.     This Court has specific personal jurisdiction over Defendants because the acts giving rise to Plaintiff's claims took place in New York State, and because several of the Defendants are domiciled in New York State and/or regularly transact business in New York State.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## JURY DEMAND

19. Plaintiff hereby demands a trial by jury on her claims in this action.

## FACTUAL ALLEGATIONS

*Background*

20.     Plaintiff's family immigrated to New York City when Plaintiff was a teenager in connection with her mother's work.  Her family ultimately settled in Rego Park, Queens, where she completed her education, and where she was living when she met Combs.

21.     Defendant Combs, also known by his stage names Puff Daddy, Puffy, P. Diddy, Diddy, Brother Love, or Love, is a prominent rapper, record executive, and businessman.  He rose to fame in the 1990s with his record label Bad Boy, and continued to be a notable figure in the music and entertainment industry in the following years.  Combs has continued to amass wealth and power through his business ventures in the music, fashion, fragrance, beverage, marketing, film, television, and media industries.

22.     The Bad Boy enterprise is the foundation of Combs' wealth and power.  Bad Boy has sold over 500 million records through its lucrative distribution deals with the top music companies in the world, and has signed acclaimed hip hop and R&B artists, including The Notorious B.I.G., Mary J. Blige, and Usher.  Combs later founded CE OPCO, LLC a/k/a Combs Enterprises, later rebranded as Combs Global, to serve as a home for his portfolio of businesses, including his investments in the music, fashion, fragrance, beverage, marketing, film, television, and media industries.  On information and belief, Combs Global houses Bad Boy and other notable businesses such as Combs' fashion line Sean Jean, his vodka line Cîroc, and his cable media company REVOLT MEDIA.

23.     As detailed below, *see infra* ¶¶ 57 through 64, Combs has a long history of violence and of abusing and raping women, and there have been several civil lawsuits filed against Combs in the past year alleging sexual violence and abuse.  On September 16, 2024 Combs was arrested and charged with racketeering and sex trafficking.  He was denied bail.

24.     Defendant Sherman, also known as "Big Joe," was employed by Combs as his bodyguard and head of security during the relevant time period described herein and served in various roles in the Combs Corporations.  Sherman is also the founder of Rhymes N Dimes Magazine, Inc., a New York State registered corporation, and through or in connection with that company produces and distributes pornography.  On information and belief, he has often distributed videos of his and/or his friends' sexual assaults through his pornography company.

25.     Plaintiff met Defendant Combs in or around late 1999 or early 2000 through her then-boyfriend, who was an executive at Bad Boy.  In addition to working together, Plaintiff's boyfriend and Combs had a close personal relationship.  Plaintiff frequently visited her boyfriend at the Bad Boy studio in New York City and attended events hosted at Combs' residences.  Over

time, Plaintiff became familiar with Combs, and he knew about her relationship with her boyfriend.

***Defendants Trick, Drug, and Violently Rape Plaintiff***

26.     In or around the summer of 2001, Plaintiff received a call from Combs concerning her boyfriend's employment at Bad Boy.  He told her he wanted to meet with her in person to discuss her boyfriend's supposed performance issues.  Her boyfriend was determined to climb up the ladder at Combs' records label and as his romantic partner, Plaintiff was committed to helping him.  Plaintiff agreed to meet with Combs.  In retrospect, it was evidently a sick and twisted way of using his ownership of and title at Bad Boy and its affiliate entities to abuse Plaintiff and also show his power and ability to humiliate her boyfriend, his executive.

27.     A few hours later, Combs arrived at Plaintiff's mother's residence in Queens with Sherman, who was employed by Combs as his bodyguard at the time.  Sherman was driving an SUV and Combs was in the backseat.  After Plaintiff entered the vehicle, Combs offered her a glass of wine, which she accepted.

28.     Combs began discussing his alleged concerns about her boyfriend's performance at work.  Meanwhile, as Plaintiff drank what had been handed to her, she started to feel lightheaded, dizzy, and physically weak.  In retrospect, it is clear that Combs had caused a drug to be put into Plaintiff's drink, as a few sips of wine had never impacted her that way.

29.     Combs and Sherman drove Plaintiff to the Bad Boy studio in Manhattan.  When they arrived and Plaintiff tried to get out of the car, she realized that she was feeling odd, and found it difficult to walk.  She assumed this was her fault, and did her best to act normal, and followed Combs as he led her eventually to a couch in a private room in the Bad Boy studio.  She later came to understand this was Combs's personal lounge and office at the Bad Boy studio.

Combs sat on the couch next to Plaintiff and continued speaking to her. Plaintiff began feeling even more woozy and sedated. She then lost consciousness.

30.     When Plaintiff regained consciousness, she was naked, and her hands were tied behind her back with what felt like a plastic grocery bag. Plaintiff shouted for help. In response Sherman lifted her up from the couch and forcefully slammed her face down on what was apparently a pool table. Shortly thereafter, Combs entered the room naked.

31.     Combs reached for a container of lubricant that smelled like menthol, and proceeded to apply it to his penis. He then bent Plaintiff over the table causing her feet to dangle above the floor, forcefully held her down, and anally penetrated her without her consent. Plaintiff is 4 feet 11 inches tall and weighed only 103 pounds at the time. Plaintiff was unable to move, totally overpowered physically, in addition to being drugged and bound.

32.     Plaintiff screamed out in pain, but Combs continued to violently anally rape her. He easily physically overpowered her, smashing her head down on the pool table while she futilely tried to wriggle out from under him.

33.     During the brutal attack, Plaintiff vomited into her mouth and on the table. At one point, she involuntarily defecated. Combs was undeterred. He wiped himself off, applied more lubricant, and without any acknowledgement of Plaintiff's distress, proceeded to vaginally penetrate Plaintiff.

34.     Plaintiff experienced intense pain and burning sensations in her vagina and anus. Plaintiff continued to scream for help because of the extreme pain she felt as Combs penetrated her over and over. She then lost consciousness again.

35.     The next time she regained consciousness, Plaintiff was on the couch and Sherman was standing in front of her with his bare penis in her face. Sherman slapped Plaintiff

in the face and forcefully inserted his penis into her mouth. Sherman slapped her yet again, and continued to thrust his penis into Plaintiff's mouth. Plaintiff once again lost consciousness.

36.     When she next awoke, Plaintiff was on the couch naked and alone in the room.

37.     Plaintiff was in severe pain and distress. Her anus and vagina burned, her face and wrists were bruised, and her genital area smelled strongly of menthol. She felt a liquid, presumably semen, dripping out from inside of her.

38.     Her dress was thrown over her, her purse was on the couch next to her, and her bra was on the floor nearby. She did not see her underpants.

39.     Terrified that Combs and Sherman would return, Plaintiff quickly got dressed and bolted out of the studio room where she had been raped.

40.     Still dizzy and weak, Plaintiff called a livery driver that her family regularly hired and knew well. The driver picked her up from outside Bad Boy studio. She was disheveled, crying uncontrollably and suffering from agonizing pain.

41.     The driver drove her to the hospital and tried to convince her to report the rape and get a rape kit, but she was unable to leave the car, "shaking and crying hysterically" and terrified of what Combs would do to her and her family if she reported him.

### The Aftermath and Impact of the Rape on Plaintiff

42.     Plaintiff sustained serious physical injuries in the aftermath of the rape. As noted, she had burning in her vagina and anus, and bruising on her wrists and face. In the days after the assault, she suffered prolonged anal bleeding and hemorrhoids.

43.     Because of Combs' power and notoriety, Plaintiff was afraid to report what had happened. She was involved in a contentious divorce and custody battle at the time and feared that reporting the rape would cause her to lose custody of her young child.

44.    Plaintiff confided in her boyfriend, Combs' employee, hoping he would comfort and support her.  But instead of supporting her, he discouraged her from disclosing the assault, telling her that it could negatively impact his own career.

45.    Following the assault and multiple times over the years, both Combs and Sherman contacted Plaintiff and warned her to be silent, threatening repercussions including Plaintiff potentially losing custody of her son if she ever disclosed the assault.  Because of their enormous power in the industry, including through their ownership of and positions at the Combs Corporations, Plaintiff knew that they could follow through on their threats.

46.    Plaintiff told close friends that Combs and Sherman had drugged and savagely raped her, but as noted was afraid to report the attack to the police out of fear that Defendants would follow through on their threats.  She was even afraid to stay in New York City while Combs lived there, so with the help of a friend, she fled to Pennsylvania.  Plaintiff has in fact relocated multiple times throughout the years in an effort to stay away from Combs.

47.    Plaintiff has suffered irreparable harm because of the brutal rape by Defendants Combs and Sherman.  She suffers from severe depression and post-traumatic stress disorder. She also has suffered suicidal ideation and intrusive thoughts, and has attempted to end her life.

48.    Plaintiff lives in constant fear.  She struggles with hypervigilance and experiences anxiety and panic attacks in social settings, preferring to be alone.  Her need to hide to feel safe has strained her relationships with friends and family.

49.    Defendants' rape has also impacted Plaintiff's ability to engage in sexual acts with her intimate partners.  To this day, she cannot be in certain sexual positions without experiencing flashbacks of Combs violently penetrating her from behind.

*Plaintiff Learns that the Rape was Videotaped and Published*

50.     On or around November 27, 2023, all the trauma of the rape came flooding back to Plaintiff when her former boyfriend revealed to her for the first time that Combs and Sherman had recorded and published the video of the horrific attack.

51.     Earlier that month, Cassie Ventura had come forward and filed a lawsuit against Combs for subjecting her to years of severe sexual and physical abuse.  The case had been settled one day after it had been filed.  Plaintiff's former boyfriend invoked Ms. Ventura's effort to hold Combs' accountable and for the first time confessed that years earlier, but sometime after the actual rape itself, Sherman and Combs had showed him and a group of men – some of whom were also employed by Combs' companies and/or their related entities – the video of Plaintiff being raped.  He disclosed that Combs and Sherman had a pattern and practice of non-consensually recording women engaging in sexual acts and making those videos available to the public, including by selling tapes as pornography.  A Bad Boy artist later corroborated in a text message that Sherman "use[d] to sell porn of him doing this to chix" and that Sherman "did that to a lot of women."

52.     Plaintiff's former boyfriend reported that he and the other men watched the recording of Plaintiff's rape on a handheld camera while at the Bad Boy studio in New York City.  Combs, Sherman, and some of the other men made derogatory comments about the former boyfriend's relationship with Plaintiff, in an attempt to shame him into cutting ties with Plaintiff and to cause her further emotional harm and embarrassment.

53.     On information and belief, Defendants continued to show the video of the rape to others over the years and through to the present and/or sold the video as pornography.

54.     Plaintiff was shocked and horrified that Combs and Sherman had recorded and publicized the video of them raping her.  After over two decades spent trying to heal and distance herself from the experience, Plaintiff was devastated by the news.  She felt as if her life had been turned upside down, again, and like the rape had been happening again and again even as she was trying to forget it.  She experienced acute psychological distress, plunging into a deep depression and having suicidal ideations.  She felt intense fear, anger, and anxiety.

55.     Plaintiff lives with the distress of knowing that the video of her brutal rape is in circulation and that anyone, including her family, friends, and peers, could view it at any time.

56.     In a panic, she reached out to Sherman after learning about the tape, hoping to protect herself from further humiliation by convincing him to destroy the tape or provide it to her, but he did not respond.

### Combs' Pattern and Practice of Violence and Abuse, Including of Drugging, Raping, and Secretly Recording His Violence Against Women

57.     Combs has a long history of violence and abuse.  This long-standing behavior has been enabled by his ownership of and titles at the Combs Corporations and their affiliated entities and the immense wealth and power he has amassed through such business dealings.

58.     Among a long list of allegations:  In 1996 he was found guilty of criminal mischief for threatening a photographer from the *New York Post* with a gun.  In 1999 he was arrested and charged with second-degree assault and criminal mischief in connection with the beating of a record executive, and arrested again the same year in relation to a shooting at a club in New York; that female victim has consistently stated that Combs shot her in the face at point-blank range.

59.     Combs also has a pattern and practice of using his power and influence in the music and entertainment industries to submit people to sexual violence, often drugging his

15

victims and/or coercing them to consume drugs and recording the assaults, often without the victim's knowledge, just as he did with Plaintiff.  In the past year, a number of these people have come forward to accuse Combs of sexual assault, violent rapes and/or sex trafficking:

a.  In November 2023, three lawsuits were filed against Combs under the New York Adult Survivors Act.  As noted above, Cassie Ventura, an artist signed to Bad Boy, sued Combs in the Southern District of New York for rape and years-long physical abuse, facilitated in part by Combs having supplied Ms. Ventura with copious amounts of drugs and urging her to take them, beginning in 2006.  Combs regularly recorded Ms. Ventura engaging in sex acts he forced her to engage in.

b.  Joi Dickerson-Neal, who had appeared with Combs in a music video, sued Combs in New York County Supreme Court alleging Combs drugged her, sexually assaulted her, and secretly recorded the assault in 1991.

c.  Liza Gardner, whom Combs met at an event hosted by a record label affiliated with Bad Boy, sued him for raping her and a friend in 1990 or 1991 when she was only 16.

d.  In December 2023, an anonymous plaintiff sued Combs in the Southern District of New York for drugging and gang-raping her in 2003 when she was only 17 years old.  That complaint alleges that Combs and one of his business associates and employees lured the plaintiff to Daddy's House through their affiliations with the Bad Boy enterprise and its related entities, and raped her at the same location where Plaintiff was raped.

e.  In February 2024, Rodney "Lil Rod" Jones, one of Combs' former producers, sued Combs for forcing him to engage in unwanted sex acts and sex trafficking,

among other allegations. In that complaint, Mr. Jones alleges that Combs regularly drugged others including minors by giving them alcoholic beverages laced with ecstasy and other date rape drugs, that he believes he himself was drugged by Combs, and that Combs routinely secretly recorded sexual encounters.

f. In May 2024, two more women sued Combs. Former model Crystal McKinney sued Combs in the Southern District of New York for drugging and sexually assaulting her at his recording studio in 2003. Combs had promised to help advance Ms. McKinney's modeling career, a promise she believed he would fulfill because of his ownership of and/or titles at the Bad Boy enterprise and its related entities. April Lampros, an intern at Arista Records, which was an owner of Bad Boy, also sued Combs in May 2024 in New York County Supreme Court for raping her on multiple occasions, secretly filming at least one of the assaults, and showing the recording to multiple people. Ms. Lampros alleges that Combs ordered her to take drugs on one occasion before he raped her.

g. In July 2024, former adult film star Adria English – who was employed by Combs as an entertainer at his infamous White Parties that brought together the biggest names in the music and entertainment industries – sued Combs in the Southern District of New York for sex trafficking, alleging that he required her to consume drinks laced with ecstasy and secretly recorded the sexual acts he forced her to engage in.

h. In September 2024, singer and songwriter Dawn Angelique Richard also sued Combs. Richard was employed by Combs as part of the girl group Danity Kane, formed by Combs, and later as a key member of Combs' band Diddy – Dirty

Money.  She sued Combs in the Southern District of New York for sexual assault, false imprisonment, and for subjecting her to hostile working conditions due to her gender, including degrading comments and threats.  Ms. Richard has alleged that Combs regularly supplied others including minors with copious amounts of drugs and alcohol, and subjected them to sexual acts while they were sedated and/or unconscious due to the drugs and alcohol.

60.     On September 16, 2024, Combs was arrested at a Manhattan hotel after a grand jury indicted him on charges of sex trafficking and racketeering.  The indictment details how "[f]or decades, [Combs] abused, threatened, and coerced women and others around him to fulfill his sexual desires, protect his reputation, and conceal his conduct."  *See United States of America v. Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love,"* Index No. 24 Crim. 542, Indictment (SDNY), at ¶ 1.[1]  It notes that Combs' abuse of women was enabled by "the employees, resources, and influence of the multi-faceted business empire that he led and controlled—creating a criminal enterprise whose members and associates engaged in, and attempted to engage in, among other crimes, sex trafficking, forced labor, kidnapping, arson, bribery, and obstruction of justice."  *Id.*

61.     The indictment notes that Combs' "business" was operated at various times in both Manhattan and Los Angeles, "under a variety of United States-based corporate entities, including Bad Boy Entertainment, Combs Enterprises, and Combs Global (collectively, the 'Combs Business')."  *Id.* at ¶ 2.

62.     According to the indictment, "[p]hysical abuse by [Combs] was recurrent and widely known."  *Id.* at ¶ 4.  It notes that Combs' assaults on women included "striking,

---

[1] All allegations in the indictment are incorporated by reference herein.

punching, dragging, throwing objects at, and kicking them." *Id.* Combs was also charged with "us[ing] the Combs Business, including certain employees, to carry out, facilitate, and cover up his abuse and commercial sex" and the indictment notes that his employees' conduct "was facilitated and assisted by Combs' control of the Combs Business." *Id.* at ¶ 5. The indictment specifically refers to the involvement of "Combs' security staff," likely referring to Sherman. *Id.* It notes that Combs and his affiliates recorded sexual assaults and controlled victims through the use of drugs. *See id.* at ¶ 12. In or about March 2024, law enforcement seized narcotics and more than 1,000 bottles of baby oil and lubricant from Combs' residences. *Id.*

63. Combs' long history of violence against women makes unmistakably clear that his actions, including his attack of Plaintiff, have been motivated by gender. Specifically, he has a profound contempt for women and an ongoing practice of denigrating and trying to humiliate them.

64. Combs' treatment of Plaintiff accords with his pattern and practice of drugging, raping, and secretly recording the women he is abusing.

**FIRST CAUSE OF ACTION**
**(Violation of New York City Victims of Gender-Motivated Violence Protection Act)**
**(All Defendants)**

65. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

66. By viciously and violently forcing sexual contact, oral sex, anal sex, and sexual intercourse on Plaintiff, Defendants Combs and Sherman committed a "crime of violence motivated by gender" under the Victims of Gender-Motivated Violence Protection Act ("VGMVPA") as defined in New York City Administrative Code § 10-1103.

67.     The requirement that the crime of violence be committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender is satisfied because Defendants Combs and Sherman violently forced Plaintiff to engage in vaginal intercourse, and oral and anal sex without her consent.  Gender animus inheres when consent is absent.  Moreover, Combs' long history of violence against women evinces a deep contempt for women, as does Sherman's alleged pattern of committing his own sexual assaults, recording them, and selling them as pornography.

68.     Defendants Combs' and Sherman's rapes of Plaintiff presented a serious risk of physical injury to her and in fact caused her significant physical injuries including burning and pain in her vagina and anus, anal bleeding, and bruising to her face and wrists.

69.     The Combs Corporations enabled Combs and/or Sherman to commit the crime of violence motivated by gender because Combs and Sherman raped Plaintiff at the Bad Boy studio, where on information and belief they routinely committed sexual assault and gender-motivated violence, as detailed in other civil lawsuits.  Given Combs' and Sherman's long-standing pattern and practice of committing sexual violence against women, including at the same location where they raped Plaintiff, the Combs Corporations had and/or should have had knowledge of Combs and Sherman using the premises for this unlawful conduct, and did nothing to stop it.

70.     The Combs Corporations enabled Combs and/or Sherman to commit the crime of violence motivated by gender by failing to, among other things, protect Plaintiff from a known danger and/or have sufficient policies and procedures in place to prevent sexual assault and/or train their employees on identifying and preventing sexual assault.  Given Combs' and Sherman's long-standing pattern and practice of committing sexual violence against women,

including on premises owned and/or operated by Defendants, the Combs Corporations had and/or should have had knowledge that Combs and Sherman were a danger to Plaintiff, and did nothing to stop Combs and Sherman.

71.    The Combs Corporations enabled Combs and/or Sherman to commit the crime of violence motivated by gender by failing to properly supervise Combs and/or Sherman.  Further, Combs, as the owner of Bad Boy and Daddy's House, watched Plaintiff being raped by his employee, on the premises of Bad Boy.  The Combs Corporations had knowledge and/or should have had knowledge of Combs' widespread and well-known practice of committing sexual assault and gender-motivated violence, including on premises owned and/or operated by Defendants, and did nothing to stop it.

72.    The Combs Corporations further enabled Combs and/or Sherman to commit the crime of violence motivated by gender by actively placing, maintaining, and/or employing Combs and/or Sherman in positions of power and authority, despite the fact that they knew and/or should have known that Combs had a widespread and well-known practice of committing sexual assault and gender-motivated violence, including on premises owned and/or operated by Defendants.  Combs and Sherman used their titles and authority conferred by the Combs Corporations, including as CEO, Founder, and Chairman (Combs) and Head of Security (Sherman), to facilitate and perpetuate the violent assault on Plaintiff, and to intimidate and force Plaintiff to keep quiet in subsequent years.

73.    The Combs Corporations also enabled Combs and/or Sherman to commit the crime of violence motivated by gender because Combs and Sherman used Plaintiff's boyfriend's employment as an executive for Bad Boy and Daddy's House, and their stated concerns about his performance at work, to lure Plaintiff out of her home to meet with them alone.

74.     On information and belief, Plaintiff alleges that Defendant Organizational Does 1 through 10, inclusive, are other parties not yet identified who have enabled Combs and/or Sherman to commit the crime of violence motivated by gender, in the ways articulated above and/or in other ways.

75.     As a result of Defendants' actions, Plaintiff suffered damages in an amount to be determined at trial and pursuant to the fee-shifting provision of the statute.

76.     This legal action has been commenced within the statutory timeframe provided by the two-year look-back window for VGMVPA claims.  *See* New York City Administrative Code § 10-1105.

## SECOND CAUSE OF ACTION
### (Violation of New York Civil Rights Law § 52-B)
### (Combs and Sherman)

77.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

78.     By raping Plaintiff and recording it, Defendants caused Plaintiff to be depicted in a video image unclothed and with intimate body parts exposed, and engaging in sexual conduct with another person in violation of New York Civil Rights Law § 52-B.

79.     Defendants published and/or disseminated the video without Plaintiff's knowledge or consent.  On information and belief, Defendants have continued to disseminate the video, including by selling it as pornography, through the present.

80.     Plaintiff was fully identifiable in the video.

81.     Plaintiff had a reasonable expectation that Defendants would not secretly record a violent rape of her and disseminate the video to others.

82.     By intentionally publicly humiliating Plaintiff and trying to ruin Plaintiff's romantic relationship with her then-boyfriend when they published the video, Defendants had the purpose of harassing, annoying, and/or alarming Plaintiff.

83.     As a direct and proximate result of Defendants' actions in violation of New York Civil Rights Law § 52-B, Plaintiff has suffered and continues to suffer emotional harm, including mental anguish, emotional distress, and humiliation in an amount to be determined at trial.

84.     Defendants' violations of New York Civil Rights Law § 52-B were malicious, willful, wanton, and outrageous, entitling Plaintiff to an award of punitive damages.

85.     Defendants should be ordered to account for and destroy all copies of the video that are in their actual or constructive possession, custody, or control.

86.     Defendants should be temporarily and permanently enjoined from further disseminating or publishing any intimate images of Plaintiff.

**THIRD CAUSE OF ACTION**
**(Violation of New York City Administrative Code § 10-180)**
**(Combs and Sherman)**

87.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

88.     By recording and showing others the video of themselves violently raping Plaintiff, Defendants disclosed an intimate image of Plaintiff without her consent in violation of New York City Administrative Code § 10-180.

89.     Defendants are covered recipients because they recorded and/or caused the video to be recorded themselves.

90.     On information and belief, Defendants have continued to disseminate the video, including by selling it as pornography, through the present.

91.     Such intimate images depicted Plaintiff unclothed and with intimate body parts exposed, and engaging in sexual conduct with another person, in violation of § 10-180.

92.     Plaintiff was fully identifiable in the video.

93.     Plaintiff had a reasonable expectation that Defendants would not secretly record a violent rape of her and disseminate the video to others and certainly did not intend for the recording to be disclosed to anyone.

94.     Defendants intentionally disclosed and disseminated the video to Plaintiff's then-boyfriend and others without Plaintiff's consent with the intent to publicly humiliate Plaintiff and ruin her relationship with her then-boyfriend, causing her economic, physical, and/or substantial emotional harm.

95.     Defendants' intention in disseminating and publishing the video was to harass, annoy, alarm, and humiliate Plaintiff, and to cause her economic, physical, and/or substantial emotional harm.

96.     As a direct and proximate result of Defendants' actions in violation of New York City Administrative Code § 10-180, Plaintiff has suffered and continues to suffer emotional harm, including mental anguish, emotional distress, and humiliation in an amount to be determined at trial.

97.     Defendants' violations of New York City Administrative Code § 10-180 were malicious, willful, wanton, and outrageous, entitling Plaintiff to an award of punitive damages.

98.     Defendants should be ordered to account for and destroy all copies of the video that are in their actual or constructive possession, custody, or control.

99.     Defendants should be temporarily and permanently enjoined from further disclosing and disseminating any intimate images of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

a.  Awarding compensatory damages for all physical injuries, emotional distress, psychological harm, anxiety, humiliation, physical and emotional pain and suffering, family and social disruption, and other harm, in an amount to be determined at trial;

b.  Awarding punitive damages in an amount to be determined at trial;

c.  Awarding attorneys' fees and costs pursuant to any applicable statute or law, including under New York City Administrative Code § 10-1104, New York Civil Rights Law § 52-B(2), New York City Administrative Code § 10-180, and any other applicable statute or law;

d.  Awarding pre- and post-judgment interest on all such damages, fees, and/or costs;

e.  Attaching any and all of Defendants' real property and other assets located in the State of New York pursuant to Federal Rule of Civil Procedure 64;

f.  Ordering Defendants to account for and destroy all copies of any and all images and videos taken of or in connection with Combs' and Sherman's sexual assault of Plaintiff that are in their actual or constructive possession, custody, or control, and enjoining Defendants temporarily and permanently from further disseminating or publishing any intimate images or videos of Plaintiff; and

g.  Awarding such other and further relief as this Court may deem just and proper.

Dated: New York, New York
        September 24, 2024

CUTI HECKER WANG LLP

By: _Mariann Wang_
        Mariann Meier Wang
        Heather Gregorio
        Jazly Liriano
        305 Broadway, Suite 607
        New York, New York 10007
        (212) 620-2603
        mwang@chwllp.com
        hgregorio@chwllp.com
        jliriano@chwllp.com

ALLRED, MAROKO & GOLDBERG
        Gloria Allred
        305 Broadway, Suite 607
        New York, New York 10007

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAWN ANGELIQUE RICHARD,<br><br>    Plaintiff,<br><br>  v.<br><br>SEAN COMBS, HARVE PIERRE, REMOTE PRODUCTIONS INC, NEW REMOTE PRODUCTIONS INC, THE NORDLINGER GROUP LLC, NOVEMBER 15 LLC, DADDY'S HOUSE RECORDING STUDIO, BAD BOY ENTERTAINMENT LLC, BAD BOY RECORDS LLC, BAD BOY ENTERTAINMENT HOLDINGS INC, BAD BOY PRODUCTIONS HOLDINGS INC, BAD BOY BOOKS HOLDINGS INC, THE SEAN COMB MUSIC INC, SEAN COMBS CAPITAL LLC, COMBS ENTERPRISES, LLC, UNIVERSAL MUSIC GROUP NV,  INTERSCOPE GEFFEN A&M RECORDS, DIAGEO AMERICAS SUPPLY INC D/B/A CIROC DISTILLING COMPANY D/B/A CIROC CANNING CO, COMBS WINES AND SPIRITS LLC, JANICE COMBS PUBLISHING INC, JANICE COMBS PUBLISHING HOLDINGS INC, SONY SONGS, a division of SONY MUSIC PUBLISHING LLC, LOVE RECORDS INC,  EPIC RECORDS**, DOE CORPORATIONS  1-10, AND DOE DEFENDANTS 11-20,<br><br>    Defendants. | CIVIL CASE NO. cv-24-6848<br><br><br>__COMPLAINT__<br><br>__JURY TRIAL DEMAND__ |

Plaintiff Dawn Angelique Richard ("Ms. Richard"), by and through her attorneys, The Bloom Firm and IP Legal Studio LLC, brings this action against Defendants.  Ms. Richard alleges upon knowledge concerning her own experience and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.  Dawn Angelique Richard, known professionally as Dawn Richard, is an American musician, singer, songwriter, and performer. She gained widespread recognition as a member of

the girl group *Danity Kane*, formed by Defendant Sean Combs ("Mr. Combs"), and later transitioned into a key member of Mr. Combs' band *Diddy – Dirty Money.*

2.      Defendant Sean Combs, a once-celebrated hip-hop mogul popularly known by his stage names Puff Daddy, Puffy, P. Diddy, Diddy, or Love, skyrocketed to fame in the late 1990s and became a powerful and enduring figure in the music and entertainment industry. In 1998, Mr. Combs explained the origins of his stage name in a *USA Today* interview: his nickname was "**Puff**" because he had a "**temper**" and was known to "**huff and puff**" when he was angry.

3.      Over the decades following his rise to fame, Mr. Combs' star-studded, larger-than-life persona overshadowed his vicious temper and pervasive acts of violence directed towards those in his inner circle – specifically, women.

4.      Mr. Combs' namesake temper frequently manifested in physical violence. Mr. Combs regularly hurled objects in fits of rage, often throwing items such as mobile phones, laptops, food, and studio equipment across the room or at people. On numerous occasions, Ms. Richard witnessed Mr. Combs brutally beat his girlfriend, Ms. Casandra ("Cassie") Ventura ("Ms. Ventura"). His persistent abuse included choking and strangling Ms. Ventura, striking her with his hands and with objects, slapping her, punching her, and throwing items at her, including a scalding hot pan.

5.      On many occasions, Ms. Richard tried to intervene, offering Ms. Ventura support and encouragement to leave Mr. Combs. Each time, Mr. Combs learned of her efforts to help Ms. Ventura and became enraged, threatening Ms. Richard's life with statements such as "**you want to die today,**" "**I make n***** go missing**" and "**I end people.**"

6.      Compounding Mr. Combs' violent acts and death threats, he flagrantly exploited Ms. Richard's musical talent as a singer and writer while withholding her rightful earnings, stealing her copyrighted works, and subjecting her to years of inhumane working conditions which included groping, assault, and false imprisonment, among other violations.

7.     For nearly a decade, Mr. Combs manipulated Ms. Richard with mantras that submission to his depraved demands was necessary for career advancement, instilling in her the belief that such abuse and exploitation were required for female artists to succeed in the music industry. It was not until Ms. Ventura's bravery in coming forward that Ms. Richard realized her own personal suffering was tied to the many years of abuse by Mr. Combs that had become normalized for her.

8.     As more women courageously come forward, Plaintiff has been empowered by this collective strength and now adds her voice to the growing chorus of victims bravely sharing their harrowing stories. Together, they seek justice and stand in solidarity, as the latest victims of the #Me Too movement in the music industry.

## PARTIES

9.     Ms. Dawn Angelique Richard is a resident of the State of California and was employed by Defendants Remote Productions Inc., New Remote Productions Inc., Bad Boy Entertainment LLC, Bad Boy Records LLC, Bad Boy Entertainment Holdings LLC, Bad Boy Productions Holdings Inc., Bad Boy Books Holdings Inc., The Sean Comb Music Inc., Sean Combs Capital LLC, and Combs Enterprises LLC (hereinafter collectively "Bad Boy Records") from 2005 until 2012. At all relevant times herein, Ms. Richard met the definition of an "employee" of Defendant Bad Boy Records and related entities. At all relevant times herein, Ms. Richard was a resident of the State of New York.

10.     Defendant Sean Combs, upon information and belief, resides within the State of California. At all relevant times herein, Mr. Combs met the definition of an "employer" of Ms. Richard under all relevant statutes.

11.     Defendant Harve Pierre ("Mr. Pierre"), upon information and belief, resides within the state of New Jersey. At all times relevant herein, Defendant Harve Pierre was the president of

3

Bad Boy Entertainment and Bad Boy Records in New York and met the definition of an "employer" of Ms. Richard under all relevant statutes.

12.     Defendants Remote Productions Inc. ("RPI") and New Remote Productions Inc. ("NRPI") are Delaware corporations and television production companies, which upon information and belief, were created by Mr. Combs to produce *Making The Band* in New York and in California. At all relevant times herein, RPI and NRPI employed Ms. Richard under all relevant statutes.

13.     Defendant The Nordlinger Group LLC is a finance firm with its principal place of business in New York, and on information and belief, is/was employed by other named defendants herein to pay and account to Ms. Richard pursuant to her employment with other named defendants.  On information and belief, The Nordlinger Group LLC formed November 15 LLC for purposes of disbursing funds relative to *Making The Band.*

14.      Upon information and belief, Defendant Daddy's House Recording Studio Inc. is a New York corporation and a music recording studio owned by Defendant Bad Boy Records, in New York.  At all relevant times herein, Ms. Richard was an employee required to work at said studio.

15.     Defendant Bad Boy Entertainment LLC is a music, media, and entertainment company founded by Defendant Sean Combs, which includes the record label Defendant Bad Boy Records LLC. Defendant Bad Boy Entertainment LLC is a Delaware limited liability company and successor-in-interest to RPI. At all relevant times herein, Bad Boy Entertainment LLC met the definition of an "employer" of Ms. Richard under all relevant statutes.

16.     Defendant Bad Boy Entertainment Inc. is a Florida corporation.  At all relevant times herein, Bad Boy Entertainment Inc. met the definition of an "employer" of Ms. Richard under all relevant statutes.

17.     Defendant Bad Boy Entertainment Holdings Inc. is a New York corporation. Upon information and belief, Defendant Bad Boy Entertainment Holdings Inc. is a successor-in-interest to Defendants Bad Boy Entertainment LLC, Bad Boy Records LLC, and Bad Boy Entertainment Inc. as alleged herein.

