UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RODNEY JONES,

Plaintiff,

-v-

SEAN COMBS, *et al.*,

Defendants.

24-CV-1457 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff brings this suit alleging, *inter alia*, violations of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, and the Trafficking Victims

Protection Act of 2000 ("TVPA"), 18 U.S.C. §§ 1591, *et seq.*, based on Defendant Sean Combs's

alleged sexual misconduct. Before the Court are motions to dismiss filed by Combs, his business

enterprises, and Kristina Khorram. For the reasons that follow, the motions are granted in part

and denied in part.

I.    **Background**

A.    **Factual Background**

Plaintiff Rodney Jones brought this action against Sean Combs ("Combs") asserting a

variety of claims based on Combs's alleged history of sexual assault and human trafficking.

(ECF No. 38 ("SAC").) Named alongside Combs are Combs's son Justin Dior Combs ("Justin")

(*id.* ¶ 7), the actor Cuba Gooding, Jr. (*id.* ¶ 9), Combs's Chief of Staff Kristina Khorram (*id.*

¶ 10), his record label Love Records (*id.* ¶ 13), his company Combs Global Enterprises (*id.* ¶ 14),

and an unidentified female described as "Yung Miami's cousin" ("Jane Doe 1") (*id.* ¶ 29).[1] The

---

[1] The caption of the operative complaint also lists "John and Jane Does 1-10" and "ABC
Corporations 1-10." (SAC at 1.) Jane Doe 1 is identified as Yung Miami's cousin (*id.* ¶ 92), but

Second Amended Complaint asserts seventeen causes of action, of which fourteen remain.  (SAC at 42-96.)[2]  These include two federal claims—a RICO claim against Combs, Justin, Khorram, Combs Global, and Love Records, and a TVPA claim against Combs, Justin, Khorram, and Combs Global—and various state-law claims against Combs, Gooding, Jane Doe 1, and Love Records for breach of contract, sexual assault, premises liability, and infliction of emotional distress.  (*Id.*)

The following facts are taken from Jones's complaint and are presumed true for purposes of this opinion.  *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).  Jones's claims stem from his work between September 2022 and September 2023 as a producer on Combs's "Love" album.  (SAC ¶ 23.)  During this time, Jones "lived with Mr. Combs for months, spending holidays, birthdays and missing major family events."  (*Id.* ¶ 24.)  Jones "resided at Mr. Combs's residences in Los Angeles, California and Miami, Florida," "spent several weeks on a yacht rented by Mr. Combs in the US Virgin Islands and Saint-Barthélemy," and "made several trips with Mr. Combs to New York City."  (*Id.* ¶ 25.)

Jones alleges that disturbing incidents began nearly immediately after he joined Combs's team.  On approximately September 12, 2022, Jones alleges that he was present at Chalice Recording Studio in Los Angeles when Combs and Justin shot an unidentified man, and that

---

the complaint does not plead any facts or assert any causes of action as to the other unidentified defendants.  The Court therefore dismisses them from the action.

[2] Jones named several defendants affiliated with Universal Music Group ("UMG"), including: UMG itself; Lucian Grainge, UMG's chief executive; Motown Records ("Motown"), a record label owned by UMG; and Ethiopia Habtemariam, Motown's chief executive.  (ECF Nos. 1 and 2; SAC.)  Jones also named Chalice Recording Studios.  (ECF Nos. 1 and 2.)  Jones later voluntarily dismissed his claims against those defendants.  (ECF Nos. 18, 19, 47, 51.)  Jones dismissed his claims against the UMG defendants other than Habtemariam only after those defendants served him with notice of their intent to seek sanctions pursuant to Federal Rule of Civil Procedure 11(c).  (ECF No. 29-1.)

Jones provided first-aid services to the victim.  (*Id.* ¶¶ 30-54.)  Jones also alleges that he and other witnesses were pressured to hide the shooting from the police and the public.  (*Id.* ¶¶ 45, 70-72.)

Jones alleges that "[t]hroughout his time living with Mr. Combs, Mr. Jones was the victim of constant unsolicited and unauthorized groping and touching of his anus by Mr. Combs" and that he was "forced . . . to work in Mr. Combs' bathroom as Mr. Combs walked around naked and showered."  (*Id.* ¶¶ 73-75.)  Combs allegedly "used access to" powerful individuals in the music industry, including "Producer Steven Aaron Jordan," or "Stevie J," to "groom and entice Mr. Jones to engage in homosexual acts," including by "shar[ing] a video [with Jones] of who he claims was Stevie J anally penetrating [another man]."  (*Id.* ¶¶ 82-89.)  In addition, Combs "promised to make sure that Mr. Jones wins producer of the year at the Grammys if he engaged in homosexual acts."  (*Id.* ¶ 91.)  Khorram was allegedly aware of and "attempted to downplay" Combs's misconduct, and "work[ed] with Mr. Combs to groom [Jones] into accepting a homosexual relationship."  (*Id.* ¶¶ 78, 80.)

Jones alleges that other individuals in Combs's orbit committed sexual misconduct against him as well.  For example, on Thanksgiving Day, 2022, Jones alleges that he was sexually assaulted by Jane Doe 1 while he was staying in Combs's house in Miami, Florida.  (*Id.* ¶¶ 92-98.)  Jones also alleges that he was assaulted by Gooding when Combs left them alone together in a "makeshift studio" on his yacht.  (*Id.* ¶¶ 125-30.)

During his time working for Combs, Jones was "transported from California to New York, Florida, Saint-Barthélemy, and the United States Virgin Islands."  (*Id.* ¶ 99.)  And, while accompanying Combs to these various locations, Jones was allegedly coerced into participating in commercial sex acts against his will.  (*Id.* ¶¶ 100-15.)  Combs allegedly "forced [Jones] to

solicit sex workers and perform sex acts," and to "bring prostitutes and sex workers back to [Combs's] home." (*Id.* ¶¶ 100-01, 106-10.) On approximately February 2, 2023, Jones "believes Mr. Combs drugged him" and "recalls waking up naked, dizzy, and confused . . . in bed with two sex workers and Mr. Combs." (*Id.* ¶ 102.) On approximately July 2, 2023, Jones alleges that he was present while Combs solicited sex workers, some of whom were underage, and forced them to drink liquor laced with narcotic drugs. (*Id.* ¶¶ 116-21.) When Jones attempted to leave, Combs allegedly "forced him to stay," including "tak[ing] Mr. Jones' car keys to prevent him from leaving." (*Id.* ¶¶ 122-23.) Jones alleges that Combs then "forced" him to drink the laced liquor, after which Jones "began feeling lightheaded and recalls passing out and waking up at 4 am the following morning naked with a sex worker sleeping next to him." (*Id.* ¶ 124.) Jones alleges that Khorram was intimately involved in Combs's misconduct, and at times requested that Jones participate in transporting Combs's drugs and ordering sex workers on Combs's behalf. (*Id.* ¶¶ 180-84.)