18.     Defendant Bad Boy Productions Holdings Inc. is a New York corporation.  Upon information and belief, Defendant Bad Boy Production Holdings Inc. is a successor-in-interest to other "Bad Boy" Defendants as alleged herein.

19.     Defendant Bad Boy Books Holdings Inc. is a New York corporation.  Upon information and belief, Defendant Bad Boy Books Holdings Inc. is a successor-in-interest to other "Bad Boy" Defendants as alleged herein.

20.     Defendant The Sean Comb Music Inc. is a company under which Ms. Richard was employed by Defendant Sean Combs.  Upon information and belief, The Sean Comb Music Inc. is a part or successor to other "Bad Boy" company Defendants as alleged herein.

21.     Defendants Sean Combs Capital LLC and Combs Enterprises LLC are New York limited liability companies, which upon information and belief are successor-in-interest companies to Defendant The Sean Comb Music, Inc.

22.     Defendant Universal Music Group N.V. ("UMG") is a Dutch–American multinational music corporation. UMG's corporate headquarters are located in Hilversum, Netherlands and its operational headquarters are located in Santa Monica, California.  Defendant Interscope Geffen A&M Records are subsidiaries of UMG, with operational headquarters in California.  At all relevant times herein, UMG and subsidiaries Interscope Geffen A&M Records financially benefited from, condoned and enabled Defendant Combs' misconduct as defined under all relevant statutes.

23.      Defendant Diageo Americas Supply Inc. was a New York corporation, and upon information and belief, currently is a Kentucky and/or an Illinois corporation, doing business as

Ciroc Distilling Company in New York.  Ms. Richard conferred a benefit on these Defendants pursuant to the direction of Defendant Combs.

24.     Defendant Combs Wines and Spirits LLC is a New York limited liability company, which upon information and belief, is Defendant Combs' holding company for sponsorships by Defendant Diageo Americas Supply Inc. d/b/a Ciroc Distilling Company.  At all relevant times, Ms. Richard was employed by Defendant Combs Wines and Spirits LLC under all relevant statutes.

25.     Defendant Janice Combs Publishing Inc. is a music publishing administrator and a New York corporation, who at all relevant times, held or holds the publishing copyrights of Ms. Richard pursuant to her employment with other defendants herein under all relevant statutes.

26.     Defendant Janice Combs Publishing Holdings Inc. is a music publishing administrator, a New York corporation, and a successor in interest to Janice Combs Publishing Inc., who at all relevant times, held or holds the publishing copyrights of Ms. Richard pursuant to her employment with other defendants herein under all relevant statutes.

27.     Defendant Sony Songs, a division of Sony Music Publishing LLC, is a New York limited liability company who is the assignee of Ms. Richard's publishing copyrights from Defendants Janice Combs Publishing Inc. and Janice Combs Publishing Holdings Inc.

28.     Defendant Love Records Inc. is a music record label owned and/or, upon information and belief, controlled by Defendant Sean Combs, with its principal place of business in California.  Ms. Richard conferred a benefit on this Defendant pursuant to the direction of Defendant Combs.

29.     Defendant Epic Records, a record label currently managing other defendants' companies, interests and music, is a subsidiary of Sony Music Entertainment, with its principal place of business in New York.  Ms. Richard conferred a benefit on these Defendants pursuant to the direction of Defendant Combs.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, as this action asserts violations of 18 U.S.C. § 1591 *et seq.*, 18 U.S.C. § 1589 *et seq.*, and 17 U.S.C. § 106 *et seq.*, and therefore raises federal questions regarding the deprivation of Ms. Richard's rights. The Court has supplemental jurisdiction over Ms. Richard's related claims arising under state and city law pursuant to 28 U.S.C. § 1367(a).

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District, and Defendants Sean Combs and Bad Boy Records conduct substantial business and/or are domiciled in this District.

## FACTUAL ALLEGATIONS

**I.      Ms. Richard is selected to be in Mr. Combs' all-female musical group *Danity Kane* after competing on MTV's *Making The Band***

32.     In or around 2004, Ms. Richard was selected to participate in Season 3 of MTV Networks' reality television show, *Making The Band.* The show centered around the formation and development of a new musical group under the mentorship of Mr. Combs. The contestants would compete and be chosen by Mr. Combs to form a band, which would go on to create albums and perform.

33.     For aspiring artists like Ms. Richard, *Making The Band* represented a concrete path to a career in the entertainment industry. Ms. Richard appeared in Seasons 3 and 4 of *Making The Band*, which first aired in 2005,[1] and in Season 5 of *Making His Band*, which aired in 2009.[2]

---

[1] *Making The Band* is a reality television series that premiered on MTV in 2000. The show has had several iterations, each featuring a different musical group. The stars of Season 3 and 4 were Aubrey O'Day, Wanita "D. Woods" Woodgett, Shannon Bex, Aundrea Fimbres, and Ms. Richard, known as the all-female group *Danity Kane.*

[2] Season 5 of *Making The Band* featured *Diddy – Dirty Money*, a trio consisting of Mr. Combs, Kalenna Harper, and Ms. Richard.

34.     Out of thousands of contestants, Ms. Richard along with approximately twelve other women were selected to participate in Season 3 of *Making The Band*. Five women, including Ms. Richard, were ultimately chosen to be in the group, *Danity Kane*, which was named by Ms. Richard.

35.     Prior to and including the first *Danity Kane* album, *Making The Band* was filmed entirely at Daddy's House Recording Studio at 3120 W. 44th Street, New York, New York. The *Making The Band* content that focused on *Danity Kane*'s work on its second album, *Welcome to the Dollhouse*, was filmed at Daddy's House and at Mr. Combs' Miami residence. Other *Making The Band* episodes included Los Angeles as a third filming location.

36.     Upon information and belief, to create *Making The Band*, camera crews filmed 24 hours a day, gathering months' worth of footage to condense into mere hours of entertainment for viewers.

37.     *Danity Kane* released its self-titled debut album in August 2006 and its second album *Welcome to the Dollhouse* in March 2008.

38.     *Danity Kane's* first album sold over 4,000,000 copies; damages to Ms. Richard for unpaid salaries are estimated at $1,000,000.00; *Danity Kane's* second album *Welcome to the Dollhouse* sold over 2,000,000 copies; damages to Ms. Richard for unpaid salaries and royalties are estimated at $500,000.00. Damages on unpaid wages for touring on over 100 dates for Ms. Richard with *Danity Kane* are estimated at $1,800,000.00.

39.     Mr. Combs fired bandmate Aubrey O'Day and Wanita "D. Woods" Woodgett from *Danity Kane* on live television at the height of its fame in 2008; which resulted in *Danity Kane* being disbanded in 2009.

//

//

## II.    Ms. Richard first encounters Mr. Combs' aggressive, intimidating behavior and animus toward women

40.    During the auditions and on the set of *Making The Band*, Mr. Combs projected an aura of superiority, wealth, and power. Mr. Combs regularly wore sunglasses and avoided looking the female contestants in the eyes, contributing to an atmosphere of uncertainty and intimidation.

41.    During auditions, Mr. Combs spoke to the female contestants in a hostile, condescending manner, making disparaging gender-based remarks such as calling them "fat," "ugly," "bitches," and "hoes." Ms. Richard felt threatened and intimidated by Mr. Combs' blatant disdain for the young women, like herself, who were excited for the opportunity to be on his show.

42.    Once the band was made, Mr. Combs' contempt for women was readily apparent as he continued to display aggressive and hostile behavior towards Ms. Richard and her all-female *Danity Kane* bandmates. Mr. Combs regularly referred to the five women as "bitches" and "hoes" and denigrated their physical appearances. By way of example, Mr. Combs stated that Ms. Richard was too skinny and needed to "do something about this [her face]."

43.    On one occasion in or around 2005, during the first season of *Making The Band 3*, Ms. Richard observed Mr. Combs' ex-partner and the mother of three of his children, Kim Porter, leaving Mr. Combs' recording studio in tears with visible facial injuries including a lacerated lip. Realizing that Mr. Combs was capable of committing acts of violence against women caused Ms. Richard to feel deep apprehension and fear that Mr. Combs could one day physically harm her.

44.    Ms. Richard was present when Mr. Combs was introduced to Casandra ("Cassie") Ventura for the first time, in or around 2006. The moment Mr. Combs first saw Ms. Ventura, his demeanor noticeably shifted. Mr. Combs positioned himself directly in front of Ms. Ventura's seat, invading her personal space, and fixated on her with an intense, unyielding stare, isolating her from the other people in the room including Ms. Ventura's then-boyfriend, music producer Ryan Leslie.

45.     Coincidentally, this first meeting between Mr. Combs and Ms. Ventura was the first time that Ms. Richard was in Mr. Combs' presence without a camera crew filming. Observing Mr. Combs behave in such an intimidating, predatory manner the first time that they were off camera made Ms. Richard feel deeply apprehensive and afraid of him.

46.     Subsequently, Ms. Ventura ended her relationship with Mr. Leslie and began dating Mr. Combs, who would become violent and abusive towards her.

### III.     *Danity Kane*: Sexual harassment, inhumane treatment, and denial of basic needs by Mr. Combs

47.     For the majority of Ms. Richard's tenure as a member of *Danity Kane* and *Diddy – Dirty Money*, Mr. Combs required her to remain at his various residences and studios in New York, Los Angeles, Florida, and New Jersey for activities such as recording, rehearsing, dressing, preparing costumes, and exercising.

48.     Throughout the productions of *Making the Band* 3 and 4, Mr. Combs deprived Ms. Richard and her *Danity Kane* bandmates of basic needs such as adequate food and sleep. When Ms. Richard or her *Danity Kane* bandmates requested meals or rest, Mr. Combs refused and chastised them with derogatory comments like "you bitches don't want this" or "y'all are not hungry enough" and "I'm paying you bitches to work." This demeaning behavior gradually undermined Ms. Richard's confidence and contributed significantly to her growing feelings of insecurity and fear of reprisal from Mr. Combs.

49.      Upon information and belief, Mr. Combs would regularly be awake for prolonged periods of time because he was high on drugs. During these periods, Mr. Combs demanded continuous access to Ms. Richard and her *Danity Kane* bandmates, often forcing them to record and rehearse for stretches of 36 to 48 hours without breaks. Forced to choose between eating and sleeping, Ms. Richard lost a significant amount of weight, weighing approximately 100 pounds

at a height of 5'4". Ms. Richard began to normalize these extreme conditions and perceive them as standard requirements of her participation in *Danity Kane*.

50.     Mr. Combs regularly sent his associates to wake Ms. Richard and her *Danity Kane* bandmates in the overnight hours so he could watch them rehearse. The regularity of these disturbances led Ms. Richard to adapt by sleeping in a sitting position, fully dressed and with makeup on, heightening her anxiety. Over time, this abnormal sleeping arrangement came to feel routine, further normalizing Mr. Combs' invasive demands.

51.     In addition to exhausting rehearsals, Mr. Combs required Ms. Richard and her bandmates to participate in intense workouts with a personal trainer. On one occasion, while running on the beach, Ms. Richard became so dehydrated that she vomited. Instead of offering medical assistance, MTV Networks' camera crew filmed the incident – contributing to her acceptance of such treatment as part of her professional life.

52.     The unrelenting and rigorous schedule of rehearsals, performance, and near-constant filming that Mr. Combs imposed caused Ms. Richard to experience extreme weight loss, dehydration, fatigue, and painful rashes from the microphone pack she was required to wear on her back. These conditions intensified Ms. Richard's feelings of powerlessness, as she increasingly viewed them as part of her professional reality and feared the consequences of any resistance.

53.     In a further assertion of power and dominance, Mr. Combs insisted on holding meetings while dressed only his underwear. On one occasion in 2008 at his Miami residence, Mr. Combs emailed Ms. Richard directing her to meet him in the living room. When she arrived, he was wearing only his underwear. Ms. Richard asked Mr. Combs to put clothes on, but he refused, stating "This is my fucking house." Mr. Combs then conducted a meeting lasting approximately an hour while dressed in his underwear, causing Ms. Richard to feel violated and embarrassed, and amplifying her feelings of powerlessness.

54.     Following the official *Danity Kane* breakup in early 2009 effectuated by Mr. Combs, Ms. Richard experienced significant financial hardship. With no prospective opportunities for employment within the entertainment field, Ms. Richard spent several months traveling from Baltimore to Daddy's House Recording Studio in New York, without pay or allocated budget. Mr. Combs promised that Ms. Richard's compositions would result in payment of license fees and royalties pursuant to her contract with Bad Boy Records; however, no such compensation was ever reported or paid to Ms. Richard. Damages relative to these continuing copyright infringements will be proved at trial.

**IV.     *Diddy – Dirty Money*: Ms. Richard experiences Mr. Combs' gender-based physical violence, criminal acts, sexual assault, threats, and intimidation**

55.     By approximately the fall of 2009, many of Ms. Richard's compositions had been recorded by other Bad Boy Records artists. Due to the success of her compositions, Ms. Richard was invited to meet with musical artist Kalenna Harper ("Ms. Harper") and shortly thereafter Mr. Combs, Ms. Richard and Ms. Harper formed a new group: *Diddy – Dirty Money*.

56.     Initial recording for *Diddy – Dirty Money*'s album *Last Train to Paris* took place in Mr. Combs' home on Doheny Drive in Los Angeles, California. On the first day of recording, Ms. Richard and Ms. Harper arrived at Mr. Combs' home and waited in the kitchen, where Mr. Combs' girlfriend, Ms. Ventura, was frying eggs for him.

57.     Ms. Richard observed Mr. Combs come down the stairs looking high on drugs, enter the kitchen, approach Ms. Ventura, and scream, "I've been asking you for my shit; I can't stand you bitch, you never do it right!" Mr. Combs pushed Ms. Ventura against the wall and choked her, then picked up the scalding hot pan of eggs and threw it at her, causing her to fall to the ground in a fetal position. Cursing and screaming, Mr. Combs dragged Ms. Ventura up the stairs.

58.     Frozen in shock and terror, Ms. Richard heard glass shattering, crashing, and banging noises as Mr. Combs dragged Ms. Ventura up the stairs. Ms. Richard wanted to intervene and help Ms. Ventura, but Ms. Harper adamantly refused to interfere in Mr. Combs' relationship, and physically led Ms. Richard out of the residence. Terrified and shaken, Ms. Richard returned to her hotel where she was unable to sleep due to worrying about Ms. Ventura and her own safety.

59.     The following day, Ms. Richard received a call demanding that she return to Mr. Combs' residence to continue recording. Mr. Combs brought Ms. Richard and Ms. Harper into the recording room at his studio, locked the door, dimmed the lights, and gave each of them flowers.  Mr. Combs went on at length, stating: "this is normal, this was just a lover's argument where no one was hurt . . . this is what love is… I'm giving you an opportunity, if you want to make it you'll shut your mouth…*if you say anything, there will be consequences."*  Mr. Combs further warned that "*people end up missing.*" Being threatened while locked for over 20 minutes in a small, enclosed space with Mr. Combs after observing Mr. Combs violently assault Ms. Ventura the day before, Ms. Richard was terrified and genuinely believed that Mr. Combs would follow through on his threats.

60.     In or around November 2009, after the Soul Train Awards in Atlanta, Georgia, Mr. Combs flew Ms. Richard and Ms. Harper to his house in New York on his private jet for an afterparty. There were many well-known celebrities at the afterparty, and copious amounts of illegal drugs were being openly consumed. Upon information and belief, Mr. Combs had arranged for dozens of young women and girls – some of whom appeared to be underage – to be transported to the party. The women arrived wearing little to no clothing and were given drugs and alcohol. Many of them appeared lethargic or passed out while Mr. Combs and his guests performed sexual acts on them. Ms. Richard believed that her presence at the party was a test to see whether Mr. Combs could trust her.

61.     Mr. Combs repeatedly said things like "this is a buffet, enjoy yourselves; this is what we do, this is how we party." Ms. Richard felt shocked and horrified at the sight of Mr. Combs and his guests violating incapacitated young women, and implored Mr. Combs' personal assistant Capricorn Clark to allow her to leave. Ms. Clark insisted that Ms. Richard wait 15 minutes for Ms. Clark to "make it make sense" – that is, to make Ms. Richard's exit less conspicuous so that Mr. Combs would not notice that she had left. Knowing that she was not free to leave and had to wait for Ms. Clark to help her orchestrate her departure, Ms. Richard experienced feelings of panic and being trapped against her will.

62.     Mr. Combs regularly placed Ms. Richard in similar situations with no means to escape. At Mr. Combs' drug-fueled parties, his guests, including Ms. Richard, were required to surrender their phones upon entry. Mr. Combs kept the doors locked and guarded by security personnel, making it impossible for Ms. Richard to leave without alerting Mr. Combs that she had done so. Mr. Combs hired police officers to attend his parties, sending a clear message to guests that his influence extended to law enforcement officers, and creating a climate of fear and a tacit warning that reporting him to authorities would be both unacceptable and futile.

63.     On many occasions, Mr. Combs had parties at his Miami, Florida residence that lasted for several days. At one of the parties, Ms. Richard witnessed Mr. Combs openly stating that he had arranged for busloads of young "exotic" girls, such as mixed Black and Asian, Indonesian, and albino. Once again, Ms. Richard observed inebriated young girls being sexually violated by Mr. Combs and his guests. In a state of panic and terror, Ms. Richard fled to the bedroom Mr. Combs had insisted she stay in and barricaded the door shut with furniture.

64.     Mr. Combs openly assaulted Ms. Ventura in front of Ms. Richard and other witnesses on multiple occasions. On one occasion in or around the fall of 2009, *Diddy – Dirty Money* was in New York preparing to perform at a festival. Inside their vehicle, Mr. Combs grabbed Ms. Ventura's neck, pulled her out of the van onto the grass and pinned her head down,

choking her while yelling "you gonna get fucked up today." This incident took place in the backstage area just outside the festival and was entirely visible to passersby.

65.    In another instance, in or around early 2010, Mr. Combs punched Ms. Ventura in the face in the bathroom of a party in Los Angeles. Frequently, when Ms. Ventura attempted to voice an opinion or stand up to Mr. Combs, he would strike her or wrap his hands around her throat and choke her.

66.    On the first several occasions that they observed Mr. Combs assault Ms. Ventura, Ms. Richard and Ms. Harper spoke with Ms. Ventura to support and encourage Ms. Ventura in escaping her abusive relationship with Mr. Combs. Every time that Ms. Richard and Ms. Harper tried to intervene, Mr. Combs learned of the conversation and became irate. Mr. Combs screamed at the women: "Y'all bitches don't get in my relationship," "Don't tell my bitch [Ms. Ventura] what she need to be doing," "Just make money and shut the fuck up," "I end artists," "I shelve careers," "*You could be missing*," and "*You bitches want to die today*," among other threats.

## V.    Interscope Records Enabled Mr. Combs' Gender-Motivated Violence

67.    In or around late 2009 or early 2010, Bad Boy Entertainment ("Bad Boy") entered an agreement with Interscope Geffen A&M Records ("Interscope"). Upon information and belief, Bad Boy was paid $50 million in exchange for Bad Boy's future releases being distributed through Interscope. In so doing, Mr. Combs intended to capitalize on Interscope's significant resources and enhance the promotion and sales of Bad Boy's releases, including *Diddy – Dirty Money*'s upcoming album.

68.    In the weeks and months leading up to the Bad Boy-Interscope deal, Mr. Combs had frequent meetings with producer and then-CEO of Interscope Records Jimmy Iovine. On one such occasion, Combs hosted a dinner at a West Hollywood, California restaurant, which Ms. Richard and Ms. Harper were required to attend. Among the guests at the dinner were celebrities like NeYo and Usher, as well as Mr. Iovine. At the dinner, Mr. Combs and Ms. Ventura had an

argument. In front of the dinner guests, Mr. Combs hissed at Ms. Ventura in a screaming whisper and forcefully punched her in the stomach causing her to double over in visible pain, crying. Ms. Clark escorted Ms. Ventura out of the restaurant, and Mr. Combs remained and continued socializing with the dinner guests. At this point, Interscope Records clearly had actual knowledge that Combs was dangerous around females and that Combs was willing to brazenly batter a female in public.

69.     Even after Mr. Iovine watched Mr. Combs commit a violent assault in front of numerous high-profile witnesses, the Bad Boy-Interscope deal took place and remained in effect, providing Mr. Combs with immense financial rewards and enabling him to commit further acts of violence without fear of repercussions. Watching Mr. Combs openly assault Ms. Ventura in front of Mr. Iovine and various celebrities – and observing that other powerful music industry representatives were complicit in Mr. Combs' behavior – amplified Ms. Richard's fears that Mr. Combs could one day harm her and that his actions would be accepted and normalized by everyone surrounding him.

70.     As part of the agreement between Bad Boy and Interscope, Interscope heavily promoted Diddy – Dirty Money's *Last Train to Paris* album. Mr. Iovine had presented Mr. Combs with a demo of "*Coming Home*" for him to produce – a song that would become a multi-platinum hit.[3] Mr. Iovine was encouraging Mr. Combs to develop a new sound for the album, into which Interscope was investing significant resources. Ms. Richard, Ms. Harper and Ms. Ventura all provided vocal performances for this project. Released in November 2010, the album "*Last Train to Paris*" became *Diddy – Dirty Money*'s most commercially successful project, providing vast financial rewards to both Interscope and Mr. Combs.

---

[3]  The album "*Last Train to Paris*" credits both Interscope Records and Bad Boy Records. https://www.discogs.com/master/347136-Diddy-Dirty-Money-Last-Train-To-Paris; https://www.revolt.tv/article/2020-12-14/64067/studio-sessions-never-before-heard-stories-of-diddy-dirty-moneys-last-train-to-paris-creation

### VI. *Diddy- Dirty Money*: Mr. Combs subjects Ms. Richard to Labor Trafficking and Oppressive Working Conditions

71.    In or around the fall of 2009, *Diddy – Dirty Money* began recording the song *Love Comes Down*. Upon information and belief, Mr. Combs continued to use drugs that caused him to remain awake for prolonged periods of time. When he was awake, he would demand that Ms. Richard and Ms. Harper record in the studio, where they would spend three to four consecutive days recording without a break to eat or sleep. Mr. Combs required Ms. Richard and Ms. Harper to remain at his home(s) continuously, denying the opportunity to return to their hotel rooms for breaks. The degree of control Mr. Combs exercised over Ms. Richard's daily life and basic needs exacerbated the significant power imbalance and threatening atmosphere that ensured Ms. Richard's compliance with his demands.

72.    Mr. Combs regularly left the studio and required Ms. Richard and Ms. Harper to stay and write verses to songs. Occasionally, Ms. Richard tried to leave to get something to eat or to go to her hotel. Whenever Ms. Richard tried to leave, Mr. Combs would call and demand, "where the fuck are you" and "we have an album to make." Mr. Combs frequently made threats, especially if they asked for food or rest, stating "you're a bitch," "I don't want to see your fucking face," "I make n****s go missing," and "I make things go away." Each time, Ms. Richard returned to the studio immediately, believing that Mr. Combs was capable of following through with his threats.

73.    Mr. Combs criticized Ms. Richard for being "too skinny," yet denied her requests for food and demanded that she drink only peanut butter shakes. Mr. Combs had full meals prepared by a chef and ate them in front of Ms. Richard and Ms. Harper, never offering them food.

74.    Ms. Richard and Ms. Harper begged for food and rest breaks, but Mr. Combs refused, making statements such as "absolutely fucking not" and "this is what it takes to be great."

Mr. Combs' responses underscored the threat he posed and heightened Ms. Richard's concerns for her safety and well-being.

75.     As Ms. Richard continued to work non-stop – transitioning between the studio, rehearsals, workouts, and back to the studio – she became severely dehydrated and experienced chronic stomach cramping from being undernourished and excessively thin. On the numerous occasions that she told Mr. Combs that she was not feeling well, he called her lazy and dismissed her health concerns, instilling in her further apprehension of communicating her needs.

76.     In or around the summer of 2010, Ms. Richard experienced abdominal pain, swollen glands and a fever. She was hospitalized and diagnosed with arthralgia (joint pain due to overuse, sprains, tendonitis and infection), anemia, and a low white blood cell count. Ms. Richard presented Mr. Combs with her medical records specifying that she needed to emphasize eating well, being adequately hydrated, and getting adequate rest, but Mr. Combs ordered her to report to the studio the next day for another multi-day recording session. Mr. Combs' blatant disregard for her health and well-being cemented Ms. Richard's fear of his authority and control over her career and health.

77.     Ms. Richard continued to witness Mr. Combs' abuse towards Ms. Ventura. Ms. Ventura often wore sunglasses and makeup in an attempt to hide visible injuries. These incidents further solidified Ms. Richard's fear of Mr. Combs, as they were constant reminders of the physical dangers she potentially could – and eventually would – face.

78.     Mr. Combs often exhibited uncontrollable anger during recording sessions, throwing objects like albums, laptops, and food against the wall or at individuals. Mr. Combs frequently flew into frenzied, unpredictable rages. Ms. Richard feared making any misstep that could direct his anger toward her. However, her fears went beyond her immediate physical safety. Because she had witnessed Mr. Combs' violent nature, a side of Mr. Combs that the world had not yet seen, she feared that falling out of Mr. Combs' good graces or worse, standing up to him

or speaking out against him, could result in serious harm to her. Ms. Richard frequently thought about Mr. Combs' threat about making people "go missing" and feared taking any action that could label her as a target.

79.     Despite Mr. Combs' violence, threats, and misogyny, *Diddy-Dirty Money* experienced significant sales of records, selling 2,000,000 copies of one single, 500,000 of another in the US, and in Australia 5,000,000 single copies. Ms. Richard's unpaid wages and royalties are estimated at $1,200,000.00. Ms. Richard's unpaid touring wages are estimated at over $350,000.00 for touring dates within the United States alone.

## VII.    CIROC / DiddyBeats / Nonpayment

80.     In or around the summer of 2009, Ms. Richard and Ms. Harper were required by Mr. Combs to perform as part of *Diddy – Dirty Money* and attend numerous promotional events, including late or overnight parties, all of which were under contract between Mr. Combs and CIROC Vodka, or between Mr. Combs and DiddyBeats pursuant to the Bad Boy – Interscope record deal.

81.     Ms. Richard was never compensated for the extra time she spent fulfilling Mr. Combs' promotional contracts, including the CIROC and the DiddyBeats campaign. Mr. Combs was paid approximately $250,000 per CIROC appearance. Mr. Combs did not compensate Ms. Richard or Ms. Harper for these appearances, other than just $5,000 each on a handful of occasions.   Mr. Combs' ongoing explanation for withholding compensation was that their appearances were a requirement for their tour. Additionally, Ms. Richard was required to appear, and to promote DiddyBeats, through parties, album songs and videos.

82.     Over time, Mr. Combs was paid $6.25 million for 25 CIROC shows that Ms. Richard was required to attend.[4]  Following each show, Ms. Richard and Ms. Harper approached

---

[4] Numerous videos depict Ms. Richard performing at CIROC events, such as the video available at
https://youtu.be/HtIiNNsIgkw?si=4FFCB1tD6gCeX4R3. This video depicts Ms. Richard singing as part of *Diddy – Dirty Money* and is representative of her performances as part of Mr. Combs' CIROC campaign.

Mr. Combs to inquire about their insufficient and sporadic payments. Mr. Combs routinely responded with statements such as "You bitches aren't grateful" and "you don't want this."  Ms. Richard estimates losses from CIROC campaign promotions totaling at least $1,562,500.00. Upon information and belief, Mr. Combs received an advance on DiddyBeats for which Ms. Richard received no compensation.

### VIII.   Mr. Combs Sexually Harasses and Assaults Ms. Richard

83.      Between approximately 2009 and 2011, throughout *Diddy – Dirty Money*'s recording process, rehearsals, and performances, Mr. Combs repeatedly ordered Ms. Richard to strip down to her underwear. He frequently referred to her as a "bitch" or "whore" and made demeaning remarks about her body, alternatingly calling her lazy, fat, ugly, and skinny, particularly in front of his friends, producers, and bodyguards.

84.      Mr. Combs frequently held meetings with Ms. Richard wearing only his underwear, despite Ms. Richard's protests and repeated requests for him to put on clothing. In response, Mr. Combs called her a "bitch" and "whore" and reminded her that she should be grateful for the opportunity to be there.

85.      Often while they were recording in the studio, Mr. Combs would hold "parties" where he would invite young men and women, who were often scantily dressed and appeared underage, to use drugs and engage in sex acts. Ms. Richard observed Mr. Combs and his colleagues kissing, groping, and inappropriately touching the young women. Upon information and belief, the participants often left the immediate area to have sex and returned shortly thereafter.

86.     On numerous occasions between approximately 2009 and 2011, under the guise of preparing for performances, Mr. Combs would intrude into Ms. Richard's changing room at *Daddy's House* unannounced while Ms. Richard was undressed.

87.     Even though a female stylist was present and assisting Ms. Richard with her wardrobe, Mr. Combs would grope Ms. Richard's body, including her bare buttocks and her chest area near her breasts. With no legitimate purpose, and without Ms. Richard's consent, Mr. Combs caressed her buttocks to show the stylist where he wanted her high-waisted panties positioned, and attempted to touch her breasts, claiming to show the stylist where he wanted her bra straps to go.

88.     When Mr. Combs would enter the changing room, Ms. Richard would cover her chest with her hands to prevent Mr. Combs from seeing or touching her breasts. When Mr. Combs would touch her body, Ms. Richard would attempt to swat his hands away and state "don't touch me."

89.     Mr. Combs frequently smacked Ms. Richard's bare buttocks and often commented on her body, noting that although she was "too skinny," she had an "ass."

90.     Ignoring her visible and communicated discomfort, Mr. Combs persisted and continued to intrude when Ms. Richard was in the dressing room, continued to touch her buttocks and breast area under the guise of showing the stylist what to do, and continued to smack her buttocks without her consent.

91.     In or around October 2010, *Diddy – Dirty Money* performed in Glasgow, Scotland, where Mr. Combs engaged in overt sexual advances towards Ms. Richard. On numerous occasions when Ms. Richard exited the dressing room fully styled, Mr. Combs looked at her approvingly and smacked her buttocks while making comments such as "you're looking good," "OK Dawn, OK," and "I see what that is" in a flirtatious tone. Each time, Ms. Richard moved away and asked him not to touch her, but Mr. Combs disregarded her protests.

21

92.     On their last night in Glasgow, Ms. Richard witnessed Mr. Combs and several other males gang-banging Mr. Combs' female assistant at the hotel pool. Ms. Richard immediately left and went to her hotel room.

93.     On their flight back to the United States the next day, Ms. Richard asked Mr. Combs where his assistant was; Mr. Combs replied, "I don't give a fuck where that bitch is." Ms. Richard later learned that Mr. Combs had taken his assistant's passport with him to the United States, leaving the assistant stranded in the United Kingdom.

94.     In Glasgow, Ms. Harper confided in Ms. Richard that her husband and manager, Tony Vick ("Mr. Vick"), was abusive. After an especially severe assault, she confided in Ms. Richard that she wanted to leave Mr. Vick, and Ms. Richard helped her to plan her exit from the relationship. However, Ms. Harper and Mr. Vick reconciled, and both Mr. Combs and Mr. Vick – who had a close relationship – learned of Ms. Richard's role in helping Ms. Harper. Both Mr. Combs and Mr. Vick became noticeably distrustful of Ms. Richard, which exacerbated her fears of harm and reprisal.

95.     When Mr. Combs would require his *Diddy – Dirty Money* bandmates to stay at his residence in Miami, Ms. Richard would barricade herself inside her room at night, placing heavy furniture against the door because she feared being harmed in her sleep.

96.     In or around late December 2010, Ms. Richard, Ms. Harper, and Ms. Ventura were in Mr. Combs' Los Angeles home when Mr. Combs stated "I want to gift you [fake] titties for Christmas." Mr. Combs reached out and cupped Ms. Richard's breasts without her permission and stated "You're an A; I'm thinking a D." Ms. Richard recoiled in shock and left the room.

97.     Throughout the abovementioned time period, when Ms. Richard resisted Mr. Combs' advances, Mr. Combs retaliated by denying her singing parts in songs, removing her from songs, refusing to allow her to sing in performances, and turning her microphone off during

performances. The more Ms. Richard rebuffed his advances, the more Mr. Combs' retaliatory behavior increased.

### IX.     Mr. Combs Assaults and Falsely Imprisons Ms. Richard

98.     In or around December 2010, *Diddy – Dirty Money* was preparing for an upcoming performance on *Saturday Night Live* ("SNL"). As usual, rehearsals lasted for days without the opportunity to eat or rest, and the rehearsal schedule was unpredictable.  After waiting all day for Mr. Combs to call or send a car, Ms. Richard received a phone call from Mr. Combs demanding "Where the fuck are you bitches?  You bitches don't want this; y'all don't deserve to have someone pick you up; get a cab." Ms. Richard and Ms. Harper immediately took a taxi to SIR Studios at 520 West 25th St, New York NY, anxious because Mr. Combs sounded enraged.

99.     Upon their arrival at SIR Studios, Mr. Combs and Harve Pierre were waiting for them in the lobby. Mr. Combs screamed obscenities at them: "**Where the fuck were you bitches? You bitches don't want to win . . . you don't want this . . . I'm so tired of y'all.**" Ms. Richard noticed that people in the lobby were reacting to Mr. Combs' tirade. Embarrassed, Ms. Richard asked Mr. Combs to stop swearing and calling them "bitches" in front of everyone.

100.     Mr. Combs' facial expression shifted as he stepped towards Ms. Richard, raised his arm, and swung his fist toward her face. Believing that Mr. Combs was going to hit her, Ms. Richard braced for the impact. Before Mr. Combs could strike her, Mr. Combs' bodyguard grabbed her, escorted her out of the studio and forced her into the Bad Boy Records Bentley that was parked outside. Ms. Harper ran after Ms. Richard, and Mr. Combs' bodyguard closed and locked the Bentley's doors with both women inside.