Jones states that "Combs used his power and influence to intimidate and force" Jones into performing these actions. (*Id.* ¶¶ 111, 113.) This included promising Jones "a Grammy for Producer of the Year for the Love Album," "$250,000 to purchase all the instruments he wanted," "ownership of [Combs's] $20,000,000 property . . . in Miami," and "access to record label executives," as well as "threatening Mr. Jones with physical harm." (*Id.* ¶¶ 114-15.) The threats took various forms, including "threaten[ing] to eat Mr. Jones' face," informing Jones that Combs "was willing to kill his [own] mother, . . . so he wouldn't think twice about harming Mr. Jones" (*id.* ¶ 115), "display[ing] his guns" in front of Jones and "bragg[ing] about getting away with shooting people" (*id.* ¶ 145) and telling Jones that Combs's "head of security . . . had the power to make people and problems disappear" (*id.* ¶ 154). During the production of the Love

Album, Combs allegedly required his employees to consume alcohol and dismissed them if they refused, further stoking Jones's "fear[] [of] what could happen to him if he told Mr. Combs no." (*Id.* ¶ 172.)

In addition to Jones's various claims of sexual misconduct, he also alleges that he was "not compensated for his time living with Mr. Combs or for the songs [Jones] produced." (*Id.* ¶ 131.) Jones claims that this violated the terms under which he was recruited to work on the Love Album, which included $20,000 up front for each song he produced, four royalty points, credit as producer and for each instrument he played on the songs, and retention of publishing rights. (*Id.* ¶ 133.) When Jones confronted Combs about this, Combs allegedly offered him $29,000 in total compensation, which Jones refused. (*Id.* ¶¶ 139-41.)

### B.    Procedural Background

Jones brought this action on February 26, 2024 (ECF No. 1) and filed the operative complaint on April 12, 2024 (SAC). Jones voluntarily dismissed his claims against certain defendants on May 14, 2024 (ECF No. 51), and the Court thereafter denied a request by those defendants to impose sanctions on Jones and his counsel, *see Jones v. Combs*, No. 24-CV-1457, 2024 WL 5107365, at *5 (S.D.N.Y. Dec. 13, 2024). Sean Combs, Combs Global Enterprises, and Love Records (the "Combs Defendants") moved to dismiss the operative complaint on August 26, 2024 (ECF No. 66) and filed a supporting memorandum of law (ECF No. 67 ("Mem.")). Khorram moved to join that motion on the same day. (ECF No. 71.) Jones opposed the motion on September 30, 2024 (ECF No. 78 ("Opp.")), and the Combs Defendants replied on October 18, 2024 (ECF No. 83). Khorram also requested permission to join in the Combs Defendants' reply brief. (ECF No. 84.) Khorram did not file her own motion or memorandum of law.

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This means that a complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.* at 678, the Court must draw "all inferences in the light most favorable to the non-moving party . . . ." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Determining whether a complaint states a plausible claim is ultimately a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.    Discussion

### A.    Warning to Counsel

Before addressing the substance of Jones's claims, the Court finds it necessary to issue a warning to his counsel, Tyrone Blackburn.  Previously, the Court declined to impose sanctions on Blackburn related to the admittedly false claims he filed on behalf of Jones against Universal Music Group and associated defendants. *Jones*, 2024 WL 5107365, at *5.  "[W]hile Blackburn may have acted incompetently at times," the Court determined that "there [was] insufficient evidence . . . to conclude that he ha[d] engaged in a pattern of bad faith." *Id.*  Blackburn also has a pending referral to the Southern District's disciplinary committee for his repeated failure to

investigate basic elements of his cases. *Zunzurovski v. Fisher*, No. 23-CV-10881, 2024 WL 1434076, at *2 (S.D.N.Y. Apr. 3, 2024).

In light of this, the Court finds much of Blackburn's conduct regarding Defendants' motion to dismiss to be unsettling. Blackburn's filings are replete with inaccurate statements of law, conclusory accusations, and inappropriate ad hominem attacks on opposing counsel. For example, in urging the Court to consider a grand jury indictment of Combs on related criminal charges, Blackburn writes "as evidenced by US Attorney Williams's press conference and the Grand Jury Indictment . . . Defendant Sean Combs and the Combs RICO Enterprise are *presumed guilty* of being a RICO criminal organization." (Opp. at 7 (emphasis added).) That any licensed member of the bar would espouse such an absurd understanding of the law is not just disturbing, but shocking. Then, rather than focusing on the claims pleaded in this lawsuit, Blackburn writes that "it is evident from the multiple civil lawsuits and the fourteen-page indictment the kind of sexually deviant monster Sean Combs is." (*Id.* at 12.) Both the operative complaint and Blackburn's opposition brief are full of similar irrelevant insults, misstatements, and exaggerations. In response to defense counsel's understandable objections, Blackburn hurls schoolyard taunts at them, writing that "[i]t is clear [that defense counsel] are obsessed with me, and although initially flattering, their obsession has become creepy." (*Id.* at 2 n.1.)

The Court has inherent authority to sanction Blackburn should he act "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 141 (2d Cir. 2023) (quoting *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013)). While the Court will not hold Blackburn's antics against Jones at this point, it warns Blackburn that further misconduct may lead to sanctions or to referral for discipline. Blackburn has a professional obligation, both to the Court and to his client, to state the law accurately, to

collaborate in a respectful and constructive manner with fellow lawyers, and to allow this litigation to proceed efficiently.  The Court will not hesitate to enforce this obligation moving forward.

### B.    RICO

Jones's first federal claim is for violations of RICO, 18 U.S.C. § 1962, which makes it unlawful to deploy the proceeds of "racketeering activity" in "any enterprise," *id.* § 1962(a), to "participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity," *id.* § 1962(c), or "to conspire" to do so, *id.* § 1962(d).  To establish a RICO claim, a plaintiff must show a violation of the statute, an "injury to business or property," and causation. *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir.2001) (quotations omitted).

Defendants argue that Jones has not pleaded an injury to "business or property" caused by such a violation, and therefore lacks standing under the Act.  (Mem. at 14-15.)  According to Defendants, the "sole injury to 'business or property' alleged . . . is the purported non-payment for services Jones claims he performed on the Love Album," but Jones "alleges no causal connection between this injury and any purported RICO 'predicate act'."  (*Id.* at 14.)  Jones does not respond to this argument.

A compensable "injury to business or property" encompasses specific pecuniary losses, *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 518 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009) (summary order), but does not reach "personal injuries suffered," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979), or reputational harm unaccompanied by a "quantifiable and non-speculative" "loss of business opportunities." *Nygard v. Bacon*, No. 19-CV-1559, 2021 WL 3721347, at *5 (S.D.N.Y. Aug. 20, 2021).  Such a "compensable injury" must also be "caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the

conduct of an enterprise." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)); *see also Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990) ("[A] plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property *by the conduct constituting the violation*." (quoting *Sedima*, 473 U.S. at 496) (emphasis in original)); *J.S. Serv. Ctr. Corp. v. Gen. Elec. Tech. Servs. Co.*, 937 F. Supp. 216, 220 (S.D.N.Y. 1996) ("[I]n order to establish [RICO] standing, [a plaintiff] must show that the damage to its business or property resulted from the alleged predicate acts constituting the RICO violation in this case.").  Both factual and proximate causation are required; the former is assessed under the familiar "but-for" standard, while the latter requires that "the RICO pattern or acts" be "a substantial factor in the sequence of responsible causation" and that "the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).