101.     Inside the vehicle, Ms. Richard realized there were no interior door handles, and that they were locked inside with no way to escape. Ms. Richard's belongings were in the studio, but she was able to call her father from Ms. Harper's cell phone. Ms. Richard relayed to her father what had happened, and that she needed help and feared that she would go missing. Moments

later, Mr. Combs' bodyguard removed only Ms. Harper from the Bentley, leaving Ms. Richard locked in the car alone for over two hours.

102.    Ms. Richard screamed as loudly as she could, but no one responded.  It was late evening in the wintertime, the windows were heavily tinted, and the interior of the car was dark except for faint interior lights. Ms. Richard's belongings and winter coat were in the studio, while the ignition was off and there was no heat. With Mr. Combs' prior threats and violence running through her mind, Ms. Richard felt sheer panic, terror, and feelings of claustrophobia at being locked in a small, dark, enclosed space with no way to communicate or call for help. She began to feel cold and feared for her life, not knowing when or if she would be released.

103.    Ms. Richard's father drove to New York from Baltimore and arrived at the studio approximately two hours later. Only after her father arrived and demanded to see her did Mr. Pierre order Mr. Combs' bodyguard to release Ms. Richard from the vehicle.  Mr. Pierre ushered Ms. Richard's father between several rooms at SIR Studios, where he waited for approximately two hours before being able to confront Mr. Combs.  Once Ms. Richard's father expressed that he intended to contact police, Mr. Combs warned him to "think about your family" and "think about your daughter's career." Her father appeared visibly frightened by Mr. Combs' threats and actions, which in turn made Ms. Richard feel terrified for herself and her family's safety.

104.    The next night, *Diddy – Dirty Money* performed on SNL. Mr. Combs subsequently called Ms. Richard, complimented her performance, and concluded with a threat: "you don't call your dad unless you're in the hospital."

//

//

//

//

//

24

## X.    Unjust Enrichment of Defendants by Breach of Contract and/or Copyright Infringement

105.    As a member of *Danity Kane*, Ms. Richard has performed on over 15 songs[5] and holds composition credits for more than 3 songs.[6]  Defendants have failed to account to or pay Ms. Richard as agreed for her compositions and her performances and have breached contracts and infringed her copyrights, all of which has unjustly enriched Defendants.

106.    As a member of *Diddy-Dirty Money*, Ms. Richard has performances recorded on over 9 songs;[7] additionally Ms. Richard has composition rights and credits on more than 5 songs.[8]  Defendants have failed to account to or pay Ms. Richard as agreed for her compositions and her

---

[5]  1. "Show Stopper" 2. "Ride for You" 3. "Damaged" 4. "Bad Girl" 5. "Pretty Boy" 6. "Striptease" 7. "Poetry" 8. "Lights Out" 9. "Sucka for Love" 10. "Ain't Going" 11. "2 of You" 12. "Do Me Good" 13. "Ecstasy" (featuring Rick Ross) 14. "Lemonade" (featuring Tyga) 15. "All in a Day's Work"

[6]

1. "Bad Girl" (featuring Missy Elliott) Written by Dawn Richard, Mary Brown, Mary Brockert, Missy Elliott, Sean Combs, Quincy Jones, David Wolinski, Shanell Woodgett
2. "Secret Place" (Interlude) • Performed by Dawn Richard
3. "Infrared" Written by Dawn Richard, Kwame Holland

[7]  1. "Angels"
2. "Love Come Down"
3. "Yeah Yeah You Would"
4. "Hate That You Love Me"
5. "Your Love" (featuring Trey Songz)
6. "Ass on the Floor" (featuring Swizz Beatz)
7. "Yesterday" (featuring Chris Brown)
8. "I Hate That You Love Me"
9. "Shades" (featuring Lil Wayne and Justin Timberlake)

[8]  1. "I Hate That You Love Me"
Written by Dawn Richard, Richard Butler, Warren Trotter, Arden Altino, Durrell Artaze Babbs
 2.  "Looking for Love" (featuring Usher)
Written by Dawn Richard, Usher Raymond IV, Sean Combs, Kalenna Harper, Kevin "KC" Cossom, Marcella
 Ms. Lago Araica, Eric "E-Class" Akon, Mario "Yellowman" Winans
3. "Strobe Lights" (featuring Lil Wayne)
Written by Dawn Richard, Lil Wayne, Sean Combs, Richard Butler, Warren Trotter, Arden Altino, Marcella Ms.
Lago Araica, Kevin "KC" Cossom
4. "Loving You No More" (featuring Drake)
Written by Drake, Dawn Richard, Sean Combs, Richard Butler, Warren Trotter, Arden Altino, Mario Winans, Jerry
"Wonda" Duplessis
5. Change" Written by Dawn Richard, Richard Butler, Warren Trotter, Arden Altino

25

performances and breached contracts and/or infringed her copyrights, unjustly enriching Defendants.

107. In 2020, Mr. Combs selected Ms. Richard for a reboot of *Making The Band*, and Ms. Richard spent hours preparing to be a judge on the new show. However, the COVID-19 pandemic halted those plans, and Ms. Richard was never compensated in any way.

108. On or about July 1, 2021, Mr. Combs and Bad Boy Records (or Holdings or both), directed Janice Combs Publishing Inc. to assign its administration rights of Ms. Richard's songs,[9]

---

9

| SONG TITLE | WRITER NAME | ARTIST |
|---|---|---|
| 86 | CARLA HAYNES-CARTER (20), **DAWN RICHARD (20)**, ANDREW SCOTT (60) | |
| 2 SIDES (TWO SIDES) | Ray Romulus (15), **Dawn Angelique Richard (13.34)**, Jeremy Reeves (15), Jonathan Yip (15), Malcolm McDaniel (13.33), Ray McCullough (15), Rosina Russell (13.33) | DANITY KANE |
| AIN'T GOING | Iyanna Dean (45), Bernard Malik (50), **DAWN RICHARD (2.5)**, WANITA WOODGETT (2.5) | DANITY KANE |
| ASS ON THE FLOOR | SEAN COMBS (5), KASSEEM DEAN (55), KALENNA HARPER (20), **DAWN RICHARD (10)**, LEROY WATSON (10) | DIDDY-DIRTY MONEY |
| Burn So Deep | James Michael Edgar (50), **DAWN RICHARD (50)** | Jimmy Edgar Feat. Dawn Richard |
| Dance | Noise Castle (25), Ester Dean (25), DAVID RYAN HARRIS (25), **Dawn Richard (25)** | DAWN RICHARD |
| Faith | Ricky Lewis (50), **DAWN RICHARD (50)** | |
| FIREFLIES | **DAWN RICHARD (25),** HARMONY SAMUELS (50), ANDREW SCOTT (25) | ZENDAYA |
| FLASHBACK (INTERLUDE) | Romeo IX (50), **DAWN RICHARD (25),** WANITA WOODGETT (25) | DANITY KANE |
| HATE YOU NOW | Marcela aracia (5), SEAN COMBS (10), JAMES FAUNTLEROY (35), KALENNA HARPER (2.5), Nathaniel Hills (45), **DAWN RICHARD (2.5)** | DIDDY-DIRTY MONEY |
| HOME FOR CHRISTMAS | **DAWN RICHARD (100)** | DANITY KANE |
| HURT (LOVING YOU NO MORE) | SEAN GARRETT (50), AUBREY GRAHAM (15), **DAWN RICHARD (5)**, MIKAL SNODDY (25), MARIO WINANS (5) | DIDDY |
| LIGHTS OUT | Craig Betz (20), Neil Betz (20), SEAN COMBS (5), **DAWN RICHARD (50)**, MARIO WINANS (5) | DANITY KANE |
| LOVE COME DOWN | Shawn Carter (7.5), SEAN COMBS (17), BERRY GORDY JR (1.5), KALENNA HARPER (10.63), ROB HOLLADAY (34), ALPHONSO MIZELL (1.5), FREDDIE PERREN (1.5), **DAWN RICHARD (10.62)**, DEKE RICHARDS (1.5), LEROY WATSON (12.75), KANYE WEST (1.5) | DIDDY |
| PERFECTLY BLIND | BRIAN ANDREWS (6.25), Robert Curry (6.25), MICHAEL MCCLUNEY (6.25), QWANELL MOSLEY (25), DIRK PATE (25), **DAWN RICHARD (25),** Willie Taylor (6.25) | DAY26 |
| SECRET PLACE (INTERLUDE) | SHANNON BEX (10), AUNDREA FIMBRES (10), AUBREY O'DAY (10), **DAWN RICHARD (10)**, MARIO MENDELL WINANS (50), WANITA WOODGETT (10) | DANITY KANE |
| Stopwatch | Derek Scott Bergheimer (10), Jesse Dee Boykins III (33), **DAWN RICHARD (20)**, Karl Rubin (5), Travis Wayne Stewart (32) | |
| Stopwatch (Salva Remix) | Jesse Dee Boykins III (20), **DAWN RICHARD (10)**, PAUL SALVA (50), Travis Wayne Stewart (20) | |
| STRIP TEASE | Marcella Araica (5), SHANNON BEX (6), AUNDREA FIMBRES (6), NATE HILL (45), AUBREY O'DAY (6), **DAWN RICHARD (6),** JAMES WASHINGTON (20), WANITA WOODGETT (6) | DANITY KANE |
| Strobe Lights | SEVEN AURELIUS (30), Dwayne Carter (10), Kenneth Coby (7.5), KALENNA HARPER (27.5), Tim McEwan (20), **DAWN RICHARD (5)** | DIDDY-DIRTY MONEY |
| TAILOR MADE SUIT | DANIEL BRYANT (0), PHILLIP BRYANT (0), CYNTHIA LOVING (0), **DAWN RICHARD (0)** | LIL MO |
| TELL ME | Ray Romulus (12.50), Briana Jackson (16.67), **Dawn Angelique Richard (16.67)**, Jeremy Reeves (12.50), Jonathan Yip (12.50), Ray McCullough (12.50), Rosina Russell (16.66) | DANITY KANE |
| YEAH YEAH YOU WOULD | MARCELLA ARACIA (5), RICHARD BUTLER (12), KALENNA HARPER (23), Floyd Hills (45), **DAWN RICHARD (5),** LEROY WATSON (10) | DIDDY-DIRTY MONEY |

held from her tenure with Defendants in the years 2005-2012, to Sony Songs, a division of Sony Music Publishing LLC ("Sony"). The assignment, signed by Ms. Richard on October 22, 2024, purported to credit, through a semi-annual accounting, Ms. Richard's royalty account for Ms. Richard's compositions from between 80 to 90% of publisher's share. However, no statements were ever provided, no payments were ever made, and no reversions nor assignment were ever recorded with Performing Rights Organizations or other royalty collecting entities by Defendants or by Sony. Defendants have wholly failed to account to or pay Ms. Richard as agreed for her compositions and her performances in breach of the assignment and have thereby infringed her copyrights, resulting in Defendants being unjustly enriched.

109.    During the summer of 2023, Mr. Combs' new record company, Love Records Inc., tendered a contract for negotiation to Ms. Richard for the song entitled "*Deliver Me*," embodied as Track 3 on *The Love Album: Off The Grid*, officially released on September 15, 2023. Upon information and belief, *Deliver Me* sold well prior to Mr. Combs' legal troubles in November 2023. Continuing to the present, Ms. Richard sought to establish her rightful percentage as a 21% composer on *Deliver Me*, Mr. Combs personally called Ms. Richard and left a voicemail complaining about her fair requests. Upon information and belief, Mr. Combs directed his attorneys to avoid confirming the composition percentages on the song; and in fact, list composers who played no part in composing the song. As a result, the contract was never signed by either Ms. Richard or Love Records Inc. Nevertheless, Ms. Richard obtained a copyright registration certificate on a timely basis; said registration lists authors/claimants as agreed when the song was created in 2009. That registration is filed separately in the Court and supports Ms. Richard's claim of copyright infringement by Defendants herein. Defendants Love Records Inc. and Mr.

Combs infringed Ms. Richard's copyrights in the composition of *Deliver Me* by releasing *Deliver Me* without Ms. Richard's permission and without compensation.

## DAMAGES

110.     As a result of the acts and conduct complained of herein, Ms. Richard has suffered and will continue to suffer the loss of income, wages, benefits, royalties, promotional fees, touring fees and other compensation. Ms. Richard has also suffered, among other things, future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, post-traumatic stress disorder, anxiety disorder, insomnia, panic attacks and other non-pecuniary losses entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorney's fees and costs, and other remedies as this Court may deem appropriate.

## FIRST CAUSE OF ACTION
### Violation of The Victims of Gender-Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq*. ("VGMVPL")
### *Against Defendants Sean Combs, Harve Pierre, Interscope Records & Bad Boy Records*

111.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

112.     The above-described conduct of Mr. Combs, including but not limited to Mr. Combs' physical and sexual assaults, harassment, and unlawful imprisonment of Plaintiff in New York City constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 of the New York City VGMVPL. The term "crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution or conviction; and the term "crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

113.    The above-described conduct of Mr. Combs, including, but not limited to, sexual assault, physical assault, threats, and false imprisonment, all conduct proscribed by PL 110/120.00(1), PL 120.15, PL 240.30(3), PL 135.05; PL 135.10 Pl 130.52, PL 240.30(1)(a), PL 120.14(2), PL S 135.5(3), constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103.

114.    Defendants Harve Pierre, Interscope Records, and Bad Boy Records have financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

115.    Defendants Harve Pierre, Interscope Records, and Bad Boy Records enabled, condoned, had knowledge of, and failed to act to prevent or mitigate Mr. Combs' commission of the abovementioned crimes of violence motivated by gender and are therefore also liable under the VGMVPL.

116.    As a direct and proximate result of the above mentioned crimes of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate, as set forth in § 10-1104.

117.    Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

## SECOND CAUSE OF ACTION
### Sexual Assault pursuant to The California Sexual Abuse and
### Cover Up Accountability Act, Cal. Civ. Proc. § 340.16
### *Against Defendants Sean Combs & Bad Boy Records*

118.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

119.    Mr. Combs subjected Plaintiff to sexual battery, as defined in Cal. Penal Code §§ 234.4(e)(1). In doing so, he intended to and did cause harmful and sexually offensive contact with their person and place them in imminent apprehension of such contact.

120.    Pursuant to California Code of Civil Procedure § 340.16, as amended by Assembly Bill 2777, this cause of action is timely because it is commenced within three years of the date Plaintiff discovered the injuries resulting from Defendants' acts, which Plaintiff did not discover, and could not have reasonably discovered, until November 2023 when Ms. Ventura filed a lawsuit against Defendant.

121.    Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

122.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

123.    Plaintiff also seeks reasonable attorneys' fees as provided under Cal. Civil Code § 52.5.

## THIRD CAUSE OF ACTION
### Forced Labor in Violation of 18 U.S.C. §§ 1589 and 1595
### *Against Defendants Sean Combs, Bad Boy Records & UMG Interscope Geffen A&M*

124.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

125. Defendants knowingly obtained labor from Plaintiff through threats of serious harm, physical restraint, and other means of coercion, in violation of 18 U.S.C. § 1589.

126. Defendants Bad Boy Records, UMG Interscope Geffen A&M Records knowingly benefited from the forced labor and the trafficking activities conducted by Mr. Combs.

127. Under 18 U.S.C. § 1595, Plaintiff is entitled to bring a civil action against all Defendants for their violation of 18 U.S.C. § 1589.

128. As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

129. Plaintiff seeks compensatory damages for the harm suffered as a result of Defendants' forced labor practices.

130. Plaintiff also seeks punitive damages to deter such conduct by Defendants in the future, along with reasonable attorney's fees and costs.

131. Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## FOURTH CAUSE OF ACTION
### Violation of New York Services for Victims of Human Trafficking, N.Y. Servs. Law § 483-bb(c)
#### Against Defendants Sean Combs & Bad Boy Records

132. Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

133. Plaintiff is a victim of labor trafficking within the meaning of N.Y. Penal Law 135.35 and is therefore entitled to bring a civil action under N.Y. Soc. Serv. § 483-bb.

134. The Defendants' acts and omissions, taken separately and/or together, as outlined above, constitute a violation of N.Y. Soc. Serv. § 483-bb. Specifically, Defendant Sean Combs

perpetrated labor trafficking of Ms. Richard by inducing her to engage or continue to engage in labor activity by means of instilling a fear in her that, if she refused to comply, he would cause physical injury, serious physical injury, or engage in other conduct constituting a felony or unlawful imprisonment in the second degree in violation of New York Penal Law 135.05, and Defendant Bad Boy Records benefitted from Mr. Combs' venture by holding Ms. Richard, an artist signed with Defendant Bad Boy Records and otherwise employed by other Defendant Doe Corporations, captive to Mr. Combs' demands and desires. At all relevant times, Defendant Bad Boy Records participated in and facilitated the obtainment of Plaintiff's labor induced by force, fraud, or coercion.

135.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

136.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

### FIFTH CAUSE OF ACTION
### Sex Trafficking under 18 U.S.C. § 1591, *et seq.*
### *Against Defendant Sean Combs & Bad Boy Records*

137.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

138.    Mr. Combs, one of the most prominent musical artists and producers in the industry, recruited and enticed Plaintiff by initiating a professional relationship with her and inviting her to join his band *Diddy- Dirty Money* as a singer, songwriter, and performer. This opportunity instilled in Plaintiff the hope and expectation of advancing her career and achieving greater success in the music industry.

139.    Mr. Combs, through a pattern of coercive threats and displays of brutal violence, caused Plaintiff to engage in commercial sex acts, as defined by 18 U.S.C. § 1591(e)(3). These acts were carried out to further Mr. Combs' financial gain from Ms. Richard's participation in *Diddy-Dirty Money*, to exert control over her, and to satisfy his own sexual gratification.

140.    Mr. Combs used fraud and force to coerce and entice Ms. Richard into commercial sex acts. Mr. Combs did so by making threats of career derailment and promises of career advancement in exchange for Ms. Richard acquiescence to Mr. Combs' sexual batteries and assaults.

141.    Mr. Combs acted with knowledge or in reckless disregard of the fact that Plaintiff was forced to engage in these acts through coercion and that these acts were in exchange for her continued place in the band and her financial stability.

142.    Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

143.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

144.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

**SIXTH CAUSE OF ACTION**
**Violation of the California Trafficking Victims Protection Act,**
**Cal. Civil Code § 52.5**
***Against Defendants Sean Combs & Bad Boy Records***

145.    Plaintiff repeats and realleges each and every allegation contained in all of the preceding paragraphs as if fully set forth herein.

33

146. Plaintiff is a victim of trafficking within the meaning of Cal. Penal Code § 236.1 and is therefore entitled to bring a civil action under Cal. Civil Code § 52.5.

147. The Defendants' acts and omissions, taken separately and/or together, as outlined above, constitute a violation of Cal. Civ. Code § 52.5. Specifically, Defendant Sean Combs perpetrated human trafficking of Ms. Richard by depriving or violating her personal liberty with the intent to obtain forced labor, and Defendant Bad Boy Records benefitted from Mr. Combs' venture by holding Ms. Richard, an artist signed with Defendant Bad Boy Records and otherwise employed by other Defendant Doe Corporations, captive to Mr. Combs' demands and desires. At all relevant times, Defendants participated in and facilitated the obtainment of Plaintiff's labor induced by force, fraud, or coercion.

148. Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

149. As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

150. Pursuant to Cal. Civ. Code § 52.5(d)(3), Defendants' continuous death threats and coercion induced Plaintiff to delay the filing of this action and asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

151. Pursuant to Cal. Civ. Code § 52.5(d)(4), the suspension of the statute of limitations due to estoppel applies to all other related claims arising out of the trafficking situation, including but not limited to, Violation of The Victims of Gender-Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq*., Forced Labor in Violation of 18 U.S.C. §§ 1589 and 1595, New York Services for Victims of Human Trafficking, N.Y. Servs. Law § 483-bb(c), Sex Trafficking under

18 U.S.C. § 1591, Assault Under New York Law, Battery/Sexual Battery Under New York Law, False Imprisonment under New York Law, False Imprisonment under California Law, Intentional Infliction of Emotional Distress, Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.*, Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York City Human Rights Law, N.Y. Exec. Law §§ 8-101, *et seq.*, Retaliation in Violation of New York State Human Rights Law, ("NYSHRL") Section 296 and California Government Code Section 12940(h), Hostile Work Environment in violation of California Government Code §12940, Gender Discrimination in violation of California Government Code §12940,Violation of Right of Publicity Under New York Civil Rights Law § 50 and § 51, Unjust Enrichment, Copyright Infringement 17 U.S.C. § 106, Breach of Contract, Breach of Implied Covenant of Good Faith & Fair Dealing, Fraud, Intentional Misrepresentation, False Promise.

152.    Pursuant to Cal. Civ. Code § 52.5(e), the running of the statute of limitations may be suspended as Plaintiff could not have reasonably discovered the cause of action due to circumstances resulting from the trafficking, including psychological trauma.

## SEVENTH CAUSE OF ACTION
### Assault Under New York Law
*Against Defendants Sean Combs, & Bad Boy Records*

153.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

154.    In engaging in the conduct described above, Mr. Combs committed an assault against Plaintiff because he intentionally placed Plaintiff in reasonable apprehension of imminent harmful or offensive contact, and Plaintiff reasonably feared immediate bodily harm as a result of Defendant's conduct. Defendant's actions amount to violations under N.Y. Penal Law §§ 110/120.00(1), 120.15, as well as analogous California law and the common law of New York and California.

155. Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

156. As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

157. The conduct of Mr. Combs described above was willful, wanton, and malicious. At all relevant times, Mr. Combs acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Defendant Combs according to proof at trial.

158. Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

### EIGHTH CAUSE OF ACTION
#### Battery/Sexual Battery Under New York Law
##### *Against Defendants Sean Combs & Bad Boy Records*

159. Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

160. In engaging in the conduct described above, Mr. Combs committed a battery against Plaintiff because he intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff's person. Mr. Combs repeatedly and without consent touched Ms. Richard's body including her buttocks and chest area. Defendant's actions amount to violations under N.Y. Penal Law §§ 150.50, 130.52, 130.55, and 130.65, as well as analogous California law and the common law of New York and California.

36

161.    Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

162.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

163.    The above-described conduct by Mr. Combs was willful, wanton, and malicious. At all relevant times, Mr. Combs acted with conscious disregard of Ms. Richard's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Ms. Richard, and intended to cause fear, physical injury, and/or pain and suffering to Ms. Richard. By virtue of the foregoing, Ms. Richard is entitled to recover punitive and exemplary damages from Mr. Combs according to proof at trial.

164.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

### NINTH CAUSE OF ACTION
### False Imprisonment under New York Law
#### *Against Defendants Sean Combs, Harve Pierre & Bad Boy Records*

165.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

166.    Defendants Mr. Combs and Mr. Pierre falsely imprisoned Plaintiff in New York as alleged in this Complaint, by suddenly and without provocation, willfully and maliciously falsely imprisoning Ms. Richard against her will in the Defendants' corporate vehicle for over two hours.

167. Following Plaintiff's false imprisonment in the Defendants' corporate vehicle, Defendant Mr. Combs issued a clear retaliatory threat of future injury and bodily harm to Plaintiff, underscoring the intent to both control and to silence Plaintiff as to Defendant's crimes.

168. Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

169. As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

170. Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## TENTH CAUSE OF ACTION
### False Imprisonment under California Law
*Against Defendants Sean Combs & Bad Boy Records*

171. Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

172. Defendant Mr. Combs falsely imprisoned Ms. Richard in California as alleged in this Complaint, by demanding, under false pretenses, that Ms. Richard appear for work, and subsequently, willfully and maliciously falsely imprisoning and threatening Ms. Richard in Mr. Combs' home studio against her will for over twenty minutes.

173. Following Plaintiff's false imprisonment in Mr. Combs' home studio, Defendant Mr. Combs issued a clear retaliatory threat of future injury and bodily harm to Plaintiff, underscoring the intent to both control and to silence Plaintiff as to Defendant's crimes.

174.    Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

175.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

176.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

**ELEVENTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
*Against Defendants Sean Combs, Harve Pierre & Bad Boy Records*

177.    Plaintiff repeats and re-alleges each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

178.    Defendants Sean Combs and Harve Pierre's conduct, which included abuse, death threats, sexual assault, false imprisonment, deprivation of basic necessities in the workplace, nonpayment or underpayments, and labor violations was extreme and outrageous, going beyond all possible bounds of decency and utterly intolerable in a civilized community.

179.    Defendants' conduct was intentional and reckless and Defendants knew or should have known that such conduct would cause Plaintiff severe emotional distress.

180.    Defendants Harve Pierre and Bad Boy Records have financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

181.    Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

39

182.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

### TWELFTH CAUSE OF ACTION
### Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL")
### *Against Defendants Sean Combs & Bad Boy Records*

183.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

184.    Defendants Sean Combs and Bad Boy Records discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment, verbal abuse, systematic exclusion, failure to address complaints of discrimination and/or harassment, retaliation, derogatory gender-based slurs and comments, insults and offensive gender-based language, intimidation and bullying, threats, unfair treatment, and denial of opportunities, promotions, or benefits based on gender.

185.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has sustained and will continue to sustain, monetary and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

186.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

187.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendant should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

40

## THIRTEENTH CAUSE OF ACTION
### Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York City Human Rights Law, N.Y. Exec. Law §§ 8-101, *et seq.* ("NYCHRL")
### *Against Defendants Sean Combs & Bad Boy Records*

188.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

189.    Defendant Sean Combs and Bad Boy Records discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to unwanted touching of her intimate parts, forcing Plaintiff to endure derogatory name-calling, and exposing Plaintiff to sex trafficking and sex acts, constituting a hostile work environment. Defendants engaged in a pattern of criminal conduct in the workplace that created an offensive, intimidating, and hostile atmosphere for Plaintiff based on her gender.

190.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

191.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

192.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

//

//

//

41

## FOURTEENTH CAUSE OF ACTION
### Retaliation in Violation of New York State Human Rights Law, ("NYSHRL") Section 296 and California Government Code Section 12940(h).
### *Against Defendants Sean Combs & Bad Boy Records*

193.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

194.    Plaintiff engaged in protected activity by rejecting Defendant's sexual advances, which constitutes opposition to unlawful sexual harassment under New York State Human Rights Law (NYSHRL), Section 296. This rejection is protected activity under NYSHRL and California Government Code, as it opposes discriminatory conduct in the workplace.

195.    Defendants Sean Combs and Bad Boy Records' persistent denial of prominent or continuing singing/writing/performing roles as to Plaintiff constitutes adverse employment actions. Plaintiff's rejection of Combs' sexual advances subjected her to an increasingly hostile work environment based on her gender. These actions materially and detrimentally affected Plaintiff's terms and conditions of employment, and were in direct response to Plaintiff's protected activity of rejecting Defendant's sexual advances.

196.    Further, Defendants' failure to pay Ms. Richard earned wages, royalties, and concert and promotional appearance fees according to contracts and other promises constitute adverse employment actions based on gender and were done in retaliation by Defendants.

197.    There is a direct causal connection between Plaintiff's protected activity and Defendants' adverse employment action. The timing and circumstances indicate Defendant's retaliatory motives.

198.    As a direct and proximate result of Defendants' retaliation, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

199.    Defendants' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

200.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

### FIFTEENTH CAUSE OF ACTION
### Hostile Work Environment in violation of California Government Code §12940
#### *Against Defendants Sean Combs & Bad Boy Records*

201.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

202.    Defendants Sean Combs and Bad Boy Records subjected Plaintiff to sexual harassment on the basis of her gender in violation of California Government Code § 12940, including unwanted touching of her intimate parts, forcing Plaintiff to endure derogatory name-calling, and exposing Plaintiff to sex trafficking and sex acts, all of which constituted a hostile work environment.

203.    The conduct of Defendants Sean Combs and Bad Boy Records created an intimidating, hostile, and offensive working environment in violation of California Government Code §12923.

204.    As a direct and proximate result of Defendants' unlawful conduct in violation of Cal. Gov. Code § 12940, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

205.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Cal. Gov. Code § 12940 for which Plaintiff is entitled to an award of punitive damages.

206. Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## SIXTEENTH CAUSE OF ACTION
### Gender Discrimination in violation of California Government Code §12940
### *Against Defendants Sean Combs & Bad Boy Records*

207. Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

208. Defendants Sean Combs and Bad Boy Records discriminated against Plaintiff on the basis of her gender in violation of California Government Code § 12940 by subjecting Plaintiff to disparate treatment, verbal abuse, systematic exclusion, failure to address complaints of discrimination and/or harassment, retaliation, derogatory gender-based slurs and comments, insults and offensive gender-based language, intimidation and bullying, threats, unfair treatment, and denial of opportunities, promotions, or benefits based on her gender.

209. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Cal. Gov. Code § 12940, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

210. Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Cal. Gov. Code § 12940 for which Plaintiff is entitled to an award of punitive damages.

211. Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

//

## SEVENTEENTH CAUSE OF ACTION
### Violation of Right of Publicity Under New York Civil Rights Law
### § 50 and § 51 and Unjust Enrichment
*Against Defendants Sean Combs, Bad Boy Records, Universal Music Group NV, Interscope Geffen A&M Records, Diageo Americas Supply Inc. d/b/a Ciroc Distilling Company d/b/a Ciroc Canning Co., Combs Wines and Spirits LLC*

212.   Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

213.   Mr. Combs required Ms. Richard to perform at and attend numerous promotional events as part of *Diddy – Dirty Money*, including late or overnight parties  which were under contract between Mr. Combs and CIROC Vodka, or were between Mr. Combs and DiddyBeats pursuant to the aforementioned deal between Bad Boy Records and  Interscope Records.

214.   Defendants knowingly used Plaintiff's voice, likeness, image, and persona without Plaintiff's consent for advertising and promotion purposes and for the purpose of trade.

215.   Defendants have been unjustly enriched at Plaintiff's expense by using Plaintiff's voice, image, likeness, and persona without compensating Plaintiff.

216.   It would be inequitable for Defendant to retain the benefit conferred by the unauthorized use of Plaintiff's voice, image, likeness, and persona.

217.   As a result of Defendants' unauthorized use of Plaintiff's likeness, image, and persona, Plaintiff has suffered damages and is entitled to restitution in an amount to be determined at trial.

218.   Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

//

//

## EIGHTEENTH CAUSE OF ACTION
## Copyright Infringement
## 17 U.S.C. § 106
### *Against Defendants Sean Combs, Bad Boy Records & Love Records, Inc.*

219.   Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

220.   Plaintiff wrote, created and performed on the music composition and sound recording of the song *Deliver Me* in 2009, as included on Defendants' 2023 released album *The Love Album: Off the Grid*.

221.   The composition and recording of *Deliver Me* was published by Defendants absent agreement on terms; thus, Defendants have no signed or enforceable agreement with Plaintiff. Plaintiff registered the musical composition and sound recording pertinent thereto with the Register of Copyrights and received the certificate of registration therefor.   Plaintiff owns copyrights in the musical composition, rights of performance therein, and the exclusive rights to reproduce and distribute to the public by sale or other transfer of ownership, or by lease, lending or license, reproductions of the copyrighted works under Copyright Act, 17 U.S.C.§ 106.

222.   Plaintiff is informed and believes and thereon alleges that on September 14-15, 2023, and continuing to the present, Defendants, and each of them, knowingly and willfully and without securing Plaintiff's permission or license: embodied, adapted, used, reproduced, marketed, distributed and sold Plaintiff's copyrighted material on *Deliver Me* as affixed in the Defendants' album *The Love Album: Off the Grid*.

223.   Accordingly, Plaintiff alleges her claim for copyright infringement based on each Defendant's publication of *Deliver Me* as Plaintiff's copyrighted musical composition without license, permission or approval.

224.   Each Defendant unquestionably had access to Plaintiff's work through Defendants previous companies, Bad Boy Records, et al.  or other of Defendants' holders of recorded

compositions, and each Defendant knowingly and willfully ratified and confirmed said access thereafter.

225. In undertaking the conduct complained of in this action, Defendants knowingly and intentionally violated Plaintiff's rights.

226. At no time did Plaintiff authorize Defendants to use, license, own, reproduce, adapt or distribute Plaintiff's copyrighted material. At the times of the acts of infringement complained of, Plaintiff was and is the owner of the copyright in the music composition identified and named above.

227. After the respective dates of first publication and continuing to the present, the Defendants, and each of them, have infringed and continue to infringe Plaintiff's copyrights in the music composition by reproducing or causing, contributing to, and participating in the unauthorized reproduction of the copyrighted music composition and by causing, contributing to, and participating in the distribution of the unauthorized reproductions of the music composition as recorded to the public.

228. Despite their actual or constructive knowledge through their individual and collective recording industry experience and knowledge of copyright laws, enforcement of intellectual property rights in other instances and their duties to view and examine licenses for uses of copyrighted works, Defendants have used and promoted and continue to use and promote, reproduce and to enable others to reproduce Plaintiff's copyrighted music composition in its complete or substantial entirety as and for the commercial profit of Defendants without any ongoing payment to or authorization by Plaintiff (i.e. no accountings have been received).

229. As a direct and proximate result of the Defendants' knowing and willful infringing use of the copyrights, Plaintiff has sustained and will continue to sustain substantial injury, loss and damage to her ownership, publishing and performance rights in her music composition, which is copyrighted material.

230.    As a result of all of Defendants' joint, several, willful and deliberate acts of copyright infringement, Plaintiff is further entitled to recover from Defendants all of the damages sustained by Plaintiff permitted by federal copyright law, including but not limited to compensatory damages and the profits derived by Defendants as a result of their infringing acts, in an amount to be determined according to proof at trial.