"[T]he Supreme Court has set out 'general principles surrounding this statute,' one of which is that 'RICO is to be read broadly' not only because of 'Congress' self-consciously expansive language and overall approach,' but also because of Congress' 'express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sperber v. Boesky*, 849 F.2d 60, 63 (2d Cir. 1988) (quoting *United States v. Turkette*, 452 U.S. 576, 586-87 (1981)), *Sedima*, 473 U.S. at 497-98, and Pub. L. 91-452, § 904(a), 84 Stat. 947).  At the same time, "[b]alanced against this is the principle—also recognized by [the Supreme Court]—that legal liability should not extend as far as factual causation," and that allowing liability to become so broad would "set society on edge and fill the courts with endless litigation." *Id.* (quotation marks omitted).

Applying these principles to the operative complaint precludes most of Jones's alleged injuries from supporting RICO standing, including his claims of trauma, mental-health problems, emotional pain and suffering, and embarrassment and humiliation. (*Cf.* SAC ¶¶ 53, 226.) Nor can Jones base standing on secondary economic consequences of these personal injuries, such as difficulty finding employment. *See Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 171 (S.D.N.Y. 2019). Defendants are therefore correct that the only compensable injury that Jones pleads is Defendants' non-payment for his work on the Love Album. (SAC ¶¶ 131-41.) Defendants are also correct that their alleged refusal to honor the contract with Jones is not itself a RICO predicate act, even if the contract breach resulted from Jones's refusal to participate in Combs's alleged racketeering scheme. *See J.S. Serv. Ctr.*, 937 F. Supp. at 220; *Bigsby v. Barclays Cap. Real Est., Inc.*, 170 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) ("[B]reach of contract claims . . . do not constitute predicate acts." (quotation marks omitted)); *see also Haviland v. J. Aron & Co.*, 796 F. Supp. 95, 98 (S.D.N.Y.), *aff'd*, 986 F.2d 499 (2d Cir. 1992) (collecting "refusal to cooperate" cases and concluding that "any injury flowing from the employer's retaliatory conduct was not sufficiently proximate to the alleged RICO violations to confer standing").[3]

The question, then, is whether any of the other alleged RICO predicates (or the pattern of racketeering activity as a whole) caused Defendants' failure to pay Jones under the putative contract.[4] The Court cannot identify any such causal link. Defendants' alleged sex, drug, and

---

[3] Jones also never alleges that Defendants threatened to breach Jones's contract in order to induce him to do anything illegal. Rather, the only time that Jones mentions such a threat is in connection with his requests "for permission to visit his family for their birthdays and holidays." (SAC ¶ 231.)

[4] Defendants argue syllogistically that because Jones's injury was caused by Defendants' breach of contract, and because breach of contract is not a RICO predicate, then Jones's injury cannot have been caused by a RICO predicate (or pattern thereof). (Mem. at 15.) But this is not

gun trafficking activities—the vast majority of the predicate acts pleaded in the operative complaint—did not foreseeably or naturally preclude Defendants from honoring their recording contract with Jones. Indeed, Jones's own theory of why he felt pressured to go along with Combs's sex-, drug-, and firearm-related misconduct for so long is that he believed he would be compensated not only under his contract, but in additional benefits like "securing Grammy Awards, purchasing $20 million homes, participating on future projects, $250,000 cash payments, and meeting influential music industry executives." (SAC ¶ 227.)

Nor can Jones base standing on the notion that Defendants fraudulently induced him to enter the contract in the first place. (*Cf. id.* ¶ 240.) "[B]ecause RICO compensates only for injury to business or property, a victim who is induced to part with his property by the misrepresentations of a fraudster is generally not entitled to benefit of the bargain damages—meaning recovery of what the fraudster promised, as opposed to the property the victim lost." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 122 (2d Cir. 2013) (cleaned up); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) (refusing to find injury based on "expectancy damages . . . in cases that sound in fraud in the inducement"). Jones also fails to plead any facts from which the Court could infer that Defendants never intended to perform under the contract in the first place. (*See* SAC ¶ 268 (alleging in a conclusory fashion that "Defendants sought to acquire wire transfers and cash payments and to utilize their talents and labor to produce music and other tangible goods and services without full compensation.").)

---

quite accurate. Jones's injury here is not the breach itself, but the loss of compensation he was owed for the services he provided. If Jones were deprived of that compensation as a result of RICO violations subsequent to the formation of the contract, such a deprivation would be compensable under RICO. *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 (2d Cir. 2013) (finding a RICO injury where the plaintiff "entered into contracts that entitled its customers to 'cost-plus' pricing," but were "systematically deceived [by the defendants] into believing they were being afforded such pricing when, in fact, they were being overcharged").

And Jones identifies no specific examples of fraud occurring after the formation of his contract that reduced the value of the contract or caused Defendants' failure to pay. While Jones repeats the word "fraud" throughout the operative complaint, he appears to often do so as a synonym for "illegal," and does not identify any specific misrepresentations related to his contract.[5]

In sum, whether or not Jones has adequately alleged the existence of a RICO enterprise, he has not tied the activities of that enterprise to Defendants' breach of contract or any other "business or property" harm incurred by Jones. It also bears reiterating that Jones fails to address any of these arguments in his opposition brief, and while the Court prefers to decide issues on the merits, it should not be necessary to root around a 402-paragraph complaint to contrive novel arguments on Jones's behalf. *See Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); *see also Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 642 (S.D.N.Y. 2008) (same); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) (same); *Lee v. Banks*, No. 23-CV-05800, 2024 WL 1657908, at *5 (S.D.N.Y. Apr. 17, 2024) (same). Jones's effort to convert a "garden variety . . . breach of contract case[]" into a RICO suit therefore fails, *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000), and his RICO claims are dismissed as to the Combs Defendants and Khorram.

---

[5] (*See, e.g.*, SAC ¶¶ 266 ("[T]hey agreed to rely on the mail to secure wire frauds and cash payments from purchasers of the illegal firearms and drugs they required others to sell and distribute."); 270 ("Defendants agreed to rely on interstate wires to disseminate funds and to submit payment to sex workers and prostitutes, as well as to transfer payment for the distribution and procurement of drugs and guns.").)