231.    Plaintiff is further entitled to recover from Defendants the gains, profits and advantages Defendants, and each of them, have obtained as a result of their acts of copyright infringement.

232.    Plaintiff is entitled to the maximum statutory damages which copyright registration confers upon a copyright owner, pursuant to 17 U.S.C. §504(c), in the amount of $150,000.00 with respect to each Defendant for each work infringed, or for such other amounts as may be proper under 17 U.S.C. §504(c).

<div align="center">

### NINETEENTH CAUSE OF ACTION
#### Breach of Contract
***Against Defendants Sean Combs, Bad Boy Records, The Sean Comb Music Inc, The Nordlinger Group LLC, November 15, LLC, Janice Combs Publishing Inc & Sony Songs***

</div>

233.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

234.    Under the initial Participant Agreement signed by Plaintiff in 2005 with Defendant Remote Productions Inc., on information and belief, a company owned by Sean Combs, Plaintiff was promised transportation to and from venues, adequate meals, rest and sleep, medical care and impliedly, safety from a hostile workplace.  Despite that Plaintiff fulfilled all of her duties and beyond, Defendants breached its duty to provide these basic remunerations.  Defendants also failed to pay salary, royalties, profit participation, promotions, and touring to Plaintiff.

235.    In late 2007, Plaintiff signed The Performer Agreement with Defendant Remote Productions, Inc. which promised minimum compensation to Plaintiff of $4,000 per episode of

*Making The Band,* travel and transportation costs, promotions pay at $3,000 per episode after 6 free, $250 per day for voiceovers or remixes, and performance rights. Despite Plaintiff's working overtime and double-time, wages or other promised compensation was withheld at least 80% of the time.

236. Defendant Bad Boy Records, LLC, naming itself as successor-in-interest to Remote Productions, Inc, and Plaintiff signed an agreement entitled The Danity Kane Letter Amendment [the "DK Letter"] in late 2007. The DK Letter promised Plaintiff approval rights, advances, concert remuneration, royalties at 12.5% payable by Defendant The Nordlinger Group and/or November 15, LLC. Such payments were not made in accordance with contract, if at all, despite demands to Defendants' attorneys.

237. Defendants not only breached terms of the agreements listed above, but additionally breached the implied covenants of an employer-employee relationship by acting in bad faith and unfairly frustrating Plaintiff's right to receive the benefits of the agreements actually made.

238. Plaintiff entered a contract with Defendants "The Sean Comb Music, Inc." on January 1, 2009, promising payment to Plaintiff of 12.5% on sound recording masters in the US and 10% of Net Tour Revenues or 5% per performance; Plaintiff was required to exclusively license her music compositions to Defendants and assign the publishing administration to Defendants.

239. On information and belief, at an unknown point in time, Defendant The Sean Comb Music Inc. assigned its publishing administration to Janice Combs Publishing, Inc. and such administration rights are alleged to be held by Janice Combs Publishing Holdings Inc.

240. On July 1, 2021, Defendants Janice Combs Publishing Inc. granted exclusive administration rights in Plaintiff's compositions to Sony Songs, a division of Sony Music Publishing LLC. Plaintiff signed her assent to the assignment on October 22, 2021. The

assignment provided that Plaintiff would receive 90% of publisher's share of performance income, 80% of synchronization income and 90% of all other income.

241.    Since a music publisher owes a duty to a writer to account to the writer for royalties earned, each of the Defendants named in this count have wholly failed to provide accountings, statements, payments nor validly register, administer, exploit or oversee the Plaintiff's copyrights they were entrusted with via the contracts and thereby breached the contracts with Plaintiff.

242.    Plaintiff provided her talent as a singer, writer, performer, dancer and recording artist.  Defendants received significant benefits and compensation from Plaintiff's services. Yet none of the wages, royalties, publishing, touring, promotional fees and other profits promised by Defendants were paid as agreed; conversely,  Defendants routinely refused to pay despite Plaintiff's requests, nor was Plaintiff made whole at any time.

243.    Defendants' failure to perform the required duties set forth in the terms and conditions of the contracts was foreseeable in causing Plaintiff to suffer general, consequential and incidental damages, including economic damages.  Defendants' conduct is a breach of contract.

244.    As an actual and proximate result of Defendants' unlawful and unconscionable conduct in breaching its fiduciary duties, Plaintiff has lost wages, profits, benefits, royalties, and has incurred other out of pocket expenses.

245.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

//

//

//

## TWENTIENTH CAUSE OF ACTION
## Breach of Implied Covenant of Good Faith & Fair Dealing
### *Against All Defendants*

246.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

247.    Plaintiff entered several contracts with Defendants.

248.    Plaintiff did all, or substantially all of the significant things the contracts required her to do.

249.    The allegations set forth in this complaint detail the malevolent and intentional behavior by Defendants repeated throughout a 20 year span, all of which constitute breaches of the implied covenant of good faith and fair dealing and demonstrate the bad faith of Defendants at all relevant times.

250.    Defendants did not pay Plaintiff her salary as agreed.

251.    Defendants did not pay Plaintiff her royalties, nor extraneous promotions in any instance.

252.    Defendants did not pay Plaintiff her share of income for her contributions to musical compositions, her publishing, as agreed, despite the assignments to various companies.

253.    Not only have Defendants failed to pay Plaintiff, they have failed to promote Plaintiff's works, and infringed her copyrights.

254.    Defendants' unfair interference with Plaintiff's right to receive the benefits of each contract was foreseeable in causing Plaintiff to suffer general, consequential and incidental damages, including economic damages according to proof at trial.

255.    Defendants knew or could reasonably have foreseen that the harm and/or special circumstances were likely to occur in the ordinary course of events as a result of the breaches of Defendants' obligations to act in good faith, make Plaintiff's property productive and account for

and pay Plaintiff as agreed. Accordingly, Defendants' conduct was a breach of implied covenant of good faith and fair dealing.

256.    As an actual and proximate result of the aforementioned violations, Plaintiff has been harmed in an amount according to proof, and has lost wages, benefits, and other out of pocket expenses.

257.    As an actual and proximate result of Defendants' aforementioned acts, Plaintiff has suffered physical injury and became mentally upset, stressed and aggravated. Plaintiff has experienced post-traumatic stress disorder, mental anguish, aggravation, anxiety, humiliation, embarrassment, sleeplessness, loss of appetite, low self-esteem, depression, upset stomach, and other forms of extreme emotional distress. Plaintiff claims damages for physical injuries and mental distress in an amount according to proof at trial.

258.    The above-described actions were perpetrated and/or ratified by a managing agent, employee or officer of Defendants, and each of them. These acts were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights. Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendants' future conduct.

259.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

<div align="center">

**TWENTY FIRST CAUSE OF ACTION**
**Fraud / Intentional Misrepresentation / False Promise**
***Against All Defendants***

</div>

260.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

261.    Plaintiff asserts this cause of action against all Defendants.

262.    Defendants represented to Plaintiff that certain facts relative to payments to Plaintiff were true in each of the contracts above-listed. Further, Defendants made multiple promises in writing to Plaintiff.

263.    Defendants' representations were false; Defendants did not intend to perform these promises when they were made or at any time.

264.    Defendants knew that their representations were false when they were made and they made such representations recklessly and without regard for the truth in such representations.

265.    Defendants intended that Plaintiff rely on their representations and promises.

266.    Plaintiff reasonably relied on Defendants' representations and promises.

267.    Defendants did not perform the promised acts.

268.    Plaintiff was harmed.

269.    Plaintiff's reliance on Defendants' representations and promises was a substantial factor in causing Plaintiff to suffer general, consequential and incidental damages, including economic damages according to proof at trial. Defendants knew or could reasonably have foreseen that the harm and special circumstances were likely to occur in the ordinary course of events as a result of the Defendants' breaches of contracts. Accordingly, Defendants' conduct was intentional misrepresentation.

270.    As an actual and proximate result of Defendants' intentional and unlawful misrepresentation and false promises, Plaintiff has lost wages, profits, benefits, royalties, and has incurred other out of pocket expenses.

271.    As an actual and proximate result of Defendants' fraudulent acts, Plaintiff has suffered physical injury and became mentally upset, stressed and aggravated. Plaintiff has experienced post-traumatic stress disorder, mental anguish, aggravation, anxiety, humiliation, embarrassment, sleeplessness, loss of appetite, low self-esteem, depression, upset stomach, and

other forms of extreme emotional distress.  Plaintiff claims damages for physical injuries and mental distress in an amount according to proof at trial.

272.    The above-described actions were perpetrated and/or ratified by a managing agent, employee or officer of Defendants, and each of them.  These acts were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights.  Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendants' future conduct.

273.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## PRAYER FOR RELIEF ON CLAIMS

**WHEREFORE**, Ms. Richard prays that this Court enter judgment against Defendants herein and any other Defendants who may later be added to this action as follows:

1.    For a money judgment representing compensatory damages, including but not limited to:   consequential damages, lost wages, earning, royalties, publishing, touring and promotional income, and non-economic damages, and all other sums of money, together with interest on these amounts, according to proof;

2.    For a money judgment for mental pain and anguish and severe emotional distress, according to proof;

3.    For restitution;

4.    For disgorgement of all sums unjustly obtained from Plaintiff or inured to the benefit of Defendants;

5.    For civil penalties;

6.    For punitive and exemplary damages according to proof;

54

7.     For attorneys' fees and costs;

8.     For prejudgment and post-judgement interest; and

9.     For such other and further relief as the Court may deem just and proper.

### JURY DEMAND

1.  Ms. Richard demands a trial by jury on all issues triable of right by jury.


DATED:          September 10, 2024
                New York, New York


                            Respectfully submitted,

                            **THE BLOOM FIRM**

                            By: _____
                                 Lisa Bloom
                                 Arick Fudali
                                 Yasmine Meyer
                                 Devin Meepos
                            Attorneys for Ms. Richard


                            **IP LEGAL STUDIO LLC**

                            By: ___/s/ Lisa A. Cervantes___
                                 Lisa A. Cervantes
                            Attorneys for Ms. Richard

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
ADRIA ENGLISH,                                          :
                                                        :
                              Plaintiff,                :        Civil Case No.:
                                                        :
                       v.                               :
                                                        :
                                                        :        **COMPLAINT**
SEAN COMBS a/k/a "P. DIDDY, DIDDY, PUFF, PUFF          :
DADDY, PUFFY, BROTHER LOVE",                           :
BAD BOY ENTERTAINMENT HOLDINGS, INC.,                  :
SEAN JOHN CLOTHING LLC, INC.,                          :
COMBS GLOBAL ENTERPRISES,                              :
TAMIKO THOMAS,                                          :
JACOB ARABOV a/k/a "JACOB THE JEWELER,"                :        **JURY  DEMAND**
VIBE MAGAZINE a/k/a "VIBE,"                             :
PENSKE MEDIA CORPORATION a/k/a and d/b/a               :
"PMC,"                                                  :
JOHN and JANE DOES 1-10, and                                    :
ORGANIZATIONAL DOES 1-10                                :
                              Defendants                :
-----------------------------------------------------------------------X

+------------------------------------------------------------+
|                  **TRIGGER WARNING:**                       |
|   **THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A** |
|      **SEXUAL NATURE, INCLUDING SEXUAL ASSAULT**            |
+------------------------------------------------------------+

       Plaintiff, ADRIA ENGLISH ("PLAINTIFF" or "PLAINTIFF ENGLISH" or "MS.

ENGLISH"), by and through her attorneys, hereby alleges and avers of the Defendants SEAN

COMBS a/k/a "P. DIDDY, DIDDY, PUFF, PUFF DADDY, PUFFY, BROTHER LOVE," BAD

BOY ENTERTAINMENT HOLDINGS, INC. ("BBE"), SEAN JOHN CLOTHING LLC.

("SJC"), COMBS GLOBAL ENTERPRISES ("CGE"), TAMIKO THOMAS, JACOB

ARABOV a/k/a "JACOB THE JEWELER" ("JACOB") VIBE MAGAZINE a/k/a "VIBE,"

PENSKE MEDIA CORPORATION a/k/a and d/b/a "PMC," JOHN and JANE DOES 1-10, and

ORGANIZATIONAL DOES 1-10, (collectively referred to as "Defendants"), alleges upon information and belief as to all other matters as follows:

## PRELIMINARY STATEMENT

1. On November 16, 2023, Casandra Ventura a/k/a "Cassie" filed a 35-page lawsuit in which she exposed Defendant Combs of subjecting her to nearly a decade of physical, sexual and emotional abuse punctuated by rape, sex trafficking and being forced to engage in drug-fueled nonconsensual sexual encounters with other men.

2. Ordinarily, when a lawsuit such as Ms. Ventura's is filed that involves events that took place long ago, witnesses are few and far between and evidence hard to muster. Not so for the claims brought against Defendant Combs. Within minutes of the filing, Ms. Ventura's claims were confirmed by various witnesses, including a rival musician whose car Defendant Combs blew up, various individuals who observed Defendant Combs beat Ms. Ventura and a video released by CNN, just a few weeks ago, showing Defendant Combs physically abusing, battering and assaulting Ms. Ventura.

3. Since Ms. Ventura's brave decision to file a lawsuit against Defendant Combs, Defendant Combs has accumulated numerous lawsuits across the country for the same conduct alleged by Ms. Ventura.

4. Days later, more lawsuits were filed against Defendant Combs. One being, Plaintiff Joi Dickerson-Neal,[1] alleged that Defendant Combs drugged and sexually assaulted her when she was a college student. The other lawsuit, currently being appropriately refiled in New Jersey, accused Ms. Combs and singer Aaron Hall of forcing the Plaintiff and another unidentified woman into nonconsensual sex.

---

[1] Supreme Court of the State of New York, New York County Index No. 952341/2023

5. At the same time, a fourth lawsuit was filed; this one against Defendant Combs'
companies and Defendant Harve Pierre, the longtime President of Bad Boy Entertainment
Holdings, Inc. The suit alleged that Mr. Pierre used his position of power at Bad Boy to
groom and sexually assault his former assistant, and that Bad Boy looked the other way at
the time.[2]

6. The fifth lawsuit filed against Defendant Combs include allegations brought by a Doe
Plaintiff are just as egregious than those brought by his prior victims including that
Plaintiff Doe was sex trafficked and gang raped by Defendant Combs and various other
individuals.[3]

7. A sixth lawsuit was filed against Defendant Combs and various other Defendants by
Plaintiff Rodney Jones, including allegations of sexual assault, sex work, sex and drug
trafficking, and an ongoing criminal Enterprise and corrupt organization,[4] similar to the
claims Plaintiff files in this instant action.

8. A seventh lawsuit was filed against Defendant Combs and Defendant's son Christian
Combs by Plaintiff Grace O'Marcaigh.[5] Plaintiff in that suit alleges she was sexually
assaulted and physically harmed by the actions of Defendant's son and that Defendant
Combs aided and abetted in his son's tortious conduct.

9. An eighth lawsuit was filed against Defendant Combs by model Plaintiff Crystal
McKinney alleging that she was "drugged and sexually assaulted" by Defendant Combs.[6]

---

[2] Supreme Court of the State of New York, New York County Index No. 952246/2023
[3] United States District Court Southern District of New York Case No. 1:23-cv-10628
[4] United States District Court Southern District of New York Case No. 1:24-cv-1457
[5] Superior Court of the State of California, County of Los Angeles Case No.: 24STCV08571
[6] United States District Court Southern District of New York Case No. 1:24-cv-03931

The allegations in Plaintiff McKinney's complaint echo similar claims filed by the Plaintiff in the instant action.

10. A ninth lawsuit was filed against Defendant Combs by Plaintiff April Lampros.[7] In that suit, Plaintiff Lampros alleges the Defendant of battery, assault, negligent infliction of emotional distress and violation of the victims of gender-motivated violence protection of the law, again eerily similar to the claims made by Plaintiff herein.

11. Prior to any of the cases above being filed, Defendant Combs was named as a Defendant in a civil sexual assault lawsuit in Florida involving R&B Singer Tremaine Neverson a/k/a Trey Songz.[8]



12. Defendant Combs was also implicated in a lawsuit filed in California against R&B Singer Chris Brown for a sexual assault that took place on a yacht anchored at Defendant Combs' Star Island estate in Miami, FL.[9]

---

[7] New York County Supreme Court Index No. 154859/2024
[8] 11th Judicial Circuit Court, Miami, Florida Case No.: 21-26889-CA-01
[9] Superior Court of the State of California, County of Los Angeles Case No.: 22VECV00140

13. Chris Brown was also referenced in the lawsuit between Plaintiff Rodney Jones and

Defendant Combs, implicating Mr. Brown was "in Mr. Combs Los Angeles home

consorting with underaged girls and sex workers."[10]



14. This is now the tenth lawsuit filed against Defendant Combs since November 16, 2023.

Just as the allegations brought by the other nine Plaintiffs, Plaintiff English's claims are

just as egregious.

15. Due to these numerous lawsuits filed against Defendant Combs alleging the same or

similar acts, there is now a growing awareness that Defendant Combs was engaging in far

more sinister acts than previously known including physical abuse and sex trafficking.

16. Specifically, from 2004-2009, Plaintiff was sex trafficked by Defendants Combs,

Thomas, and Arabov.

17. Additionally, because of Defendant Combs relationship with Defendant VIBE, due to

their conspiracy in the sex trafficking Enterprise, Defendants knew they could publish

Plaintiff's likeness, without her consent, and fear of recourse and chose Plaintiff's

likeness to use, without permission, in an effort to continue the Defendants sex

---

[10] United States District Court Southern District of New York Case No. 1:24-cv-1457, E.C.F 38 ¶ 29(j)

trafficking Enterprise for their financial benefit. Therefore, Plaintiff brings claims pursuant to New York Civil Rights Law §§ 50 and 51 and 15 U.S.C. § 1125(a).

18. Plaintiff can support her allegations within this complaint and has lived her adult life with the memories of being trapped in a cycle of sex trafficking she never asked to be a part of and was chosen because Defendant Combs knew he could groom her. For years, Plaintiff has been affected by Defendants actions and has suffered extreme emotional distress impacting nearly every aspect of Plaintiff's life and personal relationships. Given all the brave individuals who have come forward against Defendant Combs, Plaintiff is doing the same.

19. Plaintiff brings this action seeking injunctive, declaratory and monetary relief against Defendants in violation of the Victims of Gender-Motivated Violence Protection Law, Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq.* ("VGMVPL"), .

## **JURISDICTION AND VENUE**

20. This Court has personal jurisdiction over the Defendants under and consistent with the Constitutional requirements of Due Process in that the Defendants, acting directly or through his agents or apparent agents, committed one or more of the following:

    a.  The transaction of any business within the state;

    b.  The making of any contract within the state;

    c.  The commission of a tortious act within this District; and

    d.  The ownership, use, or possession of any real estate in this state.

21. As of the date of this filing, Defendants Combs, Jacob, BBE, SJC, VIBE, PMC and Organizational Does have consistently and purposefully availed themselves of the

privilege of conducting activities within New York, thus invoking the benefits and protections of New York law. In return for these benefits and protections, Defendants must submit to the burdens of litigation in New York.

22. This litigation arises from or relates to the tortious activities the Defendants Combs, Jacob and Thomas, BBE, SJC, VIBE, PMC and Organizational Does visited upon Plaintiff Jones in New York and Florida. This tortious conduct violated United States Federal Rico Laws and the United States Victims ("USVI") of the Trafficking and Violence Protection Act of 2000 ("TVPA").

23. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise from some conduct occurring by Defendants in New York, specifically, the trafficking of Plaintiff across State lines between New York and Florida.

24. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 for original jurisdiction over civil actions where the matter in controversy exceeds to the sum and value of $75,000 and is between citizens of different states. This Court has subject matter jurisdiction over this matter under 15 U.S. Code § 1121 because one claim at issue arises under the Lanham Act. This Court also has subject matter jurisdiction under 28 U.S. Code § 1332 and supplemental jurisdiction under 28 U.S. Code § 1367 because the state law claim forms part of the same case and controversy as the claim arising under the federal statute.

25. Pursuant to 28 U.S.C. § 1391(b), (c) and 1400(a), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, alleged herein, occurred in this district.

26. Plaintiff brings suit against Defendants pursuant to the NYC Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 8-901 *et. seq*, to redress the substantial and lifetime injuries she has suffered as a result of being drugged, sex trafficked and assaulted by Defendants Combs, Thomas and Jacob.

27. This action arises under N.Y. Civ. Rights Law §§ 50 and 51 and 15 U.S.C. § 1125(a).

28. This Court has personal jurisdiction over Defendants and each of them because Defendants have purposefully directed their unlawful conduct to this judicial district and have conducted substantial business in this judicial district.

## PROCEDURAL REQUIREMENTS

## THE N.Y.C. VICTIMS OF GENDER MOTIVATED VIOLENCE PROTECTION ACT

29. The N.Y.C. Victims of Gender Motivated Violence Protection Act ("NYC Gender Motivated Violence Act") created a lookback window on March 01, 2023, which runs for two years, for survivors of gender motivated violence, allowing them to sue their abusers regardless of when the abuse occurred. N.Y.C. Admin. Code § 10-1105(a).

30. The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

31. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

32. The above-described conduct of Defendant Combs, Thomas and Jacob including, but not limited to, Defendant Jacob's sexual assault of Plaintiff constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as well as Defendant Combs' direction, enabling, participation and conspiring in the commission of a crime of violence motivated by gender as defined by the NYC Gender Motivated Violence Act.

33. Given the extensive media coverage and numerous lawsuits filed in the District of New York, both federal and State against Defendant Combs, Defendants BBE, Combs Enterprises, Jacob, VIBE, PMC and Does and Doe Organizations were put on notice of the sexual abuse and trafficking allegations made against Defendant Combs.

**PARTIES**

**DEFENDANT SEAN COMBS**



34. Defendant Combs retains residences in both Florida and California and upon information and belief is a citizen of the State of California.

35. At all relevant times, Defendant Combs was a citizen and resident of the State of New York.

36. Defendant Sean Combs is a rapper and record executive popularly known by his stage names Puff Daddy, Puffy, Puff, P. Diddy, Diddy, Brother Love or Love. Defendant Combs rose to prominence in the music and entertainment industry over the decades and

is regularly referred to as a hip-hop mogul. Defendant Combs was first accused of acts described in this complaint by his long-time paramour and former BBE artist, Cassie Ventura as pictured above, on November 16, 2023.

37. Defendant Combs is a Grammy-awarded musician, rapper and producer.

38. Defendant P. Diddy founded co-Defendants BBE, SJC and CGE.

39. Defendant Diddy has signed, through BBE, some of the biggest stars in music including Rick Ross, Machine Gun Kelly, Notorious B.I.G., New Edition, Mase, Pitbull, Lil John, Fabolous, French Montana and groups like Danity Kane, 112, and Total, to name just a few.[11]

40. In 2008, Defendant P. Diddy was the first male rapper to get a star on the Hollywood Walk of Fame.

41. Defendant Diddy "founded Bad Boy Records in 1992, and the company has sold over 500 million records, produced 38 platinum albums, and won multiple Grammy Awards" according to the official website of Combs Global.[12]

42. In 2022, Forbes estimated that Defendant Diddy was one of the wealthiest hip-hop artists in America and that his net worth is over $1 billion.

43. Upon information and belief, Defendant Diddy has a long history of committing physical and sexual violence against women and men, both of age and underaged, as documented and publicly available in over nine lawsuits across the country as well as extensive media coverage on the lawsuits and the allegations made therein.

---

[11] https://www.ranker.com/list/bands-and-musicians-on-bad-boy-records/music-lover
https://combsglobal.com/bad-boy-entertainment/
[12] https://combsglobal.com/bad-boy-entertainment/

**DEFENDANT BAD BOY ENTERTAINMENT HOLDINGS, INC.**



44. Bad Boy Entertainment Holdings, Inc., is a domestic business corporation licensed to do business in New York and headquartered at 1440 Broadway, Third Floor, New York, NY 10018.

45. Bad Boy Entertainment Holdings, Inc. is a domestic business corporation licensed to do business in New York since 1992.

46. Defendant Bad Boy Entertainment Holdings, Inc. ("BBE") is a music, media, and entertainment company founded and owned by Defendant Sean Combs. Bad Boy is incorporated and headquartered in New York, New York.

47. Defendant BBE has been named in several lawsuits where Defendant Combs has been accused of claims of sexual abuse and sex trafficking as every business Defendant Combs engages with play a role in his illegal Enterprise.

**SEAN JOHN CLOTHING LLC**

*Sean John*

48. In 1998, Combs founded Sean John, which has retail sales of over $450 million.

49. As CEO and president of the company, Defendant Combs was representing Sean John when he conspired and sex trafficked Plaintiff.

50. Sean John Clothing LLC is a domestic liability company licensed to business in New York.

## DEFENDANT COMBS ENTRERPRISE LLC



51. Defendant Combs Enterprise has its principal place of business located in New York, NY.

52. Upon information and belief, Combs Enterprise, LLC., d/b/a Combs Global.

53. Upon information and belief, Combs Enterprise LLC is a domestic liability company license to do business in New York.

54. Combs Enterprise, LLC. Is a business conglomerate founded by Defendant Combs which is prevalent in the music, entertainment, fashion, spirits, and television industries, while including a diverse portfolio of business and investments including fragrance, marketing, media properties and liquor.

## DEFENDANT TAMIKO THOMAS



55. Defendant Thomas, upon information and belief, is a citizen of the State of New York.

56. Defendant Thomas, upon information and belief, was an employee of Defendant BBE at all relevant times.

57. Defendant Thomas, in her employment capacity, was responsible for transporting and making payment to individuals like Plaintiff, in furtherance of a corrupt organization of sex trafficking on behalf of Defendant Combs and the beneficiaries of the corrupt organization including Defendants Jacob, VIBE and PMC.

**DEFENDANT JACOB ARABOV "JACOB THE JEWELER"**



58.  Upon information and belief, Defendant Jacob, at all relevant times, was a resident of the State of New York.

59. Upon information and belief, Defendant Jacob, at all relevant times, was a citizen of the State of New York despite being born in Uzbekistan.

60. Defendant Jacob was a beneficiary of the corrupt organization ran by Defendants Combs, BBE, Thomas, VIBE and PMC, and is pictured with the Plaintiff above, when he knowingly had intercourse with Plaintiff, who was trafficked for that specific purpose.

61. Defendant Jacob, in 2008, was sentenced to two and a half years in federal prison regarding a multistate drug ring, was fined $50,000 and had to forfeit $2,000,000.00 to the U.S. Government.

62. Prior to being imprisoned, Defendant Jacob frequented parties thrown by Defendant Combs and BBE where he knowingly participated in the illegal commodification of women via sex trafficking.

63. Upon information and belief, Defendant Jacob still runs a business, Jacob and Co., licensed to do business in New York with its headquarters located at 48 East 57th Street, NY 10022.

**DEFENDANT VIBE MAGAZINE**



64. Upon information and belief, Defendant VIBE runs a magazine, licensed to do business in New York with its headquarters located at 475 5th Ave. New York, NY 10022.

65. Defendant VIBE has had an ongoing relationship with Defendant Combs and all of Defendant's Enterprises include BBE, SJC and CGE, was corrupt and exploitive to Plaintiff and to benefit Defendant VIBE and other members of the corrupt organization.

66. Defendant VIBE's ongoing beneficial relationship with Defendant Combs dates back as far as 1993.

67. Defendant VIBE further injured Plaintiff in an effort to further the corrupt organization when it published Plaintiff's picture, in the issue pictured above, without Plaintiff's notice or consent, written or otherwise.

## DEFENDANT PENSKE MEDIA CORPORATION



68. Upon information and belief, Defendant PMC is the owner and the parent company of Defendant VIBE.

69. Upon information and belief ,PMC is a Delaware corporation with its headquarters in California.

70. Defendant PMC does business in New York throughout its ownership of Defendant VIBE and its distribution of several media outlets that are distributed, marketed and consumed in this jurisdiction.

### DEFENDANT JOHN and JANE DOES 1-10 and Organizational Does 1-10

71. Upon information and belief, Plaintiff alleges that Defendant Does 1 through 10, inclusive, are other parties not yet identified who have violated Plaintiff by sex trafficking her, conspired, and/or aided and abetted the Defendant in sex trafficking the Plaintiff through their participation in a corrupt organization that contributed to the

Plaintiff being sex trafficked or having engaged in one or more of the wrongful practices alleged herein. The true names, whether corporate, individual or otherwise, of Defendants 1 through 10, inclusive, are presently unknown to Plaintiff, which therefore sues said Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained, pursuant to CPLR §1024.

72. Upon information and belief, Plaintiff believes all of the Defendant Does 1-10 are citizens of the State of New York and/or Florida.

73. Upon information and belief, Plaintiff believes and thereon alleges that at all times relevant hereto each of the Defendant Organizational Does 1-10 were the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of Defendants Combs, BBE, SJC and/or CME and was at all times acting within the scope of such agency, affiliation, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged, with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately caused thereby.

74. Upon information and belief, Plaintiff believes all of the Defendant Organizational Does 1-10 are business licensed and/or doing business in the State of New York and/or Florida.

75. Upon information and belief, Plaintiff alleges that Defendant Organizational Does 1 through 10, inclusive, are other parties not yet identified who have violated Plaintiff by sex trafficking her, and/or conspired through their participation in a corrupt organization that contributed and aided and abetted the Defendant in sex trafficking the Plaintiff or

having engaged in one or more of the wrongful practices alleged herein. The true names, whether corporate, individual or otherwise, of Defendants 1 through 10, inclusive, are presently unknown to Plaintiff, which therefore sues said Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained, pursuant to CPLR §1024.

76. The limitations Article 16 of the CPLR do not apply because one or more of the exceptions set forth in CPLR §1601 and/or §1602 apply.

## PLAINTIFF ADRIA ENGLISH



77. Plaintiff is an individual who is a citizen of the United States and a resident of California.

78. Plaintiff, at all times relevant to the action, resided and was domiciled in the State of New York.

79. Prior to moving to New York, in or around early 2004, Plaintiff participated as an actor in the adult film industry under the name "Omunique."

80. Plaintiff participated in approximately eight adult films prior to moving to New York which were done while Plaintiff was a teenager. Plaintiff was coerced by veteran porn

star Jake Steed into doing these films with the promise they would never be viewed or circulated within the United States.[13]




81. Plaintiff moved to New York from California to evade the disappointment of her family when they discovered she was acting in adult movies, as Plaintiff was led to believe the adult movies would only be seen and purchased abroad therefore difficult to be viewed by those who knew her personally.

82. Plaintiff moved to New York, destitute and homeless with her then-boyfriend, starving up and coming model Anthony Gallo.

---

[13] https://www.tnaflix.com/amateur-porn/Omunique-vs.-Jake-Steed-Black-Street-Hookers-18/video5461090
https://xxxbunker.com/omunique_is_ready_to_fuck
https://spankbang.com/6lb3e/video/jake+steed+ft+omunique+part+1
https://www.holedk.com/sugarwalls-7/
https://www.holedk.com/booty-talk-4/



83. While Plaintiff's then-boyfriend auditioned for modeling gigs and attended go-sees in New York, Plaintiff began go-go dancing and performing at Larry Flint's Hustler Club on 51st Street in New York under the stage name of "Sasha."



84. On or about mid 2004, Mr. Gallo attended an audition for a Sean John modeling campaign in New York where Plaintiff accompanied him.

85. During that audition, another model and Mr. Gallo were asked to perform felatio on Defendant Combs in order to book the modeling campaign.

86. Mr. Gallo refused but was later reapproached by employee, Defendant Thomas, offering new terms. The terms being that Mr. Gallo could still book the Sean John campaign if he commanded the Plaintiff to work Defendant Combs' and BBE's upcoming "White Party"

in the Hamptons as a go-go dancer, as Plaintiff was a well-known talented and highly

sought after dancer at Larry Flint's Hustler Club.

87. In an effort to assist Mr. Gallo's desire to become a model, Plaintiff agreed to what she

believed to be legitimate employment with Defendant Combs and BBE as entertainment

at the "White Parties" in the Hamptons, NY and Miami, FL from 2004-2009. Plaintiff did

not agree to a lifetime of aftermath of being used as a sexual pawn for the pleasure and

financial benefit of others.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment at Defendant Combs' Labor Day "White Party"

88. As agreed to between Mr. Gallo, Defendant Thomas and Defendant Combs, SJC and

BBE, Plaintiff began her employment at the ultra-exclusive and lavish Labor Day parties

thrown by Defendant Combs and BBE called the "White Party," and Mr. Gallo began his

employment as a Sean John Model.



89.  Plaintiff's first employment at a "White Party" was Summer, 2004.

20



90. Plaintiff believed this to be a legitimate employment opportunity.

91. Plaintiff was picked up by Defendant Thomas in a car driven by one of the Defendant Does owned either by Defendant Combs, BBE, SJC, CGE or Organizational Doe, and transported to Defendant Combs' estate in the Hamptons, NY which served as the venue for the Labor Day "White Party."

92. When Plaintiff arrived at Defendant Combs' Hampton Estates with Defendant Thomas, and other sex trafficked individuals, Defendant Thomas brought them into a room where they changed into clothes provided for them.

93. Plaintiff's outfit in the above picture was provided to her as a uniform as she was led to believe she was in an employment capacity, and Plaintiff was required to wear the clothing provided as part of her employment.

94. Plaintiff was also provided a separate room from the party, away from where the partygoers congregated, that was used by Plaintiff and other employees as a break room to take respite during the party as Plaintiff was there in an employment capacity.

95. Plaintiff was encouraged directly by Defendant Thomas to provide lap dances and be sexually flirtatious with the guests at the "White Party."

96. Plaintiff was also instructed and directed by Defendant Combs as to which guests Plaintiff should focus attention and interaction with to ensure his guests were having a great time.