C.      TVPA

1.      Combs

Jones next asserts TVPA claims against Combs, Khorram, and Combs Global.  (SAC ¶¶ 298-313.)[6]  The TVPA makes it unlawful to "recruit[], entice[], harbor[], transport[], provide[], obtain[] . . . maintain[], patronize[], or solicit[] by any means a person . . . knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act."  18 U.S.C. § 1591(a).  The statute does not define terms like "entice" or "recruit," so courts have given those terms their ordinary meaning, holding that they cover conduct ranging from "attracting [a] victim by offering something that arouses hope or desire" to "somehow secur[ing] the services of [a] victim[]."  *Ardolf v. Weber*, 332 F.R.D. 467, 474 (S.D.N.Y. 2019).  The term "coercion" is defined as "(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process."  18 U.S.C. § 1591(e)(2).  The term "commercial sex act" means "any sex act, on account of which anything of value is given to or received by any person."  *Id.* § 1591(e)(3).  And the term "serious harm" means that which would "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."  *Id.* § 1591(e)(5).  The jurisdictional component of the act is satisfied by "a de minimis effect on interstate commerce," including such minor conduct as "the use of cell

---

[6] Jones also asserts a TVPA claim against Justin (SAC ¶¶ 298-313), but that claim is not currently subject to a motion to dismiss.

phones and the internet." *United States v. Garrett*, No. 17-59, 2022 WL 2979588, at *3 (2d Cir. July 28, 2022).

The TVPA provides for civil actions by the "victim . . . against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)." 18 U.S.C. § 1595(a). Courts have counseled that the TVPA is to be given "broad interpretation" in light of its remedial purpose and the "[b]road, expansive language [it] employ[s]." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 516 (S.D.N.Y. 2018).

Given the TVPA's breadth, Jones has adequately pleaded violations as to Combs. On numerous occasions, Combs allegedly recruited or enticed Jones to solicit and perform sex acts with commercial sex workers, as well as transported Jones across state and international borders in order to do so. (*See, e.g.*, SAC ¶¶ 99-101.) Combs allegedly secured Jones's compliance with his requests both by promising economic benefits that never materialized, and by threatening Jones with physical restraint and harm. Because the operative complaint is lengthy and includes multiple examples of conduct adequate to ground a TVPA claim, the Court here lists only a representative sample.

On July 2, 2023, Jones—having traveled from his home in New York to Combs's home in California—was allegedly asked by Combs to solicit female sex workers on Combs's behalf, including multiple individuals under the age of eighteen. (*Id.* 116-19.) When Jones expressed his discomfort with the situation and "attempted to leave," Combs "forced him to stay." (*Id.* ¶ 122.) This included confiscating Jones's car keys to physically "prevent him from leaving." (*Id.* ¶ 123.) Combs then pressured Jones into drinking ecstasy-laced liquor, after which Jones

"recalls passing out" and waking up in bed with a sex worker.  (*Id.* ¶ 124.)  Jones has thus

alleged recruitment to participate in commercial sex acts, along with physical restraint and a

threat of force resulting from Combs's seizing Jones's keys.  Jones alleges that a similar episode

occurred at Combs's home in Miami, Florida on February 2, 2023, when Combs "drugged

[Jones]" and Jones woke up "naked, dizzy, and confused . . . in bed with two sex workers and

Mr. Combs."  (*Id.* ¶ 102.)

      In addition to drugging and physically restraining Jones, Combs also allegedly used

verbal threats of force and fraudulent promises to induce Jones to solicit and have sex with

commercial sex workers at Combs's home in Miami.  (*Id.* ¶ 252 (listing dates on which Jones

was directed to solicit sex workers on Combs's behalf).)  To secure Jones's compliance, Combs

allegedly "threatened to eat Mr. Jones' face," informed Jones that Combs "was willing to kill his

[own] mother, . . . so he wouldn't think twice about harming Mr. Jones" (*id.* ¶ 115), "displayed

his guns" in front of Jones and "bragged about getting away with shooting people" (*id.* ¶ 145),

and told Jones that Combs's "head of security . . . had the power to make people and problems

disappear" (*id.* ¶ 154).[7]

      Combs also promised Jones benefits such as "access to record label executives" and

funds to "purchase all the instruments he wanted."  (*Id.* ¶¶ 113-14.)  Courts have found the

---

     [7] Defendants argue that these comments occurred after the forced solicitations, and
therefore cannot have motivated them.  (Mem. at 12.)  It is true that the dates Jones offers for
some of the alleged comments postdate some of the solicitations.  For example, Jones alleges
that the comment about eating his face occurred in approximately April 2023, while many of the
solicitations occurred between November 2022 and January 2023.  (SAC ¶ 252.)  However, at
least some of the solicitations occurred after the threats of force—including five alleged
instances of "forced solicitation" in May 2023.  (*Id.*)  Moreover, the Court understands the
examples provided by Jones not as an exhaustive list, but rather as illustrative of continuous
conduct that occurred "[t]hroughout his time with Mr. Combs"—the roughly one-year period
between September 2022 and September 2023.  (*Id.* ¶ 26.)

making of similar promises, combined with their repudiation and non-performance after the desired sex acts have occurred, to constitute "fraud" for purposes of TVPA liability.  *See, e.g.*, *Noble*, 335 F. Supp. 3d at 518; *see also Geiss*, 383 F. Supp. 3d at 168 ("[T]he TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or, as alleged here, non-consensual sexual activity.").  While some of Combs's promises—such as ownership of a $20 million mansion—were perhaps too ludicrous to be taken seriously, others—such as access to power players in the music business and help purchasing equipment—were not.  *Cf. Noble*, 335 F. Supp. 3d at 518 (finding TVPA liability based on promises of film roles, interviews with famous directors, and assurances that "everything will be taken care of for you").  The Court therefore concludes that Jones has adequately pleaded that, on multiple occasions between September 2022 and September 2023, Combs recruited or enticed Jones to participate in commercial sex acts that Combs knew would involve threats of force or fraud.

Finally, Jones adequately alleges that direct sexual assaults committed by Combs himself were "commercial" for purposes of the TVPA.  Jones alleges that "[t]hroughout his time living with Mr. Combs, Mr. Jones was the victim of constant unsolicited and unauthorized groping and touching . . . ."  (SAC ¶ 73.)  Jones alleges that, in order to "entice" him to accept this unwanted conduct, Combs "used access to" successful music producers, and "promised to make sure that Mr. Jones [won] producer of the year at the Grammys" for his work on the Love Album "if he engaged in homosexual acts."  (*Id.* ¶¶ 87-91.)  As in the Harvey Weinstein cases, such promises constitute "anything of value" and are sufficient to transform the resulting sex acts into "commercial" ones.  *See Noble*, 335 F. Supp. 3d at 521; *Geiss*, 383 F. Supp. 3d at 168; *see also United States v. Raniere*, 55 F.4th 354, 362 (2d Cir. 2022).