97. Plaintiff was strictly instructed by Defendant Combs and Thomas on which bottles of alcohol and champagne female employees were to exclusively drink from and also required Plaintiff to take narcotics offered by a "White Party" guest.

98. Despite being forced to drink copious amounts of alcohol and consume illicit narcotics, the encounters Plaintiff was forced to endure were so excruciating that Plaintiff remembers them as they still haunt her to this day.

99. Plaintiff was forced to consume liquor and illicit narcotics as part of her employment at the "White Party."

100.      Upon information and belief, Defendant Combs laced the liquor with ecstasy which is why Plaintiff was provided strict rules on which bottles to consume from.

101.     Plaintiff performed to the expectations of Defendant Combs, was personally thanked for her obedience by Defendant Combs and was subsequently invited for future employment at the "White Parties."

102.     Plaintiff was paid, in cash, at the end of the night typically between 4-6 am once the party had concluded. Plaintiff was paid by Defendant Thomas who was given the money from Defendant Combs.

103.     The first "White Party" in 2004 had no sinister intent or requirements for physical sexual contact and seemed to be a legitimate employment opportunity; so, when Plaintiff was offered employment in the proceeding years at the Labor Day "White Party," she accepted the employment opportunity.

104.     Plaintiff was employed as entertainment at subsequent "White Parties" in the Hamptons, NY.

105.     Plaintiff was always transported to the Hamptons by way of car service provided by either Defendant Combs, BBE, SJC, CGE or Organizational Does, with a driver who was also an employee of either Defendant Combs, BBE, SJC, CGE or Organizational Does and with Defendant Thomas also being present as liaison and coordinator between employees and Defendant Combs.

106.     Plaintiff would use numbers provided to contact either, or both, Defendant Combs and Thomas to arrange transportation to the "White Parties." This included using the telephone and text messaging services to confirm the date, time and location of pick up.

107.     Defendant Thomas would then arrive at the location provided by Plaintiff, at the agreed date and time, in a chauffeured driven vehicle provided, or under the control of, Defendant Combs which would include Defendant Thomas, a member of Defendant

Combs' security team and other employees who were hired as entertainment for the party.

108.     Plaintiff was always provided wardrobe by Defendants Thomas and Combs and also was provided a breakroom while attending the "White Parties."

109.     Defendant Thomas and Combs groomed Plaintiff into sex trafficking over time.

110.     Around the third "White Party," Defendants Thomas and Combs demanded Plaintiff begin engaging in vaginal sexual intercourse with guests, as they had learned about her past in adult entertainment and used it forcefully to coerce Plaintiff into sex work for the benefit of Defendant Thomas and Combs and their beneficiaries.

111.     During this "White Party," Plaintiff was provided a "black dress" to wear by Defendants Thomas and Combs when previously Plaintiff was provided white clothing like other guests and the theme of the party.

112.     Upon information and belief, Plaintiff believes she was required to wear a black dress to the "White Party" to denote her capacity there as an employee, but more sinisterly as a sex trafficked sex worker.

113.     One beneficiary is Defendant Jacob, who Plaintiff was demanded by Defendant Combs to engage in sexual intercourse during a "White Party."

114.     Plaintiff, fearing not only her safety, but her and her then-boyfriend's job security, did as instruct and went with Defendant Jacob where she engaged in forced sexual intercourse with Defendant Jacob at the demand and behest of Defendant Combs. Plaintiff knew refusing Defendant Combs demands was not an option and to do so would be at her and Mr. Gallo's detriment.



115.    Plaintiff was coerced by Defendant Combs into consuming copious amounts of,

        allegedly laced, alcohol prior to being coerced and forced into having sexual intercourse

        with Defendant Jacob.

116.    Plaintiff is pictured with Defendant Jacob after the assault as Plaintiff was still in

        her role of employment at the "White Party."



117.    Plaintiff received an additional one thousand dollars, in cash, on top of what she had received as payment at the prior two "White Parties" from Defendant Thomas at the end of the night.

118.    At the end of the night, Defendant Combs, personally, congratulated Plaintiff for following his directives with Defendant Jacob and for a job well done.

119.    Plaintiff has personally witnessed Defendant Combs, Thomas and Jacob solicit and ingest narcotics and engage in illicit sex acts.

120.    Plaintiff was also employed at the "White Parties" that commenced at Defendant Combs' Miami, Star Island, residence.

121.    During these "White Party" employments, Plaintiff's travel was arranged by Defendant Thomas. Upon arrival at Ft. Lauderdale airport, a car service owned and operated by either Defendant Combs, BBE, SJC, CGE or Organizational Does would retrieve Plaintiff, Defendant Thomas and the other individuals from the airport and transport them to Defendant Combs' residence on Star Island.

122.     Defendant Thomas was to Defendant Combs as Ghislaine Maxwell was to Jeffrey Epstein.

123.     Without Defendant Thomas, a woman using her inherent good will as a woman to gain the trust of another woman, coordinating and acting as an avatar for Defendant Combs, Defendant Combs would be unable to execute his corrupt sex trafficking organization.

124.     Plaintiff is unable to recall details from the Miami "White Parties" due to the increased demand that Plaintiff engage in illicit narcotics and alcohol use while employed for Defendant Combs.

125.     Defendants Thomas and Combs passed off Plaintiff to other Defendants, outside of Defendant Jacob named as Defendant Does, to be sexually assaulted as part of their ongoing corrupt sex trafficking organization.

126.     Upon information and belief Plaintiff, believes Defendant Combs had hidden cameras in every room of his home in the Hamptons, NY and Star Island, Miami, FL.

127.     Upon information and belief, Defendant Does, who were individuals Defendants Thomas and Combs passed off Plaintiff to be sexually assaulted, were filmed by Defendant Combs security cameras sexually assaulting Plaintiff while Plaintiff was unconscious during the "White Parties" in both New York and Florida.

128.     Upon information and belief, these individuals and Plaintiff, were recorded without their knowledge and consent.

129.     Upon information and belief, this treasure trove of evidence in Defendant Combs' possession may either still be in Defendant's possession or in the possession of the FBI, as the FBI executed a warrant and raided Defendant Combs residences in April 2024.

**Defendant Combs Makes Promises of Career Advancement by way of Music Artist to Plaintiff**

130.    Defendant Combs is very forceful, demanding and does not take no for an answer and would often threaten to inflict bodily harm and/or terminate Plaintiff or her then-boyfriend's, Mr. Gallo, employment and "blackball" them from the industry if Plaintiff did not comply with his demands. As Defendant Combs acted and was viewed in such a way to where Mr. Gallo and Plaintiff believed he had the power where Defendant Combs threats were credible.

131.    Defendant Combs used his power, and influence to threaten and intimidate Plaintiff to continue participating in Defendant Combs' corrupt sex and drug trafficking organization.

132.    Defendant Combs, in an effort to continue to silence Plaintiff and keep her in his sex trafficking organization, offered to help Plaintiff enter into the music business as a part of an all-female music group.



My girl group when I worked for @diddy

133.     Plaintiff knew of Defendants Combs' prowess in the music industry and knew he

         had the power to help her advance her music career.

134.     Plaintiff believed Defendant Combs would fulfill his promises to help her career

         just as he had helped Plaintiff's then-boyfriends modeling career.

135.     Plaintiff, having been professionally exposed to the music industry side of

         Defendant Combs' empire, grew more aware of the true nature of her employment at the

         "White Parties" was grotesque, inexcusable, exploitative and criminal.

136.     Plaintiff's only way to escape Defendant Combs was to return to California,

         which Plaintiff did in 2009.

137.     Upon information and belief, in retaliation for Plaintiff's escape, Defendant Combs had Plaintiff's then-boyfriend, Mr. Gallo, "blackballed" from the modeling industry and had all of Mr. Gallo's campaigns with Sean John removed.

138.     Upon information and belief, in retaliation for Plaintiff's escape, Defendant Combs had Plaintiff "blackballed" from the entertainment industry.

**Defendant Combs' Corrupt Sex and Drug Trafficking Organization Has Caused Plaintiff Lifelong Harm**

139.     Plaintiff became severely depressed and began to blame herself for being trafficked and for sabotaging her own career.

140.     Being sex trafficked and abused has led Plaintiff into a tailspin of anxiety and depression.

141.     In or about 2010, Plaintiff was hospitalized for mental illness as a direct cause of her being trafficked by Defendants.

142.     Everywhere Plaintiff looked, she was reminded of being trafficked by Defendant Combs, as he is an inescapable presence in music, television, and film.

143.     In the ensuing years, Plaintiff has also experienced alcohol and drug addiction, as she attempted to cope with the emotional trauma of being assaulted and trafficked.

144.     Plaintiff has also experienced intimacy issues, as she struggles to maintain emotional and sexual relationships with men.

145.     Plaintiff was recently married, however fears her marriage may fall apart due to her mental breakdowns precipitated by memories of the assault and trafficking.

146.     Defendant Combs has altered the trajectory of Plaintiff's career, denying her a successful and lucrative career in the music industry.

147.     To this day, Plaintiff experiences bouts of depression, anxiety, body image issues, feelings of worthlessness, and intimacy issues because of being trafficked by Defendant Combs.

148.     Plaintiff is a woman of faith and when she saw news coverage of the countless lawsuits, initiated by brave other individuals against Defendant Combs, she knew she had a moral obligation to speak up.

149.     Plaintiff feared further violence and/or retaliation from Defendant Combs in filing this lawsuit, but ultimately decided that it was imperative she speak her truth with the hopes that no other individual would have to endure the egregious and heinous treatment she has.

150.     Plaintiff seeks justice for herself and for any of other Combs' victims.

**Trafficking And Victims' Protection Act**

151.      According to Plaintiff, she was transported from New York to Florida throughout by Defendant Combs for the purpose of engaging in sexual activities.

152.     Plaintiff asserts during this time; Plaintiff was forced to engage in sex work and perform sex acts to the pleasure of and the behest of Defendant Combs.

153.     Between 2006-2009, Defendant Combs forced Plaintiff to engage in prostitution and sex work at his homes in Hampton, NY and Miami, Florida.

154.     Plaintiff asserts that Defendants VIBE and PMC were involved in Defendant Combs organized sex trafficking Enterprise.

155.     Plaintiff asserts that Defendants VIBE and PMC's involvement in the Enterprise

included providing Defendant Combs' resources like intentionally and falsely marketing

and promoting Defendant Combs' "White Parties" in its publication as a high-profile

networking and social event in an effort to disguise and deceive the real intent of the

event which was to further Defendant Combs, and his various businesses including BBE,

SJC, CGE, and VIBE and PMC's profits.

156.     In furtherance of Defendants illegal Enterprise Defendants VIBE and PMC

ensured Defendant Combs, and his businesses BBE, SJC, and CGE, appeared

overwhelming in its magazine be it on covers or pages inside Defendants magazine

featuring pages dedicated to Defendant Combs personally or his businesses.

157.     Plaintiff believes Defendants VIBE and PMC engaged in Defendant Combs'

illegal Enterprise to increase the visibility and profitability of its publication, VIBE

Magazine, through the magazine's constant affiliation and relationship with Defendant

Combs.

158.     Plaintiff seeks justice against all Defendants for sex trafficking.

**Claims Related To Plaintiff's Picture And Likeness**

159.     On or around Labor Day, 2004, Plaintiff's picture was taken while in her

employment capacity at Defendant Combs' "White Party" in Hampton, NY.

160.     Plaintiff did not know what her picture was being taken for, or would be used for,

nor was Plaintiff's consent sought or given.

161.     Plaintiff has never entered into any agreement with any Defendant to license her

likeness, nor was it a term for employment at the "White Party."

162.    Defendant VIBE, and PMC, intentionally mislabeled Plaintiff as a guest at the "White Party" in its magazine to further conceal the true intentions of the event and Plaintiff's employment role at the event in an effort to further the goals of the Defendants illegal and criminal Enterprise.

163.    Defendant VIBE and PMC exploited Plaintiff's likeness in their November 2006 magazine, where Defendant Combs was the cover and the story was about Defendant's "White Parties," which by this point was a cultural phenomenon.



164.    Plaintiffs' unauthorized, non-consensual and infringing use of her picture and likeness appears on Page 140 of the magazine.



165.     Plaintiff did not discover the infringing use until approximately April, 2024.

166.     This infringing use promoted, without limitation, products synonomus with Defendant Combs including the "White Party" and Defendants BBE, SJC and CGE.

167.     Plaintiff is readily and easily identifiable in the infringing use, and her picture and likeness is prominently displayed in Defendants VIBE and PMC's publication.

168.     The aforementioned act violates Plaintiff's rights to privacy via misappropriation.

169.     Plaintiff has never given any Defendant a release to use her likeness in any publication or platforms, media or formats digital, physical or otherwise.

170.     The November 2006 issue of Defendants VIBE and PMC is still readily available for sale and viewable online.

171.     At all relevant times, Plaintiff had the sole and exclusive right of publicity with regard to the use of her picture, portrait, and likeness under New York State Law and Common Law Right of Publicity.

172.     Defendants have, without Plaintiff's authorization or consent, since used Plaintiff's likeness for advertising and other trade purposes without consent and without a license to promote Defendant Combs, BBE, SJC, CGE, VIBE and PMC products for commercial gain. Plaintiff is further informed and believes and thereon alleges that Defendants VIBE and PMC used Plaintiff's likeness in its magazine nationwide, including in this District.

173.     None of the Defendants at any point had a license for the use of Plaintiff's picture and likeness to promote the "White Parties."

174.     At no point did Plaintiff authorize, consent to, or otherwise seek to allow the
Defendants, or any of them, to exploit her picture, image, or likeness as seen in the
infringing use in any manner.

175.     Plaintiff is informed and believes and thereon alleges, that Defendants, and each
of them, engaged in the unauthorized exploitation and misappropriation of Plaintiff's
photograph, image, picture, and likeness by prominently featuring Plaintiff in an
advertisement and marketing materials for Defendant Combs, BBE, SJC and CGE on
various online platforms and physical materials, including but not limited to the
infringing use.

176.     Plaintiff is informed and believes and thereon alleges, that Defendants, and each
of them, engaged in the unauthorized exploitation and misappropriation of Plaintiff's
photograph, image, picture, and likeness in an effort to further and continue their corrupt
sex and drug trafficking organization.

177.     Through their general business partnership, and financial support of Defendant
Combs, Defendants VIBE and PMC aided and abetted Defendant Combs' actions as
herein.

178.     Defendants' publication and distribution of the infringing use has resulted in
substantial injury to Plaintiff.


**FIRST CAUSE OF ACTION**


**CONDUCT AND PARTICIPATE IN A RICO ENTERPRISE THROUGH A PATTERN
OF RACKETEERING ACTIVITY A VIOLATION OF RACKETEER INFLUENCED
ANDCORRUPT ORGANIZATION ACT, CODIFIED AT 18 U.S.C. § 1962(A), (C)-(D)
(Against ALL Defendants)**

179.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as
if set forth fully herein.

180.     Defendants VIBE and PMC are 100% liable for the actions of Defendant Combs,
and by extension, BBE, SJC, CGE, and Thomas ("RICO orchestrators"). Defendants
VIBE and PMC financially benefited from Defendants Combs, BBE, SJC, and CGE
through their partnership with Defendant Combs and the brands he owned, listed as
Defendants above. The collective provided the RICO orchestrators with unfettered access
to resources and failed to adequately investigate, supervise, and or monitor how those
resources were being used, who was using those resources and the purpose of use of
those resources.

181.     The support provided by Defendants Thomas, Jacob, BBE, SJC, CGE, VIBE and
PMC was a lifeline that spearheaded and maintained the RICO orchestrators' depraved
actions. Upon information and belief, the establishment of a business relationship with a
prominent publication, VIBE, PMC and Combs allowed for distribution platform for all
Defendant Combs business endeavors to disguise his true intentions with overly broad
and vague in nature description of activities. Defendants VIBE and PMC knew or should
have known that Defendants Combs, BBE, SJC, and CGE had no intention to utilize the
resources he received for business related purposes and they did not put any mechanism
in place to ensure that their resources, specifically their publication, were not being used
for any illegal activity. Defendants VIBE and PMC willful blindness resulted in Plaintiff
suffering the harm detailed herein.

182.     Defendants are individuals and entities within the meaning of "person" as defined
in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or

beneficial interest in property." The association is composed of Defendants Combs, BBE, SJC, CGE, VIBE, PMC, Thomas, Jacob, John and Jane Does 1-10, and Organizational Does 1-10.

183.        In the relevant part, 18 U.S. Code 1961 defines a racketeering activity as:

> (1) (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, ***dealing in obscene matter, or dealing in a controlled substance or listed chemical** (as defined in section 102 of the Controlled Substances Act)*, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: *... section 933 (relating to trafficking in firearms)*, section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ***sections 1461–1465 (relating to obscene matter), section 1511 (relating to the obstruction of State or local law enforcement)***, ***sections 1581–1592 (relating to peonage, slavery, and trafficking in persons)***, section 1952 (relating to racketeering), section 1956 (relating to the laundering of monetary instruments), (D) any offense involving fraud connected with a case under title 11...the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical.

184.        Section 1962(a) makes it: ***unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity*** or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any Enterprise which is engaged in, or the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a).

185.        Section 1962(c) makes it: ***unlawful for any person employed by or associated with any Enterprise engaged in,*** or the activities of which affect, interstate or foreign commerce, ***to conduct or participate***, directly or indirectly, in ***the conduct of such Enterprise's affairs through a pattern of racketeering activity.*** 18 U.S.C. §1962(c).

186.     Section 1962(d) makes it: unlawful for *"any person to conspire to violate"* Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

187.     Defendants mentioned herein are associated with each other as an Enterprise within the meaning of "Enterprise" as defined in 18 U.S.C. § 1961(4).

188.     Plaintiff, in its pleading, has detailed many acts by Defendants Combs, BBE, SJC, CGE, VIBE, PMC, Thomas, Jacob, Does 1-10 and Organizational Does 1-10, which are prohibited under 18 U.S.C. §1962.

189.     Defendants have unlawfully increased their profits by luring and deceiving individuals such as Plaintiff to their organization for the misstated purpose of using their talents as entertainment. Defendants' true intentions are later revealed through a calculated grooming scheme that involves false promises of business opportunities, exposure to high level celebrity individuals including: former President Donald Trump, Reverend Al Sharpton, and Paris Hilton, music mogul Jay-Z, and music executives like Russell Simmons, Irv Gotti, Steve Stout, Andre Harrell, and Lyor Cohen, with the promise of introductions, networking, fame and fortune which quickly shifts to unauthorized drugging, threats and sex trafficking.



11.06

**1998**
"There were many illustrious guests at the White Party, but Puffy was the star attraction."
—Donald Trump

**1998**
Simmons with a fresh face Kimora Lee.

"I remember being with Betsey Johnson, Donna Karan, and Ronald Perelman—all of us were trying to figure out if we should buy a white outfit to make sure we got in."
—Russell Simmons

**1998**
The pre-Fergie Black Eyed Peas show love.

# CONTENTS

**122 // ON MY OWN**
After getting dropped by both G Unit and Aftermath, the odds seemed stacked against **THE GAME**. But this underdog's back. By Allen Scott Gordon. Photographs by Jonathan Mannion.

**126 // YOU DON'T KNOW ME, BUT...I'M YOUR BROTHER**
**TAYLOR HICKS** may just be the most successful American Idol yet. But who's really feeling his gray-haired soul man routine? By Jon Caramanica. Photographs by Joaquin Palting.

**130 // DELIVERANCE**
The son of a hustler and a preacher, **LIL SCRAPPY'S** been battling God and the Devil his entire life. Now he's got 50 Cent and Lil Jon on his side. By Laura Checkoway. Photographs Julia Beverly.

**132 // ...AND STILL CHAMPION**
SEAN "DIDDY" COMBS IS READY TO TAKE ON ALL COMERS
The ruler's back. With a new Bad Boy roster making noise on the Nielsen SoundScan charts and a best-selling fragrance, **SEAN COMBS** sits down for a candid Q&A. By Danyel Smith. Photographs by Matthias Clamer.

**135 // CHANGE CLOTHES—AND GO THE NOTORIOUS B.I.G.** was 'hood certified. So how did Puffy transform the kid in the "red and black lumberjack" into a fashion icon? By Mark Allwood

**136 // BEEN AROUND THE WORLD**
Bad Boy's influential production unit, **THE HITMEN,** remember the session that made legends. By Gregory Johnson

**138 // WHITE HEAT**
VIBE cleans up to give you access t PD's exclusive **WHITE PARTY.** By Keith Murphy

**141 // BAD BOY'S GREATEST MISSES**
Because sometimes it just has to s

**142 // MO MONEY, NO PROBLE**
The hip hop Frank Sinatra's strikin diverse business empire is arguabl as gangsta as it ever was. By Robert LaFranco

(CONTINUED ON PAGE 18)

16 VIBE





190.     While employed by Defendant Combs at the "White Parties," Plaintiff witnessed

Defendant Combs instruct, direct Defendant Thomas and other employees to acquire and

transport the illicit narcotics. Plaintiff personally witnessed Defendant Thomas transport

illicit narcotics to and from the "White Parties" in New York and Florida. Plaintiff

personally witnessed Defendant Combs ingest and distribute the illicit narcotics once he

received them. Plaintiff personally witnessed and was directed by Defendant Combs to

engage in sex work while employed as an entertainer at the "White Parties." Plaintiff was

required to engage in sex acts with attendees at the "White Parties" when instructed by

Defendant Combs or Thomas. Plaintiff would be paid in cash for complying with the

demands for se work and there was no negotiation between Plaintiff and either Defendant

Combs, Thomas or the party receiving services regarding a price to be paid for Plaintiff

complying with sex work demands.

191.     The RICO Enterprise activities affected interstate commerce, is comprised of an

association of persons, including each Defendant and other unnamed co-conspirators

herein. That association was structured by various agreements, deals, contracts, and non-

contractual relationships between the Defendants, by which Defendants assumed

different roles in knowingly and directly or indirectly participating in the acts necessary

to carry out the directives of the Enterprise which was to acquire and distribute narcotics,

prostitutes, and sex workers. Defendants also worked collectively to deceptively obtain

the labor of models and entertainers, such as Plaintiff and Mr. Gallo, to utilize their

talents and labor to produce tangible goods and services without full compensation. As

detailed herein, Plaintiff worked for Defendant Combs for several years. Additionally,

Plaintiff's then-boyfriend, Mr. Gallo, was also employed by one of Defendant Combs'

businesses Defendant SJC. Employee Defendant Thomas solicited Plaintiff, via Mr.

Gallo, to work for Defendant Combs at his "White Parties" as entertainment. Plaintiff

was never allowed to negotiate a rate for her employment with Defendant Combs. In fact,

Plaintiff agreeing to employment with Defendant Combs was a condition precedent to

Mr. Gallo gaining his employment with Defendant Combs as a model with Defendant

SJC. Plaintiff fulfilled the condition precedent by providing services of sex work

demanded by Defendant Combs at his "White Parties." Defendant Combs benefited from

Plaintiff's forced sex work, did not compensate Plaintiff fairly and ultimately blackballed

Plaintiff, and Mr. Gallo once she no longer cowered to Defendant Combs' demand for

continued participation.

192.     Defendants Combs, BBE, SJC, CGE, VIBE, PMC, Thomas, Jacob, Doe 1-10, and

Organizational Doe 1-10 all share a common purpose: to use deception, coercion, force,

and the threat of violence to enrich themselves at the expense of individuals like the

Plaintiff. As set forth herein, although all Defendants may not have directly threatened

coerced, forced or violently threatened Plaintiff, they financially benefitted from

Defendants Combs, BBE, SJC, CGE, Thomas, and Jacob's scheme of defrauding, and

intimidating the Plaintiff with threats of destitution and isolation from the music and

entertainment industry (which Defendant Combs made good on as there is no evidence of

Mr. Gallo's Sean John campaign available and both Plaintiff and Mr. Gallo were

effectively banned from the industry after Plaintiff refused continuing her employment at

the "White Parties"), fake promises of a music career, guaranteed access to future

exclusive celebrity events, fame and fortune. It is reasonable to believe Defendants

Combs, BBE, SJC, CGE, VIBE, PMC, Thomas, Jacob, Doe 1-10, and Organizational Doe 1-10 would not have engaged in these acts of threats but for the existence of the RICO scheme and their understanding that they would have unfettered access to engage in their illegal and corrupt Enterprise without question.

193.     As evidenced in Plaintiff's complaint herein, Defendants all orchestrated, participated, managed, and executed the RICO Enterprise.

194.     Defendants Combs, Thomas and Does purchased and distributed illegal narcotics to employees and guest of the "White Parties." Defendants transported the narcotics by flying on commercial airlines from New York to Florida and distributed the narcotics to guests of the "White Party" and/or to Defendant Combs directly.

195.     The RICO Enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

196.     This is the second case in this jurisdiction where Defendant Combs has been accused of engaging in racketeering, and both cases have similar fact patterns and descriptions of racketeering activities.

197.     Defendant Combs has a pattern of making false representations and omissions to entertainers who used their talents to provide services to the RICO Enterprise. These false representations and omissions were designed to induce people like the Plaintiff to utilize their talents and labor to provide entertainment and engage in forced sex work services without full compensation. Entertainers, like Plaintiff, were also forced to solicit and participate in sexual encounters with guests of the "White Parties" as part of their employment capacity. Entertainers, like Plaintiff, were also required to purchase and distribute narcotics. As further part of the Enterprise, Defendant Combs required

entertainers, like Plaintiff, wear clothing provided by Defendant Combs, so that she could easily be identified as a sex worker by the partygoers.

198.     Additionally, Defendant Combs used the prospects of a music career, participating in future "White Parties" and meeting influential music industry executives, coupled with threats to blackball Plaintiff, and her then-boyfriend, if they did not comply with Defendant Combs demands. This pattern of false representations was disseminated to Plaintiff in Florida and New York. The dissemination typically used interstate telephone wires.

199.     The true nature of Defendants' Enterprise was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the Enterprise, causing further injury to Plaintiff and possibly many others.

200.     Upon information and belief, Defendants profited from the Enterprise, and Plaintiff suffered because the Enterprise diminished Plaintiff's finances for nonpayment of services rendered and diminished Plaintiff's health through consistent drugging and forced sexual encounters as a sex trafficking victim. Defendants used the proceeds from the Enterprise to advance the Enterprise by funding and operating their marketing machine, including through the use of the mail, magazine coverage, word of mouth, and interstate wires to sell the illusion that Defendant Combs was a serious and legitimate businessman who held exclusive networking events that would allow entertainers the opportunity to maximize their skills in the entertainment industry when nothing could be further from the truth.

201.     Defendants VIBE and PMC were a direct participant in the marketing aspect of the scheme as, in one issue of VIBE Magazine, November 2006, Defendant Combs received an astonishing 18 pages of advertisement including the cover of the magazine, the centerfold cover, and several direct 2-page advertisements for Defendant Combs' other Enterprises within CGE, including clothing, liquor and a cologne called "UNFORGIVABLE." The tagline for "UNFORGIVABLE" cologne was "Life without passion is UNFORGIVABLE." Who knew Defendant Combs' true passion was being the head of a corrupt organization that abused women, and trafficked sex and narcotics.





Two- page "UNFORGIVABLE" cologne advertisement featuring Kimora Lee Simmons.







Sean John campaign featuring Defendant Combs son, Justin Combs.

Childhood photos of Defendant Combs used to humanize him in furtherance of the conspiracy.





Multiple Covers of Defendant Combs for Defendants VIBE and PMC publication "VIBE Magazine."



Two- page Centerfold Poster of Defendant Combs
"and still champion"



Defendant Combs with Jennifer Lopez on World Tour



Several pages dedicated to Defendant Combs Labor Day "White Parties" in the Hamptons, NY and Star Island, FL







202.    To reiterate, Defendants Combs, BBE, SJC and CGE appeared in 18 (eighteen) pages including the cover of Defendants VIBE and PMC's publication "VIBE Magazine" in a SINGLE issue.

203.    Defendants provided the general public at large this misrepresentative information, including over interstate wireline communications systems via their nationwide publishing VIBE magazine which is available in print and online.

204.    Upon information and belief, Defendants obtained revenue via wire transfers, documents, and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the Enterprise and causing further injury to Plaintiff as described throughout.

205.    Defendants' scheme was reasonably calculated to deceive Plaintiff of ordinary prudence and comprehension through the execution of their complex and illegal scheme to misrepresent the true purpose of employment at Defendant Combs' "White Parties"

and that employment at those parties would not and could not lead to a career in the music industry, fame nor fortune. Plaintiff would have never engaged in any regard with Defendant Combs for five years if not but for the complex and illegal racketeering scheme operated by Defendants.

206.     Upon information and belief, Defendants each had the specific intent to participate in the overall RICO Enterprise and scheme to defraud Plaintiff and each participated in the Enterprise as follows:

207.     Upon information and belief, Defendants Combs, BBE, SJC, CGE, VIBE and PMC control and participate in the activities of the Enterprise in a variety of ways as set forth herein, including but not limited to, developing marketing campaigns to legitimize the "White Parties" as a "way to integrate hip hop into the echelons of the mega-rich, to find an intersection of both worlds for the sake of unity."[14]

208.      Upon information and belief, throughout the relevant period, Defendant VIBE and PMC entered into a partnership agreement with Defendant Combs, BBE, SJC and CGE. As general business partners, each member is responsible for the partners' actions in the partnership. Defendants VIBE and PMC have an ethical obligation to ensure their business partners, Defendant Combs, BBE, SJC and CGE, were not using the partnership to engage in illegal activity.

209.     Defendants VIBE and PMC provided resources to their general business partners, Defendants Combs, BBE, SJC and CGE. Defendants Combs, BBE, SJC and CGE used the resources provided by their general business partners to solicit through the mail,

---

[14] https://www.yahoo.com/entertainment/diddy-white-party-labor-day-celebrity-fashion-photos-style-hip-hop-120027194.html

world wide web, and telephone entertainers whom they would promise music careers, modeling careers and meetings with powerful music industry executives. Defendants Combs and his staff, including Defendant Thomas and Does, would solicit entertainers who resided in New York and Florida. Defendants Combs and his staff, including Defendant Thomas, VIBE, PMC and Does, relied on the mail, world wide web  and telephone to disseminate the misleading information described herein. Defendants Combs, BBE, SJC, CGE, Thomas, VIBE or PMC did not disclose to the individuals they solicited the fact that they would be drugged, required to act as sex workers and forced to perform sex work without compensation.

210.    Defendants authorized the resources to their general business partner, Defendant Combs. In furtherance of the goals of their conspiracy, Defendants VIBE and PMC used the "White Parties" as a ruse to provide Defendants Combs, BBE, SJC and SGE cover to disguise their covert sex trafficking Enterprise. Throughout the relevant period, Defendants Combs BBE, SJC and CGE used the resources their general business partners provided to solicit entertainers. As detailed throughout, they relied on the mail, email, and world wide web to disseminate the misleading information described herein and profit from the free labor of these entertainers. In addition to the forced free labor, they used their power and influence to force these entertainers to engage in sex work and to engage in unwanted sexual encounters with friends and associates of the RICO Enterprise. Defendants also used their power and influence to force these entertainers to purchase, transport, and distribute illegal narcotics. As the general business partner of Defendants Combs, BBE, SJC and CGE, Defendants VIBE and PMC are equally liable for the commission of these acts.

211.     Upon information and belief, Defendant Thomas ensured the cash payments to
employees, like Plaintiff, were executed. Plaintiff was never given the opportunity to
directly negotiate the fees for forced sex work outside of her employment and would
typically be at the sole discretion of Defendant Thomas's grace for payment for sex work.
Plaintiff does not recall receiving appropriate United States federal tax documents for
payments or if they independently declared these payments on their taxes. It is unclear if
Defendants BBE, SJC, CGE, Jacob, VIBE or PNC requested an audit of Defendant
Combs business financial records to ensure the resources provided to Defendant Combs
was not being used to fund illegal activities like sex and drug trafficking.

212.     During the ten (10) years preceding the filing of this action and to the present, all
Defendants did cooperate jointly and severally in the commission of predicate acts
itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as
described in this Complaint.

213.     Beginning at an exact date unknown to Plaintiff, but within ten (10) years
preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully
participated in a pattern of racketeering activity that continues possibly to this day.

214.     The "Racketeering Acts" followed the same pattern and purpose: to defraud the
Plaintiff for the Defendants' benefit. Each Racketeering Act involved the same or similar
methods of commission and participants.

215.     Defendants' business would not have succeeded without the repeated predicate
acts and the ability to conduct their fraud using mail, telecommunications wires, interstate
travel, and possibly money laundering. Which is not far-fetched considering Defendant

Jacob was sentenced to thirty months for activities related to money laundering and required to forfeit over $2,000,000.00 in civil penalties and fees.[15]

216. The Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the Enterprise to operate their businesses to solicit potential victims as detailed herein.

217. The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the Enterprise to operate their businesses to fraudulently induce Plaintiff, and others like Plaintiff, to utilize their talents and labor to provide services without full compensation. In addition to the forced free labor, Defendants used their power and influence to force Plaintiff to engage in sex work and to engage in unwanted sexual encounters with others when directed. Defendants, specifically Defendant Combs, used his power and influence to force Plaintiff to engage in sex work but also distribute and consume illegal narcotics.

218. Defendants' wrongful conduct has injured Plaintiff, remaining part of Defendants' ongoing business practices, and continues to threaten Plaintiff and the public.

219. Defendants' association with the Enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

220. To further their collective goals, Defendants worked in concert to engage in various forms of criminal activity, including forcing individuals into sex work by forcing them to solicit and engage in sexual encounters with others and to consume and distribute illegal narcotics at the direction and demand of Defendant Combs'.