Defendants make two main arguments.  First, Defendants argue that Combs's threats and promises were so "outlandish" that they "fail to meet the general requirement that pleadings be plausible," as well as the TVPA's specific requirement that coercion be assessed from the standpoint of a "reasonable person . . . in the same circumstances."  (Mem. at 24 (quoting 18 U.S.C. § 1591(e)(5)).)  The Court disagrees.  "It is not just what [Combs] said that supports an inference of fraud.  The context and history of [Combs's and Jones's] professional relationship imports a degree of legitimacy, of materiality, to the statements."  *See Noble*, 335 F.Supp.3d at 520.  Combs is not only a successful artist and executive with extensive ties to the industry but has a track record of winning precisely the awards that he promised to Jones.  (*See, e.g.*, SAC ¶ 85.)  Combs also has a long history of public allegations of violence, specific instances of which Jones allegedly witnessed firsthand.  (*See e.g.*, *id.* ¶¶ 30-54.)  Given this context, it was not unreasonable as a matter of law to take Combs's promises and threats at face value.  And, while Jones's counsel may be unfortunately inclined to use incendiary and salacious language, *see supra* Section III.A, it is not facially absurd or irrational that a powerful artist and producer would engage in sexual coercion of the sort alleged here.  Jones's allegations also need only be plausible, not probable, at this stage in the proceedings.  *See Iqbal*, 556 U.S. at 679-80; *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (recalling the "age-old insight that many allegations might be strange, but true," for truth is often "stranger than fiction" (cleaned up)).  *Cf. Moore v. Fox News*, No. 24-CV-5470, 2024 WL 4635337, at *2 (S.D.N.Y. Oct. 30, 2024) (granting a motion to dismiss where the plaintiff claimed that she had been detained by "the British Monarchy" at the "Disney Yacht Club" and forced to "curtsy in the shower for six (6) hours with the brain hijacking . . . experiment," and that "there would be whippings for not curtsying correctly" (cleaned up)).

Second, Defendants argue that Jones fails to provide dates for some of Combs's threats and promises, and that Jones fails to link those threats and promises to specific sex acts. (Mem. at 12, 23-25.) Defendants therefore argue that "[b]ecause no specific threat is causally linked to any sex act," Jones fails to establish TVPA liability. (*Id.* at 23-24.) Setting aside the specific, dated allegations of Combs drugging and restraining Jones to secure his compliance, Defendants are correct that Jones does not connect most of Combs's verbal threats to specific sex acts on specific dates. However, while a "causal relationship" is required, *Noble*, 335 F. Supp. 3d at 504, Jones's allegations suffice to plead one here. As in the Weinstein cases, the complaint must be read as a whole, not deconstructed and parsed sentence by sentence. *Id.* at 519. Here, Jones provides a bounded timeframe within which Combs's conduct occurred—namely, the year that Jones spent living and traveling with Combs. (SAC ¶¶ 24-26.) Jones also alleges that "throughout" that year he was the victim of unwanted sexual advances from Combs, along with an ongoing campaign to "groom" Jones into accepting such advances. (*See, e.g.*, SAC ¶¶ 73, 80, 125, 172, 211, 252 (cleaned up).) Jones provides specific, dated examples of Combs making threats of violence, and alleges that such threats were "part of his grooming" process. (*Id.* ¶ 252.) The complaint also specifies at least some occasions on which Combs made the quid pro quo nature of his promises clear. (*See, e.g.*, *id.* ¶ 91.) Taken together, and with all inferences drawn in Jones's favor, these allegations support an overall inference that Combs used a combination of threats and promises to secure compliance with his requests, and that those requests included participation in numerous commercial sex acts. Federal pleading standards do not require more precision at this stage in the litigation.[8]

---

[8] No party argues that the TVPA claims here sound in fraud and must therefore be evaluated under Federal Rule of Civil Procedure 9's more stringent pleading standard, nor has the Court been able to identify any authority for doing so.

### 2.    Khorram

According to Jones, Khorram was Combs's "Chief of Staff" (*id.* ¶ 10), and was aware of Combs's sexual misconduct, including his unwanted groping and touching of Jones (*see id.* ¶¶ 76-78). Jones also alleges that he expressed his discomfort with Combs's behavior to Khorram (*id.* ¶ 76) and that Khorram refused to intervene, justifying Combs's conduct by saying that "Sean will be Sean" and that it was just Combs's "way of 'showing that he likes you'" (*id.* ¶¶ 77-78). Khorram also allegedly requested that Jones order sex workers for Combs on at least one occasion. (*Id.* ¶¶ 181, 252.)

Defendants do not advance any independent basis on which to dismiss Jones's TVPA claims as to Khorram.[9] It is a reasonable inference that Khorram violated TVPA Section 1591(a)(1) by recruiting and enticing Jones to engage in commercial sex acts, knowing or at least acting in reckless disregard of the likelihood of coercion. Khorram may also be liable under Section 1591(a)(2) as one who benefitted from Combs's venture, notwithstanding her awareness of and participation in the venture's TVPA violations, but the Court need not evaluate that secondary basis for liability at this stage.

### 3.    Combs Global

The operative complaint does not allege that Combs Global, the corporate entity, directly enticed, recruited, or otherwise induced Jones to participate in any commercial sex acts. Liability thus depends on whether Combs Global benefitted from participation in Combs's venture notwithstanding knowledge or reckless disregard of his TVPA-liable misconduct. *See* 18 U.S.C. § 1591(a)(2).

---

[9] Khorram filed a motion requesting leave to join in the Combs Defendants' motion to dismiss. (ECF No. 71.) That motion is granted. Khorram does not, however, advance any additional defenses on her own behalf.

Although the Second Circuit has not conclusively determined the meaning of "participation" in the TVPA, courts in this District have tended to interpret it as requiring "a causal relationship between the [defendant's] participation in sex trafficking and their purported benefit." *See Geiss*, 383 F. Supp. 3d at 169; *Noble*, 335 F. Supp. 3d at 524; *see also United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) (explaining that a defendant must actually have "commit[ted] some overt act that furthers the sex trafficking aspect of the venture," and cannot be liable based on "mere negative acquiescence" to the conduct of the perpetrator (quotation marks omitted)).  Applying these principles in various cases against the company that employed Harvey Weinstein, courts have distinguished between allegations that the company merely paid for a perpetrator's travel or legal settlements of prior claims of sexual misconduct, *Noble*, 335 F. Supp. 3d at 524 (no liability), and allegations that the company entered non-disclosure agreements with women in order to cover up assaults, a practice which had "the predictable effect of enabling future assaults," *Canosa v. Ziff*, No. 18-CV-4115, 2019 WL 498865, at *24 (S.D.N.Y. Jan. 28, 2019) (liability).  The court in *Canosa* determined that the non-disclosure agreements "facilitat[ed] and cover[ed] up Weinstein's sexual assaults," and thus "made Weinstein more likely to continue to work for [the company]."  *Id.* 2019 WL 498865, at *24.  The result was a "symbiotic relationship, . . . in which the companies affirmatively enabled and concealed Weinstein's predations as a means of keeping him happy, productive, and employable which led the companies to achieve fame and reap financial benefits."  *Id.*

The situation here is closer to *Noble* than to *Canosa*.  The operative complaint only discusses Combs Global in laundry lists alongside Combs, Love Records, Khorram, and others. (*See, e.g.*, SAC ¶¶ 299-301, 304-07.)  The complaint fails to identify any distinct actions taken by Combs Global to either facilitate or cover up Combs's conduct, and it does not identify any

funds contributed by Combs Global that Combs used to commit the alleged misconduct.  The

complaint further fails to even identify the "businesses and investments" that make up Combs

Global's "diverse portfolio."  (*Id.* ¶ 14.)  Accordingly, the allegations fail to support a reasonable

inference that Combs Global benefited from any "participation" in a trafficking venture, and

Jones's TVPA claim against Combs Global is therefore dismissed.[10]

### D.    State Tort Claims

In addition to his federal claims, Jones asserts a variety of state-law tort claims based on

incidents of sexual misconduct that allegedly occurred while he was living and traveling with

Combs.  Although Defendants' misconduct allegedly occurred in at least three states and one

foreign jurisdiction (*id.* ¶ 25), no party addresses choice of law in their briefs.  Applying New

York choice-of-law rules, the Court determines for now that the relevant law for each of Jones's

tort claims is the law of the state where the tort occurred.[11]

---

[10] While the complaint extensively discusses Love Records as being implicated in Combs's sex trafficking activities, Love Records is not named as a defendant with respect to Jones's TVPA claim.  (SAC ¶¶ 299-31371.)  However, even if Jones did intend to assert a TVPA claim against Love Records, the claim would fail for the same reason that the TVPA claim fails as to Combs Global.  The Court therefore concludes that Jones does not have, if he ever did, a viable TVPA claim as to Love Records.