---

[15] https://www.cbsnews.com/news/jacob-the-jeweler-jailed/

221.     Defendant's ongoing racketeering activity has injured and continues to injure Plaintiff. Defendant's pattern of forcing Plaintiff and others like Plaintiff, to engage in sex work and engage in sexual encounters with others and to purchase, transport, and distribute illegal narcotics was the proximate cause of the injuries suffered by Plaintiff.

**Defendants Committed Multiple Acts of Sex Trafficking in Violation of 18 U.S.C. § 1591 (Sex trafficking by force, fraud, or coercion) in Furtherance of the Enterprise**

222.     As detailed throughout this complaint, Defendants knowingly affected interstate commerce, by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting by any means a person, Plaintiff, to engage in illegal sex acts and sex work. In addition to violating federal law, these acts violated the following state statutes: Florida, Penal Code 796.07(2)(f); and New York, Penal Code 230.05.

223.     As detailed throughout this complaint, Defendants BBE, SJC, CGE, Jacob, VIBE and PMC provided resources to Defendant Combs through their general business partnership, Defendants BBE, SJC, CGE, Jacob, VIBE and PMC, and by extension through Defendant Combs, knowingly benefited, financially or by receiving anything of value, in an Enterprise which has engaged in an act described in violation of paragraph (1) of 18 U.S.C. § 1591.

224.     Defendants BBE, SJC, CGE, Jacob, VIBE and PMC, and by extension through Defendant Combs, knowingly, or, except where the act constituting the violation of paragraph (1) 18 U.S.C. § 1591 advertised, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2) of 18 U.S.C. § 1591,

or any combination of such means will be used to cause Plaintiff to engage in several commercial sex acts.

225.    By way of example, in the Summer of 2007, Plaintiff was forced to engage in sex work at the "White Party" at Defendant Combs' home in Hampton, NY with Defendant Jacob. The picture included in this pleading of Defendant Jacob and Plaintiff was taken after Plaintiff was forced to engage in illegal sex acts with Defendant Jacob at the behest and demand of Defendant Combs. Defendant Combs forced Plaintiff to have sex with Defendant Jacob against her will. According to Plaintiff, Defendant Combs' required sex work and engaging in sex acts as part of the employment at the "White Parties." Plaintiff was only paid for her services at the party but not for the sex work she was forced to engage in.

226.    By way of example, between 2004-2009, Plaintiff was forced by Defendant Combs and Thomas to transport herself to Mr. Combs home located in Miami, FL. Plaintiff, upon information and belief, believes there may be videos showing her being sexually assaulted, while unconscious, during the "White Parties" at Defendant Combs' Florida residence.

227.    From at least 2004 through 2009, in the states of New York and Florida, and possibly elsewhere, Defendant Combs and others known and unknown, in affecting interstate commerce, knowingly combined, conspired, confederated and agreed to recruit, entice, harbor, transport, provide, obtain and maintain, by any means, a person, and to benefit, financially and by receiving anything of value, from participation in an Enterprise which has engaged in such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud and coercion and a combination of such

means, would be used to cause the person, Plaintiff, to engage in commercial sex acts, to wit, Defendants Combs, Jacob and others, known and unknown, caused Plaintiff to engage in commercial sex acts in the United States cities of Miami and New York by means of force, threats or force, fraud and coercion, and a combination of such means.

228.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the States of New York, and Florida:

    a.   In or about 2004, Defendant Sean Combs, through his employee, Defendant Thomas, recruited Plaintiff to work for him as an entertainer at his "White Parties." Defendant Combs promised to book Plaintiff's then-boyfriend in the Sean John Clothing campaign he auditioned for as a model, make Plaintiff a music artist, and introduce Plaintiff to an ultra-exclusive group of high-profile individuals to further her career in the entertainment industry.

    b.   In or about 2005, after Plaintiff's second "White Party," Defendant Combs began more aggressively grooming Plaintiff into engaging in sex work. Defendant Combs directed Plaintiff with whom to engage in sex work and would give approval and congratulations after Plaintiff complied with Defendant Combs' demands.

    c.   As part of his grooming of Plaintiff, Defendant Combs threatened that if Plaintiff did not continue her employment at the "White Parties" that Defendant Combs would blackball Plaintiff from the entertainment industry and Plaintiff's then-boyfriend, Mr. Gallo, from the modeling industry, which Defendant Combs eventually did anyway.

d. At the direction of Defendants Combs and Thomas, Plaintiff was forced to engage in sex work at Defendant Combs' homes in Hampton, NY and Miami, Florida. Plaintiff had no authority to be on Defendant Combs' residential premises without Defendant Combs' consent. All of Defendant Combs' properties are protected by 24-hour security, and all visitors must be verified before entry.

e. Plaintiff communicated with Defendants Combs and Thomas by telephone. Defendant Combs communicated by a California number ending in "1496." However, a search of that number leads to New York-based artist Paloma Baillie[16] as the registered owner. Why or how a number registered to Ms. Baillie is being used by Defendant Combs is another conspiracy for another time. The number Plaintiff communicated with Defendant Thomas is seemingly still registered to Defendant Thomas.



-1496

**Paloma Baillie**

Los Angeles, CA



-7852

**Tameka T Trapp**

Los Angeles, CA

---

[16] https://www.palomabaillie.com/about

229.     From 2004-2009, in the States of New York, and Florida, Defendants Combs,

Thomas and others known and unknown, in and affecting interstate commerce,

knowingly did recruit, entice, harbor, transport, provide, obtain, and maintain, by any

means a person, Plaintiff, and did benefit, financially and by receiving anything of value,

from participation in an Enterprise which has engaged in any such act, knowing and in

reckless disregard of the fact that means of force, threats of force, fraud and coercion, and

a combination of such means, would be used to cause the person to engage in a

commercial sex act, to wit, Defendants Combs, Thomas and Jacob caused Plaintiff to

engage in commercial sex acts utilizing force, threats of force, fraud and coercion, and a

combination of such means. Additionally, Defendant Combs received personal

gratification by directing and ensuring Plaintiff engage in commercial sex acts with the

individuals Defendant Combs directed her to engage.

230.     From 2004-2009, up to and including currently, in the States of New York, and

Florida, Defendants Combs, Thomas and others known and unknown, in and affecting

interstate commerce did use, and cause to be used, facilities in interstate and foreign

commerce, to wit internet and cellular telephone services, with the intent to promote

manage, establish, carry on and facilitate the promotion, management, establishment and

carrying on of an unlawful activity, to wit, a business Enterprise involving prostitution

offenses in violation of applicable state law, and thereafter performed and attempted to

perform an act to promote, manage, establish and carry on, and to facilitate the

promotion, management, establishment and carrying on of such unlawful activity.

**Defendants Committed Multiple Acts of procuring, transporting, and distributing
controlled substances in Violation of Title 18, United States Code, Sections 1961(1) and
1961(5) Furtherance of the Enterprise**

231.     Defendants knowingly affected interstate or commerce did knowingly and

intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to

conduct and participate, directly and indirectly, in the conduct of the affairs of that

Enterprise through a pattern of racketeering activity, as defined in Title 18, United States

Code, Sections 1961(1) and 1961(5). In addition to violating federal law, these acts

violated the following state statutes: Florida, Penal Code 893.135 and New York, Penal

Codes 220.77, 220.18, 220.50, and 220.06.

232.     **The Combs Rico Enterprise**:[17] As detailed throughout this pleading, Defendants

are an Enterprise as the term is defined pursuant to 18 USCS § 1961 (4). That is, a group

of individuals associated, in fact, that engaged in, and the activities of which affected

interstate commerce. The Enterprise constituted an ongoing organization whose members

functioned as a continuing unit to achieve the Enterprise's objectives.

233.     Upon information and belief, the Combs Rico Enterprise is comprised of

individuals residing in and around Los Angeles, California, Miami, Florida, New York,

and among other places. Members and associates of the Combs Rico Enterprise have

engaged in drug trafficking and sex trafficking.

234.     Upon information and belief, members and associates of the Combs Rico

Enterprise procured, transported, and distributed ecstasy, cocaine, and other illicit

narcotics, in and around the States of New York and Florida. During the relevant

timeframe, through their general business partnership, Defendants provided resources to

---

[17] "Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C.S. § 1961

Defendant Combs in furtherance of the Enterprise during its highly exclusive and sought after summer "White Parties."

235.    **The purpose of the Combs Enterprise**: As detailed herein, and according to Plaintiff, the purpose of the Combs Enterprise is to:

    a.  Use its position, power, and influence to control entertainers and force these entertainers to purchase, transport, and distribute illegal narcotics and engage in sex work;

    b.  Promote and enhance the prestige, reputation, and position of the Enterprise with respect to rival music labels, artists and executives;

    c.  Preserve and protect the power, territory, and criminal ventures of the Enterprise through the use of intimidation, threats of violence, and coercion;

    d.  Keep victims in fear of the Enterprise and its members and associates;

    e.  Enrich the members and associates of the Enterprise through criminal activity, including narcotics trafficking, sex trafficking and fraud;

    f.  Conceal the activities of the Enterprise from law enforcement by threatening individuals' livelihoods if they ever spoke about their experiences to others, especially law enforcement.

236.    **Methods and Means of the Enterprise**: Upon information and belief, among the means and methods by which the Defendants and their associates conducted and participated in the conduct of the affairs of the Enterprise were the following:

    a.  Members of the Enterprise and their associates procured, transported and distributed illegal narcotics to Defendant Combs at his homes in New York and

Florida. Plaintiff personally witnessed members of the Enterprise doing this during domestic travel.

    b.   Members of the Enterprise and their associates used force, coercion, threats, or a combination therein to force Plaintiff to engage in sex work and have sex with "White Party" goers at the direction of Defendant Combs and/or Thomas.

237.    The pattern of racketeering activity through which Defendants, together with others, agreed to conduct and participate directly and indirectly, in the conduct of the affairs of the Enterprise consisted of multiple offenses involving dealing in controlled substances, in violation of Title 21, United States Code, Sections 841, 843 and 846. Parts of the conspiracy involved each Defendant agreeing that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

**Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

238.    Defendants voluntarily and intentionally devised and participated in a scheme with the intent to defraud Plaintiff.

239.    Defendants used the mail to execute the fraudulent scheme herein.

240.    Specifically, the Defendants agreed to each of the acts of mail fraud described throughout this Complaint. In addition, they agreed to rely on the mail to distribute their marketing materials, VIBE Magazine, secure wires and cash payments from purchasers of the illegal sex services and narcotics they required others to sell, distribute and perform.

241.    In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants, either individually or in

combination with themselves, used and caused to be used the U.S. mail by both placing

and causing to be placed, marketing materials, advertisements, agreements and other

matters in depositories and by removing, or causing to be removed, letters and other

mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. §

1341.

242.    Defendants could not have furthered their fraudulent scheme without the use of

the mail. For example, without the mail, Defendants VIBE and PMC would be unable to

distribute its marketing magazine as, during that time, "online viewing" was still in its

infancy. Defendants also required the mail to distribute misleading advertisements to

various states, including New York. For these reasons, the use of mail to conduct

fraudulent activity was necessary and inevitable.

**Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

243.    Defendants voluntarily and intentionally devised and participated in a scheme

with the intent to defraud Plaintiff.

244.    Defendants agreed to each of the acts of wire fraud described herein.

Additionally, Defendants agreed to rely on interstate wires to disseminate funds to others

in the Enterprise. Defendants illegally acquired and utilized wire transfers to further their

collective goal of furthering their RICO Enterprise. Defendants knew that these purchases

were illegally made.

245.    Defendants agreed that Defendants should facilitate these fraudulent purchases

over interstate wires in furtherance of the fraud. Plaintiff has received payment for

employment and sex work, comingled, in New York and Florida from Defendants Combs and Thomas.

246.    In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants, either individually or in combination with themselves, used, or caused to be used, interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343.

247.     Defendants could not have furthered their fraudulent scheme without the ability to use telecommunications to share information with clients and retailers nationwide. Defendants needed to communicate with clients and retailers around the country, utilizing interstate telecommunications wires to conduct the fraudulent activity. Which was necessary and inevitable to use.

248.    Plaintiff has been damaged in her business or property because Defendants violated 18 U.S.C. § 1962(a), (c)-(d)), and, therefore, Plaintiff is entitled to recover the damages and other remedies enumerated therein.

249.    Defendants' acts or omissions were actuated by actual malice and a willful and wanton disregard for the consequences suffered by Plaintiff, were directed towards her because of her gender, and with knowledge of a high degree of probability of harm to Plaintiff and reckless indifference to the consequences of their acts or omissions.

250.    Compensatory damages alone will be insufficient to deter such conduct in the future. There needs to be a criminal referral to the United States Justice Department, as well as to the States Attorney General's Office.

**WHEREFORE,** Plaintiff requests that the Court issue an Order and grant Judgment to the Plaintiffs as follows:

- Grant Plaintiff statutory, common law, and punitive damages, and applicable pre- and post-judgment interest, in full recompense for damages;

- Enter judgment according to the declaratory relief sought;

- Grant Plaintiff such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

- Grant Plaintiff an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

## SECOND CAUSE OF ACTION

### SEXUAL ASSAULT AND SEXUAL HARASSMENT
**(Against Defendant Combs)**

251.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

252.     As described herein, Defendant Combs frightened and placed Plaintiff in apprehension of harm when he forced and coerced Plaintiff to engage in sex work for him during his "White Parties" from 2004-2009 at Defendant Combs' homes in Miami, FL and Hampton, New York.

253.     Defendant Combs used threats, coercion to force Plaintiff into engaging in sex work and sex acts with his partygoers at his "White Parties."

254.     Defendant Combs directed Plaintiff to engage in sex acts with Defendant Jacob against Plaintiff's will at Defendant Combs' "White Party" in Hampton, NY.

255.     Upon information and belief, Defendant Combs may have directed others to engage in sex acts with Plaintiff while Plaintiff was unconscious at his "White Party" in Miami, FL.

256.     As a result of Defendant Combs' conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

257.     Defendant Combs' conduct described herein was willful, wanton, and malicious. At all relevant times, Defendant Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. Plaintiff believes Defendant Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and/or humiliation to Plaintiff due to Plaintiff's gender. By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

### THIRD CAUSE OF ACTION

### SEXUAL ASSAULT AND SEXUAL HARASSMENT
#### (Against Defendant Jacob)

258.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

259.     As described herein, Defendant Jacob, Combs and Thomas frightened and placed Plaintiff in apprehension of harm of physical and sexual assault while employed as entertainment at Defendant Combs' "White Parties."

260.      Plaintiff was forced to engage in sex acts with Defendant Jacob against her will while the "White Party" was occurring.

261.     As a result of Defendant Jacob's assault, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

262.     The conduct of Defendant Jacob willful, wanton, and malicious. At all relevant times, Defendant Jacob acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION

### SEXUAL ASSAULT
**(Against Defendant Does)**

263.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

264.     As described herein, Defendant Does frightened and placed Plaintiff in apprehension of harm when they physically and sexually assaulted her at the "White Party" in Miami.

265.     Defendant Does forcibly touched and attempted to touch Plaintiff's intimate areas and/or touched Plaintiff with their own intimate body parts. Upon information and belief, Defendant Does touched Plaintiff's intimate areas while Plaintiff was unconscious from forced narcotics use by Defendant Combs. Defendant Combs and/or Thomas failed to intervene.

266.     As a result of Defendant Does conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

267.     The conduct of Defendant Does described herein was willful, wanton, and malicious. At all relevant times, Defendant Does acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION

## THE NYC VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION ACT
### (Against ALL Defendants)

268.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

269.     The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime

of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

270.    The herein described conduct of Defendant Combs, Thomas and Jacob, including forcing Plaintiff to engage in sex work, constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in N.Y. C. Admin Code § 10-1103. ("The term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

271.    Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

272.    Defendants' crimes of violence were motivated by Plaintiff's gender as defined in in the New York City Administrative Code § 8-903, as Defendant Jacob committed forcible sex acts upon Plaintiff that would constitute felonies under state law and as the conduct presents a serious risk of physical injury, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

273.    The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act

69

itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

274.     The described conduct herein of Defendant Combs, Thomas and Jacob constitutes sexual offenses as defined in Article 130 of the New York Penal Law.

275.     Plaintiff is a woman, who is older than 18, who alleges misdemeanor and/or felony penal law violations, including but not limited to sexual misconduct (N.Y. Penal L. § 130.20), criminal sexual act in the first degree (N.Y. Penal L. § 130.50), criminal sexual act in the third degree ( N.Y. Penal L. § 130.40), forcible touching (N.Y. Penal L. § 130.52), sexual abuse in the first degree (N.Y. Penal L. § 130.65), and sexual abuse in the second degree ((N.Y. Penal L. § 130.60).

276.     Defendant Combs coerced and forced Plaintiff to engage in sexual contact and/or sexual intercourse with Defendant Jacob, despite her refusal and unwillingness to do so.

277.     Defendant Combs demanded Plaintiff drink laced alcohol while in her employment capacity as entertainment at the "White Party." Thus, Defendant Combs knew or should have known that Plaintiff was incapable of consenting to sexual contact and/or sexual conduct.

278.     Defendants Combs' and Jacobs' actions presented a serious risk of physical injury to Plaintiff's person, regardless of whether or not those acts resulted in criminal charges, prosecution or conviction.

279.     Furthermore, Defendants BBE, SJC, CGE, VIBE and PMC enabled Defendant Combs' commission of the crimes of violence motivated by gender, and thus, are liable under the NYC Victims of Gender-Motivated Protection Act.

280. Defendants Thomas, Jacob, BBE, SJC, CGE, VIBE and PMC enabled or participated in the sexual trafficking of Plaintiff because Defendants failed to, among other things, protect Plaintiff from a known danger; have sufficient policies and procedures in place to prevent sexual assault; properly implement policies and procedures to prevent sexual assault; take reasonable measures to ensure that policies to prevent sexual assault were working; train their employees on identifying sexual assault and inappropriate workplace behaviors; protect their employees from sexual assault; and adhere to the applicable standard of care.

281. Defendants BBE, SJC, CGE, VIBE and PMC enabled or participated in the sexual trafficking of Plaintiff because Defendants failed to timely and properly educate, train, supervise, and/or monitor their agents or employees regarding policies and procedures that should be followed when sexual trafficking is suspected or observed.

282. Prior to Defendant Combs forcing Plaintiff into sex work, Defendants BBE, SJC, CGE, VIBE and PMC knew, or should have known, that Defendant Combs was not fit to be in a position of authority. Defendants, by and through their agents, servants and/or employees, became aware, or should have become aware of Defendant Combs' propensity to commit sexual assault and of the risk to Plaintiff's safety. At the very least, Defendants knew, or should have known, that they did not have sufficient information about whether or not their leaders, managers, and people were safe to be in positions of power.

283. Defendants BBE, SJC, CGE, VIBE and PMC knew, or should have known, that Combs posed a risk of sexual violence, assault, harassment and trafficking.

284.     Defendants BBE, SJC, CGE, VIBE and PMC failed to properly supervise Defendant Combs and protect Plaintiff from a known danger, and thereby enabled Combs' sexual trafficking of Plaintiff.

285.     Defendants BBE, SJC, CGE, VIBE and PMC negligently deemed that Defendant Combs was fit to be in a position of authority; and/or that any previous suitability problems Defendant Combs had were fixed and cured; and/or that Combs would not commit acts of sexual assault, battery, harassment or trafficking; and/or that Combs would not injure others.

286.     Moreover, Defendants BBE, SJC, and CGE enabled the sexual trafficking of Plaintiff by actively maintaining and employing Defendant Combs in a position of power and authority through which Combs had control over people, including Plaintiff.

287.     As a direct and proximate result of the aforementioned crime of violence and gender- motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys' fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants that:

- Declares Defendant Combs engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that Combs drugged and sex trafficked Plaintiff;

- Declares that Defendants BBE, SJC, CGE, Thomas, Jacob, VIBE, PMC, Does and Organizational Does engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that they enabled Defendant Combs' commission of the crimes of violence motivated by gender;

- Awards Plaintiff compensatory damages for mental, and emotional injury, distress, pain and suffering and injury to her reputation, consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts in an amount to be proven;

- Awards Plaintiff damages against Defendants joint and severally;

- Awards Plaintiff punitive and exemplary damages according to proof;

- Awards Plaintiff attorneys' fees, costs, and expenses incurred in the pursuance of this action;

- Awards prejudgment and post-judgment interest; and

- Awards Plaintiff such other and further relief as the Court may deem equitable, just and

### SIXTH CAUSE OF ACTION

**PREMISES LIABILITY FOR THE SEXUAL ASSAULT COMMITTED BY DEFENDANT JACOB**
**(Against Defendant Combs)**

288.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

289.     Plaintiff was sex trafficked to Defendant Jacob at the "White Party" in 2007 in Hampton, NY. Defendant Combs was present, along with other high profiled individuals, while Plaintiff was being assaulted by Defendant Jacob during the party. Plaintiff was legally on the premises as an employee of Defendants Combs, BBE, SJC and CGE.

Defendant Jacob was legally on the premises owned by Defendant Combs as a guest and invitee of Defendant Combs. Mr. Combs owned the premises and had dominion and control over the premises where Plaintiff was harmed. Defendant Combs had dominion and control over the actions of Defendant Jacob and failed to step in and stop Defendant Jacob from sexually assaulting Plaintiff.

290.     As the property owner, Defendant Combs had a duty to protect Plaintiff from the harm she suffered at the hands of Defendant Jacob. Defendant Combs breached his duty when he failed to stop Defendant Jacob from sexually assaulting Plaintiff. In furtherance of this breach, Defendant Combs demanded and encouraging Defendant Jacob, and possibly others, to assault Plaintiff. Plaintiff has suffered immensely because of Defendant Combs' intentional breach of his duty.

291.     As a result of Defendant Combs' breach of his duty, Plaintiff has suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages, for which she is entitled to an award of monetary damages and other relief.

292.     Defendant Combs' conduct described above was willful, wanton, and malicious. At all relevant times, Defendant Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. Plaintiff believes Defendant Combs intended his conduct against Plaintiff primarily because of her gender. By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## SEVENTH CAUSE OF ACTION

## TRAFFICKING AND VICTIMS' PROTECTION ACT
### (Against ALL Defendants)

293.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

294.     Defendants knowingly and intentionally participated in, perpetrated, assisted, supported, and facilitated a sex-trafficking Enterprise that was in and affecting interstate commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

295.     Among other things, Defendants Combs and Thomas knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Plaintiff, knowing that Defendants Combs and Thomas would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff to engage in commercial sex acts.

296.     Defendants BBE, SJC, CGE, VIBE, PMC and its employees had actual knowledge that they were perpetrating and facilitating Defendant Combs' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Plaintiff, as well as others, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

297.     Despite such knowledge, Defendants intentionally paid for, facilitated, perpetrated, and participated in Defendant Combs' violations of 18 U.S.C. § 1591(a)(1), which Defendants were in reckless disregard of the fact that Defendant Combs would coerce, defraud, and force Plaintiff to engage in sex work via commercial sex acts.

298.     Defendants' actions were in and affecting interstate commerce, including its distributing of marketing material and publishing activities with VIBE magazine which were in and affecting interstate commerce.

299.     By taking the concrete steps alleged in this complaint, Defendants knowingly participated in sex trafficking and furthered Defendant Combs' sex-trafficking Enterprise. The concrete steps constituted taking part in the sex-trafficking Enterprise and were necessary for its success. The concrete steps constituted active engagement by all Defendants in Defendant Combs's sex-trafficking Enterprise. Defendants knew that their active engagement would lead to and cause coercive commercial sex trafficking.

300.     In perpetrating TVPA violations, upon information and belief, Defendants Combs and Thomas willfully failed to file required taxes with the federal government.

301.     Defendants' affirmative conduct was committed knowing, and in reckless disregard of the facts, that Defendant Combs would use cash and the financial support provided by Defendants BBE, SJC, CGE, VIBE, PMC as a means of defrauding, forcing, and coercing sex acts from Plaintiff, as well as others. Defendants' conduct was outrageous and intentional.

302.     Defendants' knowing and intentional conduct has caused Plaintiff serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

303.     This case does not involve mere fraud. Instead, Defendants' criminal conduct in perpetrating TVPA violations was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants conduct also evinced a high degree of moral turpitude and demonstrated such

wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants'
criminal conduct was directed specifically at Plaintiff, because of her gender, who was a
victim of Defendant Combs' sex-trafficking Enterprise.

304.      Defendants' outrageous and intentional conduct in this case is part of a pattern
and practice of profiting by undertaking illegal "high-risk, high reward" actions.

305.      By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1),
1595, Defendants are liable to Plaintiff for the damages she sustained, and reasonable
attorneys' fees.

## EIGHTH CAUSE OF ACTION

### AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING ENTERPRISE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595
### (against Defendants Thomas, Jacob, BBE, SJC, CGE, VIBE, PMC, Does, Organizational Does)

306.      Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as
if set forth fully herein.

307.      Defendants BBE, SJC, CGE, VIBE and PMC entered into a general partnership
agreement with Defendant Combs. As general business partners, each individual member
is responsible for the actions of the partners of the partnership. Defendants BBE, SJC,
CGE, VIBE and PMC provide resources to Defendant Combs to throw the lavished
"White Parties." According to Plaintiff, the Combs Rico Enterprise was engaging in sex-
trafficking activities during almost every "White Party" specifically those attended by
Plaintiff from 2004-2009. As a result of their intentional or negligent failure of their duty
to supervise, Defendants BBE, SJC, CGE, VIBE and PMC aided, abetted, and induced

Sean Combs' sex-trafficking Enterprise that was in and affecting interstate commerce, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

308.     The crimes that Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does aided and abetted are (1) Defendant Combs' perpetrating of coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(1), and (2) Defendant Combs' co-conspirators knowingly benefitting from coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate commerce.

309.     Defendant Combs' co-conspirators benefitted financially and received things of value from their participation in the Combs' sex-trafficking Enterprise, including payments and other compensation, like actual sex acts co-conspirator Jacob received, from Defendant Combs. All co-conspirators who benefitted financially.

310.     Under 18 U.S.C. § 2, as a result of their general business partnership with Defendant Combs, and their failure to monitor Defendant Combs, Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does are punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, counseled, commanded, induced, and procured Defendant Combs' and his sex-trafficking Enterprise and sex trafficking of Plaintiff , as well as others.

311.     Under 18 U.S.C. § 2, as a result of their general business partnership with Defendant Combs, and their failure to monitor Defendant Combs, Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, inducing, and procuring Defendant Combs' and his sex-trafficking Enterprise and the sex trafficking of Plaintiff.

312.     Defendants directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing the sex-trafficking Enterprise and the sex trafficking of Plaintiff. Defendants Combs, Thomas and Jacob directly violated Chapter 77 by committing and perpetrating these violations.

313.     Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does aided, abetted, and induced Defendant Combs' sex-trafficking Enterprise and sex trafficking of Plaintiff knowing that Defendant Combs would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff to engage in commercial sex acts.

314.     By aiding, abetting, and inducing Defendant Combs' and his co-conspirators' sex-trafficking Enterprise and sex trafficking of Plaintiff, Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does benefited financially and received things of value for participating in Defendant Combs' sex-trafficking Enterprise.

315.     Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does and their employees had actual knowledge that they were aiding, abetting, and inducing Defendant Combs' and his co-conspirators' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Plaintiff, as well as others, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion. Defendants knew, and should have known, that Defendant Combs had engaged in acts in violation of the TVPA.

316.     Despite such knowledge, and through their intentional or negligent failure to monitor Defendant Combs, Defendants BBE, SJC, CGE, VIBE , PMC, Does and

Organizational Does financed and aided, abetted, and induced Defendant Combs'
violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations
of those laws under 18 U.S.C. § 2. Defendants BBE, SJC, CGE, Jacob, VIBE and PMC
knew or should have known if they had conducted a simple investigation, they would
have discovered that Defendant Combs was acting in reckless disregard and was
coercing, defrauding, and forcing Plaintiff to engage in commercial sex acts.

317.    Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does
affirmative conduct of blind resources to Defendant Combs aided, abetted, and induced
Defendant Combs to continue his sex-trafficking Enterprise. Their violations were
committed knowingly, and in reckless disregard of the facts, that Defendant Combs
would use the resources provided as a means of defrauding, forcing, and coercing sex
acts from Plaintiff. Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational
Does conduct was outrageous and intentional.

318.    Upon information and belief, Defendants BBE, SJC, CGE, VIBE , PMC, Does
and Organizational Does intentional conduct of aiding, abetting, and inducing Defendant
Combs's violations has caused Plaintiff serious harm including, without limitation,
physical, psychological, emotional, financial, and reputational harm.

319.    This case does not involve mere fraud. Instead, Defendants' criminal conduct in
aiding, abetting, and inducing Defendant Combs' violations of the TVPA was outrageous
and intentional, because it was in deliberate furtherance of a widespread and dangerous
criminal sex trafficking organization. Defendants BBE, SJC, CGE, VIBE , PMC, Does
and Organizational Does criminal conduct also evinced a high degree of moral turpitude
and demonstrated such wanton dishonesty as to imply a criminal indifference to civil

obligations. Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does criminal conduct was directed specifically at Plaintiff who was the victim of Defendant Combs' sexual abuse and sex-trafficking organization.

320.    Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does outrageous and intentional conduct in this case is part of a pattern and practice of Defendants profiting by undertaking illegal "high-risk, high reward" general business partnerships.

321.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants are liable to Plaintiff for the damages she sustained and reasonable attorneys' fees.

322.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants are liable to Plaintiff for punitive damages.

## NINTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Combs)

323.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

324.    Defendant Combs created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Combs knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

325.    Plaintiff's emotional distress was foreseeable to Defendant Combs.

326.    As a direct and proximate result of the negligent conduct of Defendant Combs, Plaintiff suffered and will continue to suffer severe emotional distress.

327.     Defendant Combs' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Jacob)

328.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

329.     Defendant Jacob created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Jacob knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

330.     Plaintiff's emotional distress was foreseeable to Defendant Jacob.

331.     As a direct and proximate result of the negligent conduct of Defendant Jacob, Plaintiff suffered and will continue to suffer severe emotional distress.

332.     Defendant Jacob's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## ELEVENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Thomas)

333.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

334.     Defendant Thomas created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Thomas knew or should have known that such conduct was

likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

335.     Plaintiff's emotional distress was foreseeable to Defendant Thomas

336.     As a direct and proximate result of the negligent conduct of Defendant Thomas, Plaintiff suffered and will continue to suffer severe emotional distress.

337.     Defendant Thomas's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWELTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant BBE)

338.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

339.     Defendant BBE created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant BBE knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

340.     Plaintiff's emotional distress was foreseeable to Defendant BBE.

341.     As a direct and proximate result of the negligent conduct of Defendant BBE, Plaintiff suffered and will continue to suffer severe emotional distress.

342.     Defendant BBE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## THIRTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant SJC)

343.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

344.     Defendant SJC created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant SJC knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

345.     Plaintiff's emotional distress was foreseeable to Defendant SJC.

346.     As a direct and proximate result of the negligent conduct of Defendant SJC, Plaintiff suffered and will continue to suffer severe emotional distress.

347.     Defendant SJC's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## FOURTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant CGE)

348.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

349.     Defendant CGE created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant CGE knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

350.     Plaintiff's emotional distress was foreseeable to Defendant CGE.

351.     As a direct and proximate result of the negligent conduct of Defendant CGE, Plaintiff suffered and will continue to suffer severe emotional distress.

352.     Defendant CGE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## FIFTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant VIBE)

353.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

354.     Defendant VIBE created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant VIBE knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

355.     Plaintiff's emotional distress was foreseeable to Defendant VIBE.

356.     As a direct and proximate result of the negligent conduct of Defendant VIBE, Plaintiff suffered and will continue to suffer severe emotional distress.

357.     Defendant VIBE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## SIXTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant PMC)

358.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

359.     Defendant PMC created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant PMC knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

360.     Plaintiff's emotional distress was foreseeable to Defendant PMC.

361.     As a direct and proximate result of the negligent conduct of Defendant PMC, Plaintiff suffered and will continue to suffer severe emotional distress.

362.     Defendant PMC's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## SEVENTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Does)

363.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

364.     Defendant Does created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Does knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

365.     Plaintiff's emotional distress was foreseeable to Defendant Does.

366.     As a direct and proximate result of the negligent conduct of Defendant Does, Plaintiff suffered and will continue to suffer severe emotional distress.

367.     Defendant Does' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## EIGHTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Organizational Does)

368.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

369.     Defendant Organizational Does created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Organizational Does knew or should have known that

such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

370.     Plaintiff's emotional distress was foreseeable to Defendant Organizational Does.

371.     As a direct and proximate result of the negligent conduct of Defendant Organizational Does, Plaintiff suffered and will continue to suffer severe emotional distress.

372.     Defendant Organizational Does' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## NINETENTH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant Combs)

373.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

374.     Defendant Combs engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

375.     The sexual assault, trafficking and misconduct by Defendant Combs were extreme and outrageous conduct that shocks the conscience.

376.      These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

377.     As a direct and proximate result of Defendant Combs's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

378.     Defendant Combs' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTIETH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant Jacob)

379.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

380.     Defendant Jacob engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

381.     The sexual assault, trafficking and misconduct by Defendant Jacob were extreme and outrageous conduct that shocks the conscience.

382.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

383.     As a direct and proximate result of Defendant Jacob's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

384.     Defendant Jacob's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-FIRST CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant Thomas)

385.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

386.     Defendant Thomas engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

387.     The sexual assault, trafficking and misconduct by Defendant Thomas were extreme and outrageous conduct that shocks the conscience.

388.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

389.     As a direct and proximate result of Defendant Thomas' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

390.     Defendant Thomas' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

### TWENTY-SECOND CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant BBE)

391.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

392.     Defendant BBE engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

393.     The sexual assault, trafficking and misconduct by Defendant BBE were extreme and outrageous conduct that shocks the conscience.