[11] "A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989)).  Accordingly, New York choice-of-law rules govern Combs's various tort claims and dictate that "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied."  *Id.* (quoting *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006)).  When a conflict arises in tort cases like the one here, which law to apply depends on whether the conflict is between "conduct-regulating rules"—i.e., "rules . . . that people use as a guide to governing their primary conduct,"—or "[l]oss-allocating rules"—i.e., "laws that prohibit, assign, or limit liability after the tort occurs."  *Id.* (quotation marks omitted).  "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *Id.* (quoting *GlobalNet*, 449 F.3d at 384).  Here, the underlying torts are quintessentially conduct-regulating rules—they guide people not to commit misdeeds like sexual assault—and no affirmative defenses or immunities are at issue.

###### 1.    Sexual Assault

Jones asserts a claim for "sexual assault"—which the Court construes as a claim for assault and battery based on sexual contact—against Combs.  (SAC ¶¶ 278-87.)[12]  Combs's only argument against this claim is that Jones fails to allege sufficient factual detail, which both "provides insufficient notice of the claim" and "render[s] Plaintiff's claim implausible on its face."  (Mem. at 26.)

While Jones does allege in general terms that Combs continuously touched and groped him throughout their time living and working together (SAC ¶ 73), Jones also alleges specific instances of unwanted sexual contact.  This includes Combs drugging and sleeping with Jones at Combs's Miami home on February 2, 2023.  (*Id.* ¶ 102.)  Such allegations, at least some of which include specific dates and descriptions of sex acts, are sufficient to provide Defendants with adequate notice.  *Cf. Adilovic v. County of Westchester*, No. 08-CV-10971, 2009 WL 10740170, at *2 (S.D.N.Y. June 9, 2009) (dismissing a complaint "because it is unintelligible . . . [and] the paragraphs in the Complaint contain so many clauses that their meaning is impossible to determine"); *see also Iconix Brand Grp., Inc. v. Bongo Apparel, Inc.*, No. 06-CV-8195, 2008 WL 2695090, at *3 (S.D.N.Y. July 8, 2008) ("Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is 'not meant to impose a great burden upon a plaintiff.'" (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005))); *Doe v. NYS Off. of Child. & Fam. Servs.*, No. 20-CV-01195, 2021 WL 2826457, at *10 (N.D.N.Y. July 7, 2021) ("While the . . . complaint contains no specific dates, [the plaintiff]

---

Thus, if there is a conflict between New York law and the law of the state where the tortious conduct occurred (*lex loci delicti*), the latter governs.  If there is no such conflict, applying *lex loci delicti* will produce the correct outcome regardless, and therefore suffices for this opinion.

[12] Combs also asserts sexual assault claims against Jane Doe 1 (SAC ¶¶ 278-87) and Gooding (*id.* ¶¶ 366-369), but those claims are not the subject of the present motions.

alleges an ongoing course of conduct during her placement at [a foster-care center] from 2014 to 2018, thus the omission of specific dates does not provide a basis for dismissal."); *Baird v. Kingsboro Psychiatric Ctr.*, No. 11-CV-159, 2013 WL 5774288, at *10 (E.D.N.Y. Oct. 24, 2013) (declining to dismiss a retaliation claim that failed to "include the specific dates of her complaints" of sexual harassment but did plead that the plaintiff "made ongoing complaints" over a defined period of time (quotation marks omitted)); *Ward v. Shaddock*, No. 14-CV-7660, 2016 WL 4371752, at *7 (S.D.N.Y. Aug. 11, 2016) (declining to dismiss a hostile work environment claim even though "the Amended Complaint [was] not entirely specific about the exact dates of certain incidents, or about the frequency of the comments," because "such specificity is not required at this stage" (quotation marks omitted)).

Jones's allegations are also sufficient to state a plausible claim under at least Florida law, which imposes civil liability for the threat of offensive sexual contact or the intentional infliction of such contact.  *See Doe No. 3 v. Epstein*, No. 08-CV-80232, 2009 WL 383330 (S.D. Fla. Feb. 12, 2009) (describing Florida sexual assault and battery law).  The Court thus declines to dismiss Jones's sexual assault claim as to Combs.

### 2.    Emotional Distress

Jones asserts claims for negligent and intentional infliction of emotional distress against Combs based on the same conduct underlying his sexual assault claim.[13]  Jones fails, however, to adequately plead a required element of those torts—severe emotional distress.  Regardless of which substantive state law governs Jones's claims, that element is required and must be pleaded with specificity.  *See, e.g.*, *Winter v. Pinkins*, No. 14-CV-8817, 2016 WL 1023319, at *7

---

[13] Jones also asserts infliction of emotional distress claims against Jane Doe 1 (SAC ¶¶ 332-336, 342-347) and Gooding (*id.* ¶¶ 354-364), but, as above, those claims are not the subject of the present motions.

(S.D.N.Y. Mar. 8, 2016) (granting a motion to dismiss where "Plaintiff offers no facts indicating what emotional distress he suffered, how long it lasted, how severe it was, and whether he sought medical treatment for the distress"); *Hollis v. Miami-Dade County*, No. 20-CV-21930, 2022 WL 4124300, at *7 (S.D. Fla. Aug. 10, 2022), *report and recommendation adopted*, No. 20-21930-CIV, 2022 WL 4119753 (S.D. Fla. Sept. 9, 2022) ("[Plaintiff] states in a conclusory fashion that she suffered severe emotional distress. The complete lack of factual specificity on this element independently warrants dismissal of the Count."); *Ahmed v. Wells Fargo Bank & Co.*, No. 11-CV-0436, 2011 WL 1751415, at *6 (N.D. Cal. May 9, 2011) (finding emotional distress allegations "insufficient where although appellants alleged they suffered severe emotional distress, they failed to set forth any facts which indicate the nature or extent of any mental suffering incurred as a result of defendants' alleged outrageous conduct." (cleaned up)). Here, Jones merely recites the elements of the tort throughout the operative complaint, without providing further detail as to the nature and extent of the emotional suffering he has experienced due to Combs's actions. (*See, e.g.*, SAC ¶¶ 281, 286, 291, 296, 308, 333, 338, 345, 351.)[14] And, while Jones includes a few additional details in his opposition to the motions to dismiss (*see, e.g.*, Opp. at 13 ("Plaintiff is in ongoing therapy now and has been for over a year.")), Jones "cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to Defendant[s'] motion to dismiss," *Levin v. Sarah Lawrence Coll.*, No. 23-CV-10236, 2024 WL 4026966, at *5 (S.D.N.Y. Sept. 3, 2024) (quoting *K.D. ex rel. Duncan v. White Plains Sch.*

---

[14] Jones alleges slightly more in the context of the shooting at Chalice Studios. (SAC ¶ 53 ("As a result of this shooting, Mr. Jones is severely traumatized. Mr. Jones now suffers from PTSD, severe anxiety, depression, and insomnia.").) But the Chalice shooting is separate from the sexual misconduct that forms the basis for Jones's emotional distress claims. Jones's laundry list of psychiatric conditions is also too general and conclusory to state a claim for an emotional distress tort.

*Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013)).  Jones's intentional and negligent infliction of emotional distress claims are therefore dismissed as to Combs.

### 3. Premises Liability

Jones also asserts claims for premises liability against Combs based on the alleged sexual assaults committed by Jane Doe 1 and Gooding.  (*Id.* ¶¶ 288-92, 293-97.)  Defendants argue, and Jones concedes, that Florida law applies to the incident involving Doe, and that Virgin Islands law applies to the incident involving Gooding.  (Mem. at 26-27.)  In both jurisdictions, premises liability is a subspecies of negligence, and thus requires a plaintiff to plead duty, breach, causation, and damages.  *Conner v. Marriott Hotel Servs., Inc.*, 559 F. Supp. 3d 1305, 1308 (M.D. Fla. 2021); *Polanco v. S. Holdings, LLC*, 78 V.I. 796, 800 (V.I. 2024).  In both Florida and the Virgin Islands, premises owners need only protect invitees from foreseeable dangers. *See Seaberg v. Steak N' Shake Operations, Inc.*, 154 F. Supp. 3d 1294, 1299 (M.D. Fla. 2015), *aff'd*, 697 F. App'x 941 (11th Cir. 2017) (quoting *Post v. Lunney*, 261 So.2d 146, 148 (Fla. 1972)); *Polanco*, 78 V.I. at 803. [15]  When such dangers involve criminal acts committed by third parties, liability requires that the offender have been actually or constructively known to have a "dangerous propensity."  *Stone v. United States*, 373 F.3d 1129, 1132 (11th Cir. 2004); *accord Robbins v. Port of $ale, Inc.*, No. ST-12-CV-90, 2018 WL 5024920, at *11 (V.I. Super. Oct. 10, 2018). [16]  Both Florida and Virgin Islands law also require that there be a "special relationship

---

[15] The Virgin Islands abolished the traditional distinctions between invitees, licensees, and trespassers, making the "foreseeability of harm . . . the touchstone . . . [in] all premises liability actions."  *Polanco*, 78 V.I. at 801 (quotation marks omitted).  While Florida law retains such distinctions, Jones was likely an invitee, as he was traveling and living with Combs for the purpose of conferring economic benefits on Combs—namely, producing songs for the Love Album.  (*See, e.g.*, SAC ¶¶ 177-78, 227, 398.)  Defendants also do not argue that Jones held a lesser status on Combs's property, such as that of a mere licensee or trespasser.

[16] The Court has been unable to identify Virgin Islands appellate case law defining the precise bounds of premises liability based on the criminal acts of third parties. *Cf. Robbins*, 2018

between the parties" for a duty to prevent third-party misconduct to arise. *Johnson v. Exxon Mobil Corp.*, No. 605-CV-874, 2006 WL 8439360, at *2 (M.D. Fla. June 22, 2006); *accord Robbins*, 2018 WL 5024920, at *5. Finally, both jurisdictions require that the defendant "had possession or control of the premises when the alleged injury occurred." *Conner*, 559 F. Supp. 3d at 1308; *Polanco*, 78 V.I. at 805-06 (denying summary judgment in part because defendant landlords retained "the unrestricted right . . . to make repairs to and abate nuisances on the property . . .").

Regarding Doe, Jones alleges that the assault occurred in Combs's house, meaning that Combs had both possession and control of the premises. (SAC ¶ 284.) Jones also pleads sufficient facts to support a reasonable inference of the existence of at least two special relationships—"landowner-invitee" and "employer-employee"—as Jones was working under contract for Combs at the time of the assault. *See Doe v. Faerber*, 446 F. Supp. 2d 1311, 1320 (M.D. Fla. 2006); *see also K.M. ex rel. D.M. v. Publix Super Markets, Inc.*, 895 So. 2d 1114, 1118 n.3 (Fla. Dist. Ct. App. 2005). And even though Jones does not allege that Doe had a known history of committing sexual assaults, he alleges that Combs witnessed Doe attempt to straddle and have sex with Jones while "laughing and encouraging" her to continue. (SAC¶¶ 285, 290.) Jones also alleges that Combs was aware that Doe was assaulting him in the bathroom while it happened and that he did nothing to intervene. (*Id.* ¶ 94.)[17] Together, this is sufficient to permit the reasonable inference that Combs knew or should have known about her

---

WL 5024920, at *4. Regardless, Defendants argue, and Plaintiff concedes, that Virgin Islands law is "similar" to that of Florida in this area. (Mem. at 27.)

[17] Defendants argue that Jones does not plead sufficient facts to permit an inference that Combs was aware or that he caused the assault. (Mem. at 27 n.15.) But Jones does allege that Combs laughed and encouraged Doe to continue forcing herself on Jones after the two of them left the bathroom. (SAC ¶ 290.) It is plausible to infer that Combs was aware of Doe's conduct inside of the bathroom based on his reaction to Doe's conduct outside of the bathroom.

propensity to commit sexual assaults, and that he violated his duty to prevent her assault on

Jones.  Combs invokes Florida's "impact rule," which generally bars pure claims for emotional

or mental damages unless the plaintiff "sustained a physical impact from an external source."

*Cartategui v. Walgreen Co.*, No. 20-CV-380, 2021 WL 1795345, at *2 (M.D. Fla. Feb. 1, 2021)

(quotation marks omitted).  But Jones "plainly alleged an impact to [his] body—a sexual

assault."  *Doe v. Sch. Bd. of Palm Beach Cnty., Fla.*, No. 21-CV-81560, 2021 WL 11134842, at

*6 (S.D. Fla. Dec. 8, 2021); *see also Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 857

(Fla. 2007) ("[W]here there is . . . an unauthorized touching, there is no need to demonstrate

physical injury." (Lewis, C.J., concurring)).  Accordingly, Jones need not plead in detail his

physical or emotional injuries to survive a motion to dismiss.

Regarding Gooding, the situation is similar.  Jones alleges that Gooding's actions should

have been foreseeable to Combs, as Gooding pleaded guilty to a misdemeanor charge based on

sexual misconduct in 2022, among other publicly reported instances of similar misconduct.