394.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

395.     As a direct and proximate result of Defendant BBE'S extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

396.     Defendant BBE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-THIRD CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant SJC)

397.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

398.     Defendant SJC engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia*, subjecting her to sexual assault and misconduct.

399.     The sexual assault, trafficking and misconduct by Defendant SJC were extreme and outrageous conduct that shocks the conscience.

400.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

401.     As a direct and proximate result of Defendant SJC's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

402.     Defendant SJC's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-FOURTH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant CGE)

403.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

404.     Defendant CGE engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

405.     The sexual assault, trafficking and misconduct by Defendant CGE were extreme and outrageous conduct that shocks the conscience.

406.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

407.     As a direct and proximate result of Defendant CGE's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

408.     Defendant CGE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-FIFTH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant VIBE)

409.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

410.     Defendant VIBE engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

411.     The sexual assault, trafficking and misconduct by Defendant VIBE were extreme and outrageous conduct that shocks the conscience.

412.    These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

413.    As a direct and proximate result of Defendant VIBE's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

414.    Defendant VIBE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-SIXTH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant PMC)

415.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

416.    Defendant PMC engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

417.    The sexual assault, trafficking and misconduct by Defendant PMC were extreme and outrageous conduct that shocks the conscience.

418.    These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

419.    As a direct and proximate result of Defendant PMC's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

420.    Defendant PMC's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-SEVENTH CAUSE OF ACTION

**IIED – SEX TRAFFICKING**
**(Defendant Does)**

421.　　Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

422.　　Defendant Does engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

423.　　 The sexual assault, trafficking and misconduct by Defendant Does were extreme and outrageous conduct that shocks the conscience.

424.　　These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

425.　　As a direct and proximate result of Defendant Does' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

426.　　Defendant Does' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-EIGHTH CAUSE OF ACTION

**IIED – SEX TRAFFICKING**
**(Defendant Organizational Does)**

427.　　Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

428.　　Defendant Organizational Does engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

429.    The sexual assault, trafficking and misconduct by Defendant Organizational Does were extreme and outrageous conduct that shocks the conscience.

430.    These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

431.    As a direct and proximate result of Defendant Organizational Does' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

432.    Defendant Organizational Does' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-NINTH CAUSE OF ACTION

**KNOWING BENEFICIARY IN A SEX-TRAFFICKING ENTERPRISE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 1591(A)(2), 1595**
**(Against ALL Defendants)**

433.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

434.    Upon information and belief, Defendants knowingly and intentionally benefitted financially and by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive sex-trafficking Enterprise that was in and affecting interstate commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2). Defendants took several concrete steps to aid and participate in Defendant Combs' sex-trafficking Enterprise. Among the concrete steps that Defendants took to aid Defendant Combs was providing unfettered access to resources in his control which made the sex-trafficking Enterprise possible. Enabling Defendant Combs with significant, unmonitored, resources caused Defendants to receive the benefits detailed throughout this

complaint. Defendants' willingness to provide significant, unmonitored, resources to Defendant Combs was the quid pro quo for it receiving the benefits detailed herein.

435.     Upon information and belief, the resources provided were necessary for Defendant Combs to coerce Plaintiff to engage in commercial sex acts. The resources directly formed part of the commercial nature of the sex acts. The resources were also a necessary and required part of Defendant Combs' recruitment of Plaintiff. By providing unchecked resources, Defendants knew, or should have known, that the money would be used to fund the sex-trafficking Enterprise. Through their general business partnership with Defendant Combs, Defendants actively participated in the recruitment of sex-trafficking victims to the Enterprise.

436.     Upon information and belief, the unchecked resources that Defendants provided went far beyond providing routine partnership or compensation to a general business partner. It was far from routine for Defendants to provide substantial marketing and resources throughout the years to Defendant Combs on his business ventures including the "White Parties" and who did not have an apparent legitimate need for such extravagant marketing and resources. The sheer number of pages in which Defendant Combs appears in one issue of Defendants VIBE and PMC publication went far beyond normal for the music industry. Defendants knew, or should have known, through reasonable inquiry that they were feeding Defendant Combs' sexual deviancy.

437.     Upon information and belief, Defendants provided extravagant marketing and resources to Defendant Combs, which, under the circumstances of this case, was entirely inconsistent with the ordinary duties of a partner, or general business partnership member.

438. Upon information and belief, the reason that Defendants ignored numerous "red flags" about Defendant Combs was to receive financial benefits from the sex-trafficking Enterprise. Defendants knew that they would gain far-from-routine benefits by ignoring the "red flags" associated with Defendant Combs and by participating in his sex-trafficking Enterprise.

439. Upon information and belief, among the concrete steps that Defendants took to aid and participate in the Combs' sex-trafficking Enterprise were legitimizing Defendant Combs' "White Parties" as legitimate, high-profile networking events through intentionally false and misleading stories in its magazine. By cloaking the true nature of the "White Parties," Defendants were able to continue the Enterprise and receive benefits from its participation in the sex-trafficking Enterprise. Through their general business partnership agreement with Defendant Combs, Defendants adopted, by association ,the intentional acts of their general business partner, Defendant Combs, affirmative conduct causing Defendants to receive those benefits.

440. Upon information and belief, by taking the concrete steps outlined above (along with the others alleged in this complaint), Defendants knowingly participated in sex-trafficking and furthered the Combs' sex-trafficking Enterprise. The concrete steps above constituted taking part in the sex-trafficking Enterprise and were necessary for its success. The concrete steps above constituted active engagement by Defendants in Combs' sex- trafficking Enterprise.

441. Upon information and belief, Defendants knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking Enterprise named herein with knowledge, or reckless disregard of the fact, that Defendant Combs

would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff to engage in commercial sex acts.

442.     Upon information and belief, Defendants knew of Defendant Combs deviant and violent behavior, through years of lawsuits, hush money settlements, and negative publicity surrounding Defendant Combs as early as 2021 and most notably by Ms. Cassie Ventura in 2023. Almost all of the suits, since Ms. Ventura's suit, allege Defendant Combs was engaging in sex-trafficking, among other things.

443.     Upon information and belief, Defendants' actions extend well beyond a situation of failing to train themselves and their staff about recognizing the warning signs of sex-trafficking. Defendants did recognize the signs of Combs' sex-trafficking which is why they prominently featured it in Defendants VIBE and PMC's November 2006 magazine publication of VIBE. Upon information and belief, indeed, Defendants' employees, knew about Combs sex-trafficking Enterprise but decided to continue facilitating the Combs' sex-trafficking Enterprise rather than ending its participation in the Enterprise.

444.     Upon information and belief, Defendants VIBE and PMC were also in the business of promoting money for sex as seen in the classified section of Defendants VIBE and PMC's November 2006 magazine.



445.     Upon information and belief, due to the facts that came to their attention through complaint filed by Cassie Ventura, and others, accusing Defendant Combs of sex-trafficking, Defendants knew to a certainty that Combs was engaged in sex-trafficking.

446.     Upon information and belief, Defendants knew the names of many of Combs' sex-trafficking victims, including Plaintiff.

447.     Upon information and belief, Defendants helped to conceal the names of Combs' victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking Enterprise, including failing to get a release of Plaintiff before publishing her picture in Defendants VIBE and PMC's November 2006 magazine. Among the ways in which Defendants helped to conceal the Enterprise's

existence was by failing to properly monitor or audit Defendant Combs to ensure that the

resources provided were being used in a legal manner as well as ensuring that the proper

accounting and tax reporting was made to the federal government.

448.     Defendants had constructive knowledge of Combs' sex-trafficking Enterprise

because of specific acts by Defendant Combs that put it on notice of a particular and

ongoing sex-trafficking Enterprise. Among the specific acts were Combs' "White Party"

events that representatives of Defendants, specifically Thomas, Jacob, VIBE and PMC,

periodically attended; Defendant Combs had narcotics and sex workers present in

circumstances that should have prompted Defendants and its employees to raise questions

about Combs's sex-trafficking, and/or if he was using the resources provided to him by

Defendants to continue such Enterprise.

449.      Upon information and belief, among the financial benefits that the Defendants

received for participating in and facilitating Combs' sex-trafficking Enterprise were the

affiliation and access to Defendant Combs' popularity and network of celebrities.

Defendant Combs was a popular and highly influential figure in the entertainment and

music industries to whom everyone wanted to connect. Defendant Combs was known for

the "White Parties" turning it to a cultural phenomenon. Affiliation with and/or general

business partnerships with Defendant Combs and his "White Parties" garnered

legitimacy, immense success, and access to top and emerging artists, celebrities, famous

athletes, political figures, musicians, and international dignitaries like former President

Donald Trump. Defendants knew first-hand the power, influence, and effect attaching

themselves to Defendant Combs would have on their bottom-line as evidenced by their

repeated general business partnership with Defendant Combs ranging from 1993 to

recently. Defendants profited from their affiliation with Defendant Combs and their general business partnership may have supported his sex-trafficking Enterprise. Defendant Combs and Combs-controlled entities used the marketing and resources they received from their general business partners to facilitate their sex-trafficking Enterprise. Defendant Combs benefited from his general business partners' apparent willful blindness through their willingness to provide substantial resources in suspicious circumstances including their failure to ensure that their general business partners properly reported to the U.S. Federal Government.

450.    Upon information and belief, among the financial benefits that Defendants received for participating in Combs' sex-trafficking Enterprise was the referral of business opportunities from Defendant Combs and his co-conspirators and access to other celebrities, up-and-coming artists, entertainers, producers, songwriters, and creatives. Defendants profited from these business opportunities. Defendants VIBE and PMC received further financial benefits via an increase in revenue and sales from publications featuring Defendant Combs. Defendant Combs supplies numerous benefits to Defendants in exchange for assisting in his sex-trafficking Enterprise. These referrals and benefits were a quid pro quo for Defendants participation.

451.    Defendants, especially VIBE and PMC, knew, or should have known, that if they stopped assisting, supporting, and facilitating Combs' sex-trafficking Enterprise, they would no longer receive those benefits.

452.    Upon information and belief, Defendants knew and was in reckless disregard of the fact that it was Defendant Combs' pattern and practice to use the channels and instrumentalities of interstate commerce (vehicles, yachts and commercial airplanes) to

entice, recruit, solicit, harbor, provide, obtain, and transport individuals, like the Plaintiff, for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

453.    Upon information and belief, Defendants and their employees had actual knowledge that they were facilitating Defendant Combs' sexual abuse and trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and propel Plaintiff into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion, and a combination of all these means.

454.    Upon information and belief, despite such knowledge, Defendants intentionally facilitated, and participated in Combs' violations of 18 U.S.C. § 1591(a)(1), which Defendants knew, and were in reckless disregard of the fact that Defendant Combs would coerce, defraud, and force Plaintiff to engage in commercial sex acts.

455.    Upon information and belief, Defendants, through its employees and agents, actively participated in the sex trafficking conspiracy and led Plaintiff to engage in sex work under the belief that she would be rewarded if she cooperated and acquiesced to Defendant Combs' coercive demands.

456.    Initially, Plaintiff was rewarded by Defendant Combs' coercive demands as Defendant kept his word and hired Plaintiff's then then-boyfriend, Mr. Gallo, as a model in a nationwide Sean John clothing campaign.

457.    Upon information and belief, Defendants' affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Defendant Combs would use the resources provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Plaintiff. Defendants' conduct was outrageous and intentional.

458.     Upon information and belief, in addition to actual knowledge that they were participating in and facilitating the Combs' sex-trafficking Enterprise, Defendants also should have known that they were participating in and facilitating an Enterprise that had engaged in coercive sex-trafficking, as covered by 18 U.S.C. § 1595(a).

459.     Upon information and belief, in exchange for facilitating and covering up Combs' commercial sex-trafficking, Defendants received international recognition, notoriety, acclaim and praise in their magazines with Defendant Combs, which was a result of securing the partnership with Defendant Combs.

460.     Facilitating and covering up Combs' sexual trafficking and misconduct was a means of obtaining economic success and promotion within the Defendants' hierarchy.

461.     Upon information and belief, Defendants' knowing and intentional conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

462.     Upon information and belief, Defendants' knowing and intentional conduct has caused Plaintiff harm that is sufficiently serious.

463.     This case does not involve mere fraud. Instead, Defendants' criminal conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex-trafficking Enterprise. Defendants' willful blindness to Defendant Combs' criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' criminal conduct was directed specifically at Plaintiff, who was the victim of Defendant Combs' sexual abuse and sex-trafficking Enterprise directed at Plaintiff, largely due to her gender.

464.     Upon information and belief, Defendants' outrageous and intentional conduct, in

this case, is part of a pattern and practice of Defendants by undertaking illegal "high-risk,

high reward" general business partnerships.

465.     By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2),

1595, Defendants are liable to Plaintiff for the damages she sustained and reasonable

attorneys' fees.

## THIRTIETH CAUSE OF ACTION

**OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM
PROTECTION ACT, 18 U.S.C. § 1591(d)
(against ALL Defendants)**

466.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as

if set forth fully herein.

467.     Defendants, and its officers and employees, knowingly and intentionally

obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18

U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is

hereinafter referred to collectively simply as "obstruction."

468.     Upon information and belief, Defendants' obstruction of the enforcement of 18

U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Defendants

thereby violated Chapter 77, Title 18. Defendants' obstruction described herein directly,

proximately, and foreseeably harmed Plaintiff by directly resulting in her coercively

being caused to engage in commercial sex acts and in other ways.

469.     Upon information and belief, Defendant Combs has a well-documented history of

criminal investigations. Defendants were on notice of Defendant Combs' proclivity to

criminal activity. They knew or should have known that Defendant Combs sex-trafficking Enterprise would or could result in a criminal investigation by State and Federal prosecutors for violating (among other laws) the TVPA. Defendants should have taken a que from the Federal Prosecutors arrest and prosecution of Jeffrey Epstein on or about July 8, 2019. The U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice victims to travel to be abused by Epstein. Defendant Combs, Jacob, Thomas and Does all engaged in the same activities as Mr. Epstein and Ms. Maxwell. In fact, Defendant Combs, Jacob, Thomas and Does may have done worse.

470.     Upon information and belief, by providing marketing and resources for Defendant Combs' sex trafficking Enterprise, and concealing their actions thereafter, Defendants obstructed, interfered with, and prevented the state and federal government enforcement of the TVPA against Defendant Combs, Jacob, Thomas and Does. Any filing of charges was delayed by Defendants' actions; and because of that delay, Plaintiff, and many others subsequently, thereafter, was coercively caused to engage in commercial sex acts.

471.     One example of how Defendants obstructed, attempted to obstruct, interfered with, and prevented state and federal government's enforcement of the TVPA, Defendants Combs and Thomas paid Plaintiff in cash so that the coercive commercial sex acts would escape the detection of state and federal law enforcement and prosecuting agencies. Defendants provided resources to further Defendant Combs' sex-trafficking Enterprise and with the purpose of helping Defendants evade criminal liability for violating the TVPA.

472.     By providing unchecked resources to Defendant Combs, Defendants intended and knew that Defendant Combs' coercive commercial sex acts would escape the detection of law enforcement and prosecuting agencies for some period of time. Defendants provided resources to further the Combs sex-trafficking Enterprise and with the purpose of helping Defendant Combs evade criminal liability for violating the TVPA.

473.     Upon information and belief, Defendants' obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, Defendants knew that Defendant Combs was high risk— specifically, high risk to violate the TVPA through continuing criminal sex-trafficking activities. As evidenced by Ms. Ventura's civil complaint, she informed members of Defendant Combs' parent label about the abuses he was visiting upon her.

474.     Upon information and belief, Defendants were aware Defendant Combs had a laundry list of criminal charges, and barely escaped serving prison time. Defendants were aware that there were public allegations that Defendant Combs' illegal conduct was facilitated by several named co-conspirators. They were made aware of this through complaints made by Ms. Ventura, and other lawsuits including R&B singers Tremaine Neverson, a/k/a Trey Songz, and Chris Brown. Defendants intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by investigators and prosecuting agencies.

475.     Upon information and belief, Defendants' relationship with Defendant Combs by providing his sex-trafficking Enterprise with unchecked resources went far beyond a normal (and lawful) partnership relationship. Defendants knew, and intended, that their relationship with Defendant Combs would go far beyond a normal entertainment industry

relationship. Defendants knew that its decision to go beyond a normal industry

relationship with Defendant Combs obstructed the ability of law enforcement and

prosecuting agencies to enforce the TVPA.

476. Upon information and belief, Defendants' obstruction of the government's TVPA

and other law enforcement efforts was intentional and willful and, therefore, Defendants

intentionally and willfully caused Defendant Combs' commission of the forcible

commercial sex acts with Plaintiff through its obstruction supporting the concealment of

Defendant Combs' sex-trafficking Enterprise. Defendants knew that Defendant Combs

and his other co-conspirators would use means of force, threats of force fraud, coercion,

and a combination of such means to cause Plaintiff to engage in commercial sex acts.

477. Upon information and belief, Defendants knew, acted in reckless disregard of the

fact, and should have known, that their obstruction in violation of 18 U.S.C. § 1591(d)

would directly and proximately lead to unlawful coercive commercial sex acts by

Plaintiff with men, like Defendant Jacob.

478. Upon information and belief, Defendants' obstruction has caused Plaintiff serious

harm, including, without limitation, physical, psychological, financial, and reputational

harm. That harm was directly and proximately caused by the obstruction and the harm

resulting from obstruction was foreseeable.

479. Defendants' obstruction has caused Plaintiff harm that is sufficiently serious.

480. Upon information and belief, this case does not involve mere fraud. Instead,

Defendants' criminal conduct in obstructing enforcement of the TVPA was outrageous

and intentional because it was in deliberate furtherance of a widespread and dangerous

criminal sex-trafficking organization. Defendants' obstruction also evinced a high degree

of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' obstruction was directed specifically at Plaintiff who was the victim of Defendant Combs' sex-trafficking Enterprise.

481.     By virtue of these violations of 18 U.S.C. § 1591(d), Defendants are liable to Plaintiff for the damages she sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Defendants perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

- Declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate Federal laws and laws of the States of New York and Florida;

- Award Plaintiff damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

-  Award Plaintiff damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

- Award Plaintiff punitive damages, in an amount to be determined at trial;

- Award prejudgment interest on all amounts due;

- Award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

- Any such other and further relief as the Court may deem just and proper.

## THIRTY-FIRST CAUSE OF ACTION

### Violation of New York Civil Rights Law §§ 50 and 51
### (against Defendants VIBE and PMC)

482.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

483.     Upon information and belief, Plaintiff alleges that Defendants VIBE and PMC knowingly used Plaintiff's picture, image, and likeness for the purposes of advertising and marketing their illegal sex-trafficking Enterprise disguised as a lavish and exclusive Summer party and otherwise obtaining commercial gain including, without limitation through the infringing uses, in violation of New York Civil Rights Law §§ 50 and 51, as depicted herein when Defendants VIBE and PMC published Plaintiff's picture, image, and likeness, without permission or consent of Plaintiff, in its November 2006 magazine.

484.     Defendants VIBE and PMC unlawful uses of Plaintiff's picture, image, and likeness resulted in injuries to Plaintiff.

485.     Plaintiff's claim is timely as she discovered Defendants VIBE and PMC infringing use in or about April 2024.

486.     This statute further applies as the violation against Plaintiff occurred within New York State.

487.     There is no room for doubt that the identity of the person pictured in Defendants

VIBE and PMC's November 2006 magazine is Plaintiff and Plaintiff is easily identifiable

in the picture.

488.     The statute does not require Plaintiff to be a celebrity in order to have a

commercially valuable identity.

489.     Plaintiff's picture was used for purposes of false advertisement and trade.

490.     Defendants VIBE and PMC may argue the incidental use exception that

Defendant Combs' "White Parties" were a newsworthy matter or a matter of public

interest, which would be an incredulous untruth, as Defendant Combs' "White Parties"

were a ruse to disguise a corrupt sex-trafficking Enterprise.

491.     Defendants VIBE and PMC attempting to argue the incidental use exception also

fails because the use of Plaintiff's likeness is a disguised advertisement to promote

Defendants VIBE and PMC co-conspirator, Defendant Combs', "White Parties" and

various entertainment businesses.

492.     Defendants VIBE and PMC attempting to argue the incidental use exception

would further fail because Defendants VIBE and PMC did not give a factual account of

the Plaintiff's presence at the "White Parties." Defendants VIBE and PMC print

magazine falsely states Plaintiff was a "guest [striking] a revealing pose" despite Plaintiff

not being a guest of the party. Plaintiff was an employee who was required to act

revealing, seductive and sexually at the direction of Defendant Combs in an effort to

further benefit Defendant Combs' and his co-conspirators sex-trafficking Enterprise.

493.     The above referenced violations of New York Civil Rights Law §§ 50 and 51 and injuries to Plaintiff subject Defendants VIBE and PMC to statutory damages and penalties, including punitive damages, in amounts to be determined at trial.

494.     Upon information and belief, Plaintiff alleges that Defendants VIBE and PMC's conduct as alleged herein was willful, reckless, and/or with knowledge that such uses of Plaintiff's picture, image, and likeness were forbidden or unlawful. Consequently, Plaintiff is entitled to exemplary damages.

## THIRTY-SECOND CAUSE OF ACTION

### Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)
### (against Defendants VIBE and PMC)

495.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

496.     Defendants VIBE and PMC commercially exploited and publicized Plaintiff's image, likeness, and identity as part of the infringing uses and in doing so created a false sponsorship and affiliation between Plaintiff and all Defendants. Through the infringing uses, Defendants VIBE and PMC have falsely implied that Plaintiff endorses Defendants' goods and services like continuing the farce that Defendant Combs' "White Parties" were lavish, high-profile networking events and/or Plaintiff was a willing participant in Defendant Combs' sex-trafficking Enterprise.

497.     The unauthorized use of the Plaintiff's image, likeness and identity in Defendants VIBE and PMC November 2006 issue, is likely to confuse, deceive, or mislead consumers into falsely believing that Plaintiff approves, sponsors, or endorses Defendants' goods or services of the business at issue, like continuing the farce that

Defendant Combs' "White Parties" were lavish, high-profile networking events or as a willing participant in Defendant Combs sex-trafficking Enterprise.

498.　　Defendants VIBE and PMC's conduct as set forth above is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Plaintiff with all Defendants, and as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by Plaintiff.

499.　　Plaintiff's claim is timely as the Lanham Act does not contain a statute of limitations for claims under the Act, nor can the district court borrow from an analogous state statute.[18]

500.　　As a result of the above conduct, Plaintiff has incurred special and general damages and seeks the same along with any statutory damages as allowed by law.

501.　　As a result of the above conduct, Plaintiff has been irreparably harmed and is entitled to and seeks the remedy of injunctive relief in the form of an order prohibiting Defendants VIBE and PMC from exploiting her identity, image, or likeness without her prior express written consent.

502.　　Defendants VIBE and PMC's conduct as alleged herein was willful, wanton, and malicious, and exposes them to additional and elevated damages in an amount to be proven at trial.

### THIRTY-THIRD CAUSE OF ACTION

**Violation of Common Law Unfair Competition
(against Defendants VIBE and PMC)**

---

[18] *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284 (2021)

503.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

504.    Defendants VIBE and PMC commercially exploited and publicized Plaintiff's image, likeness, and identity as part of the infringing uses and in doing so created a false sponsorship and affiliation between Plaintiff and Defendants. Through the infringing uses, Defendant has falsely implied that Plaintiff endorses Defendants' goods and services, like continuing the farce that Defendant Combs' "White Parties" were lavish, high-profile networking events and/ or as a willing participant in Defendant Combs' sex-trafficking Enterprise.

505.    The unauthorized use of the Plaintiff's image, likeness, and identity in Defendants VIBE and PMC November 2006 issue, is likely to confuse, deceive, or mislead consumers into falsely believing that Plaintiff approves, sponsors, or endorses Defendants' goods or services of the business at issue, like continuing the farce that Defendant Combs' "White Parties" were lavish, high-profile networking events or as a willing participant in Defendant Combs' sex-trafficking Enterprise.

506.    Defendants VIBE and PMC's conduct as set forth above is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Plaintiff with Defendants, and as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by Plaintiff.

507.    As a result of the above conduct, Plaintiff has incurred special and general damages and seeks the same along with any statutory damages as allowed by law.

508.    As a result of the above conduct, Plaintiff has been irreparably harmed and is entitled to and seeks the remedy of injunctive relief in the form of an order prohibiting

Defendants VIBE and PMC from exploiting her identity, image, or likeness without her prior express written consent.

509.    Defendants VIBE and PMC acted in bad faith when they misappropriated and exploited Plaintiff's identity, image, or likeness to promote, market, and advertise Defendant Combs' businesses, (BBE, SJC, CGE) and corrupt sex-trafficking Enterprises via the "White Parties" and is likely to cause confusion or deceive purchasers as to the intent of Defendant Combs' and goods and services provided by his conglomerate of businesses.

510.    Defendants VIBE and PMC acted in bad faith because they were co-conspirators with Defendant Combs in an organized corrupt sex-trafficking Enterprise.

511.     Defendants VIBE and PMC's conduct as alleged herein exposes them to additional and elevated damages in an amount to be proven at trial.

**WHEREFORE,** Plaintiff prays for judgment as follows:

- Compel Defendants VIBE and PMC, as well as their employees, agents, or anyone acting in concert with them, be enjoined from displaying, publishing, reproducing, or otherwise exploiting any materials using Plaintiff's picture, image, or likeness or that otherwise violates Plaintiff's rights to privacy;

- Compel Defendants VIBE and PMC, and their respective employees and agents, be enjoined from using or displaying Plaintiff's picture, image, or likeness in any manner;

- Award all profits of Defendants VIBE and PMC sales of the November 2006 issue of VIBE magazine, plus all losses of Plaintiff, plus punitive damages if found applicable, and all costs and attorneys' fees, the exact sums to be proven at trial, per N.Y. Civ. Rights Law § 50 and/or 51 and/or the Lanham Act;

- Award Plaintiff  exemplary damages under N.Y. Civ. Rights Law § 50 and/or 51 and/or the Lanham Act;

- Award Plaintiff her costs and fees;

- Award Plaintiff pre-judgment interest as allowed by law; and

- Award Plaintiff further legal and equitable relief as deemed proper.

## **FINAL PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for all of the relief enumerated and sought within this complaint.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein, so triable, pursuant to Fed. R. Civ. P. 38 and the 7th Amendment to the United States Constitution.

Respectfully Submitted,

Dated: July 3, 2024

By:/s/ Ariel E. Mitchell-Kidd, Esq.
Ariel E. Mitchell-Kidd, Esq.
**The Law Office of Ariel E. Mitchell, P.A.**
500 NW 2nd Ave. #12864
Miami, FL 33103
305-903-5835
ariel@arielesq.com
*Attorney for Plaintiff*
(pro hac vice motion pending)


By:/s/ Steven A. Metcalf, II, Esq.
Steven A. Metcalf, II, Esq.
**METCALF & METCALF**
99 Park Ave., Suite 110
New York, NY 10004
646-253-0514
*Attorney for Plaintiff*
(Co-counsel/local counsel)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JANE DOE,                                                    :
                                                             :     Civil Case No. 1:23-cv-10628-JGLC
                              Plaintiff,                     :
                                                             :     **<u>AMENDED COMPLAINT</u>**
               v.                                            :
                                                             :     **<u>JURY TRIAL DEMAND</u>**
SEAN COMBS, HARVE PIERRE; THE THIRD                          :
ASSAILANT; DADDY'S HOUSE RECORDINGS,                         :
INC. and BAD BOY ENTERTAINMENT                               :
HOLDINGS, INC.,                                              :
                                                             :
                              Defendants.                    :
-------------------------------------------------------------X

<div style="border:2px solid black; text-align:center; color:red;">

**TRIGGER WARNING:**
**THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A**
**SEXUAL NATURE, INCLUDING SEXUAL ASSAULT**

</div>

Plaintiff Jane Doe ("Ms. Doe") hereby alleges as follows:

<u>PRELIMINARY STATEMENT</u>

1.      On November 16, 2023, Casandra Ventura a/k/a "Cassie" filed a 35-page lawsuit in which she exposed Sean Combs for subjecting her to nearly a decade of physical, sexual and emotional abuse punctuated by rape, sex trafficking and being forced to engage in drug fueled nonconsensual sexual encounters with other men.

2.      Ordinarily, when a lawsuit such as Ms. Ventura's is filed that involves events that took place long ago, witnesses are few and far between and evidence hard to muster.  Not so for the claims brought against Mr. Combs.  Within minutes of the filing, salient facts of Ms. Ventura's claims were confirmed by various witnesses, including a rival musician whose car Mr. Combs blew up as well as various individuals who observed Mr. Combs beat Ms. Ventura.

1

3.     Only a few days later, two other lawsuits were filed against Mr. Combs.  In one, plaintiff Joi Dickerson-Neal alleged that Mr. Combs drugged and sexually assaulted her when she was a college student.  The other lawsuit accused Ms. Combs and singer Aaron Hall of forcing the plaintiff and another unidentified woman into nonconsensual sex.

4.     At the same time, a fourth lawsuit was filed; this one against Mr. Combs' companies and Defendant Harve Pierre, the longtime President of Bad Boy Entertainment Holdings, Inc. ("Bad Boy").  The suit alleged that Mr. Pierre used his position of power at Bad Boy to groom and sexually assault his former assistant, and that Bad Boy looked the other way at the time.

5.     This lawsuit was the fifth suit filed against Mr. Combs over a three-week period in winter 2023.  Incredibly, the allegations brought by Ms. Doe are in many ways even more egregious than those brought by his prior victims.

6.      Specifically, in 2003, when she was only 17 years old and in the 11th grade, Ms. Doe was sex trafficked and gang raped by Mr. Combs, Mr. Pierre and the Third Assailant.[1]  In short:

- When she was just a teenager, Ms. Doe met Mr. Pierre and the Third Assailant in a lounge in the Detroit, Michigan area.  While at the lounge, Mr. Pierre insisted that he was "best friends" with Mr. Combs, and even called Mr. Combs with Ms. Doe.

- Mr. Combs convinced Ms. Doe, who was half his age at the time, to accompany Mr. Pierre and the Third Assailant on a private jet to come to his studio in New York City.

- Before they left for the private jet, Mr. Pierre smoked crack cocaine in a bathroom at the lounge, in which he also sexually assaulted Ms. Doe by forcing her to give him oral sex.

---

[1]     The "Third Assailant" is a pseudonym.  When the name of the Third Assailant is revealed during discovery, Plaintiff will seek to amend the Complaint to replace the pseudonym.

2

- Mr. Pierre, Third Assailant and another gentleman then escorted the highschooler to a private jet, which flew them to Teterboro, New Jersey. There were SUVs awaiting the group at Teterboro, and the four of them were driven to Daddy's House Recording Studio, a studio famously owned and operated by Mr. Combs and Bad Boy.

- While at the studio, Mr. Combs and his associates, including Mr. Pierre, plied Ms. Doe with drugs and alcohol. As the night wore on, the 17-year-old Ms. Doe became more and more inebriated, eventually to the point that she could not possibly have consented to having sex with anyone, much less someone twice her age.

- While at the studio, Ms. Doe was gang raped by Mr. Combs, the Third Assailant and Mr. Pierre, in that order.

- While Mr. Combs was raping Ms. Doe, he complained that he could not "get off" unless she pinched his nipples as hard as she could.

- Mr. Combs then watched on as Third Assailant, who Ms. Doe had not even realized had begun to have sex with her, raped Ms. Doe as she told him to stop.

- After Third Assailant was finished, Mr. Pierre took his turn at raping Ms. Doe and then violently forced her to give him oral sex, during which Ms. Doe was choking and struggling to breathe.

- When Mr. Pierre finished, he left Ms. Doe in the bathroom alone. Ms. Doe fell into the fetal position and lay on the floor. Her vagina was in pain.

- Finally, after a period of time, Ms. Doe regained her bearings. However, she could barely stand up following the gang rape, and had to be helped to walk out of the building and back into a car. She was taken back to an airport and flown back to Michigan. However, she has very limited recollection of her transport home, and only remembers being in her car sometime early in the morning.

7.      Unlike many victims who have come forward after decades, Ms. Doe can prove that she not only met Mr. Combs on the night in question, but was in his studio, in New York City, with him on that night.  Remember when viewing these, Ms. Doe was 17 years old.[2]



  

8.      Ms. Doe has lived with her memories of this fateful night for 20 years, during which time she has suffered extreme emotional distress that has impacted nearly every aspect of

---

[2]      Ms. Doe's face has been blurred in the following pictures for the purpose of anonymity.

her life and personal relationships.  Given the brave women who have come forward against Ms. Combs and Mr. Pierre in recent weeks, Ms. Doe is doing the same.

9.      To that end, Ms. Doe brings this action seeking injunctive, declaratory and monetary relief against Defendants in violation of the Victims of Gender-Motivated Violence Protection Law, Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq.* ("VGMVPL").

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and city law pursuant to 28 U.S.C. § 1367(a).

11.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and intentional and negligent tortious conduct alleged herein, occurred in this district.

## PARTIES

12.      Plaintiff Jane Doe is a citizen of State of Michigan and Canada.

13.      Defendant Sean Combs is a citizen of the State of California.  At all relevant times Mr. Combs was the owner of Defendants Bad Boy Entertainment Holdings and Daddy's House Recordings, Inc.

14.      Defendant Harve Pierre is, upon information and belief, a citizen of the State of New Jersey.  At all relevant times Mr. Pierre was a high-ranking executive (Senior Vice

President) of Defendant Bad Boy Entertainment Holdings, Inc., and was promoted to Executive VP and General Manager of Bad Boy in 2003, the year the events described herein took place.