(SAC ¶ 27 n.17.)[18]  More importantly, however, Jones alleges that Combs intentionally left him

and Gooding "alone in a makeshift studio on [Combs's] yacht" after suggesting that Gooding

"'get to know' Mr. Jones better."  (*Id.* ¶ 127.)  Along with Jones's allegations that Combs was

"grooming him" by frequently suggesting that Jones "engage in homosexual acts" (*id.* ¶¶ 88-91),

---

[18] Defendants argue that the news article linked in the complaint postdates the alleged
assault.  (Mem. at 28.)  While the article itself postdates the assault, it discusses various
allegations against Gooding that predate the assault.  *See* Edward Segarra, *Cuba Gooding Jr.
sued for sexual assault, battery in two new lawsuits by former accusers*, USA Today (Nov. 23,
2023), https://www.usatoday.com/story/entertainment/celebrities/2023/11/22/cuba-gooding-jr-
lawsuits-sexual-assaultbattery/71682417007/.  Moreover, Jones does not need to offer admissible
evidence to support his claims at this stage.  Rather, the Court understands Jones's citation to the
article as an allegation that the information contained therein was publicly available at the time
of Gooding's assault, and such allegations must be accepted as true when resolving a motion to
dismiss.

this supports the plausible inference that Combs foresaw and enabled Gooding's alleged assault of Jones.  Combs responds that Gooding had only been accused of assaulting women, not men, making his assault of Jones unforeseeable.  But it is not implausible as a matter of law to think that someone who has assaulted members of one sex in the past is more likely to assault members of the other sex in the future.

Combs also argues that because he "chartered" the yacht on which the assault occurred and was not the yacht's owner (*id.* ¶ 366), he cannot bear premises liability (Mem. at 28-29 n.17).  Jones acknowledges that the yacht was "rented by Combs" for "several weeks," not owned.  (SAC ¶ 25.)  The Court disagrees with Combs for two reasons.  First, Combs cites only Florida law for this proposition, not Virgin Islands law, which he concedes governs Jones's claims concerning Gooding.  Unlike Florida, the Supreme Court of the Virgin Islands has held that "in all premises liability actions the touchstone is the foreseeability of harm, and not the labels attached to the plaintiff or the defendant," and has "rejected the use of outdated and formalistic distinctions pertaining to ownership or possession of property or chattels."  *Polanco*, 78 V.I. at 801-02.

Second, the case on which Combs relies concedes that a vessel charterer can bear premises liability when it holds "operational control" over the circumstances giving rise to the claimed injury.  *Johnson v. Del Monte Fresh Produce Co.*, No. 09-CV-22425, 2010 WL 11606066, at *8 (S.D. Fla. Dec. 8, 2010).  In *Johnson*, the court explained that time charterers typically delegate to vessel owners the responsibility "to arrange and pay for all stowage activities," and that it would therefore be nonsensical for the charterer to "owe a duty to ensure the safety of longshoreman who engage in those activities."  *Id.*  Here, however, Jones's injury arose from Combs's decision to invite Gooding onto the yacht that Combs had rented.  Because

Combs held control over the circumstances that led to the alleged injury—Gooding's presence—
*Johnson* is inapposite.

Because Gooding allegedly engaged in unwanted sexual contact, Jones need not plead
detailed physical or emotional damages stemming from that contact.[19]  The Court therefore
declines to dismiss Jones's premises liability claims.

### E.  Breach of Contract

Finally, Jones asserts breach of contract claims against Combs and Love Records for
failure to compensate him for his work on the Love Album.  (*Id.* ¶¶ 394-400.)  "[I]n a contract
case, New York courts will normally apply the law of the jurisdiction having the greatest interest
in the litigation, as measured by that jurisdiction's contacts with the litigation."  *In re Gaston &
Snow*, 243 F.3d 599, 607-08 (2d Cir. 2001).  However, as with tort claims, the first step in any
choice-of-law analysis for a contract claim is "to determine whether there is an actual conflict."
*Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993).  Here, Defendants maintain, and
Plaintiff concedes, that there is no such conflict (Mem. at 31 n.18), so the Court applies New
York law based on Jones's residence in New York.

Under New York's statute of frauds, any contract that cannot be performed within one
year is unenforceable unless it is in writing.  N.Y. Gen. Oblig. L. § 5-701.  This includes an
indefinite agreement to pay royalties, like the alleged contract at issue here.  *See Andrews v.
Sony/ATV Music Publ., LLC*, No. 15-CV-7544, 2017 WL 770614, at *6 (S.D.N.Y. Feb. 24,
2017) ("New York courts have specifically determined that open-ended oral agreements for the
payment of royalties are subject to the Statute of Frauds." (cleaned up)).  And "[u]nder New

---

[19] Defendants produce no Virgin Islands case law to the contrary, nor is the Court aware
of any Virgin Islands case articulating a version of the impact rule that deviates from Florida's.

York law, an oral agreement that is void under the Statute of Frauds may not be severed to save

an otherwise enforceable agreement." *Thiam v. Am. Talent Agency, Inc.*, No. 11-CV-1465, 2012

WL 1034901, at *4 (S.D.N.Y. Mar. 27, 2012). Jones fails to respond to this argument, other than

by arguing that "[a]ll of the songs composed by Mr. Jones were completed in less than a year."

(Opp. at 16.) This is irrelevant, as it is Defendants' portion of the contract that could not be

completed within a year, not Jones's portion. Because the oral agreement is subject to the statute

of frauds, Jones's contract claims are dismissed.

### F. Other Defendants

On September 9, 2024, Jones filed a letter with the Court requesting an extension of time

to serve Defendants Justin and Gooding. (ECF No. 74.) The Court granted the request and

directed Jones to serve those defendants by November 8, 2024. (ECF No. 76.) Jones has not

since notified the Court that service has been completed. Accordingly, Jones is directed to file a

letter with the Court explaining the status of service as to Justin and Gooding within two weeks

of the date of this opinion. Should Jones fail to do so, the claims against those defendants may

be dismissed for insufficient service or failure to prosecute.

Jones has also not yet served Jane Doe 1 but has provided no explanation for his failure

to do so. The Court therefore dismisses Jones's claims against Jane Doe 1. *See* Fed. R. Civ. P.

4(m).

### IV. Conclusion

For the foregoing reasons, the Combs Defendants' motion to dismiss is GRANTED IN

PART and DENIED IN PART. The motion is granted as to Jones's RICO claims, negligent and

intentional infliction of emotional distress claims, and contract claims. The motion is also

granted as to Jones's TVPA claims against Combs Global. The motion is otherwise denied.

Jones shall file a letter within two weeks of the entry of this opinion explaining the status of service as to Justin Combs and Cuba Gooding, Jr.

Jones's claims are dismissed as to John and Jane Does 1-10 and ABC Corporations 1-10.

Defendants who have been served shall file an answer to the surviving claims with 14 days after the date of this opinion.

The Clerk of Court is directed to close the motions at Docket Numbers 40, 66, and 71.

SO ORDERED.

Dated:  March 24, 2025
        New York, New York

_____
            J. PAUL OETKEN
        United States District Judge