15.     Defendant the Third Assailant is, upon information and belief, a citizen of the State of New York.  Upon information and belief, at all relevant times, the Third Assailant was an employee and/or agent of Defendant Bad Boy Entertainment Holdings, Inc.

16.     Defendant Daddy's House Recordings, Inc. ("Daddy's House") is a music, media, and entertainment company founded and owned by Defendant Sean Combs and Bad Boy. Daddy's House is incorporated and headquartered in New York, New York.  During the relevant time period, Daddy's House and/or Sean Combs owned and operated the Daddy's House Recording Studio wherein Ms. Doe was raped by Mr. Combs, Mr. Pierre and Third Assailant.  As described herein, Mr. Combs used the facts of his ownership of and title at Daddy's House in order to facilitate the unlawful conduct described herein.  In addition, he, as the owner of Daddy's House, watched Ms. Doe being raped by two of his employees, on the premises of Daddy's House, and did nothing to stop them (in fact, he encouraged it).

17.     Defendant Bad Boy Entertainment Holdings, Inc. ("Bad Boy") is a music, media, and entertainment company founded and owned by Defendant Sean Combs.  Bad Boy is incorporated and headquartered in New York, New York.  During the relevant time period, Bad Boy and/or Sean Combs owned and operated the Daddy's House Recording Studio wherein Ms. Doe was raped by Mr. Combs, Mr. Pierre and Third Assailant.  As described herein, Mr. Combs used the facts of his ownership of and title at Bad Boy in order to facilitate the unlawful conduct described herein.  In addition, he, as the owner of Bad Boy, watched Ms. Doe being raped by two of his employees, on the premises of Daddy's House, and did nothing to stop them (in fact, he encouraged it).  Moreover, Mr. Pierre used his title and that of Mr. Combs in order to facilitate

6

the unlawful conduct described herein.  Further, he, the Senior Vice President of Bad Boy,

watched Ms. Doe being raped by its owner and one of its employees, on the premises of Daddy's

House, and did nothing to stop them (in fact, he encouraged it).

## FACTUAL ALLEGATIONS

18.     In 2003, Ms. Doe was a 17-year-old 11th grader residing in a suburb of Detroit

Michigan.

19.     At the time, Mr. Combs was 34 years old – twice the age of Ms. Doe – and one of

the most well-known and influential music artists of all time.

20.     A decade earlier, Mr. Combs founded Bad Boy and installed his longtime friend,

Mr. Pierre, into the role of Senior Vice President, then the role of Executive Vice President, and

eventually, promoted him to President of the Company.

21.     At the time, Mr. Combs had many connections to Michigan, including, among

others, to the Black Mafia Family ("BMF"), a drug trafficking and money laundering

organization that is rumored to have seeded Bad Boy.  Accordingly, upon information and belief,

Mr. Combs' associates, including Mr. Pierre and the Third Assailant, spent significant time in and

around Detroit, Michigan.

22.     On one evening between the spring and fall of 2003, Ms. Doe was out with

friends.  It was not uncommon for her and her friends to frequent bars and lounges in the Detroit

area.  Certain of Ms. Doe's friends were well connected with people in the music industry.

23.     On the evening in question, Ms. Doe was with friends in a lounge when she was

approached by who she later learned was Mr. Pierre.  Mr. Pierre was with his own friends and/or

business associates, including the Third Assailant.  Mr. Pierre, the Third Assailant and their

friends were dressed in suits.

7

24. Mr. Pierre complimented Ms. Doe's appearance, saying that she was hot, among other things. He then began talking about his self-described "best friend" and "brother," Mr. Combs.

25. He told Ms. Doe that he and his friends, including the Third Assailant, were executives at Bad Boy, Mr. Combs' well-known recording label. He referenced his affiliation with Bad Boy and Mr. Combs as a means of keeping Ms. Doe interested in the conversation.

26. Specifically, Mr. Pierre continually stated that Mr. Combs would love to meet Ms. Doe.

27. Mr. Pierre even called Mr. Combs and put Ms. Doe on the line. Mr. Combs told Ms. Doe that he would love to meet her, and that she should accompany Mr. Pierre to New York City in a private jet.

28. The individual defendants used not only their affiliations with Bad Boy as a means to facilitate the unlawful conduct to follow, but also their affiliations with Daddy's House, where Ms. Doe was enticed to meet Mr. Combs.

29. Shortly thereafter, Mr. Pierre directed Ms. Doe to go with him into the bathroom at the lounge. Once inside the bathroom, Mr. Pierre began to smoke crack cocaine from what appeared to be an aluminum can.

30. After he finished smoking crack, Mr. Pierre suddenly took out his penis, demanded that Ms. Doe "suck [his] dick" and forced Ms. Doe's head down to perform oral sex on him.

31. After sexually assaulting Ms. Doe, Mr. Pierre directed her to accompany him, the Third Assailant and a third member of their group to an airport in Pontiac, Michigan, where

Signature, a Fixed Base Operator, had prepared a private jet to take the four of them to New York City.

32.     Upon information and belief, the private jet landed at Teterboro Airport. Upon departing the jet, two black SUVs were awaiting the group.

33.     Ms. Doe got into an SUV with Mr. Pierre, and the Third Assailant and the other member of the group went in the second SUV.

34.     The SUVs brought the group to Daddy's House Recording Studio, a recording studio and hangout owned and operated by Mr. Combs and Bad Boy.

35.     When Ms. Doe arrived, she was escorted into the building, where she distinctly remembers seeing a sign for the company, Technicolor.

36.     Upon entering the studio, Ms. Doe first encountered Mr. Combs. At the time she arrived, a female recording artist was using the studio as Mr. Combs and her parents watched on. She finished up shortly after Ms. Doe arrived and left. In other words, Mr. Combs had Ms. Doe trafficked to New York to observe him working prior to committing unlawful acts against her at his place of employment.

37.     While still in the studio section of Daddy's House, Mr. Combs asked Ms. Doe to sit on his lap to take a picture. A copy of the photograph is below.



38. Mr. Combs, Mr. Pierre and the Third Assailant began to ply Ms. Doe – a 17-year-old child at the time – with copious amounts of drugs and alcohol.

39. While the evening became a blur, Ms. Doe does recall Mr. Combs, Mr. Pierre and the Third Assailant hitting on her incessantly, stroking her body, asking to see her "ass" and telling her how "hot" and "sexy" she was.

40. Various other pictures were taken in the studio that night, leaving no doubt that Ms. Doe was in Mr. Combs' New York City studio, with Mr. Combs, on the night she was raped.



41. And, not only was Ms. Doe at the studio, but the individual defendants used the accoutrements of the studio (as depicted above) to entice Ms. Doe to stay and drink alcohol and do drugs.

42. As the night wore on, the 17-year-old Ms. Doe became more and more inebriated, eventually to the point that she could not possibly have consented to having sex with anyone, much less someone twice her age.

10

43.     Nevertheless, that evening Mr. Combs directed Ms. Doe to accompany him to the bathroom at the studio.  Once there, Mr. Combs removed Ms. Doe's skirt and underwear and penetrated her from behind with his penis while she hung over the sink.

44.     Ms. Doe did not consent to having sex with Mr. Combs, but he continued thrusting.  At some point, Mr. Combs turned Ms. Doe around to face him.  He told her that he could not orgasm and asked her to squeeze his nipples as hard as she could to help him "get off." He then turned her back around and continued to rape her.

45.     Mr. Pierre, then SVP of Bad Boy, and the Third Assailant, who upon information and belief was also an executive of Bad Boy, watched Mr. Combs rape Ms. Doe, on the premises of Daddy's House, and did nothing to stop him.  In fact, he encouraged it.

46.     By this point, Ms. Doe was coming in and out of consciousness because of the drugs and alcohol she had been given by Defendants.  Her next memory was looking up into the mirror above the sink to find that the Third Assailant had replaced Mr. Combs and was raping her from behind.  Mr. Combs was watching the Third Assailant sexually assault Ms. Doe from a chair outside of the bathroom.

47.     At this point, Ms. Doe mustered the energy to tell the Third Assailant to stop, and that she did not want to be having sex with him.  The Third Assailant did not stop, and continued to rape Ms. Doe, who did not have the strength to force him off of her.

48.     Mr. Combs used the facts of his ownership of and title at Daddy's House in order to facilitate the unlawful conduct described herein.  In addition, he, as the owner of Daddy's House, watched Ms. Doe being raped by one of his employees, on the premises of Daddy's House, and did nothing to stop him.  In fact, he encouraged it.

49.     And Mr. Pierre, then SVP of Bad Boy, watched one of his employees rape Ms. Doe, on the premises of Daddy's House, and did nothing to stop him.  In fact, he encouraged it.

50.     After the Third Assailant was finished, he was replaced by Mr. Pierre, who began by having nonconsensual vaginal sex with Ms. Doe before violently forcing her to give him oral sex.  During the latter part of the sexual assault, Mr. Pierre forced his penis into Ms. Doe's mouth without her consent.  Ms. Doe remembers that Mr. Pierre was sweaty and that she had difficulty breathing.

51.     Mr. Combs used the facts of his ownership of and title at Daddy's House in order to facilitate the unlawful conduct described herein.  In addition, he, as the owner of Daddy's House, watched Ms. Doe being raped by the Senior Vice President of his Company, on the premises of Daddy's House, and did nothing to stop him.  In fact, he encouraged it.

52.     When Mr. Pierre finished, he left Ms. Doe in the bathroom alone.  Ms. Doe fell into the fetal position and lay on the floor.  Her vagina was in pain.

53.     Finally, after a period of time, Ms. Doe regained her bearings.  However, she could barely stand up following the gang rape, and had to be helped to walk out of the building and back into a car.  She was taken back to an airport and flown back to Michigan.  However, she has very limited recollection of her transport home, and only remembers being in her car sometime early in the morning.  Her underwear was missing.

54.     As a result of being raped by Mr. Combs, Mr. Pierre and the Third Assailant, Ms. Doe suffered significant emotional distress and feels of shame that have plagued her life and personal relationships for 20 years.

55.     Ms. Doe knew that speaking out against Defendants would be extremely difficult and that she would likely be subjected to retaliation and defamatory slurs and attacks.

56.     However, in November 2023, Ms. Doe read about a lawsuit filed against Mr. Combs by Casandra Ventura a/k/a "Cassie." Ms. Ventura's suit described a decade of physical, sexual and mental abuse. Most triggering for Ms. Doe was reading about Ms. Ventura's allegations of sex trafficking and being forced to have sex with other men against her will. Ms. Doe obviously understands that she too had been sex trafficked, and that Mr. Combs' behavior in forcing women into nonconsensual sex was not an isolated incident or unique only to Ms. Ventura.

57.     Then, just days later, Ms. Doe read about a case filed against Mr. Pierre. The suit alleged that Mr. Pierre used his position of power at Bad Boy to groom and sexually assault his former assistant.

58.     Seeing two other women bravely speak out against Mr. Combs and Mr. Pierre, respectively, gave Ms. Doe the confidence to tell her story as well. As such, she filed this suit.

### FIRST CAUSE OF ACTION
**Violation of the Victims of Gender-Motivated Violence Protection Law,
N.Y.C. Admin. Code §§ 10-1101, *et seq.* ("VGMVPL")
*Against All Defendants***

59.     Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

60.     New York City's Victims of Gender-Motivated Violence Protection Law was first passed in 2000 as a remedial statute intended to correct "the void left by the Supreme Court" when it struck down the federal Violence Against Women Act, VAWA, and "to resolve the difficulty that victims face in seeking court remedies by providing an officially sanctioned and legitimate cause of action for seeking redress for injuries resulting from gender-motivated violence." New York City, Local Law No. 73 Int. 752-A (2000), Sec.1.

61.     In June 2022, the City Legislature amended the VGMVPL to include a two year "lookback" period, finding that "any civil claim or cause of action brought under this chapter that is barred because the applicable period of limitation has expired is hereby revived and may be commenced not earlier than six months after, and not later than two years and six months after, September 1, 2022."

62.     The above-described conduct of Defendant Mr. Combs, including, but not limited to, Mr. Combs's sexual assault of Plaintiff in New York City, constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 ("The term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

63.     The above-described conduct of Defendant Mr. Pierre, including, but not limited to, Mr. Pierre's sexual assault of Plaintiff in New York City, constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 ("The term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by

14

gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

64.     The above-described conduct of Defendant the Third Assailant, including, but not limited to, the Third Assailant's sexual assault of Plaintiff in New York City, constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 ("The term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

65.     Defendant Bad Boy Entertainment Holdings, Inc. and Daddy's House Recordings, Inc. enabled the commission of the crime of violence motivated by gender, and is therefore also liable under the VGMVPL § 10-1104.

66.     As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

67.     The above-described conduct of Defendants constitutes a sexual offense as defined in Article 130 of the New York Penal Law.

15

68. Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays judgment be entered in her favor against Defendants, and each of them, as follows:

A. For a money judgment representing compensatory damages including consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts, according to proof;

B. For a money judgment for mental pain and anguish and severe emotional distress, according to proof;

C. For punitive and exemplary damages according to proof;

D. For attorneys' fees and costs;

E. For prejudgment and post-judgment interest; and

F. For such other and further relief as the Court may deem just and proper.

Dated: March 29, 2024
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Douglas H. Wigdor
Michael J. Willemin
Meredith A. Firetog

85 Fifth Avenue
New York, New York 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845

dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
mfiretog@wigdorlaw.com

16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

CRYSTAL MCKINNEY,

                             Plaintiff,

                 - against -

SEAN COMBS a/k/a "P. DIDDY," BAD BOY
ENTERTAINMENT LLC d/b/a BAD BOY
RECORDS, BAD BOY ENTERTAINMENT
HOLDINGS, INC., SEAN JOHN CLOTHING LLC,
and DADDY'S HOUSE RECORDINGS, INC.,

                             Defendants.

-----------------------------------------------------------------------X

**Index No: 24-3931**

**AMENDED COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

         Plaintiff CRYSTAL MCKINNEY ("Plaintiff"), by and through her attorneys, PHILLIPS

& ASSOCIATES, PLLC, hereby alleges and avers of the Defendants SEAN COMBS a/k/a "P.

DIDDY," BAD BOY ENTERTAINMENT LLC d/b/a BAD BOY RECORDS, BAD BOY

ENTERTAINMENT HOLDINGS, INC, (collectively Bad Boy Entertainment LLC and Bad Boy

Entertainment Holdings, Inc. are referred to as "Defendants Bad Boy Records"), SEAN JOHN

CLOTHING LLC ("Sean John"), and DADDY'S HOUSE RECORDINGS INC ("Daddy's

House") (Bad Boy Records, Sean John, and Daddy's House, are collectively referred to as

"Corporate Defendants") alleges upon information and belief as to all other matters as follows.

## NATURE OF THE ACTION

1.      Plaintiff brings suit against Defendants pursuant to the NYC Gender Motivated Violence

        Act, N.Y.C. Admin. Code §§ 8-901 *et. seq*, to redress the substantial and lifetime injuries

        she has suffered as a result of being drugged and sexually assaulted by Sean Combs or "P.

        Diddy."

## JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 insofar as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

3. Plaintiff is a citizen of the State of Georgia.

4. Defendant Combs is a citizen of the State of California.

5. Bad Boy Entertainment Holdings, Inc. is a domestic business corporation licensed to do business in New York and is headquartered at 1440 Broadway, 3rd Floor, New York, New York 10018.

6. Bad Boy Entertainment LLC is a domestic limited liability company licensed to do business in New York and is headquartered at 1440 Broadway, 3rd Floor, New York, New York 10018.

7. Sean John is a domestic liability company licensed to business in New York and is headquartered at 1440 Broadway, New York, NY 10018.

8. Daddy's House is a domestic business corporation licensed to business in New York and its primary place of business is located at 321 W 44th St # 201, New York, NY 10036.

9. Venue is proper in the Southern District of New York because a substantial part of the events giving rise to the claim, including but not limited to, Defendant Combs' assault of Plaintiff, occurred in this District.

## PROCEDURAL REQUIREMENTS

## THE N.Y.C. VICTIMS OF GENDER MOTIVATED VIOLENCE PROTECTION ACT

10. The N.Y.C. Victims of Gender Motivated Violence Protection Act ("NYC Gender Motivated Violence Act") created a lookback window on March 01, 2023, which runs for two years, for survivors of gender motivated violence, allowing them to sue their abusers

regardless of when the abuse occurred. N.Y.C. Admin. Code § 10-1105(a).

11.  The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

12.  The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

13.  The above-described conduct of Defendant Combs, including, but not limited to, Defendant Combs' sexual assault of Plaintiff in New York City, constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by the NYC Gender Motivated Violence Act.

## PARTIES

## DEFENDANT COMBS

14.  P. Diddy a.k.a. Puff Daddy or Diddy is a Grammy-awarded musician, rapper and producer.

15.  In 1992, P. Diddy founded Defendants Bad Boy Records.

16.  In 2008, P. Diddy was the first male rapper to get a star on the Hollywood Walk of Fame.

17.  In 2022, Forbes estimated that P. Diddy is one of the wealthiest hip-hop artists in America and that his net worth is over $1 billion.

18.  Upon information and belief, P. Diddy has a long history of committing physical and sexual violence against women and men as documented in publicly available lawsuits and extensive media coverage.

3

19.     On November 16, 2023, Cassie Venture, an artist signed onto Bad Boy Records, filed a suit in the United States District Court of the Southern District of New York alleging that Combs provided her with copious amounts of drugs, before sexually assaulting her.

20.     On November 23, 2023, Joi Dickerson-Neal, filed suit in the Supreme Court of New York, New York County, alleging that Combs drugged her, sexually assaulted her, and filmed a "revenge porn" tape of his assault.

21.     On November 23, 2023, Liza Gardener, filed suit in the Supreme Court of New York, New York County, alleging that Combs and Aaron Hall sexually assaulted her when she was a minor.

22.     On December 06, 2023, a Jane Doe, filed suit in the United States District Court of the Southern District of New York alleging that when she was a minor, she was gang raped by Combs, Harve Pierre, and a third unnamed assailant at Daddy's House Recording Studios.

23.     On February 26, 2024, Rodney Jones, filed suit in the United States District Court of the Southern District of New York alleging that Combs sexually assaulted him and provided laced alcoholic beverages to minors.

24.     On May 23, 2024, April Lampros, filed suit in the Supreme Court of the State of New York, County of New York, alleging that Combs sexually assaulted her on multiple occasions.

25.     On July 03, 2024, Adria English, filed suit in the United States District Court of the Southern District of New York, alleging that Defendant Combs forced her to take narcotics and engage in sexual intercourse with guests at Combs' White Parties.

**DEFENDANTS BAD BOY RECORDS**

4

26.     In 1992, Combs founded Bad Boy Records, a record label which has sold over 500 million records, and where he produced records by Mary Blige, The Notorious B.I.G., and Usher.

27.     On February 08, 2003, Combs and other Bad Boy Entertainment employees were working on *One Love*, an album by New Edition, at Daddy's House Recording Studio, located at 321 W 44th St # 201, New York, NY 10036.

## DADDY'S HOUSE

28.     Daddy's House is a recording studio located at 321 West 44th Street, New York, NY, 10036.

29.     At all relevant times, Daddy's House was owned by Sean Combs and/or Bad Boy Records.

30.     At Daddy's House, albums and singles for Bad Boy Records artists were mixed, recorded, and engineered.

## SEAN JOHN

31.     In 1998, Combs founded Sean John, which has retail sales of over $450 million.

32.     As CEO and president of the company, Defendant Combs was representing Sean John when he attended the Men's Fashion Week dinner where he met Plaintiff.

33.     As CEO of Sean John, and a prominent figure in the world of fashion, Combs promised Plaintiff to help Plaintiff advance her modeling career.

## FACTUAL ALLEGATIONS

**Plaintiff Begins Her Modeling Career**

34.     At the age of seventeen, Plaintiff won MTV's inaugural Model Mission on December 05, 1998, a televised modeling competition akin to Miss America, and was awarded a modeling contract with IMG.

35.     Shortly thereafter, Plaintiff's career took off.

5

36.    Plaintiff modeled for a Tommy Hilfinger jeans campaign.

37.    Plaintiff was also featured in Macy's catalogs, Elle, Cosmopolitan and Mademoiselle magazines.

38.    Plaintiff also made appearances in television and film program such as MTV's Total Request Live ("TRL"), Fashionably Loud, True Life, and a movie with Joan Rivers.

39.    Furthermore, Plaintiff had international modeling gigs in Germany and Australia.

**A Fashion Designer Invites Plaintiff To Men's Fashion Week to Meet Combs**

40.    On or about February 2003, when Plaintiff was twenty-two years old, a fashion designer ("the Designer") invited Plaintiff to attend a Sean John Fall 2003 Fashion Show event held at Cipriani Downtown, located at 376 W. Broadway, New York, NY 10012.

41.    At the time, Plaintiff was engaged in modeling gigs in Miami, Florida and flew to New York for the event that would take place on February 08, 2003.

42.    The Designer told Plaintiff that he would be introducing her to Combs which could advance her modeling career.

43.    The Designer began to direct Plaintiff's appearance, as he sought to ensure Combs found her attractive.

44.    For instance, the Designer instructed Plaintiff to go to Elizabeth Arden to get a root touch up to ensure it was platinum blonde.

45.    The Designer also scheduled a stylist to put in hair extensions for Plaintiff.

46.    The Designer then handpicked a black leather coat with a fur hood, a translucent chiffon beige v-cut shirt, fur-lined handbag, and jewel encrusted jeans for Plaintiff to wear to the event.

47.    Due to the traumatic events to occur later, Plaintiff saved the unwashed clothing from that

6

night in her closet where they remain in a plastic wrap.

**Combs Makes Promises of Career Advancement**

48.     Soon thereafter, Plaintiff took a car to Cipriani Downtown, where the Designer was dining

        with Combs and other guests.

49.     Plaintiff felt little control over the events as she was directed what to do and put on display,

        for the others in attendance.

50.      For instance, Plaintiff sat down at an empty seat next to the Designer, but he insisted that

        she sit down directly across from Combs instead.

51.     Once seated, Combs made a very public display of coming on to Plaintiff in a sexually

        suggestive manner, which continued throughout the dinner.

52.     For others to hear, Combs bestowed compliments on Plaintiff by stating for example that

        she was beautiful and that her eyes were gorgeous.

53.     Later, and at a more intimate volume, Combs told Plaintiff that she "was going to make it

        big one day" as a model.

54.     Combs went on to tell Plaintiff that he had power in the industry and was going to help her

        advance her career.

55.     Combs provided Plaintiff with his phone number as a gesture of good faith in his promises

        to help her.

56.     Throughout their interactions, Combs was flirtatious, bordering on leering, as he leaned

        across the table towards her.

57.     Combs also plied Plaintiff with alcohol throughout the dinner as he repeatedly refilled her

        glass with wine.

58.     After the meal ended, Combs told Plaintiff that he wanted to get to know her better.

7

59.     Combs asked Plaintiff to call him a bit later.

60.     Plaintiff felt confused but hopeful that Combs would fulfill his promises to help her career.

**Plaintiff Meets Combs At His Studio Where He Drugs and Sexually Assaults Her**

61.     Later that night, Combs requested Plaintiff come see his studio Daddy's House located at
        321 W. 44th Street, New York, NY 10036.

62.     Upon information and belief, Combs regularly recorded albums at Daddy's House that
        were produced and released by Bad Boy Records. Upon information and belief, Combs
        invited other women to Daddy's House to drug and/or sexually assault them.

63.     Plaintiff felt reassured that she would be with others at the studio rather alone in a personal
        residence.

64.     When Plaintiff arrived in the Demo Room, she found that Combs and several other men
        seated together.

65.     The men were Bad Boy Records employees and/or other industry professionals who were
        working on *One Love,* a New Edition album.

66.     She found that the men were passing around a bottle of Hennesy and joints.

67.     After Plaintiff sat down, one of Combs' associates asked her: "Do you smoke weed?", to
        which she responded affirmatively.

68.     Combs' associate replied: "You've never had weed like this before."

69.     Plaintiff later came to understand that Combs had laced the joint with a narcotic or other
        intoxicating substance.

70.     Combs passed her the joint and Plaintiff took a hit, which felt very powerful.

71.     Although Plaintiff insisted that she had enough after that, Combs pressured her to imbibe
        more alcohol and marijuana by telling her that she was acting too uptight.

8

72. Plaintiff felt as if she was floating.

73. Although Plaintiff had smoked marijuana in the past, she had never experienced such a disorienting feeling after smoking and has not since that night.

74. Plaintiff would not have ingested the joint if she had known that Combs had laced it.

75. In providing Plaintiff with a laced joint and/or intoxicating substance, Combs involuntarily drugged her. Seeing Plaintiff was very intoxicated, Combs demanded Plaintiff follow him and he physically led Plaintiff to the bathroom that adjoined the Demo Room.

76. The bathroom had a frosted, semi-transparent glass pane which allowed occupants of the Demo Room to see activity within the room.

77. In the bathroom, Combs forced himself on Plaintiff and began kissing her without her consent.

78. Combs, then, shoved her head down to his crotch before commanding her to "suck it."

79. Plaintiff refused, but Combs pushed her head down onto his phallus and forced her to perform oral sex on him.

80. As she was being assaulted, Plaintiff felt panicked and physically sick.

81. Afterwards, Combs led Plaintiff back into the studio.

82. Upon standing and walking, Plaintiff felt more and more woozy and then lost consciousness.

83. Plaintiff awakened in shock to find herself in a taxicab heading back to the Designer's apartment.

84. As her consciousness returned, Plaintiff realized that she had been sexually assaulted by Combs.

85. Plaintiff felt humiliated and traumatized and without recourse.

86. Upon information and belief, Combs purposely assaulted Plaintiff so others could see it in a voyeuristic display for his associates and others present.

87. A prominent music industry professional who worked for Bad Boy Records was present that night and witnessed the events as described herein

**Combs' Assault Has Caused Plaintiff Lifelong Harm**

88. Following the assault, Plaintiff's modeling opportunities quickly began to dwindle and then evaporated entirely.

89. Upon information and belief, Combs had Plaintiff "blackballed" in the industry and utilized his significant influence to impede Plaintiff's career growth.

90. Plaintiff became severely depressed as she began to blame herself for the assault and for sabotaging her own career.

91. The assault led Plaintiff into a tailspin of anxiety and depression.

92. In or about 2004, Plaintiff attempted suicide and was hospitalized.

93. Everywhere Plaintiff looked she was reminded of Combs' assault, as Combs was an inescapable presence in music, television, and film.

94. In the ensuing years, Plaintiff has also experienced alcohol and drug addiction, as she attempted to cope with the emotional trauma of being assaulted.

95. Plaintiff has also experienced intimacy issues, as she struggles to maintain emotional and sexual relationships with men.

96. Plaintiff was married from approximately 2006 to 2010, however, her marriage fell apart as she had a mental breakdown precipitated by memories of the assault.

97. Combs' assault has altered the trajectory of Plaintiff's career, denying her a successful and lucrative career in the modeling and film industries.

10

98.     To this day, Plaintiff experiences bouts of depression, anxiety, body image issues, feelings of worthlessness, and intimacy issues because of Combs' assault.

99.     Plaintiff is a woman of faith and when she saw news coverage of the lawsuits from Ms. Cassie Ventura, Ms. Dickerson-Neal, and others, she knew she had a moral obligation to speak up.

100.    Plaintiff prayed to G-d before bringing this lawsuit, as she feared further violence and/or retaliation from Defendant Combs, but ultimately decided that she needed to speak her truth.

101.     Plaintiff seeks justice for herself and for any of other Combs' victims.

**Corporate Defendants' Knowledge Of Combs' Behavior**

102.    Corporate Defendants knew, should have known and/or had actual and constructive notice of Defendant Combs' propensity for sexually harassing, assaulting, and/or drugging women.

103.    Upon information and belief, Combs' propensity for violence was an open industry secret.

104.    Upon information and belief, industry professionals regularly discussed that Combs engaged in forceful sex with women and made promises of career advancement.

105.    In a May 28, 2024, article, Rolling Stone reported on several violent acts allegedly committed by Combs prior to his assault of Plaintiff.

106.    Rolling Stone reported that Defendant Combs publicly beat his then-girlfriend while he was a student at Howard University in approximately 1989 or 1990.

107.    Combs' propensity for violence was not a secret, as he allegedly told Jet Magazine: "I had a temper. That's why my friend started calling me Puffy."

108.    Indeed, Combs released his first single in 1996 utilizing the stage name "Puff Daddy" –

11

seven years prior to his assault of Plaintiff.

109. That same year, Combs allegedly threatened Kirk Burrowes, former president of Bad Boy Records, with a baseball, as detailed in the Rolling Stone article and a 2003 lawsuit.

110. Rolling Stone also reported that Burrowes witnessed Combs attack a woman at the Bad Boys office in 1994.

111. In 2000, according to Rolling Stone, Combs allegedly approached a Bad Boy Records employee named "Anna" and began to massage her shoulders without her consent and allegedly approached her boss to solicit Anna for sex.

112. Lawsuits by Liza Gardner and Joi Dickerson-Neal also detail sexual assaults committed by Combs in 1990 and 1991.

113. Given the above-referenced acts, Corporate Defendants were on notice of Combs' violent behavior and negligently placed him and/or allowed him to remain in positions of power where he could engage in sexual and/or violent misconduct.

114. Defendants Bad Boy Records, Sean John, and Daddy's House allowed Defendant Combs to remain in leadership positions such as CEO, which allowed him access to victims such as Plaintiff, which he sexually assaulted.

115. Corporate Defendants and/or their agents, servants and/or employees did not use reasonable care in making decisions in regard to hiring and retaining Defendant Combs.

116. Corporate Defendants and/or their agents, servants and/or employees would have discovered Defendant Combs' ongoing harassing conduct but for their negligence in carrying out their supervisory duties.

117. Corporate Defendants and/or their agents, servants and/or employees breached the above-stated duty in a negligent, reckless, willful, and wanton manner, and caused Plaintiff to be

sexually harassed, abused, and assaulted.

## CAUSE OF ACTION

### AS A FIRST CAUSE OF ACTION
### THE NYC VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION ACT
### (Against Defendants)

118. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

119. The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

120. The above-described conduct of Defendant Combs, including sexually assaulting or abusing Plaintiff at a music studio located in Manhattan. constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in N.Y. C. Admin Code § 10-1103.

121. Defendant Combs' crimes of violence were motivated by Plaintiff's gender as defined in in the New York City Administrative Code § 8-903, as Defendant committed forcible sex acts upon Plaintiff that would constitute felonies under state law and as the conduct presents a serious risk of physical injury, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

122. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

123. The above-described conduct of Defendant Combs constitutes sexual offenses as defined

13

in Article 130 of the New York Penal Law.

124.   Plaintiff is a woman, who is older than 18, who alleges misdemeanor and/or felony penal law violations, including but not limited to sexual misconduct (N.Y. Penal L. § 130.20), criminal sexual act in the first degree (N.Y. Penal L. § 130.50), criminal sexual act in the third degree ( N.Y. Penal L. § 130.40), forcible touching (N.Y. Penal L. § 130.52), sexual abuse in the first degree (N.Y. Penal L. § 130.65), and sexual abuse in the second degree (N.Y. Penal L. § 130.60).

125.   Defendant Combs coerced Plaintiff to engage in sexual contact and/or sexual intercourse, despite the fact that he was rendered incapable of consenting due to intoxication.

126.   Defendant Combs gave Plaintiff several drinks throughout the night and a laced blunt, thus, he knew or should have known that Plaintiff was incapable of consenting to sexual contact and/or sexual conduct.

127.   Defendant Combs' actions presented a serious risk of physical injury to Plaintiff's person, regardless of whether or not those acts resulted in criminal charges, prosecution or conviction.

128.   Prior to Combs sexually assaulting Plaintiff, Corporate Defendants knew or should have known that Combs was not fit to be in a position of authority. Corporate Defendants, by and through their agents, servants and/or employees, became aware, or should have become aware of Combs' propensity to commit sexual assault and of the risk to Plaintiff's safety.

129.   Corporate Defendants knew or should have known that Combs posed a risk of sexual assault.

130.   Corporate Defendants failed to protect Plaintiff from a known danger, and thereby enabled Combs' sexual assaults of Plaintiff.

131. Corporate Defendants negligently deemed that Combs was fit to be in a position of authority; and/or that any previous suitability problems Combs had were fixed and cured; and/or that Combs would not commit acts of sexual assault; and/or that Combs would not injure others.

132. Moreover, Corporate Defendants enabled the sexual abuse of Plaintiff by actively maintaining and employing Combs in a position of power and authority through which Combs had control over people, including Plaintiff.

133. As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

## **JURY DEMAND**

134. Plaintiff demands a trial by jury of all issues.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendant Combs engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that Combs drugged and sexually assaulted Plaintiff;

B. Declaring that Corporate Defendants engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that they enabled Defendant Combs' commission of the crimes of violence motivated by gender;

C.      Awarding Plaintiff compensatory damages for mental, and emotional injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.      Awarding Plaintiff damages for Defendants' breach of contract;

E.      Awarding Plaintiff punitive damages;

F.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful practices.

Dated:  New York, New York
        August 1, 2024


                                        **PHILLIPS & ASSOCIATES,**
                                        **Attorneys at Law, PLLC**


                        By:     _____
                                Michelle A. Caiola, Esq.
                                Jonathan Goldhirsch, Esq.
                                *Attorneys for Plaintiff*
                                45 Broadway, Suite 430
                                New York, New York 10006
                                T: (212) 248-7431
                                F: (212) 901 - 2107
                                mcaiola@tpglaws.com
                                jgoldhirsch@tpglaws.com

16